1548

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,       : 11-CR-00683(NG)
                                :
                                :
                                :
        -against-              : United States Courthouse
                               : Brooklyn, New York
                                :
                                :
STEVENSON DUNN, LEE HYMOWITZ   : Monday, March 24, 2014
AND MICHAEL FREEMAN,          : 9:45 a.m.
                                :
        Defendant.            :
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NINA GERSHON
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                     271 Cadman Plaza East
                     Brooklyn, New York 11201
                BY:  ANTHONY M. CAPOZZOLO, ESQ.
                     CRISTINA MARIE POSA, ESQ.
                     Assistant United States Attorney

For the Defendant:   BY:ROBERT A. EVANS, JR., ESQ.
Stevenson Dunn

For the Defendant:   BY:MAURICE H. SERCARZ, ESQ.
Lee Hymowitz            ROBERT CALIENDO, ESQ.

For the Defendant:   BY:GERALD J. DICHIARA, ESQ.
Michael Freeman         NICHOLAS PINTO, ESQ.

Also Present:           Naushan Richards, Special Agent
                        Susannah Apuzzo, Paralegal

Court Reporter:     VICTORIA A. TORRES BUTLER, CRR
                    225 Cadman Plaza East / Brooklyn, NY 11201
                    **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

1549

(In open court.)

(Judge NINA GERSHON enters the courtroom.)

(The following occurs outside the presence of the jury.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  The United States District Court for the Eastern District of New York is now in session, the Honorable Nina Gershon is now presiding.

Criminal cause for a trial, United States versus Stevenson Dunn.

May I have your appearances for the Government, please.

MS. POSA:  Christina Posa, Anthony Capozzolo, Special Agent Naushan Richards and Susannah Apuzzo for the Government.

Good morning, Your Honor.

THE COURT:  For the defendant Stevenson Dunn.

MR. EVANS:  The offices of Evans and El-Shabazz by Robert A.  Evans.

Good morning, Your Honor.

THE COURTROOM DEPUTY:  For Lee Hymowitz.

MR. SERCARZ:  For defendant Hymowitz Maurice Sercarz -- S-E-R-C-A-R-Z and Robert Caliendo.

THE COURTROOM DEPUTY:  For Michael Freeman.

MR. DiCHIARA:  Good morning, Your Honor.

VB       OCR       CRR

1550

Gerald DiChiara and Nicholas Pinto for Mr. Freeman.

THE COURTROOM DEPUTY:  Please, be seated.

THE COURT:  Good morning, Counsel.

We all really have to try harder to get here on time.  We have issues that we have to take up, it is now almost 10:30.

The first issue is that Juror Number 6, Mr. Mitchell, has called in sick and he reported to Victor that he has a fever, diarrhea and coughing and he didn't think he would be able to come in.

Is that not correct?

THE COURTROOM DEPUTY:  That is correct.

And also, I received a voice message before that, indicating that he fainted this morning and that it was unlikely that he was going to come in today.

THE COURT:  Did you hear that Counsel?

ALL:  No.

THE COURT:  Would you repeat that for Counsel.

THE COURTROOM DEPUTY:  He also left me a voice message, he indicated that he had fainted this morning and that he's unlikely to come in.

THE COURT:  All right.

So Counsel, we have a number of options and I would like to hear from you as to what your wishes are before a decision is made.

MS. POSA:  Should we start, Your Honor?

THE COURT:  That's fine.

MS. POSA:  We are concerned about timing.  We're now in the third week and we told the jury it's only a three-week trial.  Given the fact that it sounds like the defense case will take at least all day today and tomorrow, we're unlikely to sum up before Wednesday and I am concerned that if we start going into the fourth week we might lose more than just one juror.

So, our preference would be to simply let him go and bring in one of our four alternates because of timing.

THE COURT:  Defense?

MR. EVANS:  Your Honor, given that I think -- well, I'm certain that in my house we struggled with issues of illness this weekend and my voice is stretched, I would just as soon not change the mixture of the jury.  I know we're very close to the end and haven't begun deliberating but that would be my preference.  I know the Court has discretion.

THE COURT:  I don't know what you're asking me for. What is your application?

MR. EVANS:  I believe we should simply wait and see if this juror can return to his position tomorrow morning or late this afternoon, but I would rather not remove a juror at this point.

THE COURT:  Yes, the other defense counsel?

MR. SERCARZ:  Your Honor, I would agree with my colleague and I can report that my client has been ill all weekend and is, thankfully, better how.  I understand there was a lot of illness in the Freeman household and I am concerned that if we start substituting jurors now we could reach the circumstance where we may not have enough by the time deliberations are in process.

We do have things we can accomplish today, we can discuss the charge.  There are ways to move the ball forward even without further testimony.  So, I line up on the side of those who don't want to substitute the juror.

MR. DiCHIARA:  Judge, I agree with that.  And I actually think we are moving pretty expeditiously.

I think we are already into the defense case and by all counts it should take one or two days to be finished and we can still sum up this week and charge this week, even if we delay to this afternoon or to tomorrow.

THE COURT:  I don't know how you're counting your time, but I would be prepared to call the juror.  I certainly wouldn't rely on waiting for him for a day because it might be two days or it could be a week; I don't know what his condition is, I don't know whether he's planning to see a doctor, so I think since some of you would prefer to wait, I think I need to get more facts to find out whether that is sensible.

1553

So, if you have no objection, I will go and call
Mr. Mitchell and ask him whether he thinks there is any
realistic possibility that he will be back tomorrow.  If there
isn't, then I think it would be appropriate to excuse him.

Does everyone agree with that procedure?

MR. EVANS:  Yes, Your Honor.

MR. SERCARZ:  Yes, Your Honor.

MR. DiCHIARA:  Yes, Your Honor.

THE COURT:  Are there any other questions you think
I should put to him?

All right.  Then we will take a recess.

(Recess taken.)

13

14          (In open court.)

15          (Judge NINA GERSHON enters the courtroom.)

16          THE COURTROOM DEPUTY:  All rise.

17          Thank you, please be seated.

18          THE COURT:  Is everybody back?  Okay.

19          All right, Counsel, I spoke with Mr. Mitchell to

20  clarify, he said that he didn't actually faint, but after he

21  tried to get dressed and after showering, he felt faint and

22  didn't feel that he could make it in.

23          He's told me that he was in the third day of this

24  illness, he has not seen a doctor and so there is no doctor

25  that I can call to help evaluate this, but he said that based

1554

1  upon his own prior experience his quote best guess is he'll

2  need a couple more days.

3          So, in light of that, I'd like to know whether you

4  still have the same position about wanting to wait for him to

5  return and I will consider that.

6          MR. EVANS:  Your Honor, if we could have just a

7  moment, the three Defense Counsel to confer.

8          THE COURT:  Sure.

9          (Pause in the proceedings.)

10         MR. SERCARZ:  Your Honor, our suggestion is going to

11  be that we give him until tomorrow morning and if he's not

12  here, we substitute the alternate.

13         MS. POSA:  Your Honor, we see no reason to lose a

14  whole day when it sounds likely that's he's not going to be

15  here.

16         I am very nervous that we told the jurors it's only

17  going to be a three-week trial and now we're not going to be

18  summing up until later this week.  Their deliberations will

19  almost certainly spill over into the fourth week.

20         THE COURT:  All right, Counsel, I am going to

21  substitute an alternate based upon what the juror said to me.

22  I pressed him on whether or not he could be here tomorrow, he

23  told me that he did not think he could be here tomorrow and

24  that his best guess was that he would need a couple more days.

25         So I said, do you mean until Thursday, is that what

1555

1  you're saying?

2          And that is his best guess, that he needs more than

3  just today.

4          So, based upon that, I would hate to lose a day and

5  then we have to substitute him out anyway, so that is how

6  we'll proceed.  I will ask Victor to call him and tell him

7  he's been excused.

8          Let me think if there was anything else.

9          Was there anything else that we need to take care of

10 before we proceed with the trial?

11         MR. SERCARZ:  Your Honor, I have spoken to Mr. Evans

12 and I have spoken to the Government and it appears that we're

13 not going to reach the Hymowitz case today, based on my

14 understanding.  I would like to contact my witnesses and

15 release them until tomorrow morning.

16         Mr. Evans, I don't think I'm speaking out of school,

17 has told me his direct is going to take us at least the rest

18 of the morning and this may not be the last witness that --

19         MR. EVANS:  It may not, but this is the last

20 significant witness.  If there is a witness after this, it

21 will be a very brief direct.

22         THE COURT:  Well, why don't you wait until late in

23 the afternoon.  Why don't you wait until say, 2:00 o'clock and

24 then we'll know better, all right?

25         MR. SERCARZ:  I've got to call, Mr. Caliendo will do

1556

1   it, I've got to call some people now who wanted to know

2   whether they needed to be here at 2:00 o'clock.

3            THE COURT:  Well, can we wait until 1:00 o'clock, at

4   least, and we'll have a better idea?  I don't see why we would

5   need the whole day to finish Mr. Evans's case.  I realize

6   we've lost almost an hour, but I am not keen on excusing

7   witnesses at this point.

8            Mr. Sercarz, I don't know whether we are on the same

9   page at the moment or not.

10           Mr. Sercarz, I don't know whether you are hearing

11  me.

12           MR. SERCARZ:  I'm sorry, I apologize.

13           THE COURT:  I appreciate your problem, but I just

14  don't think we should just excuse all of your witnesses at

15  this point, okay?

16           MR. SERCARZ:  Yes, Your Honor.

17           THE COURT:  Maybe later.

18           All right, so if there is nothing else, can we bring

19  in the jury.

20           MR. SERCARZ:  Your Honor, you may wish to wait to

21  treat this, but I filed a motion dealing with the Government's

22  cross-examination.

23           THE COURT:  I reviewed that letter over the weekend.

24           MR. SERCARZ:  I just wanted to remind you it was

25  there.  You asked if there was anything else that needs to be

1557

1    reviewed.

2          THE COURT:  Yes, I think that what we need to do is

3    that after the conclusion of Mr. Dunn's direct, that we need

4    to discuss this issue.

5          MR. SERCARZ:  Yes, Your Honor.

6          THE COURT:  The other thing was that the Government

7    filed a letter, which I assume you received, with respect to

8    forfeiture and whether or not that needs to go to the jury.

9          I'd like to know what the defendants' position is

10   with respect to that before I do any further analysis of the

11   issue.  You may agree.

12         MR. EVANS:  I'd like an opportunity to respond.  I

13   am not prepared to respond this morning because I'm still on

14   my direct case.  I did see the letter and I read it briefly,

15   but I would like an opportunity to respond.  I don't know that

16   it has to be a written response, but.

17         THE COURT:  Well, this letter was written some time

18   ago and either Friday or Saturday I reviewed it.  I would have

19   expected Counsel to review it.  It has to do with what happens

20   at the time if there is a conviction and we have to act

21   immediately at that point, so I can't wait for Counsel to take

22   a lot of time to think about this.

23         You've had several days, this is the way trials are,

24   so I am going to expect you to look at this very promptly and

25   Mr. Sercarz, Mr. DiChiara, I'm assuming forfeiture allegations

1558

1   are against all three defendants.

2           MS. POSA:  Yes, Your Honor.

3           THE COURT:  One minute, please, Victor.

4           MR. SERCARZ:  How about if we discuss this with

5   Mr. Evans and give you an answer after lunch?

6           THE COURT:  Very excellent, thank you.

7           All right.

8           THE COURTROOM DEPUTY:  All rise.

9           (Jury enters.)

10          THE COURT:  Good morning, Members of the Jury, I am

11  sorry for our delay.

12          We need Mr. Dunn.

13          THE COURTROOM DEPUTY:  Mr. Dunn.

14          THE COURT:  Take the witness stand.

15          But before we return to the examination of Mr. Dunn,

16  you obviously are aware that Mr. Mitchell is not here.

17  Mr. Mitchell is ill and I have conferred with him and he is

18  too ill be here today and so, I am excusing him.

19          I am going ask Mr. Barns to step into seat number

20  six and then we'll ask all of the other alternates to please

21  move down one seat.

22

23          (Continued on following page.)

24

25

VB        OCR        CRR

Dunn - direct - Evans                          1559

1          THE COURT:  So and counsel and I will try to make up

2   the hour that we have lost this morning by being very

3   efficient.

4          So Mr. Evans, would you proceed, please.

5          THE CLERK:  Mr. Dunn, please be advised you're still

6   under oath.

7   STEVENSON    DUNN     ,

8       called as a witness, having been previously duly

9       sworn, was examined and testified as follows:

10  DIRECT EXAMINATION (Continued)

11  BY MR. EVANS:

12  Q    Good morning, Mr. Dunn.

13         MR. EVANS:  Thank you, Your Honor.  Good morning.

14         Victor, can I ask you to turn this on.

15  Q    Mr. Dunn, I would like to ask you about the management of

16  the Lexington Avenue SML cluster.

17         Do you recall who your construction lender was?

18  A    Sorry.  For the NEP cluster or --

19  Q    I'm talking about the Lexington Avenue NEP program.

20  A    Fleet Bank and the Enterprise.

21  Q    And what role did Fleet Bank play, if any, in the ongoing

22  administration of that cluster?

23  A    They just financed the construction, preconstruction and

24  construction loan.

25  Q    Do you remember what the purpose of the SML Lexington

Dunn - direct - Evans                    1560

1    Avenue cluster was?

2    A    The purpose of the SML Lexington Avenue cluster was to

3    develop 21 buildings and 121 apartments for rehab for low

4    income housing.

5    Q    So in that program, as the developer, what was your

6    responsibility after the rehabilitation of the apartments, if

7    any?

8    A    To occupy the cluster with qualified low income tenants.

9    Q    And who was the architect for that cluster?

10   A    Witt Delacour.

11   Q    And the general contractor for that cluster?

12   A    MCR Restoration.

13   Q    I'd like the Court to publish for the witness only this

14   summary chart I've prepared and ask you if that summary chart

15   properly recites the information you just went over for us?

16   A    My screen just went out.

17            THE COURT:  I think it's my fault.  Oh, there it is.

18   Do you have it now?

19            THE WITNESS:  Yes, I do, Your Honor.

20   Q    Okay.  Good.  So the Lexington Avenue cluster was a

21   $20 million rehab of rental apartment plan?

22   A    Yes.

23   Q    And was the $20 million budget set at the beginning of

24   the bidding process?

25   A    Yes.  I believe so, yes.

Dunn - direct - Evans                               1561

1   Q    Now, you testified last week that the contractor was

2   selected by HPD.  Do you recall that testimony?

3   A    Yes, I do.

4   Q    Who selected the architect for that project?

5   A    HPD.

6   Q    And did you as the developer have an opportunity to

7   recommend or to ask for a specific architect?

8   A    No, we did not.

9   Q    And how did you come to discover that Delacour and

10  Ferrara would be your architect?

11  A    We were informed by HPD.

12  Q    Now, on this Lexington Avenue cluster, were, did the work

13  on all 21 buildings begin at once or did it go in phases?

14  A    It went in phases, three phases.

15  Q    So there were three phases to this rehab of apartments?

16  A    Yes, it was.

17  Q    And as the developer, were you guaranteed at the

18  beginning that you would participate in all three phases?

19  A    No.

20  Q    Did you as SML complete the work that you bid on for the

21  Lexington Avenue cluster?

22  A    Can you explain that question again?

23  Q    Did you complete the work in this cluster?

24  A    Yes.

25          MR. EVANS:  And has the Court published this also to

1    counsel?  Can you see this?

2            MR. CAPOZZOLO:  Yes.

3    Q    I'd like to show you, Mr. Dunn, what I've marked as Dunn

4    Exhibit M and ask if that properly reflects what you've just

5    told the jury?

6    A    What I'm looking at right now?

7    Q    Yes.

8    A    Yes, it appears to be accurate.

9            MR. EVANS:  Your Honor, I'd like to move what's been

10   marked for identification as Exhibit M in evidence.

11           MR. CAPOZZOLO:  Judge, we do object.

12           THE COURT:  You want to come to the side bar.

13           Is what is on my screen the entire document or is

14   the screen up?

15           MR. EVANS:  If you can see the exhibit tab, you've

16   seen the edges.

17           THE COURT:  I don't see the exhibit tab.

18           I see it.  Okay.  That's perfect.  Thank you.

19           Can we have the witness perhaps identify what the

20   document is before I make a ruling on it.

21           MR. EVANS:  Okay.

22   Q    Mr. Dunn, would you read the title of this document

23   that's printed in the top middle?

24   A    The square box?

25           THE COURT:  No.  What do you understand the document

Dunn - direct - Evans                              1563

1   to be?

2   A      An outline of the program.

3               THE COURT:  Prepared by whom?

4               THE WITNESS:  I can't remember.

5               THE COURT:  All right.

6               (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Side Bar                               1564

1        (The following occurred at side bar.)

2        MR. CAPOZZOLO:  I don't think it qualifies as a

3   summary chart.  It's just the restatement of the defendant's

4   testimony.  It's not voluminous records that he summarized.

5   It's key points the defendant said in his testimony.

6        If Mr. Evans wants to use it as a demonstrative

7   exhibit in his summation, he's free to, but it should not be

8   an exhibit.

9        MR. EVANS:  Your Honor, this is intended to make

10  sure there's no confusion between what's a rehab for rental

11  and what's a rehab for sale and allows me to move much

12  quicker.  I think that there's nothing here that's

13  argumentative.  There's nothing here that's not factual.

14       THE COURT:  But I don't know what the document is.

15  I have no basis for any determination on it.  I don't even

16  know what it purports to be actually.

17       MR. EVANS:  I think the witness called it an outline

18  of the program.

19       THE COURT:  I don't know whether he prepared it.  I

20  think Mr. Capozzolo's point is well taken on this.

21       Does anybody else want to be heard on that?

22       MR. SERCARZ:  The last time I tried to help, I got

23  my, I got my tongue bitten off.  I don't think I'm going to

24  say anything this time.

25       THE COURT:  I assume it wasn't me that did the

Side Bar                                        1565

1    biting.  There's no dogs.  There's no doghouse.

2              MR. SERCARZ:  It wasn't, Judge.

3              THE COURT:  It wasn't me at least.  Okay.

4              Anything else?  All right.  I just think it's, but

5    as Mr. Capozzolo said, if you want to print it out and use it

6    as a demonstrative aid, that would be okay.

7              MR. EVANS:  Okay.  I'll just use it to refresh his

8    memory of the program to keep it moving faster.

9              THE COURT:  Yes.  Okay.  Thank you.

10             (Side bar ends.)

11             THE COURT:  Go ahead, Mr. Evans.

12             MR. EVANS:  Okay.  For the record, I'm withdrawing

13   my application to move this into evidence.

14             THE COURT:  All right.  Thank you.

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Dunn - direct - Evans                              1566

1    BY MR. EVANS:

2    Q    Mr. Dunn, on the first phase of the Lexington Avenue

3    cluster, how many buildings, if you remember, came to you for

4    rehabilitation?

5    A    Ten.

6    Q    And did you do any work as a subcontractor on those ten

7    buildings?

8    A    No.

9    Q    In the second phase, how many buildings came to your

10   cluster?

11   A    Nine.

12   Q    And did you do any work on those nine buildings as a

13   subcontractor?

14   A    Yes.

15   Q    What work did you do as a subcontractor?

16   A    I did work framing, sheetrocking, entire finish work.

17   Q    Do you remember what building you did that for?

18   A    Yes, it was a four family unit, 626-628 Myrtle Avenue.

19   Q    And did you do that in your role as a developer or did

20   you do it as a separate company?

21   A    Separate company.

22   Q    And did you bid that business to the general contractor?

23   A    Yes.

24   Q    Did you provide a kickback to the general contractor in

25   order to be selected as a subcontractor?

1   A    No.

2   Q    Who was the general contractor, remind us, please?

3   A    MCR Restoration.

4   Q    And do you remember what your bid for the work you did on

5   626-628 Myrtle Avenue was?

6   A    239, $239,000.

7   Q    And for $239,000, what work did you do as a

8   subcontractor?

9   A    I did the framing, allocation of space as per the

10   blueprints, did all the insulation sheetrocking, installed

11   finished floors, all of the finished work, painting, taping.

12   I did exterior cement work in the front and the back yards.

13   Also roofing.

14   Q    Did you do all of that work yourself or did you use a

15   crew?

16   A    I used a crew.

17   Q    And did you do that work through 334 Marcus Garvey

18   Corporation?

19   A    No, I did not.

20   Q    What company did you do that work through or with?

21   A    New World Developers.

22   Q    Was that the company owned by Rodney Rasheed?

23   A    Yes, it was.

24   Q    And were you paid for the $239,000 worth of work that you

25   bid on that project by the general contractor?

Dunn - direct - Evans                                          1568

1    A    No, I was not.

2    Q    Were you paid some or any, for any of the work you

3    performed?

4    A    I was paid some.

5    Q    How much, if you recall, were you paid?

6    A    Between about 65, $70,000.

7    Q    And who paid you that 65 or $70,000?

8    A    It was paid, MCR Restoration.

9    Q    And what about the balance which would have been

10   approximately $165,000, of that balance, were you paid that

11   balance when you finished that work?

12   A    No, I was not.

13   Q    In the third and I think final phase of the Lexington

14   Avenue cluster, how many buildings were there to be

15   rehabilitated?

16   A    There were two.

17   Q    And did you do any work as a subcontractor on those

18   buildings?

19   A    Yes, I did a large emergency repair at 295 Throop Avenue.

20   Q    When you say you did an emergency repair, why did you do

21   an emergency repair?

22   A    Well, in the winter of that year, we had a freeze-over in

23   one of the sprinkler heads and the water went behind the

24   walls.  In May, it got very hot, the building was sealed and

25   the floors began to buckle in all the apartments causing

Dunn - direct - Evans                          1569

1   massive damages to all the floors and all the apartments and

2   the doorways and the ceilings.

3   Q    So is it your testimony that the work had been completed

4   and then there was damage which you repaired?

5   A    Yes.

6   Q    Did you do the work originally?

7   A    No.

8   Q    And to do this emergency repair, did the general

9   contractor call you and ask you to do the emergency repair?

10  A    No.

11  Q    Who called you and asked you to do the emergency repair?

12  A    The Enterprise, Rylona Watson, project manager.

13  Q    For the Lexington Avenue cluster, what was to be the

14  developer's fee if you recall?

15  A    It was over $300,000.

16  Q    And was that developer's fee to be paid when?

17  A    After the HPD Enterprise received tax credits for all the

18  buildings in all three phases.

19  Q    So as the developer for these now rental apartments, were

20  you getting any other compensation?

21  A    We were allowed to collect eight percent of the rental

22  income.

23  Q    So for the Lexington Avenue cluster through the NEP

24  program, you were expecting to collect a developers fee?

25  A    Yes.

Dunn - direct - Evans                    1570

1   Q    And you expected to collect a percentage of the rent roll

2   payments, is that correct?

3   A    Yes.

4   Q    Did you ever receive from the Enterprise the developer's

5   fee that was due you from the Lexington Avenue cluster?

6   A    They never paid us.  No, we did not receive a developer's

7   fee.

8   Q    Did you request your developer's free from the

9   Enterprise?

10  A    Many times.

11  Q    And did you, in your role as a subcontractor, collect the

12  balance of the fees that was owed to you by MCR Restoration?

13  A    No, I did not.

14  Q    Were you reimbursed or paid for the emergency repairs you

15  did at 295 Throop Avenue?

16  A    No, I was not.

17  Q    Do you know why you weren't paid for that work?

18  A    Rylona Watson of the Enterprise refused to pay me for the

19  repairs.

20  Q    And the Enterprise as the funder had the final say on

21  payments of those items?

22  A    Yes.

23  Q    Did you notify HPD or the Enterprise that you were owed

24  money as a subcontractor by the general contractor?

25  A    Yes, I did.

Dunn - direct - Evans                    1571

1    Q    And did they take any action to affect your payment?

2    A    No, they basically didn't respond.

3    Q    Now, as the developer on a project like the Lexington

4    Avenue cluster, did you have other duties other than the ones

5    we've just talked about?

6    A    We managed the properties' day-to-day occurrences with

7    the tenants.

8    Q    When you first took the properties in the Lexington

9    Avenue cluster, were they all vacant or were some of them

10   occupied?

11   A    I believe half were vacant and half were occupied.

12   Q    And what did you do, if anything, about the occupied

13   apartments?

14   A    I first made sure that they were in good condition.

15   These were HPD buildings so the service wasn't always kept up

16   to par.

17   Q    Were the tenants in those buildings allowed to stay

18   during rehabilitation?

19   A    No.  We had to -- no.

20   Q    And who was responsible for removing those tenants from

21   the buildings?

22   A    I was.

23   Q    And was that in your role as a developer?

24   A    Yes.

25   Q    How long does it take to relocate the people in the

Dunn - direct - Evans                              1572

1  buildings at the Lexington Avenue cluster, if you recall?

2  A     It's tedious work.  You have to match families.

3  Q     How long does it take?

4  A     It takes a while.

5  Q     And who bears the cost of relocating the tenants in these

6  buildings?

7  A     I did.

8  Q     You as a subcontractor or you as a developer?

9  A     As a subcontractor.

10 Q     Was that work that you bid on?

11 A     No.

12 Q     How were you assigned that responsibility?

13 A     At the developer meetings, they identified that they

14 would, based on our input of families, a set amount was

15 applied to each family for relocation.

16 Q     And the relocation for those families, was that part of

17 the budget?

18 A     Yes, it was.

19 Q     Was that what you developers called hard costs or soft

20 costs?

21 A     That would be soft costs.

22 Q     And how would you go about being reimbursed for the cost

23 of relocating families?

24 A     At a certain point, usually when we submitted a

25 requisition, we would submit the cost of how many families we

Dunn - direct - Evans                        1573

1    may have moved at that time.

2    Q    And who would you submit that requisition to?

3    A    It would be submitted with the same -- oh, I'm sorry.  A

4    separate requisition to the Enterprise.

5    Q    And did you do this monthly or quarterly or

6    semi-annually?

7             How often did you put in a requisition for this

8    relocation?

9    A    As -- quickly after we relocated the families.

10   Q    And do you recall how much money was in the budget for

11   the Lexington Avenue cluster to relocate families?

12   A    Quite a few hundred thousands of dollars.

13   Q    And do you recall how -- did you collect that money that

14   you requested from the Enterprise?

15   A    In the Lexington Avenue cluster?

16   Q    Yes, sir.

17   A    I didn't collect all that was due to me.

18   Q    Do you recall if there was a reason when you didn't, why

19   you didn't?

20   A    We submitted the paperwork for reimbursement the same

21   every time, but maybe after the second request, it just kept

22   rejecting it.

23   Q    The Lexington Avenue -- excuse me.  The SML Lexington

24   Avenue cluster was your first NEP program?

25   A    Yes, it was.

Dunn - direct - Evans                    1574

1   Q    And you testified that you completed it, is that correct?

2   A    Yes.

3   Q    In the running of a cluster like this, as the developer,

4   did you attend the construction closing?

5   A    Yes.

6   Q    Were you familiar with the process for submitting

7   requisitions and the budgets?

8   A    Yes.

9   Q    And did you have input on the budgets for these clusters?

10  A    Very little.

11  Q    I'd like to now move to the second project, the SML Bed

12  Stuy cluster.

13           Was this a cluster that was awarded to you through

14  the NEP program?

15  A    Thanks.

16  Q    And do you recall when this cluster was awarded to your

17  development company?

18  A    2005.

19  Q    And do you recall who the general contractor was who was

20  selected for this project?

21  A    MCR Restoration.

22  Q    And were they selected in the way that we discussed

23  previously?

24  A    Yes.

25  Q    What was the purpose of the Bed Stuy cluster?

Dunn - direct - Evans                                        1575

1    A    The purpose of the Bed Stuy cluster was to develop,

2    through gut rehab, the buildings in the SML Bed Stuy award and

3    then put the houses on the market for approved buyers.

4    Q    So as the developer on this project which you called a

5    gut rehab, were you to get -- how was the developer to be

6    paid?

7    A    They worked out a developer's fee.  I believe it was

8    $300,000.

9    Q    And when was that developer's fee to be paid to you?

10   A    At the very end after the loan was paid back.

11   Q    Okay.  Do you remember the size of this cluster?  How

12   many buildings were or units were in this cluster?

13   A    Between 12 and 14 buildings.

14   Q    And who was the lender for this cluster?

15   A    The Enterprise.

16   Q    Did you have a construction lender in this one?

17   A    That was the Enterprise.

18   Q    So only one --

19   A    Oh, I'm sorry.  And a grant was given by HUD.

20   Q    And who was appointed as the architect on this cluster,

21   if you recall?

22   A    Hugo Skalvosofski (phonetic).

23   Q    Do you mean Hugo Subotovsky?

24   A    Subotovsky.  I'm sorry.

25   Q    For the record, Mr. Subotovsky's last name is spelled

1    S-U-B-O-T-O-V-S-K-Y.

2            Is that the gentleman who was the architect for this

3    project?

4    A    Yes.

5    Q    Okay.  I'd like to show you what's already in evidence as

6    Government Exhibit 202.

7            (Exhibit published.)

8    Q    Do you recognize this document, sir?

9    A    Yes, I do.

10   Q    What is that document?

11   A    It's a Interparticipant Agreement between the Bed Stuy

12   cluster and HPD HUD and the Enterprise.

13   Q    I'd like to draw your attention to certain portions of

14   this agreement and ask you first did you read this agreement

15   or review this agreement before signing it?

16   A    Yes.

17   Q    Now, it says here in the recitals that HUD agreed to

18   provide the developer with a grant.  Is that the money you

19   were talking about before?

20   A    Yes.

21   Q    And it also says -- I'm going to go over to page two

22   where we define roles and responsibilities.

23           Would you read what it says under Section 2,

24   Definitions, where it begins, Authorized representative.

25   A    Authorized representative means with respect to all

1    parties, an officer, a principal, an agent, or another person

2    who is authorized to act on behalf of and whose actions are

3    binding upon that party.  As of the date of execution of this

4    agreement, the primary authorized representative, A, of

5    developer is Stevenson Dunn, member, 914 Bedford Avenue,

6    Brooklyn, New York 11205, B, of Enterprise is William R. Frey,

7    assistant secretary, 80 Fifth Avenue, 6th floor, New York

8    New York 10011-8002.

9    Q    Okay.  I think that -- now, it says here that your

10   architect is Hugo Subotovsky, is that correct?

11   A    Yes.

12   Q    And it says here that the Enterprise had an inspector.

13        Do you remember what the inspector's

14   responsibilities are or were?

15   A    To make sure that the work was being done as per the

16   scope of the architect.

17   Q    Moving on through the definition phase, I want to draw

18   your attention to page three.

19        Would you read the section for us that says, HUD's

20   monitor, which is one third of the way down on that page,

21   about line 12 to 14.

22   A    HUD's monitor means Tim Roberts of Roberts Architectural

23   Concepts, PC, 1521 Alton Road, 818, Miami Beach, Florida

24   33139.

25   Q    Now, Mr. Dunn, do you recall meeting Mr. Tim Roberts of

Dunn - direct - Evans                           1578

1    Roberts Architectural Concepts during the development of this

2    cluster?

3    A    No, I do not.

4    Q    Did, to the best of your recollection, Mr. Roberts attend

5    any of the site visits in New York?

6    A    No.

7    Q    And did Mr. Roberts participate in any planning meetings

8    with you in person?

9    A    No.

10   Q    Did he participate or have someone participate via

11   telephone conference calls or videoconference?

12   A    No.

13   Q    During the course of this entire project, did you as the

14   primary representative of the developer ever meet or talk to

15   Mr. Tim Roberts, the HUD monitor defined in this contract?

16   A    No.

17   Q    Drawing your attention to page four of Government

18   Exhibit 202, Section 5, which says, Representations of HPD.

19        Section 5 says, No member, official, employee, agent

20   or representative of the City -- I suppose they mean the City

21   of New York -- or HPD shall have any personal interest, direct

22   or indirect, in the funding documents, nor shall any such

23   member, official, employee, agent or representative

24   participate in any decision relating to the funding documents

25   or agreement rising out of or through these documents which

1   affects his or her personal interest or the interest of any

2   corporation, partnership, or association in which he or she is

3   directly or indirectly interested.

4        Mr. Dunn, did you understand that section of this

5   agreement?

6   A    Yes.

7   Q    Did you understand that to mean that no one from the city

8   should have an interest in the funding of this project?

9   A    Yes.

10  Q    In section B, it says, No member, officer, employee,

11  agent or representative of the City or HPD has directly or

12  indirectly been given, offered or promised anything of value

13  for the making of the HUD grant documents and no officer,

14  employee, agent or representative of the City or HPD has or

15  will have any interest directly or indirectly in the premises

16  or the proceeds thereof.

17       Did you read and understand that section, sir?

18  A    Yes.

19            (Continued on next page.)

20

21

22

23

24

25

1  BY MR. EVANS:

2  Q    Now, I want to draw your attention to section 6,

3  administering the rehabilitation.  In section 6.1, we have a

4  detailed description of the authorities and the protocol for

5  modifying project plans, specifications or construction

6  contracts.

7           Did you review this section of this document,

8  Mr. Dunn.

9  A    Yes.

10 Q    I draw your attention to the last sentence of this

11 section, which begins, as the very last full sentence of page

12 five, "All costs incurred in excess of the amount of the

13 funding are incurred at the developer's risk, and a creditor

14 has no obligation to reimburse for such costs, unless the

15 creditor approves the obligation or advancement of additional

16 funds and such approval is in writing and executed by a duly

17 authorized official of the creditor obligating or advancing

18 the additional funds."

19           Did you review that section of this agreement, sir.

20 A    Yes.

21 Q    What did you understand that to mean?

22 A    Any costs beyond what we were loaned came out of the

23 developer's pocket.

24 Q    During the course of this SML Bed/Stuy cluster, did you

25 request an increase in financing from the enterprise?

Dunn - direct - Evans                          1581

1   A     No, we did not.

2   Q     I draw your attention to page six, section 6.2,

3   section G. This section talks about the prior approvals that

4   are required under this document specifically relating to

5   changes that the developer may want to submit to HUD or HPD.

6           Do you see this section, sir.

7   A     You have to move it up a little bit.

8   Q     Do you see section 6.2?

9   A     I see 6.2, but I can't see G.

10  Q     Can you see G now?

11  A     Yes.

12  Q     Can you read what G of section 6.2 says?

13  A      "A change in the identity of the general contractor

14  specified in Exhibit C of the HUD BLC, pursuant to Section 2.4

15  of the HUD BLC."

16  Q     So, is it your understanding, from this section of this

17  document, that to change the general contractor, you need

18  prior approval?

19  A     Yes.

20  Q     Who had to give that approval to change the general

21  contractor?

22  A     Wendell Walters, HPD.

23  Q     This document also outlines the payment procedure in

24  section 8; is that correct, sir?

25  A     Yes, it does.

Dunn - direct - Evans                    1582

1  Q    I would like to draw your attention to page 8, section 8,

2  the payment procedure, and ask you to take a look at that, and

3  to see if that is the information that was in the document

4  when you closed on this on April 27 of 2006?

5  A    Yes, it does.

6  Q    And do you understand this payment procedure, sir?

7  A    Yes.

8  Q    And without reading it to us, can you explain what you

9  understand the payment procedure on the SML Bed/Stuy cluster

10 to be?

11 A    Yes.  After meeting at the development site, a city

12 inspector, an engineer for the bank, the bank, the general

13 contractor and the architect would do a walk-through.  The

14 contractor with the architect, using a drawdown sheet, would

15 then determine and confirm the percentage of work done in each

16 phase that the contract was requesting payment.

17 Q    And I want to draw your attention now -- I'm maxing out

18 on my Elmo -- to this document which is Government's Exhibit

19 108-C. I believe it's already entered into evidence by

20 stipulation.  I ask you, can you -- first, can you see that

21 document?

22 A    Yes, I can.

23 Q    And can you describe what this document is for us?

24 A    Application for certification of payment.

25 Q    And is this the application and certification that was

Dunn - direct - Evans                    1583

1   referred to in the interagency agreement we just reviewed?

2   A    Yes.

3   Q    And looking specifically at this document for the

4   Bed/Stuy SML project, does this document, Government's Exhibit

5   108-C, bear your signature?

6   A    Yes, it does.

7   Q    Is this your signature here for the Bed/Stuy SML?

8   A    Yes.

9   Q    Did you read this Application No. 8 for payment and

10  review it before signing it?

11  A    Yes.

12  Q    Now, this document, which is entered as 108-C, is a

13  two-page document.  I would like you to look at page two for

14  us, and can you tell the jury what this page is on this

15  requisition?

16  A    This is the trade line sheet that the architect and the

17  contractor use to determine how much of a line item the

18  contractor was entitled to get paid for that requisition.

19  Q    Are all of the costs in the budget for the cluster

20  represented on this document that we see?

21  A    No.

22  Q    What costs are on this document, if you know?

23  A    Contractor-related costs, hard costs.

24  Q    Are there any soft costs, as you all use that term, on

25  this document?

1   A    No.

2   Q    So, the requisition process for the SML Bed/Stuy that

3   we're seeing here from the general contractor includes only

4   hard-cost items?

5   A    I believe so.

6   Q    So, drawing your attention to the bottom of this document

7   where it says -- I don't know if you can read

8   this here, "Insurances," are those the insurance

9   responsibilities that the developer has for this cluster

10  A    No.  Those are the contractor insurances.

11  Q    Where it says "for the bond," is that a bond that the

12  developer has to pay for?

13  A    No.  That is also a contractor's expense.

14  Q    So, the line items we see here are all what you described

15  previously as hard costs?

16  A    Yes.

17  Q    And would you get, as a developer, any supporting

18  documentation for this requisition beyond what we see here in

19  these two pages?

20  A    No.

21  Q    So, how is this requisition reviewed before being paid,

22  then?

23  A    Again, the architect and the contractor, through the

24  architect inspecting the phase of work with the contractor

25  next to him, determine the percentage that was to be paid.

Dunn - direct - Evans                    1585

1   Q     What if a hard cost -- withdrawn.

2         Are there any hard costs, in your experience as a

3   contractor or subcontractor, that you don't anticipate when

4   you make your trade budget?

5   A     Possibly.

6   Q     Could you think of an example of a hard cost that might

7   pop up after you already started?

8   A     An unexpected event, either structural, like a wall that

9   is not strong enough after the demolition is done.  More than

10  what was required in regard to beam replacement.

11  Q     Okay?

12        And if -- let's use beam replacement.  If, in the

13  course of your rehabilitation, the general contractor calls

14  you and says, The beams have to be replaced, they can't be

15  saved as we thought they would, where does that come from in

16  your budget?

17  A     In the budget, they have a -- I believe it's called

18  hard-cost contingency.  What that was was, the scenario you

19  just presented, the unforeseen.

20  Q     And would you reallocate the money from a hard-cost

21  contingency to a specific line item, or did someone else?

22  A     No, the enterprise, Rylanda Watson.

23  Q     Would you be notified if the general contractor made a

24  change like that?

25  A     We should.

Dunn - direct - Evans                    1586

1  Q     Must the general contractor notify you?

2  A     No.

3  Q     On the SML Bed/Stuy cluster, did you provide any work as

4  a subcontractor?

5  A     No.

6  Q     On the SML Bed/Stuy cluster, did you complete your work

7  as the developer?

8  A     Except for one building.

9  Q     Did you -- was the failure to complete that building a

10 consequence of your responsibility as the developer, or

11 something else?

12 A     Something else.

13 Q     Did you apply for your developer fee for the SML Bed/Stuy

14 cluster?

15 A     We -- yes, we did.

16 Q     And did you receive your $350,000 developer's fee?

17 A     No, we did not.

18 Q     Do you know why you didn't see your developer's fee?

19 A     There was a problem -- we had several buildings in line

20 to get C of O's, which were necessary to sell the building.

21 Q     A C of O is what?

22 A     Certificate of occupancy.

23 Q     Who issues the certificate of occupancy?

24 A     The City of New York.

25 Q     Why were you having trouble getting C of O's for the

Dunn - direct - Evans                    1587

1  building you rehabilitated?

2  A    The contractor didn't explain.

3  Q    Whose responsibility is it to collect the specifics of

4  occupancy?

5  A    The contractor.

6  Q    Did the contractor, if you recall, collect all of the

7  money budgeted for the hard costs on this cluster?

8  A    Yes, I believe so.

9  Q    In the SML Bed/Stuy cluster, were there any persons who

10 had to be relocated out of these buildings?

11 A    Yes.

12 Q    And who handled the relocation of those persons?

13 A    I did.

14 Q    And what was the budget assigned for the relocation of

15 those persons?

16 A    $90,000.

17 Q    And of that $90,000, do you recall how much, if any, you

18 were paid?

19 A    30,000.

20 Q    And did you bill for the balance due for the other

21 $60,000?

22 A    Yes.

23 Q    And did you collect the other $60,000?

24 A    No, I did not.

25 Q    Were you told why?

Dunn - direct - Evans                    1588

1    A    The enterprise, Rylanda Watson, just delaying the

2    process.  We sent the requisitions in the same way as we did

3    to collect the 30,000.

4    Q    And did you make HPD or the New York City folks aware

5    that you hadn't been paid for the relocation?

6    A    Yes, I did.

7    Q    Did you ask them to intervene to help you collect this

8    money?

9    A    Yes, I did.

10   Q    What was the source of the money that you spent to

11   relocate these families?

12   A    It was an out-of-pocket expense.

13   Q    Out of whose pocket?

14   A    My pocket.

15   Q    I want to ask you a few questions now about the Hancock

16   cluster.  Can you describe for the jury how you came to work

17   on the Hancock cluster?

18   A    While we were participating in the Bed/Stuy, we got a

19   call and asked if we wanted to participate in the DAMP

20   project, which is down on this Hancock Street cluster.

21   Q    Do you know what that acronym represents?

22   A    No.  I mean, I did, but I just can't remember.

23   Q    What was the purpose of this cluster?

24   A    The purpose was to take abandoned or specially occupied

25   buildings, gut, rehab and sell them.

Dunn - direct - Evans                    1589

1   Q    And do you remember the total size of the budget for this

2   program?

3   A    I believe it was 5.6 or 5.8 million.

4   Q    How many buildings or units were part of this program?

5   A    I believe eight.

6   Q    Did you bid on this program?

7   A    No.

8   Q    So, how did you come to participate in the Hancock

9   cluster?

10  A    When we filled out a questionnaire, and also based on our

11  success with the NEP, the first big project that we had.

12  Q    Who was your lender for this project, if you recall?

13  A    CPC.

14  Q    Was there a construction lender, also?

15  A    CPC did everything.

16  Q    Who was the NEP project manager assigned to you on this

17  project?

18  A    Victoria Smith.

19  Q    And CPC, as the funding source, assigned a project

20  manager, as well?

21  A    Rose Brown.

22  Q    Do you recall who was the architect selected for this

23  project?

24  A    I believe it was we said Delacour.

25  Q    On the Hancock cluster, was the architect selected in the

Dunn - direct - Evans                         1590

1    same manner as we discussed before?

2    A     Yes.

3    Q     Did you make recommendations to the city on the architect

4    on this project?

5    A     No, I did not.

6    Q     Who was the general contractor on the Hancock cluster?

7    A     Metropolis Development.

8    Q     And Metropolis Development was owned and operated by

9    whom?

10   A     George Armstrong.

11   Q     And what was your role as the developer on the SML

12   Hancock cluster?

13   A     Basically, to develop the buildings, relocate, if any,

14   occupants of the buildings, turn them over to the contractor,

15   same as Bed/Stuy.

16   Q     Were there relocations involved in this project?

17   A     Maybe one or two.  Not many.

18   Q     What's the first significant step in the development of a

19   cluster like this?

20   A     Is to get the architectural plans approved, superior

21   funding, and make sure the contractor is on the job.

22   Q     Were there any difficulties with this cluster that you

23   recall?

24   A     Yes.

25   Q     What were they?

Dunn - direct - Evans                    1591

1    A    Well, after we closed the construction loan, the

2    contractor didn't show up for work for almost four months.

3    Q    So, closing a construction loan, what does that entail?

4    A    It entails getting a loan from CPC approved, and then

5    getting all the parties at the closing table.

6    Q    At the closing of a construction loan, does the bank

7    provide the initial money for the contractor to get started or

8    do the developers provide that money?

9    A    The bank.

10   Q    Do you remember how much money there was involved in the

11   construction loan of the Hancock cluster?

12   A    Like I said, 5.9.

13   Q    But the contractor wouldn't collect $5.9 million at the

14   closing of the construction loan, would they?

15   A    No.

16   Q    What did they collect here, some percentage of that?

17   A    Yes.  I believe the number that comes to mind is like

18   500,000.

19   Q    What's the purpose of that $500,000?

20   A    I guess to start the process of construction.

21   Q    Now, does the developer control that first $500,000?

22   A    No.

23   Q    Who provides that first $500,000 to the general

24   contractor?

25   A    The bank.

Dunn - direct - Evans                    1592

1   Q    So, Metropolis Construction was provided money at the
2   construction closing?
3   A    Yes.
4   Q    And did you have to relocate families?
5   A    A few, yes.
6   Q    And does the contractor have to wait for you to relocate
7   those families before they can start?
8   A    Yes.  But only one or maybe two buildings had occupants.
9   The other six were vacant.
10  Q    So, was there any reason that you can recall that the
11  general contractor didn't begin work immediately upon
12  collecting that $500,000?
13  A    Initially, no.
14  Q    Now, what did -- did you have a provide a personal
15  guarantee as the developer on this program?
16  A    Yes.
17  Q    Do you remember how much it was?
18  A    The amount of the loan.
19  Q    So, if the loan was $5 million in a round number, you
20  would have a $5 million guarantee?
21  A    Between me and the members of my group.
22  Q    So, your portion would be 2.5?
23  A    Yes.
24  Q    So, you had a personal guarantee on the Hancock cluster?
25  A    Yes, I did.

Dunn - direct - Evans                    1593

1   Q     When does the developer start to pay the interest on the

2   construction loan?

3   A     Immediately after closing.

4   Q     Do you, as the developer, have to provide insurance for

5   the site?

6   A     Yes.  We had to have some insurance provided.

7   Q     Is that insurance money paid out of the budget, or is it

8   paid by the developer?

9   A     It's paid as a soft-cost item.

10  Q     Who pays that soft-cost item, sir?

11  A     We're responsible for it through the loan.

12  Q     Where is the source of funds that you -- where did you

13  get the money to pay the interest on the construction loan?

14  A     We borrowed it.

15  Q     And how long after the construction loan closing did it

16  take for the general contractor, Metropolis, to come to work

17  on that site?

18  A     Four months.

19  Q     Did you notify anyone?

20  A     I notified HPD, Wendell Walters.  I repeatedly reached

21  out to the contractor, and I talked to my members about it.

22  Q     What does a contractor say when you call him and ask --

23  did you call the contractor?

24  A     Yes, I did.

25  Q     And what did you ask him, if anything?

Dunn - direct - Evans                    1594

1  A    George, why haven't you started the project?  The bank is

2  calling me.

3  Q    And what response did he give you?

4  A    You'll have to speak to Wendell.

5  Q    Was Wendell Walters working for Metropolis Construction?

6  A    No.

7  Q    Was there a directive from the NEP for the contractor not

8  to begin?

9  A    No.

10  Q    What did you understand that he meant that you would have

11  to talk to Wendell?

12  A    After we were awarded the cluster, right before the

13  closing of the construction loan, Wendell directly and then

14  George asked me for money.

15  Q    Wendell Walters directly approached you?

16  A    Yes.

17  Q    And he asked you for what?

18  A    $75,000.

19  Q    What did he say the $75,000 was for, if you remember?

20  A    For him.

21  Q    And where were you when Wendell Walters asked you for

22  $75,000?

23  A    He came to visit me at my home at Hart Street.

24  Q    Did he come once or more than once?

25  A    He came once.

Dunn - direct - Evans                    1595

1    Q     And after that, did anyone else approach you about paying

2    a kickback to Wendell Walters?

3    A     Yes, the contractor, George Armstrong.

4    Q     When did he approach you about paying Wendell Walters?

5    A     He also came to my home, and then at the closing, he

6    demanded the check.

7    Q     He demanded that check from whom?

8    A     From our development company, Hancock Street, payable to

9    him, so he can give it to Wendell.

10   Q     Was that agreed on before going to the closing?

11   A     No, it was not.

12   Q     How much was the check to be made out to Metropolis

13   Construction for, if you remember?

14   A     The check that was requested by Wendell was $75,000.

15   Q     So, when George Armstrong made a request at closing, what

16   was he requesting, how much?

17   A     The 500,000 that he was supposed to get to start the

18   project.

19   Q     But I thought that 500 came from the bank.

20   A     Yes, it came from the bank.

21   Q     But you said he asked for a check from you as a developer

22   for the benefit of Wendell Walters?

23   A     Yes.

24   Q     What amount was that?

25   A     75,000.

Dunn - direct - Evans                    1596

1    Q     Did you write him a check for $75,000?

2    A     No, we did not.

3    Q     What happened after that?

4    A     George made a phone call, and then he came to us -- well,

5    came to me, which I told my members that the big guy was very

6    upset with us.

7    Q     Where were you when George Armstrong approached you?

8    A     In the closing room at the bank, at CPC.

9    Q     Did he go to work after making that request?

10   A     We didn't see --

11   Q     Did he go to work after making that request?

12   A     No, he did not.

13   Q     Did there come a time when you decided to remove yourself

14   from the Hancock cluster?

15   A     Yes.  We thought about it.

16   Q     Did you?  Sir?

17   A     I said yes.

18   Q     Okay?

19             How did you remove yourself from the Hancock

20   cluster.

21   A     We tried to just basically give it back.  But it was

22   explained it was too late.  We would lose all our

23   out-of-pocket money.  And because we closed the loan, the bank

24   would do a foreclosure action and possibly enforce the

25   personal guarantee.

Dunn - direct - Evans                    1597

1  Q    So, if you resigned as the developer, you were told that

2  the bank would foreclose the amount they had already put out

3  or put forward as a construction loan?

4  A    Yes.

5  Q    Did anyone from the funding source, to the best of your

6  recollection, attempt to call back that construction loan?

7  A    Yes.

8  Q    Were they successful?

9  A    No.  The contractor eventually showed up.

10 Q    How did you remove yourself as the developer from this

11 cluster, then?

12 A    You're talking at the end of the project, not the

13 beginning?

14 Q    Yes.

15 A    Oh.  At the end, again, the contractor became scarce and

16 didn't show up.

17 Q    I'm sorry.  How did you, as SML Hancock cluster, exit

18 that cluster, if you were able to?

19 A    We sold it to --

20 Q    To whom?

21 A    -- to George Armstrong.

22 Q    The general contractor?

23 A    Yes.

24 Q    Did you sell it to him at the same price that you owed

25 for your participation in it?

Dunn - direct - Evans                              1598

1  A    Yes.

2  Q    And did you recover any of the soft costs you had spent

3  on the project to that point of the sale?

4  A    No.  We took a very small amount.

5  Q    Did you recover all of your soft costs?

6  A    No, we did not.

7  Q    Okay.  And were you doing any subcontracting work for the

8  Hancock cluster?

9  A    Yes, I was.

10  Q    What work were you doing as a subcontractor?

11  A    I was selling appliances.

12  Q    Appliances?

13  A    Yes.

14  Q    Were you selling appliances to the general contractor?

15  A    Yes.

16  Q    And were you selling them through a company?

17  A    Yes.

18  Q    What was the name of that company or what is the name of

19  that company?

20  A    Closeout Kings.

21  Q    And when you say you were selling appliances to a

22  developer, what does that mean?

23  A    We sold appliances, meaning everything that went into the

24  kitchen:  Refrigerator, stove, microwave, range hood,

25  dishwasher, we sold the complete sets.  In addition, all the

1    bathroom hardware:  Tile, tub, vanities, shower bodies.  The

2    lighting fixtures, both interior and exterior, and wood

3    flooring.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. EVANS:   (CONTINUING)

2    Q    Did you, where did you get these goods wholesale?

3    A    Lowe's and Home Depot.

4    Q    And were they being delivered to these, to the site or

5    were they being delivered to your building or how did that

6    work?

7    A    Well, for the purchases that I had to, that were beyond

8    my inventory, I would go into Lowe's, order, and then based on

9    the site where Metropolis wanted it delivered, I had it

10   delivered directly from the store.

11   Q    And did you do this for any other general contractors

12   other than Metropolis?

13   A    Other small contractors that were in, basically in

14   Brooklyn.

15   Q    When did you start this line of business, if you

16   remember?

17   A    Maybe 2002, 2001, 2002.

18   Q    And were you providing invoices to the general contractor

19   for these appliances and goods?

20   A    Yes.

21   Q    When were you paid and how were you paid for this

22   appliance wholesale business?

23   A    Usually, when in the case of Metropolis who I was

24   servicing three or four of their projects, it was centered

25   around when they got paid through a requisition process.

Dunn - direct - Evans                          1601

1    Q    And so that means the payments were coming on a regular

2    basis or off-cycle or how were they coming?

3    A    Whenever the contractor receives funds from a

4    requisition.

5    Q    And at the time that you sold your role as the developer,

6    were you owed any monies for goods delivered to Metropolis?

7    A    Yes, I was.

8    Q    And do you know how much you were owed?

9    A    137 to 140,000.

10   Q    Is that the amount that you say you were owed just for

11   the appliances delivered?

12   A    Yeah, all the appliance and other goods I mentioned.

13   Q    So, that $137,000 figure doesn't include any actual

14   contracting work?

15   A    No.

16   Q    That's just goods and appliances delivered?

17   A    Yup.

18   Q    And did Metropolis pay you for the $137,000 worth of

19   goods they had received?

20   A    When we decided to sell the cluster, me and George

21   Armstrong worked out a payment plan.

22   Q    And did Mr. Armstrong fulfill that payment obligation?

23   A    No.

24   Q    Did he make any payments on his $137,000 balance?

25   A    I received two checks at the closing, one dated the month

Dunn - direct - Evans                              1602

1    of the closing in May for $50,000 and a second one dated to

2    deposit in July for 19,000.

3    Q    And did you deposit that $50,000 check you received from

4    George Armstrong?

5    A    Yes, I did.

6    Q    Where did you deposit that check?

7    A    In a Citibank.

8    Q    And after depositing that check to Citibank, do you

9    remember what you did?

10   A    Paid bills, bought more inventory, stuff like that.

11   Q    And were you, after selling the Hancock cluster, actively

12   involved in any development activity after that point?

13   A    No, not with HPD.

14   Q    So, after selling the Hancock cluster, what did you do?

15   A    I, I deposit the check and about five days later the

16   check came back returned.

17   Q    Where were you when you found out that the check was

18   returned for insufficient funds?

19   A    I was, I was in New York at the time.

20   Q    And what did, did that check for insufficient funds have

21   a negative impact on your monies at Citibank?

22   A    I woke up and had a $47,000 negative balance.

23   Q    And did Citibank use funds that you had in your account

24   to cover that negative balance or seize funds that you had?

25   A    Yes, they did.

Dunn - direct - Evans                    1603

1   Q    Do you remember how much they seized?

2   A    I believe it was $20,000 -- no, not that much.  About

3   $17,000.

4   Q    So, in addition to getting a check that was no good, they

5   held your $17,000 towards that payment?

6   A    Yes.

7   Q    Did Mr. Armstrong replace that bad check?

8   A    No, he did not.

9   Q    What's the role of a construction consultant?

10  A    I would -- the role of a construction consultant would be

11  to maybe match a development project with a lender or to

12  oversee the flow of work on behalf of a lending institution.

13  Q    Okay.  When you delivered these appliances to Metropolis,

14  did anyone sign for or take responsibility for accepting those

15  items?

16  A    Yes.  Usually it was Mr. Williams from George Armstrong's

17  office.

18  Q    Do you remember Mr. Williams's first name?

19  A    I think -- I cannot remember, it starts with a J.

20  Q    Okay.  If I could have just one minute, Your Honor?

21         THE COURT:  Yes.

22         (Pause in the proceedings.)

23  A    Oh, I'm sorry, I remember his name.

24  Q    Yes?

25  A    Noel Williams.

Dunn - direct - Evans                                    1604

1  Q    Noel Williams?

2  A    Yes.

3  Q    Did you, as the developer, always follow the requisition

4  approval process that we discussed earlier when we were

5  looking at Government's Exhibit, I believe it was 202?

6  A    When it was brought to me to sign, yes.

7  Q    And did you ever request on the Hancock cluster that the

8  budget be increased?

9  A    No.

10 Q    On the SML Bed-Stuy cluster, which was a rehabilitation

11 of homes for affordable sale, did you request that the budget

12 be increased?

13 A    No.

14 Q    On the Lexington Avenue NEP project, did you ever request

15 that the budget be increased?

16 A    No.

17 Q    And in these instances where we've described or you've

18 described for the jury your subcontracting work, was

19 subcontracting work allowed as part of the NEP program?

20 A    Yes.

21 Q    Was subcontracting allowed as a part of the Bed-Stuy

22 rehabilitation of homes?

23 A    Yes.

24 Q    Was subcontracting allowed on the SML Hancock cluster

25 work?

Dunn - direct - Evans                                    1605

1   A    Yes, it was.

2   Q    And were the funding sources, the enterprise, CPC, Fleet

3   Bank, were they all aware when you were providing

4   subcontracting services?

5   A    I don't know.

6   Q    Okay.  Did you ever seek to hide or disguise your work as

7   a sub-contractor?

8   A    Not at all.

9   Q    Were the monies to be paid to you as a sub-contractor

10  paid to the development company or were they paid to your

11  separate companies?

12  A    In what project?

13  Q    Let's talk about the Hancock cluster, the last one.

14  A    It was paid to one of my companies, one or two of my

15  companies.

16  Q    And it was not paid to your development company?

17  A    No.

18  Q    On the Bed-Stuy cluster, did you do any subcontracting

19  work?

20  A    No, I did not.

21  Q    Okay.  On the Lexington Avenue cluster, when you did

22  subcontracting work on 626-628 Myrtle Avenue, was that work

23  paid for to your development company or to a separate company?

24  A    A separate company.

25  Q    And did you ever file a complaint or make a complaint for

Dunn - direct - Evans                    1606

1    the monies that you were not paid?

2    A    Several, several times.

3    Q    Who did you file a complaint with?

4    A    I made a written complaint to, with regards to

5    outstanding monies from the subcontracting in the NEP and --

6    in the NEP to Wendell Walters and also my project manager and

7    a direct letter to MCR Restoration.

8    Q    When Metropolis contracting or construction wrote you a

9    check for $50,000 that was returned, did you take any action

10   to complain there?

11   A    Yes, I did.

12   Q    What action did you take?

13   A    I made a complaint to the DA's office.

14   Q    Which district attorney?

15   A    Brooklyn district attorney.

16   Q    And do you know if any action was taken after that

17   complaint?

18   A    No.

19   Q    Did you go in and file a complaint yourself?

20   A    No, I had someone from my team do that.

21   Q    Okay.

22        MR. EVANS:  Your Honor, if I could just have one

23   moment.

24        THE COURT:  All right.

25        (Pause in the proceedings.)

```
                      Proceedings                    1607
```

1   Q    Mr. Dunn, when you were operating your subcontracting

2   companies, was Michael Freeman a partner or a member in any of

3   those?

4   A    No, he was not.

5   Q    Was Lee Hymowitz a partner or a member in any of your

6   subcontracting companies?

7   A    No, he was not.

8           MR. EVANS:  I have nothing further for this witness

9   at this time.

10          THE COURT:  Thank you.

11          All right, let's take a short recess.

12          Members of the Jury, please step out, remember not

13  to discuss the case.

14          THE COURTROOM DEPUTY:  All rise.

15          (Jury exits.)

16          THE COURTROOM DEPUTY:  You can step down.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right, you can be seated.

19          Counsel, you want to come up here and discuss this

20  issue that we have?

21          (Pause in the proceedings.)

22          THE COURT:  All right, Counsel, turning to the

23  question that has been raised as to whether the Government can

24  use the unredacted statement of Mr. Dunn, at this point I

25  still do not know what position Mr. Dunn will take when he is

Proceedings                                    1608

1    cross-examined, so do we need to wait until we hear that

2    before we have any further discussion?

3              MR. SERCARZ:  Understood.

4              At the very least, Your Honor, I would ask the Court

5    to depart from the ordinary order in which you've been calling

6    upon to us examine because it really would make no sense for

7    me to have to make that decision before the Government seeks

8    to test Mr. Dunn's version of whether or not he spoke to the

9    agents of law enforcement.

10             Because depending on the answers to those questions,

11   I may or may not be required by the Court to delve into this,

12   but we won't know until the Government goes there.  So, I ask

13   that they be required to cross-examine first.

14             THE COURT:  On that point.

15             MR. SERCARZ:  Yes.

16             THE COURT:  Can't the defense cross-examine in the

17   normal course and then the Government will cross-examine?  You

18   may have no cross-examination at this point, you may only have

19   cross-examination after the Government crosses, but I think we

20   should use the normal route.

21             You won't be deprived of further cross-examination

22   once the Government addresses this.  I think that would be

23   more wise.

24             MR. PINTO:  Your Honor, I would like to alert the

25   Court to a motion.

Proceedings                                1609

1          THE COURT:  I read it.

2          MR. PINTO:  It's a mirror of Mr. Sercarz's.

3          THE COURT:  It's a little different, actually.

4          So, that's what I think we have to do at this point,

5    unless there is something else in a general way that you want

6    to address.

7          MR. CAPOZZOLO:  No, Judge.

8          THE COURT:  All right.  So, either Counsel or, if I

9    notice it myself, I will call for a recess, but otherwise, if

10   anyone thinks that it's the appropriate time for us to be

11   discussing the issue, please alert me, okay?

12         All right, so let's take a short recess for

13   ourselves, thank you.

14         ALL:  Thank you.

15         (Recess taken.)

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

Dunn - cross - Capozzolo                                    1610

1        (In open court; outside the presence of the jury.)

2        THE CLERK:  Thank you.  Please be seated.

3        THE COURT:  All right.  Let's bring in the jury.

4        (Jury enters.)

5        THE CLERK:  Thank you.  Please be seated.

6        THE COURT:  Cross-examination?

7        MR. SERCARZ:  No questions, Your Honor.

8        MR. DiCHIARA:  No questions, Your Honor.

9        MR. CAPOZZOLO:  May I proceed, Your Honor?

10       THE COURT:  Yes.

11       MR. CAPOZZOLO:  If I can publish what will be

12  Government Exhibit 638.  Actually, I will just hand it to the

13  witness.

14       THE COURT:  I'm sorry.  Is it in evidence?

15       MR. CAPOZZOLO:  No, it is not in evidence.

16       THE COURT:  And the number is what, please?

17       MR. CAPOZZOLO:  It would be Government Exhibit 638.

18  CROSS-EXAMINATION

19  BY MR. CAPOZZOLO:

20  Q    Do you recognize that, Mr. Dunn?

21  A    No.

22  Q    You've never seen it before?

23  A    I don't recall.

24  Q    Are you aware the government provided, the defense

25  provided this to the government as an exhibit, your lawyer?

1   A     No.

2   Q     You're not?

3            When you became a neighborhood entrepreneur, you did

4   not review a guide for prospective entrepreneurs?

5   A     Yes, we did.

6   Q     You did?  And did that guide lay out the rules of what a

7   neighborhood entrepreneur would do?

8   A     Yes, it would.

9   Q     Did that guide list the roles of participating parties

10  including the neighboring entrepreneurs?

11  A     Yes.

12  Q     Do you recall what those roles were?

13  A     In the neighborhood entrepreneur program?

14  Q     Yes.

15  A     Yes, to acquire properties from the City, relocate

16  families and to develop, develop the properties for low income

17  housing.

18  Q     And do you know if one of those roles was also to screen

19  and recommend general contractors subject to the approval of

20  HPD?

21  A     We didn't screen them.  We didn't screen the contractors.

22  Q     But isn't that the role of a neighborhood entrepreneur,

23  one of the roles is to interview the general contractors and

24  decide whether they should participate in a project?

25  A     No.

Dunn - cross - Capozzolo                    1612

1    Q    You have to work pretty extensively as a general

2    contractor in a case, don't you?

3    A    Yes.

4    Q    Every day sometimes might be --

5    A    Not every day.

6    Q    You had meetings at the site, correct?

7    A    Only during the requisition process.

8    Q    And what about -- during the requisition process, that's

9    once a month when hundreds of thousands of dollars are being

10   requested from HPD, you have to meet with the general

11   contractor, right?

12   A    With a group of people, yes, including the general

13   contractor.

14   Q    And you made a lot of statements about the big personal

15   guarantee on these loans.  That's the person who's going to

16   get most of the letter through the requisitions, correct?

17   A    I didn't understand the question.

18   Q    The general contractor, those are costs of what make up

19   about over 90 percent of the loan, isn't that correct?

20   A    Yes.

21   Q    And so the person who you're going to work with whose

22   going to get most of that loan that you're providing the

23   personal guarantee, that's the general contractor, correct?

24   A    Yes, it is.

25   Q    And you're saying you didn't screen that person at all in

Dunn - cross - Capozzolo                    1613

1    any of these projects you've described today?

2    A    No, we didn't screen them.

3    Q    You just testified that during the requisition, the

4    contract and requisition process on the Hancock cluster, you

5    said that the process was delayed by four months because of

6    the general contractor, correct?

7    A    Yes.

8    Q    And you said it was delayed for four months after closing

9    on the loan, correct?

10   A    Yes.

11              MR. CAPOZZOLO:  If I can show the witness some

12   exhibits that are in evidence.

13              THE COURT:  That's a document in evidence and we can

14   publish it?

15              THE CLERK:  No, it's not.

16              MR. CAPOZZOLO:  It's in evidence, yes.  I'm sorry.

17              THE COURT:  Okay.

18              (Exhibit published.)

19   A    Can you make it a little bigger, please?

20   Q    Yes.

21              This is Government Exhibit 400, the attendance sheet

22   for the closing on the Hancock SML project.  Is it correct

23   that the date for that closing was June 11, 2007?

24   A    Yes.

25   Q    That's the date that the loan closed that you talked

Dunn - cross - Capozzolo                    1614

1   about just a moment ago?

2   A    Yes.

3   Q    I'd like to show you what's in evidence as Government

4   Exhibit 301.

5              (Exhibit published.)

6   Q    That's -- correct me if I'm wrong, but is this the first

7   requisition on the Hancock project?

8   A    Yes.

9   Q    I'll zoom in a little bit.  The date is a little hard to

10  read, but does that appear to be July 30, 2007?

11  A    Yes.

12  Q    Is that four months after the closing date?

13  A    No.

14  Q    It's about a month, correct?  A little over a month?

15  A    Two months.

16  Q    Two months.

17             Let me ask you something else with regard to this

18  exhibit.  You said at the closing, somehow the general

19  contractor got $500,000 out of the contract at the closing,

20  correct?

21  A    Yes.

22  Q    The total contract sum here is $2,970,000, correct?

23  A    Yes.

24  Q    It says, Less previous certifications, and there's no

25  amount, correct?

Dunn - cross - Capozzolo                    1615

1   A    Yes.

2   Q    So according to this document, no previous money was

3   given to the contractor, correct?

4   A    The contractor received a check at closing.  I don't know

5   why it's not on there.

6   Q    Now, you described, you used the term "team" in

7   discussing these various projects, that you had a team that

8   worked with you on Bed-Stuy, Lexington and Hancock, correct?

9   A    Yes.

10  Q    For Bed-Stuy, who were the members of your team?

11  A    Me and Michael Freeman.

12  Q    And what about Mr. Hymowitz?

13  A    No.

14  Q    What was his role?

15  A    Legal, from time to time, advisor on some budgetary stuff

16  with the bank but very little.

17  Q    He had no financial interest in the outcome of that

18  project?

19  A    No.

20  Q    And what about in Hancock?

21  A    The same.

22  Q    During the course of your working with Mr. Freeman on

23  these projects, did you become familiar with this signature?

24  A    Michael Freeman's?  Yes.

25  Q    So, just for example, showing you Government Exhibit 101

Dunn - cross - Capozzolo                    1616

1   A.    It's in evidence.

2              (Exhibit published.)

3   Q     Do you recognize that as Mr. Freeman's signature?

4   A     Yes.

5   Q     And you've seen his signature on a number of documents

6   throughout the course of the trial, correct?

7   A     Yes.

8   Q     Do those also appear to be his signature?

9   A     Yes.

10  Q     And any of the documents in which your signature is

11  identified such as that closing sheet which was Government

12  Exhibit 400 and some of the other documents, do all of those

13  signatures appear to be yours?

14  A     Yes.

15  Q     Now, I just want to turn your attention now to Government

16  Exhibit 109 which is in evidence.

17             (Exhibit published.)

18  Q     This is requisition number nine, correct?

19  A     Yes.

20  Q     The third bullet point states that the requisition is for

21  work that has actually been performed in a good and

22  workmanlike manner and, where applicable, within the perimeter

23  of the premises, correct?

24  A     Yes.

25  Q     And that phrase actually appears on all of the

Dunn - cross - Capozzolo                    1617

1   requisitions throughout this project, the Bed-Stuy project, is

2   that correct?

3   A    Yes.

4   Q    And in addition, this document also requires you to

5   certify that the AIA document, the G702, which, during the

6   course earlier in the trial, people identified as the

7   breakdown for the requisition is complete and accurate and the

8   amount requested from HUD plus any amounts previously paid

9   does not exceed the amount allocated in the HUD BLC, that

10  would be the contract, correct?

11  A    Yes.

12  Q    And so you have an obligation that when you're submitting

13  these requisitions, that the amount you're requesting is

14  within the contract, correct?

15  A    Yes.

16  Q    And in this case, the contract amount was determined by a

17  bid before, before the contract with the general contractor

18  was assigned, correct?

19        There was a bidding process?

20  A    It was not -- are you talking about the Hancock Street

21  cluster?

22  Q    No.  This is Bed-Stuy.

23  A    Yes, there was a bidding process.

24  Q    And the purpose of that bidding process was to get to the

25  lowest, lowest possible bid by a qualified contractor,

Dunn - cross - Capozzolo                                    1618

1  correct?

2  A     Yes.

3  Q     And if that bidding process is corrupted and the price is

4  higher than what would be produced by a clean bidding process,

5  you would acknowledge that that would be improper, correct?

6  A     If I would know it.

7  Q     I'm not talking about what you know.  I'm just talking

8  about that, that would undermine the purpose of the bidding

9  process if somehow there were some agreement that the bid

10 would be higher than a clean low bid system?

11 A     Yes.

12 Q     And if, if you knew that that amount was higher than it

13 should have, then these certifications would be incorrect?

14 A     I did not know and yes.

15 Q     But if you did know --

16 A     Yes.

17 Q     -- it would be incorrect?

18 A     Yes.

19 Q     And it would cause HPD to lose money because if the

20 bidding process had worked properly, they would have paid less

21 money on the hard costs?

22 A     Yes.

23 Q     And you would agree with me that in 109C, which is in

24 evidence -- 109C, again, which relates to the ninth

25 requisition.

```
                    Dunn - cross - Capozzolo                    1619
```

1            (Exhibit published.)

2   Q    And, again, on the first page, that's your signature,

3   correct?

4   A    Yes.

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dunn - cross - Capozzolo                    1620

1    BY MR. CAPOZZOLO:

2    Q    And then on page two, it lists general categories of

3    performance with relation to the hard costs; correct?

4    A    Yes.

5    Q    And then later on, as I believe I went through with

6    Mr. Starzecki, there are breakdowns for each property, and

7    then there is an even more finite breakdown of like

8    subcategories for the larger categories; correct?  So, for

9    example, demolition has many smaller categories; correct?

10   A    Yes.

11   Q    And you would agree with me that none of the categories

12   in any of these requisition documents lists kickbacks as one

13   of the categories; correct?

14   A    Can you repeat the question again, please?

15   Q    None of the categories, such as demolition or the other

16   items, list kickbacks as one of the items for which you can

17   recover hard costs; correct?

18   A    Yes.

19   Q    And that would be improper, to try to request a kickback

20   in a requisition; correct?

21   A    Yes.

22   Q    Now, I would like to show you Government's Exhibit 207,

23   which is in evidence.  Is it correct that this is the loan

24   commitment letter by Enterprise dated April 20, 2006?

25   A    Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Dunn - cross - Capozzolo                    1621

1   Q     And it's directed to SML Bed/Stuy Development, LLC?

2   A     Yes.

3   Q     And it indicates that the construction loan is about $5.2

4   million?

5   A     Yes.

6   Q     And it indicates that SML Bed/Stuy Development is the

7   borrower; correct?

8   A     Yes.

9   Q     On page two, there's a subparagraph 5 which says "Payment

10  terms for the Enterprise HUD Homes portion and the Enterprise

11  HPD homes portion"; correct?

12  A     Yes.

13  Q     You testified on direct that at the time of the closing

14  of the loan, you would immediately begin accruing interest

15  payments; is that correct?

16  A     Yes.

17  Q     That's not true, is it?

18  A     It is true.

19  Q     I direct your attention to paragraph C. It says:  "Date

20  interest begins accruing, date of the first disbursement,

21  whether to borrower or placed in escrow on so much thereof as

22  may be from time to time disbursed."

23        It indicates that the interest accrues from the

24  first disbursement; correct.

25  A     Yes.

Dunn - cross - Capozzolo                1622

1   Q    No money is disbursed until the first requisition is

2   done; correct?

3   A    As I said, the contractor got a check at closing.

4   Q    Excuse me?

5   A    The contractor received a check at closing.

6   Q    Do you have a copy of that check, by the way?

7   A    No, I do not.

8   Q    We looked at the first requisition.  It doesn't indicate

9   that the contractor got any money, does it?

10  A    It said, on the requisition, the contractor didn't

11  receive anything for that requisition, not anything doing with

12  the closing.

13  Q    Repayment schedule says:  "Mandatory partial repayments.

14  Loan shall be made upon the sale of each home in accordance

15  with the release price schedule to be established prior to

16  settlement and to be incorporated as part of the loan

17  documents.  Each home's release price shall be applied to the

18  payment of the principal balance of the loan, and a portion

19  thereof shall fund the costs which the development budget

20  indicates to be paid by sales proceeds."

21          Is that correct?

22  A    That's what it reads, yes.

23  Q    That indicates that the partial repayment of the loan is

24  at the time of the sale, and that's when the interest is due;

25  correct?  The interest accrues, but you only pay the interest

Dunn - cross - Capozzolo                          1623

1   once the sale has occurred?

2   A    I don't understand.

3   Q    Okay.  Looking at, again, this is under paragraph D,

4   Sub 2:  "The entire principal balance of the note evidencing

5   the loan, the note, together with all accrued and unpaid

6   interest thereon and all of the fees, costs and charges, if

7   any, shall be due and payable in full twenty-four months from

8   the date of the note, the maturity date"; correct

9   A    Yes, sir.

10  Q    Now, which project was it that the contractor got the

11  $500,000?

12  A    I believe it was -- it was Hancock, I believe -- as a

13  matter of fact, not Hancock.  I believe that may have been

14  Bed/Stuy.

15  Q    You are not sure, or you don't recall?

16  A    500,000 I believe I said received by George Armstrong.

17  Q    That would have been Hancock?

18  A    Yes, it would.

19  Q    These documents; correct, apply to the Bed/Stuy

20  Development; correct?

21  A    Yes.

22  Q    Going to the last page of this document.  Is that your

23  signature; correct?

24  A    Yes.

25  Q    And this is Mr. Freeman's?

Dunn - cross - Capozzolo                    1624

1    A    Yes, it is.

2    Q    Do you recognize this signature?

3    A    I do.

4    Q    That's Lee Hymowitz?

5    A    Yes, it is.

6    Q    When the Bed/Stuy project -- when you were taken off the

7    Bed/Stuy project, Cornerstone, an entity created by

8    Enterprise, took over; correct?

9    A    Yes.

10   Q    That was run by Cheryl Ighodaro; correct?

11   A    Yes.

12   Q    And correct me if I'm wrong, but the closing on the

13   Bed/Stuy project was approximately April of 2006; correct?

14   A    Yes.

15   Q    And the first requisition on the Bed/Stuy project was

16   approximately September of 2006; is that correct?

17   A    Yes.

18   Q    Just to show you, if you would agree with, draw 18, the

19   last requisition on Bed/Stuy took place in November 2008; does

20   that sound about right?

21   A    The last requisition?

22   Q    Yes.

23   A    I don't recall the exact date.

24   Q    Let me pull that out?

25            (Pause.)

Dunn - cross - Capozzolo                    1625

1    Q    We'll come back to that.

2         With regard to the Hancock project, I want to first

3    show you what's in evidence as Government's Exhibit 404.  Does

4    that appear to be the loan agreement with regard to the

5    Hancock project.

6    A    Yes.

7    Q    That was June 11, 2007?

8    A    Yes.

9    Q    That was the closing date on that project; correct?

10   A    Yes.

11   Q    On page six, is that your signature; correct?

12   A    Yes.

13   Q    And above it is Wendell Walters's signature; correct?

14   A    Yes.

15   Q    Turning your attention to page 24, are you familiar with

16   the city investigation clause?

17   A    Yes.

18   Q    That's a typical rider placed in public contracts such as

19   this; correct?

20   A    Yes.

21   Q    And the last paragraph of that contract states:  "In

22   addition to, and notwithstanding any other provisions of this

23   agreement, the Commissioner or agency head may, in his or her

24   sole discretion, terminate this agreement upon not less than

25   three days' written notice in the event the sponsor fails to

Dunn - cross - Capozzolo                     1626

1   promptly report in writing to the Commissioner of

2   Investigation of the City of New York any solicitation of

3   money, goods, requests for future employment or other benefits

4   or things of value, by or on behalf of any employee of the

5   city or other person, firm, corporation or entity for any

6   purpose which may be related to the procurement or obtaining

7   of this agreement by the sponsor or affecting the performance

8   of this agreement."

9          Would you agree with me that the kickbacks described

10  by Mr. Starzecki would be something that should be reported

11  under that contract clause?

12  A    If they were kickbacks, yes.

13  Q    And you would agree with me that requests for payments by

14  an Assistant Commissioner of HPD would be something that

15  should be reported under this clause?

16  A    Yes.

17  Q    And you just previously testified on direct, did you not,

18  that Mr. Walters made a request for $75,000 from you?

19  A    Yes.

20  Q    You did not report that, did you?

21  A    I was more overwhelmed with the city officials asking me

22  and worrying about the things he was threatening me with, like

23  foreclosing by the bank and enforcing the personal guarantee

24  for the things I worked my life for.

25  Q    Okay.  So, the answer is, no, you did not report it?

Dunn - cross - Capozzolo                    1627

1   A    I didn't recall it.  I didn't recall that clause.

2   Q    So, you needed to be reminded of this clause to know that

3   you should go to the authorities to report a bribe attempt?

4   A    Again, as I said, I was overwhelmed by the whole

5   scenario.

6   Q    You knew you could go to the DA office on a bounced

7   check, but didn't know you could go to report a bribe?

8   A    I didn't recall -- I didn't recall that statement in the

9   agreement.

10  Q    You said Mr. Walters threatened you?

11  A    Do you mean physically?

12  Q    No.  No.  No.  You said foreclosures or other things he

13  threatened you?

14  A    He threatened to put a stop and he did put a stop to my

15  project.

16  Q    He put a stop to it, or the bank put a stop to it?

17  A    No.  At the beginning, he instructed George Armstrong not

18  to show up to do the work, thus creating a trickle-down

19  effect, the bank wondering why we're not developing.

20  Q    And the Bed/Stuy project, it was Enterprise that removed

21  you, wasn't it?

22  A    I'm sorry?  Say that again, please.

23  Q    On the Bed/Stuy project, it was Enterprise, the bank,

24  that removed you; correct?

25  A    Yes.

Dunn - cross - Capozzolo                    1628

1    Q    You weren't happy about that; correct?

2    A    I was -- I was happy.

3    Q    You were happy?

4    A    At that point, we were dealing with the contractor not

5    performing, HPD not giving us C of O's, the interest on the

6    money began to be an out-of-pocket event, because we ran out

7    of money on the budget line, and also the security became a

8    personal hardship to SML Bed/Stuy, and the market was very,

9    very bad for housing.  And lastly, the marketing company that

10   the Enterprise assigned to us was underperforming in

11   processing the candidates that we had.

12   Q    Enterprise didn't replace the marketer, they replaced

13   you; correct?

14   A    Yes.

15   Q    And they put Ms. Ighodaro in charge?

16   A    Yes, they did.

17   Q    They were not happy with you, not the marketer?

18   A    I think it was mutual.

19   Q    You saw -- did you see previously-marked exhibits,

20   Government's Exhibits 609 and 610, which dealt with the

21   transfer of the 538 Hart Street property to Marcus Garvey

22   Corporation, and subsequently from Marcus Garvey Corporation

23   to you personally?

24   A    Yes.

25   Q    And that was a property that you still possess; correct?

Dunn - cross - Capozzolo                    1629

1    A    Yes.

2    Q    And the Marcus Garvey corporation, that's a shell

3    corporation you used to conduct business transactions;

4    correct?

5    A    Not at all.  Marcus Garvey was formed in, I believe,

6    1998.  I bought a building called -- it was located at

7    334 Marcus Garvey, and at that time, I was advised, because I

8    was owning a lot of properties, to put properties in different

9    corporations.  The purpose of 334 Marcus Garvey was to collect

10   the rent, pay the bills for the building, the actual physical

11   building that I owned

12   Q    But later on, you used it for other purposes; correct?

13   A    I used it for management purposes.  I used it for other

14   purposes.

15   Q    You used it for more than just collecting rents?

16   A    Mostly collecting rents.

17   Q    Did you collect payments from subcontractors?

18   A    I accepted payments from -- that was owed to me for

19   monies from the Lexington Avenue LLP by MCR Restorations, yes.

20   Q    It's correct that you used it as a corporation to accept

21   monies not related to the original purpose of the company;

22   correct?

23   A    It was money that belonged to me.  It was owed to me.

24   Q    But it was to a subcontractor, not 334 Marcus Garvey

25   Corporation, because that corporation has no employees,

1  couldn't do any work; correct?

2  A    In the case of doing the subcontracting, again, I

3  subcontracted through New World, and in return, New World paid

4  at that time my other company, SD Property Management.  And

5  two years later I believe is when MCR decided to pay me the

6  outstanding, SD Property Management was no longer functioning,

7  and because I was a one hundred percent shareholder in both

8  companies, I didn't think it was a problem to accept what was

9  owed to me in 334 Marcus Garvey.

10  Q    My question was simply that you had him direct money to a

11  company that had no employees; correct?

12  A    I was an employee.  I was the only employee.

13  Q    You were an employee?

14  A    Shareholder.

15  Q    You are a shareholder.  You didn't pay yourself a salary

16  through that corporation; correct?

17  A    I may have a small salary, yes.

18  Q    You saw Government's Exhibit 628; correct?

19  A    Yes.

20  Q    The New York State Taxation, that for five years there's

21  no report of any income being reported to the State of New

22  York?

23  A    Yes -- from what years was that?

24  Q    I think it was 2006 to 2011.

25  A    I think prior to that, I did.  But 2006 to 2011, I just

Dunn - cross - Capozzolo                    1631

1   collected rents.

2   Q    And the payments from MCR?

3   A    That was owed to me, yes.

4   Q    Yes.  And those were payments to a company that had no

5   employees; correct?

6   A    Yes.

7   Q    Thank you?

8        Now, you also received checks from Metropolis,

9   didn't you.

10  A    Yes.

11  Q    And that was subcontractor work, as well; correct?

12  A    Yes, selling goods, yes.

13  Q    Number of items, like what kind of goods?

14  A    I sold all the appliances to all the renovated apartments

15  in all the buildings in the Hancock Street cluster, also a

16  cluster that was -- he was doing in Brooklyn under another

17  developer, and two other sites in Harlem.

18  Q    You had a bank account for Closeout Kings; correct?

19  A    Yes.

20  Q    And the checks were not made out to Closeout Kings, they

21  were to 334 Marcus Garvey Corporation, and that was done at

22  your direction; correct?

23  A    There was some checks --

24  Q    It's a simple answer.  Was it done at your direction?

25  A    Yes.

Dunn - cross - Capozzolo                    1632

1    Q    I would like to show you --

2         MR. CAPOZZOLO:   Is 552 in evidence?

3    Q    I'm going to show you Government's Exhibit 552, which is

4    in evidence.  SML Bed/Stuy was the corporation you used; as

5    you said, you would create corporations when you did these

6    projects; correct?

7    A    SML Bed/Stuy, yes.

8    Q    And you just testified that who were the members of that

9    entity?

10   A    Michael Freeman and myself.

11   Q    No one else; correct?

12   A    No.

13   Q    Is this a business signature card for the bank account

14   for SML Bed/Stuy Development?

15   A    Yes, it is.

16   Q    And did you sign this card?

17   A    Yes.

18   Q    And it describes you as member; correct?

19   A    Yes.

20   Q    And the top, it says "Print name, title and signature";

21   correct?

22   A    Yes.

23   Q    And member was your title in SML Bed/Stuy; correct?

24   A    In an LLC, yes.

25   Q    Mr. Freeman's role was member, as well?

Dunn - cross - Capozzolo                    1633

1    A    Yes.

2    Q    What's the description for Mr. Hymowitz?

3    A    Vice president.

4    Q    That doesn't say counsel or lawyer; correct?

5    A    No, it doesn't.

6    Q    Were you present when that was filled in?

7    A    No.

8    Q    Do you recognize this as Mr. Hymowitz's signature?

9    A    Yes.

10   Q    And the date of this is May 4, 2005; correct?

11   A    Yes.

12   Q    Do you recall the earlier testimony about when there was

13   an application by you, Mr. Freeman and Mr. Hymowitz to be

14   developers in a joint corporate entity and it was rejected?

15   A    In the second round of the NEP, yes.

16   Q    That was in 2002; correct?

17   A    Yes.

18   Q    And this is three years after that; correct?

19   A    Yes.

20   Q    With a new corporate entity?

21   A    Yes.

22   Q    And he's describing himself as vice president; correct?

23   A    Yes.

24   Q    And by signing as a member or having a title with this

25   entity, this is what gives you access to the money of that

1634

1    corporation; correct?

2    A    Yes.

3    Q    And at the bottom, it's signed "Michael Freeman";

4    correct?

5    A    Yes.

6    Q    Lee Hymowitz and Michael Freeman were well aware that you

7    had a business entity named 334 Marcus Garvey Corporation;

8    correct?

9                MR. SERCARZ:  Objection.

10               THE COURT:  Let's take our luncheon recess now.

11               Members of the jury, be back here, please, at 2:15.

12   Please remember not to discuss the case.

13               THE CLERK:  All rise.

14               (Jury excused.)

15               THE COURT:  Everyone can be seated, except counsel.

16               You want to speak?

17               MR. SERCARZ:  The basis for the objection, your

18   Honor, was that the witness was asked a question about whether

19   my client and, for that matter, Mr. Freeman were, quote, "well

20   aware," unquote, of certain facts.  I object to the form of

21   the question.  He's being asked for an opinion on the state of

22   mind of someone else.

23               MR. CAPOZZOLO:  I'll just rephrase it.  I intend to

24   ask him if he had discussions with them about that.

25               THE COURT:  All right.  Thank you.

1635

1        Okay.  Have a good lunch, and we'll see you at 2:15.

2        MR. SERCARZ:  I understand the government may have

3   another hour or more of cross-examination; is that about

4   right?  I also understand that Mr. Evans may be calling

5   another witness this afternoon.  If the Court wants me to have

6   somebody here just in case, I will, but I don't think we're

7   going to reach my witnesses today.

8        THE COURT:  All right.  I'll excuse them.  We'll

9   start up with your defense tomorrow morning.

10        MR. SERCARZ:  Thank you, your Honor.

11        (Lunch recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dunn - cross - Capozzolo                                    1636

1                        AFTERNOON SESSION

2              (In open court.)

3              (Judge NINA GERSHON enters the courtroom.)

4              THE COURTROOM DEPUTY:  All rise.

5              Please, be seated.

6              THE COURT:  We'll bring in the jury.

7              (Witness resumes stand.)

8              THE COURTROOM DEPUTY:  All rise.

9              (Jury enters.)

10             THE COURT:  Good afternoon everyone.

11             THE JURY:  Good afternoon.

12             THE COURTROOM DEPUTY:  Thank you, please be seated.

13             MR. CAPOZZOLO:  May I enquire, Your Honor.

14             THE COURT:  Yes.

15  CROSS EXAMINATION

16  BY MR. CAPOZZOLO:  (Continuing)

17  Q    Mr. Dunn, I'm just going to rephrase the last question I

18  posed before the break.

19             To your personal knowledge, was Mr. Hymowitz and

20  Mr. Freeman, either or both, aware of your corporation 334

21  Marcus Garvey Corp?

22  A    Yes.

23  Q    In fact, if I can show you Government's Exhibit 639.

24             MR. CAPOZZOLO:  May I approach, Judge.

25             THE COURT:  Yes.

Dunn - cross - Capozzolo                    1637

1           THE WITNESS:  Thank you.

2    Q    I'm just going to ask you to look at the first page,

3    first.  The rest of the pages I have an electronic version

4    which I will blow up because it is hard to read.

5           THE COURT:  Is this something in evidence?

6           MR. CAPOZZOLO:  It is not in evidence, Judge.

7           THE COURT:  All right.

8           The number then is what?

9           MR. CAPOZZOLO:  639.

10           THE COURT:  Thank you.

11   Q    Do you see the first page, Mr. Dunn?

12   A    Yes, I do.

13   Q    And is that a check from 334 Marcus Garvey Corp, Inc. to

14   Hymowitz and Freeman?

15   A    Yes.

16   Q    Is that a check you signed?

17   A    Yes, it is.

18   Q    All right.  I am going to, just because of the limited

19   size of some of the other Exhibits --

20           THE COURT:  I can barely hear you.

21           MR. CAPOZZOLO:  If I can just publish it to the

22   witness.

23           THE COURT:  All right.

24           Mr. Capozzolo, you have to use the mic.  There you

25   go, thank you.

Dunn - cross - Capozzolo                    1638

1    Q    On page two, Mr. Dunn, there are two columns of checks.

2    If you look on the screen, you will see the one in the center

3    of the screen?

4    A    Yes.

5    Q    Is that a check from 334 Marcus Garvey, Inc. to Michael

6    Freeman?

7    A    Yes.

8    Q    And on page three, again I'm just blowing it up for a

9    little bit, is that in the top right-hand side corner, is that

10   a check from 334 Marcus Garvey, Inc. to Hymowitz and Freeman?

11   A    Yes.

12   Q    Signed by you?

13   A    Yes.

14   Q    And on page four, does that appear to be a check from 334

15   Marcus Garvey, Inc. to Lee Hymowitz?

16   A    Can you blow it up so I can see?

17   Q    Yes.

18   A    Yes, it is.

19   Q    On the last page, is that a check in the center of the

20   screen from 334 Marcus Garvey, Inc. to Michael Freeman?

21   A    Yes, it is.

22   Q    Signed by you?

23   A    Yes, it is.

24          MR. CAPOZZOLO:  Move to admit.

25          MR. DiCHIARA:  No objection.

Dunn - cross - Capozzolo                    1639

1      MR. SERCARZ:  No objection.

2      MR. EVANS:  No objection.

3      THE COURT:  No objection from anyone?

4      All right, received.

5      (Government's Exhibit 639 was received in evidence.)

6      MR. CAPOZZOLO:  Mr. DiChiara, no objection?

7      MR. DiCHIARA:  No.

8      MR. CAPOZZOLO:  All right.

9      THE COURT:  It is received.

10  Q   I'll go in reverse order, page five; correct, that's the

11  check to Michael Freeman?

12  A   Yes.

13  Q   That's a check to Lee Hymowitz on page four?

14  A   Yes.

15  Q   Check, for the record, 1971.

16      On page three, the top right corner, check 1954,

17  that's the check to Hymowitz and Freeman from 334 Marcus

18  Garvey, Inc.

19  A   Yes.

20  Q   Page two, check 1930 to Michael Freeman for $4,800.

21  A   Yes.

22  Q   And finally on the last page, that's a check from 334

23  Marcus Garvey to Hymowitz and Freeman; correct?

24  A   Yes.

25  Q   Now, you said that with regard to the Hancock -- well, I

Dunn - cross - Capozzolo                         1640

1   don't think I asked you this.

2          With regard to the Hancock project who, if anyone,

3   was part of your team on that project, SML Hancock?

4   A    My partner Michael Freeman.

5   Q    And what about Mr. Hymowitz?

6   A    No.

7          MR. CAPOZZOLO:  There was a question yesterday asked

8   and I just want to go back to it and ask you if you can

9   explain the context.  You were asked two questions, this is on

10  page 1475.

11         And who was in the company you formed, if you

12  remember?

13         Lee Hymowitz and Michael Freeman.

14         QUESTION:  Was Lee Hymowitz in the company?

15         ANSWER:  Yes.

16  Q    Was that with regard to another corporate entity?

17  A    Possibly, if I understood the question correctly.

18         MR. CAPOZZOLO:  Prior to those questions, I'll just

19  ask you these, if you were asked these questions and gave

20  these answers?

21         QUESTION:  So, did you have to form a company to

22  apply for acceptance in the Neighborhood Entreprenuer Program?

23         ANSWER:  Yes, we were.

24         QUESTION:  Were you required to?

25         ANSWER:  Answer yes, we were.

Dunn - cross - Capozzolo                    1641

1   Q     And then those other questions and answers were asked.

2         Does that give you the context?

3   A     Yes.

4   Q     What was that?

5   A     I'm not sure that I quite understand the line of

6   question.  Can you say it to me again?

7   Q     I just want to understand when was it that Mr. Hymowitz

8   applied with you in the NEP program?

9   A     On the second, the round six NEP, wanted to apply as a

10  partner, like me and Mike were on the previous.

11        MR. CAPOZZOLO:  I'm going to show you just another

12  Exhibit, Government's Exhibit 413, it's already in evidence.

13  Q     Is this a wire transfer agreement that on page two is

14  signed by you?

15  A     Yes.

16  Q     And am I correct that a wire transfer agreement is, it's

17  dated June 11th, 2007, which was the closing date for the

18  Hancock project; correct?

19  A     Yes.

20  Q     And what this agreement basically acknowledges is that

21  the funding sources may send you money by wire transfers to

22  your accounts?

23  A     Yes.

24  Q     That you designate; correct?

25  A     Yes.

1  Q    So, you understood that certain money would be
2  transferred by wire?
3  A    Yes.
4  Q    Now, along those lines, I am correct, right, to say that
5  the way the funding works for both Bed-Stuy and Hancock is
6  that you close, there is a commitment for these loan amounts
7  which would be disbursed in whatever manner takes place during
8  the course of the project and that one of the ways is through
9  the requisition process where a portion of the project is
10 completed, everybody agrees on that percentage and then a
11 certain amount of that is paid to the contractor minus monies
12 that have been already paid and minus that retainage amount
13 that we've talked about a little bit like the ten percent
14 that's held back until the end of the job; correct?
15 A    Yes.
16 Q    And in this case you've repeatedly testified that Bob
17 Starzecki owed you money for certain work that was performed
18 on the Lexington project; correct?
19 A    SML Bed-Stuy.
20 Q    And the Bed-Stuy project?
21 A    Oh, that would be from, I'm sorry, from the Lexington
22 Avenue, LP, I'm sorry.
23 Q    And again, what was the exact work that he owed you?  It
24 was for finishing and certain interior carpentry work, right,
25 to one of the buildings?

Dunn - cross - Capozzolo                        1643

1    A    Yeah, basically the entire finish of the interior and

2    exterior of the building.

3    Q    Now, it's true, isn't it, Mr. Dunn, that the developer is

4    the one most in a position to make sure you get paid as a

5    sub-contractor?

6              Aren't you in the best position to get paid?

7    A    To pay the contractor?  Yes.

8    Q    To get paid by the contractor?

9    A    Yes.

10   Q    In fact, there should never be a circumstance that you

11   don't get paid; correct?

12   A    Yes, there might be.

13   Q    Well, if work was done on that particular building and

14   then, in the next requisition that work is included in the

15   requisition, correct, because you're establishing how much of

16   a project is done.

17             So, your sub-contractor work would have appeared in

18   one of the requisitions as a part of the percentage of the

19   work done; correct?

20   A    Yes, however, the project that I was working on 626-628

21   Myrtle, was taken away from another contractor who had already

22   been paid some of the monies.  MCR Construction asked me to

23   finish the building and also, asked me if I could wait for

24   some of my money after the project.

25   Q    Now, you say they had to wait for the money.  But the

Dunn - cross - Capozzolo                                    1644

1    money would come to you first as developer; correct?

2    A    Money would not -- the money would be allocated to us

3    through the wire and we would pay the requisition.  I wasn't

4    allowed to take money because I was a sub-contractor, I would

5    have to get that from the contractor.

6    Q    The contract between you and the lender only specifies

7    how you get the money.  It doesn't specify how the general

8    contractor has to be paid; correct?

9    A    I believe it does.

10   Q    The contract says that you submit requisitions based on

11   the work completed; correct?

12   A    Yes.

13   Q    And once that money is transferred to you, you can do

14   with it in any way you lawfully can; correct?

15   A    No, that's wrong.

16   Q    You can transfer, if the general contractor owes you

17   money, there is nothing legally to stop you from setting off

18   the amount of money the general contractor owes you; isn't

19   that correct?

20   A    He owed an entity New World Developers, which I was

21   project managing and I had no power to pay them separately.

22   That had to be done by the contractor.

23   Q    There is nothing in the contract that could have stopped

24   from you taking the money that sat in SML Bed-Stuy's bank

25   account and writing a check to 334 Marcus Garvey; would there?

1   A    Yes.

2   Q    There's nothing in the contract would stop that?

3   A    The contract is clear that the requisition and the amount

4   on the requisition had to be paid to the primary contractor,

5   not a sub-contractor.

6   Q    Exactly.  But you, being the sub-contractor, can set off

7   the amount?

8   A    No.

9   Q    There's nothing in the contract that said you couldn't do

10  a set-off?

11  A    No, I could not.

12  Q    Where in the contract did it say you couldn't do that?

13  A    I don't know, I couldn't point it out to you.  If you had

14  a contract, I'd look at it, but I know from our training at

15  HPD that it was very clear what to do when we did the wires

16  and how we had to pay contractors.

17  Q    You have to pay the contractor the money that's due him.

18  But if he owes you say, a hundred thousand dollars, that's a

19  hundred thousand dollars less you owe him.  You have to pay

20  him what he's due, but if he owes you money you don't owe him

21  that much?

22  A    No, it's not, I can't pay his bills.  I have to give him

23  the money that's on that requisition and then he takes care of

24  his business.

25  Q    But in this case his business was your business; correct?

Dunn - cross - Capozzolo                    1646

1    A     Not, not exactly.

2    Q     You accepted the money; correct?  334 Marcus Garvey?

3    A     What money?

4    Q     The money that came, the money that you were later paid

5    that you're claiming is not a kickback, you let it go to 334

6    Marcus Garvey, which was not the sub-contractor; correct?

7    A     Yes.

8    Q     You were allowed to do that under the contract?

9    A     Yes, he paid the sub-contractor and I was the sub under

10   that sub.  And it was two years after the debt wasn't cured

11   and he knew that I was the sub-contractor.  I mean, I dealt

12   with him on a regular basis, so when he got the money he paid

13   me.

14   Q     You talked at length about you having to make a personal

15   guarantee on these loans; is that correct?

16   A     Yes.

17   Q     And you indicated that should something happen, that they

18   could come after you for the amount of money; correct?

19   A     The bank wanted to foreclose, they would enforce the

20   personal guarantee, yes.

21   Q     The personal guarantee, though, would not really kick

22   into effect in these cases because there was substantial

23   collateral to secure the loan; isn't that correct?

24   A     I don't understand how you're phrasing the question.

25   Q     Sure.  When you closed, for example, on the Bed-Stuy

Dunn - cross - Capozzolo                    1647

1  project, you received a number of buildings for a dollar; is

2  that correct?

3  A    Yes.

4  Q    And those buildings were worth substantially more than a

5  dollar; correct?

6  A    Not in the condition -- yes, more than a dollar, yes.

7  Q    I'm not saying they were worth millions but the property

8  alone had value and the buildings, even without

9  rehabilitation, they had some value?

10  A    Yes.

11  Q    And when the bank pays you on a requisition, they only

12  pay based on the fact that work has been put into the

13  buildings; correct?

14  A    Yes.

15  Q    So, if you, the first requisition is a hundred thousand

16  dollars in a million dollars project and you say ten percent

17  of the project's done, so I should get a hundred thousand

18  dollars and they pay it minus the retainage, a hundred

19  thousand dollars of work has been put into those buildings;

20  correct?

21  A    Yes.

22  Q    That enhances their value; correct?

23  A    I guess, you could say that, yes.

24  Q    And when the whole project is actually done, in fact,

25  they have a value that because you're forced to sell them at a

Dunn - cross - Capozzolo                    1648

1  lower rate, that you actually get some subsidy related to

2  those sales to make up for the fact that the Government is

3  forcing you to sell them for less than they're really worth?

4  A    We get a developer's fee for the overall project, yes.

5  Q    I'm not talking about the developer's fee.

6           I am saying that when you sell these buildings at a

7  lower rate, HPD actually provided you with a subsidy so that

8  those prices could be buffered because you're selling them at

9  below-market rate.

10 A    Okay, yes.

11 Q    Correct?

12 A    Yes.

13 Q    And so my point is that with the work that goes into

14 these buildings, and the buildings, they're worth far in

15 excess of just the construct loan because the loan you're

16 guaranteeing is only for construction, it's not the value of

17 the properties?

18 A    Yes.

19 Q    So, if the banks foreclosed, you're really not at risk of

20 losing anything because the buildings are insured, they burn

21 down tomorrow, you get a big insurance check and you pay off

22 the loan.

23           If you got halfway through the project and it was a

24 million dollar contract and you put $500,000 of work into the

25 project and they foreclosed, they would take the properties

Dunn - cross - Capozzolo                                  1649

1   that were worth more than the 500,000.  You wouldn't lose any

2   money?

3   A    I don't think that's how it works, no.

4   Q    Okay.  But the buildings are worth a lot more than a

5   dollar, we agree on that; correct?

6   A    Yes.

7   Q    And that's, and the only money that you're getting, this

8   large $6 million dollars on Bed-Stuy, that was only for

9   construction; correct?

10  A    You mean our risk.

11  Q    The construction costs?

12  A    Yes, the construction cost.

13  Q    The large majority of the money that you are given when

14  this closes that you're promised under the contract for the

15  hard costs of construction?

16  A    Weaver soft costs, too.

17  Q    Some, but that's a much smaller percentage; correct?

18  A    Yeah, it is.

19  Q    I want to show you Government's Exhibit 2-T.

20       Now it's correct in your direct examination you

21  didn't discuss these recordings at all; correct?

22  A    Yes.

23  Q    I'm referring to the part on the screen clip A, on

24  page two of 2-T.  There's an exchange between you and George

25  Armstrong; correct?

Dunn - cross - Capozzolo                    1650

1   A     Yes.

2   Q     And in that, the beginning of that clip Mr. Armstrong

3   refers to my little brother, he's a little, he's a little, um,

4   scaredy-cat, you know.

5             Your understanding is that he was referring to

6   Anthony Armstrong; correct?

7   A     Yes.

8   Q     That's the Anthony Armstrong that testified at this

9   trial?

10  A     Yes.

11  Q     And is it correct that you made this statement, I just

12  bark, man, I don't be coming with no.  And then it's

13  unintelligible.

14            Was that your statement?

15  A     Part of it.

16  Q     Okay.  But are those words, is that correct, I just bark,

17  man?

18  A     Yeah, that was part of the statement.

19  Q     And that, that part of the statement refers to the

20  conversation you had with Anthony Armstrong, correct, about

21  the money that George owed you?

22            MR. EVANS:  Objection.

23            THE COURT:  Overruled.

24  A     Yes.

25  Q     Now I want to turn your attention to clip H on page 7.

Dunn - cross - Capozzolo                    1651

1       Your statement is, I was walking around with

2    soldiers for a month, aight?

3       Is that your statement?

4  A    Part of it.

5  Q    But those words are correct; correct?

6  A    Yes.

7  Q    You heard Anthony Armstrong testify; correct?

8  A    Yes.

9  Q    And he also mentioned soldiers, too; correct?

10      MR. EVANS:  Objection.

11      THE COURT:  Overruled.

12 A    He repeated what you said to him, yes.

13 Q    You used the word soldiers; correct?

14 A    That's a fragmented statement.  That's part of the whole

15 statement, yes.

16 Q    Okay.  And the statement by Mr. Armstrong, remember that,

17 that's what you hit my brother with, my son, he was also.

18      That's a reference and the line before that, George

19 Armstrong says, you was under pressure with your son, was

20 getting beat with some stuff, some cat.

21      Is that an accurate description if what you said on

22 the tape, that line?

23 A    Yes, I said that, but --

24 Q    I just want to know --

25 A    -- again, fragmented statements.

Dunn - cross - Capozzolo                1652

1    Q    I understand, but that's what you said; correct?

2    A    Part of what I said, yes.

3    Q    Okay.  Back to page one.  I'm sorry on page two, about

4    two thirds of the way down it reads, he got 15 grand from me

5    and about 25 grand (unintelligible).  He's trying to trick me

6    for 75, I was saying suck my dick under my breath because that

7    was piggish.

8              Correct, is that your statement?

9    A    Yes.

10   Q    I realize this isn't part of the conversation?

11   A    It was part of the conversation, but.

12   Q    Yes?

13   A    The truth of the matter was, I was trying to get paid

14   back from the bounced checks that George got in.  At this

15   point, dealing with him, I was just going along with the

16   conversations, which doesn't seem to be on his side of what he

17   was saying back to me.

18   Q    But in this part of the conversation, you're informing

19   George Armstrong that you had paid Wendell Walters a sum of

20   money; correct?

21   A    It wasn't accurate, I was just blowing smoke.

22   Q    Is it correct what you were saying, whether you are now

23   saying it's true or not, you're referring to paying Wendell

24   Walters money; correct?

25   A    Yes.

Dunn - cross - Capozzolo                    1653

1    Q    And, in fact, you say 75; correct?

2    A    I didn't say I paid him 75.  I said he was asking for.

3    Q    You refer to an amount of 75, that's what I mean.

4    A    Yes.

5    Q    When you're saying, I was saying suck my dick under my

6    breath, were you still overwhelmed at the thought that Wendell

7    Walters had asked you for money?

8                MR. EVANS:  Objection.

9                THE COURT:  Overruled.

10   A    That was two to three years, maybe longer, when that

11   occurred.

12   Q    You still hadn't reported it to DOI; had you?

13   A    Again, I didn't even recall that clause being in the

14   agreement.

15   Q    That's not my question?

16               THE COURT:  Mr. Dunn, listen to the question and

17   just answer the particular question that is asked.

18   Q    Did you report it to DOI then?

19   A    No, I did not.

20   Q    And this portion of the conversation I'm referring to

21   now, on the next page, in the middle of the paragraph you say,

22   Bob Starzecki walked away from 150 fucking large

23   (unintelligible) the remainder in my deal with him on my

24   neighborhood home.

25               Is that correct?

Dunn - cross - Capozzolo                    1654

1   A     Yes.

2   Q     And neighborhood home, haven't you, didn't you testify to

3   the jury that the amount of money that Bob owed you was from

4   the Lexington cluster?

5   A     Yes, it was.

6   Q     And isn't this referring to a deal you had with Bob

7   Starzecki on Bed-Stuy, which was a Neighborhood Home Project?

8   A     No.

9   Q     And this is actually a reference to your kickback that

10  you had demanded from Bob Starzecki?

11  A     I didn't ask or receive a kickback from Bob Starzecki.

12  Q     And, in fact, he had paid 300 -- approximately $300,000

13  kickback and he had stuck you for 150; correct?

14  A     No.  The balance was from money owed from the NEP and

15  other expenses in the SML that were transferred to him.

16  Q     Isn't it true that following that portion of the

17  conversation, George Armstrong and you had a specific

18  conversation as to which project this is tied to, either NEP

19  or Neighborhood Home and, in fact, you go out of your way to

20  say it's not the NEP, it's the Neighborhood Home Project?

21  A     Again, this is fragmented.  I am pretty sure that George

22  knew what I was talking about regarding the money that was

23  owed to me.

24  Q     Well, isn't it correct that George Armstrong said, you're

25  not talking about NEP.

Dunn - cross - Capozzolo                    1655

1          And you say, yeah, the NEP, yeah, the NEP the one,

2     you know, I only had one NEP.

3          Isn't that correct?

4     A    Yeah, I did make that statement, yes.

5     Q    And on the next page, is it correct you made the

6     statement, yo, pay me the rest of our money.

7          Whose money was it?

8     A    When we sold the Hancock Street cluster to George

9     Armstrong there was a developer's fee that he was required to

10    pay Hancock Street cluster and he still, he didn't -- he paid

11    half of it at the closing and he owed us, I can't remember the

12    amount, but it was more than or about half.

13    Q    The line above this is you talking about Bob using PVC on

14    the Neighborhood Homes project.  Isn't that next paragraph you

15    referring to Bob paying you the rest of our money?  And I'll

16    put it up just so you can re-read it.

17         George Armstrong says, you saying Bob used PVC on

18    that.

19         Your response, Bob used PVC on the Neighborhood Home

20    Project that we did.  We got that Bed-Stuy cluster.  We put

21    PVC in there.  Wayne called and then two-family home again.

22         George says, oh, okay.

23         Your next line is, yo, pay me the rest of our money.

24         Isn't that in reference to Bob Starzecki?

25    A    I don't think so, no.

Dunn - cross - Capozzolo                    1656

1   Q    Well, you're speaking to George Armstrong who is the

2   person who owes you the money and you're saying, yo, pay me

3   the rest of our money and you're saying it to George not Bob;

4   correct?

5   A    Forgive me.  I'm asking George to pay us the rest of the

6   development fee, yes.

7   Q    So, you don't believe that's a reference to Bob

8   Starzecki, the money he owes you?

9   A    I don't, I don't believe so and only because most of

10  these statements are fragmented.  The whole conversation's not

11  there.

12

13              (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

VB       OCR      CRR

1   BY MR. CAPOZZOLO:   (Continuing)

2   Q    On page four, there's a statement.  You said, Remind that

3   "N" word that the cash that he gave you is bought.  You let

4   that "N" word know now that he is fucking fronting on you

5   because, you know, "N" word, one thing I tell you only Steve

6   and you can know this.

7            That's you telling George Armstrong that only you

8   and him are talking about money you paid to Wendell Walters,

9   is that correct?

10  A    I don't recall because it's only part of what I said.

11  Q    And the next line where it says, That wine you got, you

12  had the stack in it that day.  You showed up in your fucking

13  BMW baby momma's car, all right?  Charcoal gray.  You on film,

14  "N" word.  I got cameras.  I keep cameras up.

15           That was you threatening Wendell Walters to George

16  Armstrong that you had him on tape, correct?

17  A    Yes, but I didn't have any cameras at my building.

18  Q    But you weren't so overwhelmed or afraid of Wendell

19  Walters to send a threat to Wendell Walters through Armstrong

20  that you had him on tape, right?

21  A    Again, two or three years removed from when it occurred,

22  I had time enough to accept all that was going wrong with even

23  doing a project.

24  Q    The surveillance photos that were introduced of you

25  meeting with Mr. Armstrong on June 17, 2011, do you recall

Dunn - cross - Capozzolo                    1658

1    seeing those?

2    A    Yes.

3    Q    Those were of you and Mr. Armstrong, correct?

4    A    Yes, that was me and Mr. Armstrong.

5    Q    I'd like to show you Government Exhibit 624 which is in

6    evidence.

7              (Exhibit published.)

8    Q    Is this the Miranda waiver form you signed?

9    A    Yes.

10   Q    And that took place on the day of your arrest on

11   October 5, 2011?

12   A    Yes.

13   Q    In the evening hours, correct?

14   A    Say that again, please?

15   Q    In the evening hours, like approximately 8:45 p.m.?

16   A    Yes.

17   Q    And did you have an opportunity to read this before

18   signing it?

19   A    Honestly, I do not recall.  I was going through a

20   diabetic episode from not having my medicine for 48 hours.

21   So, I recall the beginning hours asking for my attorney,

22   several, and I was denied that and at the very end of the

23   interview, they say I signed this but I was very befogged.

24   Q    You just went through your entire direct examination and

25   never talked about this, correct?

Dunn - cross - Capozzolo                    1659

1   A    Excuse me?

2   Q    You just went through your entire direct examination to

3   present your side of things and now you're bringing up that

4   you were in diabetic shock at the time you signed this?

5             MR. EVANS:  Objection.

6             THE COURT:  Overruled.

7   A    I was not asked these questions.

8   Q    That's what I'm saying.

9   A    You're the first person asking me.

10  Q    How long were you in the hospital after you suffered this

11  diabetic shock?

12  A    I was in jail and --

13  Q    For one night, correct?

14  A    Overnight.

15  Q    And then you were released in the morning?

16  A    I was allowed to call my son on the FBI agent's phone to

17  meet me on the side of the federal court and my son brought my

18  diabetes insulin and I got an injection minutes before I went

19  in front of the judge.

20  Q    Exactly.  And so you, you were saying you were in

21  diabetic shock at 9 o'clock at night and you were able to not,

22  you didn't go into a coma, you didn't go into any kind of

23  cardiac arrest, you didn't have any medical condition.  You

24  were able to go all the way until the next morning when your

25  son came and gave you the medication.  In fact, you were able

Dunn - cross - Capozzolo                    1660

1   to walk right out of the courthouse, weren't you?

2           MR. EVANS:  Objection.

3           THE COURT:  Overruled.

4   A    Not true.

5   Q    You walked right out of the courthouse that day, didn't

6   you?

7   A    That is because when we got to the jail that morning,

8   they fed me breakfast which I was able to get my sugar levels

9   up by eating fruit and other things that diabetics eat.

10  Q    So how many hours were you able -- like at what point had

11  you begun this diabetic condition, because you were rested in

12  the evening hours, correct?

13  A    I had just returned from a trip in Florida.  Because of

14  rushing to the airport, I did not medicate myself in the

15  morning so I decided when I would meet Mr. Armstrong in the

16  afternoon, as I always did when I met him, I would go into the

17  bathroom at Juniors, inject myself, and then we would have a

18  bite to eat.

19  Q    You actually had food in your car ready, didn't you?  You

20  had Chinese food, didn't you?

21  A    No.

22  Q    In fact, they gave you the Chinese food after, later that

23  evening, didn't they?

24  A    That is not the truth.

25  Q    And so at what point, what point were you so disabled by

1   this diabetic shock that you were no longer able to read words

2   written on a page?

3   A    I would say maybe an hour into it.  I pleaded for the

4   agent to go in my car.  I keep an insulin pen right in the arm

5   compartment.  It's standard with my pills.

6            Officer Richards instructed two of his agents to go

7   down and look at my car and came back upstairs and said they

8   didn't see anything.  They did not give me any food.  Go into

9   the jail, I was handcuffed, so it was impossible.

10  Q    Isn't it true that you actually engaged in a very lengthy

11  conversation, detailed conversation with Agent Richards?

12  A    You mean part of my statement?

13  Q    During the statement with the Detective after you signed

14  this document, didn't you engage him in a very lengthy

15  conversation about the underlying facts of this case?

16  A    I don't recall that.

17  Q    So you don't recall any of the conversation you had with

18  Agent Richards?

19  A    I recall some, yes.

20  Q    Do you remember saying, I bought a ticket to the show?

21  A    No.  Those were his words.

22            (Continued on next page.)

23

24

25

```
                        Side Bar                    1662
```

1   BY MR. CAPOZZOLO:

2   Q    Do you remember saying you didn't want to go down for the

3   two lawyers?

4               MR. EVANS:  Objection.

5               MR. SERCARZ:  Objection, Your Honor.

6               THE COURT:  Sustained.

7               MR. SERCARZ:  Move for a mistrial.

8               THE COURT:  The application is denied.

9               MR. SERCARZ:  May we approach?

10              THE COURT:  The jury is directed to disregard the

11  last question and answer.

12              (The following occurred at side bar.)

13              MR. SERCARZ:  I spent a lot of time in advance of

14  this cross-examination setting up the issue, waiting for the

15  appropriate time for a ruling.  The government knew it.

16  There's just no excuse for that, Your Honor.

17              MR. CAPOZZOLO:  I didn't get into the details of

18  what went on.

19              THE COURT:  This question never came out with

20  Agent Richards.  This question has never come up in the trial

21  up until now, so why you would ask a question about something

22  that, either it was redacted or you just chose not to ever

23  present it, but to ask the question now, I agree was entirely

24  inappropriate.  At the same time, I don't want a motion for a

25  mistrial made in front of a jury.  Just ask for side bar and

1   we'll address it, but I don't understand how this question

2   could have been asked.

3           MR. CAPOZZOLO:  Mr. Dunn asked to speak to the two

4   lawyers when he was arrested and made aware that they were

5   going to be arrested and that was his response.

6           I wasn't going to get into anything about the

7   details of the crime.  I was simply going to ask him did you

8   ask to speak to Mr. Freeman or Mr. Hymowitz when you were

9   arrested.

10          THE COURT:  No, that's not what the Q and A was.

11          MR. CAPOZZOLO:  That's what my next question was

12   going to be.

13          THE COURT:  But the question you just asked, as I

14   recall, came up, I'm not sure where it came up.

15          MR. CAPOZZOLO:  I think it was in the hearing.

16          THE COURT:  In the suppression hearing.

17          MR. EVANS:  In the suppression hearing.

18          THE COURT:  When Agent Richards, it wasn't part of

19   the 302, but he said he remembered something that Dunn said he

20   wasn't going to take the fall for the two lawyers, right?

21          MR. CAPOZZOLO:  Yes.

22          THE COURT:  And you never attempted to present that

23   to this jury, right, before and I assume you thought that that

24   would probably have been redacted just like we redacted the

25   Whitney documents.  Am I correct?

1664

1     MR. CAPOZZOLO:  I'll move on, but it was more to ask

2  the question that he asked to speak to the lawyers because he

3  knew it was about.

4     MR. SERCARZ:  May I propose this clearly now because

5  we're at the stage where the Court has to make a ruling on the

6  appropriate scope of impeachment.  Can I propose that we

7  excuse the jury for a few minutes and we have an opportunity

8  to flesh this out on the record and that the Court provide

9  clear guidance and instruction to the government as to the

10  parameters of proper impeachment going forward.

11     THE COURT:  Well, it makes sense to excuse the jury.

12     (Side bar ends.)

13     (Open court.)

14     THE COURT:  We will excuse the jury for a few

15  minutes, please.  Take a recess.

16     (Jury exits.)

17     THE CLERK:  The parties can be seated.

18     MR. DiCHIARA:  Judge, do you want us at the bench?

19     THE COURT:  Sure.  Why don't you come up here.

20     Mr. DiChiara, I think it was your turn.

21     MR. DiCHIARA:  Yes, Judge.  I want to add to

22  Mr. Sercarz's motion for mistrial because the problem with

23  what the government asked is that it can't be taken in

24  isolation.

25     We've just spent the whole afternoon of their

1   cross-examine with them showing document after document trying

2   to tie Mr. Dunn as wrongdoing to Hymowitz and Freeman by

3   showing them checks from Marcus Garvey going to them,

4   documents that show Hymowitz on bank accounts.

5         So it's not in a vacuum that they asked this

6   question.  They asked this question and they know that we've

7   written on this and that the Court was going to rule before we

8   did it.  It was deliberate and there is no way that a curative

9   instruction at this point could unring the bell that just

10  occurred.

11        THE COURT:  Well, first of all, it depends on

12  whether or not, in fact, after I hear from you I would allow

13  these types of questions about what he said to the agent.

14        MR. DiCHIARA:  Okay.

15        THE COURT:  So if I do allow it --

16        MR. DiCHIARA:  Maybe I am putting the cart before

17  the horse.

18        THE COURT:  Yes.  Let me just, if you can go back,

19  Charleane, to the question that was asked.

20        (Record read.)

21        MR. DiCHIARA:  Maybe you should ask the question

22  before that.

23        THE COURT:  Okay.  What was the question before?

24        (Record read.)

25        MR. EVANS:  Your Honor, since my client is on the

 1   stand, perhaps it would be best here if he waited in the

 2   witness room so that his testimony is not influenced by what

 3   he hears now.

 4              MR. CAPOZZOLO:  I won't ask about it, but I don't

 5   think we can exclude him.  I won't point out that he's been

 6   here for it.

 7              MR. EVANS:  Well, he excused himself to go to the

 8   restroom before we came here to talk.

 9              MR. CAPOZZOLO:  That's fine.  I don't want to --

10              THE COURT:  I don't think I agree.  The government

11   is correct that he is a witness, but he is also a defendant so

12   I don't think he can be excluded.  And the government is

13   saying they will not ask him --

14              MR. CAPOZZOLO:  No, I won't.

15              THE COURT:  -- about hearing our conversations.

16   Okay.

17              MR. SERCARZ:  Your Honor, as I indicated in the

18   letter that I gave to you on Friday, the controlling authority

19   here is United States versus Brown.  The Court has the

20   citation in my letter and it is to the effect that if the

21   witness denies having made the relevant portion of the

22   statement, there is no meaningful cross-examination that can

23   be conducted by defense counsel.

24              THE COURT:  All right.  At this point, the questions

25   Mr. Capozzolo asked him about the statement and he, my

1667

1    recollection is Mr. Dunn said I don't recall all of the

2    statement.  He didn't say he didn't recall any of it.  So at

3    this point, we don't know how much he will acknowledge and how

4    much he won't acknowledge.

5              MR. SERCARZ:  Well, I believe he said that he was

6    having a diabetic episode, that he was befogged and that he

7    recalls the events leading to his arrest and that he recalls

8    the events of the next day.

9              I would also point out, Your Honor, that in his

10   affidavit, his reply affidavit in support of the motion to

11   suppress, the witness states on the record, I'm trying to find

12   it.

13             MR. EVANS:  In the Court's --

14             MR. SERCARZ:  Just a minute.  I will try and lay my

15   hands on it but he says he has no recollection of what he said

16   during the conversation and he appears to be adhering to that.

17             There's just no basis for the government to go

18   through his statements with a line by line for the sake of

19   seeing if they can jog his recollection or prompt it and if

20   they're allowed to do so, they ought to be confined only to

21   the portion of the statement, and it is voluminous, which is

22   already in evidence through Agent Richards.

23             What the government did is they, they used a

24   subterfuge to go right around that, right around the statement

25   that is already in evidence which is about three pages long

1668

1   and went for a formulation that would demonstrate to the jury

2   in one question even without an answer that the statement was

3   longer and that it implicated the defendants Hymowitz and

4   Freeman which is why I moved for a mistrial.  There was no

5   basis for it.  It doesn't impeach anything that the witness

6   has said in the record thus far.  It was --

7           THE COURT:  What doesn't impeach?

8           MR. SERCARZ:  That question.

9           MR. EVANS:  That question.

10          MR. SERCARZ:  It is not proper impeachment.

11          The witness on direct examination denied having been

12  paid kickbacks by Mr. Starzecki.  It's fair game to see

13  whether he'll move off of that.  It may be fair game if he's

14  alone on trial to go through a prior statement that he gave

15  that is at odds to it, but given that we have three defendants

16  on trial, I thought we were laying ground rules and I thought

17  the ground rules were that without a trip up to the bench, the

18  government was not going to be allowed to suggest in any way,

19  shape or form to this jury that there was more to his

20  post-arrest statement than was admitted through

21  Agent Richards.  And all of that has been, pardon me, Your

22  Honor, shot to hell by the question that the government asked.

23          MR. EVANS:  More to the point, Your Honor, in the

24  issue, as to the issue of an inconsistency, this Court found

25  in its order as a result of the suppression hearing that on

1   May 20th, the trial transcript beginning at 15, when Mr. Dunn

2   was asked on direct examination whether in response to hearing

3   the questions or reading the document, he raised the name of

4   any lawyers, if that's the area of impeachment, the record

5   says that Agent Richards testified that yes, he did.

6           And how did that come about if you can describe it?

7           Answer:  When I read him the rights, he said I want

8   to talk to Lee Hymowitz, I believe.  I said that's not going

9   to do you any good because he's going to be arrested.

10          There is a statement in the record in the 20th of

11  May transcript that goes to the issue of whether or not he

12  asked for counsel or sought counsel.  If the government wants

13  to impeach him, that information is available and the Court's

14  already taken notice of it.

15          We went on for some length at the May 20th

16  suppression hearing about whether or not Mr. Dunn's invocation

17  of asking for Mr. Hymowitz or Mr. Freeman was an invocation as

18  to counsel.

19          THE COURT:  Right.  Anything else from the defense

20  before I hear from the government on this initial point?

21          Okay.  Mr. Capozzolo?

22          MR. CAPOZZOLO:  Yes, Judge.  The law says full and

23  fair cross-examination --

24          THE COURT:  Well, first, there's an issue here about

25  the proper procedure.  Everyone I believe in this courtroom

1    including you understood that before you would be permitted to

2    ask any questions about what Mr. Dunn may have said about the

3    other two defendants in statements prior to this trial, that

4    we were going to have a conference about it, a colloquy.  It

5    is the last thing I said on the record before we went to

6    lunch.

7              So, I do not understand how this question came up in

8    this fashion, especially because it's not even a question --

9    it's not especially because, but it's not even a question that

10   was in the unredacted statement but, rather, something that

11   was referred to by Agent Richards which the government has

12   never in this trial suggested that it was going to offer.

13             MR. CAPOZZOLO:  The defendant did not challenge the

14   invocation of rights waiver which obviously includes the

15   reference to attorneys.  There was a specific -- he's claiming

16   he was in a diabetic haze and couldn't understand what was

17   going on.  The thing that got past the waiver of rights, the

18   most significant conversation was the discussion about

19   attempting to speak to the two lawyers and my next question --

20             THE COURT:  I'm sure I don't -- could you say that

21   again?  The thing that got past --

22             MR. CAPOZZOLO:  In the rights waiver, the most

23   significant discussion that Agent Richards had with Stevenson

24   Dunn during the rights waiver was the fact that Dunn had asked

25   to speak to Hymowitz and Freeman and was told that they were

1   going to be arrested the next morning which prompted him to

2   reply with that statement, I brought it up because nothing in

3   the direct indicated the defendant was going to deny that he

4   had waived his rights and that's what he did and so I asked

5   the questions with the intent of seeing if he would recollect

6   that he had a specific conversation about Agent Richards.

7           My intent was not to go into details of transactions

8   or the other parts of the conversation that had been redacted

9   from the statement.  It was simply to bring out the fact that

10  he had had a conversation with Agent Richards about the

11  attorneys which he's now claiming he was in such a fog, he has

12  no recollection of these things.

13          THE COURT:  All right.  So putting -- okay.  Putting

14  this aside, then let's discuss what it is, if anything, that

15  the government actually wants to ask this witness that would,

16  from the prior statements he made, that would implicate

17  Hymowitz and Freeman.

18          Is it now your position that you don't intend to ask

19  him any questions about the unredacted statement?

20          MR. CAPOZZOLO:  Well, Judge --

21          THE COURT:  You might have saved all of us a lot of

22  energy had you told us that.

23          MR. CAPOZZOLO:  The law, the law indicates in <u>Brown</u>

24  and <u>Insana</u>, that if the defense is on the same page with each

25  other and they have a full and fair opportunity to cross

1672

1   Mr. Dunn --

2        THE COURT:  I just want to know what your position

3   is.

4        MR. CAPOZZOLO:  I think the law would allow it

5   because he's here and he can talk about it.

6        THE COURT:  But you just said -- okay.  I'm

7   confused.  I want a proffer from you as to what you want to

8   ask him because you said twice now, I think, that we weren't,

9   I wasn't trying to ask him any details about the transactions

10  with Hymowitz and Freeman, just I wanted to know about this

11  comment about the lawyers.

12       MR. CAPOZZOLO:  Just my intent of those initial

13  questions about the waiver, that's what, the topic I was on

14  with Mr. Dunn.

15       THE COURT:  All right.  And then your proffer, do

16  you have a proffer then with respect to other questions you

17  want to ask him?

18       Do you want to make use of the unredacted statement

19  with respect to Hymowitz and Freeman, is that your intention?

20       MR. CAPOZZOLO:  I believe I can, yes.

21       THE COURT:  Forget about whether you can.  I will

22  decide whether you can.  You are going to tell me what you

23  want to do.

24       MR. CAPOZZOLO:  Yes, Judge.

25       THE COURT:  What do you want to do?  That is your

1673

1    intention, what you want to do?

2              MR. CAPOZZOLO:  Yes.

3              THE COURT:  Okay.  So tell me what basis you think

4    you are entitled to do that, then I will hear from the defense

5    and then we will take a little recess.

6              MR. CAPOZZOLO:  Mr. Dunn has explicitly denied now

7    making an agreement with the lawyers to extract a kickback

8    from Mr. Starzecki.  In his statement, he admits doing that.

9              Mr. Dunn is here.  The lawyers can cross-examine

10   him.  He will deny the underlying facts.  There is full and

11   fair opportunity to cross Mr. Dunn and his defense is

12   absolutely mutual with the other defendants.  He has not put

13   the other defendants in a position where they are antagonistic

14   in their defenses and that in Brown and Insana, the deciding

15   issues was that they have a full and fair opportunity to cross

16   Mr. Dunn and that their defenses were in line.

17             THE COURT:  All right.  Do you agree that while

18   that, in your view, would take care of the Bruton issue,

19   nonetheless any prior statements do not come in for --

20             MR. CAPOZZOLO:  I agree.

21             THE COURT:  -- their truth --

22             MR. CAPOZZOLO:  Yes.

23             THE COURT:  -- as to Hymowitz and Freeman.

24             MR. CAPOZZOLO:  I agree.

25             THE COURT:  Okay.  So that in any event, under your

1674

1  theory, we would need a limiting instruction to the jury that

2  they may not consider anything that any statements that you

3  find that Mr. Dunn may have made as to Hymowitz and Freeman

4  for their truth.  They are offered solely to allow the

5  government to test the credibility of Mr. Dunn.

6          MR. CAPOZZOLO:  Correct.

7          THE COURT:  Is that --

8          MR. CAPOZZOLO:  Yes, Judge.

9          THE COURT:  Yes.

10         MR. SERCARZ:  Brown stands for the proposition that

11  the right of confrontation is resolved when the co-defendant

12  is present in court only when defense counsel have a full and

13  fair opportunity to confront and cross-examine.  In Brown, the

14  court, the Second Circuit ruled that that opportunity was

15  lacking when the witness denied having made the prior

16  statement that was going to be used for impeachment purposes.

17         I respectfully submit that it is the functional

18  equivalent of a denial that he made this statement.  For the

19  witness to say, I don't remember what I said because of my

20  diabetes and my lack of insulin, there's just nothing the

21  lawyer can do to cross-examine.

22         THE COURT:  Well, he didn't actually say that.  He

23  said I don't recall all of this statement.

24         MR. SERCARZ:  The government has a fair right and

25  opportunity to probe how much of those events the witness can

1675

1    remember and they don't have to bring in the offending

2    statement in order to do it.

3         It may be that they reached a point where Mr. Dunn

4    recants his earlier assertions about the insulin and the

5    diabetes and says, oh, yes, I remember, and at that point,

6    perhaps the Court would find that Mr. DiChiara and I would

7    have a sufficient opportunity to cross-examine in order to

8    allow in the unredacted version of this statement, but every

9    indication that we have received thus far is to the effect

10   that Mr. Dunn is going to deny any recollection of the

11   portions of the statement that implicate Mr. Hymowitz and

12   Mr. Freeman.

13        So, the predicate for allowing cross-examination,

14   impeachment with the unredacted statement is thus far lacking,

15   I respectfully submit.

16        Moreover, I went back and looked at this witness'

17   direct examination and when you're talking about what he is

18   ultimately being impeached on, he denied that he accepted

19   kickbacks from Mr. Starzecki.  That's the only statement that

20   ultimately is present to be impeached by all of this

21   testimony.

22        The Insana case is readily distinguishable because

23   in that case, the defendants had interlocking alibis and the

24   testimony of the co-defendant was I was elsewhere at the time

25   of the crime with the defendant.  Under those circumstance,

1676

1    there's an immediate benefit to the defendant.  The defenses

2    are inextricably intertwined and if the government does not

3    have a chance to impeach that statement, then the defendant

4    whose rights are being considered, derives an unintended

5    benefit.

6              Moreover, there is no way under those circumstances

7    to impeach the alibi defense of one defendant without

8    eviscerating the alibi defense of the other.  That's not the

9    case here and I took pains to set this out.

10             Mr. Dunn's defense to these charges is I was getting

11   money that was due and owing me for subcontracting work.  And

12   he asked at the end of his examination are Hymowitz and

13   Freeman entitled to any of this money from subcontracting work

14   and the answer was unequivocally no.

15             Mr. Hymowitz has been arguing throughout the trial,

16   intimated and indeed, obtained testimony from Mr. Starzecki

17   that would suggest that the money that went into the Hymowitz

18   and Freeman account was payment for non-HPD work.  The

19   government has a fair opportunity to attack those assertions

20   and they rise or fall independent of whether or not the money

21   that went to Marcus Garvey was kickback money or subcontractor

22   money.

23             So for the government to sit, to stand here and say

24   they're all in the same boat, they're all together, is a gross

25   oversimplification and an effort to paper over what it is that

1  distinguishes the Brown case, on the one hand, from the other

2  authorities that the government would like to cite.

3          THE COURT:  Well, let me ask you a question.

4          Isn't there, as in the O'Neill case, a common

5  defense here and hasn't Dunn testified favorably to his

6  co-defendants concerning the underlying facts?

7          MR. SERCARZ:  To the degree that Dunn has denied

8  receiving a kickback, the defendants derive a benefit from

9  that and there's no question about that, but I respectfully

10 submit that that's not sufficient.  It wasn't sufficient in

11 Brown where --

12         THE COURT:  Well, no.  In Brown, the court,

13 Judge Mansfield --

14         MR. SERCARZ:  Withdrawn.  There was only one

15 defendant on trial in Brown.

16         THE COURT:  Right.

17         MR. SERCARZ:  But the government may succeed in

18 convicting the defendants Hymowitz and Freeman if they can

19 demonstrate that the money that went into the Hymowitz and

20 Freeman account was kickback money, whether or not Dunn

21 prevails on his defense.  The same is true in reverse.

22         THE COURT:  Well, there may be different -- they may

23 each also have different defenses, but they are not at all

24 inconsistent and they are at least, in part, common.

25         Also, in the Brown case, it seems to me that that

1   decision depends on finding that the co-defendant's testimony

2   was not directly favorable to Bishop, the co-defendant.  Here,

3   of course, it is.  The testimony of Mr. Dunn is directly

4   favorable to Hymowitz and Freeman and he has set forth some

5   detail of how the development project worked and what

6   Freeman's role was and what Hymowitz's role was.

7          So I think that the government has a significant

8   argument here that if they are not permitted to cross-examine

9   him on those statements, based upon what he said previously,

10  that there, they are being improperly limited.

11         MR. SERCARZ:  Frankly, Your Honor, this is a

12  question of balancing and it's a question of limits.

13         I have moved for a severance.  Indeed, I renewed my

14  motion for a severance here because I submitted that the trial

15  of Dunn and the admission of evidence against Dunn alone would

16  ultimately deprive my client of a significant trial right, in

17  this case, the right of meaningful confrontation.  There is no

18  meaningful confrontation of a witness who's already given

19  every indication, and I respectfully submit will probably

20  continue to indicate that I can't answer questions regarding

21  the content of my statement because I was, quote, unquote,

22  from his direct testimony, "befogged" based on his insulin

23  condition.

24         So if the Court is going it deny the severance

25  motion, which I renew, and require us to sit through this

1679

1  trial and the Court knows when it does about the limits of any

2  effective cross-examination, the Court ought most respectfully

3  to weigh that in the balance and the government has not

4  explained why it is that they can't try and prompt a better

5  recollection by this witness of the events that took place

6  during his questioning by Agent Richards by focusing on those

7  portions of the statement that are already in evidence.

8          THE COURT:  All right.

9          MR. SERCARZ:  They have assiduously avoided

10  answering that question.  And I would respectfully submit that

11  in fairness to the two defendants that didn't make those

12  statements, the Court ought to require the government to do

13  that first.  Of course the government went right for the

14  portion that was damaging to the defendants Hymowitz and

15  Freeman and didn't even seek to draw out of the witness

16  whether he recalled more about the content of the statements.

17  He found it more expedient to elicit a statement indicating

18  that the statements incriminated the two defendants.

19          THE COURT:  Anybody else?

20          MR. DiCHIARA:  Judge, may I just add one little

21  thing.

22          I mean, the only thing that Mr. Dunn says that is of

23  benefit to us in his theory is that he didn't take a kickback.

24  That's tantamount of saying he's not guilty of accepting

25  kickbacks.

1680

1        His defense that he's chasing money that was

2    legitimately owed to him for these HPD projects have

3    absolutely nothing to do with the Hymowitz and Freeman

4    defense.

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1681

1        MR. DiCHIARA:  We are going to proffer evidence that
2   our defense has all to do with work that has to do with other
3   jobs, other jobs, and Mr. Starzecki gave us the basis of it in
4   his own testimony, by saying that Hymowitz showed him plans to
5   bid on that were unrelated to the HPD work.
6        Now, we do not have the same defense.  We do not.
7   Mr. Dunn's factual defense and our factual defenses are
8   entirely different.  The only thing that we agree that we have
9   in common, we're saying we're not guilty.
10        THE COURT:  All right.
11        Mr. Capozzolo.
12        MR. CAPOZZOLO:  They do have a full and fair
13   opportunity to cross, unlike Brown, where the defendant was
14   claiming that he couldn't even discuss the underlying facts.
15        Here, Mr. Dunn -- the government's proof is that
16   Mr. Starzecki has a specific conversation with Mr. Dunn about
17   negotiating this whole kickback, one kickback of $50,000,
18   which he denies now that occurs.  There's also testimony by
19   Mr. Starzecki that he had a conversation with Mr. Freeman
20   about this.  Mr. Dunn's testimony about his relationship with
21   Mr. -- I'm sorry, Mr. Dunn's testimony about his relationship
22   with Mr. Starzecki directly refutes the heart of the
23   government's allegation that this was a joint enterprise.
24   Mr. Dunn also rejects --
25        THE COURT:  I didn't follow that.

1682

1     MR. CAPOZZOLO:  The government's allegation is that
2  the three men were working together for a joint kickback, not
3  individual kickbacks to each person.
4     Mr. Dunn has said a couple of things, one that's not
5  true.  He also said Mr. Hymowitz was not a developer in the
6  project, which the government's proof demonstrates that he
7  was.  These are things that Mr. Dunn can directly discuss on
8  cross-examination by the defense, facts which will not be
9  favorable to the government's position.
10     Whether he claims lack of memory as to some of the
11  statements he made, that's one issue.  But the full and fair
12  cross-examination also applies to the underlying circumstances
13  of how the contracts were formed, what the understanding was
14  between him and Mr. Starzecki and all those things that
15  Mr. Dunn, I fully expect to deny, that he had any illicit
16  understanding with Mr. Starzecki.  All of that is favorable to
17  the defense.
18     MR. SERCARZ:  Your Honor, the answer to that is
19  simple.  Have Adam, ask him, whether or not he didn't admit
20  earlier that the money he took from Mr. Starzecki was bribe
21  money.  Have Adam, let him ask what the underlying
22  circumstances were for the bribe, and let him point to
23  anything within the four corners of the redacted statement
24  that suggests that he gave a detailed account of how he took
25  the money, why it is a kickback, how it relates to the work on

1683

1    the project.

2            The issue here is, why is it necessary for the

3    government to go into the small portions of this statement in

4    which he uses the royal "we" and said, We knew that we could

5    obtain a bribe from Mr. Starzecki.  We asked for a bribe from

6    Mr. Starzecki.

7            And the government, in describing what it is that

8    they feel they need to do with this witness, hasn't told you

9    why that becomes necessary, because it's not necessary in

10   order for them to obtain full and fair cross-examination of

11   this witness.  Even if it were helpful to the government at

12   the margins, the damage to our client is irreparable, because

13   it's going to put us in the middle of this in a way that is

14   inappropriate.

15           The Court is going to have to instruct the jury that

16   these statements apply only to the witness on the stand, and

17   if we get up and cross-examine and then we're confronted with

18   the, I don't remember exactly what I said, because I needed my

19   insulin, we have not had any fair cross-examination.

20           And I know I'm beating the dead horse here, but this

21   is why we were supposed to resolve this earlier.  This is why

22   this cross-examination should have proceeded in stages.  This

23   is why only with the imprimatur of the Court, after the

24   government had exhausted other available means, would the

25   Court reach the issue of what is full and fair

1684

1   cross-examination of this witness for the government, and

2   that's not what happened here.

3           THE COURT:  Did you want to say something?

4           MR. EVANS:  I do want to say that I don't believe

5   for three codefendants to enter equally responsive not guilty

6   pleas to conspiracy doesn't mean that they have a mutual

7   defense.  It was only Thursday of last week when cocounsel

8   were asking for a mistrial, because my interest in

9   understanding the opinion of the investigating agent ran

10  contrary to their interest.

11          We do not have the same factual bases, and I think

12  that an attempt to bring in a statement, but not for its

13  truth, means that the government will get a chance to bring in

14  some derogatory statement that Mr. Dunn may or may not have

15  made, that he has consistently said he didn't make, or didn't

16  recall making about the black guy and the Jewish lawyers.  And

17  this will be no different than showing us a tagged building on

18  Throop Avenue.  It will only be brought in for the purpose of

19  inflaming the jury and confusing the issue.

20          If the government has proof that these three

21  codefendants were engaged in a coconspiracy --

22          THE COURT:  Since the government has never proffered

23  that statement, it seems to me that that statement is just out

24  of this case.

25          I granted -- I sustained an objection to that, and I

1685

1    think it is far too late to raise this statement in particular

2    on cross-examination.  So, as far as I'm concerned, that was

3    out.  Agent Richard was on the stand, and he was asked what

4    the defendant Mr. Dunn said, and the issue never came up.

5               MR. SERCARZ:  Frankly, so that we're clear, your

6    Honor --

7               THE COURT:  As far as I'm concerned, the issue now

8    is only whether or not what's in the 302 that has been

9    redacted that is being used by the government on

10   cross-examination.

11              MR. SERCARZ:  Frankly, and so the issue is clear,

12   should the Court rule that those portions of the statement,

13   the statement, that implicate Mr. Hymowitz and Freeman can

14   come out, I would like to cross-examine Mr. Dunn about that

15   statement, and indeed, I may wish to recall Mr. Richards --

16   agent Richards, I should say, I apologize to him, Special

17   Agent Richards to elicit that statement.  Why?  Because that

18   may supply the witness Mr. Dunn's motive for having falsely

19   implicated my client, and that would be fair game, your Honor.

20              The reason that it's so objectionable to have done

21   it now is that, I respectfully submit, on a fair balancing of

22   the equities in this case, the whole subject of whether Mr.

23   Dunn said anything about Hymowitz and Freeman ought to have

24   been precluded.

25              But if you rule that it comes in, then, your Honor,

1686

1  I may need to go into that statement, for the reason that it

2  speaks to the motive --

3           THE COURT:  On bias?

4           MR. SERCARZ:  That's right.

5           MR. CAPOZZOLO:  We would expect to recall Agent

6  Richards to rebut Mr. Dunn's allegation anyway, so the Court

7  is aware.

8           THE COURT:  As to what is in the 302?

9           MR. CAPOZZOLO:  No.  Mr. Sercarz said he wanted to

10 call Agent Richards, and it's likely that we would call him as

11 a rebuttal witness.

12          THE COURT:  Let me ask this:  There's a very

13 interesting footnote in the Brown case.

14          Now, my questions are directed to the government,

15 and it talks about ---

16          MR. CAPOZZOLO:  The different categories?

17          THE COURT:  No.  It's talking about severance.

18          It says that had the government announced in advance

19 of trial its intention to introduce Brown's unredacted

20 confession, Bishop's counsel could have obtained a severance.

21          Now, in this case, I know the defense moved for a

22 severance.  They said there would be prejudicial spillover

23 from all the evidence presented against Mr. Dunn.  But my

24 recollection, which I'm confident is correct, is that no one,

25 not defense counsel, not government counsel, certainly not

1687

1  myself, ever said anything about the potential for the

2  unredacted statement coming in if, for example, Mr. Dunn

3  testified.

4           Now, I don't know whether sophisticated counsel

5  understood that that was a real possibility, or whether we all

6  neglected thinking about that possibility.  So, I'm not

7  faulting anyone for not presenting this issue.  As I say, I

8  can tell you with candor that I did not think about it in

9  making my decision on the severance motion.

10          First of all, I doubt that I ever contemplated that

11  Mr. Dunn would testify.  So, I just would like to know what

12  the government has to say about this comment by Judge

13  Mansfield in this footnote.

14          MR. EVANS:  Is that 7?

15          THE COURT:  Footnote 7.

16          MR. CAPOZZOLO:  Judge, if you feel that upon defense

17  motion that there would be a severance if we go into it, our

18  preference would be that there would not be a severance.  If

19  that's our choice, then we would choose not to go into it.

20          THE COURT:  All right.

21          Anything else on this issue before we take a short

22  recess?  No.  Okay.

23          So, Mr. Capozzolo, how much do you have left?

24          MR. CAPOZZOLO:  I have other things to do.  I can

25  stay off the topic.

1688

1           THE COURT:  I'm not sure.  Is there anything else?

2           MR. CAPOZZOLO:  There's some other documents that I

3    was going to go into.

4           THE COURT:  Are you suggesting I not make a ruling

5    now on the documents?

6           MR. CAPOZZOLO:  If you plan to stop at 4:30, I can

7    do everything else but that.

8           THE COURT:  But the documents?  I'm not sure I

9    understand.

10          MR. CAPOZZOLO:  I will not go into any discussion of

11   Mr. Dunn's statements about the lawyers.  I will do everything

12   else and stop.

13          MR. EVANS:  Are you going to go back into his

14   statement generally?

15          MR. CAPOZZOLO:  I would probably talk about some of

16   the statements that he made that are not redacted.

17          THE COURT:  Okay.  So, you think if we're talking

18   just about the redacted statements, you think you can finish

19   by 4:30?

20          MR. CAPOZZOLO:  Yes.  Those matters I could get to.

21          THE COURT:  All right.  Let me take a few minutes

22   and you take a few minutes, and we'll resume.

23          (Recess taken.)

24          (In open court; jury not present.)

25          THE COURT:  For now, we'll go forward with

1689

1    Mr. Capozzolo examining the witness, solely with regard to the

2    redacted statement, and then and if you wish to go further

3    than that, then we'll discuss that with me later.

4              MR. SERCARZ:  Your Honor, if my memory serves me,

5    before we left, the question was asked and the objection was

6    made and we were called to the sidebar.  We would like an

7    admonition to the jury that they are to disregard the

8    question -- I don't believe it was answered -- the question

9    stricken, and you instruct them to disregard.

10             THE COURT:  I thought I did that.  Maybe I didn't.

11             MR. SERCARZ:  If you did, I'm not asking that it be

12   done again.

13             THE COURT:  I don't know.  I can remind the jury

14   that the last question and answer were stricken.

15             MS. POSA:  Is there any way to read it back?

16             THE COURT:  I can just remind them.

17   STEVENSON DUNN, resumed.

18             (Jury present.)

19             THE CLERK:  Thank you.  Please be seated.

20             THE COURT:  All right.  Members of the jury, before

21   we continue, I just want to remind you that I struck from your

22   consideration and from the record the last question, and I

23   don't believe there was an answer, but the last question and

24   any answer, if there were one.  All right.

25             MR. CAPOZZOLO:  May I proceed?

1          THE COURT:  Yes.

2     CROSS-EXAMINATION (Continued)

3     BY MR. CAPOZZOLO:

4     Q    Mr. Dunn, do you recall telling the agent that you

5     threatened Armstrong on the telephone with him?

6     A    No, I do not remember telling him that.

7     Q    Do you remember telling Special Agent Richards that you

8     knew people in the Marcy project, and that you were angry at

9     Mr. Armstrong because he had bounced a $50,000 check to you?

10    A    Yes.

11    Q    Do you recall telling Special Agent Richards that it was

12    your intention to sell George Armstrong after-market goods

13    from Lowes and Home Depot, and that in connection to the

14    HPD-related project, the project named Hancock, that you

15    accepted more money than you were supposed to related to those

16    invoices for those appliances?

17    A    I do not recall that.

18    Q    You told Special Agent Richards that you in fact made a

19    cash payoff to Wendell Walters; correct?

20    A    Yes.

21    Q    You told Special Agent Richards that you had approached

22    Mr. Starzecki and asked him to hire you as a subcontractor on

23    the Myrtle Avenue project; correct?

24    A    No, I did not approach him.  He approached me.

25    Q    But you don't remember telling Special Agent Richards

Dunn - cross - Capozzolo                    1691

1    that you approached him?

2    A    No, I do not.

3    Q    Mr. Starzecki, by that time, had been an accomplished

4    subcontractor; correct?

5    A    Accomplished subcontractor?

6    Q    He had performed as a subcontractor and contractor on

7    other projects before working for you; correct?

8    A    I didn't know his history prior to him working for us.

9    Q    You had no discussion with Mr. Starzecki before he was

10   hired about what other projects he worked on?

11   A    Can you repeat that?

12   Q    You had no discussion with Mr. Starzecki about what other

13   projects he had worked on?

14   A    No, I did not.

15   Q    You weren't familiar with the fact that he had done

16   interior carpentry himself?

17   A    No.

18   Q    You don't recall telling Special Agent Richards that you

19   explained that SML selected Starzecki again as its general

20   contractor, because Starzecki is a good contractor?

21   A    No, we didn't choose him.  It was a bid.

22   Q    And you didn't tell Special Agent Richards that Starzecki

23   agreed to make kickbacks payments to Dunn on the neighborhood

24   HPD project?

25   A    No.

Dunn - cross - Capozzolo                    1692

1  Q    You didn't tell Agent Richards that Starzecki had paid

2  you 75,000 in kickback payments disguised by fake invoices for

3  334 Marcus Garvey Corp.?

4  A    No.

5  Q    I would like to show you what's in evidence as

6  Government's Exhibit 420-A. Do you recognize this kind of

7  document?

8  A    Yes.

9  Q    That's an individual disclosure statement; correct?

10  A    Yes.

11  Q    This statement is provided to HPD as part of your

12  qualifications to work on HPD-related projects; correct?

13  A    Yes.

14  Q    And this one, and the top of the page indicates that it's

15  related to the Hancock Street SML, LLC?

16  A    Yes.

17  Q    That's the corporate entity that was created for the

18  Hancock project; correct?

19  A    Yes.

20  Q    At the bottom of the first page, it indicates that

21  a "related company."  That means any entity identified in

22  response to Question 2; correct?

23  A    Yes, that's what it reads.

24  Q    Going down to page 2, it says:  "During the past three

25  years, have you or any immediate family member been an officer

Dunn - cross - Capozzolo                1693

1    or principal of, or otherwise owned, managed or controlled or

2    had any interest in, any other companies or entities?"

3              And you indicated "Yes"; correct?

4    A    Yes.

5    Q    And one of those companies would be 334 Marcus Garvey

6    Corp., wouldn't it?

7    A    One of them, yes.

8    Q    I want to direct your attention to on the next page,

9    paragraph four.  There's a question:  "E. Do you or will you

10   or any related company receive, directly or indirectly, any

11   form of payment, income, revenue, compensation or remuneration

12   or anything else of value from any other entity or person with

13   which you will conduct business in connection with this

14   project?"

15             And your answer is "No"; is that correct?

16   A    That's the answer that's checked, yes.

17   Q    That's not correct, with regard to Hancock; right, you

18   took payments?

19   A    Actually, this form was filled out by my attorney, not by

20   me, and I did not share any business separate and outside of

21   what we were doing with them.

22   Q    But this is a document you signed; correct?

23   A    Yes, I did.

24   Q    That statement is not true; correct?

25   A    That I signed it?  I did sign it.

Dunn - cross - Capozzolo                    1694

1   Q     Yes.  This statement, E, is not correct?

2   A     Well, at the time, he didn't know that I was planning on

3   selling goods.  I did that after we closed the project.

4   Q     Are you saying you didn't know 334 Marcus Garvey Corp.

5   would be getting payments at the time you signed this?

6   A     I -- again, this was filled out by my attorney.  What my

7   plans were to sell appliances, which was through my other

8   business, Closeout King, I don't think I even shared it with

9   them.

10  Q     You read this before you signed it, didn't you?

11  A     It was put in front of me, I did sign it, and I may not

12  have read every caption.  I trusted Lee as the attorney on

13  what he put in front of me.

14  Q     So, he put it in front of you, and you didn't have a

15  discussion about its contents?

16  A     Again, my role in the development, I did mostly the field

17  work.  I did trust my attorney.  Most of the documents, we

18  glanced through.  It's possible that I missed that.

19  Q     And on page eleven of this document, part F, "Related

20  companies."  Where it says "Related company name," it

21  says "See appendix for list of companies"; correct?

22  A     Yes.

23  Q     And on related company organization chart on page 13, it

24  says all listed companies are the same, Michael Freeman,

25  Stevenson Dunn as owners; correct?

Dunn - cross - Capozzolo                    1695

1    A    Yes.

2    Q    And Michael Freeman was not a part owner of 334 Marcus

3    Garvey; correct?

4    A    No.

5    Q    And on page 14, this is the certification you signed;

6    correct?

7    A    Yes.

8    Q    It says "I certify that the information set forth in or

9    attached to this individual disclosure statement is true and

10   correct to the best of my knowledge and belief.  I am aware

11   that the City of New York is relying upon all of information

12   set forth in or attached to this statement, and that this

13   statement is submitted to induce the City of New York to

14   approve this project."

15        Correct?

16   A    Yes.

17   Q    And this is the thing you signed without reading;

18   correct?

19   A    Can you please scroll it up a little bit, so I can see

20   the bottom of it, please?

21   Q    The bottom?

22   A    Yes.

23   Q    And it's notarized by Mr. Hymowitz; correct?

24   A    Yes.

25   Q    That's October 6, 2006?

1    A    Yes.

2    Q    And then on the following page, in response to

3    Question 2, for related companies, six, there's a list of

4    corporations here:   Lexington Avenue, LLP, SML.   Lexington

5    Avenue Development, LLC.   SML Bed/Stuy Development, LLC.   And

6    SML Bed/Stuy Development, LLC.

7         Correct.

8    A    Yes.

9    Q    Not on that list is 334 Marcus Garvey Corporation;

10   correct?

11   A    No, it's not.

12   Q    And by leaving that out of that form, the government

13   would not be aware that you getting payments for 334 Marcus

14   Garvey, they would not be aware of it; correct?

15   A    Yes.

16   Q    And when you do the requisitions, when you say, I want

17   payment because all of this work has been completed, you don't

18   submit the invoices of 334 Marcus Garvey Corp. to let the

19   government know what subcontractors are getting paid; correct?

20   A    Can you rephrase that question?

21   Q    In the requisition for payment, the very long documents,

22   for example, on Bed/Stuy, where it says "The certification,"

23   and then it has the initial breakdown of the whole project,

24   and then it goes building by building on those requisitions,

25   no invoices are attached to those documents; isn't that

Dunn - cross - Capozzolo                    1697

1    correct?

2    A    You mean invoices from 334?

3    Q    Yes.

4    A    It wouldn't be.  The requisition is designed to pay the

5    contractor.  Then the contractor is allowed to buy materials

6    and supplies from whomever they choose.

7    Q    Exactly.  And so anyone from HPD, looking at this

8    document and the requisitions, would have no idea that you're

9    getting money from the general contractor as the

10   subcontractor?

11   A    No.

12   Q    It would also be a good way to hide a kickback, wouldn't

13   it?

14   A    I wouldn't know.

15   Q    Let me show you one other document in evidence,

16   Government's Exhibit 422-E in evidence.

17            MR. EVANS:  Did we stipulate to this?

18            MR. CAPOZZOLO:  Yes.

19   Q    Is it correct that this is an affidavit of no change

20   which relates to the individual disclosure statement?

21   A    Yes.

22   Q    And this one is signed by you on June 11, 2007?

23   A    Yes.

24   Q    And it indicates, with respect to Hancock Street, SML,

25   LLC, it indicates that there's no change with the previously

Dunn - cross - Capozzolo                    1698

1    submitted disclosure form; correct?

2    A    Yes.

3    Q    And this one is dated on the date of the closing;

4    correct, June 11, 2007?

5    A    Yes.

6    Q    Had you at that point learned that 334 Marcus Garvey

7    Corporation was receiving money from the construction hard

8    costs of the Hancock project?

9    A    I don't recall, no.

10   Q    I want to show you Government's Exhibit 422-G in

11   evidence.  This is another affidavit of no change; correct?

12   A    Yes.

13   Q    Hancock Street, SML, LLC; correct?

14   A    Yes.

15   Q    This one is dated March 15, 2010; correct?

16   A    Yes.

17   Q    Signed by you?

18   A    Yes.

19   Q    In fact, on the first page, there's a fax coversheet

20   signed by you; correct?

21   A    Yes.

22   Q    This one was not prepared by Mr. Hymowitz, was it?

23   A    No, it was not.

24   Q    This one, it also says there's no change; correct?

25   A    Yes.

Dunn - cross - Capozzolo                    1699

1  Q    By this time, 334 Marcus Garvey Corporation had received

2  a number of payments out of the Hancock cluster; correct?

3  A    Can you move up to the top of the page, please?

4  Q    Sure.

5  A    I was looking for the date that it was signed.

6  Q    I'll go down to the bottom.  All right?

7  A    Yes.

8  Q    March 15, 2010?

9  A    Yes.

10 Q    That's in fact very close to the time in which the

11 project was transferred to George Armstrong; correct?

12 A    Yes.

13 Q    With regard to this statement, the other individual

14 entity disclosure statements, and with regard to your -- with

15 regard to the contract, you also didn't disclose Closeout King

16 in any of these disclosure forms; correct?

17 A    No, I did not.

18 Q    Now, I'm going to show you what's in evidence as

19 Government's Exhibit 617, an e-mail dated June 21, 2010.  Do

20 you recall this being introduced earlier into court?

21 A    Yes.

22 Q    And this is an e-mail conversation between you and

23 Wendell Walters; correct?

24 A    Yes.

25 Q    And is it correct that this conversation is directly

1  related to the dispute you were having with George Armstrong

2  related to the $50,000 check?

3  A    Yes.

4  Q    And Wendell makes the statement "Why were you bringing me

5  into this in the first place?  This is between you and him.

6  To call me and tell me this is crazy"?

7  A    Yes, I recall that response, yes.

8  Q    And your response is "I'd rather not say over this

9  medium"; correct?

10  A    Yes.

11  Q    So, you did not want to discuss the details of the George

12  Armstrong's dispute over e-mail; correct?

13  A    Yes.

14  Q    And that was an e-mail to Wendell Walters's work e-mail;

15  correct?

16  A    Yes.

17  Q    I show you Government's Exhibit 616.  This is an e-mail

18  dated June 1, 2008?

19  A    Yes.

20  Q    And this is about a reimbursement of money for one of the

21  SML projects; correct?

22  A    Yes.

23  Q    Your first line says "Both my partners and I have been

24  informed that the closing for our former cluster is 6/19 at

25  the Enterprise office."

1              That relates to the Bed/Stuy cluster, does it not.

2    A    No, it does not.

3    Q    Which cluster does it relate to?

4    A    The Grove Street cluster.

5    Q    What tells you that it's the Grove Street cluster?

6    A    The subject matter.  We were discussing them reimbursing

7    us for our relocation, repairs, legal fees for the

8    landlord/tenant, and other expenses that may have been from

9    Hymowitz and Freeman.

10   Q    So why was it closing?

11   A    Because we decided to give that -- give back that

12   project, because the market was going bad.  So, HPD assigned

13   Cheryl Ighodaro to take over the cluster.  We had a closing

14   where Cheryl Ighodaro was instructed through this e-mail,

15   approved by Ms. Sheffer, who took Wendell Walters's place,

16   that approved the reimbursements for the previously sent

17   invoices.

18              (Continued on next page.)

19

20

21

22

23

24

25

Dunn - cross - Capozzolo                    1702

1    (CONTINUING)

2    Q    So, is it true, then, according to you within June of

3    2008 and then November 2008 you got off two projects?

4    A    Yeah, it was by design.

5    Q    For different reasons; correct?

6    A    Well, a month in, me and Michael we decided that because

7    of not getting our reimbursements and the history of not being

8    treated too well, and primarily the downfall of real estate

9    and being able to sell houses that were extremely expensive,

10   and at the price as set by HPD at that time, we felt as long

11   as we can get out from under the personal guarantee that was

12   really the primary reason why we got out.

13   Q    And so, Cheryl Ighodaro took over both projects?

14   A    Yes, she did.

15   Q    And in this E-mail you say both my partners.

16        Who are you referring to?

17   A    That's more of a Freudian slip.  It meant just me and

18   Mike.

19   Q    I agree.

20   A    Just with that.

21   Q    Okay.

22   A    That's all.  That had nothing to do with, just Michael.

23   Me and my partner.  Me and my partner.

24   Q    It doesn't refer to you, Mr. Freeman and Mr. Hymowitz?

25   A    No.

VB        OCR        CRR

Dunn - cross - Capozzolo                1703

1  Q    You claim that when Hancock closed the second time and

2  George Armstrong took over the project that he was supposed to

3  pay you the money this money and one of the checks bounced?

4  A    We had an agreement at the closing that he would pay me

5  part of what he owed me and he would pay me the rest at a

6  later point in time.

7  Q    And I assume it's correct that you're the same for the

8  same reason you claim you couldn't set off the money that

9  Starzecki owed you, you chose not to set off the final

10 requisitions against what George Armstrong owed you?

11 A    I don't quite understand your question.

12 Q    The Hancock project, you were at the second to last

13 requisition when this closing happened; isn't that correct?

14 A    I remember that we had no more requisitions once we

15 decided to sell the cluster to George Armstrong.

16 Q    Are you aware that George Armstrong signed the last

17 requisition?

18 A    You mean the last requisition that --

19 Q    Hancock?

20 A    -- that me an my partner Mike had obligations to?

21 Q    No, I'm sorry.  George Armstrong's signed the last

22 requisition on the Hancock project, the last one submitted

23 that got to the total contract price was signed by George

24 Armstrong as developer?

25 A    We had, by then, sold him the development project.

VB      OCR      CRR

Dunn - cross - Capozzolo                    1704

1   Q    Exactly.  And before that, there were requisitions where

2   Hancock SML, which at that time you were controlling before

3   the closing, there was money coming to you on these

4   requisitions that you then would have sent to George Armstrong

5   as the general contractor; correct?

6   A    We would have had to do a last requisition and George,

7   whatever the draw was, he would get, yes.

8   Q    And my point is, is for the same reasons you said you

9   couldn't hold back the money from Bob Starzecki, you didn't

10  hold back any money in that last requisition you signed

11  because you're claiming you didn't have the authority to do

12  that?

13  A    Yeah, exactly.

14  Q    At the closing, was there any documents at all at the

15  closing documenting this money that George Armstrong was

16  supposed to pay you?

17  A    What appeared on the cut sheet, which is a bank statement

18  at closing detailing what banks disburse, I believe that our

19  developer's fee, the portion that he was funding was on that.

20  Q    Well, the agreement on the contracts was that you and

21  your partner were supposed to receive $120,000 to get bought

22  out; correct?

23  A    Yes.

24  Q    That 120,000 did not include the $50,000 check that

25  bounced by George Armstrong; correct?

VB        OCR        CRR

Dunn - cross - Capozzolo                                    1705

1   A    It didn't include any cost he might have had to vendors

2   outside of the cluster.

3   Q    Any vendors he had outside the cluster would have been

4   dealt with in the requisitions; correct?

5   A    No.

6   Q    The appliances that he would be paying for the Hancock

7   cluster?

8   A    That's a separate bill.  That's not anything that the

9   bank forwarded him.

10  Q    Those are not hard costs?  The appliances and the

11  furnishings?

12  A    No, basically they're not -- they're not costs that are

13  part of the budget that's part of the program.  These are

14  costs like buying a box of nails.  The vendor would not put

15  that on a, in a closing.  He would, you know, take care of

16  what he owed out of the proceeds.

17  Q    You agree with that, that the Hancock cluster closing

18  where George Armstrong took over was delayed so that you could

19  close on several properties; correct?

20       Or was that Bed-Stuy, excuse me.  Bed-Stuy was

21  delayed several times so some properties could close; is that

22  correct?

23  A    No.

24  Q    Do you recall Daniel Magidson testifying that the closing

25  for Bed-Stuy, the transfer to Cheryl Ighodaro, was delayed

1  several times so that you guys would close on some of the

2  properties that were being sold to buyers?

3  A    I recall him saying that, I recall it not being accurate,

4  though.

5  Q    Okay.  So you disagree with that?

6  A    I do.

7  Q    Okay.  In this case do you have in your possession any

8  documents that there was some agreement over legitimate

9  expenses that George Armstrong was paying you this $50,000?

10  A    Not with me today, no.

11  Q    How is the $120,000 paid at the closing?  What type of

12  instrument was used?

13  A    I can't recall.  You mean the development fee?

14  Q    No, no, no.  The $120,000 that George Armstrong was

15  paying out to you as a buyout to get out of the project.

16  A    That was our -- that was the buyout.  That wasn't a

17  developer fee, it was a buyout.

18  Q    Paid by bank check; correct?

19  A    Yes.

20  Q    Like most closings are, the money is done in bank checks

21  so that the closing goes forward without the risk that someone

22  is not going to get paid; correct?

23  A    Yes.

24  Q    And this money that George Armstrong owed you on the

25  $50,000, that was still an outstanding issue with you and him;

Dunn - cross - Capozzolo                       1707

1  correct?

2  A     Yes.

3           MR. CAPOZZOLO:  I believe that's the last of the

4  area.  I can stop, as we discussed.

5           THE COURT:  All right.

6           Members of the Jury, I'm going to ask you to leave

7  for the evening.  Have a good evening, hopefully we will not

8  have the delay that we had this morning.

9           So I ask you once again to be prompt and we'll start

10  at 10:00 in the morning.

11           Thank you very much and have a good night.  Remember

12  not to discuss this case.

13           THE COURTROOM DEPUTY:  All rise.

14           (Jury exits.)

15           (In open court; outside the presence of the jury.)

16           THE COURT:  All right, Counsel, let's see where we

17  are.

18           First of all, my law clerk will be providing you

19  with copies of the draft charge tonight, so please wait until

20  she has the copies for you.  So, then if we finish tomorrow,

21  we can have our final charge conference or close to final

22  charge conference tomorrow afternoon.  Hopefully, we'll be

23  able to do that.

24           And Defense, you were going to tell me about your

25  position with regard to forfeiture.

VB        OCR        CRR

Dunn - cross - Capozzolo                    1708

1          MR. SERCARZ:  We did not forget, Your Honor.  I

2    believe that all of us are in agreement that we will not be

3    seeking a jury trial on the forfeiture issues.

4          THE COURT:  May I hear that from everyone, please.

5          MR. DiCHIARA:  Agreed, Your Honor.

6          MR. EVANS:  Your Honor, that's correct.

7          THE COURT:  Okay.  Thank you.

8          So, let me just ask whether there is anything more

9    that you want to say.

10         Mr. Capozzolo are you finished except for the

11   possibility that if I allowed it, you would ask about the

12   unredacted portions or have you decided?

13         MR. CAPOZZOLO:  I might have two or three other

14   questions, but that's it.

15         THE COURT:  You are pursuing your request to be able

16   to ask those questions or not?

17         You're not?

18         MR. CAPOZZOLO:  I mean, quite frankly, Judge, if you

19   were predisposed toward granting severance, then my answer is

20   clearly not.  If you're not predisposed toward granting

21   severance, I think the law would allow it.

22         It would be like, two questions and I would move on.

23         THE COURT:  All right, let me hear the two

24   questions.

25         MR. CAPOZZOLO:  I mean, it would just be, I would

Dunn - cross - Capozzolo                    1709

1    essentially just read, there's a line about Stevenson Dunn

2    negotiating the kickback with the two lawyers and I think

3    there's one other sentence in that statement that's... I don't

4    think I have the unredacted one, I apologize.

5           The one line is, during this time period of the

6    kickback payments Dunn along with Lee Hymowitz and Michael

7    Freeman were the Hancock developers and Armstrong was a

8    contract developer under his company name Metropolis

9    Development Corporation MDC.  Did you know Hymowitz and

10   Freeman operated SML Development, SML, which was the entity

11   they used to develop the Hancock project.

12          MR. EVANS:  Is that on the top of page two?

13          MR. CAPOZZOLO:  Page two; correct.

14          And then the second question would be, you know,

15   whether he stated it was Dunn, Hymowitz and Freeman who had

16   collectively negotiated the $300,000 kickback payment from

17   Starzecki in connection with this project.

18          MR. EVANS:  Where is that, Counsel?

19          MR. CAPOZZOLO:  I'm sorry, that's on page three and

20   it's in the large paragraph in the middle, it's about the

21   second to last sentence, third to last sentence.

22

23          (Continued on following page.)

24

25

1710

1        THE COURT:  All right.  Is there anything else that

2   anyone would like to address on this subject?

3        You said you have a couple of other questions for

4   tomorrow, Mr. Capozzolo?

5        MR. CAPOZZOLO:  Yes, just very -- there might be one

6   or two questions.

7        MR. SERCARZ:  Your Honor, I have one observation.

8        THE COURT:  Yes.

9        MR. SERCARZ:  You've heard from me at great length.

10       THE COURT:  I'm sorry?

11       MR. SERCARZ:  You've heard from me at great length

12   and this is going to be it.

13       THE COURT:  Okay.

14       MR. SERCARZ:  I think it's worthy of note that the

15   government's witness, Mr. Starzecki, says that he negotiated

16   this kickback with John Mallone.

17       The government seeks to impeach this witness with

18   regard to two statements that would suggest that all three of

19   them negotiated the kickback, thereby putting the lie to what

20   Mr. Starzecki himself had said and I think it's fair to ask

21   the question what is it that they're really seeking to

22   accomplish here.  These statements are clearly inadmissible

23   against Mr. Hymowitz and Mr. Freeman, clearly.

24       The government suggests that they need this

25   additional two questions, just two, to be able to fully

CMH        OCR        RMR        CRR        FCRR

1711

1    confront this witness and I think it's fair to ask whether the

2    real motive isn't just to throw dirt at Hymowitz and Freeman

3    in a manner that is inadmissible.

4              That's all I have to add.

5              MR. CAPOZZOLO:  My only response is many of the

6    charges in this case are a conspiracy.  Mr. Dunn has

7    repeatedly indicated that he has not conspired with

8    Mr. Hymowitz or Mr. Freeman to conduct any of the criminal

9    acts in this case and so, therefore, I think it goes right to

10   the heart of many of the charges in the case.

11             The only reason I limited it too is to try to do

12   some balancing because I'm sure if I said I want to ask 60

13   questions about it which I could, they would really be

14   screaming that there would be prejudice, so I have censored

15   myself to limit the questions for that very reason.

16             THE COURT:  All right.  Anything else then?

17             All right.  Anything else that we should address

18   tonight before tomorrow?

19             Okay.  And tomorrow, do we know who the witnesses

20   will be tomorrow?  Because I assume, Mr. Evans, there's not

21   going to be that much cross or redirect.

22             MR. EVANS:  There will be some redirect.

23             THE COURT:  Okay.

24             MR. EVANS:  But the final two witnesses for Mr. Dunn

25   are both brief and one of them is a City official, I've

1  informed the U.S. Attorney of this, who was on our list,

2  Ann Marie Hendrickson from HPD and the other is from the

3  architect firm, Hugo Stobotowsky (phonetic) --

4          MR. SERCARZ:  Subotovsky.

5          MR. EVANS:  Subotovsky, and it will be a very brief

6  direct as to the requisition and payment process.

7          MR. CAPOZZOLO:  Judge, I want to make you aware of

8  one thing.  I talked about this with Mr. Evans.

9          There was a proffer as to whether or not Mr. Dunn

10 had provided some benefit to Ms. Hendrickson in the past.

11 Because I now know they're going to call her, I'm likely, and

12 I've already discussed this with Mr. Evans, I'm just letting

13 you know because it would be an unusual question, is that

14 whether or not Mr. Dunn has provided her any benefit in the

15 past.

16         I believe there will be some acknowledgment of that

17 so that if she testifies later, I may also repeat the

18 question, but Mr. Evans and I have already discussed it and he

19 has no objection to me asking the question.  I just want to

20 make you aware because it might grab your attention when I ask

21 it.

22         THE COURT:  Okay.  And then Mr. Sercarz.

23         MR. SERCARZ:  Your Honor, I have three character

24 witnesses, one of whom was here most of the afternoon, is not

25 available tomorrow, likely to be available only on Wednesday

1    morning.  I have alerted the government there's a likelihood

2    that Mr. Hymowitz will testify.

3              THE COURT:  Anything else?

4              Mr. DiChiara?

5              MR. DiCHIARA:  Judge, there's a possibility that my

6    client will testify as well as possible character witnesses

7    but we'll see how Mr. Hymowitz testifies.

8              THE COURT:  All right.  Okay.  Then have a good

9    night.  We'll see you in the morning.

10             MR. EVANS:  Thank you, Your Honor.

11             (Matter adjourned to March 25, 2014 at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDENT

1714

# <u>I N D E X</u>

<u>WITNESS</u>                                              <u>PAGE</u>


**STEVENSON    DUNN**                                    1559

     DIRECT EXAMINATION (Continued)

     BY MR. EVANS                                    1559

     CROSS-EXAMINATION

     BY MR. CAPOZZOLO                                1610

# <u>E X H I B I T S</u>

  Government's Exhibit 639                            1639

Case 1:11-cr-00683-NG   Document 275   Filed 07/25/14   Page 168 of 192 PageID #: 1563
All Word // USA v Stevenson Dunn, et al.

1

## $

**$120,000** [3] - 1704:21, 1706:11, 1706:14
**$137,000** [3] - 1601:13, 1601:18, 1601:24
**$165,000** [1] - 1568:10
**$17,000** [2] - 1603:3, 1603:5
**$2,970,000** [1] - 1614:22
**$20** [2] - 1560:21, 1560:23
**$20,000** [1] - 1603:2
**$239,000** [3] - 1567:6, 1567:7, 1567:24
**$300,000** [4] - 1569:15, 1575:8, 1654:12, 1709:16
**$350,000** [1] - 1586:16
**$4,800** [1] - 1639:20
**$47,000** [1] - 1602:22
**$50,000** [9] - 1602:1, 1602:3, 1606:9, 1681:17, 1690:9, 1700:2, 1704:24, 1706:9, 1706:25
**$500,000** [7] - 1591:19, 1591:21, 1591:23, 1592:12, 1614:19, 1623:11, 1648:24
**$60,000** [2] - 1587:21, 1587:23
**$70,000** [2] - 1568:6, 1568:7
**$75,000** [6] - 1594:18, 1594:19, 1594:22, 1595:14, 1596:1, 1626:18
**$90,000** [2] - 1587:16, 1587:17

## 1

**1** [1] - 1700:18
**10011-8002** [1] - 1577:8
**101** [1] - 1615:25
**108-C** [3] - 1582:19, 1583:5, 1583:12
**109** [1] - 1616:16
**109C** [2] - 1618:23, 1618:24
**10:00** [1] - 1707:10
**10:30** [1] - 1550:6
**11** [4] - 1613:23, 1625:7, 1697:22, 1698:4
**11-CR-00683(NG** [1] - 1548:3
**11201** [2] - 1548:15, 1548:24
**11205** [1] - 1577:6
**11th** [1] - 1641:17
**12** [2] - 1575:13, 1577:21
**120,000** [1] - 1704:24
**121** [1] - 1560:3
**13** [1] - 1694:23
**137** [1] - 1601:9
**14** [3] - 1575:13, 1577:21, 1695:5
**140,000** [1] - 1601:9
**1475** [1] - 1640:10
**15** [4] - 1652:4, 1669:1, 1698:15, 1699:8
**150** [2] - 1653:22, 1654:13
**1521** [1] - 1577:23
**1559** [2] - 1714:6, 1714:8
**1610** [1] - 1714:10
**1639** [1] - 1714:18
**17** [1] - 1657:25
**18** [1] - 1624:18

**19,000** [1] - 1602:2
**1930** [1] - 1639:20
**1954** [1] - 1639:16
**1971** [1] - 1639:15
**1998** [1] - 1629:6
**1:00** [1] - 1556:3

## 2

**2** [5] - 1576:23, 1623:4, 1692:22, 1692:24, 1696:3
**2-T** [2] - 1649:19, 1649:24
**2.4** [1] - 1581:14
**2.5** [1] - 1592:22
**20** [1] - 1620:24
**2001** [1] - 1600:17
**2002** [3] - 1600:17, 1633:16
**2005** [2] - 1574:18, 1633:10
**2006** [7] - 1582:4, 1620:24, 1624:13, 1624:16, 1630:24, 1630:25, 1695:25
**2007** [6] - 1613:23, 1614:10, 1625:7, 1641:17, 1697:22, 1698:4
**2008** [4] - 1624:19, 1700:18, 1702:3
**2010** [3] - 1669:15, 1699:8, 1699:19
**2011** [4] - 1630:24, 1630:25, 1657:25, 1658:11
**2014** [2] - 1548:7, 1713:11
**202** [3] - 1576:6, 1578:18, 1604:5
**207** [1] - 1620:22
**20th** [3] - 1669:1, 1669:10, 1669:15
**21** [3] - 1560:3, 1561:13, 1699:19
**225** [1] - 1548:24
**239** [1] - 1567:6
**24** [2] - 1548:7, 1625:15
**25** [2] - 1652:5, 1713:11
**27** [1] - 1582:4
**271** [1] - 1548:14
**295** [2] - 1568:19, 1570:15
**2:00** [1] - 1555:23, 1556:2
**2:15** [2] - 1634:11, 1635:1

## 3

**30** [1] - 1614:10
**30,000** [2] - 1587:19, 1588:3
**300** [1] - 1654:12
**301** [1] - 1614:4
**302** [2] - 1663:19, 1685:8, 1686:8
**33139** [1] - 1577:24
**334** [28] - 1567:17, 1629:7, 1629:9, 1629:24, 1630:9, 1631:21, 1634:7, 1636:20, 1637:13, 1638:5, 1638:10, 1638:14, 1638:20, 1639:17, 1639:22, 1644:25, 1646:2, 1646:5, 1692:3, 1693:5, 1694:4, 1695:2, 1696:9, 1696:13, 1696:18, 1697:2, 1698:6, 1699:1

## 4

**4** [1] - 1633:10
**400** [2] - 1613:21, 1616:12

**404** [1] - 1625:3
**413** [1] - 1641:12
**420-A** [1] - 1692:6
**422-E** [1] - 1697:16
**422-G** [1] - 1698:10
**48** [1] - 1658:20
**4:30** [2] - 1688:6, 1688:19

## 5

**5** [6] - 1578:18, 1578:19, 1592:19, 1592:20, 1621:9, 1658:11
**5.2** [1] - 1621:3
**5.6** [1] - 1589:3
**5.8** [1] - 1589:3
**5.9** [2] - 1591:12, 1591:13
**500** [1] - 1595:19
**500,000** [1] - 1591:18, 1595:17, 1623:16, 1649:1
**538** [1] - 1628:21
**552** [2] - 1632:2, 1632:3

## 6

**6** [4] - 1550:7, 1580:2, 1649:8, 1695:25
**6.1** [1] - 1580:3
**6.2** [4] - 1581:2, 1581:8, 1581:9, 1581:12
**6/19** [1] - 1700:24
**60** [1] - 1711:12
**609** [1] - 1628:20
**610** [1] - 1628:20
**616** [1] - 1700:17
**617** [1] - 1699:19
**624** [1] - 1658:5
**626-628** [3] - 1566:18, 1567:5, 1605:22, 1643:20
**628** [1] - 1630:18
**638** [2] - 1610:12, 1610:17
**639** [4] - 1636:23, 1637:9, 1639:5, 1714:18
**65** [2] - 1568:6, 1568:7
**6th** [1] - 1577:7

## 7

**7** [3] - 1650:25, 1687:14, 1687:15
**75** [4] - 1652:6, 1653:1, 1653:2, 1653:3
**75,000** [2] - 1595:25, 1692:2

## 8

**8** [4] - 1581:24, 1582:1, 1583:9
**80** [1] - 1577:7
**818** [1] - 1577:23
**8:45** [1] - 1658:15

## 9

**9** [1] - 1659:21
**90** [1] - 1612:19
**914** [1] - 1577:5
**9:30** [1] - 1713:11

**9:45** [1] - 1548:7

## A

**a.m** [2] - 1548:7, 1713:11
**abandoned** [1] - 1588:24
**able** [12] - 1550:10, 1597:18, 1659:21, 1659:24, 1659:25, 1660:8, 1660:10, 1661:1, 1702:9, 1707:23, 1708:15, 1710:25
**absolutely** [2] - 1673:12, 1680:3
**accept** [3] - 1629:20, 1630:8, 1657:22
**acceptance** [1] - 1640:22
**accepted** [4] - 1629:18, 1646:2, 1675:18, 1690:15
**accepting** [2] - 1603:14, 1679:24
**access** [1] - 1633:25
**accomplish** [2] - 1552:8, 1710:22
**accomplished** [2] - 1691:3, 1691:5
**accordance** [1] - 1622:14
**according** [2] - 1615:2, 1702:2
**account** [7] - 1602:23, 1631:18, 1632:13, 1644:25, 1676:18, 1677:20, 1682:24
**accounts** [2] - 1641:22, 1665:4
**accrued** [1] - 1623:5
**accrues** [2] - 1621:23, 1622:25
**accruing** [2] - 1621:14, 1621:20
**accurate** [5] - 1562:8, 1617:7, 1651:21, 1652:21, 1706:3
**acknowledge** [3] - 1618:5, 1667:3, 1667:4
**acknowledges** [1] - 1641:20
**acknowledgment** [1] - 1712:16
**acquire** [1] - 1611:15
**acronym** [1] - 1588:21
**act** [2] - 1557:20, 1577:2
**action** [5] - 1571:1, 1596:24, 1606:9, 1606:12, 1606:16
**actions** [1] - 1577:2
**actively** [1] - 1602:11
**activity** [1] - 1602:12
**acts** [1] - 1711:9
**actual** [2] - 1601:13, 1629:10
**Adam** [2] - 1682:19, 1682:21
**add** [3] - 1664:21, 1679:20, 1711:4
**addition** [4] - 1598:25, 1603:4, 1617:4, 1625:22
**additional** [3] - 1580:15, 1580:18, 1710:25
**address** [4] - 1609:6, 1663:1, 1710:2, 1711:17
**addresses** [1] - 1608:22
**adhering** [1] - 1667:16
**adjourned** [1] - 1713:11
**administering** [1] - 1580:3
**administration** [1] - 1559:22
**admission** [1] - 1678:15
**admit** [2] - 1638:24, 1682:19
**admits** [1] - 1673:8
**admitted** [1] - 1668:20

**admonition** [1] - 1689:7
**advance** [2] - 1662:18, 1686:18
**advancement** [1] - 1580:15
**advancing** [1] - 1580:17
**advised** [2] - 1559:5, 1629:7
**advisor** [1] - 1615:15
**affect** [1] - 1571:1
**affecting** [1] - 1626:7
**affects** [1] - 1579:1
**affidavit** [4] - 1667:10, 1697:19, 1698:11
**affordable** [1] - 1604:11
**afraid** [1] - 1657:18
**after-market** [1] - 1690:12
**AFTERNOON** [1] - 1636:1
**afternoon** [10] - 1551:23, 1552:17, 1555:23, 1635:5, 1636:10, 1636:11, 1660:16, 1664:25, 1707:22, 1712:24
**agency** [1] - 1625:23
**agent** [11] - 1577:1, 1578:19, 1578:23, 1579:11, 1579:14, 1661:4, 1665:13, 1684:9, 1685:3, 1685:16, 1690:4
**Agent** [25] - 1548:22, 1549:14, 1661:11, 1661:18, 1662:20, 1663:18, 1667:22, 1668:21, 1669:5, 1670:11, 1670:23, 1671:6, 1671:10, 1679:6, 1685:17, 1686:5, 1686:10, 1690:7, 1690:11, 1690:18, 1690:21, 1690:25, 1691:18, 1691:22, 1692:1
**agent's** [1] - 1659:16
**agents** [2] - 1608:9, 1661:6
**ago** [2] - 1557:18, 1614:1
**agree** [18] - 1552:1, 1552:12, 1553:5, 1557:11, 1618:23, 1620:11, 1624:18, 1626:9, 1626:13, 1649:5, 1662:23, 1666:10, 1673:17, 1673:20, 1673:24, 1681:8, 1702:19, 1705:17
**agreed** [4] - 1576:17, 1595:10, 1691:23, 1708:5
**Agreement** [1] - 1576:11
**agreement** [24] - 1576:14, 1576:15, 1577:4, 1578:25, 1579:5, 1580:19, 1583:1, 1618:9, 1625:4, 1625:23, 1625:24, 1626:7, 1626:8, 1627:9, 1641:13, 1641:16, 1641:20, 1653:14, 1673:7, 1703:4, 1704:20, 1706:8, 1708:2
**agrees** [1] - 1642:10
**ahead** [1] - 1565:11
**AIA** [1] - 1617:5
**aid** [1] - 1565:6
**aight** [1] - 1651:2
**airport** [1] - 1660:14
**alert** [2] - 1608:24, 1609:11
**alerted** [1] - 1713:1
**alibi** [2] - 1676:7, 1676:8
**alibis** [1] - 1675:23
**ALL** [2] - 1550:17, 1609:14
**allegation** [3] - 1681:23, 1682:1, 1686:6
**allegations** [1] - 1557:25
**allocated** [2] - 1617:9, 1644:2
**allocation** [1] - 1567:9

**allow** [6] - 1665:12, 1665:15, 1672:4, 1674:4, 1675:8, 1708:21
**allowed** [12] - 1569:21, 1571:17, 1604:19, 1604:21, 1604:24, 1644:4, 1646:8, 1659:16, 1667:20, 1668:18, 1697:5, 1708:11
**allowing** [1] - 1675:13
**allows** [1] - 1564:11
**almost** [4] - 1550:6, 1554:19, 1556:6, 1591:2
**alone** [3] - 1647:8, 1668:14, 1678:15
**alternate** [2] - 1554:12, 1554:21
**alternates** [2] - 1551:11, 1558:20
**Alton** [1] - 1577:23
**AMERICA** [1] - 1548:3
**amount** [22] - 1572:14, 1580:12, 1592:18, 1595:24, 1597:2, 1598:4, 1601:10, 1614:25, 1617:8, 1617:9, 1617:13, 1617:16, 1618:12, 1642:11, 1642:12, 1644:18, 1645:3, 1645:7, 1646:18, 1653:3, 1654:3, 1655:12
**amounts** [2] - 1617:8, 1642:6
**analysis** [1] - 1557:10
**AND** [1] - 1548:7
**angry** [1] - 1690:8
**Ann** [1] - 1712:2
**announced** [1] - 1686:18
**annually** [1] - 1573:6
**answer** [16] - 1558:5, 1626:25, 1631:24, 1640:25, 1653:17, 1662:11, 1668:2, 1676:14, 1678:20, 1682:18, 1689:14, 1689:23, 1689:24, 1693:15, 1693:16, 1708:19
**ANSWER** [3] - 1640:15, 1640:23, 1640:25
**Answer** [1] - 1669:7
**answered** [1] - 1689:8
**answering** [1] - 1679:10
**answers** [3] - 1608:10, 1640:20, 1641:1
**antagonistic** [1] - 1673:13
**ANTHONY** [1] - 1548:15
**Anthony** [5] - 1549:13, 1650:6, 1650:8, 1650:20, 1651:7
**anticipate** [1] - 1585:3
**anyway** [2] - 1555:5, 1686:6
**apartment** [1] - 1560:21
**apartments** [8] - 1560:3, 1560:6, 1561:15, 1568:25, 1569:1, 1569:19, 1571:13, 1631:14
**apologize** [3] - 1556:12, 1685:16, 1709:4
**appear** [5] - 1614:10, 1616:8, 1616:13, 1625:4, 1638:14
**appearances** [1] - 1549:11
**appeared** [2] - 1643:17, 1704:17
**appendix** [1] - 1694:21
**appliance** [2] - 1600:22, 1601:12
**appliances** [14] - 1598:11, 1598:12, 1598:14, 1598:21, 1598:23, 1600:19, 1601:11, 1601:16, 1603:13, 1631:14, 1690:16, 1694:7, 1705:6, 1705:10

applicable [1] - 1616:22
application [6] - 1551:20, 1565:13, 1582:24, 1582:25, 1633:13, 1662:8
Application [1] - 1583:9
applied [3] - 1572:15, 1622:17, 1641:8
applies [1] - 1682:12
apply [5] - 1586:13, 1623:19, 1640:22, 1641:9, 1683:16
appointed [1] - 1575:20
appreciate [1] - 1556:13
approach [5] - 1595:1, 1595:4, 1636:24, 1662:9, 1690:24
approached [5] - 1594:15, 1596:7, 1690:21, 1690:24, 1691:1
appropriate [4] - 1553:4, 1609:10, 1662:15, 1664:6
approval [5] - 1580:16, 1581:18, 1581:20, 1604:4, 1611:19
approvals [1] - 1581:3
approve [1] - 1695:14
approved [5] - 1575:3, 1590:20, 1591:4, 1701:15, 1701:16
approves [1] - 1580:15
April [3] - 1582:4, 1620:24, 1624:13
Apuzzo [2] - 1548:22, 1549:14
architect [17] - 1560:9, 1561:4, 1561:7, 1561:10, 1575:20, 1576:2, 1577:10, 1577:16, 1582:13, 1582:14, 1583:16, 1584:23, 1584:24, 1589:22, 1589:25, 1590:3, 1712:3
Architectural [2] - 1577:22, 1578:1
architectural [1] - 1720:20
area [2] - 1669:4, 1707:4
arguing [1] - 1676:15
argument [1] - 1678:8
argumentative [1] - 1564:13
arm [1] - 1661:4
Armstrong [50] - 1590:10, 1595:3, 1595:15, 1596:7, 1597:21, 1601:21, 1601:22, 1602:4, 1603:7, 1623:16, 1627:17, 1649:25, 1650:2, 1650:6, 1650:8, 1650:20, 1651:7, 1651:16, 1651:19, 1652:19, 1654:17, 1654:24, 1655:9, 1655:17, 1656:1, 1657:7, 1657:16, 1657:19, 1657:25, 1658:3, 1658:4, 1660:15, 1690:5, 1690:9, 1690:12, 1699:11, 1700:1, 1703:2, 1703:10, 1703:15, 1703:16, 1703:24, 1704:4, 1704:15, 1704:25, 1705:18, 1706:9, 1706:14, 1706:24, 1709:7
Armstrong's [3] - 1603:16, 1700:12, 1703:21
arrest [4] - 1658:10, 1659:23, 1667:7, 1668:20
arrested [5] - 1663:4, 1663:5, 1663:9, 1669:9, 1671:1
aside [1] - 1671:14
assertions [2] - 1675:4, 1676:19
assiduously [1] - 1679:9
assigned [7] - 1572:12, 1587:14, 1589:16, 1589:19, 1617:18, 1628:10,

1701:12
Assistant [2] - 1548:16, 1626:14
assistant [1] - 1577:7
Assisted [1] - 1548:25
association [1] - 1579:2
assume [5] - 1557:7, 1564:25, 1663:23, 1703:7, 1711:20
assuming [1] - 1557:25
attached [3] - 1695:9, 1695:12, 1696:25
attack [1] - 1676:19
attempt [3] - 1597:6, 1627:3, 1684:12
attempted [1] - 1663:22
attempting [1] - 1670:19
attend [2] - 1574:4, 1578:4
attendance [1] - 1613:21
attention [15] - 1576:13, 1577:18, 1578:17, 1580:2, 1580:10, 1581:2, 1582:1, 1582:17, 1584:6, 1616:15, 1621:19, 1625:15, 1650:25, 1693:8, 1712:20
attorney [7] - 1606:14, 1606:15, 1658:21, 1693:19, 1694:6, 1694:12, 1694:17
Attorney [3] - 1548:13, 1548:16, 1712:1
attorneys [2] - 1670:15, 1671:11
authorities [3] - 1580:4, 1627:3, 1677:2
authority [2] - 1666:18, 1704:11
Authorized [1] - 1576:24
authorized [4] - 1576:25, 1577:2, 1577:4, 1580:17
available [4] - 1669:13, 1683:24, 1712:25
Avenue [34] - 1559:16, 1559:19, 1560:1, 1560:2, 1560:20, 1561:12, 1561:21, 1566:2, 1566:18, 1567:5, 1568:14, 1568:19, 1569:13, 1569:23, 1570:5, 1570:15, 1571:4, 1571:9, 1572:1, 1573:11, 1573:15, 1573:23, 1573:24, 1577:5, 1577:7, 1604:14, 1605:21, 1605:22, 1629:19, 1642:22, 1684:18, 1690:23, 1696:4, 1696:5
avoided [1] - 1679:9
award [1] - 1575:2
awarded [3] - 1574:13, 1574:16, 1594:12
aware [15] - 1558:16, 1588:4, 1605:3, 1610:24, 1634:6, 1634:20, 1636:20, 1663:4, 1686:7, 1695:10, 1696:13, 1696:14, 1703:16, 1712:7, 1712:20

**B**

baby [1] - 1657:13
bad [3] - 1603:7, 1628:9, 1701:12
balance [12] - 1568:9, 1568:10, 1568:11, 1570:12, 1587:20, 1601:24, 1602:22, 1602:24, 1622:18, 1623:4, 1654:14, 1679:3
balancing [3] - 1678:12, 1685:21, 1711:12
ball [1] - 1552:9
bank [26] - 1582:12, 1591:6, 1591:9,

1591:25, 1594:1, 1595:19, 1595:20, 1596:8, 1596:23, 1597:2, 1615:16, 1626:23, 1627:16, 1627:19, 1627:23, 1631:18, 1632:13, 1644:24, 1646:19, 1647:11, 1665:4, 1704:17, 1705:9, 1706:18, 1706:20
Bank [3] - 1559:20, 1559:21, 1605:3
banks [2] - 1648:19, 1704:18
bar [6] - 1562:12, 1564:1, 1565:10, 1662:12, 1662:25, 1664:12
barely [1] - 1637:20
bark [2] - 1650:12, 1650:16
barns [1] - 1558:19
based [11] - 1553:25, 1554:21, 1555:4, 1555:13, 1572:14, 1589:10, 1600:8, 1644:10, 1647:12, 1678:9, 1678:22
bases [1] - 1684:11
basis [8] - 1564:15, 1601:2, 1634:17, 1646:12, 1667:17, 1668:5, 1673:3, 1681:3
bathroom [2] - 1599:1, 1660:17
Beach [1] - 1577:23
beam [2] - 1585:10, 1585:12
beams [1] - 1585:14
bear [1] - 1583:5
bears [1] - 1572:5
beat [1] - 1651:20
beating [1] - 1683:20
became [3] - 1597:15, 1611:3, 1628:7
become [1] - 1615:23
becomes [1] - 1683:9
Bed [23] - 1574:11, 1574:25, 1575:1, 1575:2, 1576:11, 1604:10, 1604:21, 1605:18, 1615:8, 1615:10, 1617:1, 1617:22, 1642:5, 1642:19, 1642:20, 1644:24, 1646:25, 1649:8, 1654:7, 1655:20, 1705:20, 1705:25
Bed-Stuy [17] - 1604:10, 1604:21, 1605:18, 1615:8, 1615:10, 1617:1, 1617:22, 1642:5, 1642:19, 1642:20, 1646:25, 1649:8, 1654:7, 1655:20, 1705:20, 1705:25
Bed-Stuy's [1] - 1644:24
Bed/Stuy [31] - 1580:24, 1582:9, 1583:4, 1583:7, 1584:2, 1586:3, 1586:6, 1586:13, 1587:9, 1588:18, 1590:15, 1621:1, 1621:6, 1623:14, 1623:19, 1624:6, 1624:7, 1624:13, 1624:15, 1624:19, 1627:20, 1627:23, 1628:8, 1632:4, 1632:7, 1632:14, 1632:23, 1696:5, 1696:6, 1696:22, 1701:1
Bedford [1] - 1577:5
befogged [3] - 1658:23, 1667:6, 1678:22
BEFORE [1] - 1548:10
began [2] - 1568:25, 1628:6
begin [4] - 1561:13, 1592:11, 1594:8, 1621:14
beginning [7] - 1560:23, 1561:18, 1597:13, 1627:17, 1650:2, 1658:21,

1669:1

**begins** [3] - 1576:24, 1580:11, 1621:20

**begun** [2] - 1551:17, 1660:11

**behalf** [3] - 1577:2, 1603:12, 1626:4

**behind** [1] - 1568:23

**belief** [1] - 1695:10

**bell** [1] - 1665:9

**belonged** [1] - 1629:23

**below** [1] - 1648:9

**below-market** [1] - 1648:9

**bench** [2] - 1664:18, 1668:17

**benefit** [7] - 1595:22, 1676:1, 1676:5, 1677:8, 1679:23, 1712:10, 1712:14

**benefits** [1] - 1626:3

**best** [8] - 1554:1, 1554:24, 1555:2, 1578:4, 1597:5, 1643:6, 1666:1, 1695:10

**better** [4] - 1552:3, 1555:24, 1556:4, 1679:4

**between** [10] - 1564:10, 1568:6, 1575:13, 1576:11, 1592:21, 1644:6, 1649:24, 1682:14, 1699:22, 1700:5

**beyond** [3] - 1580:22, 1584:18, 1600:7

**bias** [1] - 1686:3

**bid** [12] - 1561:20, 1566:22, 1567:4, 1567:25, 1572:10, 1589:6, 1617:17, 1617:25, 1618:9, 1618:10, 1681:5, 1691:21

**bidding** [8] - 1560:24, 1617:19, 1617:23, 1617:24, 1618:3, 1618:4, 1618:8, 1618:20

**big** [4] - 1589:11, 1596:5, 1612:14, 1648:21

**bigger** [1] - 1613:19

**bill** [2] - 1587:20, 1705:8

**bills** [3] - 1602:10, 1629:10, 1645:22

**binding** [1] - 1577:3

**Bishop** [1] - 1678:2

**Bishop's** [1] - 1686:20

**bit** [5] - 1581:7, 1614:9, 1638:9, 1642:13, 1695:19

**bite** [1] - 1660:18

**biting** [1] - 1565:1

**bitten** [1] - 1564:23

**black** [1] - 1684:16

**BLC** [3] - 1581:14, 1581:15, 1617:9

**blow** [2] - 1637:4, 1638:16

**blowing** [2] - 1638:8, 1652:21

**blueprints** [1] - 1567:10

**BMW** [1] - 1657:13

**boat** [1] - 1676:24

**Bob** [14] - 1642:16, 1653:22, 1654:3, 1654:6, 1654:10, 1654:11, 1655:13, 1655:15, 1655:17, 1655:19, 1655:24, 1656:3, 1656:7, 1704:9

**bodies** [1] - 1599:1

**bond** [2] - 1584:11

**borrowed** [1] - 1593:14

**borrower** [2] - 1621:7, 1621:21

**bottom** [6] - 1584:6, 1634:3, 1692:20, 1695:20, 1695:21, 1699:6

**bought** [5] - 1602:10, 1629:6, 1657:3, 1661:20, 1704:21

**bounced** [5] - 1627:6, 1652:14, 1690:9, 1703:3, 1704:25

**box** [2] - 1562:24, 1705:14

**break** [1] - 1636:18

**breakdown** [3] - 1617:7, 1620:7, 1696:23

**breakdowns** [1] - 1620:6

**breakfast** [1] - 1548:7

**breath** [2] - 1652:6, 1653:6

**bribe** [6] - 1627:3, 1627:7, 1682:20, 1683:2, 1683:5, 1683:12

**brief** [3] - 1555:21, 1711:25, 1712:5

**briefly** [1] - 1557:14

**bring** [8] - 1551:11, 1556:18, 1610:3, 1636:6, 1671:9, 1675:1, 1684:12, 1684:13

**bringing** [2] - 1659:3, 1700:4

**Brooklyn** [7] - 1548:5, 1548:15, 1548:24, 1577:6, 1600:14, 1606:15, 1631:16

**brother** [2] - 1650:3, 1651:17

**brought** [4] - 1604:6, 1659:17, 1671:2, 1684:18

**Brown** [12] - 1589:21, 1666:19, 1671:23, 1673:14, 1674:13, 1677:1, 1677:11, 1677:12, 1677:15, 1677:25, 1681:13, 1686:13

**brown** [1] - 1674:10

**Brown's** [1] - 1686:19

**Bruton** [1] - 1673:18

**buckle** [1] - 1568:25

**budget** [16] - 1560:23, 1572:17, 1573:10, 1583:19, 1585:4, 1585:16, 1585:17, 1587:14, 1589:1, 1593:7, 1604:8, 1604:11, 1604:15, 1622:19, 1628:7, 1705:13

**budgetary** [1] - 1615:15

**budgeted** [1] - 1587:7

**budgets** [2] - 1574:7, 1574:9

**buffered** [1] - 1648:8

**building** [17] - 1566:17, 1568:24, 1586:8, 1586:9, 1586:20, 1587:1, 1600:5, 1629:6, 1629:10, 1629:11, 1643:2, 1643:13, 1643:23, 1657:17, 1684:17, 1696:24

**buildings** [36] - 1560:3, 1561:13, 1566:3, 1566:7, 1566:9, 1566:12, 1568:14, 1568:18, 1569:18, 1571:15, 1571:17, 1571:21, 1572:1, 1572:6, 1575:2, 1575:12, 1575:13, 1586:19, 1587:10, 1588:25, 1589:4, 1590:13, 1590:14, 1592:8, 1631:15, 1642:25, 1647:1, 1647:4, 1647:8, 1647:13, 1647:19, 1648:6, 1648:14, 1648:20, 1649:4

**bullet** [1] - 1616:20

**burn** [1] - 1648:20

**business** [12] - 1566:22, 1600:15, 1600:22, 1629:3, 1632:13, 1634:7,

1645:24, 1645:25, 1693:13, 1693:20, 1694:8

**BUTLER** [1] - 1548:23

**buy** [1] - 1697:5

**buyers** [2] - 1575:3, 1706:2

**buying** [1] - 1705:14

**buyout** [3] - 1706:15, 1706:16, 1706:17

**BY** [14] - 1548:15, 1548:17, 1559:11, 1566:1, 1580:1, 1600:1, 1610:19, 1620:1, 1636:16, 1657:1, 1662:1, 1690:3, 1714:8, 1714:10

**BY:GERALD** [1] - 1548:20

**BY:MAURICE** [1] - 1548:19

## C

**Cadman** [2] - 1548:14, 1548:24

**CALIENDO** [1] - 1548:19

**Caliendo** [2] - 1549:23, 1555:25

**cameras** [3] - 1657:14, 1657:17

**candidates** [1] - 1628:11

**candor** [1] - 1687:8

**cannot** [1] - 1603:19

**CAPOZZOLO** [79] - 1548:15, 1562:2, 1562:11, 1564:2, 1609:7, 1610:9, 1610:11, 1610:15, 1610:17, 1610:19, 1613:11, 1613:16, 1620:1, 1632:2, 1634:23, 1636:13, 1636:16, 1636:24, 1637:6, 1637:9, 1637:21, 1638:24, 1639:6, 1639:8, 1640:7, 1640:18, 1641:11, 1657:1, 1662:1, 1662:17, 1663:3, 1663:11, 1663:15, 1663:21, 1664:1, 1664:4, 1666:9, 1666:14, 1669:22, 1670:13, 1670:22, 1671:20, 1671:23, 1672:4, 1672:12, 1672:20, 1672:24, 1673:2, 1673:6, 1673:20, 1673:22, 1673:24, 1674:6, 1674:8, 1681:12, 1682:1, 1686:5, 1686:9, 1686:16, 1687:16, 1687:24, 1688:2, 1688:6, 1688:10, 1688:15, 1688:20, 1689:25, 1690:3, 1697:18, 1707:3, 1708:13, 1708:18, 1708:25, 1709:13, 1709:19, 1710:5, 1711:5, 1712:7, 1714:10

**Capozzolo** [8] - 1549:13, 1565:5, 1637:24, 1666:25, 1681:11, 1687:23, 1689:1, 1708:10

**capozzolo** [2] - 1669:21, 1710:4

**Capozzolo's** [1] - 1564:20

**caption** [1] - 1694:12

**car** [4] - 1657:13, 1660:19, 1661:4, 1661:7

**card** [2] - 1632:13, 1632:16

**cardiac** [1] - 1659:23

**care** [4] - 1555:9, 1645:23, 1673:18, 1705:15

**carpentry** [2] - 1642:24, 1691:16

**cart** [1] - 1665:16

**case** [31] - 1551:5, 1552:14, 1555:13, 1556:5, 1557:14, 1600:23, 1607:13, 1612:2, 1617:16, 1630:2, 1634:12, 1635:6, 1642:16, 1645:25, 1661:15,

Case 1:11-cr-00683-NG   Document 275   Filed 07/25/14   Page 172 of 192 PageID #: 1567
All Word // USA v Stevenson Dunn, et al.

5

1675:22, 1675:23, 1676:9, 1677:1, 1677:4, 1677:25, 1678:17, 1684:24, 1685:22, 1686:13, 1686:21, 1706:7, 1707:12, 1711:6, 1711:9, 1711:10

**cases** [1] - 1646:22

**cash** [2] - 1657:3, 1690:19

**cat** [2] - 1650:4, 1651:20

**categories** [7] - 1620:2, 1620:8, 1620:9, 1620:11, 1620:13, 1620:15, 1686:16

**CAUSE** [1] - 1548:10

**causing** [1] - 1568:25

**ceilings** [1] - 1569:2

**cement** [1] - 1567:12

**censored** [1] - 1711:14

**center** [2] - 1638:2, 1638:19

**centered** [1] - 1600:24

**certain** [8] - 1551:14, 1572:24, 1576:13, 1634:20, 1642:1, 1642:11, 1642:17, 1642:24

**certainly** [3] - 1552:19, 1554:19, 1686:25

**certificate** [2] - 1586:22, 1586:23

**certification** [4] - 1582:24, 1582:25, 1695:5, 1696:22

**certifications** [2] - 1614:24, 1618:13

**certify** [2] - 1617:5, 1695:8

**challenge** [1] - 1670:13

**chance** [2] - 1676:3, 1684:13

**change** [9] - 1551:16, 1581:13, 1581:17, 1581:20, 1585:24, 1697:19, 1697:25, 1698:11, 1698:24

**changes** [1] - 1581:5

**character** [2] - 1712:23, 1713:6

**charcoal** [1] - 1657:13

**charge** [6] - 1552:9, 1552:16, 1628:15, 1707:19, 1707:21, 1707:22

**charges** [4] - 1623:6, 1676:10, 1711:6, 1711:10

**Charleane** [1] - 1665:19

**chart** [4] - 1560:14, 1564:3, 1694:23

**chasing** [1] - 1680:1

**check** [40] - 1595:6, 1595:7, 1595:12, 1595:14, 1595:21, 1596:1, 1602:3, 1602:6, 1602:8, 1602:15, 1602:16, 1602:17, 1602:20, 1603:4, 1603:7, 1606:9, 1615:4, 1622:3, 1622:5, 1622:6, 1627:7, 1637:13, 1637:16, 1638:5, 1638:10, 1638:14, 1638:19, 1639:11, 1639:13, 1639:15, 1639:16, 1639:17, 1639:20, 1639:22, 1644:25, 1648:21, 1690:9, 1700:2, 1704:24, 1706:18

**checked** [1] - 1693:16

**checks** [9] - 1601:25, 1631:8, 1631:20, 1631:23, 1638:1, 1652:14, 1665:3, 1703:3, 1706:20

**Cheryl** [5] - 1624:10, 1701:13, 1701:14, 1702:13, 1705:25

**Chinese** [2] - 1660:20, 1660:22

**choice** [1] - 1687:19

**choose** [3] - 1687:19, 1691:21, 1697:6

**chose** [2] - 1662:22, 1703:9

**Christina** [1] - 1549:13

**Circuit** [1] - 1674:14

**circumstance** [3] - 1552:6, 1643:10, 1675:25

**circumstances** [3] - 1676:6, 1682:12, 1682:22

**citation** [1] - 1666:20

**cite** [1] - 1677:2

**Citibank** [4] - 1602:7, 1602:8, 1602:21, 1602:23

**city** [6] - 1579:7, 1582:11, 1590:3, 1625:16, 1626:5, 1626:21

**City** [11] - 1578:20, 1579:11, 1579:14, 1586:24, 1588:4, 1611:15, 1626:2, 1695:11, 1695:13, 1711:25

**claim** [2] - 1703:1, 1703:8

**claiming** [5] - 1646:5, 1670:15, 1671:11, 1681:14, 1704:11

**claims** [1] - 1682:10

**clarify** [1] - 1553:20

**clause** [6] - 1625:16, 1626:11, 1626:15, 1627:1, 1627:2, 1653:13

**clean** [2] - 1618:4, 1618:10

**clear** [5] - 1645:3, 1645:15, 1664:9, 1685:5, 1685:11

**clearly** [4] - 1664:4, 1708:20, 1710:22, 1710:23

**CLERK** [7] - 1559:5, 1610:2, 1610:5, 1613:15, 1634:13, 1664:17, 1689:19

**clerk** [1] - 1707:18

**client** [7] - 1552:2, 1634:19, 1665:25, 1678:16, 1683:12, 1685:19, 1713:6

**clip** [3] - 1649:23, 1650:2, 1650:25

**close** [7] - 1551:17, 1642:6, 1699:10, 1705:19, 1705:21, 1706:1, 1707:21

**closed** [7] - 1582:4, 1591:1, 1596:23, 1613:25, 1646:25, 1694:3, 1703:1

**Closeout** [5] - 1598:20, 1631:18, 1631:20, 1694:8, 1699:15

**closes** [1] - 1649:14

**closing** [46] - 1574:4, 1591:3, 1591:5, 1591:6, 1591:14, 1592:2, 1593:3, 1593:15, 1594:13, 1595:5, 1595:10, 1595:15, 1596:8, 1601:25, 1602:1, 1613:8, 1613:22, 1613:23, 1614:12, 1614:18, 1614:19, 1615:4, 1616:11, 1621:13, 1622:3, 1622:5, 1622:12, 1624:12, 1625:9, 1641:17, 1655:11, 1698:3, 1700:24, 1701:10, 1701:13, 1703:4, 1703:13, 1704:3, 1704:14, 1704:15, 1704:18, 1705:15, 1705:17, 1705:24, 1706:11, 1706:21

**closings** [1] - 1706:20

**cluster** [93] - 1559:16, 1559:18, 1559:22, 1560:1, 1560:2, 1560:8, 1560:9, 1560:11, 1560:20, 1561:12, 1561:21, 1561:23, 1566:3, 1566:10, 1568:14, 1569:13, 1569:23, 1570:5, 1571:4, 1571:9, 1572:1, 1573:11, 1573:15, 1573:24, 1574:3, 1574:12,

1574:13, 1574:16, 1574:25, 1575:1, 1575:11, 1575:12, 1575:14, 1575:20, 1576:12, 1578:2, 1580:24, 1582:9, 1583:19, 1584:9, 1586:3, 1586:6, 1586:14, 1587:7, 1587:9, 1588:16, 1588:17, 1588:20, 1588:23, 1589:9, 1589:25, 1590:6, 1590:12, 1590:19, 1590:22, 1591:11, 1592:24, 1594:12, 1596:14, 1596:20, 1597:11, 1597:17, 1597:18, 1598:8, 1601:20, 1602:11, 1602:14, 1604:7, 1604:10, 1604:24, 1605:13, 1605:18, 1605:21, 1613:4, 1617:21, 1631:15, 1631:16, 1654:4, 1655:8, 1655:10, 1655:20, 1699:2, 1700:24, 1701:1, 1701:3, 1701:4, 1701:5, 1701:13, 1703:15, 1705:2, 1705:3, 1705:7, 1705:17

**clusters** [1] - 1574:9

**co** [5] - 1674:11, 1675:24, 1677:6, 1678:1, 1678:2

**co-defendant** [3] - 1674:11, 1675:24, 1678:2

**co-defendant's** [1] - 1678:1

**co-defendants** [1] - 1677:6

**coconspiracy** [1] - 1684:21

**cocounsel** [1] - 1684:7

**codefendants** [2] - 1684:5, 1684:21

**collateral** [1] - 1646:23

**colleague** [1] - 1552:2

**collect** [15] - 1569:21, 1569:24, 1570:1, 1570:11, 1573:13, 1573:17, 1587:3, 1587:6, 1587:23, 1588:3, 1588:7, 1591:13, 1591:16, 1629:9, 1629:17

**collected** [1] - 1631:1

**collecting** [3] - 1592:12, 1629:15, 1629:16

**collectively** [1] - 1709:16

**colloquy** [1] - 1670:4

**columns** [1] - 1638:1

**coma** [1] - 1659:22

**coming** [5] - 1601:1, 1601:2, 1650:12, 1687:2, 1704:3

**comment** [2] - 1672:11, 1687:12

**Commissioner** [3] - 1625:23, 1626:1, 1626:14

**commitment** [2] - 1620:24, 1642:6

**common** [3] - 1677:4, 1677:24, 1681:9

**companies** [7] - 1605:11, 1605:14, 1605:15, 1607:2, 1607:6, 1630:8, 1693:2, 1693:5, 1694:20, 1694:21, 1694:24, 1696:3

**company** [27] - 1566:20, 1566:21, 1567:20, 1567:22, 1574:17, 1595:8, 1598:16, 1598:18, 1598:19, 1605:10, 1605:16, 1605:23, 1605:24, 1628:9, 1629:21, 1630:4, 1630:11, 1631:4, 1640:11, 1640:14, 1640:21, 1692:21, 1693:10, 1694:20, 1694:23, 1709:8

**compartment** [1] - 1661:5

**compensation** [2] - 1569:20, 1693:11

**complain** [1] - 1606:10

complaint [7] - 1605:25, 1606:3, 1606:4, 1606:13, 1606:17, 1606:19
complete [6] - 1561:20, 1561:23, 1586:6, 1586:9, 1598:25, 1617:7
completed [5] - 1569:3, 1574:1, 1642:10, 1644:11, 1696:17
Computer [1] - 1548:25
Computer-Assisted [1] - 1548:25
Concepts [2] - 1577:23, 1578:1
concerned [5] - 1551:3, 1551:7, 1552:5, 1685:2, 1685:7
concerning [1] - 1677:6
conclusion [1] - 1557:3
condition [6] - 1552:22, 1571:14, 1647:6, 1659:23, 1660:11, 1678:23
conduct [3] - 1629:3, 1693:13, 1711:8
conducted [1] - 1666:23
confer [1] - 1554:7
conference [4] - 1578:11, 1670:4, 1707:21, 1707:22
conferred [1] - 1558:17
confession [1] - 1686:20
confident [1] - 1686:24
confined [1] - 1667:20
confirm [1] - 1582:15
confront [2] - 1674:13, 1711:1
confrontation [3] - 1674:11, 1678:17, 1678:18
confronted [1] - 1683:17
confused [1] - 1672:7
confusing [1] - 1684:19
confusion [1] - 1564:10
connection [3] - 1690:13, 1693:13, 1709:17
consequence [1] - 1586:10
consider [2] - 1554:5, 1674:2
consideration [1] - 1689:22
considered [1] - 1676:4
consistently [1] - 1684:15
conspiracy [2] - 1684:6, 1711:6
conspired [1] - 1711:7
construct [1] - 1648:15
construction [30] - 1559:17, 1559:23, 1559:24, 1574:4, 1575:16, 1580:5, 1589:14, 1591:1, 1591:3, 1591:6, 1591:11, 1591:14, 1591:20, 1592:2, 1593:2, 1593:13, 1593:15, 1594:13, 1597:3, 1597:6, 1603:9, 1603:10, 1606:8, 1621:3, 1648:16, 1649:9, 1649:11, 1649:12, 1649:15, 1698:7
Construction [4] - 1592:1, 1594:5, 1595:13, 1643:22
consultant [2] - 1603:9, 1603:10
contact [1] - 1555:14
contemplated [1] - 1687:10
content [2] - 1678:21, 1679:16
contents [1] - 1694:15
context [2] - 1640:9, 1641:2
contingency [2] - 1585:18, 1585:21
continue [2] - 1678:20, 1689:21
continued [5] - 1579:19, 1599:4, 1619:5, 1680:5, 1701:18

Continued [2] - 1558:23, 1559:10, 1563:6, 1565:15, 1656:13, 1661:22, 1690:2, 1709:23, 1714:7
Continuing [1] - 1657:1
CONTINUING [2] - 1600:1, 1702:1
continuing [1] - 1636:16
contract [25] - 1578:15, 1582:16, 1613:4, 1614:19, 1614:22, 1617:10, 1617:14, 1617:16, 1617:17, 1625:21, 1626:11, 1644:6, 1644:10, 1644:23, 1645:2, 1645:3, 1645:9, 1645:12, 1645:14, 1646:8, 1648:24, 1649:14, 1699:15, 1703:23, 1709:8
contracting [2] - 1601:14, 1606:8
contractor [94] - 1560:11, 1561:1, 1566:22, 1566:24, 1567:2, 1567:25, 1569:9, 1570:24, 1574:19, 1581:13, 1581:17, 1581:21, 1582:13, 1582:14, 1583:17, 1583:18, 1583:23, 1584:3, 1584:10, 1584:23, 1584:24, 1585:3, 1585:13, 1585:23, 1586:1, 1587:2, 1587:5, 1587:6, 1590:6, 1590:14, 1590:21, 1591:2, 1591:7, 1591:13, 1591:24, 1592:6, 1592:11, 1593:16, 1593:21, 1593:22, 1593:23, 1594:7, 1595:3, 1597:9, 1597:15, 1597:22, 1598:14, 1600:18, 1601:3, 1605:7, 1605:9, 1612:2, 1612:11, 1612:13, 1612:18, 1612:23, 1613:6, 1614:19, 1615:3, 1615:4, 1617:17, 1617:25, 1622:3, 1622:5, 1622:9, 1622:10, 1623:10, 1628:4, 1642:11, 1643:5, 1643:7, 1643:8, 1643:17, 1643:21, 1644:4, 1644:5, 1644:8, 1644:16, 1644:18, 1644:22, 1645:4, 1645:5, 1645:6, 1645:17, 1646:6, 1646:9, 1646:11, 1691:6, 1691:20, 1697:5, 1697:9, 1704:5
contractor's [1] - 1584:13
contractor-related [1] - 1583:23
contractors [6] - 1600:11, 1600:13, 1611:19, 1611:21, 1611:23, 1645:16
contracts [4] - 1580:6, 1625:18, 1682:13, 1704:20
contrary [1] - 1684:10
control [1] - 1591:21
controlled [1] - 1693:1
controlling [2] - 1666:18, 1704:2
conversation [20] - 1650:20, 1652:10, 1652:11, 1652:18, 1653:20, 1654:17, 1654:18, 1661:11, 1661:15, 1661:17, 1667:16, 1670:18, 1671:6, 1671:8, 1671:10, 1681:16, 1681:19, 1699:22, 1699:25
conversation's [1] - 1656:10
conversations [2] - 1652:16, 1666:15
convicting [1] - 1677:18
conviction [1] - 1557:20
copies [2] - 1707:19, 1707:20
copy [1] - 1622:6

corner [2] - 1638:9, 1639:16
corners [1] - 1682:23
Cornerstone [1] - 1624:7
Corp [2] - 1636:21, 1637:13, 1692:3, 1693:6, 1694:4, 1696:18
corporate [4] - 1633:14, 1633:20, 1640:16, 1692:17
Corporation [10] - 1567:18, 1628:22, 1629:25, 1631:21, 1634:7, 1696:9, 1698:7, 1699:1, 1709:9
corporation [10] - 1579:2, 1626:5, 1629:2, 1629:3, 1629:20, 1629:25, 1630:16, 1632:4, 1634:1, 1636:20
corporations [3] - 1629:9, 1632:5, 1696:4
correct [210] - 1550:11, 1550:12, 1570:2, 1574:1, 1577:10, 1581:24, 1612:6, 1612:16, 1612:19, 1612:23, 1613:6, 1613:9, 1613:22, 1614:6, 1614:14, 1614:20, 1614:22, 1614:25, 1615:3, 1615:8, 1616:6, 1616:18, 1616:23, 1617:2, 1617:10, 1617:14, 1617:18, 1618:1, 1618:5, 1619:3, 1620:3, 1620:8, 1620:9, 1620:13, 1620:17, 1620:20, 1620:23, 1621:7, 1621:11, 1621:15, 1621:24, 1622:2, 1622:21, 1622:25, 1623:8, 1623:19, 1623:20, 1623:23, 1624:8, 1624:10, 1624:12, 1624:13, 1624:16, 1625:9, 1625:11, 1625:13, 1625:19, 1627:24, 1628:1, 1628:13, 1628:25, 1629:4, 1629:12, 1629:20, 1629:22, 1630:1, 1630:11, 1630:16, 1630:18, 1631:5, 1631:11, 1631:18, 1631:22, 1632:6, 1632:11, 1632:18, 1632:21, 1632:23, 1633:4, 1633:10, 1633:16, 1633:18, 1633:22, 1634:1, 1634:4, 1634:8, 1639:10, 1639:23, 1641:16, 1641:18, 1641:24, 1642:4, 1642:14, 1642:18, 1643:11, 1643:15, 1643:19, 1644:1, 1644:8, 1644:11, 1644:14, 1644:19, 1645:25, 1646:2, 1646:6, 1646:15, 1646:18, 1646:23, 1647:2, 1647:5, 1647:13, 1647:20, 1647:22, 1648:11, 1649:5, 1649:9, 1649:17, 1649:20, 1649:21, 1649:25, 1650:6, 1650:11, 1650:16, 1650:20, 1651:5, 1651:7, 1651:9, 1651:13, 1652:1, 1652:8, 1652:20, 1652:22, 1652:24, 1653:1, 1653:25, 1654:13, 1654:24, 1655:3, 1655:5, 1656:4, 1657:9, 1657:16, 1658:3, 1658:13, 1658:25, 1659:13, 1660:12, 1663:25, 1666:11, 1674:6, 1686:24, 1690:19, 1690:23, 1691:4, 1691:7, 1692:9, 1692:12, 1692:18, 1692:22, 1693:3, 1693:15, 1693:17, 1693:22, 1693:24, 1694:1, 1694:21, 1694:25, 1695:3, 1695:6, 1695:10, 1695:15, 1695:18, 1695:23, 1696:7, 1696:10, 1696:14, 1696:19, 1697:1, 1697:19, 1698:1, 1698:4, 1698:11, 1698:13, 1698:15, 1698:20, 1698:24,

1699:2, 1699:11, 1699:16, 1699:23, 1699:25, 1700:9, 1700:12, 1700:15, 1700:21, 1702:5, 1703:7, 1703:13, 1704:5, 1704:22, 1704:25, 1705:4, 1705:19, 1705:22, 1706:18, 1706:22, 1707:1, 1708:6, 1709:13

**correctly** [1] - 1640:17
**corrupted** [1] - 1618:3
**cost** [12] - 1572:5, 1572:22, 1572:25, 1584:4, 1585:1, 1585:6, 1585:18, 1585:20, 1593:9, 1593:10, 1649:12, 1705:1
**costs** [29] - 1572:19, 1572:20, 1572:21, 1580:12, 1580:14, 1580:22, 1583:19, 1583:22, 1583:23, 1583:24, 1584:15, 1585:2, 1587:7, 1598:2, 1598:5, 1612:18, 1618:21, 1620:3, 1620:17, 1622:19, 1623:6, 1649:11, 1649:15, 1649:16, 1698:8, 1705:10, 1705:12, 1705:14
**coughing** [1] - 1550:9
**counsel** [14] - 1551:25, 1559:1, 1562:1, 1633:4, 1634:15, 1666:23, 1669:12, 1669:18, 1674:12, 1686:20, 1686:25, 1687:4
**Counsel** [14] - 1550:3, 1550:16, 1550:18, 1550:23, 1553:19, 1554:7, 1554:20, 1557:19, 1557:21, 1607:19, 1607:22, 1609:8, 1707:16, 1709:18
**counting** [1] - 1552:18
**counts** [1] - 1552:15
**couple** [4] - 1554:2, 1554:24, 1682:4, 1710:3
**course** [10] - 1578:13, 1580:24, 1585:13, 1608:17, 1615:22, 1616:6, 1617:6, 1642:8, 1678:3, 1679:13
**COURT** [161] - 1548:1, 1549:6, 1549:17, 1550:3, 1550:16, 1550:18, 1550:22, 1551:2, 1551:12, 1551:19, 1551:25, 1552:18, 1553:9, 1553:18, 1554:8, 1554:20, 1555:22, 1556:3, 1556:13, 1556:17, 1556:23, 1557:2, 1557:6, 1557:17, 1558:3, 1558:6, 1558:10, 1558:14, 1559:1, 1560:17, 1562:12, 1562:17, 1562:25, 1563:3, 1563:5, 1564:14, 1564:19, 1564:25, 1565:3, 1565:9, 1565:11, 1565:14, 1603:21, 1606:24, 1607:10, 1607:18, 1607:22, 1608:14, 1608:16, 1609:1, 1609:3, 1609:8, 1610:3, 1610:6, 1610:10, 1610:14, 1610:16, 1613:13, 1613:17, 1634:10, 1634:15, 1634:25, 1635:8, 1636:6, 1636:10, 1636:14, 1636:25, 1637:5, 1637:7, 1637:10, 1637:20, 1637:23, 1639:3, 1639:9, 1650:23, 1651:11, 1653:9, 1653:16, 1659:6, 1660:3, 1662:6, 1662:8, 1662:10, 1662:19, 1663:10, 1663:13, 1663:16, 1663:18, 1663:22, 1664:11, 1664:14, 1664:19, 1665:11, 1665:15, 1665:18, 1665:23, 1666:10, 1666:15, 1666:24, 1668:7, 1669:19, 1669:24, 1670:20,

1671:13, 1671:21, 1672:2, 1672:6, 1672:15, 1672:21, 1672:25, 1673:3, 1673:17, 1673:21, 1673:23, 1673:25, 1674:7, 1674:9, 1674:22, 1677:3, 1677:12, 1677:16, 1677:22, 1679:8, 1679:19, 1681:10, 1681:25, 1684:3, 1684:22, 1685:7, 1686:3, 1686:8, 1686:12, 1686:17, 1687:15, 1687:20, 1688:1, 1688:4, 1688:8, 1688:17, 1688:21, 1688:25, 1689:10, 1689:13, 1689:16, 1689:20, 1690:1, 1707:5, 1707:16, 1708:4, 1708:7, 1708:15, 1708:23, 1710:1, 1710:8, 1710:10, 1710:13, 1711:16, 1711:23, 1712:22, 1713:3, 1713:8
**Court's** [2] - 1667:13, 1669:13
**courthouse** [2] - 1660:1, 1660:5
**Courthouse** [1] - 1548:5
**courtroom** [4] - 1549:2, 1553:15, 1636:3, 1669:25
**COURTROOM** [15] - 1549:5, 1549:21, 1549:24, 1550:2, 1550:12, 1550:19, 1553:16, 1558:8, 1558:13, 1607:14, 1607:16, 1636:4, 1636:8, 1636:12, 1707:13
**cover** [1] - 1602:24
**coversheet** [1] - 1698:19
**CPC** [6] - 1589:13, 1589:15, 1589:19, 1591:4, 1596:8, 1605:2
**crazy** [1] - 1700:6
**create** [1] - 1632:5
**created** [2] - 1624:7, 1692:17
**creating** [1] - 1627:18
**credibility** [1] - 1674:5
**creditor** [3] - 1580:13, 1580:15, 1580:17
**credits** [1] - 1569:17
**crew** [2] - 1567:15, 1567:16
**crime** [2] - 1663:7, 1675:25
**CRIMINAL** [1] - 1548:10
**criminal** [2] - 1549:9, 1711:8
**CRISTINA** [1] - 1548:16
**CROSS** [4] - 1610:18, 1636:15, 1690:2, 1714:9
**cross** [36] - 1556:22, 1608:1, 1608:13, 1608:16, 1608:17, 1608:18, 1608:19, 1608:21, 1610:6, 1635:3, 1662:14, 1665:1, 1666:22, 1669:23, 1671:25, 1673:9, 1673:11, 1673:15, 1674:13, 1674:21, 1675:7, 1675:13, 1678:8, 1679:2, 1681:13, 1682:8, 1682:12, 1683:10, 1683:17, 1683:19, 1683:22, 1684:1, 1685:2, 1685:10, 1685:14, 1711:21
**CROSS-EXAMINATION** [3] - 1610:18, 1690:2, 1714:9
**cross-examination** [19] - 1556:22, 1608:18, 1608:19, 1608:21, 1610:6, 1635:3, 1662:14, 1666:22, 1669:23, 1675:13, 1679:2, 1682:8, 1682:12, 1683:10, 1683:19, 1683:22, 1684:1, 1685:2, 1685:10

**cross-examine** [11] - 1608:13, 1608:16, 1608:17, 1665:1, 1673:9, 1674:13, 1674:21, 1675:7, 1678:8, 1683:17, 1685:14
**cross-examined** [1] - 1608:1
**crosses** [1] - 1608:19
**CRR** [1] - 1548:23
**curative** [1] - 1665:8
**cured** [1] - 1646:10
**cut** [1] - 1704:17
**cycle** [1] - 1601:2

## D

**DA** [1] - 1627:6
**DA's** [1] - 1606:13
**damage** [2] - 1569:4, 1683:12
**damages** [1] - 1569:1
**damaging** [1] - 1679:14
**DAMP** [1] - 1588:19
**Daniel** [1] - 1705:24
**Date** [1] - 1621:19
**date** [14] - 1577:3, 1613:23, 1613:25, 1614:9, 1614:12, 1621:20, 1623:8, 1624:23, 1625:9, 1633:10, 1641:17, 1698:3, 1699:5
**dated** [8] - 1601:25, 1602:1, 1620:24, 1641:17, 1698:3, 1698:15, 1699:19, 1700:18
**day-to-day** [1] - 1571:6
**days** [6] - 1552:15, 1552:21, 1554:2, 1554:24, 1557:23, 1602:15
**days'** [1] - 1625:25
**dead** [1] - 1683:20
**deal** [2] - 1653:23, 1654:6
**dealing** [3] - 1556:21, 1628:4, 1652:15
**dealt** [3] - 1628:20, 1646:11, 1705:4
**debt** [1] - 1646:10
**decide** [2] - 1611:24, 1672:22
**decided** [8] - 1596:13, 1601:20, 1630:5, 1660:15, 1701:11, 1702:6, 1703:15, 1708:12
**deciding** [1] - 1673:14
**decision** [5] - 1550:25, 1578:24, 1608:7, 1678:1, 1687:9
**defendant** [17] - 1548:8, 1549:17, 1549:22, 1564:5, 1666:11, 1670:13, 1671:3, 1674:11, 1675:24, 1675:25, 1676:1, 1676:3, 1676:7, 1677:15, 1678:2, 1681:13, 1685:4
**Defendant** [3] - 1548:17, 1548:19, 1548:20
**defendant's** [2] - 1564:3, 1678:1
**defendants** [8] - 1558:1, 1668:3, 1668:15, 1670:3, 1673:12, 1673:13, 1675:23, 1677:6, 1677:8, 1677:18, 1679:11, 1679:14, 1679:18
**defendants'** [1] - 1557:9
**defense** [29] - 1551:5, 1551:12, 1551:25, 1552:14, 1608:16, 1610:24, 1635:9, 1666:23, 1669:19, 1671:24,

1673:4, 1673:11, 1674:12, 1676:7, 1676:8, 1676:10, 1677:5, 1677:21, 1680:1, 1680:4, 1681:2, 1681:6, 1681:7, 1682:8, 1682:17, 1684:7, 1686:21, 1686:25, 1687:16
**Defense** [2] - 1554:7, 1707:24
**defenses** [5] - 1673:14, 1673:16, 1676:1, 1677:23, 1681:7
**define** [1] - 1576:22
**defined** [1] - 1578:15
**definition** [1] - 1577:17
**Definitions** [1] - 1576:24
**degree** [1] - 1677:7
**Delacour** [3] - 1560:10, 1561:9, 1589:24
**delay** [3] - 1552:17, 1558:11, 1707:8
**delayed** [5] - 1613:5, 1613:8, 1705:18, 1705:21, 1705:25
**delaying** [1] - 1588:1
**deliberate** [1] - 1665:8
**deliberating** [1] - 1551:17
**deliberations** [2] - 1552:7, 1554:18
**delivered** [8] - 1600:4, 1600:5, 1600:9, 1600:10, 1601:6, 1601:11, 1601:16, 1603:13
**delve** [1] - 1608:11
**demanded** [3] - 1595:6, 1595:7, 1654:10
**demolition** [3] - 1585:9, 1620:9, 1620:15
**demonstrate** [2] - 1668:1, 1677:19
**demonstrates** [1] - 1682:6
**demonstrative** [2] - 1564:6, 1565:6
**denial** [1] - 1674:18
**denied** [7] - 1658:22, 1662:8, 1668:11, 1673:6, 1674:15, 1675:18, 1677:7
**denies** [2] - 1666:21, 1681:18
**deny** [5] - 1671:3, 1673:10, 1675:10, 1678:24, 1682:15
**depart** [1] - 1608:5
**deposit** [4] - 1602:2, 1602:3, 1602:6, 1602:15
**depositing** [1] - 1602:8
**Depot** [2] - 1600:3, 1690:13
**deprive** [1] - 1678:16
**deprived** [1] - 1608:21
**DEPUTY** [15] - 1549:5, 1549:21, 1549:24, 1550:2, 1550:12, 1550:19, 1553:16, 1558:8, 1558:13, 1607:14, 1607:16, 1636:4, 1636:8, 1636:12, 1707:13
**derive** [1] - 1677:8
**derives** [1] - 1676:4
**derogatory** [1] - 1684:14
**describe** [3] - 1582:23, 1588:16, 1669:6
**described** [6] - 1584:14, 1604:17, 1604:18, 1613:1, 1615:6, 1626:9
**describes** [1] - 1632:18
**describing** [2] - 1633:22, 1683:7
**description** [3] - 1580:4, 1633:2, 1651:21
**design** [1] - 1702:4

**designate** [1] - 1641:24
**designed** [1] - 1697:4
**detail** [1] - 1678:5
**detailed** [3] - 1580:4, 1661:11, 1682:24
**detailing** [1] - 1704:18
**details** [5] - 1662:17, 1663:7, 1671:7, 1672:9, 1700:11
**Detective** [1] - 1661:13
**determination** [1] - 1564:15
**determine** [3] - 1582:15, 1583:17, 1584:25
**determined** [1] - 1617:16
**develop** [6] - 1560:3, 1575:1, 1590:13, 1611:16, 1709:11
**developer** [41] - 1560:5, 1561:6, 1561:17, 1566:19, 1569:19, 1571:3, 1571:23, 1572:8, 1572:13, 1574:3, 1575:4, 1575:5, 1576:18, 1577:5, 1578:14, 1581:5, 1584:9, 1584:12, 1584:17, 1586:7, 1586:10, 1586:13, 1590:11, 1591:21, 1592:15, 1593:1, 1593:4, 1593:8, 1595:21, 1597:1, 1597:10, 1598:22, 1601:5, 1604:3, 1631:17, 1643:3, 1644:1, 1682:5, 1703:24, 1706:17, 1709:8
**developer's** [15] - 1569:14, 1569:16, 1570:4, 1570:6, 1570:8, 1575:7, 1575:9, 1580:13, 1580:23, 1586:16, 1586:18, 1648:4, 1648:5, 1655:9, 1704:19
**Developers** [2] - 1567:21, 1644:20
**developers** [5] - 1569:24, 1572:19, 1591:8, 1633:14, 1709:7
**developing** [1] - 1627:19
**Development** [11] - 1590:7, 1590:8, 1621:1, 1621:6, 1623:20, 1632:14, 1696:5, 1696:6, 1709:9, 1709:10
**development** [16] - 1574:17, 1578:1, 1582:11, 1590:18, 1595:8, 1602:12, 1603:11, 1605:10, 1605:16, 1605:23, 1622:19, 1656:6, 1678:5, 1694:16, 1703:25, 1706:13
**diabetes** [3] - 1659:18, 1674:20, 1675:5
**diabetic** [8] - 1658:20, 1659:4, 1659:11, 1659:21, 1660:11, 1661:1, 1667:6, 1670:16
**diabetics** [1] - 1660:9
**diarrhea** [1] - 1550:9
**DICHIARA** [1] - 1548:20
**DiChiara** [21] - 1549:25, 1550:1, 1552:12, 1553:8, 1557:25, 1610:8, 1638:25, 1639:6, 1639:7, 1664:18, 1664:20, 1664:21, 1665:14, 1665:16, 1665:21, 1675:6, 1679:20, 1681:1, 1708:5, 1713:4, 1713:5
**dick** [2] - 1652:6, 1653:5
**different** [8] - 1609:3, 1629:8, 1677:22, 1677:23, 1681:8, 1684:17, 1686:16, 1702:5
**difficulties** [1] - 1590:22
**DIRECT** [2] - 1559:10, 1714:7

**direct** [20] - 1555:17, 1555:21, 1557:3, 1557:14, 1578:21, 1606:7, 1621:13, 1621:19, 1626:17, 1630:10, 1649:20, 1658:24, 1659:2, 1668:11, 1669:2, 1671:3, 1675:17, 1678:22, 1693:8, 1712:6
**directed** [3] - 1621:1, 1662:10, 1686:14
**direction** [2] - 1631:22, 1631:24
**directive** [1] - 1594:7
**directly** [12] - 1579:3, 1579:11, 1579:15, 1594:13, 1594:15, 1600:10, 1678:2, 1678:3, 1681:22, 1682:7, 1693:10, 1699:25
**dirt** [1] - 1711:2
**disabled** [1] - 1660:25
**disagree** [1] - 1706:5
**disburse** [1] - 1704:18
**disbursed** [3] - 1621:22, 1622:1, 1642:7
**disbursement** [2] - 1621:20, 1621:24
**disclose** [1] - 1699:15
**disclosure** [6] - 1692:9, 1695:9, 1697:20, 1698:1, 1699:14, 1699:16
**discover** [1] - 1561:9
**discretion** [2] - 1551:18, 1625:24
**discuss** [13] - 1552:9, 1557:4, 1558:4, 1607:13, 1607:19, 1634:12, 1649:21, 1671:14, 1681:14, 1682:7, 1689:3, 1700:11, 1707:12
**discussed** [6] - 1574:22, 1590:1, 1604:4, 1707:4, 1712:12, 1712:18
**discussing** [3] - 1609:11, 1615:7, 1701:6
**discussion** [7] - 1608:2, 1670:18, 1670:23, 1688:10, 1691:9, 1691:12, 1694:15
**discussions** [1] - 1634:24
**disguise** [1] - 1605:6
**disguised** [1] - 1692:2
**dishwasher** [1] - 1598:25
**dispute** [2] - 1700:1, 1700:12
**disregard** [2] - 1662:10, 1689:7, 1689:9
**distinguishable** [1] - 1675:22
**distinguishes** [1] - 1677:1
**district** [2] - 1606:14, 1606:15
**DISTRICT** [3] - 1548:1, 1548:1, 1548:11
**District** [3] - 1548:14, 1549:6, 1549:7
**doctor** [3] - 1552:23, 1553:24
**document** [37] - 1562:13, 1562:20, 1562:22, 1562:25, 1564:14, 1576:8, 1576:10, 1580:7, 1581:4, 1581:17, 1581:23, 1582:3, 1582:18, 1582:21, 1582:23, 1583:3, 1583:4, 1583:12, 1583:13, 1583:20, 1583:22, 1583:25, 1584:6, 1613:13, 1615:2, 1617:4, 1617:5, 1623:22, 1661:14, 1665:1, 1669:3, 1692:7, 1693:22, 1694:19, 1697:8, 1697:15
**documentation** [1] - 1584:18
**documenting** [1] - 1704:15
**documents** [20] - 1578:22, 1578:24, 1578:25, 1579:13, 1616:5, 1616:10,

1616:12, 1620:12, 1622:17, 1623:19,
1663:25, 1665:4, 1688:2, 1688:5,
1688:8, 1694:17, 1696:21, 1696:25,
1704:14, 1706:8

**doghouse** [1] - 1565:1

**dogs** [1] - 1565:1

**DOI** [2] - 1653:12, 1653:18

**dollar** [5] - 1647:1, 1647:5, 1647:6,
1648:24, 1649:5

**dollars** [9] - 1573:12, 1612:9, 1645:18,
1645:19, 1647:16, 1647:18, 1647:19,
1649:8

**done** [16] - 1577:15, 1582:15, 1585:9,
1622:2, 1631:21, 1631:24, 1643:13,
1643:16, 1643:19, 1644:22, 1647:17,
1647:24, 1685:20, 1689:12, 1691:15,
1706:20

**doorways** [1] - 1569:2

**doubt** [1] - 1687:10

**down** [11] - 1558:21, 1577:20, 1588:20,
1607:16, 1627:18, 1648:21, 1652:4,
1661:7, 1662:2, 1692:24, 1699:6

**downfall** [1] - 1702:8

**draft** [1] - 1707:19

**draw** [10] - 1576:13, 1577:17, 1580:2,
1580:10, 1581:2, 1582:1, 1582:17,
1624:18, 1679:15, 1704:7

**drawdown** [1] - 1582:14

**drawing** [2] - 1578:17, 1584:6

**dressed** [1] - 1553:21

**due** [8] - 1570:5, 1573:17, 1587:20,
1622:24, 1623:7, 1645:17, 1645:20,
1676:11

**duly** [2] - 1559:8, 1580:16

**DUNN** [4] - 1548:7, 1559:7, 1689:17,
1714:6

**Dunn** [74] - 1548:18, 1549:10, 1549:17,
1558:12, 1558:13, 1558:15, 1559:5,
1559:12, 1559:15, 1562:3, 1562:22,
1566:2, 1577:5, 1577:25, 1579:4,
1580:8, 1607:1, 1607:24, 1607:25,
1610:20, 1636:17, 1637:11, 1638:1,
1643:3, 1653:16, 1663:3, 1663:19,
1665:2, 1667:1, 1669:1, 1670:2,
1670:24, 1672:1, 1672:14, 1673:6,
1673:9, 1673:11, 1673:16, 1674:3,
1674:5, 1675:3, 1675:10, 1677:5,
1677:7, 1677:20, 1678:3, 1678:15,
1679:22, 1681:15, 1681:16, 1681:24,
1682:4, 1682:7, 1682:15, 1684:14,
1685:4, 1685:14, 1685:23, 1686:23,
1687:2, 1687:11, 1690:4, 1691:23,
1694:25, 1709:1, 1709:6, 1709:15,
1711:6, 1711:24, 1712:9, 1712:14

**Dunn's** [10] - 1557:3, 1608:8, 1669:16,
1676:10, 1681:7, 1681:20, 1681:21,
1685:18, 1686:6, 1688:11

**During** [1] - 1692:24

**during** [15] - 1571:18, 1578:1, 1578:13,
1580:24, 1612:7, 1612:8, 1613:3,
1615:22, 1617:5, 1642:7, 1661:13,
1667:16, 1670:24, 1679:6, 1709:5

**duties** [1] - 1571:4

---

# E

**e-mail** [7] - 1699:19, 1699:22, 1700:12,
1700:14, 1700:17, 1701:14

**E-mail** [1] - 1702:15

**East** [2] - 1548:14, 1548:24

**EASTERN** [1] - 1548:1

**Eastern** [2] - 1548:14, 1549:7

**eat** [2] - 1660:9, 1660:18

**eating** [1] - 1660:9

**edges** [1] - 1562:16

**effect** [4] - 1627:19, 1646:22, 1666:20,
1675:9

**effective** [1] - 1679:2

**efficient** [1] - 1559:3

**effort** [1] - 1676:25

**eight** [2] - 1569:21, 1589:5

**either** [6] - 1557:18, 1585:8, 1609:8,
1636:20, 1654:18, 1662:22

**El** [1] - 1549:18

**El-Shabazz** [1] - 1549:18

**electronic** [1] - 1637:3

**eleven** [1] - 1694:19

**elicit** [2] - 1679:17, 1685:17

**Elmo** [1] - 1582:18

**elsewhere** [1] - 1675:24

**emergency** [7] - 1568:19, 1568:20,
1568:21, 1569:8, 1569:9, 1569:11,
1570:14

**employee** [8] - 1578:19, 1578:23,
1579:10, 1579:14, 1626:4, 1630:12,
1630:13

**employees** [3] - 1629:25, 1630:11,
1631:5

**employment** [1] - 1626:3

**end** [7] - 1551:17, 1575:10, 1597:12,
1597:15, 1642:14, 1658:22, 1676:12

**ends** [2] - 1565:10, 1664:12

**energy** [1] - 1671:22

**enforce** [2] - 1596:24, 1646:19

**enforcement** [1] - 1608:9

**enforcing** [1] - 1626:23

**engage** [1] - 1661:14

**engaged** [2] - 1661:10, 1684:21

**engineer** [1] - 1582:12

**enhances** [1] - 1647:22

**enquire** [1] - 1636:13

**entail** [1] - 1591:3

**entails** [1] - 1591:4

**enter** [1] - 1684:5

**entered** [2] - 1582:19, 1583:12

**enterprise** [5] - 1580:25, 1585:22,
1588:1, 1605:2, 1681:23

**Enterprise** [24] - 1559:20, 1569:12,
1569:17, 1570:4, 1570:9, 1570:18,
1570:20, 1570:23, 1573:4, 1573:14,
1575:15, 1575:17, 1576:12, 1577:6,
1577:12, 1620:24, 1621:10, 1624:8,

1627:20, 1627:23, 1628:10, 1628:12,
1700:25

**enters** [6] - 1549:2, 1553:15, 1558:9,
1610:4, 1636:3, 1636:9

**entire** [7] - 1562:13, 1566:16, 1578:13,
1623:4, 1643:1, 1658:24, 1659:2

**entirely** [2] - 1662:23, 1681:8

**entities** [1] - 1693:2

**entitled** [3] - 1583:18, 1673:4, 1676:13

**entity** [14] - 1624:7, 1626:5, 1632:9,
1633:14, 1633:20, 1633:25, 1634:7,
1640:16, 1644:20, 1692:17, 1692:21,
1693:12, 1699:14, 1709:10

**entrepreneur** [4] - 1611:3, 1611:7,
1611:13, 1611:22

**Entrepreneur** [1] - 1640:22

**entrepreneurs** [2] - 1611:4, 1611:10

**episode** [2] - 1658:20, 1667:6

**equally** [1] - 1684:5

**equities** [1] - 1685:22

**equivalent** [1] - 1674:18

**escrow** [1] - 1621:21

**especially** [2] - 1670:8, 1670:9

**ESQ** [8] - 1548:13, 1548:15, 1548:16,
1548:17, 1548:19, 1548:19, 1548:20,
1548:21

**essentially** [1] - 1709:1

**established** [1] - 1622:15

**establishing** [1] - 1643:15

**estate** [1] - 1702:8

**evaluate** [1] - 1553:25

**EVANS** [48] - 1548:17, 1549:18,
1551:13, 1551:21, 1553:6, 1554:6,
1555:19, 1557:12, 1559:11, 1559:13,
1561:25, 1562:9, 1562:15, 1562:21,
1564:9, 1564:17, 1565:7, 1565:12,
1566:1, 1580:1, 1600:1, 1606:22,
1607:8, 1639:2, 1650:22, 1651:10,
1653:8, 1659:5, 1660:2, 1662:4,
1663:17, 1665:25, 1666:7, 1667:13,
1668:9, 1668:23, 1684:4, 1687:14,
1688:13, 1697:17, 1708:6, 1709:12,
1709:18, 1711:22, 1711:24, 1712:5,
1713:10, 1714:8

**Evans** [16] - 1549:18, 1549:19, 1555:11,
1555:16, 1558:5, 1559:4, 1564:6,
1565:11, 1635:4, 1711:20, 1712:8,
1712:12, 1712:18

**Evans's** [1] - 1556:5

**evening** [6] - 1658:13, 1658:15,
1660:12, 1660:23, 1707:7

**event** [4] - 1585:8, 1625:25, 1628:6,
1673:25

**events** [4] - 1667:7, 1667:8, 1674:25,
1679:5

**eventually** [1] - 1597:9

**evidence** [33] - 1562:10, 1565:13,
1576:5, 1582:19, 1610:14, 1610:15,
1613:12, 1613:13, 1613:16, 1614:3,
1616:1, 1616:16, 1618:24, 1620:23,
1625:3, 1632:2, 1632:4, 1637:5,

1637:6, 1639:5, 1641:12, 1658:6, 1667:22, 1667:25, 1678:15, 1679:7, 1681:1, 1686:23, 1692:5, 1697:15, 1697:16, 1698:11, 1699:18

**evidencing** [1] - 1623:4

**eviscerating** [1] - 1676:8

**exact** [2] - 1624:23, 1642:23

**exactly** [7] - 1645:6, 1646:1, 1659:20, 1683:18, 1697:7, 1704:1, 1704:13

**EXAMINATION** [6] - 1559:10, 1610:18, 1636:15, 1690:2, 1714:7, 1714:9

**examination** [27] - 1556:22, 1558:15, 1608:18, 1608:19, 1608:21, 1610:6, 1635:3, 1649:20, 1658:24, 1659:2, 1662:14, 1666:22, 1668:11, 1669:2, 1669:23, 1675:13, 1675:17, 1676:12, 1679:2, 1682:8, 1682:12, 1683:10, 1683:19, 1683:22, 1684:1, 1685:2, 1685:10

**examine** [12] - 1608:6, 1608:13, 1608:16, 1608:17, 1665:1, 1673:9, 1674:13, 1674:21, 1675:7, 1678:8, 1683:17, 1685:14

**examined** [2] - 1559:9, 1608:1

**examining** [1] - 1689:1

**example** [6] - 1585:6, 1615:25, 1620:9, 1646:25, 1687:2, 1696:22

**exceed** [1] - 1617:9

**excellent** [1] - 1558:6

**except** [3] - 1586:8, 1634:15, 1708:10

**excess** [1] - 1580:12, 1648:15

**exchange** [1] - 1649:24

**exclude** [1] - 1666:5

**excluded** [1] - 1666:12

**excuse** [11] - 1553:4, 1556:14, 1573:23, 1622:4, 1635:8, 1659:1, 1662:16, 1664:7, 1664:11, 1664:14, 1705:20

**excused** [3] - 1555:7, 1634:14, 1666:7

**excusing** [2] - 1556:6, 1558:18

**executed** [1] - 1580:16

**execution** [1] - 1577:3

**exhausted** [1] - 1683:24

**Exhibit** [32] - 1562:4, 1562:10, 1576:6, 1576:7, 1578:18, 1581:14, 1582:18, 1583:4, 1604:5, 1610:12, 1610:17, 1613:21, 1614:4, 1615:25, 1616:12, 1616:16, 1620:22, 1625:3, 1630:18, 1632:3, 1636:23, 1639:5, 1641:12, 1649:19, 1658:5, 1692:6, 1697:16, 1698:10, 1699:19, 1700:17, 1714:18

**exhibit** [12] - 1562:15, 1562:17, 1564:7, 1564:8, 1610:25, 1613:18, 1614:5, 1614:18, 1616:2, 1616:17, 1619:1, 1658:7

**Exhibits** [2] - 1628:20, 1637:19

**exhibits** [2] - 1613:12, 1628:19

**exit** [1] - 1597:17

**exits** [3] - 1607:15, 1664:16, 1707:14

**expect** [3] - 1557:24, 1682:15, 1686:5

**expected** [2] - 1557:19, 1570:1

**expecting** [1] - 1569:24

**expedient** [1] - 1679:17

**expeditiously** [1] - 1552:13

**expense** [2] - 1584:13, 1588:12

**expenses** [3] - 1654:15, 1701:8, 1706:9

**expensive** [1] - 1702:9

**experience** [2] - 1554:1, 1585:2

**explain** [4] - 1561:22, 1582:8, 1587:2, 1640:9

**explained** [3] - 1596:22, 1679:4, 1691:19

**explicitly** [1] - 1673:6

**extensively** [1] - 1612:1

**exterior** [3] - 1567:12, 1599:2, 1643:2

**extract** [1] - 1673:7

**extremely** [1] - 1702:9

# F

**fact** [19] - 1551:5, 1623:13, 1636:23, 1643:10, 1647:12, 1647:24, 1648:2, 1653:1, 1654:12, 1654:19, 1659:25, 1660:22, 1665:12, 1670:24, 1671:9, 1690:18, 1691:15, 1698:19, 1699:10

**facts** [7] - 1552:24, 1634:20, 1661:15, 1673:10, 1677:6, 1681:14, 1682:8

**factual** [4] - 1564:13, 1681:7, 1684:11

**fails** [1] - 1625:25

**failure** [1] - 1586:9

**faint** [2] - 1553:20, 1553:21

**fainted** [2] - 1550:14, 1550:20

**fair** [18] - 1668:12, 1668:13, 1669:23, 1671:25, 1673:11, 1673:15, 1674:13, 1674:24, 1676:19, 1681:12, 1682:11, 1683:10, 1683:19, 1683:25, 1685:19, 1685:21, 1710:20, 1711:1

**fairness** [1] - 1679:11

**fake** [1] - 1692:2

**fall** [2] - 1663:20, 1676:20

**falsely** [1] - 1685:18

**familiar** [4] - 1574:6, 1615:23, 1625:15, 1691:15

**families** [11] - 1572:2, 1572:14, 1572:16, 1572:23, 1572:25, 1573:9, 1573:11, 1588:11, 1592:4, 1592:7, 1611:16

**family** [4] - 1566:18, 1572:15, 1655:21, 1692:25

**far** [7] - 1648:14, 1668:6, 1675:9, 1675:14, 1685:1, 1685:2, 1685:7

**fashion** [1] - 1670:8

**faster** [1] - 1565:8

**fault** [1] - 1560:17

**faulting** [1] - 1687:7

**favorable** [4] - 1678:2, 1678:4, 1682:9, 1682:16

**favorably** [1] - 1677:5

**fax** [1] - 1698:19

**FBI** [1] - 1659:16

**fed** [1] - 1660:8

**federal** [1] - 1659:17

**fee** [17] - 1569:14, 1569:16, 1569:24,

1570:5, 1570:7, 1575:7, 1575:9, 1586:13, 1586:16, 1586:18, 1648:4, 1648:5, 1655:9, 1656:6, 1704:19, 1706:13, 1706:17

**fees** [3] - 1570:12, 1623:6, 1701:7

**felt** [2] - 1553:21, 1702:10

**Ferrara** [1] - 1561:10

**fever** [1] - 1550:9

**few** [7] - 1573:12, 1588:15, 1592:5, 1664:7, 1664:14, 1688:21, 1688:22

**field** [1] - 1694:16

**Fifth** [1] - 1577:7

**figure** [1] - 1601:13

**file** [3] - 1605:25, 1606:3, 1606:19

**filed** [2] - 1556:21, 1557:7

**filled** [4] - 1589:10, 1633:6, 1693:19, 1694:6

**film** [1] - 1657:13

**final** [6] - 1568:13, 1570:20, 1703:9, 1707:21, 1711:24

**finally** [1] - 1639:22

**financed** [1] - 1559:23

**financial** [1] - 1615:17

**financing** [1] - 1580:25

**fine** [2] - 1551:2, 1666:9

**finish** [6] - 1556:5, 1566:16, 1643:1, 1643:23, 1688:18, 1707:20

**finished** [5] - 1552:15, 1567:11, 1568:11, 1708:10

**finishing** [1] - 1642:24

**finite** [1] - 1620:7

**firm** [2] - 1626:5, 1712:3

**first** [36] - 1550:7, 1566:2, 1571:8, 1571:14, 1573:24, 1576:14, 1582:20, 1589:11, 1590:18, 1591:21, 1591:23, 1603:18, 1608:13, 1614:6, 1619:2, 1621:20, 1621:24, 1622:1, 1622:8, 1624:15, 1625:2, 1637:2, 1637:3, 1637:11, 1644:1, 1647:15, 1659:9, 1665:11, 1669:24, 1679:13, 1687:10, 1692:20, 1698:19, 1700:5, 1700:23, 1707:18

**five** [4] - 1580:12, 1602:15, 1630:20, 1639:10

**fixtures** [1] - 1599:2

**Fleet** [3] - 1559:20, 1559:21, 1605:2

**flesh** [1] - 1664:8

**floor** [1] - 1577:7

**flooring** [1] - 1599:3

**floors** [3] - 1567:11, 1568:25, 1569:1

**Florida** [2] - 1577:23, 1660:13

**flow** [1] - 1603:12

**focusing** [1] - 1679:6

**fog** [1] - 1671:11

**folks** [1] - 1588:4

**follow** [2] - 1604:3, 1681:25

**following** [8] - 1549:3, 1558:23, 1564:1, 1654:16, 1656:13, 1662:12, 1696:2, 1709:23

**follows** [1] - 1559:9

**food** [4] - 1660:19, 1660:20, 1660:22,

1661:8
**footnote** [3] - 1686:13, 1687:13, 1687:15
**FOR** [1] - 1548:10
**forced** [1] - 1647:25
**forcing** [1] - 1648:3
**foreclose** [2] - 1597:2, 1646:19
**foreclosed** [2] - 1648:19, 1648:25
**foreclosing** [1] - 1626:23
**foreclosure** [1] - 1596:24
**foreclosures** [1] - 1627:12
**forfeiture** [4] - 1557:8, 1557:25, 1707:25, 1708:3
**forget** [2] - 1672:21, 1708:1
**forgive** [1] - 1656:5
**form** [8] - 1634:20, 1640:21, 1658:8, 1668:19, 1693:11, 1693:19, 1696:12, 1698:1
**formed** [3] - 1629:5, 1640:11, 1682:13
**former** [1] - 1700:24
**forms** [1] - 1699:16
**formulation** [1] - 1668:1
**forth** [3] - 1678:4, 1695:8, 1695:12
**forward** [5] - 1552:9, 1597:3, 1664:10, 1688:25, 1706:21
**forwarded** [1] - 1705:9
**four** [15] - 1551:11, 1566:18, 1578:17, 1591:2, 1593:18, 1600:24, 1613:5, 1613:8, 1614:12, 1623:7, 1638:14, 1639:13, 1657:2, 1682:23, 1693:9
**fourth** [2] - 1551:8, 1554:19
**fragmented** [4] - 1651:14, 1651:25, 1654:21, 1656:10
**framing** [2] - 1566:16, 1567:9
**frankly** [4] - 1678:11, 1685:5, 1685:11, 1708:18
**free** [2] - 1564:7, 1570:8
**Freeman** [54] - 1548:21, 1549:24, 1550:1, 1552:4, 1607:2, 1615:11, 1615:22, 1632:10, 1633:13, 1634:3, 1634:6, 1634:19, 1636:20, 1637:14, 1638:6, 1638:10, 1638:20, 1639:11, 1639:17, 1639:20, 1639:23, 1640:4, 1640:13, 1663:8, 1665:2, 1668:4, 1669:17, 1670:25, 1671:17, 1672:10, 1672:19, 1673:23, 1674:3, 1675:12, 1676:13, 1676:18, 1677:18, 1677:20, 1678:4, 1679:15, 1680:3, 1681:19, 1685:13, 1685:23, 1694:24, 1695:2, 1701:9, 1702:24, 1709:7, 1709:10, 1709:15, 1710:23, 1711:2, 1711:8
**FREEMAN** [1] - 1548:7
**Freeman's** [5] - 1615:24, 1616:3, 1623:25, 1632:25, 1678:6
**freeze** [1] - 1568:22
**freeze-over** [1] - 1568:22
**Freudian** [1] - 1702:17
**Frey** [1] - 1577:6
**Friday** [2] - 1557:18, 1666:18
**front** [6] - 1567:12, 1659:19, 1662:25, 1694:11, 1694:13, 1694:14

**fronting** [1] - 1657:4
**fruit** [1] - 1660:9
**fucking** [3] - 1653:22, 1657:4, 1657:12
**fulfill** [1] - 1601:22
**full** [11] - 1580:11, 1623:7, 1669:22, 1671:25, 1673:10, 1673:15, 1674:12, 1681:12, 1682:11, 1683:10, 1683:25
**fully** [2] - 1682:15, 1710:25
**functional** [1] - 1674:17
**functioning** [1] - 1630:6
**fund** [1] - 1622:19
**funder** [1] - 1570:20
**funding** [11] - 1578:22, 1578:24, 1579:8, 1580:13, 1589:19, 1590:21, 1597:5, 1605:2, 1641:21, 1642:5, 1704:19
**funds** [8] - 1580:16, 1580:18, 1593:12, 1601:3, 1602:18, 1602:20, 1602:23, 1602:24
**furnishings** [1] - 1705:11
**future** [1] - 1626:3

## G

**G702** [1] - 1617:5
**game** [3] - 1668:12, 1668:13, 1685:19
**Garvey** [33] - 1567:17, 1628:21, 1628:22, 1629:2, 1629:5, 1629:7, 1629:9, 1629:24, 1630:9, 1631:21, 1634:7, 1636:21, 1637:13, 1638:5, 1638:10, 1638:15, 1638:20, 1639:18, 1639:23, 1644:25, 1646:2, 1646:6, 1665:3, 1676:21, 1692:3, 1693:5, 1694:4, 1695:3, 1696:9, 1696:14, 1698:18, 1698:6, 1699:1
**general** [42] - 1560:11, 1566:22, 1566:24, 1567:2, 1567:25, 1569:8, 1570:24, 1574:19, 1581:13, 1581:17, 1581:20, 1582:12, 1584:3, 1585:13, 1585:23, 1586:1, 1590:6, 1591:23, 1592:11, 1593:16, 1597:22, 1598:14, 1600:11, 1600:18, 1609:5, 1611:19, 1611:23, 1612:1, 1612:10, 1612:12, 1612:18, 1612:23, 1613:6, 1614:18, 1617:17, 1620:2, 1644:7, 1644:16, 1644:18, 1691:19, 1697:9, 1704:5
**generally** [1] - 1688:14
**gentleman** [1] - 1576:2
**George** [47] - 1590:10, 1594:1, 1594:14, 1595:3, 1595:15, 1596:4, 1596:7, 1597:21, 1601:20, 1602:4, 1603:16, 1623:16, 1627:17, 1649:24, 1650:21, 1651:18, 1652:14, 1652:19, 1654:17, 1654:21, 1654:24, 1655:8, 1655:17, 1655:22, 1656:1, 1656:3, 1656:5, 1657:7, 1657:15, 1690:12, 1699:11, 1700:1, 1700:11, 1703:2, 1703:10, 1703:15, 1703:16, 1703:21, 1703:23, 1704:4, 1704:6, 1704:15, 1704:25, 1705:18, 1706:9, 1706:14, 1706:24
**Gerald** [1] - 1550:1
**GERSHON** [4] - 1548:10, 1549:2, 1553:15, 1636:3

**Gershon** [1] - 1549:8
**given** [8] - 1551:5, 1551:13, 1575:19, 1579:12, 1615:3, 1649:13, 1668:15, 1678:18
**glanced** [1] - 1694:18
**goods** [11] - 1600:2, 1600:19, 1601:6, 1601:12, 1601:16, 1601:19, 1626:3, 1631:12, 1631:13, 1690:12, 1694:3
**government** [45] - 1610:24, 1610:25, 1635:2, 1662:15, 1664:9, 1664:23, 1666:10, 1666:12, 1667:17, 1667:23, 1668:18, 1668:22, 1669:12, 1669:20, 1670:11, 1671:15, 1674:5, 1674:24, 1676:2, 1676:19, 1676:23, 1677:2, 1677:17, 1678:7, 1679:3, 1679:12, 1679:13, 1683:3, 1683:7, 1683:11, 1683:24, 1684:1, 1684:13, 1684:20, 1684:22, 1685:9, 1686:14, 1686:18, 1686:25, 1687:12, 1696:12, 1696:19, 1710:17, 1710:24, 1713:1
**Government** [22] - 1548:13, 1549:11, 1549:15, 1555:12, 1557:6, 1576:6, 1578:17, 1607:23, 1608:7, 1608:12, 1608:17, 1608:19, 1608:22, 1610:12, 1610:17, 1613:21, 1614:3, 1615:25, 1616:11, 1616:15, 1648:2, 1658:5
**government's** [6] - 1681:15, 1681:23, 1682:1, 1682:6, 1682:9, 1710:15
**Government's** [19] - 1576:21, 1582:18, 1583:4, 1604:5, 1620:22, 1625:3, 1628:20, 1630:18, 1632:3, 1636:23, 1639:5, 1641:12, 1649:19, 1692:6, 1697:16, 1698:10, 1699:19, 1700:17, 1714:18
**grab** [1] - 1712:20
**grand** [2] - 1652:4, 1652:5
**grant** [3] - 1575:19, 1576:18, 1579:13
**granted** [1] - 1684:25
**granting** [2] - 1708:19, 1708:20
**gray** [1] - 1657:13
**great** [2] - 1710:9, 1710:11
**gross** [1] - 1676:24
**ground** [2] - 1668:16, 1668:17
**group** [2] - 1592:21, 1612:12
**Grove** [2] - 1701:4, 1701:5
**guarantee** [11] - 1592:15, 1592:20, 1592:24, 1596:25, 1612:15, 1612:23, 1626:23, 1646:15, 1646:20, 1646:21, 1702:11
**guaranteed** [1] - 1561:17
**guaranteeing** [1] - 1648:16
**guess** [5] - 1554:1, 1554:24, 1555:2, 1591:20, 1647:23
**guidance** [1] - 1664:9
**guide** [3] - 1611:4, 1611:6, 1611:9
**guilty** [3] - 1679:24, 1681:9, 1684:5
**gut** [3] - 1575:2, 1575:5, 1588:25
**guy** [2] - 1596:5, 1684:16
**guys** [1] - 1706:1

# H

**half** [4] - 1571:11, 1655:11, 1655:12
**halfway** [1] - 1648:23
**Hancock** [55] - 1588:15, 1588:17, 1588:20, 1589:8, 1589:25, 1590:6, 1590:12, 1591:11, 1592:24, 1595:8, 1596:14, 1596:19, 1597:17, 1598:8, 1602:11, 1602:14, 1604:7, 1604:24, 1605:13, 1613:4, 1613:22, 1614:7, 1615:8, 1615:20, 1617:20, 1623:12, 1623:13, 1623:17, 1625:2, 1625:5, 1631:15, 1639:25, 1640:2, 1640:3, 1641:18, 1642:5, 1655:8, 1655:10, 1690:14, 1692:15, 1692:18, 1693:17, 1697:24, 1698:8, 1698:13, 1699:2, 1703:1, 1703:12, 1703:19, 1703:22, 1704:2, 1705:6, 1705:17, 1709:7, 1709:11
**hand** [3] - 1610:12, 1638:9, 1677:1
**handcuffed** [1] - 1661:9
**handled** [1] - 1587:12
**hands** [1] - 1667:15
**happy** [4] - 1628:1, 1628:2, 1628:3, 1628:17
**hard** [18] - 1572:19, 1583:23, 1584:4, 1584:15, 1585:1, 1585:2, 1585:6, 1585:18, 1585:20, 1587:7, 1614:9, 1618:21, 1620:3, 1620:17, 1637:4, 1649:15, 1698:7, 1705:10
**hard-cost** [3] - 1584:4, 1585:18, 1585:20
**harder** [1] - 1550:4
**hardship** [1] - 1628:8
**hardware** [1] - 1599:1
**Harlem** [1] - 1631:17
**Hart** [2] - 1594:23, 1628:21
**hate** [1] - 1555:4
**haze** [1] - 1670:16
**head** [1] - 1625:23
**heads** [1] - 1568:23
**hear** [9] - 1550:16, 1550:24, 1608:1, 1637:20, 1665:12, 1669:20, 1673:4, 1708:4, 1708:23
**heard** [4] - 1564:21, 1651:7, 1710:9, 1710:11
**hearing** [8] - 1556:10, 1663:15, 1663:16, 1663:17, 1666:15, 1668:25, 1669:2, 1669:16
**hears** [1] - 1666:3
**heart** [2] - 1681:22, 1711:10
**held** [2] - 1603:5, 1642:14
**hell** [1] - 1668:22
**help** [3] - 1553:25, 1564:22, 1588:7
**helpful** [1] - 1683:11
**Hendrickson** [1] - 1712:2, 1712:10
**hide** [2] - 1605:6, 1697:12
**higher** [3] - 1618:4, 1618:10, 1618:12
**himself** [4] - 1633:22, 1666:7, 1691:16, 1710:20
**hire** [1] - 1690:22

**hired** [1] - 1691:10
**history** [2] - 1691:8, 1702:7
**hit** [1] - 1651:17
**hold** [2] - 1704:9, 1704:10
**home** [6] - 1594:23, 1595:5, 1622:14, 1653:24, 1654:2, 1655:21
**Home** [6] - 1600:3, 1654:7, 1654:19, 1654:20, 1655:19, 1690:13
**home's** [1] - 1622:17
**homes** [3] - 1604:11, 1604:22, 1621:11
**Homes** [2] - 1621:10, 1655:14
**honestly** [1] - 1658:19
**Honor** [50] - 1549:16, 1549:20, 1549:25, 1551:1, 1551:13, 1552:1, 1553:6, 1553:7, 1553:8, 1554:6, 1554:10, 1554:13, 1555:11, 1556:16, 1556:20, 1557:5, 1558:2, 1559:13, 1560:19, 1562:9, 1564:9, 1603:20, 1606:22, 1608:4, 1608:24, 1610:7, 1610:8, 1610:9, 1634:18, 1635:10, 1636:13, 1662:5, 1662:16, 1665:25, 1666:17, 1667:9, 1668:22, 1668:23, 1678:11, 1682:18, 1685:6, 1685:19, 1685:25, 1689:4, 1708:1, 1708:5, 1708:6, 1710:7, 1712:23, 1713:10
**HONORABLE** [1] - 1548:10
**Honorable** [1] - 1549:7
**hood** [1] - 1598:24
**hopefully** [2] - 1707:7, 1707:22
**horse** [2] - 1665:17, 1683:20
**hospital** [1] - 1659:10
**hot** [1] - 1568:24
**hour** [4] - 1556:6, 1559:2, 1635:3, 1661:3
**hours** [6] - 1658:13, 1658:15, 1658:20, 1658:21, 1660:10, 1660:12
**house** [1] - 1551:14
**household** [1] - 1552:4
**houses** [2] - 1575:3, 1702:9
**housing** [3] - 1560:4, 1611:17, 1628:9
**HPD** [35] - 1561:2, 1561:5, 1561:11, 1569:17, 1570:23, 1571:15, 1576:12, 1578:18, 1578:21, 1579:11, 1579:14, 1581:5, 1581:22, 1588:4, 1593:20, 1602:13, 1611:20, 1612:10, 1618:19, 1621:11, 1626:14, 1628:5, 1645:15, 1648:7, 1676:18, 1680:2, 1681:5, 1690:14, 1691:24, 1692:11, 1692:12, 1697:7, 1701:12, 1702:10, 1712:2
**HPD-related** [2] - 1690:14, 1692:12
**HUD** [11] - 1575:19, 1576:12, 1576:17, 1578:15, 1579:13, 1581:5, 1581:14, 1581:15, 1617:8, 1617:9, 1621:10
**HUD's** [2] - 1577:19, 1577:22
**Hugo** [4] - 1575:22, 1575:23, 1577:10, 1712:3
**hundred** [7] - 1573:12, 1630:7, 1645:18, 1645:19, 1647:15, 1647:17, 1647:18
**hundreds** [1] - 1612:9
**HYMOWITZ** [1] - 1548:7
**Hymowitz** [58] - 1548:19, 1549:21,

1549:22, 1555:13, 1607:5, 1615:12, 1624:4, 1633:2, 1633:13, 1634:6, 1636:19, 1637:14, 1638:10, 1638:15, 1639:13, 1639:17, 1639:23, 1640:5, 1640:13, 1640:14, 1641:7, 1663:8, 1665:2, 1665:4, 1668:3, 1669:8, 1669:17, 1670:25, 1671:17, 1672:10, 1672:19, 1673:23, 1674:3, 1675:11, 1676:12, 1676:15, 1676:17, 1677:18, 1677:19, 1678:4, 1679:14, 1680:3, 1681:4, 1682:5, 1685:13, 1685:23, 1695:23, 1698:22, 1701:9, 1702:24, 1709:6, 1709:9, 1709:15, 1710:23, 1711:2, 1711:8, 1713:2, 1713:7
**Hymowitz's** [2] - 1633:8, 1678:6

# I

**idea** [2] - 1556:4, 1697:8
**identification** [1] - 1562:10
**identified** [4] - 1572:13, 1616:11, 1617:6, 1692:21
**identify** [1] - 1562:19
**identity** [1] - 1581:13
**Ighodaro** [6] - 1624:10, 1628:15, 1701:13, 1701:14, 1702:13, 1705:25
**ill** [3] - 1552:2, 1558:17, 1558:18
**illicit** [1] - 1682:15
**illness** [3] - 1551:15, 1552:4, 1553:24
**immediate** [1] - 1676:1, 1692:25
**immediately** [4] - 1557:21, 1592:11, 1593:3, 1621:14
**impact** [1] - 1602:21
**impeach** [6] - 1668:5, 1668:7, 1669:13, 1676:3, 1676:7, 1710:17
**impeached** [2] - 1675:18, 1675:20
**impeachment** [6] - 1664:6, 1664:10, 1668:10, 1669:4, 1674:16, 1675:14
**implicate** [3] - 1671:16, 1675:11, 1685:13
**implicated** [2] - 1668:3, 1685:19
**impossible** [1] - 1661:9
**imprimatur** [1] - 1683:23
**improper** [2] - 1618:5, 1620:19
**improperly** [1] - 1678:10
**inadmissible** [2] - 1710:22, 1711:3
**inappropriate** [2] - 1662:24, 1683:14
**Inc** [6] - 1637:13, 1638:5, 1638:10, 1638:15, 1638:20, 1639:18
**include** [3] - 1601:13, 1704:24, 1705:1
**included** [1] - 1643:14
**includes** [1] - 1584:3, 1670:14
**including** [3] - 1611:10, 1612:12, 1670:1
**income** [6] - 1560:4, 1560:8, 1569:22, 1611:16, 1630:21, 1693:11
**inconsistency** [1] - 1668:24
**inconsistent** [1] - 1677:24
**incorporated** [1] - 1622:16
**incorrect** [2] - 1618:13, 1618:17
**increase** [1] - 1580:25

**increased** [3] - 1604:8, 1604:12, 1604:15
**incriminated** [1] - 1679:18
**incurred** [2] - 1580:12, 1580:13
**indeed** [3] - 1676:16, 1678:13, 1685:15
**independent** [1] - 1676:20
**indicate** [2] - 1622:8, 1678:20
**indicated** [6] - 1550:20, 1646:17, 1666:17, 1671:3, 1693:3, 1711:7
**indicates** [10] - 1621:3, 1621:6, 1621:23, 1622:20, 1622:23, 1671:23, 1692:14, 1692:20, 1697:24, 1697:25
**indicating** [2] - 1550:14, 1679:17
**indication** [2] - 1675:9, 1678:19
**indirect** [1] - 1578:22
**indirectly** [4] - 1579:3, 1579:12, 1579:15, 1693:10
**individual** [5] - 1682:3, 1692:9, 1695:9, 1697:20, 1699:13
**induce** [1] - 1695:13
**inextricably** [1] - 1676:2
**inflaming** [1] - 1684:19
**influenced** [1] - 1666:2
**information** [5] - 1560:15, 1582:3, 1669:13, 1695:8, 1695:11
**informed** [3] - 1561:11, 1700:24, 1712:1
**informing** [1] - 1652:18
**initial** [4] - 1591:7, 1669:20, 1672:12, 1696:23
**inject** [1] - 1660:17
**injection** [1] - 1659:18
**input** [2] - 1572:14, 1574:9
**Insana** [3] - 1671:24, 1673:14, 1675:22
**inspecting** [1] - 1584:24
**inspector** [2] - 1577:12, 1582:12
**inspector's** [1] - 1577:13
**installed** [1] - 1567:10
**instances** [1] - 1604:17
**institution** [1] - 1603:12
**instruct** [2] - 1683:15, 1689:9
**instructed** [3] - 1627:17, 1661:6, 1701:14
**instruction** [3] - 1664:9, 1665:9, 1674:1
**instrument** [1] - 1706:12
**insufficient** [2] - 1602:18, 1602:20
**insulation** [1] - 1567:10
**insulin** [6] - 1659:18, 1661:4, 1674:20, 1675:4, 1678:22, 1683:19
**insurance** [5] - 1584:8, 1593:4, 1593:6, 1593:7, 1648:21
**Insurances** [1] - 1584:8
**insurances** [1] - 1584:10
**insured** [1] - 1648:20
**intend** [2] - 1634:23, 1671:18
**intended** [1] - 1564:9
**intent** [3] - 1671:5, 1671:7, 1672:12
**intention** [4] - 1672:19, 1673:1, 1686:19, 1690:12
**interagency** [1] - 1583:1
**interest** [19] - 1578:21, 1579:1, 1579:8, 1579:15, 1593:1, 1593:13, 1615:17,

1621:14, 1621:20, 1621:23, 1622:24, 1622:25, 1623:6, 1628:5, 1684:8, 1684:10, 1693:2
**interested** [1] - 1579:3
**interesting** [1] - 1686:13
**interior** [4] - 1599:2, 1642:24, 1643:1, 1691:16
**interlocking** [1] - 1675:23
**Interparticipant** [1] - 1576:11
**intertwined** [1] - 1676:2
**intervene** [1] - 1588:7
**interview** [2] - 1611:23, 1658:23
**intimated** [1] - 1676:16
**introduce** [1] - 1686:19
**introduced** [2] - 1657:24, 1699:20
**inventory** [2] - 1600:8, 1602:10
**investigating** [1] - 1684:9
**investigation** [1] - 1625:16
**Investigation** [1] - 1626:2
**invocation** [3] - 1669:16, 1669:17, 1670:14
**invoices** [7] - 1600:18, 1690:16, 1692:2, 1696:18, 1696:25, 1697:2, 1701:17
**involved** [3] - 1590:16, 1591:10, 1602:12
**irreparable** [1] - 1683:12
**isolation** [1] - 1664:24
**issue** [24] - 1550:7, 1557:4, 1557:11, 1607:20, 1609:11, 1662:14, 1668:24, 1669:11, 1669:24, 1673:18, 1682:11, 1683:2, 1683:25, 1684:19, 1685:4, 1685:7, 1685:11, 1687:7, 1687:21, 1706:25
**issues** [5] - 1550:5, 1551:14, 1586:23, 1673:15, 1708:3
**item** [4] - 1583:17, 1585:21, 1593:9, 1593:10
**items** [7] - 1570:21, 1584:4, 1584:14, 1603:15, 1620:16, 1631:13

## J

**jail** [3] - 1659:12, 1660:7, 1661:9
**Jewish** [1] - 1684:16
**job** [2] - 1590:21, 1642:14
**jobs** [2] - 1681:3
**jog** [1] - 1667:19
**John** [1] - 1710:16
**joint** [3] - 1633:14, 1681:23, 1682:2
**JR** [1] - 1548:17
**judge** [7] - 1562:11, 1659:19, 1664:18, 1679:20, 1687:16, 1712:7, 1713:5
**Judge** [16] - 1549:2, 1552:12, 1553:15, 1565:2, 1609:7, 1636:3, 1636:24, 1637:6, 1664:21, 1669:22, 1671:20, 1672:24, 1674:8, 1677:13, 1687:12, 1708:18
**JUDGE** [1] - 1548:11
**July** [2] - 1602:2, 1614:10
**June** [9] - 1613:23, 1625:7, 1641:17, 1657:25, 1697:22, 1698:4, 1699:19,

1700:18, 1702:2
**Juniors** [1] - 1660:17

**juror** [6] - 1551:9, 1551:22, 1551:23, 1552:11, 1552:19, 1554:21
**Juror** [1] - 1550:7
**jurors** [2] - 1552:5, 1554:16
**JURY** [1] - 1548:10, 1636:11
**Jury** [9] - 1558:9, 1558:10, 1607:12, 1607:15, 1636:9, 1664:16, 1689:18, 1707:6, 1707:14
**jury** [33] - 1549:4, 1551:4, 1551:16, 1556:19, 1557:8, 1562:5, 1583:14, 1588:16, 1604:18, 1610:1, 1610:3, 1610:4, 1634:11, 1634:14, 1636:6, 1654:3, 1662:10, 1662:25, 1663:23, 1664:7, 1664:11, 1664:14, 1668:1, 1668:19, 1674:1, 1683:15, 1684:19, 1688:24, 1689:7, 1689:13, 1689:20, 1707:15, 1708:3

## K

**keen** [1] - 1556:6
**keep** [3] - 1565:8, 1657:14, 1661:4
**kept** [2] - 1571:15, 1573:21
**key** [1] - 1564:5
**kick** [1] - 1646:21
**kickback** [23] - 1566:24, 1595:2, 1620:19, 1646:5, 1654:9, 1654:11, 1654:13, 1673:7, 1676:21, 1677:8, 1677:20, 1679:23, 1681:17, 1682:2, 1682:25, 1692:2, 1697:12, 1709:2, 1709:6, 1709:16, 1710:16, 1710:19
**kickbacks** [9] - 1620:12, 1620:16, 1626:9, 1626:12, 1668:12, 1675:19, 1679:25, 1682:3, 1691:23
**kind** [3] - 1631:13, 1659:22, 1692:6
**King** [2] - 1694:8, 1699:15
**Kings** [3] - 1598:20, 1631:18, 1631:20
**kitchen** [1] - 1598:24
**knowledge** [2] - 1636:19, 1695:10
**knows** [1] - 1679:1

## L

**lack** [2] - 1674:20, 1682:10
**lacking** [2] - 1674:15, 1675:14
**landlord/tenant** [1] - 1701:8
**large** [5] - 1568:19, 1649:8, 1649:13, 1653:22, 1709:20
**larger** [1] - 1620:8
**last** [31] - 1555:18, 1555:19, 1561:1, 1564:22, 1575:25, 1580:10, 1580:11, 1605:13, 1623:22, 1624:19, 1624:21, 1625:21, 1636:17, 1638:19, 1639:22, 1662:11, 1670:5, 1684:7, 1689:14, 1689:22, 1689:23, 1703:12, 1703:16, 1703:18, 1703:21, 1703:22, 1704:6, 1704:10, 1707:3, 1709:21
**lastly** [1] - 1628:9
**late** [4] - 1551:23, 1555:22, 1596:22, 1685:1

All Word // USA v Stevenson Dunn, et al.

14

**law** [7] - 1608:9, 1669:22, 1671:23, 1672:4, 1707:18, 1708:21

**lawfully** [1] - 1644:14

**lawyer** [3] - 1610:25, 1633:4, 1674:21

**lawyers** [12] - 1662:3, 1663:4, 1663:20, 1664:2, 1669:4, 1670:19, 1672:11, 1673:7, 1673:9, 1684:16, 1688:11, 1709:2

**lay** [2] - 1611:6, 1667:14

**laying** [1] - 1668:16

**leading** [1] - 1667:7

**learned** [1] - 1698:6

**least** [6] - 1551:6, 1555:17, 1556:4, 1565:3, 1608:4, 1677:24

**leave** [1] - 1707:6

**leaving** [1] - 1696:12

**LEE** [1] - 1548:7

**Lee** [12] - 1548:19, 1549:21, 1607:5, 1624:4, 1634:6, 1638:15, 1639:13, 1640:13, 1640:14, 1669:8, 1694:12, 1709:6

**left** [3] - 1550:19, 1687:23, 1689:5

**legal** [2] - 1615:15, 1701:7

**legally** [1] - 1644:17

**legitimate** [1] - 1706:8

**legitimately** [1] - 1680:2

**lender** [7] - 1559:17, 1575:14, 1575:16, 1589:12, 1589:14, 1603:11, 1644:6

**lending** [1] - 1603:12

**length** [4] - 1646:14, 1669:15, 1710:9, 1710:11

**lengthy** [2] - 1661:10, 1661:14

**Less** [1] - 1614:24

**less** [4] - 1618:20, 1625:24, 1645:19, 1648:3

**letter** [9] - 1556:23, 1557:7, 1557:14, 1557:17, 1606:7, 1612:16, 1620:24, 1666:18, 1666:20

**letting** [1] - 1712:12

**levels** [1] - 1660:8

**Lexington** [28] - 1559:16, 1559:19, 1559:25, 1560:2, 1560:20, 1561:12, 1561:21, 1566:2, 1568:13, 1569:13, 1569:23, 1570:5, 1571:3, 1571:8, 1572:1, 1573:11, 1573:15, 1573:23, 1604:14, 1605:21, 1615:8, 1629:19, 1642:18, 1642:21, 1654:4, 1696:4

**lie** [1] - 1710:19

**life** [1] - 1626:24

**light** [1] - 1554:3

**lighting** [1] - 1599:2

**likelihood** [1] - 1713:1

**likely** [4] - 1554:14, 1686:10, 1712:11, 1712:25

**limit** [1] - 1711:15

**limited** [3] - 1637:18, 1678:10, 1711:11

**limiting** [1] - 1674:1

**limits** [2] - 1678:12, 1679:1

**line** [21] - 1552:10, 1577:21, 1583:16, 1583:17, 1584:14, 1585:21, 1586:19, 1600:15, 1628:7, 1641:5, 1651:18, 1651:22, 1655:13, 1655:23, 1657:11, 1667:18, 1673:16, 1700:23, 1709:1, 1709:5

**lines** [1] - 1642:4

**list** [6] - 1611:9, 1620:16, 1694:21, 1696:3, 1696:9, 1712:1

**listed** [1] - 1694:24

**listen** [1] - 1653:16

**lists** [2] - 1620:2, 1620:12

**LLC** [8] - 1621:1, 1632:24, 1692:15, 1696:5, 1696:6, 1697:25, 1698:13

**LLP** [2] - 1629:19, 1696:4

**loan** [36] - 1559:24, 1575:10, 1591:1, 1591:3, 1591:4, 1591:6, 1591:11, 1591:14, 1592:18, 1592:19, 1593:2, 1593:11, 1593:13, 1593:15, 1594:13, 1596:23, 1597:3, 1597:6, 1612:19, 1612:22, 1613:9, 1613:25, 1620:23, 1621:3, 1621:14, 1622:14, 1622:16, 1622:18, 1622:23, 1623:5, 1625:4, 1642:6, 1646:23, 1648:15, 1648:22

**loaned** [1] - 1580:22

**loans** [2] - 1612:15, 1646:15

**located** [1] - 1629:6

**look** [7] - 1557:24, 1582:2, 1583:13, 1637:2, 1638:2, 1645:14, 1661:7

**looked** [2] - 1622:8, 1675:16

**looking** [6] - 1562:6, 1583:3, 1604:5, 1623:3, 1697:7, 1699:5

**LORETTA** [1] - 1548:13

**lose** [6] - 1551:8, 1554:13, 1555:4, 1596:22, 1618:19, 1649:1

**losing** [1] - 1648:20

**lost** [2] - 1556:6, 1559:2

**low** [4] - 1560:3, 1560:8, 1611:16, 1618:10

**Lowe's** [2] - 1600:3, 1600:8

**lower** [2] - 1648:1, 1648:7

**Lowes** [1] - 1690:13

**lowest** [2] - 1617:25

**LP** [1] - 1642:22

**lunch** [4] - 1558:5, 1635:1, 1635:11, 1670:6

**luncheon** [1] - 1634:10

**LYNCH** [1] - 1548:13

**M**

**Magidson** [1] - 1705:24

**mail** [8] - 1699:19, 1699:22, 1700:12, 1700:14, 1700:17, 1701:14, 1702:15

**majority** [1] - 1649:13

**Mallone** [1] - 1710:16

**man** [2] - 1650:12, 1650:17

**managed** [2] - 1571:6, 1693:1

**management** [2] - 1559:15, 1629:13

**Management** [2] - 1630:4, 1630:6

**manager** [4] - 1569:12, 1589:16, 1589:20, 1606:6

**managing** [1] - 1644:21

**Mandatory** [1] - 1622:13

**manner** [4] - 1590:1, 1616:22, 1642:7, 1711:3

**Mansfield** [2] - 1677:13, 1687:13

**March** [4] - 1548:7, 1698:15, 1699:8, 1713:11

**Marcus** [33] - 1567:17, 1628:21, 1628:22, 1629:2, 1629:5, 1629:7, 1629:9, 1629:24, 1630:9, 1631:21, 1634:7, 1636:21, 1637:13, 1638:5, 1638:10, 1638:15, 1638:20, 1639:17, 1639:23, 1644:25, 1646:2, 1646:6, 1665:3, 1676:21, 1692:3, 1693:5, 1694:4, 1695:2, 1696:9, 1696:13, 1696:18, 1698:6, 1699:1

**Marcy** [1] - 1690:8

**margins** [1] - 1683:12

**Marie** [1] - 1712:2

**MARIE** [1] - 1548:16

**marked** [3] - 1562:3, 1562:10, 1628:19

**market** [5] - 1575:3, 1628:8, 1648:9, 1690:12, 1701:12

**marketer** [2] - 1628:12, 1628:17

**marketing** [1] - 1628:9

**massive** [1] - 1569:1

**match** [2] - 1572:2, 1603:11

**materials** [1] - 1697:5

**Matter** [1] - 1713:11

**matter** [4] - 1623:13, 1634:19, 1652:13, 1701:6

**matters** [1] - 1688:20

**maturity** [1] - 1623:8

**Maurice** [1] - 1594:22

**maxing** [1] - 1582:17

**MCR** [10] - 1560:12, 1567:3, 1568:8, 1570:12, 1574:21, 1606:7, 1629:19, 1630:5, 1631:2, 1643:22

**MDC** [1] - 1709:7

**mean** [19] - 1554:25, 1575:23, 1578:20, 1579:7, 1580:21, 1588:22, 1598:22, 1627:11, 1646:11, 1649:10, 1653:3, 1661:12, 1679:22, 1684:6, 1697:2, 1703:18, 1706:13, 1708:18, 1708:25

**meaning** [1] - 1598:23

**meaningful** [3] - 1666:22, 1678:17, 1678:18

**means** [6] - 1576:25, 1577:22, 1601:1, 1683:24, 1684:13, 1692:21

**meant** [2] - 1594:10, 1702:17

**mechanical** [1] - 1548:25

**medical** [1] - 1659:23

**medicate** [1] - 1660:14

**medication** [1] - 1659:25

**medicine** [1] - 1658:20

**medium** [1] - 1700:9

**meet** [4] - 1578:14, 1612:10, 1659:17, 1660:15

**meeting** [3] - 1577:25, 1582:11, 1657:25

**meetings** [3] - 1572:13, 1578:7, 1612:6

**member** [11] - 1577:5, 1578:19, 1578:23, 1579:10, 1607:2, 1607:5, 1632:18, 1632:23, 1632:25, 1633:24,

VB        OCR        CRR

1692:25

**members** [7] - 1592:21, 1593:21, 1596:5, 1615:10, 1632:8, 1634:11, 1689:20
**Members** [3] - 1558:10, 1607:12, 1707:6
**memory** [3] - 1565:8, 1682:10, 1689:4
**men** [1] - 1682:2
**mentioned** [2] - 1601:12, 1651:9
**message** [2] - 1550:13, 1550:20
**met** [1] - 1660:16
**metropolis** [1] - 1590:7
**Metropolis** [14] - 1590:8, 1592:1, 1593:16, 1594:5, 1595:12, 1600:9, 1600:12, 1600:23, 1601:6, 1601:18, 1603:13, 1606:8, 1631:8, 1709:8
**Miami** [1] - 1577:23
**mic** [1] - 1637:24
**MICHAEL** [1] - 1548:7
**Michael** [19] - 1548:21, 1549:24, 1607:2, 1615:11, 1615:24, 1632:10, 1634:3, 1634:6, 1638:5, 1638:20, 1639:11, 1639:20, 1640:4, 1640:13, 1694:24, 1695:2, 1702:6, 1702:22, 1709:6
**microwave** [1] - 1598:24
**middle** [4] - 1562:23, 1653:21, 1683:13, 1709:20
**might** [10] - 1551:8, 1552:20, 1585:6, 1612:4, 1643:12, 1671:21, 1705:1, 1708:13, 1710:5, 1712:20
**Mike** [3] - 1641:10, 1702:18, 1703:20
**million** [10] - 1560:21, 1560:23, 1589:3, 1591:13, 1592:19, 1592:20, 1621:4, 1647:16, 1648:24, 1649:8
**millions** [1] - 1647:7
**mind** [2] - 1591:17, 1634:22
**minus** [3] - 1642:11, 1642:12, 1647:18
**minute** [3] - 1558:3, 1603:20, 1667:14
**minutes** [5] - 1659:18, 1664:7, 1664:15, 1688:21, 1688:22
**Miranda** [1] - 1658:8
**mirror** [1] - 1609:2
**missed** [1] - 1694:18
**mistrial** [5] - 1662:7, 1662:25, 1664:22, 1668:4, 1684:8
**Mitchell** [5] - 1550:8, 1553:2, 1553:19, 1558:16, 1558:17
**mixture** [1] - 1551:16
**modifying** [1] - 1580:5
**moment** [4] - 1554:7, 1556:9, 1606:23, 1614:1
**momma's** [1] - 1657:13
**Monday** [1] - 1657:13
**money** [93] - 1570:24, 1573:10, 1573:13, 1576:18, 1585:20, 1587:7, 1588:8, 1588:10, 1591:7, 1591:8, 1591:10, 1592:1, 1593:7, 1593:13, 1594:14, 1596:23, 1615:2, 1618:19, 1618:21, 1622:1, 1622:9, 1626:3, 1628:6, 1628:7, 1629:23, 1630:10, 1633:25, 1641:21, 1642:1, 1642:17, 1643:24, 1643:25, 1644:1, 1644:2,

1644:4, 1644:7, 1644:13, 1644:17, 1644:18, 1644:24, 1645:17, 1645:20, 1645:23, 1646:2, 1646:3, 1646:4, 1646:12, 1646:18, 1649:2, 1649:7, 1649:13, 1650:21, 1652:20, 1652:24, 1653:7, 1654:3, 1654:14, 1654:22, 1655:6, 1655:7, 1655:15, 1655:23, 1656:2, 1656:3, 1656:8, 1657:8, 1676:11, 1676:13, 1676:17, 1676:20, 1676:21, 1676:22, 1677:19, 1677:20, 1680:1, 1682:20, 1682:21, 1682:25, 1690:15, 1697:9, 1698:7, 1700:20, 1703:3, 1703:8, 1704:3, 1704:9, 1704:10, 1704:15, 1706:20, 1706:24
**monies** [9] - 1601:6, 1602:21, 1605:9, 1606:1, 1606:5, 1629:19, 1629:21, 1642:11, 1642:20
**monitor** [3] - 1577:20, 1577:22, 1578:15
**month** [6] - 1601:25, 1612:9, 1614:14, 1651:2, 1702:6
**monthly** [1] - 1573:5
**months** [8] - 1591:2, 1593:18, 1613:5, 1613:8, 1614:12, 1614:15, 1614:16, 1623:7
**moreover** [2] - 1675:16, 1676:6
**morning** [25] - 1549:16, 1549:20, 1549:25, 1550:3, 1550:14, 1550:20, 1551:22, 1554:11, 1555:15, 1555:18, 1557:13, 1558:10, 1559:2, 1559:12, 1559:13, 1635:9, 1659:15, 1659:24, 1660:7, 1660:15, 1671:1, 1707:8, 1707:10, 1713:1, 1713:9
**most** [10] - 1612:16, 1612:22, 1643:4, 1656:9, 1670:18, 1670:22, 1679:2, 1694:17, 1706:20, 1712:24
**mostly** [2] - 1629:16, 1694:16
**motion** [9] - 1556:21, 1608:25, 1662:24, 1664:22, 1667:10, 1678:14, 1678:25, 1687:9, 1687:17
**motive** [3] - 1685:18, 1686:2, 1711:2
**move** [13] - 1552:9, 1558:21, 1562:9, 1564:11, 1565:13, 1574:11, 1581:7, 1638:24, 1662:7, 1664:1, 1668:13, 1699:3, 1708:22
**moved** [4] - 1573:1, 1668:4, 1678:13, 1686:21
**moving** [3] - 1552:13, 1565:8, 1577:17
**must** [1] - 1586:1
**mutual** [3] - 1628:18, 1673:12, 1684:6
**Myrtle** [5] - 1566:18, 1567:5, 1605:22, 1643:21, 1690:23

## N

**nails** [1] - 1705:14
**name** [9] - 1575:25, 1598:18, 1603:18, 1603:23, 1632:20, 1669:3, 1694:20, 1709:8
**named** [3] - 1634:7, 1690:14
**Naushan** [2] - 1548:22, 1549:14
**necessary** [4] - 1586:20, 1683:2, 1683:9
**need** [14] - 1552:24, 1554:2, 1554:24,

1555:9, 1556:5, 1557:2, 1557:3, 1558:12, 1581:17, 1608:1, 1674:1, 1683:8, 1686:1, 1710:24
**needed** [3] - 1556:2, 1627:2, 1683:18
**needs** [3] - 1555:2, 1556:25, 1557:8
**negative** [3] - 1602:21, 1602:22, 1602:24
**neglected** [1] - 1687:6
**negotiated** [3] - 1709:16, 1710:15, 1710:19
**negotiating** [2] - 1681:17, 1709:2
**Neighborhood** [6] - 1640:22, 1654:7, 1654:19, 1654:20, 1655:14, 1655:19
**neighborhood** [7] - 1611:3, 1611:7, 1611:13, 1611:22, 1653:24, 1654:2, 1691:23
**neighboring** [1] - 1611:10
**NEP** [22] - 1559:18, 1559:19, 1569:23, 1573:24, 1574:14, 1589:11, 1589:16, 1594:7, 1604:14, 1604:19, 1606:5, 1606:6, 1633:15, 1641:8, 1641:9, 1654:14, 1654:18, 1654:20, 1654:25, 1655:1, 1655:2
**nervous** [1] - 1554:16
**never** [10] - 1570:6, 1610:22, 1643:10, 1658:25, 1662:19, 1662:20, 1663:22, 1670:12, 1684:22, 1685:4
**NEW** [1] - 1548:1
**new** [2] - 1567:21, 1633:20
**New** [20] - 1548:5, 1548:14, 1548:15, 1549:7, 1577:6, 1577:7, 1577:8, 1578:5, 1578:21, 1586:24, 1588:4, 1602:19, 1626:2, 1630:3, 1630:20, 1630:21, 1644:20, 1695:11, 1695:13
**next** [21] - 1563:6, 1565:15, 1579:19, 1584:25, 1599:4, 1619:5, 1643:14, 1653:21, 1655:5, 1655:14, 1655:23, 1657:11, 1659:24, 1661:22, 1663:11, 1667:8, 1670:19, 1671:1, 1680:5, 1693:8, 1701:18
**Nicholas** [1] - 1550:1
**NICHOLAS** [1] - 1548:21
**night** [4] - 1659:13, 1659:21, 1707:11, 1713:9
**Nina** [1] - 1549:8
**NINA** [4] - 1548:10, 1549:2, 1553:15, 1636:3
**nine** [3] - 1566:11, 1566:12, 1616:18
**ninth** [1] - 1618:24
**Noel** [2] - 1603:25, 1604:1
**non** [1] - 1676:18
**non-HPD** [1] - 1676:18
**none** [2] - 1620:11, 1620:15
**nonetheless** [1] - 1673:19
**normal** [2] - 1608:17, 1608:20
**notarized** [1] - 1695:23
**note** [4] - 1623:4, 1623:5, 1623:8, 1710:14
**nothing** [12] - 1556:18, 1564:12, 1564:13, 1607:8, 1644:17, 1644:23, 1645:2, 1645:9, 1671:2, 1674:20,

1680:3, 1702:22

**notice** [1] - 1609:9, 1625:25, 1669:14
**notified** [2] - 1585:23, 1593:20
**notify** [3] - 1570:23, 1586:1, 1593:19
**notwithstanding** [1] - 1625:22
**November** [2] - 1624:19, 1702:3
**Number** [1] - 1550:7
**number** [11] - 1550:23, 1558:19, 1591:17, 1592:19, 1610:16, 1616:5, 1616:18, 1631:13, 1637:8, 1647:1, 1699:2
**NY** [1] - 1548:24

## O

**o'clock** [4] - 1555:23, 1556:2, 1556:3, 1659:21
**O'Neill** [1] - 1677:4
**O's** [3] - 1586:20, 1586:25, 1628:5
**oath** [1] - 1559:6
**object** [2] - 1562:11, 1634:20
**objection** [18] - 1553:1, 1634:9, 1634:17, 1638:25, 1639:1, 1639:2, 1639:3, 1639:6, 1650:22, 1651:10, 1653:8, 1659:5, 1660:2, 1662:4, 1662:5, 1684:25, 1689:5, 1712:19
**objectionable** [1] - 1685:20
**obligating** [1] - 1580:17
**obligation** [4] - 1580:14, 1580:15, 1601:22, 1617:12
**obligations** [1] - 1703:20
**observation** [1] - 1710:7
**obtain** [2] - 1683:5, 1683:10
**obtained** [2] - 1676:16, 1686:20
**obtaining** [1] - 1626:6
**obviously** [2] - 1558:16, 1670:14
**occupancy** [3] - 1586:22, 1586:23, 1587:4
**occupants** [2] - 1590:14, 1592:8
**occupied** [4] - 1571:10, 1571:11, 1571:12, 1588:24
**occupy** [4] - 1560:8
**occurred** [6] - 1564:1, 1623:1, 1653:11, 1657:21, 1662:12, 1665:10
**occurrences** [1] - 1571:6
**occurs** [2] - 1549:3, 1681:18
**October** [2] - 1658:11, 1695:25
**odds** [1] - 1668:15
**OF** [3] - 1548:1, 1548:3, 1548:10
**off-cycle** [1] - 1601:2
**offending** [1] - 1675:1
**offer** [1] - 1670:12
**offered** [2] - 1579:12, 1674:4
**office** [4] - 1603:17, 1606:13, 1627:6, 1700:25
**officer** [5] - 1577:1, 1579:10, 1579:13, 1661:6, 1692:25
**offices** [1] - 1549:18
**official** [4] - 1578:19, 1578:23, 1580:17, 1711:25
**officials** [1] - 1626:21

**often** [1] - 1573:7

**once** [10] - 1561:13, 1594:24, 1594:25, 1608:22, 1612:9, 1623:1, 1644:13, 1703:14, 1707:9
**one** [66] - 1551:8, 1551:11, 1552:15, 1558:3, 1558:21, 1568:23, 1575:16, 1575:18, 1577:20, 1579:7, 1586:8, 1590:17, 1592:8, 1601:25, 1602:1, 1603:20, 1605:13, 1605:14, 1606:22, 1611:18, 1611:23, 1620:12, 1620:16, 1630:7, 1632:11, 1638:2, 1642:8, 1642:25, 1643:4, 1643:18, 1652:3, 1655:1, 1655:2, 1657:5, 1659:13, 1668:2, 1676:7, 1677:1, 1677:14, 1679:20, 1681:17, 1682:4, 1682:11, 1686:24, 1689:24, 1692:14, 1693:5, 1693:7, 1697:15, 1697:22, 1698:3, 1698:15, 1698:22, 1698:24, 1700:20, 1703:3, 1703:22, 1709:3, 1709:4, 1709:5, 1710:5, 1710:7, 1711:25, 1712:8, 1712:24
**ones** [1] - 1571:4
**ongoing** [1] - 1559:21
**open** [7] - 1549:1, 1553:14, 1610:1, 1636:2, 1664:13, 1688:24, 1707:15
**operated** [2] - 1590:8, 1709:10
**operating** [1] - 1607:1
**opinion** [2] - 1634:21, 1684:9
**opportunity** [14] - 1557:12, 1557:15, 1561:6, 1658:17, 1664:7, 1671:25, 1673:11, 1673:15, 1674:13, 1674:14, 1674:25, 1675:7, 1676:19, 1681:13
**options** [1] - 1550:23
**order** [8] - 1566:25, 1600:8, 1608:5, 1639:10, 1668:25, 1675:2, 1675:7, 1683:10
**ordinary** [1] - 1608:5
**organization** [1] - 1694:23
**original** [1] - 1629:21
**originally** [1] - 1569:6
**otherwise** [2] - 1609:9, 1693:1
**ought** [4] - 1667:20, 1679:2, 1679:12, 1685:23
**ourselves** [1] - 1609:13
**out-of-pocket** [3] - 1588:12, 1596:23, 1628:6
**outcome** [1] - 1615:17
**outline** [2] - 1563:2, 1564:17
**outlines** [1] - 1581:23
**outside** [6] - 1549:3, 1610:1, 1693:20, 1705:2, 1705:3, 1707:15
**outstanding** [3] - 1606:5, 1630:6, 1706:25
**overall** [1] - 1648:4
**overnight** [1] - 1659:14
**Overruled** [3] - 1650:23, 1651:11, 1653:9
**overruled** [1] - 1659:6, 1660:3
**oversee** [1] - 1603:12
**oversimplification** [1] - 1676:25
**overwhelmed** [4] - 1626:21, 1627:4,

1653:6, 1657:18

**owe** [2] - 1645:19, 1645:20
**owed** [24] - 1570:12, 1570:23, 1597:24, 1601:6, 1601:8, 1601:10, 1629:18, 1629:23, 1630:9, 1631:3, 1642:17, 1642:23, 1644:20, 1650:21, 1654:3, 1654:14, 1654:23, 1655:11, 1680:2, 1703:5, 1703:9, 1703:10, 1705:16, 1706:24
**owes** [6] - 1644:16, 1644:18, 1645:18, 1645:20, 1656:2, 1656:8
**owing** [1] - 1676:11
**own** [2] - 1554:1, 1681:4
**owned** [4] - 1567:22, 1590:8, 1629:11, 1693:1
**owner** [1] - 1695:2
**owners** [1] - 1694:25
**owning** [1] - 1629:8

## P

**p.m** [1] - 1658:15
**page** [63] - 1556:9, 1558:23, 1563:6, 1565:15, 1576:21, 1577:18, 1577:20, 1578:17, 1579:19, 1580:11, 1581:2, 1582:1, 1583:13, 1583:14, 1599:4, 1619:2, 1619:5, 1620:2, 1621:9, 1623:22, 1625:11, 1625:15, 1637:2, 1637:11, 1638:1, 1638:8, 1638:14, 1638:19, 1639:10, 1639:13, 1639:16, 1639:20, 1639:22, 1640:10, 1641:13, 1649:24, 1650:25, 1652:3, 1653:21, 1655:5, 1656:13, 1657:2, 1661:2, 1661:22, 1671:24, 1680:5, 1692:14, 1692:20, 1692:24, 1693:8, 1694:19, 1694:23, 1695:5, 1696:2, 1698:19, 1699:3, 1701:18, 1709:12, 1709:13, 1709:19, 1709:23
**PAGE** [1] - 1714:3
**pages** [3] - 1584:19, 1637:3, 1667:25
**paid** [61] - 1567:24, 1568:2, 1568:4, 1568:5, 1568:7, 1568:8, 1568:10, 1569:16, 1570:6, 1570:14, 1570:17, 1575:6, 1575:9, 1575:10, 1583:18, 1584:21, 1584:25, 1587:18, 1588:5, 1593:7, 1593:8, 1593:9, 1600:21, 1600:25, 1602:10, 1605:9, 1605:10, 1605:14, 1605:16, 1605:23, 1606:1, 1617:8, 1618:20, 1622:20, 1630:3, 1642:11, 1642:12, 1643:4, 1643:6, 1643:8, 1643:11, 1643:22, 1644:8, 1645:4, 1646:4, 1646:9, 1646:12, 1652:13, 1652:19, 1653:2, 1654:12, 1655:10, 1657:8, 1668:12, 1692:1, 1696:19, 1706:11, 1706:18, 1706:22
**pains** [1] - 1676:9
**painting** [1] - 1567:11
**paper** [1] - 1676:25
**paperwork** [1] - 1573:20
**par** [1] - 1571:16
**paragraph** [7] - 1621:19, 1623:3, 1625:21, 1653:21, 1655:14, 1693:9,

1709:20
**Paralegal** [1] - 1548:22
**parameters** [1] - 1664:10
**pardon** [1] - 1668:21
**part** [27] - 1572:16, 1589:4, 1604:19, 1604:21, 1622:16, 1640:3, 1643:18, 1649:23, 1650:15, 1650:18, 1650:19, 1651:4, 1651:14, 1652:2, 1652:10, 1652:11, 1652:18, 1657:10, 1661:12, 1663:18, 1677:24, 1692:11, 1694:19, 1695:2, 1703:5, 1705:13
**partial** [2] - 1622:13, 1622:23
**participate** [8] - 1561:18, 1578:7, 1578:10, 1578:24, 1588:19, 1589:8, 1611:24
**participating** [2] - 1588:18, 1611:9
**participation** [1] - 1597:25
**particular** [3] - 1643:13, 1653:17, 1685:1
**parties** [4] - 1577:1, 1591:5, 1611:9, 1664:17
**partner** [8] - 1607:2, 1607:5, 1640:4, 1641:10, 1702:23, 1703:20, 1704:21
**partners** [2] - 1700:23, 1702:15
**partnership** [1] - 1579:2
**parts** [1] - 1671:8
**party** [1] - 1577:3
**past** [5] - 1670:17, 1670:21, 1692:24, 1712:10, 1712:15
**Pause** [5] - 1554:9, 1603:22, 1606:25, 1607:21, 1624:25
**pay** [29] - 1570:18, 1584:12, 1593:1, 1593:13, 1601:18, 1622:25, 1629:10, 1630:5, 1630:15, 1643:7, 1644:3, 1644:21, 1645:16, 1645:17, 1645:19, 1645:22, 1647:12, 1647:18, 1648:21, 1655:6, 1655:10, 1655:23, 1656:2, 1656:5, 1697:4, 1703:3, 1703:4, 1703:5, 1704:16
**payable** [2] - 1595:8, 1623:7
**paying** [7] - 1595:1, 1595:4, 1652:23, 1655:15, 1705:6, 1706:9, 1706:15
**Payment** [1] - 1621:9
**payment** [18] - 1571:1, 1581:23, 1582:2, 1582:6, 1582:9, 1582:16, 1582:24, 1583:9, 1601:21, 1601:22, 1603:5, 1622:18, 1676:18, 1693:11, 1696:17, 1696:21, 1709:16, 1712:6
**payments** [17] - 1570:2, 1570:21, 1601:1, 1601:24, 1621:15, 1626:13, 1629:17, 1629:18, 1631:2, 1631:4, 1691:23, 1692:2, 1693:18, 1694:5, 1696:13, 1699:2, 1709:6
**payoff** [1] - 1690:19
**pays** [2] - 1593:10, 1647:11
**PC** [1] - 1577:23
**pen** [1] - 1661:4
**people** [5] - 1556:1, 1571:25, 1612:12, 1617:6, 1690:8
**per** [2] - 1567:9, 1577:15
**percent** [5] - 1569:21, 1612:19, 1630:7,

1642:13, 1647:16
**percentage** [7] - 1570:1, 1582:15, 1584:25, 1591:16, 1642:10, 1643:18, 1649:17
**perfect** [1] - 1562:18
**performance** [2] - 1620:3, 1626:7
**performed** [4] - 1568:3, 1616:21, 1642:17, 1691:6
**performing** [1] - 1628:5
**perhaps** [3] - 1562:19, 1666:1, 1675:6
**perimeter** [1] - 1616:22
**period** [1] - 1709:5
**permitted** [2] - 1670:1, 1678:8
**person** [10] - 1577:1, 1578:8, 1612:15, 1612:21, 1612:25, 1626:5, 1656:2, 1659:9, 1682:3, 1693:12
**personal** [14] - 1578:21, 1579:1, 1592:14, 1592:24, 1596:25, 1612:14, 1612:23, 1626:23, 1628:8, 1636:19, 1646:14, 1646:20, 1646:21, 1702:11
**personally** [1] - 1628:23
**persons** [3] - 1587:9, 1587:12, 1587:15
**phase** [6] - 1566:2, 1566:9, 1568:13, 1577:17, 1582:16, 1584:24
**phases** [6] - 1561:13, 1561:14, 1561:15, 1561:18, 1569:18
**phone** [2] - 1596:4, 1659:16
**phonetic** [1] - 1712:3
**phonetic)** [1] - 1575:22
**photos** [1] - 1657:24
**phrase** [1] - 1616:25
**phrasing** [1] - 1646:24
**physical** [1] - 1629:10
**physically** [1] - 1627:11
**piggish** [1] - 1652:7
**pills** [1] - 1661:5
**PINTO** [3] - 1548:21, 1608:24, 1609:2
**Pinto** [1] - 1550:1
**place** [6] - 1624:19, 1642:7, 1658:10, 1679:5, 1700:5, 1701:15
**placed** [2] - 1621:21, 1625:18
**plan** [3] - 1560:21, 1601:21, 1688:6
**planning** [3] - 1552:22, 1578:7, 1694:2
**plans** [4] - 1580:5, 1590:20, 1681:4, 1694:7
**play** [1] - 1559:21
**Plaza** [2] - 1548:14, 1548:24
**pleaded** [1] - 1661:3
**pleas** [1] - 1684:6
**plus** [1] - 1677:21
**pocket** [6] - 1580:23, 1588:12, 1588:13, 1588:14, 1596:23, 1628:6
**point** [33] - 1551:24, 1556:7, 1556:15, 1557:21, 1564:20, 1572:24, 1598:3, 1602:12, 1607:24, 1608:14, 1608:18, 1609:4, 1616:20, 1628:4, 1645:13, 1648:13, 1652:15, 1660:10, 1660:25, 1665:9, 1666:5, 1666:24, 1667:3, 1667:9, 1668:23, 1669:20, 1675:3, 1675:5, 1682:22, 1698:6, 1703:6, 1704:8

**points** [1] - 1564:5
**pop** [1] - 1585:7
**portion** [11] - 1592:22, 1621:10, 1621:11, 1622:18, 1642:9, 1653:20, 1654:16, 1666:21, 1667:21, 1679:14, 1704:19
**portions** [6] - 1576:13, 1675:11, 1679:7, 1683:3, 1685:12, 1708:12
**POSA** [7] - 1548:16, 1549:13, 1551:1, 1551:3, 1554:13, 1558:2, 1689:15
**Posa** [1] - 1549:13
**posed** [1] - 1636:18
**position** [11] - 1551:22, 1554:4, 1557:9, 1607:25, 1643:4, 1643:6, 1671:18, 1672:2, 1673:13, 1682:9, 1707:25
**possess** [1] - 1628:25
**possession** [1] - 1706:7
**possibility** [5] - 1553:3, 1687:5, 1687:6, 1708:11, 1713:5
**possible** [3] - 1617:25, 1694:18, 1713:6
**possibly** [3] - 1585:5, 1596:24, 1640:17
**post** [1] - 1668:20
**post-arrest** [1] - 1668:20
**potential** [1] - 1687:1
**power** [1] - 1644:21
**precluded** [1] - 1685:24
**preconstruction** [1] - 1559:23
**predicate** [1] - 1675:13
**predisposed** [2] - 1708:19, 1708:20
**prefer** [1] - 1552:23
**preference** [3] - 1551:10, 1551:18, 1687:18
**prejudice** [1] - 1711:14
**prejudicial** [1] - 1686:22
**premises** [2] - 1579:15, 1616:23
**prepared** [6] - 1552:19, 1557:13, 1560:14, 1563:3, 1564:19, 1698:22
**presence** [3] - 1549:3, 1610:1, 1707:15
**present** [8] - 1633:6, 1659:3, 1662:23, 1663:22, 1674:12, 1675:20, 1688:24, 1689:18
**Present** [1] - 1548:22
**presented** [2] - 1585:19, 1686:23
**presenting** [1] - 1687:7
**president** [2] - 1633:3, 1633:22
**presiding** [1] - 1549:8
**pressed** [1] - 1554:22
**pressure** [1] - 1651:19
**pretty** [3] - 1552:13, 1612:1, 1654:21
**prevails** [1] - 1677:21
**previous** [3] - 1614:24, 1615:2, 1641:10
**previously** [9] - 1559:8, 1574:23, 1584:15, 1617:8, 1626:17, 1628:19, 1678:9, 1697:25, 1701:16
**previously-marked** [1] - 1628:19
**price** [6] - 1597:24, 1618:3, 1622:15, 1622:17, 1702:10, 1703:23
**prices** [1] - 1648:8
**primarily** [1] - 1702:8
**primary** [4] - 1577:4, 1578:14, 1645:4, 1702:12

**principal** [4] - 1577:1, 1622:18, 1623:4, 1693:1
**Print** [1] - 1632:20
**print** [1] - 1565:5
**printed** [1] - 1562:23
**probe** [1] - 1674:25
**problem** [4] - 1556:13, 1586:19, 1630:8, 1664:22
**procedure** [6] - 1553:5, 1581:23, 1582:2, 1582:6, 1582:9, 1669:25
**proceed** [5] - 1555:6, 1555:10, 1559:4, 1610:9, 1689:25
**proceeded** [1] - 1683:22
**Proceedings** [1] - 1548:25
**proceedings** [4] - 1554:9, 1603:22, 1606:25, 1607:21
**proceeds** [3] - 1579:16, 1622:20, 1705:16
**process** [21] - 1552:7, 1560:24, 1574:6, 1584:2, 1588:2, 1591:20, 1600:25, 1604:4, 1612:7, 1612:8, 1613:4, 1613:5, 1617:19, 1617:23, 1617:24, 1618:3, 1618:4, 1618:9, 1618:20, 1642:9, 1712:6
**processing** [1] - 1628:11
**procurement** [1] - 1626:6
**produced** [2] - 1548:25, 1618:4
**proffer** [5] - 1672:7, 1672:15, 1672:16, 1681:1, 1712:9
**proffered** [1] - 1684:22
**program** [16] - 1559:19, 1560:5, 1563:2, 1564:18, 1565:8, 1569:24, 1573:24, 1574:14, 1589:2, 1589:4, 1589:6, 1592:15, 1604:19, 1611:13, 1641:8, 1705:13
**Program** [1] - 1640:22
**Project** [3] - 1654:7, 1654:20, 1655:20
**project** [89] - 1561:4, 1567:25, 1569:12, 1571:3, 1574:11, 1574:20, 1575:4, 1576:3, 1578:13, 1579:8, 1580:5, 1583:4, 1588:20, 1589:11, 1589:12, 1589:16, 1589:17, 1589:19, 1589:23, 1590:4, 1590:16, 1594:1, 1595:18, 1597:12, 1598:3, 1603:11, 1604:14, 1605:12, 1606:6, 1611:24, 1613:22, 1614:7, 1615:18, 1617:1, 1623:10, 1624:6, 1624:7, 1624:13, 1624:15, 1625:2, 1625:6, 1625:9, 1627:15, 1627:20, 1627:23, 1640:2, 1640:3, 1641:18, 1642:8, 1642:9, 1642:10, 1642:20, 1643:16, 1643:20, 1643:24, 1644:21, 1647:1, 1647:16, 1647:24, 1648:4, 1648:23, 1648:25, 1654:18, 1655:14, 1657:23, 1678:5, 1682:6, 1683:1, 1690:8, 1690:14, 1690:23, 1691:24, 1692:18, 1693:14, 1694:3, 1695:14, 1696:23, 1698:8, 1699:11, 1701:12, 1703:2, 1703:12, 1703:22, 1703:25, 1706:15, 1709:11, 1709:17
**project's** [1] - 1647:17
**projects** [13] - 1600:24, 1613:1, 1615:7,

1615:23, 1632:6, 1680:2, 1691:7, 1691:10, 1691:13, 1692:12, 1700:21, 1702:3, 1702:13
**promised** [2] - 1579:12, 1649:14
**prompt** [3] - 1667:19, 1679:4, 1707:9
**prompted** [1] - 1671:1
**promptly** [2] - 1557:24, 1626:1
**proof** [3] - 1681:15, 1682:6, 1684:20
**proper** [3] - 1664:10, 1668:10, 1669:25
**properly** [3] - 1560:15, 1562:4, 1618:20
**properties** [10] - 1571:8, 1611:15, 1611:16, 1629:8, 1648:17, 1648:25, 1705:19, 1705:21, 1706:2
**properties'** [1] - 1571:6
**Property** [2] - 1630:4, 1630:6
**property** [4] - 1620:6, 1628:21, 1628:25, 1647:7
**propose** [2] - 1664:4, 1664:6
**proposition** [1] - 1674:10
**prospective** [1] - 1611:4
**protocol** [1] - 1580:4
**provide** [8] - 1566:24, 1576:18, 1586:3, 1591:7, 1591:8, 1592:14, 1593:4, 1664:8
**provided** [8] - 1592:1, 1593:6, 1610:24, 1610:25, 1648:7, 1692:11, 1712:10, 1712:14
**provides** [1] - 1591:23
**providing** [4] - 1600:18, 1605:3, 1612:22, 1707:18
**provisions** [1] - 1625:22
**public** [1] - 1625:18
**publish** [4] - 1560:13, 1610:11, 1613:14, 1637:21
**published** [8] - 1561:25, 1576:7, 1613:18, 1614:5, 1616:2, 1616:17, 1619:1, 1658:7
**pull** [1] - 1624:24
**purchases** [1] - 1600:7
**purports** [1] - 1564:16
**purpose** [13] - 1559:25, 1560:2, 1574:25, 1575:1, 1588:23, 1588:24, 1591:19, 1617:24, 1618:8, 1626:6, 1629:9, 1629:21, 1684:18
**purposes** [4] - 1629:12, 1629:13, 1629:14, 1674:16
**pursuant** [1] - 1581:14
**pursuing** [1] - 1708:15
**put** [22] - 1553:10, 1573:7, 1575:3, 1597:2, 1597:3, 1627:14, 1627:16, 1628:15, 1629:8, 1647:12, 1647:19, 1648:24, 1655:16, 1655:20, 1673:12, 1683:13, 1694:11, 1694:13, 1694:14, 1705:14
**putting** [4] - 1665:16, 1671:13, 1710:19
**PVC** [4] - 1655:13, 1655:17, 1655:19, 1655:21

---

## Q

**qualifications** [1] - 1692:12

**qualified** [2] - 1560:8, 1617:25
**qualifies** [1] - 1564:2
**quarterly** [1] - 1573:5
**QUESTION** [3] - 1640:14, 1640:21, 1640:24
**questioning** [1] - 1679:6
**questionnaire** [1] - 1589:10
**questions** [29] - 1553:9, 1588:15, 1608:10, 1610:7, 1610:8, 1640:9, 1640:18, 1640:19, 1641:1, 1659:7, 1665:13, 1666:24, 1669:3, 1670:2, 1671:5, 1671:19, 1672:13, 1672:16, 1678:20, 1686:14, 1708:14, 1708:16, 1708:22, 1708:24, 1710:3, 1710:6, 1710:25, 1711:13, 1711:15
**quicker** [1] - 1564:12
**quickly** [1] - 1573:9
**quite** [4] - 1573:12, 1641:5, 1703:11, 1708:18
**quote** [3] - 1554:1, 1634:19, 1678:21

---

## R

**raise** [1] - 1685:1
**raised** [2] - 1607:23, 1669:3
**ran** [2] - 1628:6, 1684:9
**range** [1] - 1598:24
**Rasheed** [1] - 1567:22
**rate** [3] - 1648:1, 1648:7, 1648:9
**rather** [3] - 1551:23, 1670:10, 1700:8
**re** [1] - 1655:16
**re-read** [1] - 1655:16
**reach** [4] - 1552:6, 1553:13, 1635:7, 1683:25
**reached** [2] - 1593:20, 1675:3
**read** [22] - 1557:14, 1562:22, 1576:14, 1576:23, 1577:19, 1579:17, 1581:12, 1583:9, 1584:7, 1609:1, 1614:10, 1637:4, 1655:16, 1658:17, 1661:1, 1665:20, 1665:24, 1669:7, 1689:15, 1694:10, 1694:12, 1709:1
**readily** [1] - 1675:22
**reading** [3] - 1582:8, 1669:3, 1695:17
**reads** [3] - 1622:22, 1652:4, 1692:23
**ready** [1] - 1660:19
**real** [3] - 1687:5, 1702:8, 1711:2
**realistic** [1] - 1553:3
**realize** [2] - 1556:5, 1652:10
**reallocate** [1] - 1585:20
**really** [8] - 1550:4, 1608:6, 1646:21, 1648:3, 1648:19, 1702:12, 1710:21, 1711:11, 1711:15
**reason** [9] - 1554:13, 1573:18, 1592:10, 1685:20, 1686:1, 1702:12, 1703:8, 1711:11, 1711:15
**reasons** [2] - 1702:5, 1704:8
**rebut** [1] - 1686:6
**rebuttal** [1] - 1686:11
**recalled** [1] - 1679:16
**recants** [1] - 1675:4
**receive** [7] - 1570:4, 1570:6, 1586:16,

**1622**:11, 1654:11, 1693:10, 1704:21
**received** [16] - 1550:13, 1557:7, 1569:17, 1601:19, 1601:25, 1602:3, 1615:4, 1622:5, 1623:16, 1631:8, 1639:4, 1639:5, 1639:9, 1647:1, 1675:9, 1699:1
**receives** [1] - 1601:3
**receiving** [2] - 1677:8, 1698:7
**recess** [10] - 1553:11, 1607:11, 1609:9, 1609:12, 1634:10, 1635:11, 1664:15, 1673:5, 1687:22, 1688:23
**Recess** [2] - 1553:12, 1609:15
**recitals** [1] - 1576:17
**recites** [1] - 1560:15
**recognize** [6] - 1576:8, 1610:20, 1616:3, 1624:2, 1633:8, 1692:6
**recollect** [1] - 1671:5
**recollection** [9] - 1578:4, 1597:6, 1667:1, 1667:15, 1667:19, 1671:12, 1675:10, 1679:5, 1686:24
**recommend** [2] - 1561:7, 1611:19
**recommendations** [1] - 1590:3
**record** [10] - 1565:12, 1575:25, 1639:15, 1664:8, 1667:11, 1668:6, 1669:4, 1669:10, 1670:5, 1689:22
**Record** [2] - 1665:20, 1665:24
**recorded** [1] - 1548:25
**recordings** [1] - 1649:21
**records** [1] - 1564:4
**recover** [3] - 1598:2, 1598:5, 1620:17
**redacted** [9] - 1662:22, 1663:24, 1671:8, 1682:23, 1685:9, 1688:16, 1688:18, 1689:2
**redirect** [2] - 1711:21, 1711:22
**refer** [2] - 1653:3, 1702:24
**reference** [5] - 1651:18, 1654:9, 1655:24, 1656:7, 1670:15
**referred** [1] - 1583:1, 1670:11
**referring** [7] - 1649:23, 1650:5, 1652:23, 1653:20, 1654:6, 1655:15, 1702:16
**refers** [2] - 1650:3, 1650:19
**reflects** [1] - 1562:4
**refresh** [1] - 1565:7
**refrigerator** [1] - 1598:24
**refused** [1] - 1570:18
**refutes** [1] - 1681:22
**regard** [14] - 1585:10, 1614:17, 1625:2, 1625:4, 1639:25, 1640:2, 1640:16, 1689:1, 1693:17, 1699:13, 1699:14, 1699:15, 1707:25, 1710:18
**regarding** [2] - 1654:22, 1678:20
**regards** [1] - 1606:4
**regular** [2] - 1601:1, 1646:12
**rehab** [8] - 1560:3, 1560:21, 1561:15, 1564:10, 1564:11, 1575:2, 1575:5, 1588:25
**rehabilitated** [2] - 1568:15, 1587:1
**rehabilitation** [8] - 1560:6, 1566:4, 1571:18, 1580:3, 1585:13, 1604:10, 1604:22, 1647:9
**reimburse** [1] - 1580:14

**reimbursed** [2] - 1570:14, 1572:22
**reimbursement** [2] - 1573:20, 1700:20
**reimbursements** [2] - 1701:16, 1702:7
**reimbursing** [1] - 1701:6
**rejected** [1] - 1633:14
**rejecting** [1] - 1573:22
**rejects** [1] - 1681:24
**relate** [1] - 1701:3
**related** [14] - 1583:23, 1626:6, 1629:21, 1648:1, 1690:14, 1690:15, 1692:12, 1692:15, 1692:21, 1693:10, 1694:23, 1696:3, 1700:1, 1700:2
**Related** [2] - 1694:19, 1694:20
**relates** [4] - 1618:24, 1682:25, 1697:20, 1701:1
**relating** [2] - 1578:24, 1581:4
**relation** [1] - 1620:3
**relationship** [2] - 1681:20, 1681:21
**release** [3] - 1555:15, 1622:15, 1622:17
**released** [1] - 1659:15
**relevant** [1] - 1666:21
**relocate** [4] - 1571:25, 1573:11, 1588:11, 1590:13, 1592:4, 1592:6, 1611:15
**relocated** [2] - 1573:9, 1587:10
**relocating** [2] - 1572:5, 1572:23
**relocation** [7] - 1572:15, 1572:16, 1573:8, 1587:12, 1587:14, 1588:5, 1701:7
**relocations** [1] - 1590:16
**rely** [1] - 1552:20
**relying** [1] - 1695:11
**remainder** [1] - 1653:23
**remember** [35] - 1559:25, 1563:4, 1566:3, 1566:17, 1567:4, 1575:11, 1577:13, 1588:22, 1589:1, 1591:10, 1592:17, 1594:19, 1595:13, 1600:16, 1602:9, 1603:1, 1603:18, 1603:19, 1603:23, 1607:12, 1634:12, 1640:12, 1651:16, 1655:11, 1661:20, 1662:2, 1674:19, 1675:1, 1675:5, 1683:18, 1690:6, 1690:7, 1690:25, 1703:14, 1707:11
**remembered** [1] - 1663:19
**Remind** [1] - 1657:2
**remind** [5] - 1556:24, 1567:2, 1689:13, 1689:16, 1689:21
**reminded** [1] - 1627:2
**remove** [4] - 1551:23, 1596:13, 1596:19, 1597:10
**removed** [3] - 1627:20, 1627:24, 1657:21
**removing** [1] - 1571:20
**remuneration** [1] - 1693:11
**renew** [1] - 1678:25
**renewed** [1] - 1678:13
**renovated** [1] - 1631:14
**rent** [2] - 1570:1, 1629:10
**rental** [4] - 1560:21, 1564:10, 1569:19, 1569:21
**rents** [3] - 1629:15, 1629:16, 1631:1

**repair** [6] - 1568:19, 1568:20, 1568:21, 1569:8, 1569:9, 1569:11
**repaired** [1] - 1569:4
**repairs** [3] - 1570:14, 1570:19, 1701:7
**repayment** [2] - 1622:13, 1622:23
**repayments** [1] - 1622:13
**repeat** [4] - 1550:18, 1620:14, 1691:11, 1712:17
**repeated** [1] - 1651:12
**repeatedly** [3] - 1593:20, 1642:16, 1711:7
**rephrase** [3] - 1634:23, 1636:17, 1696:20
**replace** [1] - 1603:7, 1628:12
**replaced** [2] - 1585:14, 1628:12
**replacement** [2] - 1585:10, 1585:12
**reply** [2] - 1667:10, 1671:2
**report** [8] - 1552:2, 1626:1, 1626:20, 1626:25, 1627:3, 1627:7, 1630:21, 1653:18
**reported** [5] - 1550:8, 1626:10, 1626:15, 1630:21, 1653:12
**Reporter** [1] - 1548:23
**Representations** [1] - 1578:18
**representative** [8] - 1576:24, 1576:25, 1577:4, 1578:14, 1578:20, 1578:23, 1579:11, 1579:14
**represented** [1] - 1583:20
**represents** [1] - 1588:21
**request** [12] - 1570:8, 1573:21, 1580:25, 1595:15, 1596:9, 1596:11, 1604:7, 1604:11, 1604:14, 1620:19, 1626:18, 1708:15
**requested** [4] - 1573:14, 1595:14, 1612:10, 1617:8
**requesting** [3] - 1582:16, 1595:16, 1617:13
**requests** [2] - 1626:3, 1626:13
**require** [2] - 1678:25, 1679:12
**required** [6] - 1581:4, 1585:10, 1608:11, 1608:13, 1640:24, 1655:9
**requires** [1] - 1617:4
**requisition** [48] - 1572:25, 1573:2, 1573:4, 1573:7, 1583:15, 1583:18, 1584:2, 1584:18, 1584:21, 1600:25, 1601:4, 1604:3, 1612:7, 1612:8, 1613:3, 1613:4, 1614:7, 1616:18, 1616:20, 1617:7, 1618:25, 1620:12, 1620:20, 1622:1, 1622:8, 1622:10, 1622:11, 1624:15, 1624:19, 1624:21, 1642:9, 1643:14, 1643:15, 1644:3, 1645:3, 1645:4, 1645:23, 1647:11, 1647:15, 1696:21, 1697:4, 1703:13, 1703:17, 1703:18, 1703:22, 1704:6, 1704:10, 1712:6
**requisitions** [15] - 1574:7, 1588:2, 1612:16, 1617:1, 1617:13, 1643:18, 1644:10, 1696:16, 1696:24, 1697:8, 1703:10, 1703:14, 1704:1, 1704:4, 1705:4
**resigned** [1] - 1597:1

All Word // USA v Stevenson Dunn, et al.

20

**resolve** [1] - 1683:21
**resolved** [1] - 1674:11
**respect** [6] - 1557:7, 1557:10, 1576:25, 1672:16, 1672:19, 1697:24
**respectfully** [7] - 1674:17, 1675:15, 1677:9, 1678:19, 1679:2, 1679:10, 1685:21
**respond** [4] - 1557:12, 1557:13, 1557:15, 1571:2
**response** [10] - 1557:16, 1594:3, 1655:19, 1663:5, 1669:2, 1692:22, 1696:2, 1700:7, 1700:8, 1711:5
**responsibilities** [3] - 1576:22, 1577:14, 1584:9
**responsibility** [5] - 1560:6, 1572:12, 1586:10, 1587:3, 1603:14
**responsible** [2] - 1571:20, 1593:11
**responsive** [1] - 1684:5
**rest** [8] - 1555:17, 1637:3, 1655:6, 1655:15, 1655:23, 1656:3, 1656:5, 1703:5
**restatement** [1] - 1564:3
**rested** [1] - 1660:11
**Restoration** [6] - 1560:12, 1567:3, 1568:8, 1570:12, 1574:21, 1606:7
**Restorations** [1] - 1629:19
**restroom** [1] - 1666:8
**result** [1] - 1668:25
**resume** [1] - 1688:22
**resumed** [1] - 1689:17
**resumes** [1] - 1636:7
**retainage** [2] - 1642:12, 1647:18
**return** [4] - 1551:22, 1554:5, 1558:15, 1630:3
**returned** [4] - 1602:16, 1602:18, 1606:9, 1660:13
**revenue** [1] - 1693:11
**reverse** [2] - 1639:10, 1677:21
**review** [6] - 1557:19, 1576:15, 1580:7, 1580:19, 1583:10, 1611:4
**reviewed** [5] - 1556:23, 1557:1, 1557:18, 1583:1, 1584:21
**Richard** [1] - 1685:3
**Richards** [28] - 1548:22, 1549:14, 1661:6, 1661:11, 1661:18, 1662:20, 1663:18, 1667:22, 1668:21, 1669:5, 1670:11, 1670:23, 1671:6, 1671:10, 1679:6, 1685:15, 1685:16, 1685:17, 1686:6, 1686:10, 1690:7, 1690:11, 1690:18, 1690:21, 1690:25, 1691:18, 1691:22, 1692:1
**rider** [1] - 1625:18
**right-hand** [1] - 1638:9
**rights** [7] - 1669:7, 1670:14, 1670:17, 1670:22, 1670:24, 1671:4, 1676:4
**rise** [9] - 1549:5, 1553:16, 1558:8, 1607:14, 1634:13, 1636:4, 1636:8, 1676:20, 1707:13
**rising** [1] - 1578:25
**risk** [4] - 1580:13, 1648:19, 1649:10, 1706:21

**Road** [1] - 1577:23
**Robert** [2] - 1549:19, 1549:23
**ROBERT** [2] - 1548:17, 1548:19
**Roberts** [7] - 1577:22, 1577:25, 1578:1, 1578:4, 1578:7, 1578:15
**Rodney** [1] - 1567:22
**role** [14] - 1559:21, 1566:19, 1570:11, 1571:23, 1590:11, 1601:5, 1603:9, 1603:10, 1611:22, 1615:14, 1632:25, 1678:6, 1694:16
**roles** [5] - 1576:22, 1611:9, 1611:12, 1611:18, 1611:23
**roll** [1] - 1570:1
**roofing** [1] - 1567:13
**room** [2] - 1596:8, 1666:2
**Rose** [1] - 1589:21
**round** [3] - 1592:19, 1633:15, 1641:9
**route** [1] - 1608:20
**royal** [1] - 1683:4
**rule** [3] - 1665:7, 1685:12, 1685:25
**ruled** [1] - 1674:14
**rules** [3] - 1611:6, 1668:16, 1668:17
**ruling** [4] - 1562:20, 1662:15, 1664:5, 1688:4
**run** [1] - 1624:10
**running** [1] - 1574:3
**rushing** [1] - 1660:14
**Rylanda** [2] - 1585:22, 1588:1
**Rylona** [2] - 1569:12, 1570:18

## S

**S-U-B-O-T-O-V-S-K-Y** [1] - 1576:1
**sake** [1] - 1667:18
**salary** [2] - 1630:15, 1630:17
**sale** [6] - 1564:11, 1598:3, 1604:11, 1622:14, 1622:24, 1623:1
**sales** [2] - 1622:20, 1648:2
**sat** [1] - 1644:24
**Saturday** [1] - 1557:18
**saved** [2] - 1585:15, 1671:21
**saw** [2] - 1628:19, 1630:18
**scarce** [1] - 1597:15
**scaredy** [1] - 1650:4
**scaredy-cat** [1] - 1650:4
**scenario** [2] - 1585:18, 1627:5
**schedule** [2] - 1622:13, 1622:15
**school** [1] - 1555:16
**scope** [2] - 1577:16, 1664:6
**screaming** [1] - 1711:14
**screen** [12] - 1560:16, 1562:13, 1562:14, 1611:18, 1611:21, 1612:25, 1613:2, 1638:2, 1638:3, 1638:20, 1649:23
**scroll** [1] - 1695:19
**SD** [2] - 1630:4, 1630:6
**sealed** [1] - 1568:24
**seat** [2] - 1558:19, 1558:21
**seated** [10] - 1550:2, 1553:17, 1607:18, 1610:2, 1610:5, 1634:15, 1636:5, 1636:12, 1664:17, 1689:19

**second** [10] - 1566:9, 1573:21, 1574:11, 1602:1, 1633:15, 1641:9, 1703:1, 1703:12, 1709:14, 1709:21
**Second** [1] - 1674:14
**secretary** [1] - 1577:7
**Section** [3] - 1576:23, 1578:18, 1581:14
**section** [19] - 1577:19, 1578:19, 1579:4, 1579:10, 1579:17, 1580:2, 1580:3, 1580:7, 1580:11, 1580:19, 1581:2, 1581:3, 1581:6, 1581:8, 1581:12, 1581:16, 1581:24, 1582:1
**secure** [1] - 1646:23
**security** [1] - 1628:7
**see** [32] - 1551:21, 1552:22, 1554:13, 1556:4, 1557:14, 1562:1, 1562:15, 1562:17, 1562:18, 1581:6, 1581:8, 1581:9, 1581:10, 1582:3, 1582:20, 1583:20, 1584:14, 1584:18, 1586:18, 1596:10, 1628:19, 1635:1, 1637:11, 1638:2, 1638:16, 1661:8, 1668:12, 1695:19, 1707:16, 1713:7, 1713:9
**See** [1] - 1694:21
**seeing** [3] - 1584:3, 1658:1, 1667:19, 1671:5
**seek** [2] - 1605:6, 1679:15
**seeking** [2] - 1708:3, 1710:21
**seeks** [2] - 1608:7, 1710:17
**seem** [1] - 1652:16
**seize** [1] - 1602:24
**seized** [1] - 1603:1
**selected** [8] - 1561:2, 1561:4, 1566:25, 1574:20, 1574:22, 1589:22, 1589:25, 1691:19
**sell** [11] - 1586:20, 1588:25, 1597:24, 1601:20, 1647:25, 1648:3, 1648:6, 1690:12, 1694:7, 1702:9, 1703:15
**selling** [9] - 1593:19, 1598:14, 1598:16, 1598:21, 1602:11, 1602:14, 1631:12, 1648:8, 1694:3
**semi** [1] - 1573:6
**semi-annually** [1] - 1573:6
**send** [2] - 1641:21, 1657:19
**SENIOR** [1] - 1548:11
**sense** [2] - 1608:6, 1664:11
**sensible** [1] - 1552:25
**sent** [3] - 1588:2, 1701:16, 1704:4
**sentence** [5] - 1580:10, 1580:11, 1709:3, 1709:21
**separate** [8] - 1566:20, 1566:21, 1573:4, 1605:11, 1605:23, 1605:24, 1693:20, 1705:8
**separately** [1] - 1644:21
**September** [1] - 1624:16
**Sercarz** [6] - 1549:23, 1556:8, 1556:10, 1557:25, 1686:9, 1712:22
**SERCARZ** [54] - 1548:19, 1549:22, 1549:23, 1552:1, 1553:7, 1554:10, 1555:11, 1555:25, 1556:12, 1556:16, 1556:20, 1556:24, 1557:5, 1558:4, 1564:22, 1565:2, 1608:3, 1608:15, 1610:7, 1634:9, 1634:17, 1635:2,

VB     OCR     CRR

All Word // USA v Stevenson Dunn, et al.

21

1635:10, 1639:1, 1662:5, 1662:7, 1662:9, 1662:13, 1664:4, 1666:17, 1667:5, 1667:14, 1668:8, 1668:10, 1674:10, 1674:24, 1677:7, 1677:14, 1677:17, 1678:11, 1679:9, 1682:18, 1685:5, 1685:11, 1686:4, 1689:4, 1689:11, 1708:1, 1710:7, 1710:9, 1710:11, 1710:14, 1712:4, 1712:23

**Sercarz's** [2] - 1609:2, 1664:22

**serves** [1] - 1689:4

**service** [1] - 1571:15

**services** [1] - 1605:4

**servicing** [1] - 1600:24

**SESSION** [1] - 1636:1

**session** [1] - 1549:7

**set** [11] - 1560:23, 1572:14, 1645:6, 1645:10, 1676:9, 1678:4, 1695:8, 1695:12, 1702:10, 1703:8, 1703:9

**set-off** [1] - 1645:10

**sets** [1] - 1598:25

**setting** [2] - 1644:17, 1662:14

**settlement** [1] - 1622:16

**several** [8] - 1557:23, 1586:19, 1606:2, 1658:22, 1705:19, 1705:21, 1706:1

**severance** [11] - 1678:13, 1678:14, 1678:24, 1686:17, 1686:20, 1686:22, 1687:9, 1687:17, 1687:18, 1708:19, 1708:21

**Shabazz** [1] - 1549:18

**shall** [6] - 1578:21, 1578:22, 1622:14, 1622:17, 1622:19, 1623:7

**shape** [1] - 1668:19

**share** [1] - 1693:20

**shared** [1] - 1694:8

**shareholder** [3] - 1630:7, 1630:14, 1630:15

**sheet** [5] - 1582:14, 1583:16, 1613:21, 1616:11, 1704:17

**sheetrocking** [2] - 1566:16, 1567:10

**Sheffer** [1] - 1701:15

**shell** [1] - 1629:2

**shock** [4] - 1659:4, 1659:11, 1659:21, 1661:1

**short** [3] - 1607:11, 1609:12, 1687:21

**shot** [1] - 1668:22

**show** [23] - 1562:3, 1576:5, 1591:2, 1597:16, 1613:11, 1614:3, 1620:22, 1624:18, 1625:3, 1627:18, 1632:1, 1632:3, 1636:23, 1641:11, 1649:19, 1658:5, 1661:20, 1665:4, 1692:5, 1697:15, 1698:10, 1699:18, 1700:17

**showed** [3] - 1597:9, 1657:12, 1681:4

**shower** [1] - 1599:1

**showering** [1] - 1553:21

**showing** [4] - 1615:25, 1665:1, 1665:3, 1684:17

**sick** [1] - 1550:8

**Side** [2] - 1565:10, 1664:12

**side** [9] - 1552:10, 1562:12, 1564:1, 1638:9, 1652:16, 1659:3, 1659:17, 1662:12, 1662:25

**sidebar** [1] - 1689:6

**sign** [5] - 1603:14, 1604:6, 1632:16, 1693:25, 1694:11

**signature** [15] - 1583:5, 1583:7, 1615:23, 1616:3, 1616:5, 1616:8, 1616:10, 1619:2, 1623:23, 1624:2, 1625:11, 1625:13, 1632:13, 1632:20, 1633:8

**signatures** [1] - 1616:13

**signed** [23] - 1634:3, 1637:16, 1638:12, 1638:22, 1641:14, 1658:8, 1658:23, 1659:4, 1661:13, 1693:22, 1693:25, 1694:5, 1694:10, 1695:5, 1695:17, 1697:22, 1698:17, 1698:20, 1699:5, 1703:16, 1703:21, 1703:23, 1704:10

**significant** [4] - 1555:20, 1590:18, 1670:18, 1670:23, 1678:7, 1678:16

**signing** [4] - 1576:15, 1583:10, 1633:24, 1658:18

**simple** [2] - 1631:24, 1682:19

**simply** [5] - 1551:10, 1551:21, 1630:10, 1663:7, 1671:9

**sit** [2] - 1676:23, 1678:25

**site** [7] - 1578:5, 1582:11, 1593:5, 1593:17, 1600:4, 1600:9, 1612:6

**sites** [1] - 1631:17

**six** [6] - 1558:20, 1581:2, 1592:9, 1625:11, 1641:9, 1696:3

**size** [3] - 1575:11, 1589:1, 1637:19

**Skalvosofski** [1] - 1575:22

**slip** [1] - 1702:17

**small** [4] - 1598:4, 1600:13, 1630:17, 1683:3

**smaller** [2] - 1620:9, 1649:17

**Smith** [1] - 1589:18

**SML** [43] - 1559:16, 1559:25, 1560:2, 1561:20, 1573:23, 1574:11, 1575:2, 1580:24, 1582:9, 1583:4, 1583:7, 1584:2, 1586:3, 1586:6, 1586:13, 1587:9, 1590:11, 1597:17, 1604:10, 1604:24, 1613:22, 1621:1, 1621:6, 1628:8, 1632:4, 1632:7, 1632:14, 1632:23, 1640:3, 1642:19, 1644:24, 1654:15, 1691:19, 1692:15, 1696:4, 1696:5, 1696:6, 1697:24, 1698:13, 1700:21, 1704:2, 1709:10

**smoke** [1] - 1652:21

**soft** [8] - 1572:19, 1572:21, 1583:24, 1593:9, 1593:10, 1598:2, 1598:5, 1649:16

**soft-cost** [2] - 1593:9, 1593:10

**sold** [8] - 1597:19, 1598:23, 1598:25, 1601:5, 1631:14, 1655:8, 1703:25, 1706:2

**soldiers** [3] - 1651:2, 1651:9, 1651:13

**sole** [1] - 1625:24

**solely** [2] - 1674:4, 1689:1

**solicitation** [1] - 1626:2

**someone** [5] - 1578:10, 1585:21, 1606:20, 1634:22, 1706:21

**sometimes** [1] - 1612:4

**son** [5] - 1651:17, 1651:19, 1659:16, 1659:17, 1659:25

**soon** [1] - 1551:16

**sophisticated** [1] - 1687:4

**sorry** [18] - 1556:12, 1558:11, 1559:18, 1573:3, 1575:19, 1575:24, 1597:17, 1603:23, 1610:14, 1613:16, 1627:22, 1642:21, 1642:22, 1652:3, 1681:21, 1703:21, 1709:19, 1710:10

**sought** [1] - 1669:12

**sound** [1] - 1624:20

**sounds** [2] - 1553:5, 1554:14

**source** [4] - 1588:10, 1589:19, 1593:12, 1597:5

**sources** [2] - 1605:2, 1641:21

**space** [1] - 1567:9

**speaking** [2] - 1555:16, 1656:1

**speaks** [1] - 1686:2

**Special** [10] - 1548:22, 1549:14, 1685:16, 1690:7, 1690:11, 1690:18, 1690:21, 1690:25, 1691:18, 1691:22

**specially** [1] - 1686:24

**specific** [6] - 1561:7, 1585:21, 1654:17, 1670:15, 1671:6, 1681:16

**specifically** [2] - 1581:4, 1583:3

**specifications** [1] - 1580:5

**specifics** [1] - 1587:3

**specified** [1] - 1581:14

**specifies** [1] - 1644:6

**specify** [1] - 1644:7

**spelled** [1] - 1575:25

**spent** [4] - 1588:10, 1598:2, 1662:13, 1664:25

**spill** [1] - 1554:19

**spillover** [1] - 1686:22

**spoken** [2] - 1555:11, 1555:12

**sponsor** [2] - 1625:25, 1626:7

**sprinkler** [1] - 1568:23

**square** [1] - 1562:24

**stack** [1] - 1657:12

**stage** [1] - 1664:5

**stages** [1] - 1683:22

**stand** [6] - 1558:14, 1636:7, 1666:1, 1676:23, 1683:16, 1685:3

**standard** [1] - 1661:5

**stands** [1] - 1674:10

**start** [10] - 1551:1, 1551:7, 1552:5, 1591:20, 1592:7, 1593:1, 1595:17, 1600:15, 1635:9, 1707:9

**started** [3] - 1585:7, 1591:7, 1594:1

**starts** [1] - 1603:19

**Starzecki** [35] - 1620:6, 1626:10, 1642:17, 1653:22, 1654:7, 1654:10, 1654:11, 1655:24, 1656:8, 1668:12, 1673:8, 1675:19, 1676:16, 1681:3, 1681:16, 1681:19, 1681:22, 1682:14, 1682:16, 1682:20, 1683:5, 1683:6, 1690:22, 1691:3, 1691:9, 1691:12, 1691:19, 1691:20, 1691:22, 1692:1, 1703:9, 1704:9, 1709:17, 1710:15, 1710:20

**State** [2] - 1630:20, 1630:21
**state** [1] - 1634:21
**statement** [71] - 1607:24, 1627:8,
1650:11, 1650:14, 1650:18, 1650:19,
1651:1, 1651:3, 1651:14, 1651:15,
1651:16, 1652:8, 1655:4, 1655:6,
1657:2, 1661:12, 1661:13, 1666:22,
1666:25, 1667:2, 1667:21, 1667:24,
1668:2, 1668:14, 1668:20, 1669:10,
1670:10, 1671:2, 1671:9, 1671:19,
1672:18, 1673:8, 1674:16, 1674:18,
1674:23, 1675:2, 1675:8, 1675:11,
1675:14, 1675:19, 1676:3, 1678:21,
1679:7, 1679:17, 1682:23, 1683:3,
1684:12, 1684:14, 1684:23, 1685:1,
1685:12, 1685:13, 1685:15, 1685:17,
1686:1, 1687:2, 1688:14, 1689:2,
1692:9, 1692:11, 1693:24, 1694:1,
1695:9, 1695:12, 1695:13, 1697:20,
1699:13, 1700:4, 1704:17, 1709:3
**statements** [20] - 1612:14, 1651:25,
1656:10, 1667:18, 1670:3, 1671:16,
1673:19, 1674:2, 1678:9, 1679:12,
1679:16, 1679:18, 1682:11, 1683:16,
1688:11, 1688:16, 1688:18, 1699:14,
1710:18, 1710:22
**STATES** [3] - 1548:1, 1548:3, 1548:11
**states** [3] - 1616:20, 1625:21, 1667:11
**States** [6] - 1548:5, 1548:13, 1548:16,
1549:6, 1549:9, 1666:19
**stay** [2] - 1571:17, 1687:25
**stenography** [1] - 1548:25
**step** [4] - 1558:19, 1590:18, 1607:12,
1607:16
**Steve** [1] - 1657:5
**STEVENSON** [4] - 1548:7, 1559:7,
1689:17, 1714:6
**Stevenson** [7] - 1548:18, 1549:10,
1549:17, 1577:5, 1670:23, 1694:25,
1709:1
**still** [10] - 1552:16, 1554:4, 1557:13,
1559:5, 1607:25, 1628:25, 1653:6,
1653:12, 1655:10, 1706:25
**stipulate** [1] - 1697:17
**stipulation** [1] - 1582:20
**Stobotowsky** [1] - 1712:3
**stop** [9] - 1627:14, 1627:16, 1644:17,
1645:2, 1688:6, 1688:12, 1707:4
**stopped** [1] - 1644:23
**store** [1] - 1600:10
**stove** [1] - 1598:24
**Street** [13] - 1588:20, 1594:23, 1595:8,
1617:20, 1628:21, 1631:15, 1655:8,
1655:10, 1692:15, 1697:24, 1698:13,
1701:4, 1701:5
**stretched** [1] - 1551:15
**stricken** [2] - 1689:9, 1689:14
**strong** [1] - 1585:9
**struck** [1] - 1689:21
**structural** [1] - 1585:8
**struggled** [1] - 1551:14

**stuck** [1] - 1654:13
**stuff** [3] - 1602:10, 1615:15, 1651:20
**Stuy** [22] - 1574:12, 1574:25, 1575:1,
1575:2, 1576:11, 1604:10, 1604:21,
1605:18, 1615:8, 1615:10, 1617:1,
1617:22, 1642:5, 1642:19, 1642:20,
1646:25, 1649:8, 1654:7, 1655:20,
1705:20, 1705:25
**Stuy's** [1] - 1644:24
**sub** [12] - 1605:7, 1605:9, 1643:5,
1643:17, 1644:4, 1645:5, 1645:6,
1646:6, 1646:9, 1646:10, 1646:11
**Sub** [1] - 1623:4
**sub-contractor** [10] - 1605:7, 1605:9,
1643:5, 1643:17, 1644:4, 1645:5,
1645:6, 1646:6, 1646:9, 1646:11
**subcategories** [1] - 1620:8
**subcontracted** [1] - 1630:3
**subcontracting** [14] - 1598:7, 1604:18,
1604:19, 1604:21, 1604:24, 1605:4,
1605:18, 1605:22, 1606:5, 1607:1,
1607:6, 1630:2, 1676:11, 1676:13
**subcontractor** [21] - 1566:6, 1566:13,
1566:15, 1566:25, 1567:8, 1568:17,
1570:11, 1570:24, 1572:8, 1572:9,
1585:3, 1586:4, 1598:10, 1629:24,
1631:11, 1676:21, 1690:22, 1691:4,
1691:5, 1691:6, 1697:10
**subcontractors** [2] - 1629:17, 1696:19
**subject** [4] - 1611:19, 1685:22, 1701:6,
1710:2
**submit** [11] - 1572:25, 1573:2, 1581:5,
1644:10, 1674:17, 1675:15, 1677:10,
1678:19, 1679:10, 1685:21, 1696:18
**submitted** [7] - 1572:24, 1573:3,
1573:20, 1678:14, 1695:13, 1698:1,
1703:22
**submitting** [2] - 1574:6, 1617:12
**subotovsky** [1] - 1712:5
**Subotovsky** [4] - 1575:23, 1575:24,
1577:10, 1712:4
**Subotovsky's** [1] - 1575:25
**subparagraph** [1] - 1621:9
**subsequently** [1] - 1628:22
**subsidy** [2] - 1648:1, 1648:7
**substantial** [1] - 1646:22
**substantially** [1] - 1647:4
**substitute** [4] - 1552:11, 1554:12,
1554:21, 1555:5
**substituting** [1] - 1552:5
**subterfuge** [1] - 1667:22
**succeed** [1] - 1677:17
**success** [1] - 1589:11
**successful** [1] - 1597:8
**suck** [1] - 1652:6, 1653:5
**suffered** [1] - 1659:10
**sufficient** [2] - 1575:7, 1677:10
**sugar** [1] - 1660:8
**suggest** [3] - 1668:18, 1676:17, 1710:18
**suggested** [1] - 1670:12
**suggesting** [1] - 1688:4

**suggestion** [1] - 1554:10
**suggests** [2] - 1682:24, 1710:24
**sum** [4] - 1551:7, 1552:16, 1614:22,
1652:19
**summarized** [1] - 1564:4
**summary** [2] - 1560:14, 1564:3
**summation** [1] - 1564:7
**summing** [1] - 1554:18
**superior** [1] - 1590:20
**supplies** [1] - 1697:6
**supply** [1] - 1685:18
**support** [1] - 1667:10
**supporting** [1] - 1584:17
**suppose** [1] - 1578:20
**supposed** [6] - 1595:17, 1683:21,
1690:15, 1703:2, 1704:16, 1704:21
**suppress** [1] - 1667:11
**suppression** [4] - 1663:16, 1663:17,
1668:25, 1669:16
**surveillance** [1] - 1657:24
**Susannah** [2] - 1548:22, 1549:14
**sustained** [2] - 1662:6, 1684:25
**sworn** [1] - 1559:9
**system** [1] - 1618:10

### T

**tab** [2] - 1562:15, 1562:17
**table** [1] - 1591:5
**tagged** [1] - 1684:17
**talks** [2] - 1581:3, 1686:15
**tantamount** [1] - 1679:24
**tape** [3] - 1651:22, 1657:16, 1657:20
**taping** [1] - 1567:11
**tax** [1] - 1569:17
**Taxation** [1] - 1630:20
**team** [4] - 1606:20, 1615:6, 1615:7,
1615:10, 1640:3
**tedious** [1] - 1572:2
**telephone** [2] - 1578:11, 1690:5
**ten** [4] - 1566:5, 1566:6, 1642:13,
1647:16
**tenants** [5] - 1560:8, 1571:7, 1571:17,
1571:20, 1572:5
**term** [2] - 1583:24, 1615:6
**terminate** [1] - 1625:24
**terms** [1] - 1421:10
**test** [2] - 1608:8, 1674:5
**testified** [12] - 1559:9, 1561:1, 1574:1,
1613:3, 1621:13, 1626:17, 1632:8,
1642:16, 1650:8, 1669:5, 1677:5,
1687:3
**testifies** [2] - 1712:17, 1713:7
**testify** [5] - 1651:7, 1654:2, 1687:11,
1713:2, 1713:6
**testifying** [1] - 1705:24
**testimony** [17] - 1552:10, 1561:2,
1564:4, 1564:5, 1569:3, 1633:12,
1666:2, 1675:21, 1675:24, 1676:16,
1678:1, 1678:3, 1678:22, 1681:4,
1681:18, 1681:20, 1681:21

**thankfully** [1] - 1552:3
**that's..** [1] - 1709:3
**THE** [188] - 1548:10, 1549:5, 1549:6, 1549:17, 1549:21, 1549:24, 1550:2, 1550:3, 1550:12, 1550:16, 1550:18, 1550:19, 1550:22, 1551:2, 1551:12, 1551:19, 1551:25, 1552:18, 1553:9, 1553:16, 1553:18, 1554:8, 1554:20, 1555:22, 1556:3, 1556:13, 1556:17, 1556:23, 1557:2, 1557:6, 1557:17, 1558:3, 1558:6, 1558:8, 1558:10, 1558:13, 1558:14, 1559:1, 1559:5, 1560:17, 1560:19, 1562:12, 1562:17, 1562:25, 1563:3, 1563:4, 1563:5, 1564:14, 1564:19, 1564:25, 1565:3, 1565:9, 1565:11, 1565:14, 1603:21, 1606:24, 1607:10, 1607:14, 1607:16, 1607:17, 1607:18, 1607:22, 1608:14, 1608:16, 1609:1, 1609:3, 1609:8, 1610:2, 1610:3, 1610:5, 1610:6, 1610:10, 1610:14, 1610:16, 1613:13, 1613:15, 1613:17, 1634:10, 1634:13, 1634:15, 1634:25, 1635:8, 1636:4, 1636:6, 1636:8, 1636:10, 1636:11, 1636:12, 1636:14, 1636:25, 1637:1, 1637:5, 1637:7, 1637:10, 1637:20, 1637:23, 1639:3, 1639:9, 1650:23, 1651:11, 1653:9, 1653:16, 1659:6, 1660:3, 1662:6, 1662:8, 1662:10, 1662:19, 1663:10, 1663:13, 1663:16, 1663:18, 1663:22, 1664:11, 1664:14, 1664:17, 1664:19, 1665:11, 1665:15, 1665:18, 1665:23, 1666:10, 1666:15, 1666:24, 1668:7, 1669:19, 1669:24, 1670:20, 1671:13, 1671:21, 1672:2, 1672:6, 1672:15, 1672:21, 1672:25, 1673:3, 1673:17, 1673:21, 1673:23, 1673:25, 1674:7, 1674:9, 1674:22, 1677:3, 1677:12, 1677:16, 1677:22, 1679:8, 1679:19, 1681:10, 1681:25, 1684:3, 1684:22, 1685:3, 1686:3, 1686:8, 1686:12, 1686:17, 1687:15, 1687:20, 1688:1, 1688:4, 1688:8, 1688:17, 1688:21, 1688:25, 1689:10, 1689:13, 1689:16, 1689:19, 1689:20, 1690:1, 1707:5, 1707:13, 1707:16, 1708:4, 1708:7, 1708:15, 1708:23, 1710:1, 1710:8, 1710:10, 1710:13, 1711:16, 1711:23, 1712:22, 1713:3, 1713:8
**theory** [2] - 1674:1, 1679:23
**thereby** [1] - 1710:19
**therefore** [1] - 1711:9
**thereof** [3] - 1579:16, 1621:21, 1622:19
**thereon** [1] - 1623:6
**thinking** [1] - 1687:6
**thinks** [2] - 1553:2, 1609:10
**third** [6] - 1551:4, 1553:23, 1568:13, 1577:20, 1616:20, 1709:21
**thirds** [1] - 1652:4
**thousand** [5] - 1645:18, 1645:19, 1647:15, 1647:17, 1647:19

**thousands** [2] - 1573:12, 1612:9
**threat** [1] - 1657:19
**threatened** [4] - 1627:10, 1627:13, 1627:14, 1690:5
**threatening** [2] - 1626:22, 1657:15
**three** [26] - 1551:4, 1554:7, 1554:17, 1558:1, 1561:14, 1561:15, 1561:18, 1569:18, 1577:18, 1600:24, 1625:25, 1633:18, 1638:8, 1639:16, 1653:10, 1657:21, 1667:25, 1668:15, 1682:2, 1684:5, 1684:20, 1692:24, 1708:13, 1709:19, 1710:18, 1712:23
**three-week** [2] - 1551:4, 1554:17
**Throop** [3] - 1568:19, 1570:15, 1684:18
**throughout** [3] - 1616:6, 1617:1, 1676:15
**throw** [1] - 1711:2
**Thursday** [2] - 1554:25, 1684:7
**ticket** [1] - 1661:20
**tie** [1] - 1665:2
**tied** [1] - 1654:18
**tile** [1] - 1599:1
**Tim** [3] - 1577:22, 1577:25, 1578:15
**timing** [2] - 1551:3, 1551:11
**title** [4] - 1562:22, 1632:20, 1632:23, 1633:24
**today** [9] - 1550:15, 1551:6, 1552:8, 1555:3, 1555:13, 1558:18, 1613:1, 1635:7, 1706:10
**together** [3] - 1623:5, 1676:24, 1682:2
**tomorrow** [17] - 1551:6, 1551:22, 1552:17, 1553:3, 1554:11, 1554:22, 1554:23, 1555:15, 1635:9, 1648:21, 1707:20, 1707:22, 1710:4, 1711:18, 1711:19, 1711:20, 1712:25
**tongue** [1] - 1564:23
**tonight** [2] - 1707:19, 1711:18
**took** [14] - 1571:8, 1598:4, 1624:8, 1624:19, 1658:10, 1676:9, 1679:5, 1682:20, 1682:24, 1693:18, 1701:15, 1702:13, 1703:2, 1705:18
**top** [7] - 1562:23, 1632:20, 1638:9, 1639:16, 1692:14, 1699:3, 1709:12
**topic** [2] - 1672:13, 1687:25
**TORRES** [1] - 1548:23
**total** [3] - 1589:1, 1614:22, 1703:23
**toward** [2] - 1708:19, 1708:20
**towards** [1] - 1603:5
**trade** [2] - 1583:16, 1585:4
**training** [1] - 1645:14
**transactions** [3] - 1629:3, 1671:7, 1672:9
**TRANSCRIPT** [1] - 1548:10
**transcript** [3] - 1548:25, 1669:1, 1669:11
**Transcription** [1] - 1548:25
**transfer** [5] - 1628:21, 1641:13, 1641:16, 1644:16, 1705:25
**transferred** [4] - 1642:2, 1644:13, 1654:15, 1699:11
**transfers** [1] - 1641:21

**treat** [1] - 1556:21
**treated** [1] - 1702:8
**trial** [20] - 1549:9, 1551:5, 1554:17, 1555:10, 1616:6, 1617:6, 1650:9, 1662:20, 1668:14, 1668:16, 1669:1, 1670:3, 1670:12, 1676:15, 1677:15, 1678:14, 1678:16, 1679:1, 1686:19, 1708:3
**TRIAL** [1] - 1548:10
**trials** [1] - 1557:23
**trick** [1] - 1652:5
**trickle** [1] - 1627:18
**trickle-down** [1] - 1627:18
**tried** [3] - 1553:21, 1564:22, 1596:21
**trip** [2] - 1660:13, 1668:17
**trouble** [1] - 1586:25
**true** [12] - 1621:17, 1621:18, 1643:3, 1652:23, 1654:16, 1660:4, 1661:10, 1677:21, 1682:5, 1693:24, 1695:9, 1702:2
**trust** [1] - 1694:17
**trusted** [1] - 1694:12
**truth** [5] - 1652:13, 1660:24, 1673:21, 1674:4, 1684:13
**try** [6] - 1550:4, 1559:1, 1620:19, 1667:14, 1679:4, 1711:11
**trying** [5] - 1652:5, 1652:13, 1665:1, 1667:11, 1672:9
**tub** [1] - 1599:1
**turn** [5] - 1559:14, 1590:14, 1616:15, 1650:25, 1664:20
**turning** [2] - 1607:22, 1625:15
**twenty** [1] - 1623:7
**twenty-four** [1] - 1623:7
**twice** [1] - 1672:8
**two** [49] - 1552:15, 1552:21, 1568:16, 1576:21, 1583:13, 1584:19, 1590:17, 1592:8, 1601:25, 1605:14, 1614:15, 1614:16, 1620:2, 1621:9, 1630:5, 1631:17, 1638:1, 1639:20, 1640:9, 1641:13, 1646:10, 1649:24, 1652:3, 1652:4, 1653:10, 1655:21, 1657:21, 1661:6, 1662:3, 1663:3, 1663:20, 1670:3, 1670:19, 1679:11, 1679:18, 1702:3, 1708:13, 1708:22, 1708:23, 1709:2, 1709:12, 1709:13, 1710:6, 1710:18, 1710:25, 1711:24
**two-family** [1] - 1655:21
**two-page** [1] - 1583:13
**type** [1] - 1706:11
**types** [1] - 1665:13
**typical** [1] - 1625:18

**U**

**U.S** [1] - 1712:1
**ultimately** [3] - 1675:18, 1675:20, 1678:16
**under** [18] - 1559:6, 1576:23, 1581:4, 1623:3, 1626:11, 1626:15, 1631:16, 1646:8, 1646:9, 1649:14, 1651:19, 1652:6, 1653:5, 1673:25, 1675:25,

1676:6, 1702:11, 1709:8
**underlying** [6] - 1661:15, 1673:10, 1677:6, 1681:14, 1682:12, 1682:21
**undermine** [1] - 1618:8
**underperforming** [1] - 1628:10
**understood** [5] - 1608:3, 1640:17, 1642:1, 1670:1, 1687:5
**unequivocally** [1] - 1676:14
**unexpected** [1] - 1585:8
**unforeseen** [1] - 1585:19
**unintelligible** [2] - 1650:13, 1653:23
**unintelligible)** [1] - 1652:5
**unintended** [1] - 1676:4
**unit** [1] - 1566:18
**UNITED** [3] - 1548:1, 1548:3, 1548:11
**United** [6] - 1548:5, 1548:13, 1548:16, 1549:6, 1549:9, 1666:19
**units** [6] - 1575:12, 1589:4
**unless** [2] - 1580:14, 1609:5
**unlike** [1] - 1681:13
**unlikely** [3] - 1550:15, 1550:21, 1551:6
**unpaid** [1] - 1623:5
**unquote** [2] - 1634:20, 1678:21
**unredacted** [10] - 1607:24, 1670:10, 1671:19, 1672:18, 1675:8, 1675:14, 1686:19, 1687:2, 1708:12, 1709:4
**unrelated** [1] - 1681:5
**unring** [1] - 1665:9
**unusual** [1] - 1712:13
**up** [40] - 1550:5, 1551:7, 1552:10, 1552:16, 1554:18, 1559:1, 1562:14, 1571:15, 1581:7, 1585:7, 1591:2, 1597:9, 1597:16, 1602:22, 1607:19, 1612:18, 1627:18, 1635:9, 1637:4, 1638:8, 1638:16, 1648:23, 1655:16, 1657:12, 1657:14, 1659:3, 1660:9, 1662:14, 1662:20, 1662:21, 1663:14, 1664:19, 1668:17, 1670:7, 1671:2, 1683:17, 1685:4, 1695:19, 1699:3
**upset** [1] - 1596:6
**upstairs** [1] - 1661:7
**uses** [1] - 1683:4

## V

**vacant** [3] - 1571:9, 1571:11, 1592:9
**vacuum** [1] - 1665:5
**value** [8] - 1579:12, 1626:4, 1647:8, 1647:9, 1647:22, 1647:25, 1648:16, 1693:12
**vanities** [1] - 1599:1
**various** [1] - 1615:7
**VButlerRPR@aol.com** [1] - 1548:24
**vendor** [1] - 1705:14
**vendors** [2] - 1705:1, 1705:3
**version** [3] - 1608:8, 1637:3, 1675:8
**versus** [2] - 1549:9, 1666:19
**via** [1] - 1578:10
**vice** [2] - 1633:3, 1633:22
**Victor** [4] - 1550:8, 1555:6, 1558:3, 1559:14

**Victoria** [1] - 1589:18
**VICTORIA** [1] - 1548:23
**videoconference** [1] - 1578:11
**view** [1] - 1673:18
**visit** [1] - 1594:23
**visits** [1] - 1578:5
**voice** [3] - 1550:13, 1550:19, 1551:15
**voluminous** [2] - 1564:4, 1667:21

## W

**wait** [13] - 1551:21, 1552:23, 1554:4, 1555:22, 1555:23, 1556:3, 1556:20, 1557:21, 1592:6, 1608:1, 1643:23, 1643:25, 1707:19
**waited** [1] - 1666:1
**waiting** [2] - 1552:20, 1662:14
**waived** [1] - 1671:4
**waiver** [8] - 1658:8, 1670:14, 1670:17, 1670:22, 1670:24, 1672:13
**walk** [2] - 1582:13, 1660:1
**walk-through** [1] - 1582:13
**walked** [2] - 1653:22, 1660:5
**walking** [1] - 1651:1
**wall** [1] - 1585:8
**walls** [1] - 1568:24
**Walters** [20] - 1581:22, 1593:20, 1594:5, 1594:15, 1594:21, 1595:2, 1595:4, 1595:22, 1606:6, 1626:18, 1627:10, 1652:19, 1652:24, 1653:7, 1657:8, 1657:15, 1657:19, 1690:19, 1699:23
**Walters's** [3] - 1625:13, 1700:14, 1701:15
**wants** [4] - 1564:6, 1635:5, 1669:12, 1671:15
**water** [1] - 1568:23
**Watson** [4] - 1569:12, 1570:18, 1585:22, 1588:1
**Wayne** [1] - 1655:21
**ways** [2] - 1552:9, 1642:8
**weaver** [1] - 1649:16
**Wednesday** [2] - 1551:7, 1712:25
**week** [11] - 1551:4, 1551:8, 1552:16, 1552:21, 1554:17, 1554:18, 1554:19, 1561:1, 1684:7
**weekend** [3] - 1551:15, 1552:3, 1556:23
**weigh** [1] - 1679:3
**Wendell** [26] - 1593:20, 1594:4, 1594:5, 1594:11, 1594:13, 1594:15, 1594:21, 1595:2, 1595:4, 1595:9, 1595:14, 1595:22, 1606:6, 1625:13, 1652:19, 1652:23, 1653:6, 1657:8, 1657:15, 1657:18, 1657:19, 1690:19, 1699:23, 1700:4, 1700:14, 1701:15
**wendell** [1] - 1581:22
**Whitney** [1] - 1663:25
**whole** [10] - 1554:14, 1556:5, 1627:4, 1647:24, 1651:14, 1656:10, 1664:25, 1681:17, 1685:22, 1696:23
**wholesale** [2] - 1600:2, 1600:22
**William** [1] - 1577:6

**Williams** [3] - 1603:16, 1603:25, 1604:1
**Williams's** [1] - 1603:18
**wine** [1] - 1657:11
**winter** [1] - 1568:22
**wire** [5] - 1641:13, 1641:16, 1641:21, 1642:2, 1644:3
**wires** [1] - 1645:15
**wise** [1] - 1608:23
**wish** [3] - 1556:20, 1685:15, 1689:2
**wishes** [1] - 1550:24
**withdrawing** [1] - 1565:12
**withdrawn** [2] - 1585:1, 1677:14
**Witness** [1] - 1636:7
**WITNESS** [5] - 1560:19, 1563:4, 1607:17, 1637:1, 1714:3
**witness** [37] - 1555:18, 1555:20, 1558:14, 1559:8, 1560:13, 1562:19, 1564:17, 1607:8, 1610:13, 1613:11, 1634:18, 1635:5, 1637:22, 1666:2, 1666:11, 1666:21, 1667:11, 1668:5, 1668:11, 1671:15, 1674:15, 1674:19, 1674:25, 1678:18, 1679:5, 1679:15, 1683:8, 1683:11, 1683:16, 1684:1, 1685:18, 1686:11, 1689:1, 1710:15, 1710:17, 1711:1
**witness'** [1] - 1675:16
**witnesses** [8] - 1555:14, 1556:7, 1556:14, 1635:7, 1711:19, 1711:24, 1712:24, 1713:6
**Witt** [1] - 1560:10
**woke** [1] - 1602:22
**wondering** [1] - 1627:19
**wood** [1] - 1599:2
**word** [5] - 1651:13, 1657:3, 1657:4, 1657:5, 1657:14
**words** [4] - 1650:16, 1651:5, 1661:1, 1661:21
**workmanlike** [1] - 1616:22
**works** [2] - 1642:5, 1649:3
**World** [4] - 1567:21, 1630:3, 1644:20
**worrying** [1] - 1626:22
**worth** [8] - 1567:24, 1601:18, 1647:4, 1647:7, 1648:3, 1648:14, 1649:1, 1649:4
**worthy** [1] - 1710:14
**write** [1] - 1596:1
**writing** [3] - 1580:16, 1626:1, 1644:25
**written** [6] - 1557:16, 1557:17, 1606:4, 1625:25, 1661:2, 1665:7
**wrongdoing** [1] - 1665:2
**wrote** [1] - 1606:8

## Y

**yards** [1] - 1567:12
**year** [1] - 1568:22
**years** [8] - 1630:5, 1630:20, 1630:23, 1633:18, 1646:10, 1653:10, 1657:21, 1692:25
**yesterday** [1] - 1640:7
**yo** [3] - 1655:6, 1655:23, 1656:2

**YORK** [1] - 1548:1
**York** [17] - 1548:5, 1548:14, 1548:15, 1549:7, 1577:6, 1577:7, 1577:8, 1578:5, 1578:21, 1586:24, 1588:4, 1602:19, 1626:2, 1630:20, 1630:22, 1695:11, 1695:13
**yourself** [6] - 1567:14, 1596:13, 1596:19, 1597:10, 1606:19, 1630:15
**yup** [1] - 1601:17

## Z

**zoom** [1] - 1614:9

VB        OCR        CRR