1715

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,      : 11-CR-00683(NG)
                               :
                               :
                               :
       -against-               : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
STEVENSON DUNN, LEE HYMOWITZ   : Tuesday, March 25, 2014
AND MICHAEL FREEMAN,           : 9:45 a.m.
                               :
       Defendant.              :
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NINA GERSHON
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                        United States Attorney
                        Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                    BY:  ANTHONY M. CAPOZZOLO, ESQ.
                         CRISTINA MARIE POSA, ESQ.
                         Assistant United States Attorney

For the Defendant:    BY:ROBERT A. EVANS, JR., ESQ.
Stevenson Dunn

For the Defendant:    BY:MAURICE H. SERCARZ, ESQ.
Lee Hymowitz             ROBERT CALIENDO, ESQ.

For the Defendant:    BY:GERALD J. DICHIARA, ESQ.
Michael Freeman          NICHOLAS PINTO, ESQ.

Also Present:            Naushan Richards, Special Agent
                         Susannah Apuzzo, Paralegal

Court Reporter:     VICTORIA A. TORRES BUTLER, CRR
                    225 Cadman Plaza East / Brooklyn, NY 11201
                    **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

VB      OCR      CRR

Proceedings                                            1716

1            (In open court.)

2            (Judge NINA GERSHON enters the courtroom.)

3            (The following occurs outside the presence of the

4     jury.)

5            THE COURTROOM DEPUTY:  All rise.

6            United States District Court for the Eastern

7     District of New York is now in session.  The Honorable Nina

8     Gershon is now presiding.

9            Criminal cause for a trial, United States versus

10    Stevenson Dunn, et al.

11           May I have the appearances for the Government,

12    please.

13           MS. POSA:  Cristina Posa, Anthony Capozzolo and

14    Susannah Apuzzo.  Naushan Richards will be joining us shortly.

15           Good morning, Your Honor.

16           THE COURT:  Good morning.

17           THE COURTROOM DEPUTY:  For the defendant Stevenson

18    Dunn.

19           MR. EVANS:  Robert Evans.

20           Good morning, Your Honor.

21           THE COURTROOM DEPUTY:  For Mr. Lee Hymowitz.

22           MR. SERCARZ:  The defendant Hymowitz, Sercarz and

23    Riopelle by Maurice Sercarz and Robert Caliendo.

24           THE COURTROOM DEPUTY:  For Michael Freeman.

25           MR. DiCHIARA:  Good morning, Your Honor.

Proceedings                                      1717

1          Mr. Pinto and Gerald DiChiara for Mr. Freeman.

2          THE COURTROOM DEPUTY:  Thank you, please be seated.

3          THE COURT:  Counsel, we have another juror problem

4    and that is Juror Number 8.

5          Ms. Morris, is it?

6          THE COURTROOM DEPUTY:  Yes.

7          THE COURT:  Here is her problem.  She travels here

8    on Access-A-Ride -- I'm reporting what Victor has reported to

9    me, I have not spoken to her -- and the Access-A-Ride was in

10   an accident, was hit from the back and so they took everyone

11   to the hospital.  So, she is at Jamaica Hospital where she is

12   awaiting an X-ray on her neck.  She's eager to be here for the

13   jury and as far as I know, if she has the X-ray and she

14   doesn't have a fracture, or maybe even if she does have a

15   fracture, I don't know, she can come in.

16         So, the last we heard from her, she was awaiting the

17   X-ray; is that it, Victor?

18         THE COURTROOM DEPUTY:  That's correct, at 9:30 I

19   received the message.

20         THE COURT:  At 9:30 she was waiting.

21         She hasn't called you yet?

22         THE COURTROOM DEPUTY:  She has not.

23         (Pause in the proceedings.)

24         THE COURT:  I am just discussing with Victor the

25   possibility of our calling the hospital and seeing if we can

Proceedings                                    1718

1   get this expedited.  My own suggestion would be that we give

2   this a couple of hours, maybe by the end of the morning she

3   will be fine and be able to be here.  She said to Victor she

4   could call Access-A-Ride to get from the hospital to here, but

5   I think I could arrange for her to take a taxi at our expense

6   and make sure that she just gets here, I don't want her to

7   have to go on the Access-A-Ride again.  So, that would be my

8   suggestion.

9           Then I would actually tell the jury what happened

10  and say that I would just ask them to wait at least the

11  morning to see if she can be here in time for, at the latest,

12  the afternoon session.  So, that's my thought.

13          MS. POSA:  We're okay with that, Your Honor.

14          MR. EVANS:  I'm okay with that.

15          MR. SERCARZ:  So am I, Your Honor.  We might want to

16  find out what the results of the X-ray are as well.

17          THE COURT:  Yes.

18          MR. SERCARZ:  She may not be released to come here.

19  Other than that, I'm fine with it.

20          THE COURT:  Yes, okay.  No, of course, we will find

21  out what the doctor said.

22          MR. DiCHIARA:  And I have no problem, Your Honor.

23          THE COURT:  All right.

24          Victor, let's bring in the jury.

25          THE COURTROOM DEPUTY:  Yes, ma'am.

Proceedings                                        1719

1        THE COURT:  Let me tell them what's going on, the

2   rest of them are here.  Then we'll just make them comfortable

3   in the jury room, maybe we'll get them something to eat.

4        THE COURTROOM DEPUTY:  Yes, ma'am.

5        THE COURT:  Then we will continue doing some work

6   together, Counsel and I.

7        THE COURTROOM DEPUTY:  Okay.

8        THE COURT:  All right.

9        Including that we can, after we go through some

10  rulings, we can also talk about the charge if you have had the

11  opportunity to review it.

12       (Jury enters.)

13       THE COURT:  Good morning, everyone.

14       THE JURY:  Good morning.

15       THE COURTROOM DEPUTY:  Thank you, please be seated.

16       THE COURT:  Members of the Jury, I just want to give

17  you some information.

18       We will have a delay this morning because

19  Ms. Morris, Juror Number 8, is okay but the Access-A-Ride she

20  was in had an accident on the Van Wyck Expressway, so they

21  took everybody to Jamaica Hospital so they can make sure that

22  everybody is all right.

23       She is there now and she is eager to return to the

24  jury, but we have to let her hospital business take its

25  course.  I am hoping that she will be here within a couple of

Proceedings                                    1720

1    hours, but I don't know and, in fact, after I speak with you,

2    I am going to call the hospital and see if there is anything I

3    can do.  Unfortunately, I have more power here than I have

4    over there, but I'll see what I can do.

5            In any event, what I am going to ask you to do is

6    just relax in the jury room for a few hours.  If I determine

7    that there is a problem, I may have to make some other

8    decisions, but at this point I think it's appropriate for us

9    to wait for her to see if she will be back here at least by

10   the afternoon session.  We are in touch with her on her cell

11   phone and hopefully, we'll know soon that she is on her way,

12   okay?

13           So, I am sorry about this, but Victor will check in

14   with you.  So, go on back into the jury room and Victor will

15   be in touch with you, okay?

16           THE COURTROOM DEPUTY:  All rise.

17           (Jury exits.)

18           (In open court; outside the presence of the jury.)

19           THE COURT:  So, Counsel, why don't you take ten

20   minutes, 15 minutes and I'll just see if I can get further

21   information from Victor and maybe call the hospital.

22           Let's step out.

23           In any event, she is not here so you can take ten,

24   15 minutes.

25           (Recess taken.)

VB        OCR        CRR

Proceedings                                          1721

1            (In open court.)

2            (Judge NINA GERSHON enters the courtroom.)

3            THE COURTROOM DEPUTY:  All rise.

4            THE COURT:  All right, Counsel, the good news is

5    that Juror Number 8 has been released from the hospital and is

6    on her way here, so let's take advantage of what remaining

7    time we have before she gets here.  First, let me rule on the

8    question of whether the Government can use Mr. Dunn's

9    unredacted statement on their cross-examination.

10           My conclusion is that they can use it and that we

11   will have a limiting instruction and I will discuss the

12   limiting instruction and whether the defense wants me to give

13   it in a moment.

14           To begin with, I think there is clearly now, based

15   upon Mr. Dunn's testimony, no Bruton issue.  There is ample

16   opportunity for cross-examination since based upon the

17   Defendant Dunn's testimony I find that it case is more like

18   the O'Neil case than the Brown case.  In Brown the testifying

19   defendant, Mr. Dunn, did not try to exculpate his co-defendant

20   Bishop who was the subject of the case.

21           Here, Mr. Dunn's testimony is not only exculpatory

22   of his co-defendants but he, especially with respect to

23   defendant Hymowitz, appears to be a witness for Mr. Hymowitz.

24   The unredacted statement therefore, could be highly probative

25   for the Government with respect to Mr. Dunn's credibility as

                    VB       OCR       CRR

Proceedings                            1722

1    to how this whole scheme operated, who was involved in it,

2    what their individual roles were and so on.  I think to deny

3    the Government the ability to use it would be improper and it

4    would allow Mr. Dunn to make exculpatory statements as to his

5    co-defendants without being confronted with inconsistent

6    statements he made earlier.

7              I am also satisfied that a limiting instruction

8    would resolve the potential prejudice to the co-defendants and

9    I will discuss that in a moment.

10             I wanted to just add something about the issue of

11   severance.  I raised footnote 7 of the Brown case yesterday,

12   but I am satisfied that the Government is not limited to

13   either severance or use of the statement as redacted.  It is

14   clear that in Brown the Court was faulting the Government for

15   withholding information until just prior to the co-defendant's

16   testimony.  Here the Government, of course, made known the

17   statement and the issues, including the issues about

18   redaction, were litigated at some length prior to the trial.

19             Also, of course, the Court in Brown found the

20   defenses in that case to be inconsistent.  Here, at least in

21   part as we addressed yesterday, there is a common defense and

22   whether all of the defends are treated as common, it is clear

23   that there are no inconsistent defenses, at least until this

24   point in the trial.

25             So, under those circumstances, the Government has

Proceedings                                         1723

1   proposed a couple of questions yesterday and I would allow the

2   Government to use those questions.

3          With respect to the limiting instruction I think

4   there is a question that the defense has to answer, which is

5   whether or not you want the limiting instruction before the

6   questions are asked, after the questions are asked or maybe

7   only at the time of Agent Richards's testimony, which will set

8   forth the prior inconsistent statements.  So, let me read to

9   you what I propose as the instruction.  You will tell me if

10  that is satisfactory and you'll tell me when you want me to

11  give it.

12         Members of the Jury, you are going to hear or have

13  heard questions to Mr. Dunn about statements the Government

14  claims he made prior to this trial regarding the involvement

15  of Mr. Hymowitz and Mr. Freeman.  I instruct you that you may

16  consider the statements if you find they were made by Mr. Dunn

17  only for two purposes.  First, you may consider them as to

18  Mr. Dunn's culpability.  Second, you may consider then as to

19  the credibility of Mr. Dunn's trial testimony.  You may not

20  consider them in any way as against Mr. Hymowitz or

21  Mr. Freeman.

22         MR. SERCARZ:  Can I speak to Mr. DiChiara for

23  about 30 seconds?

24         THE COURT:  As long as you like, we don't have a

25  jury.

Proceedings                                    1724

1       MR. SERCARZ:  Would you like us to do that now or

2  are you going to deal with other issues first?

3       THE COURT:  I don't think I have any other issues

4  unless you have other issues.  Do it now.

5       MR. SERCARZ:  The Government dropped another

6  in limine motion on us.

7       THE COURT:  They did.  I will hear from you on that

8  if you want to be heard.

9       MR. SERCARZ:  That's what I'm asking, would you

10  rather we talk first or discuss the in limine motion?

11       THE COURT:  Oh, I don't care.

12       MR. SERCARZ:  We'll talk first.

13       THE COURT:  Okay.

14       MR. DiCHIARA:  Judge?

15       THE COURT:  Yes.

16       MR. DiCHIARA:  Just for clarity, is the Government

17  going to be restricted to the two questions that they posed

18  yesterday afternoon?

19       THE COURT:  I don't see why not.

20       Mr. Capozzolo, that is what you proffered; right?

21       MR. CAPOZZOLO:  Yes, Judge.

22       THE COURT:  Okay, that's it.

23       (Pause in the proceedings.)

24       THE COURT:  All right, Counsel, are you ready?

25       Tell me when you want the instruction, if at all.

VB        OCR        CRR

1   You don't have to have an instruction, it is up to you.

2          MR. DiCHIARA:  Yes, Judge, we would like to have the

3   instruction.

4          Because it's so critical, we would ask that the

5   Court give the instruction before the continued cross.  And

6   then, at the complete end of Mr. Dunn's testimony, I would

7   like the Court to remind them of instruction.

8          THE COURT:  All right.

9          Are there any changes to the instruction itself that

10  you would like to propose?

11         MR. DiCHIARA:  No, nothing that we haven't already

12  argued about, the fact that we feel it's ineffective, but

13  besides that, no.

14         THE COURT:  All right.

15         So then, Mr. Capozzolo, you need to stop at the

16  point where you are going to ask those questions --

17         MR. CAPOZZOLO:  Yes, Judge.

18         THE COURT:  -- and let me know that it is time for

19  the instruction.

20         MR. CAPOZZOLO:  I plan on showing Mr. Dunn a few

21  contract documents and then I'll let you know.

22         THE COURT:  Okay.  But it is your obligation to let

23  me know.  I don't want to have happen what happened yesterday.

24         MR. CAPOZZOLO:  Absolutely, Judge, absolutely.

25         THE COURT:  All right.

Proceedings                              1726

1          Counsel, is there anything else we need to take up

2   at this point?

3          MR. SERCARZ:  May I have one moment with

4   Mr. DiChiara, Your Honor?

5          THE COURT:  Yes.

6          I am going to take five minutes.

7          (Recess taken.)

8

9          (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1727

1    (In open court; outside the presence of the jury.)

2    THE COURT:  Is everybody here?  All right.  Counsel,

3  did you want to address that recent letter from the

4  government?

5    MR. SERCARZ:  Your Honor, I believe that Mr. Freeman

6  is in the process of collecting the firm's file on this

7  mortgage.

8    I can indicate to the Court that if the government

9  questions Mr. Hymowitz regarding this loan transaction, he

10  will indicate that he doesn't recall it, at least not at this

11  time, but I can further indicate that there's much about the

12  documents that we have received that suggests that the account

13  doesn't make sense and that the government would be well

14  advised to obtain additional documentation before they'd

15  engage in this question.

16    THE COURT:  And the government is offering this only

17  on cross-examination of the two defendants, not as

18  cross-examination of the character witnesses?

19    MS. POSA:  Correct, Your Honor.

20    MR. SERCARZ:  The offer -- the questions, however,

21  do have to be asked in good faith and I'd like to point some

22  things out, if I may, just on the face --

23    THE COURT:  Yes.

24    MR. SERCARZ:  -- of the account that was provided.

25  If I may just have one moment, I'm missing my second page of

1728

1    this document.

2              (Pause.)

3              MR. SERCARZ:  The government characterizes this as a

4    mortgage between the defendants and a senior citizen who is

5    not a sophisticated business person, but the mortgage document

6    that they provide states in boldface at the top, Consult your

7    lawyer before signing this instrument.  This instrument should

8    be used by lawyers only.  It also indicates at the bottom that

9    it was signed not only by Ms. Thomas, if we can use her proper

10   name, but by two of her sons.  The amount of the mortgage is

11   clearly stated as $145,000.

12             What's customary in transactions such as this is

13   when a mortgage is provided, a portion of the mortgage is paid

14   directly to satisfy the prior mortgage and if the borrowers

15   are borrowing anything in excess of the amount needed to

16   satisfy the mortgage, only the excess is given to them.  The

17   government notes that this is a $145,000 mortgage and on page

18   two, indicates that the defendants gave $85,000 to the Doe

19   family.

20             THE COURT:  Excuse me.  When you say page two, what

21   are you referring to?

22             MR. SERCARZ:  Page two of the government's in limine

23   letter.

24             THE COURT:  Page two of their letter?  Okay.

25             MR. SERCARZ:  Yes.

1729

1    THE COURT:  Go ahead.

2    MR. SERCARZ:  And kept approximately $65,000

3  presumably as legal fees.  The government has provided no

4  documents indicating how the $145,000 loan was divided up, but

5  it appears on the face of the document that $65,000 was used

6  to satisfy the prior mortgage and the remaining money would

7  have been given to the Doe family.

8    THE COURT:  You're talking about the mortgage, the

9  document labeled "Mortgage"?

10   MR. SERCARZ:  Yes.  The mortgage is for $145,000.

11   THE COURT:  I know.  I think maybe something is

12 missing here.

13   Okay.  What part of the mortgage are you referring

14 to?

15   MR. SERCARZ:  Just the --

16   THE COURT:  What page?

17   MR. SERCARZ:  -- recitals under "Witnesseth."

18   THE COURT:  What page?

19   MR. SERCARZ:  Page one of the mortgage --

20   THE COURT:  Okay.

21   MR. SERCARZ:  -- indicates that it is to secure an

22 indebtedness of $145,000 which, to me, means that the amount

23 of the loan is $145,000 and a lien is being taken on the

24 property to secure the payment of it.  That's how I read this

25 document.

1    THE COURT:  I don't think the government disagrees

2  with that, right?

3    MR. SERCARZ:  All right.  But it indicates that

4  according to the statement that they obtained, the defendants

5  gave $80,000 to the Doe family and kept approximately $65,000.

6    Lawyers, when they are engaged in a transaction

7  meant to satisfy an earlier mortgage which is what happened

8  here, customarily cut checks to satisfy the first mortgage and

9  extinguish it at the time they make the loan.

10    THE COURT:  The government describes that, on page

11  two of their letter, that there was a $35,000 balance on the

12  existing mortgage.

13    MR. SERCARZ:  I respectfully submit that it doesn't

14  make sense in the context of the way in which these

15  transactions customarily take place.

16    THE COURT:  What doesn't make sense?

17    MR. SERCARZ:  It doesn't make sense that the

18  defendants would keep $65,000 as legal fees.  If they gave

19  80,000 to the Doe family, something had to be used to satisfy

20  the prior mortgage.

21    THE COURT:  Right, but the government's letter says

22  that was $35,000.  So if you subtract the $35,000 from

23  $65,000, you get $30,000.

24    MR. EVANS:  $80,000 to the Doe family, plus 35,000

25  which the government claims that was kept, plus 65,000 adds up

1 to more than the $145,000 that was being borrowed.

2       THE COURT:  What I was trying to do was subtract the

3 35 from the 65.

4       MS. POSA:  Your Honor, even if we accept that, those

5 facts are true, that meant that the defendant still kept

6 $30,000 if they used 35,000 to satisfy the existing mortgage.

7 Although that's not the heart of what the questioning would be

8 about, it would be about subsequent transactions with

9 Mr. Malik.

10       MR. SERCARZ:  If I can just finish.

11       THE COURT:  Okay.

12       MR. SERCARZ:  This already shows that there is

13 reason to question the account that they were given by the

14 young lady to whom the agents apparently spoke who was not

15 directly involved in the mortgage.  She is not a signatory on

16 the mortgage.  With regard to what comes later, it appears

17 that when the borrowers couldn't make their payments on this

18 mortgage, that they sold the property and they were able to

19 sell the property for a great deal more than the amount of the

20 mortgage.

21       There's nothing untoward about that.  People don't

22 always borrow the full amount or full value of the property

23 when they are seeking a mortgage and the fact that the

24 property was later flipped and sold for an amount far in

25 excess of the mortgage doesn't suggest on its face that there

1    was anything untoward.

2           MS. POSA:  Just to clarify, by later, you mean the

3    same exact day, it was sold for an additional $200,000.  It

4    wasn't months later.  It was the same day that all these

5    transactions occurred.

6           MR. SERCARZ:  That's fine.  The Hymowitz and Freeman

7    law firm had nothing to do, at least based on these documents,

8    and I don't hear you alleging anything further, with a

9    decision of a borrower to sell their property and to sell it

10   to someone who turned around and obtained significantly more

11   for it than the price that he charged or that he paid the

12   Thomases.  That has nothing to do with the defendants in this

13   cases unless there's more to the allegation.

14          If I borrow money for home improvements and I'm

15   willing to put my property up as equity or as a lien for the

16   loan and I borrow $100,000 and I find I'm having trouble

17   paying off that debt and I turn around and sell my house for a

18   million dollars and the person who buys it, sells it the same

19   day to someone else who pays $3 million for it, there's no

20   basis for suggesting that the person who provided the loan is

21   engaged in any wrongdoing.

22          THE COURT:  Well, I'm just -- Ms. Posa, why are you

23   saying it's the same day?  It looks like it's two years later.

24          MS. POSA:  The property was sold -- I have my sheet

25   here.

1733

1      THE COURT:  I can't read the number.

2      MS. POSA:  On March 5, 2009.

3      I'm sorry, Your Honor.  So the mortgage was taken

4  out in 2007.

5      THE COURT:  Right.

6      MS. POSA:  The first question, of course, is why

7  when these people could not even pay a $135,000 mortgage, the

8  defendants felt confident enough to give them $145,000, but

9  then what happens is after they predictably fall into arrears,

10  Mr. Dwight Thomas who, based on information from the family,

11  appears to have been in cahoots, for lack of a better word,

12  with the defendants, sells it to Aasif Associates on March 5,

13  2009 for $280,000.

14      THE COURT:  But you said it was the same day.

15  That's two years later.

16      MS. POSA:  Sorry.  That very same day, Aasif sells

17  it to Mahmood Malik for no money, but Mr. Malik takes out a

18  mortgage for $480,000.  So all of this happened on the same

19  day.

20      THE COURT:  All of what happened on the same day?  I

21  thought we were saying the same day that the defendants gave

22  the mortgage --

23      MS. POSA:  No, it was the subsequent sale.  It was a

24  short sale.  Instead of foreclosing on the property, trying to

25  auction it off to the highest bidder so everybody can benefit,

1734

1   we believe that they arranged a sale through a straw

2   purchaser, this Aasif Associates, for $280,000.

3          THE COURT:  But where does it say the defendants are

4   involved in that?

5          MS. POSA:  Your Honor, we don't have direct evidence

6   but we do think that the facts certainly give rise to a good

7   faith basis.  We don't have at this point to show guilt beyond

8   a reasonable doubt.  That would be for, you know, a subsequent

9   mortgage fraud investigation into the defendants, but at this

10  stage, we think that these facts certainly give rise to a good

11  faith basis because it's just incomprehensible that on the

12  same day that the Doe family or the Thomas family is told that

13  you're only going to get $280,000 for this house, all of the

14  sudden, this other person takes out a $480,000 mortgage on it

15  which, by the way, he defaulted on two months later, sorry,

16  four months later.

17         THE COURT:  But where in the March 2009 transaction,

18  where is the evidence that the defendants had anything to do

19  with that?

20         MS. POSA:  Your Honor, we don't have direct evidence

21  of that.

22         THE COURT:  Well, what's your indirect evidence?

23         MS. POSA:  We wish to inquire.  I'm sorry.  One

24  second.

25         (Pause.)

1    MS. POSA:  There is some evidence.  We indicated in

2    the letter the defendant used an intermediary to approach this

3    family, was an individual identified by Mrs. Thomas and her

4    daughter as a Robert.  This Robert apparently is good friends

5    with her son Dwight and Dwight continues to reside in that

6    house.  It's a little bit convoluted but for sure, there's a

7    good faith basis that they were somehow colluding with Dwight

8    to rip off the rest of his family.  And we're currently in the

9    process of trying to obtain the underlying documents.

10    THE COURT:  But what is the rip-off?

11    MS. POSA:  They could have sold this home presumably

12    for somewhere in the neighborhood of $480,000 and they would

13    have had to share that money with the Thomas family.  Instead,

14    they only sold it for 280 and then they did this subsequent

15    sale or they were involved in it for an additional $200,000.

16    A normal bank would have just auctioned off the house and

17    tried to get as much money as they could from it.

18    THE COURT:  Anything else until you get the rest of

19    the papers in?  Anything else?

20    MS. POSA:  No.

21    THE COURT:  All right.  We will put this aside.

22    The juror that we are waiting for is downstairs so

23    she should be here momentarily.  Anything else that we can

24    take up at this time?

25    MR. DiCHIARA:  Judge, do you have anything else?

1736

1    THE COURT:  No.

2    MR. DiCHIARA:  May I have a short restroom break?

3    THE COURT:  Yes, but the juror will be here any

4    minute.

5    MS. POSA:  Before you leave --

6    THE COURT:  Mr. DiChiara?

7    MR. DiCHIARA:  I'm sorry.

8    MS. POSA:  There is one other issue.  I'm not sure

9    if the Court has fully ruled on it, to be honest.

10    If Mr. Hymowitz testifies, as he's indicated that he

11    probably will, whether we can inquire as to the Scignano

12    lawsuit on cross-examination and that was in a prior motion we

13    made.

14    THE COURT:  Yes.  I have not ruled on it at all.  I

15    have not ruled on it yet.

16    MS. POSA:  Okay.

17    THE COURT:  Was there any additional argument on

18    that issue, on that lawsuit, that I should hear?

19    MS. POSA:  I think we put forth our position in our

20    papers, Your Honor.

21    THE COURT:  Mr. Sercarz?

22    MR. SERCARZ:  Your Honor, I don't think there's

23    anything further I can say unless I see the file on this

24    matter.

25    THE COURT:  I'm now talking about the lawsuit.

1737

1   Ms. Posa has said that I have, she's correct, I have not ruled

2   on it.

3          MR. SERCARZ:  That's right.  Sicignano.

4          THE COURT:  That's right.  Lawsuit.

5          MR. SERCARZ:  I think you've heard.  I mean, we have

6   our, we have our version of what took place there and it is,

7   frankly, it's exculpatory.  The Sicignanos were minority

8   shareholders.  If we can hold off on this until Mr. DiChiara

9   comes back.

10          THE COURT:  All right.

11          MR. SERCARZ:  He can correct me on any factual

12   assertions I make.  I want to make sure I have it right.

13          THE COURT:  All right.  Counsel.

14          (Pause.)

15          THE COURT:  All right.  Mr. DiChiara is entering the

16   courtroom.  We'll bring in the jury now.

17          (Jury enters.)

18          THE COURT:  All right.  Good morning members of the

19   jury.  We are ready to start up now and just to remind you

20   that we have Mr. Dunn on the witness stand and that

21   Mr. Capozzolo is cross-examining him.

22          THE CLERK:  Thank you.  Please be seated.  Please be

23   advised you're still under oath.

24          THE WITNESS:  Yes.

25

CMH      OCR      RMR      CRR      FCRR

Dunn - cross - Capozzolo                                1738

1    STEVENSON   DUNN         ,

2         called as a witness, having been previously duly

3         sworn, was examined and testified as follows:

4    CROSS EXAMINATION (Continued)

5    BY MR. CAPOZZOLO:

6    Q    Mr. Dunn?

7    A    Good morning.

8    Q    Good morning.  You testified yesterday that you spoke to

9    the agents after you were arrested on October 5, 2011,

10   correct?

11   A    Yes.

12   Q    Is it true that you were arrested at about 8:05 p.m.?  Is

13   that correct?

14   A    Yes.

15   Q    And isn't it true that the agents began speaking to you

16   at 8:45 p.m.?

17   A    Started speaking to me?  I don't remember when they

18   started.

19   Q    Do you remember that it was less than an hour before they

20   questioned you about any of the facts underlying this case?

21   A    Not exact on the time frame, but they did question me.

22   Q    It's true that in the round six of the NEP program, that

23   you, Mr. Hymowitz and Mr. Freeman applied to be developers

24   together for that NEP round, correct?

25   A    Yes.

Dunn - cross - Capozzolo                    1739

1   Q    And you, Mr. Hymowitz and Freeman were denied because,

2   according to their calculation, the asset cap was exceeded,

3   correct?

4   A    Yes.

5   Q    And as a result of that, you were not able to operate as

6   developers together?

7   A    For round six, yes.

8   Q    Now, yesterday we discussed that as a contractor, you

9   said that you were not able to withhold payment from a

10  contractor, is that correct, if he owed money to a

11  subcontractor like yourself?

12         THE COURT:  You said as a contractor?

13  Q    That he could not withhold payment to a contractor as a

14  developer on a requisition if there were monies owed to a

15  subcontractor and we were discussing the debt on the Lexington

16  Avenue project, that you acted as a subcontractor and

17  Mr. Starzecki had not paid that subcontractor, correct?

18  A    Yes.  I could not hold back funds.

19  Q    I'd like to show you what is in evidence as Government

20  Exhibit 209.

21         (Exhibit published.)

22  Q    Government Exhibit 209, you see the exhibit stamp there?

23  A    Uh-huh.

24  Q    Is it correct that this is a standard form of agreement

25  between an owner and contractor with relation to the Bed-Stuy

Dunn - cross - Capozzolo                    1740

1   project?

2   A    Yes.

3   Q    And that's the contract between you and Mr. Starzecki's

4   company, MCR Restoration Corporation, correct?

5   A    Yes, between Bed-Stuy SNL and MCR, yes.

6   Q    I'm just going to direct your attention to page 20 and

7   I'm going to highlight section 705.  If you can just take a

8   moment to read that.

9   A    Mechanic's liens --

10  Q    You don't have to read it out loud.  I just want you to

11  take a chance to look at it.

12              (Pause.)

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Dunn - cross - Capozzolo                    1741

1   BY MR. CAPOZZOLO:

2   A    Yes, I read it.

3   Q    A mechanic's lien is a claim that a subcontractor can

4   place against the project if they do work.  So, painters paint

5   a building, one of the buildings, and they don't get paid by

6   the contractor.  They can file what's called a mechanic's lien

7   against the project, saying, The contractor didn't pay me

8   $10,000 for doing the paint; correct?

9   A    That's what that explains, yes.

10  Q    If a subcontractor files a mechanic's lien, according to

11  this section of the provision, you, as the owner, developer,

12  can withhold payment from the general contractor; correct?

13  A    If the subcontractor puts a mechanic's lien, yes.  That's

14  what it reads in the Lexington Avenue project.

15  Q    Isn't it correct, as we discussed -- as was discussed

16  earlier in this trial, there are requisitions that are made on

17  a monthly or a little bit more than a monthly basis, and that

18  during the course of those requisitions, they hold back about

19  ten percent of the total project cost, as they call it, a

20  retainage; do you remember that?

21  A    Yes.

22  Q    I believe you said Lexington Avenue was about a $10

23  million project; correct?

24  A    230 million.

25  Q    You said your personal guarantee was ten million;

Dunn - cross - Capozzolo                    1742

1   correct?

2   A     Yes.

3   Q     So, the retainage, using very broad estimates, if it was

4   about ten percent of the hard cost, that would be somewhere in

5   the neighborhood of a million and a half to $2 million;

6   correct?

7   A     Yes.

8   Q     So, at the very end of the project, before the general

9   contractor gets that retainage, there has to be certain

10  approvals; correct?

11  A     Yes.

12  Q     And if a subcontractor filed a mechanic's lien, that

13  could stop the defendant from getting all of that retainage;

14  correct?

15          MR. EVANS:  Objection.

16  A     No, that's not correct.

17  Q     What about the final requisition on the project, could

18  you have, if there was a mechanic's lien, could you have

19  withheld the final requisition payment?

20  A     If there was a mechanic's lien against that particular

21  requisition, yes.

22  Q     Okay.  And you were -- you had brought in this

23  third-party contractor to do this work for Mr. Starzecki;

24  correct?

25  A     Yes.

Dunn - cross - Capozzolo                    1743

1    Q    And Mr. Starzecki had not paid that third-party

2    contractor; correct?

3    A    It was agreed upon, between the third-party contractor

4    and Mr. Starzecki, that he would wait, because he came in to

5    replace a contractor who had already absorbed some of the

6    budget on that building.  It was agreed between New World

7    Development and Bob Starzecki that they would wait.

8    Q    That's why there was no need for a mechanic's lien?

9    A    Exactly.  And then when it came to the end of the

10   project, when all the money on this general contractor was

11   going to be paid, Mr. Starzecki could have paid that out of

12   the retainage, couldn't he?

13              MR. EVANS:  Objection.

14              THE COURT:  Overruled.

15   A    He could have.

16   Q    You did not cause that to happen?

17   A    It was understood that -- there was an agreement that he

18   would pay it at a later point in time, not necessarily when

19   the retainage was released.

20   Q    That agreement didn't exist, because it was a kickback?

21   A    Not at all.

22   Q    There is no document that exists demonstrating that

23   agreement to pay that prior debt, is there?

24   A    From what I know, it's common practice for subs --

25   Q    I didn't ask that question, Mr. Dunn.  I asked you, is

Dunn - cross - Capozzolo                          1744

1    there a document in existence on a $150,000 debt that

2    documents that Mr. Starzecki owed New World order, yourself or

3    anyone with relation to that work?  Is there a document?

4    A    There was the original contract for $239,000, yes.

5    Q    Is there anything to document that there was an

6    outstanding invoice of $150,000, and that you, Mr. Starzecki

7    or the New World Order company was due that money?

8    A    I believe there were records kept by New World.

9    Q    You don't have them?

10   A    I don't have them handy.  This was ten years ago.

11   Q    Who owns New World order?

12   A    Rodney Rashid.

13   Q    Rodney Rashid is a friend of yours; he testified at the

14   trial?

15   A    Business associate.

16   Q    Just business associate?

17   A    I would consider him a friend, yes.

18   Q    You have a piece of property you share together; correct?

19   A    Yes.

20   Q    Where is that property located?

21   A    The property is in Martha's Vineyard.

22   Q    That's more than business associate, isn't it?

23   A    It's a business relationship, yes.

24   Q    You haven't vacationed together?

25   A    No, we've never been there together.

Dunn - cross - Capozzolo                    1745

1   Q    And just one other thing I want to point out on the

2   mechanic's lien.  It also indicates that "The lender" -- which

3   would be the banks, the nonprofit banks --  "and the owner" --

4   you, in addition to your right to withhold payments; so, there

5   is the power in certain circumstances to withhold payments;

6   correct?

7            MR. EVANS:  Objection.

8            THE COURT:  Overruled.

9            MR. EVANS:  Your Honor, may we approach?

10           THE COURT:  Yes.

11           (Sidebar.)

12           MR. EVANS:  First, we should clarify that the

13   company is called New World Development, not New World Order.

14   That's a religious thing which has its own issues.

15           Secondly, I don't believe we can interpret Mr.

16   Dunn's role as an owner relative to this contract.  There's a

17   process where these buildings are held in title between HPD

18   and the not-for-profit.  There's a joint-ownership period.

19   There's a period when it then passes over to the developer and

20   the financier, and only at the end of the fifteen-year period

21   does an individual developer convert into an actual owner.

22           THE COURT:  The contract is referring to him as

23   owner.

24           MS. CAPOZZOLO:  Just to make clear, the contract is

25   the contract between the developer and SML.  It's not relevant

Dunn - cross - Capozzolo                1746

1   to HPD.

2           MR. EVANS:  This contract is part and parcel of an

3   overall project.  I don't think it's accurate to say that he

4   is the undisputed owner.  I don't know that he knows who is

5   the owner or developer.

6           MS. POSA:  You should have straightened it out

7   before he testified.

8           THE COURT:  The objection is overruled.

9           You can ask these questions.  The witness obviously

10  understands himself to be the owner.

11          MR. EVANS:  We don't know that.  We know that he was

12  asked to answer the question -- Mr. Capozzolo asked him a

13  leading question about couldn't the owner.  He doesn't know

14  that he's the owner there.

15          THE COURT:  On redirect, you can address it.

16          MR. DiCHIARA:  Judge, my understanding is that he

17  can withhold payment, and he testified, based upon the

18  document that the government submitted to him, if a lien is

19  filed, if a mechanic's lien is filed.  If there's no

20  mechanic's lien filed, he does not have that power, and he's

21  testified that there was no mechanic's lien filed.

22          THE COURT:  So what?

23          MR. DiCHIARA:  They are asking the question again.

24  And that you have the power to withhold, it's not true.  Only

25  if a mechanic's lien is filed.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

Dunn - cross - Capozzolo                      1747

1          THE COURT:  The objections are overruled.  Let's

2    move on.

3          (In open court.)

4          MR. CAPOZZOLO:  May I proceed, your Honor?

5          THE COURT:  Yes.

6    Q    So, Mr. Dunn, is it correct that you also have right to

7    withhold payment; correct, not just on the mechanic's lien, as

8    this section of the contract points out?

9    A    I don't have the right to withhold, even though this

10   contract says "In addition to its right to withhold payments"

11   under 6(1)(a); right.  Again, I was not aware without a

12   mechanic's lien that I could hold back funds.

13   Q    This is a document that the witness has not seen.  It is

14   not in evidence.  It would be marked Government's Exhibit 640.

15   It's a little bit of a larger document, so counsel can see it,

16   as well, at the same time.

17         Do you see that, Mr. Dunn?

18   A    I see it.

19   Q    And that states, "First contract of construction related

20   to the Lexington Avenue development"; is that correct?

21   A    Yes.

22   Q    I direct you to page 53 -- I'm sorry.  I want to do 72

23   first.  Is that your signature?

24   A    Yes, it is.

25   Q    And signature of Mr. Starzecki?

1  A    Looks so, yes.

2  Q    Do you recall entering into a contract with Mr. Starzecki

3  relating to the Lexington Avenue project?

4  A    Yes.

5            MR. CAPOZZOLO:  I move to admit.

6            THE CLERK:  Is there any objection?

7            MR. SERCARZ:  May we approach and have an offer of

8  proof as to the relevance?

9            THE COURT:  All right.

10           (Sidebar.)

11           THE COURT:  All right.

12           MR. CAPOZZOLO:  This is the same type of contract

13  that I just used with Bed/Stuy.  This one is for Lexington,

14  which is where Mr. Dunn actually says the debt arose, and I

15  was just going to point to the same mechanic's lien paragraph,

16  to show that under that specific contract, he had the right to

17  withhold it.  He's raised this whole project, which we were

18  not even go going to talk about at trial other than some small

19  background amount, and he's made it a central part of where

20  the debt that he's claiming is not a kickback comes from.

21           MR. EVANS:  We've said consistently --

22           THE COURT:  Do you have any objection to this

23  document?

24           MR. EVANS:  I do.  I don't recall getting this

25  document in all the discovery we've got.  We have been looking

Dunn - cross - Capozzolo                    1749

1    for original contract documents.  This is a 521-page document,

2    and I have no recollection at all.

3              THE COURT:  Do you want to take a look at it?

4              MR. CAPOZZOLO:  We can certainly cut it down.  There

5    were seven contracts, and this is all seven.  I would just

6    restrict it to the shorter one.  The only portion I'm going to

7    show -- and I can put up on the screen for you to look at --

8    is the mechanic's lien section.

9              THE COURT:  Do you have any doubt that the contract

10   has the same provision in it?

11             MR. EVANS:  I don't know anything about it.

12             THE COURT:  It's your client who has raised the

13   issue about Lexington Avenue.

14             MR. EVANS:  He didn't say that he negotiated the

15   contracts, and if we're trying to reinforce the issue that

16   he --

17             THE COURT:  Did he sign the contract?

18             MR. CAPOZZOLO:  Yes.

19             THE COURT:  Counsel, did he sign the contract?

20             MR. EVANS:  I don't know.  I had said to the Court

21   that I have not seen this document.  I have not reviewed it

22   with him.

23             THE COURT:  Isn't it his testimony that he entered

24   into contracts?

25             MR. EVANS:  That he entered into contracts, yes.

Dunn - cross - Capozzolo                    1750

1      THE COURT:  Put it in front of him, and let him

2  decide whether it's the contract he entered into.  Let's not

3  waste a lot of time.

4           MR. EVANS:  The point that Mr. Sercarz is raising --

5           THE COURT:  Mr. Capozzolo.

6           MR. EVANS:  -- when Mr. Sercarz objected --

7           THE COURT:  He objected?

8           MR. SERCARZ:  I didn't object.  I asked for an offer

9  of proof, because we had not seen the document.  I wanted to

10  know where we are going.  I don't think I have a dog in this

11  fight.  I have no objection.

12           MR. EVANS:  If we're going to reiterate the point

13  that this contract allows for a mechanic's lien and that's all

14  we're going do with it, then fine.

15           THE COURT:  Okay.  Let's go ahead.

16           (In open court.)

17  BY MR. CAPOZZOLO:

18  Q    Very quickly, Mr. Dunn, on page two of this document, is

19  that your signature and Mr. Starzecki's?

20  A    Yes.

21  Q    And this was a contract you entered into between your

22  company, Lexington Avenue SML Development, LLC and

23  Mr. Starzecki for construction on the Lexington Avenue

24  project?

25  A    Yes.

Dunn - cross - Capozzolo                1751

1        MR. CAPOZZOLO:  Again, subject to the discussions at

2   the sidebar, I move to admit.

3        THE COURT:  Received, Government's Exhibit 640.

4        MR. CAPOZZOLO:  I do want to publish this to the

5   jury now.

6        THE COURT:  All right.

7        (So marked.)

8

9   Q    Mr. Dunn, if you can take a moment to read the paragraph

10  to yourself, and then I'll have a question for you?

11       (Pause.)

12  A    Okay.  I looked at it.

13  Q    The third line says "In the event such a mechanic's lien

14  is filed or claimed against the project, the contractor agrees

15  that it will, within thirty days of written notice from the

16  manager developer or sponsor, discharge the liens or liens";

17  correct?

18  A    That's what it reads, yes.

19  Q    And it then later provides in this section that "The

20  manager developer may request the contractor to pay the lien

21  amount, and that the contractor shall pay the lien amount to

22  the manager developer within five business days after the

23  manager developer's request for payment of the lien amount if

24  the manager developer determines that paying the amount

25  necessary to discharge any liens would adversely affect the

1   retainage being held; is that correct?

2   A    That's what it read, yes.

3   Q    It further says "In the event that the contractor fails

4   to pay the lien amount within such five-business-day period,

5   the manager developer, sponsor and/or lender may, pursuant to

6   the contract document or equity, commence an action for the

7   payment of the lien amount"; is that correct?

8   A    That's what it reads, yes.

9   Q    It's correct that you didn't take advantage of any -- of

10  that provision to obtain your money from Mr. Starzecki that

11  you claimed was owed to you?

12  A    I did not read the entire document.  That's a 72-page

13  document, one of hundreds of pages of the documents that we

14  have to sign.  Usually, our lawyers review all the documents,

15  then they put a tag where we need to sign.  So, anything of a

16  legal impact would more be in the mind of our attorney, not

17  us.  There's hundreds of documents, and we have to sign six

18  copies.

19  Q    You didn't receive payment from Mr. Starzecki?  Did you

20  ever consult a lawyer as to what your legal options were to

21  obtain that money?

22  A    It was not a hostile situation.  MCR Restoration asked

23  us, and we agreed to wait, which is normal in construction.

24  Q    What you are saying is, you agreed to wait until all the

25  monies related to that project had been discharged, and so

Dunn - cross - Capozzolo                    1753

1    there was no guarantee you were going to get the money back

2    for a debt you agreed that there's no documents to prove this

3    debt ever existed?

4    A    I did tell you that there is a contract that existed

5    between New World Developers and MCR.  We were comfortable at

6    the time with MCR, which was very busy at the time, to work

7    with him, yes.  That's what I am saying.

8    Q    You were comfortable that they had this outstanding

9    $150,000 debt?

10   A    It's a very small number in contracting, and the amount

11   of work that MCR was doing at the time, yes, we felt

12   comfortable.

13   Q    It's a small amount of the entire contract price, which

14   goes for hard costs, but it's a significant amount out of your

15   profit on the development; isn't that true?

16   A    He showed the ability to pay that amount of money, and in

17   building the relationship, we were comfortable with working

18   with him, yes.

19   Q    Because he was a good contractor?

20   A    A good contractor as far as work and business, yes.

21   Q    Government's Exhibit 638, which I showed to defense

22   counsel yesterday, I believe we now have an agreement that

23   this may be admitted into evidence?

24            MR. EVANS:  Without objection.

25            THE COURT:  Received.

1           (So marked.)

2    Q    I would like to show you, Mr. Dunn, and publish to the

3    jury at the same time, Government's Exhibit 638.  This is a

4    guide for prospective entrepreneurs; correct?

5    A    I recognize it now.  It's more enhanced than the original

6    document we received at training.

7    Q    Just turning to page three of the document.  On the right

8    side of the screen, is it correct it says "Roles of the

9    participating parties"?

10   A    Yes, I see that.

11   Q    I'm going to highlight the one section.  I believe it's

12   the fifth bullet point.  It says that "One of the roles of the

13   participating party, the neighborhood entrepreneur, is to

14   screen and recommend general contractors subject to the

15   approval of the HPD, NPHDFC and the private construction

16   lender who will bid on the project plans and enter into a

17   rehabilitation contract"; correct?

18   A    That's what it reads, yes.

19   Q    Did you understand that to be the case?

20   A    That's what it read.  However, in our case, because we

21   were new and we didn't know any contractors on any approved

22   list, HPD helped us and they gave us the contractors,

23   suggested contractors to invite to the bid.

24   Q    From that list, you could have screened them and decided

25   not to invite some of the them to bid; correct?

Dunn - cross - Capozzolo                    1755

1    A    Yes.

2    Q    Didn't you testify previously on direct that you do not

3    reject any of the contractors?

4    A    I don't recall that.

5    Q    Didn't you say that HPD forced you to accept the

6    contractors who bid on the job?

7    A    On this NEP job, on round five on the Hancock cluster?

8    Q    On this job.

9    A    No.  They gave us.  We couldn't choose the contractor.

10   It was a bidding process.

11   Q    Selecting the people who would bid.

12   A    In the first case, they gave us a list of contractors

13   they thought were good.  We didn't have any say-so at that

14   particular --

15   Q    How big was the list?

16   A    I would say maybe six or seven contractors.

17   Q    You could have told HPD that you didn't want one or more

18   of those contractors to bid; correct?

19   A    We didn't know anything negative to even suggest that.

20   Q    You could have interviewed them; correct?

21   A    We did speak to -- I don't think we spoke to them.  We

22   were trusting what HPD had given us.

23   Q    You've already testified you did a number of construction

24   projects before this particular contract; correct?

25   A    Nothing of this size.

Dunn - cross - Capozzolo                1756

1   Q    On Bed/Stuy, was there a difference in the process?

2   A    No.  We invited -- again, they offered help.  We invited

3   contractors to bid.

4   Q    Bob Starzecki was one of those contractors who you

5   invited to bid on process?

6   A    Yes.

7   Q    Isn't it correct having the opportunity to bid on a

8   project is a valuable thing, because it gives you access, the

9   possibility of getting your hands on a multi-million-dollar

10  general contract?

11  A    If they are the lowest bid?

12  Q    If they are the lowest bid.

13  A    We don't control that.

14  Q    Well, but you control who bids; correct?

15  A    We don't control how they arrive at it.  It's a sealed

16  bid oversaw by HPD.

17  Q    You heard Mr. Starzecki's testimony; correct?

18  A    Yes.

19  Q    And in that testimony, it indicated that you told

20  Mr. Starzecki that the other bidders would bid higher;

21  correct?

22  A    Not at all.  I didn't say that.

23  Q    You heard Mr. Starzecki's testimony on that point;

24  correct?

25  A    I don't recall that.  I was here at his testimony.

Dunn - cross - Capozzolo                    1757

1   Q     If four people are invited to bid, and you told all of

2   them to bid high, that would affect the contract price;

3   correct?

4   A     I wouldn't have that dialogue with them.

5   Q     But my question again is:  If that happened, that would

6   have affected the contract price; correct?

7   A     That's hypothetical.  But it didn't happen.

8              MR. CAPOZZOLO:  Pursuant to the discussion, I

9   realize there's an instruction that you would like to give for

10  the next couple of questions.

11             THE COURT:  All right.

12             Members of the jury, let me have your attention,

13  please.  You are about to hear some questions put to Mr. Dunn

14  about statements that the government claims he made prior to

15  this trial regarding the involvement of Mr. Hymowitz and

16  Mr. Freeman.  I instruct you that you may consider the

17  statements, if you find that they were made by Mr. Dunn, only

18  for two purposes.

19             First, you may consider them as to Mr. Dunn's

20  culpability, and second, you may consider them as to the

21  credibility of Mr. Dunn's trial testimony.  You may not

22  consider them in any way as against Mr. Hymowitz or

23  Mr. Freeman.

24             MR. CAPOZZOLO:  Thank you, your Honor.

25             THE COURT:  Go ahead.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

Dunn - cross - Capozzolo                    1758

1    MR. CAPOZZOLO:

2    Q    Mr. Dunn, is it correct, as you testified today -- is it

3    correct that your testimony is that you, Mr. Hymowitz and

4    Mr. Freeman did not conspire to commit the wire frauds charged

5    in the indictment; correct?

6    A    We did not.

7    Q    Isn't it true that when you were interviewed by Special

8    Agent Richards, that you stated the following:  During this

9    time period of the kickback payments, you, Stevenson Dunn,

10   along with partners Lee Hymowitz, Esq. and Michael Freeman,

11   Esq., were the Hancock developers, and Armstrong was a

12   contractor developer under his company named Metropolis

13   Development Corporation, you, Stevenson Dunn, Hymowitz and

14   Freeman operated SML Development, which was the entity they

15   used to develop the Hancock project?

16   A    As I said what Agent Richards wrote was not what I said.

17   Q    One more question:  Did you tell Agent Richards, on the

18   same date, that it was you, Stevenson Dunn, Hymowitz and

19   Freeman who had collectively negotiated the $300,000 kickback

20   payment from Starzecki in connection with this project?

21   A    No, I did not.

22           MR. CAPOZZOLO:  I have no further questions, your

23   Honor.

24           THE COURT:  Counsel, did you want me to repeat the

25   instruction?

Dunn - cross - Capozzolo                1759

1          MR. DiCHIARA:  At the end of the entire testimony.

2          THE COURT:  At the end of?

3          MR. DiCHIARA:  Mr. Dunn's testimony.

4          THE COURT:  Okay.  So, we are finished with the

5     cross-examination from the government.

6          Mr. Evans?

7          MR. EVANS:  Thank you, your Honor.

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. EVANS:

3              MR. EVANS:  Thank you, Your Honor.

4    Q    Mr. Dunn, are you an attorney?

5    A    No.

6    Q    Did you participate in the negotiations of the contracts

7    or documents for your SML companies?

8    A    No.

9    Q    Did you have business with Michael Freeman separate from

10   the SML development corporations?

11   A    Yes, he handled -- yes.

12   Q    And would you tell the jury what that business might have

13   been?

14   A    To the best of recollection, a divorce, my divorce, legal

15   matters concerning my family.

16   Q    Did you have business with Lee Hymowitz separate from the

17   SML development companies?

18   A    Yes.

19   Q    And what were those, if you remember?

20   A    Private real estate transactions, helping to secure

21   financing to my private properties and my ex-wife's property.

22   Q    In September of 2011, did you reach out to George

23   Armstrong to set up a meeting?

24   A    No.

25   Q    Do you remember if Mr. Armstrong reached out to you?

Side-Bar                                                    1761

1   A      He reached out to me.

2   Q      And when you met with Mr. Armstrong in Brooklyn, did you

3   set that meeting or did he?

4   A      No, he set the meeting.

5   Q      Did you know that George Armstrong was wearing a wire

6   when you met with him?

7   A      No, I did not.

8   Q      Did you know that George Armstrong was taping or had

9   people listening to your telephone call when you spoke to him?

10  A      No, I did not.

11  Q      You don't normally use derogatory racial terms in

12  business settings, do you, Mr. Dunn?

13  A      No, I don't.

14  Q      Did you --

15         MR. EVANS:  Withdrawn.

16         I have nothing further, Your Honor.

17         MR. SERCARZ:  Your Honor, I have a few but I need to

18  approach.

19         THE COURT:  All right, come to the side.

20         (Side-bar conference held on the record out of the

21  hearing of the jury.)

22

23         (Side-bar.)

24         MR. SERCARZ:  The witness testified on

25  cross-examination to the allegations that he was shaken down

Side-Bar                                    1762

1    for money by Wendell Walters and George Armstrong and that he

2    discussed it with his, I forget the word he used, with his

3    team or with the others or with the developers.

4           I'd like to ask the witness the question whether

5    during that meeting with George Armstrong he didn't say they

6    or my partners know nothing about my business.  If he denies

7    that, it's on the tape recording, it's not a portion that we

8    have previously been permitted to play, but under the

9    circumstances I would submit the door is open for us to

10   extract that portion and call Agent Richards and play that

11   portion for him.

12          I wanted the Government to know that it was coming

13   because I think it's a fair response to what's taking place in

14   court.

15          MR. CAPOZZOLO:  I think the proper question is did

16   Mr. Dunn tell Mr. Hymowitz this.

17          And if he says, no, I didn't, then that answer is

18   beneficial to him.

19          I don't understand why the recorded statement would

20   impeach.

21          MR. SERCARZ:  I'm impeaching the statement that he

22   already made but I have no objection with going back into this

23   for the limited purpose of inquiring as to whether he said it.

24          I just wanted you to know where I am going.

25          THE COURT:  I am not entirely --

VB        OCR        CRR

Dunn - cross - Sercarz                1763

1     MR. SERCARZ:  I will ask the prefatory question:  Do

2  you recall telling Mr. Hymowitz that Dunn and Armstrong --

3  that Armstrong and Walters were shaking you down or delaying

4  work on the project until they got money.

5          And if he says I didn't tell Hymowitz, I'm fine.

6  But if he says he did, then I will need to go further and I

7  wanted everyone to know where I was going.

8          THE COURT:  Okay.  And what you're saying is on the

9  tape recording or the recording of a conversation between Dunn

10 and Armstrong, he tells Armstrong.

11         MR. SERCARZ:  My partners don't know anything about

12 our business.

13         THE COURT:  I see.  Okay.

14         So if, in fact, he says that he did tell them, then

15 is there any objection to playing the tape?

16         MR. CAPOZZOLO:  Well, he can ask him if he told him.

17 If he acknowledges saying it, then we don't need to play the

18 tape.

19         THE COURT:  All right, fine.  Thank you.

20         MR. SERCARZ:  Thank you.

21         (Side-bar end.)

22         (In open court.)

23 CROSS EXAMINATION

24 BY MR. SERCARZ:

25         MR. SERCARZ:  Excuse me, can you put on the screen

Dunn - cross - Sercarz                    1764

1    Government's Exhibit 639.

2              MR. CAPOZZOLO:  I will look for it.

3    Q    Mr. Dunn, I'm going to show you copies of what the

4    Government offered into evidence as Exhibit 639, they're a

5    series of checks that were offered into evidence during your

6    testimony.  I'd like to show you this one first of all.

7              Can you make it out, would it be easier for you to

8    see the hardcopy and have it in your hands because I want to

9    ask you some questions about the writing on the check?

10   A    Yes, that would be helpful.

11   Q    All right.  Let's do it this way.  I'm going to point you

12   to sections of the check and if you run into any difficulty,

13   I'll come up and show it to you, all right?

14   A    Mm-hmm.

15   Q    Is that all right?  I needed a yes or no.

16   A    Oh, yes, I'm sorry.

17   Q    You just testified that Mr. Hymowitz and the Hymowitz &

18   Freeman firm did legal work for you and members of your family

19   separate and apart from the HPD matters; is that correct?

20   A    Yes, it is.

21   Q    All right.  Now, I want you to take a look at this check.

22   You can see the date is February 12th, 2007?

23   A    Yes.

24   Q    The amount is -- why don't you read the amount because

25   it's in your handwriting, I believe.  Is that $2,500?

VB       OCR       CRR

Dunn - cross - Sercarz                    1765

1    A    Yes.

2    Q    Okay.  And you can, if it helps, you can read your script

3    version?

4    A    Hymowitz & Freeman, $2,500.

5    Q    All right.  Now there's a memo entry here.

6              Do you see that?  Does that say January and

7    February?

8    A    Yes, it does.

9    Q    Does mean that this is a payment for a periodic bill that

10   is owed in January and February?

11   A    Yes, it is.

12   Q    Was this a payment that you made on the loan that was

13   obtained for you by the Hymowitz & Freeman law firm?

14   A    I believe it was the loan for a property that I bought in

15   Albany, New York.

16   Q    All right.  And if I could turn this around and ask you

17   to read the stamp indicating where the check was deposited.

18             Does it appear to you to say pay to the order of

19   JP Morgan Chase, New York, New York with deposit only

20   Hymowitz & Freeman IOLTA?

21   A    Yes, that's what it reads.

22   Q    All right.  Now, some of these other checks are

23   considerably smaller.  Now, let me show them.  And they're all

24   marked collectively in this Exhibit so let me show them to you

25   and see if you can tell us anything about them.  I'm going to

1  show you a number in the upper corner of this, another

2  Hymowitz & Freeman check.

3           Do you see that?

4  A    Yes, I do.

5  Q    All right.  Thank you very much.

6           Can you make out the date that it was prepared?

7  A    It says I think 4/22.  Is that '07 or '02?  I can't quite

8  make it out.

9  Q    I will show you another document that may help your

10 recollection.  Let me show you this check.

11 A    4/22/07.

12 Q    To Lee Hymowitz and it appears to have the next check

13 number in the sequence.

14           Do you see that?

15 A    Yes.

16 Q    And this check is a 2007 check; isn't that correct?

17 A    Yes, it is.

18 Q    All right.  So, going back to this one, check number

19 1954, does that help you to recall that this is an '07 rather

20 than an '02?

21 A    Yes, it does.

22 Q    All right.  Now, this is a $2,000 check to the law firm

23 of Hymowitz & Freeman; is that correct?

24 A    Yes.

25 Q    All right.  Now comes the difficult question.  Can you

Dunn - cross - Sercarz                                      1767

1   take a look at the memo entry and tell us what that says?

2   A    April plus 500 equals two thousand.

3   Q    Does it appear to you to say, and if you can't make it

4   out I'll approach you with it so you can see it, April 1500

5   plus 500 equals two thousand?

6   A    Yes.

7   Q    Does that help?

8   A    Yes, that's what it appears to say, yes.

9   Q    All right.  Now, armed with that information, can you

10  tell the Ladies and Gentlemen of the Jury your best

11  recollection who that check is for?

12  A    Again, I had ongoing business and I had a mortgage for

13  Albany in '07, which a mortgage was secured by Lee.

14  Q    All right.  Does that appear to you to be subsequent

15  payments on that same mortgage?

16  A    Yeah.

17  Q    All right, take a look at the next check in the sequence

18  here, 1955.  This is the payment to Lee Hymowitz that we were

19  just talking about earlier; correct?

20  A    Yes.

21  Q    All right, can you make out the amount?

22  A    2,500.

23  Q    Okay.  And now take a look at the memo entry.  This one

24  is very tough for me to read.  If you need for me to approach

25  you with the actual document, I will, but can you?

Dunn - cross - Sercarz                              1768

1   A    Yes, you will need to because I can't make that out.

2   Q    All right.

3             MR. SERCARZ:  May I, Your Honor?

4             THE COURT:  Yes.

5   Q    All right.  It's right here.  If you can't make it out,

6   I'll go back and blow it up for you.  But can you tell me

7   anything about what that memo entry stands for?

8   A    No, I can't.

9   Q    All right.

10  A    I can't make it out.

11  Q    Now, you mentioned that Mr. Hymowitz was involved with

12  you in obtaining financing?

13  A    Yes.

14  Q    And in legal matters; is that correct?

15  A    Yeah.

16  Q    All right.  Did Mr. Hymowitz ever represent you at a

17  closing in connection with the financing that you obtained?

18  A    Yes.

19  Q    All right.  This check is made out not to the firm, but

20  to Mr. Hymowitz personally.  It bears an entry that all of us

21  are having difficulty reading and it's in the amount of

22  $2,500.

23            Does that information give you any basis for a

24  recollection of what this check was for?

25  A    No.  I just can't make it out.

Dunn - cross - Sercarz                    1769

1    Q    All right.  Here is a check again to Mr. Hymowitz dated

2    May 1st of 2007; is that correct?

3    A    Yes.

4    Q    Again, well, this one appears to be for $2,800; is that

5    correct?

6            Take a look both at the number written as a number

7    and your script version; is that correct?

8    A    Yes.

9            THE COURT:  Counsel, let's put on the record the

10   check number.

11           MR. SERCARZ:  Yes, Your Honor, 1971.  And I believe

12   the other check numbers are all on the record.  The very first

13   check I showed you was check number 1749.  But this is check

14   number 1971.

15   Q    Armed with the amount of the check, the fact it was paid

16   to Mr. Hymowitz personally, can you make out anything about

17   the memo notation on this check?

18   A    Can you blow it up a little bit?

19

20           (Continued on following page.)

21

22

23

24

25

Dunn - cross - Sercarz                      1770

1    BY MR. SERCARZ:   (Continuing)

2    Q     Can I have this enlarged just a little bit?

3    A     Okay.  Can you move it up?

4          THE COURT:  There you go.

5    Q     Now, the first part of that appears to say 2,000,

6    correct?

7    A     2,800.

8    Q     See where my finger is?

9    A     Yes.

10   Q     Something about 2,000?

11   A     Yes, that's 2,000.

12   Q     There's language in here --

13   A     I can't make it out.

14   Q     -- in between and then a word ending with a name of some

15   kind?

16   A     Is that, I think that says Odd Couple.

17   Q     What is Odd Couple?

18   A     Odd couple is a management company that, a private

19   management company that me and Lee and Michael were part of.

20   Q     I believe those were the four checks that the government

21   showed you with regard to Mr. Hymowitz and, Hymowitz and

22   Freeman.  So let me give these back.

23          Now, during the course of your direct examination,

24   you testified that in connection with the Hancock Street

25   project, the work was slowed up for four months, Armstrong did

Dunn - cross - Sercarz                    1771

1    not appear.  Do you recall that?

2    A    Yes, I do.

3    Q    And that when you tried to get Mr. Armstrong to show up,

4    you learned that, in effect, he and Wendell Walters were

5    demanding money before the work would begin, is that correct?

6    A    Yes.

7    Q    Did you discuss these events with Lee Hymowitz, if you

8    recall?

9    A    I believe I mentioned it, yes.

10   Q    Do you recall in the -- do you recall discussing your

11   business with Mr. Armstrong at a conversation, portions of

12   which we have already heard, that took place at Junior's

13   Restaurant?

14        MR. SERCARZ:  I'll withdraw the question.  May I

15   speak to the government for a moment.

16        (Pause.)

17   Q    Just so that I'm clear about what it is that you say you

18   discussed with Mr. Hymowitz --

19   A    If I could --

20   Q    Let me ask the question and then you can respond.  Okay?

21        Are you saying that you mentioned to Mr. Hymowitz

22   that a bribe was being sought?

23   A    Yes, I mentioned it, I believe, yes.

24   Q    Are you also saying that you mentioned to Mr. Hymowitz

25   that the project was deliberately being slowed down until the

Dunn - cross - Sercarz                    1772

1   bribe was paid?

2   A    I told him it was being slowed down, yes.

3   Q    Do you recall having a conversation with Mr. Armstrong

4   that has been, portions of it have been played to this jury?

5   A    Yes.

6   Q    Do you recall a conversation that took place on June 17th

7   of 2011 between you and Mr. Armstrong at a restaurant?

8   A    Yes.

9   Q    And portions of that conversation were played, am I

10  correct?

11  A    Yes.

12  Q    Isn't it a fact that during the course of that

13  conversation, you said to Mr. Armstrong with reference to

14  Mr. Hymowitz and Mr. Freeman they don't know anything about

15  our business?

16  A    Referring to my Closeout King business, yes.

17  Q    Now, with regard to the post-arrest statement that you

18  made, it is your recollection that none of the agents read you

19  your rights before you were questioned, is that correct?

20  A    No, they did not.

21  Q    And it is your recollection that before you were

22  questioned, you were shown a copy of the indictment, isn't

23  that correct?

24  A    Yes.

25  Q    And it was clear from just the superficial examination of

Dunn - cross - Sercarz                    1773

1   the indictment that it dealt with the HPD projects, isn't that

2   correct?

3   A    Yes.

4   Q    And you knew that not only had you been arrested in

5   connection with these HPD projects, but that Mr. Freeman and

6   Mr. Hymowitz had been arrested in connection with that project

7   as well, am I correct?

8   A    I didn't know at the time, no.  It didn't --

9   Q    Do you recall making a demand for an attorney to

10  represent you?

11  A    Yes, I do.

12  Q    And do you recall you said I want to be able to call my

13  attorney, Mr. Hymowitz?

14  A    Yes.

15  Q    And do you recall in response to that being told

16  Mr. Hymowitz is being arrested?

17  A    That's what I was told, yes.

18  Q    And do you recall being told at some point that

19  Mr. Freeman had been arrested as well?

20  A    Yes, they were going to be arrested.  They weren't

21  arrested yet.

22  Q    And you told the ladies and gentlemen of the jury that

23  you were exhausted, correct?

24  A    Yes.

25  Q    Confused, correct?

Dunn - cross - DiChiara                    1774

1    A    For the latter part of the interview, yes.

2    Q    Frightened, is that correct?

3    A    Absolutely, yes.

4    Q    Afraid, is that correct?

5    A    Yes.

6    Q    Didn't you feel that you had to tell anything to the

7    agents in order for the agents to let you go?

8    A    Yes.

9    Q    And under those circumstances, you made the statements

10   that Mr. Capozzolo just read in court about Mr. Hymowitz and

11   Mr. Freeman and you, isn't that correct?

12   A    Again, the statement that Agent Richards wrote did not

13   reflect what I said.

14   Q    Do you recall saying to Agent Richards, I bought a

15   ticket?

16   A    No.

17   Q    Do you recall saying to Agent Richards, I'm not going

18   down for the Jews?

19   A    Absolutely not.

20        MR. SERCARZ:  Thank you.  I have no further

21   questions.

22        MR. DiCHIARA:  Just briefly, Judge.

23   CROSS-EXAMINATION

24   BY MR. DiCHIARA:

25   Q    Good afternoon, Mr. Dunn.

Dunn - recross - Capozzolo                    1775

1   A     Good afternoon.

2   Q     You know that I'm representing Mike Freeman, right?

3   A     Yes.

4   Q     Okay.  Would it be a fair statement that during the

5   course of the projects, both the Lexington Avenue, the

6   Bedford-Stuyvesant project and the Hancock project, that you

7   and Mr. Freeman often didn't see eye to eye?

8   A     Yes.

9   Q     And then that you argued a lot about how the financing

10  should go and what monies you were entitled to, et cetera?

11  A     Yes.

12          MR. DiCHIARA:  I have no other questions, Judge.

13          MR. EVANS:  No redirect.

14          MR. CAPOZZOLO:  Very brief.

15  RECROSS-EXAMINATION

16  BY MR. CAPOZZOLO:

17  Q     Mr. Dunn, the checks that were shown to you by

18  Mr. Sercarz, some of those related to some real estate

19  transactions, correct, as best you recall?

20  A     The best that I recall, some, yes.

21  Q     And, in fact, when you described that as a mortgage

22  payments, those are not, that's not a mortgage by a bank;

23  that's money that was lent directly to you by Mr. Hymowitz, is

24  that correct?

25  A     It was secured by a note, yes.

Dunn - recross - Capozzolo                1776

1    Q    But just to be clear, the money comes, the money comes

2    from Mr. Hymowitz himself, it's not from a lending

3    institution?

4    A    It was a private group of financing, group of people.

5    Q    And so, and you've engaged in other similar transactions

6    on real estate projects with Mr. Hymowitz, is that correct?

7    A    Yes.

8    Q    And the amount that the payments are supposed to be

9    between you and Mr. Hymowitz, that's something you and

10   Mr. Hymowitz and the other parties agree upon how much you

11   would pay per month?

12   A    It was a going rate based on private financing rates.

13   Q    That's the rate.  I'm talking about just the, whatever

14   minimum payment or whatever payments you might make toward the

15   note, correct?

16   A    It was a mortgage.  It was the same amount every month.

17   Q    Yes, but that was subject to your agreement.  It wasn't

18   set by a bank.  It was set by private parties because this was

19   a private mortgage, not a bank mortgage?

20   A    Yes.

21        MR. CAPOZZOLO:  Thank you.  I have no other

22   questions.

23        THE COURT:  Anyone else?

24        Mr. Dunn, you may step down.

25        THE WITNESS:  Thank you.

1777

1        (Witness steps down.)

2        MR. EVANS:  Your Honor, Mr. Dunn calls Anne Marie

3   Hendrickson.

4        THE CLERK:  Good afternoon.

5        THE WITNESS:  Good afternoon.

6        THE CLERK:  Before you sit down, let me ask you to

7   raise your right hand.

8        (Witness sworn.)

9        THE CLERK:  Thank you.  Please be seated.

10        THE COURT:  Just a minute, counsel.

11        Counsel, you asked for an instruction.  Do you want

12   that now?

13        MR. DiCHIARA:  I would, Judge.

14        THE COURT:  All right.  Before we continue with this

15   witness, I just want to repeat the instruction that I gave you

16   before you heard certain questions posed to Mr. Dunn.  You

17   have heard these questions about statements that it is claimed

18   he made prior to this trial regarding the involvement of

19   Mr. Hymowitz and Mr. Freeman.

20        I would instruct you that you may consider the

21   statements if you find that they were made by Mr. Dunn only

22   for two purposes.  First, you may consider them as to

23   Mr. Dunn's culpability and, second, you may consider them as

24   to the credibility of Mr. Dunn's trial testimony.  You may not

25   consider them in any way as against Mr. Hymowitz or

Hendrickson - direct - Evans            1778

1    Mr. Freeman.

2           Thank you.

3           THE CLERK:  Ms. Hendrickson, can you state your full

4    name for the record, please.

5           THE WITNESS:  Anne Marie A. Hendrickson.

6           THE CLERK:  Spell your last name for the court

7    reporter.

8           THE WITNESS:  H-E-N-D-R-I-C-K-S-O-N.

9           THE CLERK:  Thank you.

10   ANNE MARIE A. HENDRICKSON,

11       called as a witness, having been first duly sworn,

12       was examined and testified as follows:

13   DIRECT EXAMINATION

14   BY MR. EVANS:

15   Q    Ms. Hendrickson, my name is Robert Evans and I represent

16   Stevenson Dunn.

17          Have we ever met before today?

18   A    No.

19   Q    And have we ever talked or discussed this case?

20   A    No.

21   Q    What's your job presently?

22   A    I am the Deputy Commissioner at the New York City

23   Department of Housing, Preservation and Development.

24   Q    And how long have you held that position?

25   A    I've held that position since 2009.

Hendrickson - direct - Evans                    1779

1    Q    And have you met with the U.S. Attorney regarding this

2    case?

3    A    No.

4    Q    Have you met with any State prosecutors regarding this

5    case?

6    A    No.

7    Q    Have you met with anyone in the City's Department of

8    Investigation regarding this case?

9    A    Yes.

10   Q    And who was that?

11   A    I met with Debora Herlicka, Noah Mohney and some of the

12   other staff members at the DOI.

13   Q    When did you meet with the DOI representatives?

14   A    I believe it was back in 2011.

15   Q    And during the time that you met with the Department of

16   Investigation, were you represented by counsel?

17   A    No.

18   Q    Did you make a formal statement to the Department of

19   Investigation?

20   A    No.

21   Q    Did anyone take down stenographic minutes of that

22   meeting?

23   A    I don't recall.

24   Q    Are you presently under any agreement to cooperate with

25   either the State or federal governments in relation to this

Hendrickson - direct - Evans                    1780

1    case?

2    A    No.

3    Q    Were you involved in the Neighborhood Entrepreneurs

4    Program?

5    A    Yes.

6    Q    What was your role in that program?

7    A    I was the Assistant Commissioner of the Division of

8    Alternative Management Programs of which the Neighborhood

9    Entrepreneurs Programs was one of the programs under that

10   division.

11   Q    So in that responsibility then, did Wendell Walters

12   report to you?

13   A    Yes.

14   Q    Did you assist in the outlining or development of that

15   program?

16   A    In some regards, yes.

17   Q    In what regards?

18   A    By the time I became the Assistant Commissioner of the

19   program, the program was newly formulated at that time.

20   Q    And what responsibility were you given for that program?

21   A    Again, Wendell reported to me so I signed off on most of

22   the legal documents.

23   Q    And did you recruit or interact with the private

24   financiers?

25   A    Yes, I worked with the NPHDFC.

CMH      OCR      RMR      CRR      FCRR

Hendrickson - direct - Evans                    1781

1    Q    I'm sorry?

2    A    I worked with the Neighborhood Partnership Housing

3    Development Fund Corporation.

4    Q    What was that acronym?

5    A    NPHDFC.

6    Q    Did you work with the Enterprise?

7    A    Yes.

8    Q    Did you work with CPC?

9    A    No.

10   Q    Who did you work with or interact with at the Enterprise

11   Foundation.

12   A    It was many, many of the staff members.  We worked as a

13   team.

14   Q    Did you work with Ian Arias?

15   A    Yes.

16   Q    Rylona Watson?

17   A    Yes.

18   Q    Lenore Gordon?

19   A    Yes.

20   Q    In what roles did you work with those three persons?

21   A    During the development stage of the projects and Lenore

22   was the asset manager at Enterprise.

23   Q    When you say development of the projects, was it -- how

24   many projects were you working with the Enterprise on

25   developing?

CMH        OCR        RMR        CRR        FCRR

Hendrickson - direct - Evans                    1782

1    A    Oh, there were several projects that were going on at the
2    same time, probably easily ten.
3    Q    And for those ten projects, were you discussing financing
4    with the Enterprise or rates with the Enterprise?  What was
5    the subject of your conversation?
6    A    Well, I really oversaw the program so I didn't really
7    deal with all of the day-to-day type of issues.  I was more as
8    a -- I had played more of an oversight role.
9    Q    So you were responsible for the NEP program as part of
10   your responsibilities in alternative management?
11   A    Yes.
12   Q    So you are the person responsible for the oversight of
13   Wendell Walters?
14   A    He reported to me, yes.
15   Q    So you're the person responsible for the defalcations
16   against the City?
17   A    No.
18   Q    Did you have a method for reviewing the work of the NEP
19   team?
20   A    Yes.
21   Q    And what was that method?
22   A    Well, staff, staff was evaluated by their supervisors and
23   I would sign off on the evaluations of the staff.
24   Q    Did Mr. Walters report directly to you?
25   A    Yes.

Hendrickson - direct - Evans                    1783

1    Q    And so you reviewed his work?

2    A    On occasion, yes.

3    Q    Did you review the progress of the individual projects?

4    A    Yes.

5    Q    Did you recruit individual entrepreneurs?

6    A    No.

7    Q    Isn't it true that you went with Mr. Walters and a man

8    named Mr. Wayne Mackie to visit Stevenson Dunn?

9              MS. POSA:  Objection.  Leading.

10             THE COURT:  Sustained.

11   Q    Did you visit Stevenson Dunn?

12   A    I may have.  I don't recall.

13   Q    Did you do that with Wendell Walters?

14   A    Perhaps.

15   Q    Do you remember what the purpose of that meeting was?

16   A    I would think that it was maybe when we were evaluating

17   whether Stevenson Dunn should be an entrepreneur in the

18   program.

19   Q    So would that evaluation meeting have happened after he

20   made an application?

21   A    Yes.  He would have applied to the request for

22   qualifications.

23   Q    Would you have visited with him before that for any

24   reason?

25   A    Not to my knowledge.

Hendrickson - direct - Evans                1784

1    Q    Did you or have you discussed with Mr. Walters his

2    testimony in this case?

3    A    No.

4    Q    Have you read stories in the paper about this case and

5    its progression?

6    A    Yes.

7    Q    Were you responsible for reviewing and selecting the

8    entrepreneurs?

9    A    I played a part in that process.

10   Q    What part did you play?

11   A    The NPHDFC is really the one who evaluated the request

12   for qualifications and they submitted the recommendations to

13   HPD so I was part of that evaluation committee at HPD.

14   Q    Can you tell us who else was on the evaluation committee

15   at HPD?

16   A    There were a number of people including the director of

17   the program and my superiors, the commissioners that I

18   reported to.

19   Q    Who was the commissioner you reported to at the time?

20   A    At that time, I believe it was John Warren.

21   Q    And it's your testimony that Mr. Warren participated in

22   the selection meeting?

23   A    Yes.

24   Q    And Mr. Walters?

25   A    Yes.

1   Q     And yourself?

2   A     Yes.

3   Q     Who else?

4   A     Several other people.

5   Q     Can you name them, please?

6   A     I think at that time, Laurie LoPrimo may have been my

7   direct report and, again, the folks from the NPHDFC.

8   Q     So to the best of your recollection, yourself,

9   Mr. Walters -- was that First Deputy Commissioner John Warren?

10  A     Yes.

11  Q     And was that Ms. Primo?

12  A     Ms. Laurie LoPrimo.

13  Q     Those were the participants from the HPD?

14  A     Some of, some of the personnel.

15  Q     And who participated from the Neighborhood Partnership

16  For Housing?

17  A     At that time, I believe it was Bill Frey, Lydia Tom, and

18  I don't recall every other personnel at the NPHDFC.

19  Q     In this meeting for this evaluation process, were the

20  applicants' qualifications shared with everybody on the

21  committee?

22  A     The meeting I recall, the qualifications were already

23  kind of disseminated so the meeting that I had was more with

24  HPD staff.

25  Q     So in the meeting with the HPD staff, did everyone in

Hendrickson - direct - Evans                    1786

1    that meeting at HPD have access to the applications and asset

2    statements and information that had been submitted?

3    A    We had summary information prepared.

4    Q    And who prepared the summary information?

5    A    The NPHDFC.

6    Q    The outside party?

7    A    Yes.

8    Q    Didn't the applicants apply to HPD?

9    A    The original applications were sent to the NPHDFC.  So

10   they did the first cut of the reviews.

11   Q    So when a entrepreneur applicant applied, they would

12   apply to the Neighborhood Partnership For Housing and they

13   would do a screening, is that your testimony?

14   A    Yes.  It was a joint RFQ that we issued together but the

15   original applications were received by the NPHDFC for first

16   review.

17   Q    So they're screened at the first review before they're

18   handed over to HPD?

19   A    Yes.

20   Q    While they are being screened, did anyone at HPD have

21   access to the information?

22   A    I believe the program may have had copies of the actual

23   applications.  I did not.

24   Q    So is it possible that Mr. Walters had copies of the

25   applications of the prospective entrepreneurs during that

Hendrickson - direct - Evans                    1787

1   first screening?

2   A     Possible.

3   Q     And during that screening, was it allowed for the HPD

4   staff to interact with the Neighborhood Partnership in their

5   evaluation?

6   A     Probably.  It was an interactive process.

7   Q     And after they're screened initially by the Neighborhood

8   Partnership, what would happen?

9   A     They would make the recommendations to HPD.

10  Q     So the Neighborhood Partnership For Housing recommended

11  to HPD whom should be selected?

12  A     Yes.

13  Q     And was that information about this process communicated

14  to the applicants?

15  A     Once they were selected, they were.

16  Q     Once they were selected?

17  A     Uh-huh.

18  Q     So when an applicant makes an application, do they know

19  that the Neighborhood Partnership is going to do the screening

20  of their material?

21  A     I believe it's spelled out like that in the RFQ.

22  Q     And after that initial screening, do you remember how

23  many development companies or firms were given to HPD for

24  review?

25  A     I don't recall the total number.

CMH      OCR      RMR      CRR      FCRR

Hendrickson - direct - Evans                    1788

1    Q     Do you remember how many people were disqualified?

2    A     I don't recall.

3    Q     How long was the process of screening and evaluating

4    these participants, the applicants?

5    A     I believe it took a few months.

6    Q     After a developer is selected, what role did you play in

7    discussions or meetings with that developer?

8    A     It was minimal.  I mean, I may have talked to the

9    developer to say congratulations or something but, again, in

10   the project, we would issue the actual project and then the

11   project would start.

12   Q     When you issued the project, what role did you play?

13   A     I oversaw the program.  I didn't play the day-to-day

14   role.

15   Q     Did you have -- were you responsible for the budgeting

16   and lending allocations?

17   A     I had -- I play a part in that.

18   Q     And could you explain to us how the budgets were set for

19   the NEP program?

20   A     There's a term sheet for the program that kind of

21   describes the various line items for the, for the development

22   cost and, again, a lot of it is based on the amount of units

23   in the project and things of that nature.  So, again, the term

24   sheet really dictates how the project comes together.

25   Q     Were you responsible for interacting with the Enterprise

Hendrickson - direct - Evans                1789

1    or CPC to encourage them to bring more money into the funding

2    or less money into the funding for a project?

3    A    Well, it would depend because, again, this is really --

4    HPD is the construction lender.  They're really acting as the

5    intermediary so we try to develop a budget that's reasonable.

6    Q    HPD is the construction lender?

7    A    The construction lender is the NPHDFC, but at the end of

8    the day, HPD is the permanent lender so we definitely talk to

9    the NPHDFC about the budgets.

10   Q    Because ultimately, the City of New York was on the hook

11   finally?

12   A    Yes.

13   Q    And how did you protect or control the information that

14   you received from the applicant developers?

15   A    Which information?

16   Q    Their financial information.

17   A    I never received their financial information.

18   Q    Did you have a process for your team to manage and

19   protect that information?

20   A    Again, that information was kept in the offices.  There

21   wasn't any particular process for that.

22   Q    So there was no process discussed before collecting these

23   responses for qualification about how to protect the

24   information of these individuals?

25   A    Well, the files, you know, are kept in the office and the

1    offices are locked so it's not like everyone had access to

2    that information.

3    Q    So if the asset statement for Mr. Dunn and Mr. Freeman

4    came in on their application, how many people would have

5    access to that information?

6    A    I'm not sure.

7    Q    Didn't that application include their taxes and financial

8    statements?

9    A    Probably.

10   Q    Did you ever discuss with Wendell Walters whether or not

11   a particular developer had the financial wherewithal to

12   participate?

13   A    Yes.

14   Q    Did you participate in a discussion like that about the

15   SML Bed-Stuy developer?

16   A    Yes.

17   Q    Did you participate in a discussion like that for the

18   Lexington Avenue cluster?

19   A    Yes.

20   Q    And did you have any particular concerns about the

21   developer's financial status when they applied for the

22   Lexington Avenue cluster?

23   A    Not that I recall.

24   Q    Prior to the review of the application to be part of the

25   NEP program, did you have any individual business dealings

Hendrickson - direct - Evans                1791

1    either with Mr. Dunn or Mr. Freeman?

2    A    No.

3            (Continued on next page.)

Hendrickson - direct - Evans                    1792

1    (CONTINUING)

2    Q    Did you have any independent dealings or conversations

3    with Mr. Hymowitz?

4    A    No.

5    Q    Can you explain for the Ladies and Gentlemen of our Jury

6    how a NEP developer was finally selected?

7    A    The developer was selected based on a number of criteria,

8    including their financial ability, their ability to properly

9    manage the sites accordingly and their ability to develop and

10   have those sites developed in a timely manner.

11   Q    During the course of the development, were you kept

12   abreast of the progress of an individual development?

13   A    Yes.

14   Q    How often were you given status reports on these

15   individual developments?

16   A    Well, we would actually meet, you know, relatively often

17   to kind of track the progress of the project.

18   Q    Did you in your meetings use any grids or schedules or

19   project management reports?

20   A    Yes.

21   Q    And are those still available at HPD?

22   A    I'm not sure.

23   Q    Did you get and receive project reports directly from the

24   director of NEP or did you get them from someone else?

25   A    We participated in meetings with each other where we

VB        OCR        CRR

Hendrickson - direct - Evans                    1793

1    shared the progress -- where we shared information about the

2    progress of the project.

3    Q    So, if a project fell behind schedule, you would be made

4    aware?

5    A    Yes.

6    Q    And if there was trouble with the financing, you would be

7    made aware?

8    A    Yes.

9    Q    If there was budget concerns or considerations, you will

10   be made aware?

11   A    Yes.

12   Q    At any time during the progress of the Lexington Avenue

13   cluster, were you made aware that there were problems?

14   A    Yes.

15   Q    What problems were you notified about on the Lexington

16   Avenue cluster?

17   A    I seem to recall that there was a problem getting to a

18   what we call a syndication closing.

19   Q    Was that a problem with the developer or a problem with

20   the financing?

21   A    Well, it seemed like a problem with the developer.

22   Q    Why did it seem like a problem with the developer?

23   A    There were some outstanding checkless items that needed

24   to be completed.

25   Q    And what is the risk of the problems with the

1    syndication, can you explain that for us?

2    A    The risk of not syndicating timely is the loss of tax

3    credits.

4    Q    And what's a tax credit?

5    A    Federal income tax credits are used in our projects to

6    help with the financing of the project.

7    Q    Is that what's called an 8609 credit?

8    A    An 8609 is what gets issued that actually starts the

9    allocation of the tax credits.

10   Q    And were you responsible for assigning the program

11   managers who were handling the developers day-to-day?

12   A    No.

13   Q    How many developers during the peak of this NEP round

14   five program were you and your team overseeing?

15   A    During that, during round five itself?

16   Q    Yes.

17   A    I think in round five, which was round 5-A and 5-B, I

18   think there were a total of maybe 12 to 13 developers.

19   Q    And did you have direct contact with all of those 12 or

20   13 developers?

21   A    On occasion.

22   Q    Prior to selection of those 12 or 13 developers, did you

23   do any due diligence visits or assessments on your own?

24   A    Not that I recall.

25   Q    How are the general contractors selected for this

1  program?

2  A    The general contractors are selected.  HPD would provide

3  the developer with a pre-approved short list of contractors

4  and if they wanted to choose contractors from that list, they

5  had that choice or they could also submit contractors that

6  they had a relationship with to be added to that pre-approved

7  list.

8  Q    Do you recall if the Lexington Avenue developers

9  submitted any contractors names to be considered?

10  A    I don't recall.

11  Q    And can you explain for us your understanding of how the

12  general contractors selection process works then?

13  A    Sure.  The general contractors again, we would ask the

14  developers to submit a list of five to seven contractors that

15  would be vetted and approved and allowed to then pick up a bid

16  package and respond to the bid.

17  Q    When you say vetted and approved, what do you mean?

18  A    Meaning HPD and the NPHDFC would review them to see if

19  they had the wherewithal to complete the job and the manpower

20  before we allowed them to ten pick up the bid.

21  Q    So, they had to be vetted before they could pick up the

22  packet to bid?

23  A    Yes.

24  Q    And you, meaning HPD and the Neighborhood Partnership for

25  Housing, reviewed them and vetted them before they were

1  allowed to pick up a bid package?

2  A    Yes.

3  Q    Were there any other requirements for a general

4  contractor, other than the one you just described?

5  A    In addition, they would have to have proof of bonding or

6  a letter of credit, some type of surety.

7  Q    And was it a requirement that the general contractor

8  already be an approved New York City vendor?

9  A    That, I don't recall.

10         When you say approved New York City vendor, please

11  clarify.

12  Q    I thought that there was a list of people who are

13  approved to do business with the City and the contractors

14  would have been on that list.

15         Am I misunderstanding?

16  A    Yes, they would, but they could again, if they weren't on

17  the list, the developers still had an opportunity to submit

18  another name that we would then look at, check out their

19  financials and perhaps, be added to the list and allowed to

20  bid.

21  Q    So, a contractor could have been selected without having

22  been pre-approved on that list?

23  A    They, they could have been selected and not on the

24  original list that we gave them, but once they submitted their

25  financial information to HPD and to NPHDFC then added to that

1   list as someone that HPD did work with and added to the bid

2   list.

3   Q    So, HPD would -- would HPD approve them after that

4   vetting process and then they would be added to the City list?

5   A    They would be allowed to bid.  Okay, the list is really

6   just a list of those contractors that HPD had done work with.

7   Q    So, the list that we've been referring to is really a

8   list of people that you have already worked with?

9   A    Yes.

10  Q    So, if I wanted to work with HPD, would I first get on

11  the list or would I first win a bid?

12  A    You would first submit your credentials to HPD for the

13  committee to take a look at to be considered and added as a

14  pre-approved bidder.

15  Q    And who is on the committee that would review my

16  credentials if I submitted them?

17  A    There were a number of people at HPD and NPHDFC.

18  Q    Is there a regular committee?  If I don't want to be a

19  part of the NEP program and just want to do general

20  contracting for HPD, can I just apply?

21  A    I'm not sure if that still exists.

22  Q    And how long, if you recall, would it take for a general

23  contractor who's not on the list to be reviewed to be approved

24  for a bid?

25  A    If they submitted all the information that was requested,

1   it would take a matter of a few weeks to check references and

2   check out their information.

3   Q    So, you do check references.  And what else do you check

4   other than their financials, the bonding and their references?

5   A    We check to see, you know, if other people have done work

6   with them, the quality of the work, things of that nature.

7   Q    Do you ever disqualify a general contractor because

8   they're not big enough?

9   A    Yes.

10  Q    Do I ever disqualify a contractor because they're too

11  big?

12  A    Yes.

13  Q    And do you recall how many contractors were on the list

14  of people that were available to bid in NEP round 5-A?

15  A    If I recall correctly it was probably at least 15 to 20.

16            THE COURT:  Counsel, how much more do you have?

17            MR. EVANS:  I have a bit, Your Honor.

18            THE COURT:  Should we take our luncheon recess,

19  then?

20            MR. EVANS:  Oh, yes.

21            THE COURT:  All right.

22            I'm going to ask you to come back after lunch.

23  Let's meet at 2:10.

24            MR. EVANS:  Thank you.

25            THE WITNESS:  Thank you.

Hendrickson - direct - Evans                    1799

1        THE COURT:  So, Members of the Jury, remember that

2   you're not to discuss this case or look at any newspapers or

3   anything of that kind during the course of our recess and

4   we'll see you at 2:10.

5              THE COURTROOM DEPUTY:  All rise.

6              (Jury exits.)

7              (In open court; outside the presence of the jury.)

8              THE COURT:  You can step down, thank you.

9              (Witness excused.)

10             THE COURT:  All right, Counsel, is anything you need

11  to discuss before lunch?

12             All right, I'll see you at 2:10, thank you.

13

14             (Continued on following page with AFTERNOON

15  SESSION.)

16

17

18

19

20

21

22

23

24

25

                    VB        OCR        CRR

Hendrickson - direct - Evans            1800

1          A F T E R N O O N    S E S S I O N

2

3          (In open court; jury not present.)

4          THE COURT:   Bring in the jury, please.

5   ANNE MARIE HENDRICKSON, resumed.

6          THE COURT:   You can be seated until the jury comes

7   in.

8          (Pause.)

9          (Jury present.)

10          THE COURT:   Afternoon, ladies and gentlemen of the

11   jury.

12          Let me just remind the jurors that on the witness

13   stand is Anne Marie Hendrickson, and she's being examined by

14   Mr. Evans.

15          You may continue.

16   DIRECT EXAMINATION (Continued)

17   BY MR. EVANS:

18   Q    Ms. Hendrickson, before we broke for lunch, we were

19   talking about the general contractor selection.  I would like

20   to go back to that?

21          When the city places an RFQ or request for bids or

22   qualifications, is that a public process or a private process.

23   A    The request for qualifications is to select the

24   developer.  That's a public process.

25   Q    That's a public process?

Hendrickson - direct - Evans                    1801

1    A    Hmm.

2    Q    When the developer has been selected and it's time to

3    select the general contractor, is that a public process or a

4    private process?

5    A    More of a private process.  The advertisement for bidding

6    is not usually put in the newspaper or anything like that.

7    Q    And is it public -- is that information publicly

8    available anywhere?

9    A    Not to my knowledge.

10   Q    Is that information supposed to be private or sealed from

11   the general public?

12   A    Not to my knowledge.  I mean, again, the developer

13   selecting the contractors and the bid packages are being

14   picked up from the developer's office.

15   Q    So, the developers are recommending contractors who come

16   and pick up a bid package; is that correct?

17   A    Yes.

18   Q    And when the contractors -- what I am trying to

19   understand is, if anyone other than persons recommended can

20   come and ask to be reviewed to bid.

21   A    Again, prior to the bid process, okay, the developer has

22   the right to submit as many contractors as they want to bid.

23   They have to be approved.  And then there's a bid -- what we

24   call a bid pickup.  So, the contractors are identified.  They

25   come and pick up the package.  They are told when the bid

1    opening is going to be held.

2    Q    So, the developer could suggest that fifteen contractors

3    pick up packages; is that correct?

4    A    Yes.

5    Q    And when the packages are returned, what's the process --

6    talking now specifically about the NEP entrepreneur's program

7    -- what's the process for selecting the general contractor?

8    A    There's a bid opening, where a bid tabulation sheet is

9    done, and all of the bids are recorded at that time.

10   Q    When the bid opening is done, is that the first time that

11   you or others review those bids and tabulate them?

12   A    Yes.

13   Q    So, if I submit a bid as a contractor to HPD and the

14   Neighborhood Partner for Housing and Funding Development

15   Corporation, no one reviews that bid until the bid opening?

16   A    The bids are not returned until the date of the bid

17   opening, at which time HPD opens them and does a bid

18   tabulation sheet.

19   Q    So, the contractor doesn't return his bid until the bid

20   opening day?

21   A    Yes.

22   Q    So, on the bid opening day, the contractor brings or

23   submits their package only on that day?

24   A    Yes.

25   Q    So, they are not submitted before opening; they are only

Hendrickson - direct - Evans                    1803

1    submitted on the date that they are opened?

2    A    Hmm.

3    Q    And does anyone at HPD have a responsibility for

4    coordinating or knowing how many bidders will return bids on

5    that bid opening day?

6    A    Yes.

7    Q    Who is that?

8    A    Our construction department.

9    Q    Who is in the construction department?

10   A    At that time, the assistant commissioner was Timothy

11   Joseph.

12   Q    Did Timothy Joseph have information about the actual bid

13   that a contractor might submit?

14   A    It would be his staff that would do the bid tabulation

15   sheet.

16   Q    Are those done on the day of the bid opening or prior?

17   A    On the day of the bid opening.

18   Q    So, if bid opening was on March 15, that's the day

19   Mr. Joseph's office does the tabulation sheets?

20   A    Yes.

21   Q    And are they allowed to open or submit those bids for

22   tabulation for March 15, in my example?

23   A    No.

24   Q    Is it possible for one bidder to know what another

25   bidding contractor has put into his bid?

Hendrickson - direct - Evans                    1804

1   A     Anything is possible.  But the bid opening, which is the

2   official bid opening, is on the date that everyone is

3   notified, and the bids are opened by HPD on that date.

4   Q     How does HPD select the general contractor on the bid

5   opening date?

6   A     We don't select anything.  We are just tabulating the

7   bids that have been submitted and recorded on the bid

8   tabulation sheet.

9   Q     Isn't it true that Wendell Walter, as a director of NEP,

10  selected general contractors?

11  A     Not to my knowledge.

12  Q     Would you be surprised that that was his testimony?

13  A     If he did, I'm not sure exactly how he did that.

14  Q     Is the lowest general contractor always the bid that's

15  selected?

16  A     The lowest responsible bidder.

17  Q     What's the difference?

18  A      "Responsible" means in terms of HPD would do what we

19  call a cost estimate of what the project would cost, and the

20  lowest responsible bidder would need to submit a bid that

21  deviates ten percent above or beyond -- above or lower.

22  Q     If I submitted a bid, and I'm a first-time contractor and

23  my bid was twenty percent lower than the rest of the market,

24  that would be considered irresponsible and rejected?

25  A     It could be.

1  Q    Would I be given an opportunity to adjust my bid after

2  the tabulation?

3  A    It depends.

4  Q    What would it depend on?

5  A    It depends on whether we have identified the lowest

6  responsible bidder in the process.  Another reason why

7  somebody might not be deemed a responsible bidder, if they

8  needed to return a surety, some sort of bid bond, is what we

9  call it at the bid.  So, if you don't return that, you're not

10  deemed responsible, either.

11  Q    How would a developer -- excuse me.

12        Would a developer know what general contractors are

13  bidding before those bids are opened?

14  A    Well, they are the ones who select the bidders to pick up

15  the packages.

16  Q    Right?

17        Are those bids ever publicly allowed to be revised?

18  A    On occasion.

19  Q    What would cause a bid to be eligible for revision?

20  A    Depending on if in their trade payment breakdown, perhaps

21  they omitted something that was in a different form of the

22  document.  It happens, I think, on a few occasions.

23  Q    So, if I'm bidding, my hypothetical, and it's my first

24  bid, and I get there and you open the bids and you tabulate

25  them and everybody else is at $20 and I'm at 10, and I realize

1    I'm at ten, because I have left out something, would I be

2    given an opportunity to correct that?

3    A     I don't believe, not at that time.

4    Q     Who would make that decision?

5    A     Again, the bid openings is merely just a tabulation of

6    the bid.  That's all it is.

7    Q     Is that tabulation recorded or reported anywhere?

8    A     Yes, there's a bid tabulation sheet where it's recorded.

9    Q     How about the architects, are they selected in the same

10   way?

11   A     The developer selects -- decides who the architect is

12   going to be.

13   Q     So, is that process the same steps as you described for

14   the general contractor?

15   A     Pretty much.

16   Q     So, the developer would nominate architects for you, for

17   HPD?

18   A     They would identify the architect, hmm.

19   Q     Is there any reason that HPD would not select the

20   architect that was recommended?

21   A     Yes.

22   Q     What would those reasons be?

23   A     If it's an architect that we've had a bad experience with

24   in terms of not performing on the job.

25   Q     I want to talk about the Lexington Avenue SML cluster,

Hendrickson - direct - Evans                1807

1    which was part of the NEP program, a Round 5A, you said?

2    A    Yes.

3    Q    That was a program to rehabilitate rental apartments;

4    correct?

5    A    Yes.

6    Q    And do you recall when that project started?

7    A    I believe it was on or about in 2000.

8    Q    And do you recall who the lender was on that project?

9    A    The construction lender?

10   Q    Yes.

11   A    I believe it was the NPHDFC, which is the Neighborhood

12   Partnership Housing Development Fund Corporation.

13   Q    And do you recall who the other lender was on that

14   project?

15   A    I don't believe there was another construction lender.

16   Q    Would it be correct if I told you that the construction

17   lender was Fleet Bank?

18   A    I don't recall.  At one time in the program, we used to

19   use private banks.  I thought in Round Five, we started to

20   only solely use the NPHDFC.

21   Q    When you were working on the development of a cluster

22   like this, were you involved in looking at the project

23   development budget and the cost and financing?

24   A    Not directly.

25   Q    Did you have input on the financing or development costs?

Hendrickson - direct - Evans            1808

1    A    If I was asked for something.  But not directly.  There

2    was a lot of projects going on, and I was not the day-to-day

3    person to look at each project and the financing.

4    Q    You said that HPD was ultimately the lender before; do

5    you remember that?

6    A    Yes.

7    Q    Does that mean that HPD acquires lending from outside

8    sources and gathers that money in and then hands it out?

9    A    HPD has its own budget, and basically what we do is, take

10   out the construction loan and give -- and issue a permanent

11   loan.

12   Q    So, you would use -- in the Lexington Avenue cluster, you

13   would use an outside private bank like Fleet Bank to do the

14   construction lending, and then would HPD take them out?

15   A    Again, I'm not sure if Fleet was used here, but we would

16   take any bank, okay, any construction loan out when the

17   project has finished construction.

18   Q    How many closings, as we would understand it, would there

19   be on a project like the Lexington Avenue cluster, which has a

20   construction lender and then HPD and then other possibilities?

21   A    It could vary, because we also stagger the closings when

22   the tax credits come in for the various phases of the project.

23   Q    Is there any other reason that you would stagger the

24   closings?

25   A    No.  That's generally the reason why there is more than

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1  one permanent construction -- permanent financing closing.

2  Q    I would like to publish, just for the witness, this is a

3  Lexington Avenue cluster pre-phase budget, and I'm looking

4  particularly at where it says "Sources of financing."

5        In looking at this document, it talks about multiple

6  sources of the financing on the Lexington Avenue project.  How

7  does that reconcile with your testimony about construction

8  lenders and HPD takeouts.

9  A    Well, when it references sources of the financing.  It's

10  showing you where HPD's money, which is a combination of city,

11  capital money and Federal Home funds are being used as a

12  source of financing.

13  Q    So, the amount that's here for the NYC Home Mortgage

14  loan, is that HPD money?

15  A    That's federal money that HPD gets from the federal

16  government in order to fund the permanent construction loan.

17  Q    So, in a situation like that one, do you, HPD, take that

18  money in at the top level and then assign it out to cluster,

19  or do you have to get a cluster developed and then go ask for

20  a particular amount of money?

21  A    Usually, we get what -- we get an aggregate amount of

22  money, and then assign it as each project closes.

23  Q    So, you get money from the federal government, HUD, I

24  suspect?

25  A    Yes.

Hendrickson - direct - Evans                    1810

1    Q    In one big omnibus pass?

2    A    Right.

3    Q    And then it's up to HPD to break that money up into

4    discrete projects as agreed?

5    A    Yes.

6    Q    And when it says "HPD Article 16 Mortgage Loan," what's

7    that source of funds?

8    A    Those are city capital funds.

9    Q    Those are funds that come from the City of New York?

10   A    Yes.

11   Q    And do you get those for an individual project, or you

12   get them at an omnibus level?

13   A    We make a request to our budget office for all of the

14   sources of financing, federal and the city funds.

15   Q    Do you do that at the beginning of a fiscal year, or do

16   you do it by project?

17   A    We do it as various projects are done, and we have total

18   costs, and we make one request, what we call -- we request a

19   certificate to proceed from our budget office for the

20   programmatic costs.

21   Q    So, the certificate to proceed means that HPD's budget

22   office has done a review of the budget for this individual

23   project and we're ready to go ahead?

24   A    Yes.

25   Q    Now, when would you have the first closing on a project

Hendrickson - direct - Evans               1811

1   like this one?

2   A    Again, the permanent financing comes in as the phases are

3   completed construction.

4   Q    So, if I'm going to begin phase one, what happens at the

5   beginning of phase one relative to closings and contracts and

6   lending?

7   A    Well, again, phase one, the construction lending is done

8   by the NPHDFC, and that allows the work to get done, and then

9   HPD at the end of that phrase would come in with the permanent

10  financing to repay the construction loan.

11  Q    The not-for-profit corporation in first to provide the

12  sort of immediate cash?

13  A    Yes.

14  Q    And that's what would happen at the -- is that what's

15  called the construction closing or the phase one closing?

16  What's that called?

17  A    That's called the construction closing.

18  Q    Now, when the entrepreneurs begin this particular project

19  on Lexington Avenue, can you tell us, did they have

20  hard-dollar costs involved in getting involved?

21  A    Please clarify.

22  Q    Do the developers spend their money at the initial phases

23  of the development?

24  A    Not to my knowledge.

25  Q    Did the developers provide a guarantee to HPD, or do they

Case 1:11-cr-00683-NG   Document 275-1   Filed 07/25/14   Page 98 of 226 PageID #: 1685

Hendrickson - direct - Evans          1812

1  provide their guarantee to the Neighborhood Partnership?

2  A    I'm not quite sure.

3  Q    If the developers had a seed loan, would that be

4  reflected in this budget or development cost?

5  A    I'm not quite sure where we include the seed loan

6  repayment costs at.

7  Q    When the city, as the responsible party for the

8  financing -- does the city control the budget once the budget

9  is set?

10  A    In terms of the permanent financing?

11  Q    Yes.

12  A    Yes.

13  Q    So, if there is a savings, not looking at this example,

14  but if there is a savings in a line item, would the city have

15  the discretion to take that savings and apply it somewhere

16  else or return it back to the program?

17  A    Yes.

18  Q    So, if there was a savings in a hard-dollar cost, like

19  concrete, say you budget $200,000 for concrete and it costs

20  $190,000, who would make the decision to take that $10,000

21  remainder and move it to something else?

22  A    Well, again, if there's individual line savings, I think

23  we look at the end of the project to kind of see could it be

24  applied to something else where we have a cost overrun.

25  Q    Is it normal course of business to realign budget line

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Hendrickson - direct - Evans          1813

1    items while a project is ongoing?

2    A    It happens.

3    Q    And what would cause that to happen?

4    A    It could be cost overruns in some of the soft costs.

5    Q    So, if there were, for example, money allocated -- this

6    project at Lexington Avenue cluster was to rehabilitate rental

7    apartments; correct?

8    A    Yes.

9    Q    That meant relocating tenants from those apartments;

10   correct?

11   A    Yes.

12   Q    And so, would there have been a line item, if you recall,

13   for relocating those tenants?

14   A    Yes.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Hendrickson - direct - Evans                    1814

1    7(CONTINUING)

2    Q    And if that line item were under-utilized, would you move

3    that money to some other area?

4    A    If possible.

5    Q    Would that money be moved by the developer or by the

6    City?

7    A    It would have to be a joint decision.

8    Q    And if the developer wanted to move it and the City

9    didn't want to move it, what would happen?

10   A    We'd have some debate about it and decide accordingly.

11   Q    And conversely, if the City wanted to move it and the

12   developer didn't, what would happen?

13   A    Again, there would be a conversation about it.

14   Q    How were the developers on the NEP round 5-A program paid

15   their fees, if you recall?

16   A    The developer's fees, I believe it was paid through the

17   budget.

18   Q    And were they paid semiannually, quarterly, how were they

19   paid if you remember?

20   A    I don't recall what the disbursement schedule was.

21   Q    Who has the financial risk of failure for a developer?

22   A    At the end of day, it's the City.

23   Q    Why do you say that?

24   A    Because if there's cost overruns, you know, to a project

25   at the end of day, usually it's the City who's going have to

VB        OCR        CRR

Hendrickson - direct - Evans                1815

1    put in additional money to complete the project.

2    Q    But if the project -- if the developer in your example

3    took a house or an apartment that was empty and gutted, and

4    the developer did 50 percent of the rehab before failure, is

5    the City losing money there?

6    A    Yes.

7    Q    How?

8    A    Well again, if the tenants are relocated out of the

9    building and only half the building is done, it doesn't get

10   finished on time, there's cost overruns.

11   Q    And have there been scenarios where the City has taken

12   action to recover against a developer's personal guarantees?

13   A    I don't recall.

14   Q    Have you in your experience had developers fail?

15   A    Yes.

16   Q    And when the developer's fail, what happens?

17   A    A number of treatments could happen after that.

18   Q    When you're taking buildings in a cluster and working

19   them in multiple phases to rehabilitate them, is there any

20   clear period of time when the title to that building changes?

21   A    Yes.

22   Q    When is that?

23   A    During the construction period the title is held by the

24   NPHDFC.

25   Q    During the construction period it's held by the

1    Neighborhood Partnership?

2    A    Right.

3    Q    So, does that mean that initially the City, assuming the

4    City had the deed, it transfers it other to the Neighborhood

5    Partnership?

6    A    Yes.

7    Q    And how long does the Neighborhood Partnership hold title

8    to the property?

9    A    During the construction period.

10   Q    Okay.  So, when the construction is completed, is there

11   an event that designates completion of a rehab?

12   A    Yes.

13   Q    What is that?

14   A    Receiving a Certificate of Occupancy for the building.

15   Q    Okay.  So, when the Certificate of Occupancy is issued,

16   what happens for the Neighborhood Partnership and the

17   developer?

18   A    Upon the Certificate of Occupancy and the issuance of the

19   Federal low income tax credits, the property is deeded from

20   the NPHDFC to an entity formed by the developer.

21   Q    So, before the tax credits are issued, title remains at

22   the Neighborhood Partnership for Housing Funding and

23   Development?

24   A    Yes.

25   Q    And the title to a property doesn't transfer until the

1   tax credits are received; is that correct?

2   A    That's my recollection.

3   Q    So, if the developer and the contractor are working in

4   harmony and they finish on time, and they get the Certificate

5   of Occupancy but they don't have the tax credit paperwork

6   completed, who owns the building?

7   A    The property is still owned by the NPHDFC.

8   Q    And is it always the case that that ownership doesn't

9   change until the City gets the tax credit allocation?

10  A    Usually we need the tax credits to come in at the same

11  time.

12  Q    Okay.  Were you familiar with the requisition costs for

13  hard dollars on any of these projects?

14  A    No.  I mean, I know the requisitions came in but I wasn't

15  looking at them directly.

16  Q    And did you have responsibility for oversight of those

17  requisitions?

18  A    No.

19  Q    Would the project manager at the Neighborhood Partnership

20  have the authority over those requisitions?

21  A    I believe the requisitions were handled by the NPHDFC.

22  Q    And was that for hard costs and for soft costs?

23  A    I'm pretty sure it was for both.

24  Q    And if you know, when a requisition for hard costs is

25  submitted to the project manager of the Neighborhood

Hendrickson - direct - Evans                1818

1    Partnership, who was that money then delivered to?

2    A    The requisition process, if I recall, the NPHDFC would

3    get the requisition, send it to HPD because HPD would review

4    the hard costs, approve it, send it back and then, the NPHDFC

5    would make the payment to the developer.

6    Q    So, when a requisition was submitted, it bears the

7    signature of the developer and the contractor; correct?

8    A    And the architect of record as well, I believe.

9    Q    And the architect of record.  HPD does its own analysis

10   before allowing it to be paid?

11   A    Yes.

12   Q    Is that always the case?

13   A    To my knowledge, HPD signed off on the requisitions.  We

14   all walked the buildings at the same time to determine the

15   appropriate percentages of work completed.

16   Q    So, if the architect approves for 55 percent of a budget

17   line, is it ever a case that he would get funded for less than

18   55 percent?

19   A    If, again, there was a walk-through that's conducted to

20   evaluate the percentage so everyone agrees on what percentage

21   of that line item is completed.

22   Q    And then, when everyone agrees, who instructs the funding

23   arm to release money?

24   A    Once HPD issues its approval, then NPHDFC makes the

25   disbursement.

1    Q    The Neighborhood Partnership and HPD have to give

2    approval?

3    A    Yes.

4    Q    And what's the method for you giving approval to the

5    funder?

6    A    There is a requisition that's signed off by everyone

7    agreeing and approving the amounts to be released.

8    Q    Is that a requisition separate from the one that the

9    contractor and the developer send up?

10   A    Same requisition.

11   Q    Same requisition.

12          Who is Heidi Anderson?

13   A    Heidi Anderson was the chief underwriter in the NEP

14   program.

15   Q    And what was the role of the underwriter inside NEP?

16   A    To review the budgets.

17   Q    And did Ms. Anderson have the authority to change a

18   budget?

19   A    She would make recommendations about the budgets.

20   Q    Did she make those recommendations to the Neighborhood

21   Partnership or to the developers?

22   A    She probably made it to the director and probably to the

23   NPHDFC.

24   Q    Okay.  And did she have, if you know, oversight for

25   checking payments against budget lines?

Hendrickson - direct - Evans                    1820

1    A    I believe Heidi did.

2    Q    And did she have the responsibility to reject changes to

3    a budget line?

4    A    In concert with her director.

5    Q    And who was her director if you know?

6    A    Wendell Walters.

7    Q    So, she reported to Wendell Walters?

8    A    Yes.

9    Q    So, if I were looking at E-mail communications from Heidi

10   Anderson about budgets, I would understand that she's a part

11   of Wendell Walters's reporting organization?

12   A    Yes.

13   Q    And was there anybody in HPD outside of Wendell Walters's

14   organization looking at these budgets and payments?

15   A    There was probably a deputy director between Wendell and

16   Heidi as well.

17   Q    Did you have any authority over changing budget lines?

18   A    On occasion I may have been asked about a budget line.

19   Q    What would cause someone to come to you and ask about a

20   budget change?

21   A    If it was more than what the typical line item was.

22   Q    And how did you compare it to a typical line item?

23   A    There's a term sheet that kind of gave guidance to what

24   the line items would be and if there was a particular instance

25   that caused a cost overrun, I may have been asked about that.

VB        OCR        CRR

Side-Bar                                              1821

1  Q     Would you get consulted on cost overruns for hard costs

2  and soft costs?

3  A     On occasion.

4          THE COURT:  Mr. Evans, could you come to the side,

5  please.

6          MR. EVANS:  Yes, Your Honor.

7          (Side-bar conference held on the record out of the

8  hearing of the jury.)

9

10         (Side-bar.)

11         THE COURT:  How much more do you have?

12         MR. EVANS:  I'm at the last piece, which is this

13  budget change and then I'm done with this witness.

14         THE COURT:  Do you have one more witness?

15         MR. EVANS:  Yes, but he's very brief.

16         THE COURT:  I thought they were both going to be

17  brief.

18         MR. EVANS:  I did as well.  I'd like to rest my case

19  today.

20         MS. POSA:  Your Honor, I'm approaching an objection

21  as to relevance.  Mr. Evans had the opportunity to ask

22  Mr. Dunn in a day's worth of direct testimony about the

23  shifting of the line items, he did not.  He had the

24  opportunity to as Wendell Walters about, he did not.

25             There seems to be no relevance as to this whole line

1    of questions because there is absolutely nothing in the record

2    that it ever happened.

3              THE COURT:  You have not objected up to now.  I

4    called you up because I want to finish this up.

5              MS. POSA:  We now object.  We're trying to be

6    patient.

7              THE COURT:  All right.

8              Just move it along because much of what you are

9    eliciting also, is already in the record from other witnesses

10   and I don't know really what this is about.

11             MR. SERCARZ:  I didn't hear the beginning of the

12   colloquy.

13             Do we know about how much for direct there is and

14   whether there is going to be any cross?

15             MR. EVANS:  I'm at my last set of questions for her.

16             THE COURT:  All right, let's go.

17             (Side-bar end.)

18

19             (In open court.)

20             THE COURT:  All right, go ahead, please.

21   BY MR. EVANS:

22             MR. EVANS:  Just publishing to the witness this last

23   worksheet, this budget modification worksheet for the

24   Lexington Avenue cluster.

25   Q    Have you ever seen this document or anything like that

Hendrickson - direct - Evans                    1823

1   before?

2   A    I've seen a document similar, but I haven't seen this

3   particular one.

4   Q    So, when it says on this document that the reallocation

5   of funds is detailed there and approved by Jackie Alexander,

6   who is Jackie Alexander at NEP?

7   A    During this time, I believe Jackie may have been at the

8   NPHDFC.

9   Q    So, NEP and the Neighborhood Partnership are really one

10  entity; is that correct?

11  A    I'm sorry, say that again, sir?

12  Q    Is it correct that the Neighborhood Partnership and The

13  Enterprise were one funding vehicle?

14  A    Well, the NPHDFC I believe is an affiliate of Enterprise.

15  Q    So, the Neighborhood Partnership is an affiliate of The

16  Enterprise?

17  A    Right.

18  Q    So, is it accurate that the person at The Enterprise

19  would have the authority for changing and reallocating

20  budgets?

21  A    I believe so.

22  Q    Did you have day-to-day workings relative to the Hancock

23  cluster?

24  A    No.

25  Q    Did you have responsibility for this area of HPD when it

1    covered the Bedford Stuyvesant cluster?

2    A    Is that the Neighborhood Homes cluster?

3    Q    Yes.

4    A    Yes.

5    Q    And were you ever aware that --

6               MR. EVANS:  Withdrawn.

7    Q    Did you know Bob Starzecki and his companies directly?

8    A    I knew Bob, yes.

9    Q    And were you aware that Mr. Starzecki was paying people

10   in your organization for assistance in winning bids?

11   A    Absolutely not.

12   Q    Did you know George Armstrong when he was at the

13   New York City Partnership for Housing?

14   A    Yes.

15   Q    And were you aware that Mr. Armstrong was accepting money

16   to help in the selection of contractors and developers?

17   A    Absolutely not.

18   Q    When did you become aware that Wendell Walters was

19   accepting money from contractors and developers for bids out

20   of your office?

21   A    When he was indicted.

22   Q    And as a result of that, did you do a review of the

23   programs under his control and authority?

24   A    No.

25   Q    Did anyone in HPD do an audit of the programs or things

1   that he was responsible for after his indictment?

2   A    Not to my knowledge.

3   Q    Did you, ma'am, take any personal benefit or gain during

4   this period of time when you were at HPD and responsible for

5   the NEP program?

6   A    Absolutely not.

7   Q    Did you receive from any developer favors or money to

8   influence your decision and authority?

9   A    Absolutely not.

10  Q    And have you testified truthfully today?

11  A    Yes, sir.

12       I would like to just do one clarification when we

13  talked about the Certificate to Proceed.  I believe that was

14  done really earlier in the stage where we could fund the

15  NPHDFC to fund the construction work.

16  Q    So, the Certificates to Proceed were provided at the

17  beginning of the process?

18  A    To fund the construction and then the permanent financing

19  as well.

20       MR. EVANS:  Okay.  I have nothing further for this

21  witness, Your Honor.

22       THE COURT:  Mr. Sercarz.

23       MR. SERCARZ:  No, questions, Your Honor.

24       THE COURT:  Mr. DiChiara.

25       MR. DiCHIARA:  No questions, Your Honor.

1          THE COURT:  Ms. Posa.

2          MS. POSA:  Yes, Your Honor.

3    CROSS EXAMINATION

4    BY MS. POSA:

5    Q     Good afternoon, Deputy Commissioner.

6    A     Good afternoon.

7    Q     You're testifying here today because you were subpoenaed

8    by Mr. Dunn; correct?

9    A     Yes.

10   Q     You and I have never actually met before; have we?

11   A     No.

12   Q     Do you have any stake whatsoever in the outcome of this

13   trial?

14   A     No.

15   Q     You testified at length about the bid process; correct?

16   A     Yes.

17   Q     And the whole purpose of the bid process is to get the

18   lowest responsible bid; is that right?

19   A     Yes.

20   Q     Because the goal, as I understand it of bidding, is to

21   get the lowest price for the public money; is that right?

22   A     Yes.

23   Q     And that depends on the bidding process being honest;

24   doesn't it?

25   A     Yes.

Hendrickson - cross - Posa                    1827

1   Q    If a developer and the general contractors who are

2   bidding had an agreement whereby they agreed that the general

3   contractors would pad their bids in order to pay kickbacks,

4   would that subvert that process?

5   A    Yes.

6   Q    The bids would be higher than they should have been?

7   A    Yes.

8   Q    And who is the victim of that?

9   A    The City.

10  Q    You testified about Lexington Avenue and the different

11  phases this that project; is that right?

12  A    Yes.

13  Q    Now, are you aware when SML was initially selected as a

14  developer, whether they were selected for all of the phases of

15  that project?

16  A    Yes.

17  Q    It wasn't that they had to re-apply for each new phase;

18  was it?

19  A    No.

20  Q    Also, just discussing briefly the requisition process.  I

21  believe you said that the requisitions were based on the

22  quote, appropriate percentages of the work completed; is that

23  right?

24  A    Yes.

25  Q    So, what was being verified was the actual percentage of

Hendrickson - cross - Sercarz                1828

1    the work done; correct?

2    A    Yes.

3    Q    Not the actual contract amount; is that right?

4    A    Right.

5    Q    So, in other words, perhaps the architect would inspect

6    the project and say it looks like 20 percent of the work was

7    done; is that right?

8    A    Yes.

9    Q    He or she wouldn't say it's 20 percent, but you know

10   what, that contract is just too high so instead of being

11   20 percent of 10 million, it should really just be 20 percent

12   of 8 million?

13   A    No, they would do a percentage of the line item.

14   Q    It wasn't their job to question the actual contract sum

15   after the fact; was it?

16   A    No.

17            MS. POSA:  No further questions.

18            THE COURT:  Anything else?

19            MR. SERCARZ:  Yes, I have one.

20            THE COURT:  All right.

21   CROSS EXAMINATION

22   BY MR. SERCARZ:

23   Q    Good afternoon, Ms. Hendrickson.

24   A    Good afternoon.

25   Q    If I understand your responses to Ms. Posa, if a

VB        OCR        CRR

Hendrickson - cross - DiChiara                    1829

1    requisition were prepared and in the course of submitting that

2    requisition all the parties agreed that the work was

3    20 percent done, and indeed the work was 20 percent done -- by

4    done I mean completed -- then that requisition would be

5    accurate; isn't that correct?

6    A    Yes.

7             MR. SERCARZ:  Thank you, no further questions.

8             MR. DiCHIARA:  I have one other question, Judge.

9             THE COURT:  All right.

10   CROSS EXAMINATION

11   BY MR. DiCHIARA:

12   Q    You said you're familiar with the contractor Starzecki;

13   correct?

14   A    Yes.

15   Q    And you're familiar with George Armstrong; correct?

16   A    Yes.

17   Q    All right.  Now from what I understand there's five to

18   seven people on the list?

19   A    A minimum of five.

20   Q    Okay.  Do you know the names of any of the others?

21   A    I don't recall.

22   Q    Okay.  Was there anything -- do you know whether or not

23   Mr. Dunn had any connection to any of the other contractors

24   that might have been on that list?

25   A    No.

Hendrickson - redirect - Evans                1830

1        MS. POSA:  Nothing further, Your Honor.

2        MR. EVANS:  Just two brief questions, Your Honor.

3  REDIRECT EXAMINATION

4  BY MR. EVANS:

5  Q    Ms. Hendrickson, do you know a man named Glenn Darien?

6  A    Yes.

7  Q    And did you ever send Glenn Darien to see Steve Dunn

8  about an apartment?

9  A    No.

10 Q    So, it's not accurate that Mr. Darien represented that

11 way to Mr. Dunn?

12 A    Not accurate.  Mr. Darien knew Mr. Dunn before.

13 Q    And you never sent Mr. Darien to see Mr. Dunn?

14 A    No.

15 Q    And did you know if Mr. Darien ever stayed or rented an

16 apartment from Mr. Dunn?

17 A    Yes.

18 Q    He did.  Where was that apartment?

19 A    That have located on Decatur Street.

20 Q    And was that during the time that Mr. Dunn was in the NEP

21 program?

22 A    Yes.

23 Q    And did you ever visit that location?

24 A    Yes.

25 Q    And --

Side-Bar                                      1831

1          MR. EVANS:  Nothing further.

2          THE COURT:  Anything else Counsel?

3     You may step down.

4          THE WITNESS:  Thank you.

5          (Witness excused.)

6          THE COURT:  Mr. Evans.

7          MR. EVANS:  Your Honor, I have to see if my witness

8     is outside.

9          (Pause in the proceedings.)

10         MR. EVANS:  Your Honor, my last witness is not

11    outside, he was here yesterday.

12         MR. SERCARZ:  May I approach?

13         MR. EVANS:  Perhaps we should approach.

14         THE COURT:  All right.

15         (Side-bar conference held on the record out of the

16    hearing of the jury.)

17

18         (Side-bar.)

19         THE COURT:

20         MR. SERCARZ:  I've got a couple of character

21    witnesses I can call out of turn while Mr. Evans is waiting

22    for his witness, if that's all right with the Government.

23         THE COURT:  All right.

24         MR. EVANS:  Thank you.

25         MR. DiCHIARA:  Is it possible to have a short

Side-Bar                                          1832

1    five-minute, two-minute break?

2              THE COURT:  All right, Victor, we'll take a

3    five-minute recess.

4              (Side-bar end.)

5

6              (In open court.)

7              THE COURT:  Five minutes.

8              THE COURTROOM DEPUTY:  All rise.

9              (Jury exits.)

10             (Recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

1833

1           (In open court; outside the presence of the jury.)

2           THE COURT:  All right.  Counsel, are we going to go

3    out of order, then?  Yes?

4           Mr. Evans, your witness --

5           MR. EVANS:  -- is not here yet.

6           THE COURT:  All right.  So Mr. Sercarz, you have a

7    character witness, is it?

8           MR. SERCARZ:  Two, Your Honor, and I'd like to try

9    to get them both on this afternoon.

10          THE COURT:  All right.

11          (Jury enters.)

12          THE CLERK:  Thank you.  Please be seated.

13          THE COURT:  All right.  Members of the jury, at this

14   time, Mr. Dunn has one more witness but that person is not

15   present right now so in order to accommodate schedules, I'm

16   going to ask Mr. Sercarz on behalf of Mr. Hymowitz to begin

17   presenting Mr. Hymowitz's case.

18          MR. SERCARZ:  Thank you, Your Honor.  The defendant

19   Hymowitz calls John Fellin.

20          THE CLERK:  Good afternoon, sir.  Before you sit

21   down, I had like you to raise your right hand, please.

22          (Witness sworn.)

23          THE CLERK:  Thank you.  Please be seated.

24          THE WITNESS:  They really say that?

25          THE CLERK:  They really say that.

Fellin - direct - Sercarz                    1834

1          Can you state your full name for the record, please?

2          THE WITNESS:  John Fellin.

3          THE CLERK:  Spell your last name for the court.

4          THE WITNESS:  F, as in Frank, F-E-L-L-I-N.

5     FRANK   FELLIN   ,

6          called as a witness, having been first duly sworn,

7          was examined and testified as follows:

8     DIRECT EXAMINATION

9     BY MR. SERCARZ:

10    Q    It's not F-E-L-O-N, am I correct?

11    A    No.  It's definitely F-E-L-L-I-N.

12    Q    Okay.  Then we can proceed.

13          Mr. Fellin, where were you born?

14    A    New York.

15    Q    How old are you?

16    A    I'm 58.

17    Q    Are you married?

18    A    Yes, I am.  35 years this April, April Fool's Day.

19    Q    To the same woman?

20    A    The same woman.

21    Q    Okay.  Do you have any children?

22    A    Two boys.

23    Q    Mr. Fellin, tell us about your educational background.

24    A    Let's see.  Graduated St. John's University and came out

25    of St. John's University -- starting when I was in high

CMH      OCR      RMR      CRR      FCRR

Fellin - direct - Sercarz                1835

1   school, I had started working in my business as a busboy and I

2   worked my way up from a busboy to a waiter and when I came out

3   of St. John's University, they offered me a full-time position

4   there.  I eventually went on to become an owner of the

5   business some 25 years later.

6   Q    Now, the name of that business is Bruno's On the

7   Boulevard in Jackson Heights, New York, is that correct?

8   A    Yes.

9   Q    And you worked your way up from a busboy to the owner of

10  the place, is that right?

11  A    Forty-two years.  A lot of years there.

12  Q    Mr. Fellin, in addition to the work that you do, are you

13  engaged in any volunteer work?

14  A    Yes.  My wife years ago said I should start Volunteers

15  Anonymous because we're involved in so many things.  We had

16  done a lot of community work for my grammar school, I used to

17  help raise scholarship money for less fortunate kids to go to

18  grammar school, it was a private school, accounting school,

19  and now I serve on the board of my high school.

20         I was involved in the Oceanside Anti-Bias where I --

21  there had been a bias incident in Oceanside, many years ago,

22  about 20, 25 years ago and they had asked me to chair it and I

23  actually co-chaired it with Mr. Hymowitz.

24  Q    Speaking of Mr. Hymowitz, do you see him in the

25  courtroom?

Fellin - direct - Sercarz                1836

1   A     Yes, I do.

2   Q     Would you please point him out for the ladies and

3   gentlemen of the jury?

4   A     Sitting right over at the table there.

5   Q     Tell me how it is that you made the acquaintance of

6   Mr. Hymowitz?

7   A     I believe I met him for the first time, he was coaching

8   little league and my son was on the little league team and we

9   just struck up a conversation there and our sons went to

10  school together and we became friendly.  Then a few years

11  later after that, maybe it's about 25 years ago, I guess,

12  about two or three years later, we were, we met on the

13  anti-bias coalition meeting and they asked us if we would

14  co-chair it a year or two after that.

15  Q     Let me slow you down for a moment.  And with regard to

16  that anti-bias committee, can you explain for the ladies and

17  gentlemen of the jury how that committee came to be.  What was

18  the origination of that anti-bias committee?

19  A     There had been a bias incident in town where I guess they

20  had put some anti-Semitic material on the temple in town and

21  elsewhere in town and the town was in quite an uproar over it.

22  So they had a big town meeting and decided to form an

23  anti-bias coalition to come together to educate young people

24  to be more sensitive and so forth and that's where we got

25  involved.

CMH        OCR        RMR        CRR        FCRR

Fellin - direct - Sercarz                    1837

1   Q     Is that where you met Mr. Hymowitz?

2   A     That's where I really got to know Lee more there, you

3   know, chairing the committee together with him, and then

4   shortly thereafter, the anti-bias coalition was absorbed into

5   the Interfaith Council which I had chaired for a few years and

6   Lee was very active in the Interfaith Council.

7            They had asked Lee and I if we would chair the

8   annual Thanksgiving dinner for the less fortunate in the

9   community.  This past Thanksgiving, we served about 500

10  dinners on Thanksgiving Day.  We've been doing it now for

11  20 years.  Lee and I do all the leg work.  He lugs boxes with

12  me.  He carts things around.  The only thing he doesn't do is

13  cook because he's a terrible cook.

14  Q     With regard to the anti-bias committee that is the

15  predecessor for the Interfaith Council, how often did you see

16  Mr. Hymowitz and interact with him in connection with the work

17  of that anti-bias group?

18  A     At least once a month, at least monthly.  It's a while

19  ago.  There would probably be some instances in between where

20  we would talk to each other leading up to the next meeting and

21  discuss the agenda and what we wanted to accomplish.

22  Q     And in connection with the Interfaith Council which was

23  the outgrowth of the anti-bias committee, how often would you

24  see one another?

25  A     I would say fairly regular, on a regular basis throughout

1  the year, especially as we got closer to the fall when

2  September would start up and we were actively raising funds

3  for the interfaith dinner, the Thanksgiving dinner or, you

4  know, looking to get donations and supplies.

5  Q    By the way, is all of this volunteer work for you or are

6  you paid for it?

7  A    No.  It's 100 percent volunteer.  It usually costs us

8  money because we do tend to fill in the gaps where necessary,

9  whether we need food or whatever supplies we need.

10 Q    And Mr. Hymowitz, the same?

11 A    Yes, definitely.

12 Q    Have you had the opportunity in the course of dealing

13 with Mr. Hymowitz either on the anti-bias committee or on the

14 Interfaith Council to make use of his skills as a real estate

15 developer or as an attorney?

16 A    Not -- there were -- I believe there might have been a

17 time where there was an incorporation that was being done for

18 the Interfaith, but other than that, not really.  It was just

19 mostly volunteering, helping with the dinner.

20 Q    Does the Interfaith Council have a budget?

21 A    Yes, it is.

22 Q    And is Mr. Hymowitz at all involved in the administration

23 of that budget?

24 A    Not that I know of.  I know he'll do some fundraising for

25 it, but there is a treasurer that handles it.  He might help

Fellin - direct - Sercarz                  1839

1    with the banquet.  No, I don't think he does any of the bank

2    deposits.  I'm not sure.

3    Q    During the course of your relationship with Mr. Hymowitz,

4    have you had an opportunity to form an opinion as to his

5    character for selflessness?

6    A    Yeah.  I mean --

7    Q    Let me just ask the question.  What is your opinion of

8    his character for selflessness?

9    A    Probably one of the reasons why I liked doing so much

10   with Lee on volunteer work and being around him is because he

11   is always -- his generosity is right there.  He leads by

12   example.  He is the first one to dig into his pocket to help

13   people out if they need a hand.

14           As a matter of fact, just two weeks ago, I got a

15   phone call from an elderly woman who helps with the

16   Thanksgiving Day dinner.  She lost her house during Sandy.

17   She wanted to know, she was concerned because she couldn't get

18   ahold of Lee --

19           MR. CAPOZZOLO:  Objection.

20           THE COURT:  Sustained, Counsel.

21   Q    Have you had an opportunity to form an opinion as to

22   Lee's character as far as honesty and fair dealing?

23   A    Yeah, I trust him implicitly.

24           MR. SERCARZ:  Thank you.  No further questions.

25           THE COURT:  All right.  Counsel, come to the side.

Side Bar                              1840

1          (The following occurred at side bar.)

2          THE COURT:  Okay.  Is there a proffer?  We are in

3    cross-examination.

4          MR. CAPOZZOLO:  Yes, Judge.  I'll just read the

5    questions I intended to ask.

6          Would it change your opinion about Mr. Hymowitz's

7    character for honesty and generosity if you knew that Lee

8    Hymowitz failed to pay money he was required to pay to a

9    brother and sister who jointly owned property located at

10   510 Gates Avenue in Brooklyn that they jointly owned with

11   Mr. Hymowitz?

12         THE COURT:  Which one is this?

13         MR. SERCARZ:  The Sicignano.

14         MR. CAPOZZOLO:  Then I would just follow up by

15   saying, Would it change your opinion if you knew that Lee

16   Hymowitz was being sued by the brother and sister for

17   misappropriating that money?

18         Would it change your opinion if you knew that Lee

19   Hymowitz was being sued and accused of destroying corporate

20   documents related to that jointly owned property?

21         And in testifying as to your understanding of

22   Mr. Hymowitz's reputation in the community, were you aware

23   that Mr. Hymowitz was being sued for misappropriating money

24   from that same property?

25         THE COURT:  This is all related to this --

Side Bar                                                      1841

1          MR. CAPOZZOLO:  Sicignano lawsuit.

2          THE COURT:  Not the mortgage?

3          MS. POSA:  Your Honor, for the time being, we're

4    going to withdraw that because we haven't found additional

5    information.

6          THE COURT:  All right.

7          MR. SERCARZ:  With regard to the presence or absence

8    of a lawsuit, I don't believe that that question adds or

9    subtracts from the -- ought to add or subtract --

10         THE COURT:  No questions --

11         MR. SERCARZ:  -- to the assessment of character.

12         As to the first question, I suppose there is a good

13   faith basis and I can't object.  That's the only question that

14   I think can be asked of this witness.

15         THE COURT:  What was the other question?

16         MR. CAPOZZOLO:  The question that --

17         THE COURT:  That is not --

18         MR. CAPOZZOLO:  -- Mr. Sercarz, about the lawsuit,

19   the reason I think that's admissible is because he offered

20   reputation evidence.

21         MR. SERCARZ:  No, I did not.  Excuse me.  I asked

22   for his opinion.

23         MR. CAPOZZOLO:  Oh, just opinion.  Then I'll

24   withdraw that.  That's fine.

25         THE COURT:  So just the one question?

Side Bar                                        1842

1          MS. POSA:   And the destruction of evidence.

2          THE COURT:   What was the other one?

3          MR. CAPOZZOLO:   The allegation in the lawsuit is

4    that corporate records were destroyed because they're trying

5    to get an accounting of what happened during the course of

6    time.

7          THE COURT:   Where is that allegation?

8          MR. CAPOZZOLO:   In the lawsuit.

9          THE COURT:   The lawsuit charges brief of fiduciary

10   duty, negligence.

11         MR. CAPOZZOLO:   And there's one line that alleges

12   that Mr. Hymowitz destroyed corporate documents.

13         MR. SERCARZ:   I think only the first question should

14   be allowed, Your Honor.  This is trying to create multiple

15   questions out of one allegation which is primus on a single

16   lawsuit for which Mr. Hymowitz has an answer.  Indeed, his

17   lawyers have answered it in court.

18         THE COURT:   May I hear the first question again?  We

19   will see if it covers it.

20         MR. CAPOZZOLO:   Would it change your opinion about

21   Mr. Hymowitz's character for honesty and generosity if you

22   knew that Lee Hymowitz failed to pay money he was required to

23   pay to a brother and sister who jointly owned property located

24   at 510 Gates Avenue in Brooklyn that they jointly owned with

25   Mr. Hymowitz?

CMH        OCR        RMR        CRR        FCRR

Side Bar                                      1843

1          THE COURT:  All right.  We'll leave it at that one

2  question.

3          MR. SERCARZ:  Thank you.

4          THE COURT:  Is anything going to come up on

5  redirect?

6          MR. SERCARZ:  No, depending on the answer of the

7  question, but I don't foresee any redirect.

8          THE COURT:  All right.

9          (Side bar ends.)

10         THE COURT:  Mr. DiChiara, any questions?

11         MR. DiCHIARA:  No, Your Honor.

12         MR. EVANS:  No, Your Honor.

13         MR. CAPOZZOLO:  May I inquire?

14         THE COURT:  Yes.

15         (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. CAPOZZOLO:

3   Q     Mr. Fellin, how are you?

4   A     Great.

5   Q     We've never met before, correct?

6   A     Sorry?

7   Q     We've never met before, correct?

8   A     Not that I know of.

9   Q     The institutions you identified, where are they located?

10  A     They're located in Oceanside, New York.

11  Q     And what County is that in New York?

12  A     Nassau County.

13  Q     And are you familiar with any of Mr. Hymowitz's business

14  in New York City?

15  A     Other than that he's an attorney and has done some legal

16  work for me once in a while.

17  Q     My only other question is would it change your opinion

18  about Mr. Hymowitz's character for honesty and generosity if

19  you knew that Mr. Hymowitz failed to pay money he was required

20  to pay to a brother and sister who jointly owned property

21  located at 510 Gates Avenue in Brooklyn that they jointly

22  owned with Mr. Hymowitz?

23  A     It would be very out of characteristic for him.  I would

24  really need to talk to him about it and find out and get the

25  facts before I made a decision, but it would be so out of

Fellin - cross - Capozzolo                    1845

1   characteristic for Lee to be involved in anything like that.

2   Q     Thank you very much.

3               MR. CAPOZZOLO:  No further questions.

4               THE COURT:  Counsel, would you like an instruction

5   regarding the testimony?

6               MR. SERCARZ:  May we approach?

7               THE COURT:  You want to approach?

8               Did you have any other questions for this witness?

9               MR. SERCARZ:  I don't believe so.

10              THE COURT:  Anything else for the witness?  All

11  right.  Then you may step down.

12              (Witness excused.)

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Side Bar                    1846

1          (The following occurred at side bar.)

2          MR. SERCARZ:  I'm not sure of the instruction you

3    had in mind quite frankly, Your Honor.

4          THE COURT:  Well, there is an instruction that

5    Judge Sand recommends and it seems sensible although it's

6    longer than the testimony but it goes like this and you are

7    entitled to it if you want it.

8          MR. SERCARZ:  Okay.

9          THE COURT:  The prosecution asked certain questions

10   on cross-examination of the defendant's character witness

11   about specific acts supposedly committed by the defendant.  I

12   caution you that the prosecution was allowed to ask these

13   questions only to help you decide whether the witness was

14   accurate in forming his opinion.  You may not assume that the

15   acts -- in this case, "act" -- described in these questions is

16   true nor may you consider it as evidence that the defendant

17   committed the crimes with which he is charged.  You may,

18   therefore, consider the question only in deciding what weight,

19   if any, should be given to the testimony of the character

20   witness and for no other purpose.  You should not consider the

21   question as any proof of the conduct stated in the question.

22         MR. SERCARZ:  The answer is yes, I'd like the

23   instruction.

24         THE COURT:  Very good.

25         MR. CAPOZZOLO:  I'm shocked by that.

```
                          Side Bar                        1847

 1           THE COURT:  Okay.  And so you want -- and you have

 2   one more witness?

 3              MR. SERCARZ:  That's correct.

 4              THE COURT:  Also opinion or reputation or what?

 5              MR. SERCARZ:  That's going to be opinion.

 6              MR. EVANS:  Do you want the instruction at the end

 7   of both?

 8              MR. SERCARZ:  Yes.

 9              THE COURT:  Would you rather wait until we finish

10   the other witness?

11              MR. SERCARZ:  I would like it now and again.  It

12   sounds great to me.  It can only get better with repetition.

13              THE COURT:  All right.

14              (Side bar ends.)

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25
```

1848

1        (In open court.)

2        THE COURT:  All right.  Members of the jury, you

3    have heard a witness who is what we call a character witness

4    and I will have more to say about that in the final

5    instructions to you, but I want to address now an instruction

6    regarding the fact that the prosecution, Mr. Capozzolo, was

7    allowed to ask a question on cross-examination of the

8    character witness about a specific act supposedly committed by

9    the defendant.

10        I caution you that the prosecution was allowed to

11    ask this question only to help you decide whether the witness

12    was accurately forming his opinion and you may not assume that

13    the act that's described in the question is true nor may you

14    consider it as evidence that the defendant committed the

15    crimes with which he's charged in this case.  You may,

16    therefore, consider the question only in deciding what weight,

17    if any, to be given to the testimony of the character witness

18    and for no other purpose.  You should not consider the

19    question as any proof of the conduct that is stated in the

20    question.

21        Okay.  And I believe we are going to hear another

22    character witness, is that correct?

23        MR. SERCARZ:  Yes, Your Honor.  The defendant

24    Hymowitz calls Rabbi Mark Greenspan.

25        THE CLERK:  Good afternoon.  Before you sit down,

Greenspan - direct - Sercarz                    1849

1    I'm going to ask you to raise your right hand.

2              (Witness affirmed.)

3              THE CLERK:  Thank you.  Please be seated.

4              Please state your full name for the record, please.

5              THE WITNESS:  My name is Rabbi Mark B. Greenspan.

6              THE CLERK:  Spell your last name for the Court,

7    please.

8              THE WITNESS:  G-R-E-E-N-S-P-A-N.

9              THE CLERK:  Thank you, sir.

10   RABBI MARK B. GREENSPAN  ,

11        called as a witness, having been first duly

12        sworn/affirmed, was examined and testified as follows:

13   DIRECT EXAMINATION

14   BY MR. SERCARZ:

15   Q    Rabbi Greenspan, where were you born?

16   A    I was born in New York, in Far Rockaway actually.

17   Q    And can you tell us something about your educational

18   background?

19   A    I'm a graduate of Columbia University.  I was ordained at

20   the Jewish Theological Seminary and I've been a rabbi for the

21   past 30, 33 years, 34 years.

22   Q    Did there come a time when you became the rabbi in the

23   congregation in Oceanside, New York?

24   A    Yes.  I've been the rabbi in Oceanside since 1997.

25   Q    Incidentally before we get there, Rabbi, are you married?

1   A    Yes, I am.

2   Q    Do you have any children?

3   A    I have three children.

4   Q    Are you an officer or were you recently an officer in any

5   rabbinical organizations?

6   A    I'm a past president of the Rabbinical Assembly of Nassau

7   and Suffolk County.  I'm also president of the Interfaith

8   Council of Oceanside.

9   Q    Do you publish any articles of circulation in the

10  community?

11  A    I publish online a weekly study, bible study.  I also

12  have published a number of volumes based on Passover, the

13  holiday of Passover.

14  Q    And I apologize if I already asked you this question but

15  you said you were married.  Do you have any children?

16  A    I have three children.

17  Q    Now, do you see Lee Hymowitz in the courtroom?

18  A    Yes, I do.

19  Q    Why don't you point him out and describe what he's

20  wearing?

21  A    He as wearing a dark suit, white shirt and dark tie like

22  most of the men in the court.

23       MR. SERCARZ:  We can stipulate that he identified my

24  client.

25       THE WITNESS:  Yes.

Greenspan - direct - Sercarz                1851

1    Q    Why don't you tell us what the circumstances were under

2    which you met Mr. Hymowitz?

3    A    I've known Lee since I first came to Oceanside.  We

4    are -- he has been a very active member of my congregation and

5    we've been involved in a variety of different communal

6    projects, congregational projects over the years really from

7    the very first months that I was in Oceanside.

8              THE COURT:  When was that?

9              THE WITNESS:  In 1997.

10   Q    You mentioned your role on the Interfaith Council?

11   A    Yes.

12   Q    What is your role on the Interfaith Council?

13   A    Presently, I'm a representative of my congregation.  I'm

14   also the president of the Interfaith Council.  Actually, Lee

15   has been involved with the Interfaith Council from before I

16   even came to town.  He was one of the convenors of the group

17   originally.

18   Q    During the period that you have worked on the Interfaith

19   Council, what has the role of that body been?

20   A    The -- it is a group that brings together people of all

21   faiths in our community for monthly meetings, for dialogue,

22   mutual understanding and also for working for the betterment

23   of our Oceanside community and the larger community around us.

24             They've also put together each year a Thanksgiving

25   community service and a Thanksgiving, interfaith Thanksgiving

1   dinner which serves both kosher and non-kosher food.  It's

2   unique in that regard.

3   Q    Is the work of that Council limited to people of the

4   Jewish faith?

5   A    No, it's not.  It includes people of all faiths.

6   Q    How often do you interact with Lee, both as a congregant

7   of your synagogue and in connection with your work on the

8   Interfaith Council?

9   A    I would really say I see Lee at least on a weekly basis

10  pretty much.  He also is a regular attendee at our, our daily

11  services.  He comes at least once a week to those services and

12  I deal with him on and off in terms of his work in community

13  and in the congregation.

14  Q    In addition to your contact with Lee as a congregant and

15  on the Interfaith Council, did there come a time when Lee

16  became involved in any way in your efforts to secure a

17  contract with the synagogue?

18  A    Yes.  He was involved in my most recent contract

19  negotiations, but I would say that he was more involved as a

20  mediator rather than -- he wasn't my representative.  I had my

21  own attorney actually, but he stepped in as an elder of the

22  congregation and was able to help both sides come to a, to a

23  mutual understanding and agreement.

24  Q    Were there occasions when Lee was able to perform any

25  services in the face of a budget shortfall at the synagogue?

Greenspan - direct - Sercarz          1853

1   A     Hardly a year passes without --

2            THE COURT:  Excuse me.  Excuse me just a minute,

3   Rabbi.

4            MR. CAPOZZOLO:  Objection.

5            THE COURT:  Sustained.

6   Q    Did you have occasions in interacting with Lee, and I

7   don't want you to tell me what he did, but were there

8   occasions when Lee's services were called for in connection

9   with your contract or benefits that were given to you in your

10  capacity as a rabbi?

11           MR. CAPOZZOLO:  Same objection.

12           THE COURT:  Yes.  Sustained, Counsel.

13  Q    Were there occasions when Lee performed a function in

14  connection with remedying certain shortfalls at the synagogue?

15           MR. CAPOZZOLO:  Same objection.

16           THE COURT:  Counsel, I don't believe this is within

17  the scope of what you had proffered.

18           MR. SERCARZ:  Yes, Your Honor.

19  Q    In the course of your interactions with Lee, have you

20  been able to form an opinion as to his character for the trade

21  of selflessness?

22  A    Yes.  What I would say about Lee is that I think he is

23  probably one of the most respected members of our community.

24  He's trusted and he's the kind of person that people go to

25  because they, they see him as someone who's very fair, who has

Greenspan - direct - Sercarz                1854

1    the larger interest of the community at heart and who really

2    doesn't take a self interest.  It's never about him.  It's

3    always about the larger, the larger needs of the community.

4    Q    And in the course of your dealings with issues affecting

5    the congregation and issues between you and Mr. Hymowitz, have

6    you been able to form an opinion as to his character for

7    honesty and fair dealing?

8    A    I don't know many people as honest as he is, yes.  I find

9    him to be an extremely honest person, straightforward, and

10   straightforward.

11              MR. SERCARZ:  Thank you.  I have no further

12   questions.

13              THE COURT:  Anything from Mr. Evans or Mr. DiChiara?

14              MR. EVANS:  No, Your Honor.

15              MR. DiCHIARA:  No, Your Honor.

16              THE COURT:  Mr. Capozzolo.

17   CROSS-EXAMINATION

18   BY MR. CAPOZZOLO:

19   Q    Good afternoon, Rabbi.

20   A    Good afternoon.

21   Q    We've never met before, correct?

22   A    That's correct.

23   Q    Just a few questions.

24              Your congregation is located in Oceanside, is that

25   correct?

Greenspan - direct - Sercarz                1855

1    A     That's correct.

2    Q     What county in New York is that?

3    A     That's Nassau.

4    Q     And the extent of the activities you've described that

5    Mr. Hymowitz has been involved in, those are limited to the

6    activities in Nassau County, correct?

7    A     Yes.

8    Q     And are you familiar with any of his business dealings in

9    New York City?

10   A     No, not really.

11   Q     The activities that he's been involved in, in some of the

12   things you mentioned, you are the leader of the congregation,

13   correct?

14   A     That is correct.

15   Q     And in carrying out these activities, Mr. Hymowitz has

16   been with you in person when these things have taken place?

17         You described some of these meetings in the

18   Interfaith Council, correct, he's been with you?

19   A     Correct, not all of them.  Some of them happened within

20   the context of the synagogue board where I might not have been

21   present, but I have a sense of the way the congregation

22   interacts.  The interfaith dinner that he helps to put

23   together, he really deals with that.  I don't really attend

24   those meetings so I'm not directly involved in the actual

25   day-to-day of those programs.

Greenspan - direct - Sercarz                    1856

1   Q    And some of those events involve the public, you were

2   saying Interfaith Council bringing people of various fates

3   together?

4   A    Yes.

5            (Continued on next page.)

1    BY MR. CAPOZZOLO:

2    Q    And at those events, you and Mr. Hymowitz appear; is that

3    correct?

4    A    Correct.

5    Q    One further question is, I just would like to know if you

6    will change your opinion about Mr. Hymowitz's character for

7    honesty and generosity, if you were aware that Mr. Hymowitz

8    failed to pay money he was required to pay to a brother and

9    sister who jointly owned property located at 510 Gates Avenue

10   in Brooklyn that they jointly owned with Mr. Hymowitz?

11   A    Lee Hymowitz I know is a very honest man.  You are

12   presenting what sounds like an accusation.  I will have to

13   know more about the facts in order to make judgment like that.

14        So, I would really be -- I would hesitate to make

15   any kind of judgment.

16   Q    Fair enough.  Thank you.

17        MR. CAPOZZOLO:  No further questions.

18        THE COURT:  Anything else?

19        MR. SERCARZ:  No, your Honor.

20        THE COURT:  You may step down.  Thank you.

21        (Witness excused.)

22        MR. SERCARZ:  Your Honor, would your Honor consider

23   a truncated instruction of the instruction you gave moments

24   ago?

25        THE COURT:  All right.

1          Members of the jury, I just gave you instructions

2     regarding the other witness, and in essence, I want to give

3     you the same instruction with regard to the cross-examination

4     question asked of this witness.

5          The question was only to help you decide whether the

6     witness was accurate in forming his opinion as to the

7     defendant, and you may not assume that the act that was

8     described in the question is true nor consider it as evidence

9     that the defendant committed the crimes he's charged with

10    here.

11         So, consider the question and the answer only in

12    deciding what weight, if any, you should be giving to the

13    testimony of the character witness.

14         Thank you.

15         And now, we have something else?

16         MR. EVANS:  Your Honor, I'm told my final witness is

17    here.

18         THE COURT:  He's present?

19         MR. EVANS:  Yes.

20         THE COURT:  All right.  Shall we switch back to

21    Mr. Dunn?

22         MR. EVANS:  Mr. Dunn calls Mr. Joseph Bertolino.

23    J O S E P H    B E R T O L I N O,

24         having been duly sworn, was examined and

25              testified as follows:

Greenspan - direct - Capozzolo          1859

1          THE CLERK:  State your name and spell it, please.

2          THE WITNESS:  My name is Joseph Bertolino.

3          THE CLERK:  Spell your last name.

4          THE WITNESS:  B E R T O L I N O.

5   DIRECT EXAMINATION

6   BY MR. EVANS:

7   Q    Good afternoon, sir.  My name is Robert Anthony Evans,

8   and I represent Mr. Stevenson Dunn, the defendant in this

9   case?

10         Do you know me or have we ever met.

11  A    No.

12  Q    Do you know Mr. Dunn?

13  A    I met him once.

14  Q    Okay.  What is your job?

15  A    My job is to go to sites and view the project, the work

16  that's being done.

17  Q    Who do you work for?

18  A    I work for Ariail Afgang Architects.

19  Q    Was that a part of Subotovsky Architects?

20  A    It was.

21  Q    It was.  And I want to ask you about work you did while

22  you were at Subotovsky Architects.  Are you familiar with the

23  New York City department that we refer to as HPD?

24  A    Yes.

25  Q    Are you familiar and proficient with their requirements

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Greenspan - direct - Capozzolo                    1860

1   for buildings and inspections?

2   A    No, not totally.

3   Q    Would you describe for the jury the particular

4   responsibilities you have when you go to a construction site?

5   A    I just make sure that the project is in progress, that

6   everybody is working, materials are being installed according

7   to the plans.

8   Q    You said to the jury that you had met Mr. Dunn before; is

9   that correct?

10  A    I met him at the job sites.

11  Q    Was that for the Bedford-Stuyvesant SML project?

12  A    Correct.

13  Q    What role did you play on that project?

14  A    I would review the projects and sign off on the

15  requisitions.

16  Q    Did you know the general contractor on that assignment?

17  A    No.

18  Q    Did you have any working responsibility on that site?

19  A    Meaning?

20  Q    Meaning other than your job to check the progress, did

21  you have any other responsibilities?

22  A    No.

23  Q    Did you do any work for the contractor MCR Restoration?

24  A    No.

25  Q    Did you do any assignment work or ad hoc work for

Greenspan - direct - Capozzolo                    1861

1   Mr. Bob Starzecki?

2   A    No.

3   Q    Other than meeting at that site, have you had any other

4   business dealings with Mr. Starzecki or his company?

5   A    No.

6   Q    Would you describe for the jury what you do when you go

7   out to a job site to check it for progress?

8   A    I go to the particular job site.  We walk the buildings

9   from top to bottom and view that the progress is in progress.

10  Q    When you say "We walk the buildings," who else is with

11  you?

12  A    At the time when we meet for requisition -- you're

13  talking about that requisition?

14  Q    Yes.

15  A     -- you have a bunch of people:  You have HPD, you have

16  the bank, you have me, you have the contractor, sometimes the

17  owner.

18  Q    And are you given a request before you arrive, so that

19  you know what you are going to inspect before you arrive?

20  A    A request?

21  Q    A requisition.

22  A    Yes.

23  Q    And I'm going to show you what's been published into

24  evidence as Government's Exhibit 108-C. You should be able to

25  see it on that screen there.  Do you recognize the signature

Greenspan - direct - Capozzolo          1862

1   on the bottom right-hand portion of this document?

2   A    Yes.

3   Q    Whose signature is that?

4   A    At the lower right-hand portion, that's mine.

5   Q    What date was that signed?

6   A    January 10, '07.

7   Q    And would you just walk us briefly through what's on this

8   application and certification for payment document?

9   A    Well, this is a portion of the rec.  It's giving total

10  amount that's due to the contractor --

11  Q    Is that --

12  A     -- on the bottom.

13  Q    The $300,798?

14  A    Yes.

15            MS. POSA:  Objection, your Honor, cumulative.

16            THE COURT:  Overruled.

17  Q    So, that is 300,798 where it says "Current payment due"?

18  A    Correct.

19  Q    Did you receive this form prior to going to the

20  inspection?

21  A    I don't recall.

22  Q    You said this was a part of it.  Was this page that I am

23  going to show you now, which was page two of Exhibit 108-C,

24  also part of what you were given?

25  A    Correct.

Greenspan - direct - Capozzolo                    1863

1   Q     And where on this page do you determine what percentage

2   of the work has been -- that's been requested for payment has

3   been completed?

4   A     Line E, it says "This application."  That's what they are

5   asking for, funds.  And to the letter G, gives you -- I'm

6   sorry, letter H gives you the percentages.

7   Q     Now, do you receive this grid as we're seeing it today

8   already filled out, or do you complete this grid?

9   A     It's already filled out.

10  Q     And you check, then, against column E, you said?

11  A     Correct.

12  Q     And, for example, in checking the general conditions, how

13  would you check the general conditions of this property at the

14  Bed/Stuy SML cluster?

15  A     I don't recall.

16  Q     Would you review working drawings prior to going to a

17  walk-through like this one?

18  A     I do have a set of working drawings that I review, the

19  work that should be completed.

20  Q     Do you have the authority to sign this form on the site,

21  or do you report back to the architect in charge before

22  signing?

23  A     If all parties attending the requisition meeting agree,

24  I'm able to sign off on the rec.

25  Q     If all of the parties at the site don't agree?

Greenspan - direct - Capozzolo                1864

1    A    Then the rec would be changed accordingly.

2    Q    After the requisition is changed, do you re-inspect?

3    A    If required, yes.

4    Q    How often, if you remember, on this Bed/Stuy project did

5    you attend these walk-throughs and inspections?

6    A    At least once a month.

7    Q    And would you say you were involved in this project from

8    the beginning to the end?

9    A    I was in towards the middle of this project.

10   Q    How long were you on the project?

11   A    Until the end.

12   Q    And during the course of these monthly walk-throughs, did

13   you ever ask that a requisition be changed or modified after

14   your inspection?

15   A    Possibly.

16   Q    Did anyone resist your attempts to have the requisition

17   modified or changed?

18   A    Most likely, no.

19   Q    Did there ever come a time when the contractor or the

20   developer disagreed with your assessment of the walk-through?

21   A    Not that I can recall.

22   Q    Did the developers, particularly Mr. Dunn, who you say

23   you met at the site on one of these walk-throughs, ever try to

24   change your view or professional opinion about the progress of

25   the work?

1865

1   A     No.

2   Q     Did Mr. Dunn or anyone purporting to work for Mr. Dunn

3   ever try to convince you to sign a requisition without

4   inspecting the property?

5   A     No.

6   Q     Did Mr. Dunn ever offer you money or incentives for your

7   participation at your job?

8   A     No.

9              MS. POSA:  Objection.

10             THE COURT:  Sustained.

11             MR. EVANS:  Nothing else for this witness.

12             THE COURT:  Any cross-examination?

13             MR. SERCARZ:  No, your Honor.

14             THE COURT:  Mr. DiChiara?

15             MR. DiCHIARA:  No, your Honor.

16             THE COURT:  Ms. Posa?

17             MS. POSA:  No, your Honor.

18             THE COURT:  Thank you.  You may step down.

19             (Witness excused.)

20             MR. EVANS:  The defense for Mr. Dunn now rests.

21             THE COURT:  Thank you.

22             Do you have any other witnesses for today?

23             Mr. Sercarz?

24             MR. SERCARZ:  May we approach?

25             THE COURT:  Yes.

1866

1    (Sidebar.)

2    MR. SERCARZ:  I have one more character witness, who

3    is not here.  Mr. Hymowitz is going to testify.  My preference

4    would be to start fresh with him in the morning, your Honor.

5    THE COURT:  And the character witness is going to be

6    first in the morning?

7    MR. SERCARZ:  I would try to have her on first.  If

8    she's not available first thing in the morning, I will put

9    Mr. Hymowitz on at that time.

10    THE COURT:  How long do you anticipate his direct

11    examination to be?

12    MR. SERCARZ:  An hour to an hour and a half.  No

13    longer than that.

14    MS. POSA:  We already lost a hour with the jury

15    today.  We lost about two hours yesterday.  I don't see why we

16    can't start Mr. Hymowitz's direct.  We're in the third week of

17    this trial.  I'm getting nervous about the jury's

18    availability.

19    THE COURT:  I actually have something from the

20    jurors, one issue as to one juror.

21    MR. SERCARZ:  My preference would be, if there's

22    other work that we can do, if we're going to have to do it

23    anyway, that we do that for the half hour of the rest of the

24    afternoon.  If there isn't, your Honor, I'll put him on.

25    THE COURT:  Well, there's no more work for the jury.

1867

1    We have work, but there's no work for the jury, as I
2    understand.
3              Mr. DiChiara, what's your situation?
4              MR. DiCHIARA:  I don't have any witnesses, your
5    Honor.
6              THE COURT:  What will you have tomorrow?
7              MR. DiCHIARA:  Depends upon Mr. Hymowitz's
8    testimony.
9              THE COURT:  You have character witnesses, also?
10             MR. DiCHIARA:  I'm undecided about character
11   witnesses, your Honor.  I'm leaning against them.
12             THE COURT:  Okay.
13             So, we could be finished tomorrow.
14             Why don't you start with Mr. Hymowitz and go for
15   twenty minutes or a half hour.
16             MR. SERCARZ:  Yes, your Honor.
17             THE COURT:  And then we'll take some other things.
18             MR. SERCARZ:  Yes, your Honor.
19             MR. DiCHIARA:  Can I ask a question before we go?
20   If we finish the case tomorrow, would you require us to sum up
21   tomorrow, or can we wait until the next day?
22             THE COURT:  Let's see how this goes.  If we could
23   start, then I might be able to get the case to the jury on
24   Thursday.  We could finish tomorrow and start the summations.
25   Then -- I don't know how long your summations are going to be.

                    Hymowitz - direct - Sercarz           1868

1           MS. POSA:  I would be prepared to start summing up

2    tomorrow, depending on the time period.

3           THE COURT:  If we could get the case to the jury on

4    Thursday, that would be very good.

5           MR. EVANS:  Would they be deliberating Friday?

6           THE COURT:  As far as I'm concerned, they can

7    deliberate on Friday.  I told them about that.  I don't know

8    if they recall that.  I'll bring that to their attention

9    Wednesday, which is tomorrow.  Okay.

10          (In open court.)

11          THE COURT:  Yes.

12          MR. SERCARZ:  Your Honor, the defense call Lee

13   Hymowitz to the stand.

14   L E E    H Y M O W I T Z,

15          having been duly sworn, was examined and

16               testified as follows:

17          THE CLERK:  State your name and spell it.

18          THE WITNESS:  Lee Hymowitz, H Y M O W I T Z.

19   DIRECT EXAMINATION

20   BY MR. SERCARZ:

21   Q    Lee, I would like to clear something up right at the

22   outset.  When you formed the SML, was it your intention to

23   function as one of the real estate developers?

24   A    Yes.

25   Q    When you first started the process of filling out the

1    requests for qualification forms, was it your intention to be

2    one of the three developers?

3    A    Yes.

4    Q    There came a time, did there not, when, for reasons we'll

5    go into later on, the decision was made that you, Mike Freeman

6    and Steve Dunn could not all be developers on the same

7    project; is that correct?

8    A    Yes.

9    Q    And the decision was made that you would be counsel to

10   the developers; am I correct?

11   A    Yes.

12   Q    Did you nevertheless take an active role in connection

13   with the development process?

14   A    Yes, I did.

15   Q    Was there another occasion on which, for reasons we'll

16   get into later, you applied to be a third developer on a

17   project?

18   A    Yes.  That was in 2003.

19   Q    And a decision was made by others that you would not be

20   able to serve as a developer on that project; is that correct?

21   A    Correct, yes.

22   Q    Did you continue to maintain an active role in connection

23   with the developments?

24   A    Yes.

25   Q    But given the fact that you were not a developer but were

1  counsel to the developers, were you permitted to sign

2  requisitions for payment in connection with these HPD

3  projects?

4  A    No.

5  Q    Was it part of your responsibility among those involved

6  in the SML to scrutinize those requisitions or the underlying

7  information for the purpose of insuring that those

8  applications were accurate?

9  A    I had no involvement in that part of the business at all.

10  Q    All right?

11        Lee, tell the ladies and gentlemen of the jury where

12  you were born.

13  A    Brooklyn, New York.

14  Q    And how old are you?

15  A    I'll be sixty-three in a few weeks.

16  Q    Are you married?

17  A    Yes.

18  Q    Do you have children?

19  A    Four.  Two adopted, two natural.  One is from South

20  America, adopted.

21  Q    Tell the ladies and gentlemen of the jury about your

22  educational background.

23  A    Grew up in Brooklyn, went to Canarsie High School, Queens

24  College and New York Law School.

25  Q    After graduating law school, did you become a member of

Hymowitz - direct - Sercarz                1871

1    the bar?

2    A    Yes.

3    Q    What was your first law-related job?

4    A    I worked for the Legal Aid Society in Brooklyn.

5    Q    Is that the Criminal Defense Division of the Legal Aid

6    Society?

7    A    Yes.

8    Q    While there, did you make the acquaintance of Michael

9    Freeman?

10   A    Yes, I did.

11   Q    Was he also an attorney in the Criminal Defense Division

12   of the Legal Aid Society in Brooklyn?

13   A    Yes.

14   Q    And during what years were you there?  The best estimate,

15   if you don't recall.

16   A    I believe I started in February '76, and it was a

17   three-year commitment, so probably until around January

18   of '79.

19   Q    After you left the Criminal Defense Division of the Legal

20   Aid Society, were you involved in the representation of

21   criminal defendants at all?

22   A    Very, very little, maybe for six months or a year, just

23   trying to get in whatever business we could to make a living.

24   Q    What is your best estimate of the last occasion on which

25   you did any criminal defense work?

1  A    I'm an attorney thirty-eight years, so I'll say

2  thirty-four years ago.

3  Q    After you left the Criminal Defense Division of the Legal

4  Aid, where did you go?

5  A    I opened up a law practice in Manhattan with a gentleman

6  by the name of Louis Marett.

7  Q    How long were you and Mr. Marett in practice?

8  A    There were different associations of the law firm.

9  Mr. Marett and I probably stayed in practice probably twenty

10  years.

11  Q    Did there come a time -- you anticipated my question --

12  when the firm of Hymowitz and Marett -- withdrawn.

13          Yes, Hymowitz & Marett, or Marett & Hymowitz.

14  A    Marett & Hymowitz.

15  Q    It was Marett & Hymowitz?

16  A    Yes.

17  Q    Did there come a time when that firm expanded?

18  A    Yes, it did.

19  Q    More or less, again, best of your recollection, when was

20  that?

21  A    Probably about three years after we started.

22  Q    That's bringing us to about 1982; is that about right?

23  A    Okay.

24  Q    Okay?

25          Did there come a time when Michael Freeman became a

1    member of the firm.

2    A    Yes, he and a gentleman by the name of John Rappaport

3    joined us at the same time.

4    Q    At the time that the firm was constituted with the four

5    of you, can you give the ladies and gentlemen of the jury an

6    idea of what kind of work you were doing at that firm?

7    A    I was doing almost exclusively real estate work.

8    Q    Incidentally, we've now heard testimony from some

9    character witnesses regarding membership you had on the

10   Interfaith Council.  Did you hear that testimony?

11   A    Yes.

12   Q    And the Anti-bias Committee?

13   A    Yes.

14   Q    You heard that testimony?  Were you doing that for the

15   networking and business opportunity?

16           MS. POSA:  Objection.

17           THE COURT:  You're leading.  Otherwise, the

18   objection is overruled.

19   Q    Were you also involved with Habitat for Humanity?

20   A    Yes.

21   Q    Can you tell the ladies and gentlemen of the jury about

22   your involvement with Habitat for Humanity?

23   A    I started with Habitat for Humanity in probably around

24   1997 or '98.  My daughter was going to Brown University in

25   Rhode Island, and she called one day and told me she had

1   joined Habitat and they did not have enough people to teach

2   the college students how to build a house, and she knew that I

3   had some skills, and would dad come up to Rhode Island and try

4   to help teach some of the students.  So, that's when I first

5   got involved.

6   Q    Have you received any awards for your charitable

7   activity?  I know you don't like to talk about this.

8            MS. POSA:  Objection.

9            THE COURT:  Overruled.

10  A    I have spent my entire adult life doing community

11  service.  I have been honored by Sons of Italy, B'nai Brith as

12  Man of the Year in our community.  I am the past president of

13  Habitat for Humanity of Nassau County.  I was chairman of the

14  board of Habitat for Humanity up until, unfortunately, the

15  date that we got charged with this.  I have worked probably

16  every Saturday of my adult life over the last ten or fifteen

17  years building houses for Habitat for Humanity.  I have

18  received certificates from the Town of Hempstead, County of

19  Nassau, New York State, the United States Congress for my work

20  in the community.  I did work with St. Vincent de Paul for a

21  couple of summers.  I would bring teenagers to people's homes

22  in Nassau County to do some basic repairs to people's homes

23  who were not able to do it, mostly senior citizens.

24           I was on two boards in Queens for senior citizen

25  housing in Queens, nondenominational housing for many years,

Hymowitz - direct - Sercarz                  1875

1   as well.

2            I don't know.  I have been doing that my whole life.

3   Q    I know this is going to sound like an odd question, but

4   why did you do this?

5   A    Why did I do that?  I have always felt that we were very

6   blessed, my wife and I, my family, and I felt it was for both

7   as a role model to my children and just to give back to the

8   community.  I coached baseball, I coached soccer.  You name

9   it, I have done it.  I was class mom on school trips all the

10  time.  Whatever you can think of, I was involved with.

11  Q    Let me change the subject?

12           I want you to tell the ladies and gentlemen of the

13  jury about the circumstances that led you to make the

14  acquaintance of Stevenson Dunn.

15  A    I would go back to about 1998.  I received a call from a

16  mortgage broker that I was doing business with, and he knew

17  that from time to time, I had the ability to speak to some of

18  my real estate clients to do private financing for people

19  looking to buy properties.  He told me about a gentleman, who

20  turned out to be Stevenson Dunn, who was buying a property in

21  Brooklyn, would I have anyone interested in placing a mortgage

22  on the property?

23  Q    Did that exchange of conversation result in an agreement

24  with Mr. Dunn regarding a mortgage?

25  A    Yes.

1    Q    During the course of your conversations with Mr. Dunn,

2    did you learn anything about where Mr. Dunn grew up that had a

3    particular interest for you?

4    A    You're hitting a lot of sore points.

5            MS. POSA:  Objection.

6            THE COURT:  Overruled.

7    A    Mr. Dunn grew up in Brooklyn, as well.  And my father had

8    a fruit and vegetable store in -- in Manhattan on Segal Avenue

9    near the Lindsay Co-ops, and I used to work there as a kid, as

10   most of us did when families had family businesses.  I would

11   work there after school, on weekends, while I was in college.

12   Even when I was practicing as an attorney, my father demanded

13   that I would come Christmas and Thanksgiving and so on to help

14   the family business out.

15            Right around the time that I met Mr. Dunn, my father

16   was probably five years into Alzheimer's and he was really a

17   shell of the man that he was, you know, growing up.  It turned

18   out that Mr. Dunn and his family shopped at my father's store,

19   and when Mr. Dunn told me about that, he would tell me some

20   very interesting and amusing stories about my dad when he was

21   obviously healthy, and that sort of got us very close

22   together.

23            (Continued on next page.)

24

25

Hymowitz - direct - Sercarz                1877

1   (CONTINUING)

2   Q    You mentioned that you met Mr. Dunn in connection with a

3   transaction which you helped to provide financing for a

4   building that he wanted --

5   A    Yes.

6   Q    -- is that correct?

7          Did you also have occasion to represent Mr. Dunn in

8   any legal matters thereafter?

9   A    Yes.  What happened was we had, I had put together this

10  mortgage for him and we would speak from time to time, he

11  would call me and say if I find another building, would you be

12  interested in funding it.  Mr. Dunn's financials were not

13  particularly good at the time and he did not have the ability

14  to go to a bank.

15         Sometime thereafter he called me and he had some

16  sort of dispute with his Counsel and asked if I would be

17  interested in representing him.

18  Q    Can you give us a time frame as to approximately when it

19  was that you began representing Mr. Dunn?

20  A    I'm going to say probably the middle of 1999.

21  Q    And for how long a period of time did you represent

22  Mr. Dunn, either you or the Hymowitz & Freeman law firm?

23  A    I would say I represented Mr. Dunn from 1999 -- well,

24  until about 2007, around then.  After that he had lots of

25  other Counsel.

1    Q    I want to talk to you about the decision to become

2    developers at HPD on the HPD projects that we heard about.

3          Do you recall whose idea it was to enter into the

4    development process and form the SML?

5    A    Yes.

6    Q    Tell the ladies and gentlemen of the jury about that.

7    A    I received a phone call from Mr. Dunn who told me that he

8    had received some information about a City program and he

9    wanted to come up to speak to us about a possible business

10   venture.

11   Q    Without telling me specifically what you recall was said

12   in that conversation, as a result of the conversation, did you

13   decide to do it?

14   A    Yes, we decided we were going to go forward with applying

15   for the NEP round five.

16   Q    And is that NEP round five of a particular project or is

17   that a general request for qualifications for putative

18   developers?

19   A    There is a published request for qualifications that was

20   published back then in newspapers and when Mr. Dunn came to

21   the office, he told us about this and he was surprised because

22   what had happened is, is I had told him that I was very

23   familiar with the program because I had been representing

24   another client as their attorney in round four.

25          Decided to go forward with an application.  Before

1    we filed the application I formed a company based on our

2    conversations, which was SML Development LLC.

3    Q    At the time that you prepared the incorporation

4    documents, it was your intention to be one of the three

5    members of the corporation; is that correct?

6    A    Yes.  We had to form a company so that we could apply for

7    the project.

8    Q    When you first applied for the project, did all three of

9    you list yourselves as developers or as owners of the SML?

10   A    No.  Prior to applying, HPD got back to Mr. Dunn, I guess

11   he must have had a conversation with someone at HPD.

12   Q    All right.  So, that we avoid hearsay issues, after that

13   conversation that Mr. Dunn had with HPD, did you and he have a

14   conversation?

15   A    Michael, myself and Steve had conversation, yes.

16   Q    All right.  Before we get to the content of that

17   conversation, had Mr. Dunn in your earlier conversations told

18   you anything about the requirements for developers?

19   A    No.

20   Q    Had he spoken to you at all about the net worth caps on

21   developers?

22   A    No, not at all.  I don't think he had any knowledge of

23   that.

24   Q    Okay.  Now I bring you back to the conversation that

25   Mr. Dunn, Mr. Hymowitz and you had after Mr. Dunn had spoken

1   to the people at HPD.  Why don't you tell me what the content

2   of that conversation was.

3   A    We were advised that the three of us could not apply for

4   the program, that the community board wanted Mr. Dunn to be a

5   majority owner of the company, and that only one other person

6   would be able to be associated with him.

7   Q    As a result of that conversation, was a decision made

8   that either you or Mr. Freeman would step aside and assume

9   some other role?

10  A    It was decided that I would, obviously because I had

11  prior, I had prior work with regard to the round four cluster,

12  I could best serve the company by being its attorney as

13  opposed to being a principle.

14  Q    Thereafter, was the document that the jury has seen, I

15  believe it's Government's Exhibit 621 the request for

16  qualifications, filled out?

17  A    Yes.

18  Q    Right.  Did you have any involvement in filling out that

19  document?

20  A    Oh, I'm sure I did.

21  Q    We've heard testimony in this trial about the net worth

22  cap and whether the three of you may have exceeded the net

23  worth cap.

24       To your knowledge, was that a factor in the decision

25  to have Mr. Dunn plus one other involved as the developer?

Proceedings                        1881

1    A    No, that -- you're mixing up time frames.

2    Q    Okay.

3    A    The first, the first RFQ was in 1999, I think it was

4    December of 1999.  The situation you're referring to was a

5    different RFQ, which was I believe in the middle of 2003.

6              MR. SERCARZ:  Your Honor, would this be a good

7    place?  I've got to change gears here.

8              THE COURT:  All right.

9              MR. SERCARZ:  Thank you.

10             THE COURT:  All right then, Members of the Jury,

11   we'll excuse you for the evening.  Hopefully nothing exciting

12   happens tomorrow morning and I'll see you all here promptly

13   and we can start on time at 10:00 o'clock.

14             Remember not to discuss the case, don't read any

15   newspapers or watch any TV about this case or anything of that

16   kind and have a good evening.

17             Thank you.

18             THE COURTROOM DEPUTY:  All rise.

19             (Jury exits.)

20             (In open court; outside the presence of the jury.)

21             THE COURT:  You can step down.

22             (Witness excused.)

23             THE COURT:  All right, Counsel, let's think about

24   what we may need to do.

25             You can have a seat, please.

VB      OCR      CRR

Proceedings                                          1882

1      I don't think there are any issues that are in

2  dispute regarding the cross-examination of Mr. Hymowitz; is

3  that correct?  Or are there?

4      MS. POSA:  Your Honor, I would just hope that given

5  the fact that Mr. Hymowitz essentially acted as his own

6  character witness the Government would be allowed to

7  vigorously cross-examine him on some of the topics raised in

8  the Sicignano lawsuit.  I think we should be afforded the same

9  leeway.

10     MR. SERCARZ:  Your Honor, the Government elicited

11  from Wendell Walters that he was a member of Habitat for

12  Humanity and that he used it as a networking opportunity and

13  the clear import of that testimony was to disparage that form

14  of volunteerism as unworthy of consideration and I think the

15  defendant's testimony was a fair response to that.

16     The Government's going to have ample scope to ask

17  Mr. Hymowitz the kinds of questions that they're permitted to

18  ask under Rule 607, 608, I believe it is and I don't think

19  anything I did expanded the scope of what is permissible

20  cross-examination.

21     THE COURT:  I am not really sure, maybe the

22  Government should tell me what it is.

23     You asked one question of the character witnesses.

24     MS. POSA:  I mean, we would like to go into some

25  detail about the Sicignano lawsuit because there's a lot of

```
                          Proceedings                    1883
```

1   misconduct.

2           MR. SERCARZ:  I apologize, Ms. Posa, can you speak

3   into the microphone.

4           MS. POSA:  We would like to go into some detail

5   about the Sicignano lawsuit.  That dealt with malfeasance by a

6   foster care agency.  I mean, there's a lot of stuff there that

7   rebuts what Mr. Hymowitz just got up there to say.

8           We also, we asked Bob Starzecki one question about

9   his work for Habitat.  He spent basically 20 minutes on direct

10  talking about going back to his youth, his entire history of

11  charitable acts.  I mean, it was clearly, I believe meant to

12  be bolstering him and I don't see how we can be severely

13  curtailed in trying to undermine that effort.

14          THE COURT:  There was also the question about the

15  bar certification.  Was there any opposition?

16          MS. POSA:  I don't see how that can be.  He signed.

17          THE COURT:  There's no opposition to that; is there?

18  Asking Mr. Hymowitz about the bar re-certifications, his

19  knowledge about them.

20          MR. SERCARZ:  I thought the Court had already ruled

21  that that was in.

22          THE COURT:  Yes, okay.  So, that that can be asked

23  about.

24          MR. SERCARZ:  Yes, Your Honor.

25          THE COURT:  I just want to be clear.

Proceedings                                    1884

1          All right.  So, the only question is really the
2     scope of the questions on this Sicignano lawsuit.
3          MS. POSA:  I'm not going to spend the whole time on
4     it but I think we should be permitted to ask more than what
5     Mr. Capozzolo was able to ask the character witnesses.
6          THE COURT:  I think that's right.
7          Mr. Sercarz?
8          MR. SERCARZ:  I can't hear you.
9          THE COURT:  Why don't you come up here.
10         Ms. Posa, has said that she just wants some leeway
11    to ask more questions than the single question that
12    Mr. Capozzolo asked the character witnesses about the lawsuit.
13         MR. SERCARZ:  With regard to the Sicignano case.
14         THE COURT:  Yes.
15         MR. SERCARZ:  Frankly, in terms of the cross of the
16    character witnesses, I intended to go into that somewhat on
17    direct anyway.
18         THE COURT:  I assumed that that would be the case.
19         So, are there any other disputes regarding witnesses
20    that you anticipate?
21         MS. POSA:  No, Your Honor.
22         MR. SERCARZ:  I don't believe so.
23         However, at the end of direct I would like to
24    approach regarding what is fair and appropriate
25    cross-examination concerning the issue of billing records and

VB        OCR        CRR

Proceedings                    1885

1   the words nonrefundable on a fee agreement.  The Government

2   hasn't heard Mr. Hymowitz's version of how that document was

3   put together and what the state of his knowledge was and I

4   would respectfully submit that I would like to be heard after

5   Mr. Hymowitz has testified as to that.

6            So, perhaps we could come up for a short side-bar at

7   that point to lay the ground rules.

8            MS. POSA:  That's fine.

9            THE COURT:  All right.

10           MS. POSA:  Maybe Your Honor should know, just in

11  terms of timing for the trial while we're getting it all out

12  here, we do intend to call probably two rebuttal witnesses,

13  Special Agent Richards as well as an official from the Bureau

14  of Prisons to talk about the procedure for admitting somebody

15  who's got medical problems and possibly, one or two rebuttal

16  character witnesses.

17           MR. SERCARZ:  Can we find out who the rebuttal

18  character witnesses are, Your Honor, so that if there are

19  appropriate in limine motions to be made, we can make them?

20           MR. CAPOZZOLO:  I will give them to Counsel when

21  we're off the record.

22           THE COURT:  All right.

23           Well, Agent Richards will testify about the

24  statement.  Anything else?

25           MS. POSA:  Just about his physical condition and the

1    statements.

2         I mean, I do feel that Mr. Sercarz has opened the

3    door when he asked Mr. Dunn to deny the statement about going

4    down for the two lawyers, so I do think that at that point we

5    should certainly be able to elicit that from Special Agent

6    Richards.

7         THE COURT:  Yes.

8         And then you said you have a Bureau of Prisons

9    person.

10        MS. POSA:  Yes.

11        THE COURT:  Is that going to be anybody with actual

12   knowledge of what happened here?

13        MS. POSA:  No.  It's going to be the person who

14   supervises at admission and intake who will be able to say

15   that if somebody is ill, they will not be admitted because

16   there is no medical staff after 10:00 p.m. at the MDC, so they

17   will be sent to the hospital with Federal agents.

18        MR. EVANS:  Your Honor, absent an offer from the

19   Government of a medical professional, I'm not sure what a

20   recantation of the Bureau of Prisons procedure is.  Unless

21   this person is qualified as an expert or had personal

22   experience as to Mr. Dunn at the time of his incarceration,

23   what are we going to learn from their procedure?  They can't

24   tell us in what condition he was.  He said what he remembered

25   and Agent Richards, I, you know, he can certainly speak to his

Proceedings                                    1887

1   recollection, but I don't think we've qualified him as an

2   expert on the physical condition of anyone.

3           THE COURT:  All right, I'll think about this, I'm

4   not sure that the Bureau of Prisons person is going to be

5   relevant here.

6           MS. POSA:  He is saying essentially that when he got

7   to the MDC at 1:00 in the morning, he was in quote, a diabetic

8   shock.  And so I think we can elicit from this person who is

9   in charge of that procedure that people are routinely asked

10  medical questions, we can show where the intake form that was

11  filled out by the Bureau of Prisons and she can say it was

12  consistent.  The problem is that person has no recollection of

13  something that happened three years ago.

14          THE COURT:  But Agent Richards testified at the

15  suppression hearing about the defendant's condition and he

16  could do the same here.

17          MS. POSA:  But I think that it really undermines

18  when he says that he was not only an FBI custody but he was

19  allowed to be taken into Bureau of Prisons custody in a

20  diabetic shock when the Bureau of Prisons would say that they

21  would never take somebody in that condition.

22          Mr. Capozzolo would like to add something.

23          MR. CAPOZZOLO:  Very briefly.

24          The Agent's credibility has been attacked in the

25  course of this trial.  BOP will testify that the reason they

Proceedings                                              1888

1    won't take a person in bad medical condition is because they

2    will become civilly liable if an individual is taken into

3    custody.  And then, if he takes two steps into BOP custody and

4    collapses in diabetic shock, they are responsible for his

5    condition.  So, they have different credibility and bias

6    issues that Special Agent Richards was attacked for that they

7    do not.

8              They are not in charge of this investigation, they

9    are not responsible for the outcome of this trial and so it

10   would be someone who actually has an interest in not accepting

11   someone who has a medical condition and so now that they've

12   alleged that Mr. Dunn has this medical condition and attacked

13   the credibility of Agent Richards, we should be able to

14   introduce someone who doesn't have that motive.

15             THE COURT:  Are there any records from the Bureau of

16   Prisons?

17             MS. POSA:  There's the intake form, which doesn't

18   say anything about a medical condition.  And then there's an

19   absence of any kind of medical complaint ever being filed.

20             THE COURT:  But isn't the medical form from the BOP?

21             MS. POSA:  It's an intake form.

22

23             (Continued on following page.)

24

25

VB         OCR         CRR

1889

1        MS. POSA:  If there was a medical issue, he would

2   have received medical attention --

3        MR. EVANS:  Your Honor --

4        MS. POSA:  Excuse me.

5        -- and there's no -- the MDC legal department has

6   checked the records and they have no record of any medical

7   complaint or services being made that night --

8        MR. EVANS:  Your Honor --

9        MS. POSA:  -- to Mr. Dunn.

10       MR. EVANS:  Excuse me, Ms. Posa.  I apologize.

11       First, I think we should be very clear that Mr. Dunn

12  in his direct testimony never used the words "diabetic shock"

13  and, in fact, the words "diabetic shock" were introduced by

14  the U.S. Attorney in leading questions to the witness.  He

15  didn't say it.  That's what Mr. Capozzolo said.

16       Mr. Dunn hasn't presented a medical witness nor did

17  he testify that he was in diabetic shock.  He said that he was

18  befogged and he had a foggy memory.  We don't have any medical

19  evidence here.  We have never brought up the Bureau of Prisons

20  nor do I intend to.  It's not an element of a crime for which

21  he's charged.

22       He testified in response to cross-examination about

23  his memory and recollection and it's a stretch to go from his

24  memory and recollection to the credibility of the arresting

25  agent.  Further, if they want to buttress the credibility of

their arresting agent, I believe Agent Richardson testified at the suppression hearing that there were upwards of eight people involved at the arrest, other agents, and that Agent Della Penna was physically present in the interview or interrogation room and the government didn't bring him. They had an opportunity to do that. So, to bring in the Bureau of Prisons to read us their procedure to try to wrap their arms around something that they opened up, I don't think it should be allowed and it's beyond the scope.

Mr. Dunn didn't say he was in diabetic shock. Mr. Dunn didn't present medical evidence. The government brought up the issue and named the condition diabetic shock. We didn't.

THE COURT: Counsel, I had like to hear from you now about how long you think your summations will be.

And the government, who is going first, who is giving the summation?

MS. POSA: I'll give the summation and I think it should be certainly under two hours, maybe in the hour and a half range hopefully.

THE COURT: Mr. Capozzolo is doing the rebuttal?

MR. CAPOZZOLO: Yes, Judge.

THE COURT: And how long will that be?

MR. CAPOZZOLO: As short as possible. I mean, it will depend a little bit on the argument by counsel, but my

1891

1    thought would be 30 minutes.

2            THE COURT:  Okay.

3            MR. DiCHIARA:  Judge, I think I would be between 30

4    and 40 minutes.

5            MR. SERCARZ:  Is what I tell you going to become the

6    maximum when I offer it to you as an estimate, Your Honor?

7    Okay.  The estimate is an hour and a half.  It could go a

8    little longer.

9            THE COURT:  Mr. Evans?

10           MR. EVANS:  And I'm expecting an hour.

11           THE COURT:  So we'll be lucky if we get it all done

12   in the same whole day, right?  So realistically, what are our

13   chances of concluding the trial tomorrow?

14           MR. SERCARZ:  Your Honor, if it helps the Court

15   figure out what tomorrow is going to be like, I think I've got

16   an hour or a little bit less with this witness and the

17   character witness that I call should sort of be a repeat of

18   the prior character witnesses so that will give you a sense of

19   what's left with the Hymowitz defense case.

20           THE COURT:  Okay.  And I don't know how long the

21   cross of Mr. Hymowitz would be.

22           MS. POSA:  It's kind of hard to tell.  I would

23   probably say in the hour to hour and a half range.

24           THE COURT:  And Mr. DiChiara?

25           MR. DiCHIARA:  Judge, if I put on a witness, it

1892

1   probably, the direct would be about an hour.

2           MS. POSA:  I'm sorry.  Is this a character witness

3   or a fact witness?

4           MR. DiCHIARA:  Fact witness.

5           MS. POSA:  Can we get the name of that person?

6           MR. DiCHIARA:  It's possibly the defendant, Judge.

7           THE COURT:  I know you are, but really we're right

8   before --

9           MR. DiCHIARA:  I said possibly the defendant.

10          THE COURT:  The defendant.

11          So we could very well then conclude everything, the

12  evidentiary portion of the trial tomorrow, correct?

13          MR. DiCHIARA:  Correct.

14          THE COURT:  It looks like we can do that.

15          MR. DiCHIARA:  I don't know about the rebuttal.

16          THE COURT:  The rebuttal couldn't be too long,

17  right?

18          MR. CAPOZZOLO:  Short.

19          MS. POSA:  Short.

20          THE COURT:  So then we just have to see.  I am just

21  also considering whether or not we would ask the jury to stay

22  on Friday or not.  If we are already in deliberations, it

23  would be one thing, but I am not sure if I want to keep -- I

24  did not say that I would keep them for summations so let's see

25  how that goes.

1893

1    Counsel, I assume, are available on Friday?

2    MR. DiCHIARA:  I do have two matters on Friday but

3    unless it's necessary, Judge, I prefer to do those cases

4    unless we're into summations or a charge, then obviously I

5    wouldn't do it.  But if the government's case, if the case

6    ends tomorrow and we do the summations and charge on

7    Thursday --

8    THE COURT:  Well, I don't think we can do summations

9    and charge.  The summations look like they're going to take an

10   entire day.

11   MR. DiCHIARA:  Well, if we do the summations on

12   Thursday, would the Court be charging on Friday?

13   THE COURT:  I'm just not sure.

14   MR. SERCARZ:  Your Honor, I could make myself

15   available on Friday after 11 a.m. if that would work.

16   MR. EVANS:  And I'm available all day.

17   MR. DiCHIARA:  I would not be available really until

18   after lunch because I have a sentencing and an appearance.

19   THE COURT:  Well, then it sounds like there is no

20   reason for me to ask the jury whether they are going to be

21   available.  I thought I made it clear that you should be

22   available on Fridays in the event we hit deliberations and we

23   might.  So, let me think about this tomorrow.  You might have

24   to make some changes, Counsel.

25   Okay.  We have an unusual juror issue.  Victor, pass

1894

1    around this note, please.

2            All right.  Counsel, take a look at this note,

3    please.

4            (Pause.)

5            MR. EVANS:  It's an issue of first impression for

6    me, Your Honor.

7            MR. SERCARZ:  No objection.

8            MR. EVANS:  I have no objection.  I don't think I

9    do.

10           MR. CAPOZZOLO:  We not only not object, we would

11   welcome little Edwina in the courtroom.

12           THE COURT:  In the courtroom?

13           MS. POSA:  Is that what she said?

14           THE COURT:  No, I don't think so, but I don't know

15   what would happen, right, if we're in the courtroom, right?

16           MR. CALIENDO:  We can train her to run out in the

17   hall and fetch the witnesses.

18           MR. DiCHIARA:  It's amazing that there's always

19   something new here.

20           MR. SERCARZ:  Your Honor, all kidding aside, perhaps

21   the juror would be comfortable with the dog remaining either

22   crated or in the jury room while they're sitting in the

23   courtroom.

24           THE COURT:  I don't know the answer to that.  She

25   said, She would stay with me in her bag for the duration of

1   the day.

2           Apart from the issue of her, the dog being in the

3   courtroom with her, because she says with her, but I don't

4   think that she means the dog can be in the jury room.  She's

5   talking about the dog being with her in the courtroom, but in

6   addition to that, when we're in deliberations, which I hope we

7   will be next week, then any time the dog needs to do its

8   business, we have to stop deliberations and I have to send the

9   juror out with the marshal or something.  I mean that's the

10  only thing I can think to do.

11          Now, we sometimes, if I have smokers, there are

12  times when I have to send them out, but I think this is a

13  bit -- I mean, everyone is feeling very kindly towards the

14  doggie but I think myself, I'm a little skeptical about this.

15  The juror says that if this is not possible, it won't be taken

16  personally and she's able to, she said she's able to get

17  boarding.

18          MR. EVANS:  Your Honor, I've had several dogs

19  including a dachshund.  They're first very small, but I think

20  the Court is correct that they, they tend to, towards

21  whimpering and whining when left alone.

22          THE COURT:  I have no idea.

23          MR. EVANS:  And so I would suspect --

24          THE COURT:  As I said to Mr. Sercarz, I don't have a

25  doghouse, I don't have a dog, I know absolutely nothing about

1896

1    dogs and I'm not really, frankly, that interested in learning

2    about them.

3              MR. EVANS:  But the relief for a dog is normally no

4    more than twice a day so even if the dog did have to be

5    relieved, it would be relieved or could be relieved before

6    coming in the building in the morning and could certainly

7    manage itself to the lunch break.

8              THE COURT:  We don't take that kind of a lunch break

9    during deliberations.  That's my point.

10             Well, in any event, think about this.  As I say, my

11   inclination is to very nicely tell the juror that it's not

12   going to be possible and that we would ask her to make

13   arrangements.  I think I should probably respond by the end of

14   the day tomorrow so she has enough time to do whatever she

15   needs to do.  And as long as we're in deliberations on Monday,

16   it's only a few days.  I was hoping we might be able to use

17   Friday, but that's really not going to be possible with

18   counsel.

19             Well, let's see.  No.  If we can get the summations

20   -- let me just think.  If we get the summations in, all or

21   almost all on Wednesday, then Thursday morning --

22             MR. CAPOZZOLO:  That's tomorrow?

23             THE COURT:  No.  Tomorrow we have -- right.  Okay.

24   So then if we had the summations, we could conclude them on

25   Thursday.  Then I could charge on Monday.  It's a long period

1897

1    of time, but I don't see any other option.

2           Any other thoughts on the scheduling or on Juror

3    Number 1's problem?

4           All right.  Anything anybody wants to add to that?

5           MR. EVANS:  Judge, do we know if we're going to get

6    a draft of the verdict sheet from the government?

7           THE COURT:  No.  You will get one from me though.

8           Counsel, you have the charge.  Are you ready to talk

9    about the charge?

10          MS. POSA:  Your Honor, before we go to that, I

11   wanted to quickly revisit the BOP issue.  Maybe if we can

12   resolve this, it's a way to expedite the trial.

13          THE COURT:  All right.

14          MS. POSA:  If the defense consents, we can just ask

15   Agent Richards about his experience as an agent, what he knows

16   the procedures to be when someone is lodged and if they're not

17   going to object that he doesn't have personal knowledge, then

18   we won't have to call this additional witness.

19          MR. EVANS:  Isn't that the same scope that he

20   testified at the suppression hearing?  It sounds to me the

21   same.  He testified at the suppression hearing about asking

22   for medication because it was required for processing.

23          MS. POSA:  Okay.

24          THE COURT:  What does that mean?  Does that mean you

25   agree?

1898

1    MR. EVANS:  It sounds to me like I can agree to that

2  because I believe it to be just what we had at the suppression

3  hearing.

4    MS. POSA:  We just don't want him to be attacked on

5  cross, you're not really a BOP official, you don't really know

6  how it works, because then we will have to call a BOP

7  official.  So, if we can come to some happy medium, maybe we

8  can get things rolling here.

9    MR. EVANS:  I'm happy not to have him talk about the

10  BOP.  If he was processed at the end of his arrest --

11    THE COURT:  Counsel, you want to discuss it?

12    MS. POSA:  Then we'll continue our request.

13    THE COURT:  All right.  If you are going to work

14  something out, that's fine.

15    All right.  Counsel, my clerk made copies of what we

16  have so far.  She will hand them out to you now, but you have

17  a draft of the charge and I would like to know whether you

18  have any questions or objections to it.

19    MR. EVANS:  Will the Court in delivering the charge

20  explain that the headings included in the charge when the jury

21  gets it in written form are for explanation only and not

22  conclusory?

23    THE COURT:  What explanation -- what exactly are you

24  talking about?

25    MR. EVANS:  Well, when you say, for example, you

1899

1  know, the Court has no view or improper considerations,

2  sometimes juries will come back and say, well, this section

3  says the Court has no view, and if the Court instructs them

4  that those headings --

5      THE COURT:  The heading is correct and accurate.

6  Why should I remove it?

7      MR. EVANS:  I didn't suggest removing it.

8      THE COURT:  Why should I tell them that it doesn't

9  count?  I don't understand your point.  If you explain it to

10 me, I will consider it but I do not understand it.  As far as

11 I know, there is no heading in there that is inaccurate or

12 prejudicial in any way.  If you think they are, let me know.

13     We will have an index which will identify each -- do

14 we have it yet, an index?  Do you?  There will be an index.

15     Tell me, Mr. Evans.  Maybe I'm missing something.

16     MR. EVANS:  No, Judge.  It was just my most recent

17 experience in the Southern District that it became an issue

18 for the jury during deliberation about, you know, if a heading

19 was part of the charge or the elements, and I was simply

20 asking the question about --

21     THE COURT:  Well, like what?  Can you give me an

22 example?

23     MR. EVANS:  I can't give you an example from that

24 case because it was a conspiracy and it was --

25     THE COURT:  Well, unless you give me something

1900

1    specific that you think I should remove, if I tell them that

2    the headings don't count, I don't know what I'm advising.

3    Headings are intended to be helpful.  First of all, they can

4    find it in the index because it's very, very long, this

5    charge.  I think this is going to take a couple of hours at

6    least.

7            My clerk is going to distribute the verdict sheets.

8            Anything else about the charge, assuming you have

9    got over it already?

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH       OCR       RMR       CRR       FCRR

1      MS. POSA:  Your Honor, we have one suggestion at

2  page 60 on the extortion charge.  The simplest charge in the

3  whole thing.

4      THE COURT:  What?

5      MS. POSA:  It's the most simplest charge, where it

6  says "The term 'property' includes money."

7      It appears from what Mr. Evans has been eliciting on

8  cross-examination this defense was, this was a valid debt that

9  Mr. Armstrong owed to Mr. Dunn, and therefore it could not

10  have been extortion.  Under the extortion statute, it could be

11  collection of a perfectly valid debt or legitimate payment.

12      We would suggest this change of the language.  "The

13  term 'property' includes money.  It need not be a kickback

14  payment or other from of illicit proceeds.  It is a crime to

15  obtain even valid payments through wrongful use of force,

16  violence or fear.

17      THE COURT:  The second part of it seems appropriate.

18      I don't know if we need the other part --

19      MS. POSA:  That's fine.

20      THE COURT:  --  "It is a crime to."

21      MS. POSA:  "To obtain even valid payments through

22  wrongful use of force, violence or fear."

23      MR. EVANS:  "To obtain"?

24      THE COURT:  Any objection to that?

25      MS. POSA:  I just took the statutory use of the verb

1902

1    "obtain."

2         MR. EVANS:  Would you read it again?  "It is a crime

3    to obtain" --

4         MS. POSA:  --  "even valid payments through wrongful

5    use of force, violence or fear,"

6

7         THE COURT:  I was really saying "even validly owed

8    payments."

9         MS. POSA:  Yes.

10        THE COURT:  Sounds correct.

11        All right.  Mr. Evans, any objection to that?

12        MR. EVANS:  No.  I have no objection to that.

13        THE COURT:  Anything else?

14        MR. SERCARZ:  May I have one moment with

15   Mr. DiChiara, your Honor?

16        THE COURT:  Yes.

17        MR. EVANS:  Your Honor, on the top of page seven,

18   the bracketed instruction, "You may not attach any

19   significance to the fact."  Do we want to say "that one or

20   more of the defendants"?

21        THE COURT:  I have a few things, obviously, that

22   haven't been taken care of, because the trial isn't over yet.

23        MR. EVANS:  And on the --

24        THE COURT:  But I don't know at this point.

25        MR. EVANS:  We don't know yet.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1903

1        THE COURT:  Maybe all the defendants will testify.
2   If they do, I'll take that out.
3        MR. EVANS:  We didn't have any stipulations as to
4   testimony, did we?
5        THE COURT:  No.  That should come out.
6        MR. EVANS:  That's on page eight.
7        THE COURT:  You are not anticipating any?
8        MR. EVANS:  No.
9        Can we include a sentence that "Stipulations as to
10  exhibits simply mean that the lawyers agree that the exhibit
11  may be used," not necessarily what it's used for or what it
12  means?
13       THE COURT:  Where is that?
14       MR. EVANS:  We had "Stipulation of testimony."  I
15  was suggesting that we needed something that says -- in this
16  case, we have had stipulations as to exhibits between the
17  defense and the government.  It simply means that we have
18  agreed that those exhibits were accurate and could be used.
19  We didn't agree on what they would represent or what they
20  meant.
21       THE COURT:  Okay.
22       With respect to "Stipulations as to the
23  admissibility of documents" -- say it again?
24       MR. EVANS:  That simply means the lawyers agreed
25  that the documents may be used at trial.  It does not mean

1904

1    that we agree on what they stand for or mean.

2         THE COURT:  All right.  How about this?  "It doesn't

3    mean they agree as to the meaning of the document or any

4    inference you should draw from them."

5         MR. EVANS:  That's fine with me.

6         THE COURT:  Any objection to that?

7         MS. POSA:  Not from the government, your Honor.

8         THE COURT:  Anything else?

9         MS. POSA:  Can you point out as to where the defense

10   testimony is in the charge?

11        MR. EVANS:  Part seven.

12        THE COURT:  If Mr. Freeman doesn't testify, then it

13   would just read, "You may not attach any significance to the

14   fact" -- we'll leave it as it is.

15        The section is called "Witness testimony," starts at

16   page 7.  And it simply says "In a criminal case, a defendant

17   cannot be required to testify, but in this case, defendant

18   Dunn and defendant Hymowitz have chosen to do so, and you are

19   to evaluate their testimony in the same manner you evaluate

20   the testimony of the other witnesses."

21        MS. POSA:  That's fine, your Honor.

22        MR. EVANS:  Your Honor, did we have any

23   demonstrative aids?

24        THE COURT:  I don't know yet.  Depends on the

25   summations.  Are you going to have non-demonstrative aids?  I

1905

1   assumed somebody was going to have charts.

2         MS. POSA:  We'll probably have charts.

3         THE COURT:  You don't have demonstrative aids, okay.

4         Anything else?  So, we'll leave that in.

5         MR. EVANS:  Lastly for me, on page 16, it says

6   that "The indictment in this case contains ten counts," but

7   then eleven are enumerated.

8         THE COURT:  What page is that?

9         MR. EVANS:  Beginning on the second paragraph of;

10  page 16.

11        THE COURT:  Thank you.

12        Anything else?

13        MR. SERCARZ:  Your Honor, the Court has charged the

14  concepts of innocent association and the fact that mere

15  presence is not enough to convict only with regard to the

16  conspiracy count.  I respectfully submit it should be equally

17  applicable to the substantive counts in the indictment.  The

18  charge appears at page 35 and 40 of the Court's draft.

19        THE COURT:  35?

20        MR. SERCARZ:  39.  I'm sorry.  The bottom of 39 and

21  the top of page 40 are the mere presence and mere association

22  counts -- language.  And I believe that that is in the

23  conspiracy section.  Page 33 begins the Court's discussion of

24  conspiracy to commit mail fraud and wire fraud.  That language

25  has been made applicable to the conspiracy count, but not the

1906

1   substantive count.

2        THE COURT:  You're saying that should go in what,

3   every count?  I've never seen it in any counts other than the

4   conspiracy charge.

5        MR. SERCARZ:  I'm sorry.

6        THE COURT:  I'm not aware of this being a charge

7   that's normally given except for the conspiracy charge,

8   because otherwise, it takes the first substantive count -- it

9   would be saying "Element two of mail fraud."  So, describe it

10  in detail, "knowing, intentional and wilful conduct."

11       You're saying that should go in Count Two, and then

12  what?

13       MR. SERCARZ:  I believe it's applicable to the

14  substantive counts of mail fraud and wire fraud, as well.

15       THE COURT:  Anyone else on this?

16       MS. POSA:  Your Honor, I've only ever seen it

17  charged in conspiracy, because I think the purpose is to

18  distinguish innocent association from conspiratorial

19  association.  I think it's kind of going a little overboard to

20  put it in the substantive counts, as well.

21       THE COURT:  Anything else?

22       Do you have any authority for that, Mr. Sercarz, for

23  adding that?

24       MR. SERCARZ:  I'll see what I can find and try to

25  have something for you tomorrow morning.

1907

1          THE COURT:  All right.

2          I'm concerned that it not be confusing, because the

3    substantive count, the jury has to find actual knowledge and

4    intent very expressly as against each defendant, and it's a

5    very express, specific intent that has to be proved, and I was

6    concerned that it may be confusing to put in the other type of

7    language.  It's obviously appropriate for conspiratorial

8    charges.

9          MR. SERCARZ:  Your Honor, may I take that under

10   advisement and tell you tomorrow morning whether I'll press

11   the issue?

12         THE COURT:  Yes.  Thank you.

13         Anything else, counsel?

14         MS. POSA:  Not from the government, your Honor.

15         MR. EVANS:  Nothing on behalf of Mr. Dunn.

16         MR. SERCARZ:  Nothing on behalf of Mr. Hymowitz.

17         MR. DiCHIARA:  No, your Honor.

18         THE COURT:  Very good.  Thank you.

19         The verdict sheet?

20         MR. SERCARZ:  No objection by the defendant

21   Hymowitz.

22         MR. EVANS:  Two sheets for Mr. Dunn, one sheet for

23   Mr. Hymowitz and one sheet for Mr. Freeman.

24         MS. POSA:  We have no objections.

25         MR. EVANS:  I see no objections on first reading.  I

1908

1    would only suggest perhaps a footer with page numbers would

2    make it easier for them to keep it together.  Perhaps, since

3    there are two pages for Mr. Dunn and only one for Mr. Freeman

4    and Mr. Hymowitz, maybe we say this is the only page.

5            THE COURT:  All right.  We can put a footer on it

6    for Mr. Dunn.  It already says, on the top page, "One of one."

7    We can put that at the bottom, I mean, "Page one of two, page

8    two of two," at the bottom, if you prefer.

9            MR. EVANS:  It might be a little clearer.

10           THE COURT:  That's fine.  We want clarity.  So,

11   we'll cross our fingers there's no problems tomorrow morning,

12   and we'll move right along.

13           If by any chance we can finish early, then,

14   Ms. Posa, you say you're ready to sum up?

15           MS. POSA:  I'll be ready.

16           THE COURT:  Very good.

17           Please try to be here at 9:30 tomorrow morning, so

18   that we can deal with any issues that come up, including what

19   to do about the dog or any thought you have about that.

20           (Case adjourned to Wednesday, March 26, 2014

21   at 9:30 a.m.)

22

23

24

25

1909

1    <u>I N D E X</u>

2

3    <u>WITNESS</u>                                      <u>PAGE</u>

4

5

6    **STEVENSON   DUNN**                              1738

7         CROSS EXAMINATION (Continued)

8         BY MR. CAPOZZOLO:                        1738

9         CROSS EXAMINATION

10        BY MR. EVANS                             1760

11        CROSS EXAMINATION

12        BY MR. SERCARZ                           1763

13        CROSS-EXAMINATION

14        BY MR. DiCHIARA:                         1774

15        RECROSS-EXAMINATION

16        BY MR. CAPOZZOLO                         1775

17

18   **ANNE MARIE A. HENDRICKSON**                     1778

19        DIRECT EXAMINATION

20        BY MR. EVANS                             1778

21        CROSS EXAMINATION

22        BY MS. POSA                              1826

23        CROSS EXAMINATION

24        BY MR. SERCARZ                           1828

25

VB       OCR      CRR

1910

1        CROSS EXAMINATION

2        BY MR. DiCHIARA                          1829

3        REDIRECT EXAMINATION

4        BY MR. EVANS                             1830

5

6     **FRANK   FELLIN**                          1834

7        DIRECT EXAMINATION

8        BY MR. SERCARZ                           1834

9        CROSS-EXAMINATION

10       BY MR. CAPOZZOLO                         1844

11

12    **RABBI MARK B. GREENSPAN**                 1849

13       DIRECT EXAMINATION

14       BY MR. SERCARZ                           1849

15       CROSS-EXAMINATION

16       BY MR. CAPOZZOLO                         1854

17

18    **J O S E P H    B E R T O L I N O**        1858

19       DIRECT EXAMINATION

20       BY MR. EVANS                             1859

21

22    **L E E    H Y M O W I T Z**                1868

23       DIRECT EXAMINATION

24       BY MR. SERCARZ                           1868

25

VB       OCR      CRR

1911

1    **E X H I B I T S**

2

3

4      Government's Exhibit 640                          1751

5

6      Government's Exhibit 638                          1753

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 1741:22
**$10,000** [2] - 1741:8, 1812:20
**$100,000** [1] - 1732:16
**$135,000** [1] - 1733:7
**$145,000** [8] - 1728:11, 1728:17, 1729:4, 1729:10, 1729:22, 1729:23, 1731:1, 1733:8
**$150,000** [3] - 1744:1, 1744:6, 1753:9
**$190,000** [1] - 1812:20
**$2,000** [1] - 1766:22
**$2,500** [3] - 1764:25, 1765:4, 1768:22
**$2,800** [1] - 1769:4
**$20** [1] - 1805:25
**$200,000** [3] - 1732:3, 1735:15, 1812:19
**$239,000** [1] - 1744:4
**$280,000** [3] - 1733:13, 1734:2, 1734:13
**$30,000** [2] - 1730:23, 1731:6
**$300,000** [1] - 1758:19
**$300,798** [1] - 1862:13
**$35,000** [3] - 1730:11, 1730:22
**$480,000** [3] - 1733:18, 1734:14, 1735:12
**$65,000** [5] - 1729:2, 1729:5, 1730:5, 1730:18, 1730:23
**$80,000** [2] - 1730:5, 1730:24
**$85,000** [1] - 1728:18

## '

**'02** [2] - 1766:7, 1766:20
**'07** [4] - 1766:7, 1766:19, 1767:13, 1862:6
**'76** [1] - 1871:16
**'79** [1] - 1871:18
**'98** [1] - 1873:24
**'property'** [2] - 1901:6, 1901:13

## 1

**1's** [1] - 1897:3
**10** [3] - 1805:25, 1828:11, 1862:6
**100** [1] - 1838:7
**108-C** [2] - 1861:24, 1862:23
**10:00** [2] - 1881:13, 1886:16
**11** [1] - 1893:15
**11-CR-00683(NG** [1] - 1715:3
**11201** [2] - 1715:15, 1715:24
**12** [3] - 1794:18, 1794:19, 1794:22
**12th** [1] - 1764:22
**13** [3] - 1794:18, 1794:20, 1794:22
**15** [5] - 1720:20, 1720:24, 1798:15, 1803:18, 1803:22
**1500** [1] - 1767:4
**16** [3] - 1810:6, 1905:5, 1905:10
**1738** [2] - 1909:6, 1909:8
**1749** [1] - 1769:13
**1751** [1] - 1911:4
**1753** [1] - 1911:6
**1760** [1] - 1909:10
**1763** [1] - 1909:12

**1774** [1] - 1909:14
**1775** [1] - 1909:16
**1778** [2] - 1909:18, 1909:20
**17th** [1] - 1772:6
**1826** [1] - 1909:22
**1828** [1] - 1909:24
**1829** [1] - 1910:2
**1830** [1] - 1910:4
**1834** [2] - 1910:6, 1910:8
**1844** [1] - 1910:10
**1849** [2] - 1910:12, 1910:14
**1854** [1] - 1910:16
**1858** [1] - 1910:18
**1859** [1] - 1910:20
**1868** [2] - 1910:22, 1910:24
**1954** [1] - 1766:19
**1955** [1] - 1767:18
**1971** [2] - 1769:11, 1769:14
**1982** [1] - 1872:22
**1997** [3] - 1849:24, 1851:9, 1873:24
**1998** [1] - 1875:15
**1999** [4] - 1877:20, 1877:23, 1881:3, 1881:4
**1:00** [1] - 1887:7
**1st** [1] - 1769:2

## 2

**2** [1] - 1742:5
**2,000** [3] - 1770:5, 1770:10, 1770:11
**2,500** [1] - 1767:22
**2,800** [1] - 1770:7
**20** [11] - 1740:6, 1798:15, 1828:6, 1828:9, 1828:11, 1829:3, 1835:22, 1837:11, 1883:9
**2000** [1] - 1807:7
**2003** [2] - 1869:18, 1881:5
**2007** [5] - 1733:4, 1764:22, 1766:16, 1769:2, 1877:24
**2009** [4] - 1733:2, 1733:13, 1734:17, 1778:25
**2011** [4] - 1738:9, 1760:22, 1772:7, 1779:14
**2014** [2] - 1715:7, 1908:20
**209** [2] - 1739:20, 1739:22
**225** [1] - 1715:24
**230** [1] - 1741:24
**25** [4] - 1715:7, 1835:5, 1835:22, 1836:11
**26** [1] - 1908:20
**271** [1] - 1715:14
**280** [1] - 1735:14
**2:10** [3] - 1798:23, 1799:4, 1799:12

## 3

**3** [1] - 1732:19
**30** [4] - 1723:23, 1849:21, 1891:1, 1891:3
**300,798** [1] - 1862:17
**33** [2] - 1849:21, 1905:23
**34** [1] - 1849:21

**35** [4] - 1731:3, 1834:18, 1905:18, 1905:19
**35,000** [2] - 1730:24, 1731:6
**39** [2] - 1905:20

## 4

**4/22** [1] - 1766:7
**4/22/07** [1] - 1766:11
**40** [3] - 1891:4, 1905:18, 1905:21

## 5

**5** [3] - 1733:2, 1733:12, 1738:9
**5-A** [3] - 1794:17, 1798:14, 1814:14
**5-B** [1] - 1794:17
**50** [1] - 1815:4
**500** [3] - 1767:2, 1767:5, 1837:9
**510** [4] - 1840:10, 1842:24, 1844:21, 1857:9
**521-page** [1] - 1749:1
**53** [1] - 1747:22
**55** [2] - 1818:16, 1818:18
**58** [1] - 1834:16
**5A** [1] - 1807:1

## 6

**6(1)(a** [1] - 1747:11
**60** [1] - 1901:2
**607** [1] - 1882:18
**608** [1] - 1882:18
**621** [1] - 1880:15
**638** [3] - 1753:21, 1754:3, 1911:6
**639** [2] - 1764:1, 1764:4
**640** [3] - 1747:14, 1751:3, 1911:4
**65** [1] - 1731:3
**65,000** [1] - 1730:25

## 7

**7** [2] - 1722:11, 1904:16
**7(CONTINUING** [1] - 1814:1
**705** [1] - 1740:7
**72** [1] - 1747:22
**72-page** [1] - 1752:12

## 8

**8** [4] - 1717:4, 1719:19, 1721:5, 1828:12
**80,000** [1] - 1730:19
**8609** [2] - 1794:7, 1794:8
**8:05** [1] - 1738:12
**8:45** [1] - 1738:16

## 9

**9:30** [4] - 1717:18, 1717:20, 1908:17, 1908:21
**9:45** [1] - 1715:7

## A

**a.m** [3] - 1715:7, 1893:15, 1908:21

**Aasif** [3] - 1733:12, 1733:16, 1734:2

**ability** [7] - 1722:3, 1753:16, 1792:8, 1792:9, 1875:17, 1877:13

**able** [22] - 1718:3, 1731:18, 1739:5, 1739:9, 1773:12, 1852:22, 1852:24, 1853:20, 1854:6, 1861:24, 1863:24, 1867:23, 1869:20, 1874:23, 1880:6, 1884:5, 1886:5, 1886:14, 1888:13, 1895:16, 1896:16

**abreast** [1] - 1792:12

**absence** [2] - 1841:7, 1888:19

**absent** [1] - 1886:18

**absolutely** [10] - 1725:24, 1774:3, 1774:19, 1822:1, 1824:11, 1824:17, 1825:6, 1825:9, 1895:25

**absorbed** [2] - 1743:5, 1837:4

**accept** [2] - 1731:4, 1755:5

**accepting** [3] - 1824:15, 1824:19, 1888:10

**access** [5] - 1756:8, 1786:1, 1786:21, 1790:1, 1790:5

**Access** [5] - 1717:8, 1717:9, 1718:4, 1718:7, 1719:19

**Access-A-Ride** [5] - 1717:8, 1717:9, 1718:4, 1718:7, 1719:19

**accident** [2] - 1717:10, 1719:20

**accommodate** [1] - 1833:15

**accomplish** [1] - 1837:21

**according** [4] - 1730:4, 1739:2, 1741:10, 1860:6

**accordingly** [3] - 1792:9, 1814:10, 1864:1

**account** [3] - 1727:12, 1727:24, 1731:13

**accounting** [2] - 1835:18, 1842:5

**accurate** [10] - 1746:3, 1823:18, 1829:5, 1830:10, 1830:12, 1846:14, 1858:6, 1870:8, 1899:5, 1903:18

**accurately** [1] - 1848:12

**accusation** [1] - 1857:12

**accused** [1] - 1840:19

**acknowledges** [1] - 1763:17

**acquaintance** [3] - 1836:5, 1871:8, 1875:14

**acquires** [1] - 1808:7

**acronym** [1] - 1781:4

**act** [4] - 1846:15, 1848:8, 1848:13, 1858:7

**acted** [2] - 1739:16, 1882:5

**acting** [1] - 1789:4

**action** [2] - 1752:6, 1815:12

**active** [4] - 1837:6, 1851:4, 1869:12, 1869:22

**actively** [1] - 1838:2

**activities** [4] - 1855:4, 1855:6, 1855:11, 1855:15

**activity** [1] - 1874:7

**acts** [3] - 1846:11, 1846:15, 1883:11

**actual** [11] - 1745:21, 1767:25, 1786:22, 1788:10, 1803:12, 1827:25, 1828:3, 1828:14, 1855:24, 1886:11, 1907:3

**ad** [1] - 1860:25

**add** [4] - 1722:10, 1841:9, 1887:22, 1897:4

**added** [6] - 1795:6, 1796:19, 1796:25, 1797:1, 1797:4, 1797:13

**adding** [1] - 1906:23

**addition** [6] - 1745:4, 1747:10, 1796:5, 1835:12, 1852:14, 1895:6

**additional** [7] - 1727:14, 1732:3, 1735:15, 1736:17, 1815:1, 1841:4, 1897:18

**address** [3] - 1727:3, 1746:15, 1848:5

**addressed** [1] - 1722:21

**adds** [2] - 1730:25, 1841:8

**adjourned** [1] - 1908:20

**adjust** [1] - 1805:1

**administration** [1] - 1838:22

**admissibility** [1] - 1903:23

**admissible** [1] - 1841:19

**admission** [1] - 1886:14

**admit** [2] - 1748:5, 1751:2

**admitted** [2] - 1753:23, 1886:15

**admitting** [1] - 1885:14

**adopted** [2] - 1870:19, 1870:20

**adult** [2] - 1874:10, 1874:16

**advantage** [2] - 1721:6, 1752:9

**adversely** [1] - 1751:25

**advertisement** [1] - 1801:5

**advised** [3] - 1727:14, 1737:23, 1880:3

**advisement** [1] - 1907:10

**advising** [1] - 1900:2

**affect** [2] - 1751:25, 1757:2

**affected** [1] - 1757:6

**affecting** [1] - 1854:4

**affiliate** [2] - 1823:14, 1823:15

**affirmed** [1] - 1849:2

**afforded** [1] - 1882:8

**Afgang** [1] - 1859:18

**afraid** [1] - 1774:4

**afternoon** [19] - 1718:12, 1720:10, 1724:18, 1774:25, 1775:1, 1777:4, 1777:5, 1800:10, 1826:5, 1826:6, 1828:23, 1828:24, 1833:9, 1833:20, 1848:25, 1854:19, 1854:20, 1859:7, 1866:24

**AFTERNOON** [1] - 1799:14

**agency** [1] - 1883:6

**agenda** [1] - 1837:21

**Agent** [19] - 1715:22, 1723:7, 1758:8, 1758:16, 1758:17, 1762:10, 1774:12, 1774:14, 1774:17, 1885:13, 1885:23, 1886:5, 1886:25, 1887:14, 1888:6, 1888:13, 1890:1, 1890:4, 1897:15

**agent** [3] - 1889:25, 1890:1, 1897:15

**Agent's** [1] - 1887:24

**agents** [8] - 1731:14, 1738:9, 1738:15, 1772:18, 1774:7, 1886:17, 1890:3

**aggregate** [1] - 1809:21

**ago** [10] - 1744:10, 1835:14, 1835:21, 1835:22, 1836:11, 1837:19, 1839:14, 1857:24, 1872:2, 1887:13

**agree** [9] - 1776:10, 1863:23, 1863:25,

1897:25, 1898:1, 1903:10, 1903:19, 1904:1, 1904:3

**agreed** [10] - 1743:3, 1743:6, 1752:23, 1752:24, 1753:2, 1810:4, 1827:2, 1829:2, 1903:18, 1903:24

**agreeing** [1] - 1819:7

**agreement** [11] - 1739:24, 1743:17, 1743:20, 1743:23, 1753:22, 1776:17, 1779:24, 1827:2, 1852:23, 1875:23, 1885:1

**agrees** [3] - 1751:14, 1818:20, 1818:22

**ahead** [5] - 1729:1, 1750:15, 1757:25, 1810:23, 1822:20

**ahold** [1] - 1839:18

**Aid** [5] - 1871:4, 1871:5, 1871:12, 1871:20, 1872:4

**aids** [3] - 1904:23, 1904:25, 1905:3

**al** [1] - 1716:10

**Albany** [2] - 1765:15, 1767:13

**Alexander** [2] - 1823:5, 1823:6

**allegation** [4] - 1732:13, 1842:3, 1842:7, 1842:15

**allegations** [1] - 1761:25

**alleged** [1] - 1888:12

**alleges** [1] - 1842:11

**alleging** [1] - 1732:8

**allocated** [1] - 1813:5

**allocation** [2] - 1794:9, 1817:9

**allocations** [1] - 1788:16

**allow** [2] - 1722:4, 1723:1

**allowed** [15] - 1787:3, 1795:15, 1795:20, 1796:1, 1796:19, 1797:5, 1803:21, 1805:17, 1842:14, 1846:12, 1848:7, 1848:10, 1882:6, 1887:19, 1890:9

**allowing** [1] - 1818:10

**allows** [2] - 1750:13, 1811:8

**almost** [2] - 1873:7, 1896:21

**alone** [1] - 1895:21

**alternative** [1] - 1782:10

**Alternative** [1] - 1780:8

**Alzheimer's** [1] - 1876:16

**amazing** [1] - 1894:18

**America** [1] - 1870:20

**AMERICA** [1] - 1715:3

**amount** [30] - 1728:10, 1728:15, 1729:22, 1731:19, 1731:22, 1731:23, 1748:19, 1751:21, 1751:23, 1751:24, 1752:4, 1752:7, 1753:10, 1753:13, 1753:14, 1753:16, 1764:24, 1767:21, 1768:21, 1769:15, 1776:8, 1776:16, 1788:22, 1809:13, 1809:20, 1809:21, 1828:3, 1862:10

**amounts** [1] - 1819:7

**ample** [2] - 1721:15, 1882:16

**amusing** [1] - 1876:20

**analysis** [1] - 1818:9

**AND** [1] - 1715:7

**Anderson** [4] - 1819:12, 1819:13, 1819:17, 1820:10

**Anne** [3] - 1777:2, 1778:5, 1800:13

**ANNE** [1] - 1778:10, 1800:5, 1909:18

Case 1:11-cr-00683-NG   Document 275-1   Filed 07/25/14   Page 200 of 226 PageID #: 1787
All Word // USA v Stevenson Dunn, et al.

3

annual [1] - 1837:8
Anonymous [1] - 1835:15
answer [8] - 1723:4, 1746:12, 1762:17, 1842:16, 1843:6, 1846:22, 1858:11, 1894:24
answered [1] - 1842:17
Anthony [2] - 1716:13, 1859:7
ANTHONY [1] - 1715:15
Anti [2] - 1835:20, 1873:12
anti [10] - 1836:13, 1836:16, 1836:18, 1836:20, 1836:23, 1837:4, 1837:14, 1837:17, 1837:23, 1838:13
Anti-bias [2] - 1835:20, 1873:12
anti-bias [9] - 1836:13, 1836:16, 1836:18, 1836:23, 1837:4, 1837:14, 1837:17, 1837:23, 1838:13
anti-Semitic [1] - 1836:20
anticipate [2] - 1866:10, 1884:20
anticipated [1] - 1872:11
anticipating [1] - 1903:7
anyway [2] - 1866:23, 1884:17
apart [2] - 1764:19, 1895:2
apartment [4] - 1815:3, 1830:8, 1830:16, 1830:18
apartments [3] - 1807:3, 1813:7, 1813:9
apologize [3] - 1850:14, 1883:2, 1889:10
appear [5] - 1765:18, 1767:3, 1767:14, 1771:1, 1857:2
appearance [1] - 1893:18
appearances [1] - 1716:11
applicable [3] - 1905:17, 1905:25, 1906:13
applicant [3] - 1786:11, 1787:18, 1789:14
applicants [3] - 1786:8, 1787:14, 1788:4
applicants' [1] - 1785:20
application [9] - 1783:20, 1787:18, 1790:4, 1790:7, 1790:24, 1862:8, 1863:4, 1878:25, 1879:1
applications [6] - 1786:1, 1786:9, 1786:15, 1786:23, 1786:25, 1870:8
applied [7] - 1738:23, 1783:21, 1786:11, 1790:21, 1812:24, 1869:16, 1879:9
apply [7] - 1786:8, 1786:12, 1797:20, 1812:15, 1827:17, 1879:6, 1880:3
applying [2] - 1878:14, 1879:10
approach [12] - 1735:2, 1745:9, 1748:7, 1761:18, 1767:4, 1767:24, 1831:12, 1831:13, 1845:6, 1845:7, 1865:24, 1884:24
approaching [1] - 1821:20
appropriate [7] - 1720:8, 1818:15, 1827:22, 1884:24, 1885:19, 1901:17, 1907:7
approval [4] - 1754:15, 1818:24, 1819:2, 1819:4
approvals [1] - 1742:10
approve [2] - 1797:3, 1818:4
approved [13] - 1754:21, 1795:3,

1795:6, 1795:15, 1795:17, 1796:8, 1796:10, 1796:13, 1796:22, 1797:14, 1797:23, 1801:23, 1823:5
approves [1] - 1818:16
approving [1] - 1819:7
April [4] - 1767:2, 1767:4, 1834:18
Apuzzo [2] - 1715:22, 1716:14
architect [9] - 1806:11, 1806:18, 1806:20, 1806:23, 1818:8, 1818:9, 1818:16, 1828:5, 1863:21
Architects [3] - 1859:18, 1859:19, 1859:22
architects [2] - 1806:9, 1806:16
area [3] - 1814:3, 1823:25
argued [2] - 1725:12, 1775:9
argument [2] - 1736:17, 1890:25
Ariail [1] - 1859:18
Arias [1] - 1781:14
arm [1] - 1818:23
armed [2] - 1767:9, 1769:15
arms [1] - 1890:7
Armstrong [22] - 1758:11, 1760:23, 1760:25, 1762:4, 1761:5, 1761:8, 1762:1, 1762:5, 1763:2, 1763:3, 1763:10, 1770:25, 1771:3, 1771:11, 1772:3, 1772:7, 1772:13, 1824:12, 1824:15, 1829:15, 1901:9
arose [1] - 1748:14
arrange [1] - 1718:5
arranged [1] - 1734:1
arrangements [1] - 1896:13
arrears [1] - 1733:9
arrest [3] - 1772:17, 1890:3, 1898:10
arrested [8] - 1738:9, 1738:12, 1773:4, 1773:6, 1773:16, 1773:19, 1773:20, 1773:21
arresting [2] - 1889:24, 1890:1
arrive [3] - 1756:15, 1861:18, 1861:19
Article [1] - 1810:6
articles [1] - 1850:9
aside [3] - 1735:21, 1880:8, 1894:20
Assembly [1] - 1850:6
assertions [1] - 1737:12
assessment [2] - 1841:11, 1864:20
assessments [1] - 1794:23
asset [4] - 1739:2, 1781:22, 1786:1, 1790:3
assign [2] - 1809:18, 1809:22
assigning [1] - 1794:10
assignment [2] - 1860:16, 1860:25
assist [1] - 1780:14
assistance [1] - 1824:10
assistant [1] - 1803:10
Assistant [3] - 1715:16, 1780:7, 1780:18
Assisted [1] - 1715:25
associate [3] - 1744:15, 1744:16, 1744:22
associated [1] - 1880:6
Associates [2] - 1733:12, 1734:2
association [4] - 1905:14, 1905:21,

1906:18, 1906:19
associations [1] - 1872:8
assume [5] - 1846:14, 1848:12, 1858:7, 1880:8, 1893:1
assumed [2] - 1884:18, 1905:1
assuming [2] - 1816:3, 1900:8
attach [2] - 1902:18, 1904:13
attacked [2] - 1887:24, 1888:6, 1888:12, 1898:4
attempts [1] - 1864:16
attend [2] - 1855:23, 1864:5
attendee [1] - 1852:10
attending [1] - 1863:23
attention [4] - 1740:6, 1757:12, 1868:8, 1889:2
Attorney [4] - 1715:13, 1715:16, 1779:1, 1889:14
attorney [12] - 1752:16, 1760:4, 1773:9, 1773:13, 1838:15, 1844:15, 1852:21, 1871:11, 1872:1, 1876:12, 1878:24, 1880:12
auction [1] - 1733:25
auctioned [1] - 1735:16
audit [1] - 1824:25
authority [8] - 1817:20, 1819:17, 1820:17, 1823:19, 1824:23, 1825:8, 1863:20, 1906:22
availability [1] - 1866:18
available [10] - 1792:21, 1798:14, 1801:8, 1866:8, 1893:1, 1893:15, 1893:16, 1893:17, 1893:21, 1893:22
Avenue [28] - 1739:16, 1741:14, 1741:22, 1747:20, 1748:3, 1749:13, 1750:22, 1750:23, 1775:5, 1790:18, 1790:22, 1793:12, 1793:16, 1795:8, 1806:25, 1808:12, 1808:19, 1809:3, 1809:6, 1811:19, 1813:6, 1822:24, 1827:10, 1840:10, 1842:24, 1844:21, 1857:9, 1876:8
avoid [1] - 1879:12
awaiting [2] - 1717:12, 1717:16
awards [1] - 1874:6
aware [13] - 1747:11, 1793:4, 1793:7, 1793:10, 1793:13, 1824:5, 1824:9, 1824:15, 1824:18, 1827:13, 1840:22, 1857:7, 1906:6

## B

B'nai [1] - 1874:11
background [4] - 1748:19, 1834:23, 1849:18, 1870:22
bad [2] - 1806:23, 1888:1
bag [1] - 1894:25
balance [1] - 1730:11
bank [4] - 1735:16, 1775:22, 1776:18, 1776:19, 1808:13, 1808:16, 1839:1, 1861:16, 1877:14
Bank [2] - 1807:17, 1808:13
banks [2] - 1745:3, 1807:19
banquet [1] - 1839:1
bar [17] - 1761:20, 1761:23, 1763:21,

All Word // USA v Stevenson Dunn, et al.

4

1821:7, 1821:10, 1822:17, 1831:15, 1831:18, 1832:4, 1840:1, 1843:9, 1846:1, 1847:14, 1871:1, 1883:15, 1883:18, 1885:6
**baseball** [1] - 1875:8
**based** [11] - 1721:14, 1721:16, 1732:7, 1733:10, 1746:17, 1776:12, 1788:22, 1792:7, 1827:21, 1850:12, 1879:1
**basic** [1] - 1874:22
**basis** [9] - 1732:20, 1734:7, 1734:11, 1735:7, 1741:17, 1768:23, 1837:25, 1841:13, 1852:9
**bears** [2] - 1768:20, 1818:6
**became** [6] - 1780:18, 1836:10, 1849:22, 1852:16, 1872:25, 1899:17
**become** [6] - 1824:18, 1835:4, 1870:25, 1878:1, 1888:2, 1891:5
**Bed** [3] - 1739:25, 1740:5, 1790:15
**Bed-Stuy** [3] - 1739:25, 1740:5, 1790:15
**Bed/Stuy** [4] - 1748:13, 1756:1, 1863:14, 1864:4
**Bedford** [3] - 1775:6, 1824:1, 1860:11
**Bedford-Stuyvesant** [2] - 1775:6, 1860:11
**befogged** [1] - 1889:18
**BEFORE** [1] - 1715:10
**began** [2] - 1738:15, 1877:19
**begin** [5] - 1721:14, 1771:5, 1811:4, 1811:18, 1833:16
**beginning** [6] - 1810:15, 1811:5, 1822:11, 1825:17, 1864:8, 1905:9
**begins** [1] - 1905:23
**behalf** [2] - 1833:16, 1907:15, 1907:16
**behind** [1] - 1793:3
**beneficial** [1] - 1762:18
**benefit** [2] - 1733:25, 1825:3
**benefits** [1] - 1853:9
**Bertolino** [2] - 1858:22, 1859:2
**best** [9] - 1760:14, 1767:10, 1775:19, 1775:20, 1785:8, 1871:14, 1871:24, 1872:19, 1880:12
**better** [2] - 1733:11, 1847:12
**betterment** [1] - 1851:22
**between** [19] - 1728:4, 1739:25, 1740:3, 1740:5, 1743:3, 1743:6, 1745:17, 1745:25, 1750:21, 1753:5, 1763:9, 1770:14, 1772:7, 1776:9, 1820:15, 1837:19, 1854:5, 1891:3, 1903:16
**beyond** [3] - 1734:7, 1804:21, 1890:9
**Bias** [1] - 1835:20
**bias** [13] - 1835:21, 1836:13, 1836:16, 1836:18, 1836:19, 1836:23, 1837:4, 1837:14, 1837:17, 1837:23, 1838:13, 1873:12, 1888:5
**bible** [1] - 1850:11
**bid** [71] - 1754:16, 1754:23, 1754:25, 1755:6, 1755:11, 1755:18, 1756:3, 1756:5, 1756:7, 1756:11, 1756:12, 1756:16, 1756:20, 1757:1, 1757:2, 1795:15, 1795:16, 1795:20, 1795:22, 1796:1, 1796:20, 1797:1, 1797:5,

1797:11, 1797:24, 1798:14, 1801:13, 1801:16, 1801:20, 1801:21, 1801:22, 1801:23, 1801:24, 1801:25, 1802:8, 1802:10, 1802:13, 1802:15, 1802:16, 1802:17, 1802:19, 1802:22, 1803:5, 1803:12, 1803:14, 1803:16, 1803:17, 1803:18, 1803:25, 1804:1, 1804:2, 1804:4, 1804:7, 1804:14, 1804:20, 1804:22, 1804:23, 1805:1, 1805:8, 1805:9, 1805:19, 1805:24, 1806:5, 1806:6, 1806:8, 1826:15, 1826:17, 1826:18
**bidder** [7] - 1733:25, 1797:14, 1803:24, 1804:16, 1804:20, 1805:6, 1805:7
**bidders** [3] - 1756:20, 1803:3, 1805:14
**bidding** [8] - 1755:10, 1801:5, 1803:25, 1805:13, 1805:23, 1826:20, 1826:23, 1827:2
**bids** [16] - 1756:14, 1800:21, 1802:9, 1802:11, 1802:16, 1803:4, 1803:21, 1804:3, 1804:7, 1805:13, 1805:17, 1805:24, 1824:10, 1824:19, 1827:3, 1827:6
**big** [5] - 1755:15, 1798:8, 1798:11, 1810:1, 1836:22
**Bill** [1] - 1785:17
**bill** [1] - 1765:9
**billing** [1] - 1884:25
**Bishop** [1] - 1721:20
**bit** [9] - 1735:6, 1741:17, 1747:15, 1769:18, 1770:2, 1798:17, 1890:25, 1891:16, 1895:13
**blessed** [1] - 1875:6
**blow** [2] - 1768:6, 1769:18
**board** [4] - 1835:19, 1855:20, 1874:14, 1880:4
**boarding** [1] - 1895:17
**boards** [1] - 1874:24
**Bob** [6] - 1743:7, 1756:4, 1824:7, 1824:8, 1861:1, 1883:8
**body** [1] - 1851:19
**boldface** [1] - 1728:6
**bolstering** [1] - 1883:12
**bond** [1] - 1805:8
**bonding** [2] - 1796:5, 1798:4
**BOP** [7] - 1887:25, 1888:3, 1888:20, 1897:11, 1898:5, 1898:6, 1898:10
**born** [4] - 1834:13, 1849:15, 1849:16, 1870:12
**borrow** [3] - 1731:22, 1732:14, 1732:16
**borrowed** [1] - 1731:1
**borrower** [1] - 1732:9
**borrowers** [2] - 1728:14, 1731:17
**borrowing** [1] - 1728:15
**bottom** [7] - 1728:8, 1861:9, 1862:1, 1862:12, 1905:20, 1908:7, 1908:8
**bought** [2] - 1765:14, 1774:14
**Boulevard** [1] - 1835:7
**boxes** [1] - 1837:11
**boys** [1] - 1834:22
**bracketed** [1] - 1902:18

**break** [5] - 1736:2, 1810:3, 1832:1, 1896:7, 1896:8
**breakdown** [1] - 1805:20
**bribe** [2] - 1771:22, 1772:1
**brief** [5] - 1775:14, 1821:15, 1821:17, 1830:2, 1842:9
**briefly** [4] - 1774:22, 1827:20, 1862:7, 1887:23
**bring** [9] - 1718:24, 1737:16, 1789:1, 1800:4, 1868:8, 1874:21, 1879:24, 1890:5, 1890:6
**bringing** [2] - 1856:2, 1872:22
**brings** [2] - 1802:22, 1851:20
**Brith** [1] - 1874:11
**broad** [1] - 1742:3
**broke** [1] - 1800:18
**broker** [1] - 1875:16
**Brooklyn** [14] - 1715:5, 1715:15, 1715:24, 1761:2, 1840:10, 1842:24, 1844:21, 1857:10, 1870:13, 1870:23, 1871:4, 1871:12, 1875:21, 1876:7
**brother** [4] - 1840:9, 1840:16, 1842:23, 1844:20, 1857:8
**brought** [3] - 1742:22, 1889:19, 1890:12
**Brown** [6] - 1721:18, 1722:11, 1722:14, 1722:19, 1873:24
**Bruno's** [1] - 1835:6
**Bruton** [1] - 1721:15
**budget** [28] - 1743:6, 1789:5, 1793:9, 1807:23, 1808:9, 1809:3, 1810:13, 1810:19, 1810:21, 1810:22, 1812:4, 1812:8, 1812:19, 1812:25, 1814:17, 1818:16, 1819:18, 1819:25, 1820:3, 1820:17, 1820:18, 1820:20, 1821:13, 1822:23, 1838:20, 1838:23, 1852:25
**budgeting** [1] - 1788:15
**budgets** [7] - 1788:18, 1789:9, 1819:16, 1819:19, 1820:10, 1820:14, 1823:20
**build** [1] - 1874:2
**building** [12] - 1741:5, 1743:6, 1753:17, 1815:9, 1815:20, 1816:14, 1817:6, 1874:17, 1877:4, 1877:11, 1896:6
**buildings** [7] - 1741:5, 1745:17, 1815:18, 1818:14, 1860:1, 1861:8, 1861:10
**bullet** [1] - 1754:12
**bunch** [1] - 1861:15
**Bureau** [10] - 1885:13, 1886:8, 1886:20, 1887:4, 1887:11, 1887:19, 1887:20, 1888:15, 1889:19, 1890:6
**busboy** [3] - 1835:1, 1835:2, 1835:9
**business** [35] - 1719:24, 1728:5, 1744:15, 1744:16, 1744:22, 1744:23, 1751:22, 1752:4, 1753:20, 1760:9, 1760:12, 1760:16, 1761:12, 1762:6, 1763:12, 1767:12, 1771:11, 1772:15, 1772:16, 1790:25, 1796:13, 1812:25, 1835:1, 1835:5, 1835:6, 1844:13, 1855:8, 1861:4, 1870:9, 1871:23, 1873:15, 1875:16, 1876:14, 1878:9, 1895:8

businesses [1] - 1876:10
busy [1] - 1753:6
BUTLER [1] - 1715:23
buttress [1] - 1889:25
buy [1] - 1875:19
buying [1] - 1875:20
buys [1] - 1732:18
BY [40] - 1715:15, 1715:17, 1738:5, 1741:1, 1750:17, 1760:2, 1763:24, 1770:1, 1774:24, 1775:16, 1778:14, 1800:17, 1822:21, 1826:4, 1828:22, 1829:11, 1830:4, 1834:9, 1844:2, 1849:14, 1854:18, 1857:1, 1859:6, 1868:20, 1909:8, 1909:10, 1909:12, 1909:14, 1909:16, 1909:20, 1909:22, 1909:24, 1910:2, 1910:4, 1910:8, 1910:10, 1910:14, 1910:16, 1910:20, 1910:24
BY:GERALD [1] - 1715:20
BY:MAURICE [1] - 1715:19

## C

Cadman [2] - 1715:14, 1715:24
cahoots [1] - 1733:11
calculation [1] - 1739:2
Caliendo [1] - 1716:23
CALIENDO [2] - 1715:19, 1894:16
Canarsie [1] - 1870:23
cannot [1] - 1904:17
cap [3] - 1739:2, 1880:22, 1880:23
capacity [1] - 1853:10
capital [2] - 1809:11, 1810:8
CAPOZZOLO [58] - 1715:15, 1724:21, 1725:17, 1725:20, 1725:24, 1738:5, 1741:1, 1745:24, 1747:4, 1748:5, 1748:12, 1749:4, 1749:18, 1750:17, 1751:1, 1751:4, 1757:8, 1757:24, 1758:1, 1758:22, 1762:15, 1763:16, 1764:2, 1775:14, 1775:16, 1776:21, 1839:19, 1840:4, 1840:14, 1841:1, 1841:16, 1841:18, 1841:23, 1842:3, 1842:8, 1842:11, 1842:20, 1843:13, 1844:2, 1845:3, 1846:25, 1853:4, 1853:11, 1853:15, 1854:18, 1857:1, 1857:17, 1885:20, 1887:23, 1890:22, 1890:24, 1892:18, 1894:10, 1896:22, 1909:8, 1909:16, 1910:10, 1910:16
capozzolo [2] - 1737:21, 1774:10
Capozzolo [12] - 1716:13, 1724:20, 1725:15, 1746:12, 1750:5, 1848:6, 1854:16, 1884:5, 1884:12, 1887:22, 1889:15, 1890:21
caps [1] - 1879:20
care [3] - 1724:11, 1883:6, 1902:22
carrying [1] - 1855:15
carts [1] - 1837:12
case [42] - 1721:17, 1721:18, 1721:20, 1722:11, 1722:20, 1738:20, 1754:19, 1754:20, 1755:12, 1778:19, 1779:2, 1779:5, 1779:8, 1780:1, 1784:2, 1784:4, 1799:2, 1817:8, 1818:12,

1818:17, 1821:18, 1833:17, 1846:15, 1848:15, 1859:9, 1867:20, 1867:23, 1868:3, 1881:14, 1881:15, 1884:13, 1884:18, 1891:19, 1893:5, 1899:24, 1903:16, 1904:16, 1904:17, 1905:6, 1908:20
cases [2] - 1732:13, 1893:3
cash [1] - 1811:12
CAUSE [1] - 1715:10
caused [1] - 1820:25
caution [2] - 1846:12, 1848:10
cell [1] - 1720:10
central [1] - 1748:19
certain [5] - 1742:9, 1745:5, 1777:16, 1846:9, 1853:14
certainly [7] - 1734:6, 1734:10, 1749:4, 1886:5, 1886:25, 1890:19, 1896:6
Certificate [5] - 1816:14, 1816:15, 1816:18, 1817:4, 1825:13
certificate [2] - 1810:19, 1810:21
Certificates [1] - 1825:16
certificates [1] - 1874:18
certification [2] - 1862:8, 1883:15
certifications [1] - 1883:18
cetera [1] - 1775:10
chair [3] - 1835:22, 1836:14, 1837:7
chaired [2] - 1835:23, 1837:5
chairing [1] - 1837:3
chairman [1] - 1874:13
chance [2] - 1740:11, 1908:13
chances [1] - 1891:13
change [14] - 1817:9, 1819:17, 1820:20, 1821:13, 1840:6, 1840:15, 1840:18, 1842:20, 1844:17, 1857:6, 1864:24, 1875:11, 1881:7, 1901:12
changed [4] - 1864:1, 1864:2, 1864:13, 1864:17
changes [4] - 1725:9, 1815:20, 1820:2, 1893:24
changing [2] - 1820:17, 1823:19
character [35] - 1727:18, 1831:20, 1833:7, 1839:5, 1839:8, 1839:22, 1840:7, 1841:11, 1842:21, 1844:18, 1846:10, 1846:19, 1848:3, 1848:8, 1848:17, 1848:22, 1853:20, 1854:6, 1857:6, 1858:13, 1866:2, 1866:5, 1867:9, 1867:10, 1873:9, 1882:6, 1882:23, 1884:5, 1884:12, 1884:16, 1885:16, 1885:18, 1891:17, 1891:18, 1892:2
characteristic [2] - 1844:23, 1845:1
characterizes [1] - 1728:3
charge [24] - 1719:10, 1863:21, 1887:9, 1888:8, 1893:4, 1893:6, 1893:9, 1896:25, 1897:8, 1897:9, 1898:17, 1898:19, 1898:20, 1899:19, 1900:5, 1900:8, 1901:2, 1901:5, 1904:10, 1905:18, 1906:4, 1906:6, 1906:7
charged [9] - 1732:11, 1758:4, 1846:17, 1848:15, 1858:9, 1874:15, 1889:21, 1905:13, 1906:17

charges [2] - 1842:9, 1907:8
charging [1] - 1893:12
charitable [2] - 1874:6, 1883:11
charts [2] - 1905:1, 1905:2
Chase [1] - 1755:19
check [34] - 1720:13, 1764:9, 1764:12, 1764:21, 1765:17, 1766:2, 1766:10, 1766:12, 1766:16, 1766:18, 1766:22, 1767:11, 1767:17, 1768:19, 1768:24, 1769:1, 1769:10, 1769:12, 1769:13, 1769:15, 1769:17, 1796:18, 1798:1, 1798:2, 1798:3, 1798:5, 1860:20, 1861:7, 1863:10, 1863:13
checked [1] - 1889:6
checking [2] - 1819:25, 1863:12
checkless [1] - 1793:23
checks [5] - 1730:8, 1764:5, 1765:22, 1770:20, 1775:17
chief [1] - 1819:13
children [2] - 1834:21, 1850:2, 1850:3, 1850:15, 1850:16, 1870:18, 1875:7
choice [1] - 1795:5
choose [2] - 1755:9, 1795:4
chosen [1] - 1904:18
Christmas [1] - 1876:13
circulation [1] - 1850:9
circumstances [6] - 1722:25, 1745:5, 1762:9, 1774:9, 1851:1, 1875:13
citizen [2] - 1728:4, 1874:24
citizens [1] - 1874:23
City [24] - 1778:22, 1782:16, 1789:10, 1796:8, 1796:10, 1796:13, 1797:4, 1810:9, 1814:6, 1814:8, 1814:11, 1814:22, 1814:25, 1815:5, 1815:11, 1816:3, 1816:4, 1817:9, 1824:13, 1827:9, 1844:14, 1855:9, 1859:23, 1878:8
city [7] - 1800:21, 1809:10, 1810:8, 1810:14, 1812:7, 1812:8, 1812:14
City's [1] - 1779:7
civilly [1] - 1888:2
claim [1] - 1741:3
claimed [3] - 1751:14, 1752:11, 1777:17
claiming [1] - 1748:20
claims [2] - 1723:14, 1730:25, 1757:14
clarification [1] - 1825:12
clarify [4] - 1732:2, 1745:12, 1796:11, 1811:21
clarity [2] - 1724:16, 1908:10
class [1] - 1875:9
clear [12] - 1722:14, 1722:22, 1745:24, 1771:17, 1772:25, 1776:1, 1815:20, 1868:21, 1882:13, 1883:25, 1889:11, 1893:21
clearer [1] - 1908:9
clearly [3] - 1721:14, 1728:11, 1883:11
clerk [2] - 1898:15, 1900:7
CLERK [20] - 1737:22, 1748:6, 1777:4, 1777:6, 1777:9, 1778:3, 1778:6, 1778:9, 1833:12, 1833:20, 1833:23, 1833:25, 1834:3, 1848:25, 1849:3,

1849:6, 1849:9, 1859:1, 1859:3, 1868:17

**client** [3] - 1749:12, 1850:24, 1878:24

**clients** [1] - 1875:18

**close** [1] - 1876:21

**Closeout** [1] - 1772:16

**closer** [1] - 1838:1

**closes** [1] - 1809:22

**closing** [7] - 1768:17, 1793:18, 1809:1, 1810:25, 1811:15, 1811:17

**closings** [4] - 1808:18, 1808:21, 1808:24, 1811:5

**cluster** [20] - 1755:7, 1790:18, 1790:22, 1793:13, 1793:16, 1806:25, 1807:21, 1808:12, 1808:19, 1809:3, 1809:19, 1813:6, 1815:18, 1822:24, 1823:23, 1824:1, 1824:2, 1863:14, 1880:11

**co** [7] - 1721:19, 1721:22, 1722:5, 1722:8, 1722:15, 1835:23, 1836:14

**Co** [1] - 1876:9

**co-chair** [1] - 1836:14

**co-chaired** [1] - 1835:23

**co-defendant** [1] - 1721:19

**co-defendant's** [1] - 1722:15

**co-defendants** [3] - 1721:22, 1722:5, 1722:8

**Co-ops** [1] - 1876:9

**coached** [2] - 1875:8

**coaching** [1] - 1836:7

**coalition** [3] - 1836:13, 1836:23, 1837:4

**collapses** [1] - 1888:4

**collecting** [2] - 1727:6, 1789:22

**collection** [1] - 1901:11

**collectively** [2] - 1758:19, 1765:24

**College** [1] - 1870:24

**college** [2] - 1874:2, 1876:11

**colloquy** [1] - 1822:12

**colluding** [1] - 1735:7

**Columbia** [1] - 1849:19

**column** [1] - 1863:10

**combination** [1] - 1809:10

**comfortable** [6] - 1719:2, 1753:5, 1753:8, 1753:12, 1753:17, 1894:21

**coming** [2] - 1762:12, 1896:6

**commence** [1] - 1752:6

**commissioner** [2] - 1784:19, 1803:10

**Commissioner** [5] - 1778:22, 1780:7, 1780:18, 1785:9, 1826:5

**commissioners** [1] - 1784:17

**commit** [2] - 1758:4, 1905:24

**commitment** [1] - 1871:17

**committed** [5] - 1846:11, 1846:17, 1848:8, 1848:14, 1858:9

**committee** [13] - 1784:13, 1784:14, 1785:21, 1797:13, 1797:15, 1797:18, 1836:16, 1836:17, 1836:18, 1837:3, 1837:14, 1837:23, 1838:13

**Committee** [1] - 1873:12

**common** [3] - 1722:21, 1722:22, 1743:24

**communal** [1] - 1851:5

**communicated** [1] - 1787:13

**communications** [1] - 1820:9

**community** [17] - 1835:16, 1837:9, 1840:22, 1850:10, 1851:21, 1851:23, 1851:25, 1852:12, 1853:23, 1854:1, 1854:3, 1874:10, 1874:12, 1874:20, 1875:8, 1880:4

**companies** [4] - 1760:7, 1760:17, 1787:23, 1824:7

**company** [12] - 1740:4, 1744:7, 1745:13, 1750:22, 1758:12, 1770:18, 1770:19, 1861:4, 1879:1, 1879:6, 1880:5, 1880:12

**compare** [1] - 1820:22

**complaint** [2] - 1888:19, 1889:7

**complete** [4] - 1725:6, 1795:19, 1815:1, 1863:8

**completed** [10] - 1793:24, 1811:3, 1816:10, 1817:6, 1818:15, 1818:21, 1827:22, 1829:4, 1863:3, 1863:19

**completion** [1] - 1816:11

**Computer** [1] - 1715:25

**Computer-Assisted** [1] - 1715:25

**concepts** [1] - 1905:14

**concerned** [4] - 1839:17, 1868:6, 1907:2, 1907:6

**concerning** [2] - 1760:15, 1884:25

**concerns** [2] - 1790:20, 1793:9

**concert** [1] - 1820:4

**conclude** [2] - 1892:11, 1896:24

**concluding** [1] - 1891:13

**conclusion** [1] - 1721:10

**conclusory** [1] - 1898:22

**concrete** [1] - 1812:19

**condition** [11] - 1885:25, 1886:24, 1887:2, 1887:15, 1887:21, 1888:1, 1888:5, 1888:11, 1888:12, 1888:18, 1890:12

**conditions** [2] - 1863:12, 1863:13

**conduct** [3] - 1846:21, 1848:19, 1906:10

**conducted** [1] - 1818:19

**conference** [3] - 1761:20, 1821:7, 1831:15

**confident** [1] - 1733:8

**confronted** [1] - 1722:5

**confused** [1] - 1773:25

**confusing** [2] - 1907:2, 1907:6

**congratulations** [1] - 1788:9

**congregant** [2] - 1852:6, 1852:14

**congregation** [9] - 1849:23, 1851:4, 1851:13, 1852:13, 1852:22, 1854:5, 1854:24, 1855:12, 1855:21

**congregational** [1] - 1851:6

**Congress** [1] - 1874:19

**connection** [15] - 1758:20, 1768:17, 1770:24, 1773:5, 1773:6, 1829:23, 1837:16, 1837:22, 1852:7, 1853:8, 1853:14, 1869:12, 1869:22, 1870:2, 1877:2

**consents** [1] - 1897:14

**consider** [23] - 1723:16, 1723:17, 1723:18, 1723:20, 1744:17, 1757:16, 1757:19, 1757:20, 1757:22, 1777:20, 1777:22, 1777:23, 1777:25, 1846:16, 1846:18, 1846:20, 1848:14, 1848:16, 1848:18, 1857:22, 1858:8, 1858:11, 1899:10

**considerably** [1] - 1765:23

**consideration** [1] - 1882:14

**considerations** [2] - 1793:9, 1899:1

**considered** [3] - 1795:9, 1797:13, 1804:24

**considering** [1] - 1892:21

**consistent** [1] - 1887:12

**consistently** [1] - 1748:21

**conspiracy** [8] - 1899:24, 1905:16, 1905:23, 1905:24, 1905:25, 1906:4, 1906:7, 1906:17

**conspiratorial** [2] - 1906:18, 1907:7

**conspire** [1] - 1758:4

**constituted** [1] - 1873:4

**construction** [33] - 1747:19, 1750:23, 1752:23, 1754:15, 1755:23, 1789:4, 1789:6, 1789:7, 1803:8, 1803:9, 1807:9, 1807:15, 1807:16, 1808:10, 1808:14, 1808:16, 1808:17, 1808:20, 1809:1, 1809:7, 1809:16, 1811:3, 1811:7, 1811:10, 1811:15, 1811:17, 1815:23, 1815:25, 1816:9, 1816:10, 1825:15, 1825:18, 1860:4

**consult** [1] - 1752:20

**Consult** [1] - 1728:6

**consulted** [1] - 1821:1

**contact** [2] - 1794:19, 1852:14

**contains** [1] - 1905:6

**content** [2] - 1879:16, 1880:1

**context** [2] - 1730:14, 1855:20

**continue** [5] - 1719:5, 1777:14, 1800:15, 1869:22, 1898:12

**continued** [7] - 1725:5, 1759:8, 1791:3, 1813:15, 1856:5, 1876:23, 1900:10

**Continued** [11] - 1726:9, 1738:4, 1740:13, 1769:20, 1799:14, 1800:16, 1843:15, 1845:13, 1847:15, 1888:23, 1909:7

**continues** [1] - 1735:5

**Continuing** [1] - 1770:1

**CONTINUING** [2] - 1792:1, 1877:1

**contract** [35] - 1725:21, 1740:3, 1744:4, 1745:16, 1745:22, 1745:24, 1745:25, 1746:2, 1747:8, 1747:10, 1747:19, 1748:2, 1748:12, 1748:16, 1749:1, 1749:9, 1749:17, 1749:19, 1750:2, 1750:13, 1750:21, 1752:6, 1753:4, 1753:13, 1754:17, 1755:24, 1756:10, 1757:2, 1757:6, 1828:3, 1828:10, 1828:14, 1852:17, 1852:18, 1853:9

**contracting** [2] - 1753:10, 1797:20

**contractor** [49] - 1739:8, 1739:10, 1739:12, 1739:13, 1739:25, 1741:6,

1741:7, 1741:12, 1742:9, 1742:23,
1743:2, 1743:3, 1743:5, 1743:10,
1751:14, 1751:20, 1751:21, 1752:3,
1753:19, 1753:20, 1755:9, 1758:12,
1796:4, 1796:7, 1796:21, 1797:23,
1798:7, 1798:10, 1800:19, 1801:3,
1802:7, 1802:13, 1802:19, 1802:22,
1803:13, 1803:25, 1804:4, 1804:14,
1804:22, 1806:14, 1817:3, 1818:7,
1819:9, 1829:12, 1860:16, 1860:23,
1861:16, 1862:10, 1864:19
**contractors** [36] - 1754:14, 1754:21,
1754:22, 1754:23, 1755:3, 1755:6,
1755:12, 1755:16, 1755:18, 1756:3,
1756:4, 1794:25, 1795:2, 1795:3,
1795:4, 1795:5, 1795:9, 1795:12,
1795:13, 1795:14, 1796:13, 1797:6,
1798:13, 1801:13, 1801:15, 1801:18,
1801:22, 1801:24, 1802:2, 1804:10,
1805:12, 1824:16, 1824:19, 1827:1,
1827:3, 1829:23
**contracts** [6] - 1749:5, 1749:15,
1749:24, 1749:25, 1760:6, 1811:5
**control** [6] - 1756:13, 1756:14, 1756:15,
1789:13, 1812:8, 1824:23
**convenors** [1] - 1851:16
**conversation** [20] - 1763:9, 1771:11,
1772:3, 1772:6, 1772:9, 1772:13,
1782:5, 1814:13, 1836:9, 1875:23,
1878:12, 1879:11, 1879:13, 1879:14,
1879:15, 1879:17, 1879:24, 1880:2,
1880:7
**conversations** [4] - 1792:2, 1876:1,
1879:2, 1879:17
**conversely** [1] - 1814:11
**convert** [1] - 1745:21
**convict** [1] - 1905:15
**convince** [1] - 1865:3
**convoluted** [1] - 1735:6
**cook** [2] - 1837:13
**cooperate** [1] - 1779:24
**coordinating** [1] - 1803:4
**copies** [5] - 1752:18, 1764:3, 1786:22,
1786:24, 1898:15
**copy** [1] - 1772:22
**corner** [1] - 1766:1
**corporate** [3] - 1840:19, 1842:4,
1842:12
**Corporation** [5] - 1740:4, 1758:13,
1781:3, 1802:15, 1807:12
**corporation** [2] - 1811:11, 1879:5
**corporations** [1] - 1760:10
**correct** [124] - 1717:18, 1727:19,
1737:1, 1737:11, 1738:10, 1738:13,
1738:24, 1739:3, 1739:10, 1739:17,
1739:24, 1740:4, 1741:8, 1741:12,
1741:15, 1741:23, 1742:1, 1742:6,
1742:10, 1742:14, 1742:16, 1742:24,
1743:2, 1744:18, 1745:6, 1747:6,
1747:7, 1747:20, 1751:17, 1752:1,
1752:7, 1752:9, 1754:4, 1754:8,

1754:17, 1754:25, 1755:18, 1755:20,
1755:24, 1756:7, 1756:14, 1756:17,
1756:21, 1756:24, 1757:3, 1757:6,
1758:2, 1758:3, 1758:5, 1764:19,
1766:16, 1766:23, 1767:19, 1768:14,
1769:2, 1769:5, 1769:7, 1770:6,
1771:5, 1772:10, 1772:19, 1772:23,
1773:2, 1773:7, 1773:23, 1773:25,
1774:2, 1774:4, 1774:11, 1775:19,
1775:24, 1776:6, 1776:15, 1801:16,
1802:3, 1806:2, 1807:4, 1807:16,
1813:7, 1813:10, 1817:1, 1818:7,
1823:10, 1823:12, 1826:8, 1826:15,
1828:1, 1829:5, 1829:13, 1829:15,
1834:10, 1835:7, 1844:5, 1844:7,
1847:3, 1848:22, 1854:21, 1854:22,
1854:25, 1855:1, 1855:6, 1855:13,
1855:14, 1855:18, 1855:19, 1857:3,
1857:4, 1860:9, 1860:12, 1862:18,
1862:25, 1863:11, 1869:7, 1869:10,
1869:20, 1869:21, 1877:6, 1879:5,
1882:3, 1892:12, 1892:13, 1895:20,
1899:5, 1902:10
**correctly** [1] - 1798:15
**cost** [14] - 1741:19, 1742:4, 1788:22,
1804:19, 1807:23, 1812:4, 1812:18,
1812:24, 1813:4, 1814:24, 1815:10,
1820:25, 1821:1
**costs** [16] - 1753:14, 1807:25, 1810:18,
1810:20, 1811:20, 1812:6, 1812:19,
1813:4, 1817:12, 1817:22, 1817:24,
1818:4, 1821:1, 1821:2, 1838:7
**Council** [18] - 1837:5, 1837:6, 1837:15,
1837:22, 1838:14, 1838:20, 1850:8,
1851:10, 1851:12, 1851:14, 1851:15,
1851:19, 1852:3, 1852:8, 1852:15,
1855:18, 1856:2, 1873:10
**Counsel** [19] - 1717:3, 1719:6, 1720:19,
1721:4, 1724:24, 1726:1, 1769:9,
1777:11, 1798:16, 1799:10, 1831:2,
1839:20, 1853:12, 1877:16, 1877:25,
1881:23, 1885:20, 1893:24, 1894:2
**counsel** [22] - 1727:2, 1737:13,
1747:15, 1749:19, 1753:22, 1758:24,
1777:10, 1779:16, 1833:2, 1839:25,
1845:4, 1853:16, 1869:9, 1870:1,
1890:14, 1890:25, 1893:1, 1896:18,
1897:8, 1898:11, 1898:15, 1907:13
**Count** [1] - 1906:11
**count** [8] - 1899:9, 1900:2, 1905:16,
1905:25, 1906:1, 1906:3, 1906:8,
1907:3
**counts** [6] - 1905:6, 1905:17, 1905:22,
1906:3, 1906:14, 1906:20
**County** [7] - 1844:11, 1844:12, 1850:7,
1855:6, 1874:13, 1874:18, 1874:22
**county** [1] - 1855:2
**Couple** [2] - 1770:16, 1770:17
**couple** [8] - 1718:2, 1719:25, 1723:1,
1757:10, 1770:18, 1831:20, 1874:21,
1900:5
**course** [21] - 1718:20, 1719:25,

1722:16, 1722:19, 1733:6, 1741:18,
1770:23, 1772:12, 1775:5, 1792:11,
1799:3, 1812:25, 1829:1, 1838:12,
1839:3, 1842:5, 1853:19, 1854:4,
1864:12, 1876:1, 1887:25
**COURT** [302] - 1715:1, 1716:16, 1717:3,
1717:7, 1717:20, 1717:24, 1718:17,
1718:20, 1718:23, 1719:1, 1719:5,
1719:8, 1719:13, 1719:16, 1720:19,
1721:4, 1723:24, 1724:3, 1724:7,
1724:11, 1724:13, 1724:15, 1724:19,
1724:22, 1724:24, 1725:8, 1725:14,
1725:18, 1725:22, 1725:25, 1726:5,
1727:2, 1727:16, 1727:23, 1728:20,
1728:24, 1729:1, 1729:8, 1729:11,
1729:16, 1729:18, 1729:20, 1730:1,
1730:10, 1730:16, 1730:21, 1731:2,
1731:11, 1732:22, 1733:1, 1733:5,
1733:14, 1733:20, 1734:3, 1734:17,
1734:22, 1735:10, 1735:18, 1735:21,
1736:1, 1736:3, 1736:6, 1736:14,
1736:17, 1736:21, 1736:25, 1737:4,
1737:10, 1737:13, 1737:15, 1737:18,
1739:12, 1743:14, 1745:8, 1745:10,
1745:22, 1746:8, 1746:15, 1746:22,
1747:1, 1747:5, 1748:9, 1748:11,
1748:22, 1749:3, 1749:9, 1749:12,
1749:17, 1749:19, 1749:23, 1750:1,
1750:5, 1750:7, 1750:15, 1751:3,
1751:6, 1753:25, 1757:11, 1757:25,
1758:24, 1759:2, 1759:4, 1761:19,
1762:25, 1763:8, 1763:13, 1763:19,
1768:4, 1769:9, 1770:4, 1776:23,
1777:10, 1777:14, 1783:10, 1798:16,
1798:18, 1798:21, 1799:1, 1799:8,
1799:10, 1800:4, 1800:6, 1800:10,
1821:4, 1821:11, 1821:14, 1821:16,
1822:3, 1822:7, 1822:16, 1822:20,
1825:22, 1825:24, 1826:1, 1828:18,
1828:20, 1829:9, 1831:2, 1831:6,
1831:14, 1831:19, 1831:23, 1832:2,
1832:7, 1833:2, 1833:6, 1833:10,
1833:13, 1839:20, 1839:25, 1840:2,
1840:12, 1840:25, 1841:2, 1841:6,
1841:10, 1841:15, 1841:17, 1841:25,
1842:2, 1842:7, 1842:9, 1842:18,
1843:1, 1843:4, 1843:8, 1843:10,
1843:14, 1845:4, 1845:7, 1845:10,
1846:4, 1846:9, 1846:24, 1847:1,
1847:4, 1847:9, 1847:13, 1848:2,
1851:8, 1853:2, 1853:5, 1853:12,
1853:16, 1854:13, 1854:16, 1857:18,
1857:20, 1857:25, 1858:18, 1858:20,
1862:16, 1865:10, 1865:12, 1865:14,
1865:16, 1865:18, 1865:21, 1865:25,
1866:5, 1866:10, 1866:19, 1866:25,
1867:6, 1867:9, 1867:12, 1867:17,
1867:22, 1868:3, 1868:6, 1868:11,
1873:17, 1874:9, 1876:6, 1881:8,
1881:10, 1881:21, 1881:23, 1882:21,
1883:14, 1883:17, 1883:22, 1883:25,
1884:6, 1884:9, 1884:14, 1884:18,

1885:9, 1885:22, 1886:7, 1886:11, 1887:3, 1887:14, 1888:15, 1888:20, 1890:14, 1890:21, 1890:23, 1891:2, 1891:9, 1891:11, 1891:20, 1891:24, 1892:7, 1892:10, 1892:14, 1892:16, 1892:20, 1893:8, 1893:13, 1893:19, 1894:12, 1894:14, 1894:24, 1895:22, 1895:24, 1896:8, 1896:23, 1897:7, 1897:13, 1897:24, 1898:11, 1898:13, 1898:23, 1899:5, 1899:8, 1899:21, 1899:25, 1901:4, 1901:17, 1901:20, 1901:24, 1902:7, 1902:10, 1902:13, 1902:16, 1902:21, 1902:24, 1903:1, 1903:5, 1903:7, 1903:13, 1903:21, 1904:2, 1904:6, 1904:8, 1904:12, 1904:24, 1905:3, 1905:8, 1905:11, 1905:19, 1906:2, 1906:6, 1906:15, 1906:21, 1907:1, 1907:12, 1907:18, 1908:5, 1908:10, 1908:16

**Court's** [2] - 1905:18, 1905:23

**Courthouse** [1] - 1715:5

**courtroom** [11] - 1716:2, 1721:2, 1737:16, 1835:25, 1850:17, 1894:11, 1894:12, 1894:15, 1894:23, 1895:3, 1895:5

**COURTROOM** [17] - 1716:5, 1716:17, 1716:21, 1716:24, 1717:2, 1717:6, 1717:18, 1717:22, 1718:25, 1719:4, 1719:7, 1719:15, 1720:16, 1721:3, 1799:5, 1832:8, 1881:18

**covered** [1] - 1824:1

**covers** [1] - 1842:19

**CPC** [2] - 1781:8, 1789:1

**crated** [1] - 1894:22

**create** [1] - 1842:14

**credentials** [2] - 1797:12, 1797:16

**credibility** [9] - 1721:25, 1723:19, 1757:21, 1777:24, 1887:24, 1888:5, 1888:13, 1889:24, 1889:25

**credit** [5] - 1794:4, 1794:7, 1796:6, 1817:5, 1817:9

**credits** [8] - 1794:3, 1794:5, 1794:9, 1808:22, 1816:19, 1816:21, 1817:1, 1817:10

**crime** [4] - 1889:20, 1901:14, 1901:20, 1902:2

**crimes** [3] - 1846:17, 1848:15, 1858:9

**Criminal** [4] - 1871:5, 1871:11, 1871:19, 1872:3

**CRIMINAL** [1] - 1715:10

**criminal** [4] - 1716:9, 1871:21, 1871:25, 1904:16

**Cristina** [1] - 1716:13

**CRISTINA** [1] - 1715:16

**criteria** [1] - 1792:7

**critical** [1] - 1725:4

**cross** [25] - 1721:9, 1721:16, 1725:5, 1727:17, 1727:18, 1736:12, 1737:21, 1759:5, 1761:25, 1822:14, 1840:3, 1846:10, 1848:7, 1858:3, 1865:12, 1882:2, 1882:7, 1882:20, 1884:15,

1884:25, 1889:22, 1891:21, 1898:5, 1901:8, 1908:11

**CROSS** [18] - 1738:4, 1760:1, 1763:23, 1774:23, 1826:3, 1828:21, 1829:10, 1844:1, 1854:17, 1909:7, 1909:9, 1909:11, 1909:13, 1909:21, 1909:23, 1910:1, 1910:9, 1910:15

**CROSS-EXAMINATION** [6] - 1774:23, 1844:1, 1854:17, 1909:13, 1910:9, 1910:15

**cross-examination** [17] - 1721:9, 1721:16, 1727:17, 1727:18, 1736:12, 1759:5, 1761:25, 1840:3, 1846:10, 1848:7, 1858:3, 1865:12, 1882:2, 1882:20, 1884:25, 1889:22, 1901:8

**cross-examine** [1] - 1882:7

**cross-examining** [1] - 1737:21

**CRR** [1] - 1715:23

**culpability** [3] - 1723:18, 1757:20, 1777:23

**cumulative** [1] - 1862:15

**Current** [1] - 1862:17

**curtailed** [1] - 1883:13

**custody** [4] - 1887:18, 1887:19, 1888:3

**customarily** [2] - 1730:8, 1730:15

**customary** [1] - 1728:12

**cut** [3] - 1730:8, 1749:4, 1786:10

# D

**dachshund** [1] - 1895:19

**dad** [2] - 1874:3, 1876:20

**daily** [1] - 1852:10

**Darien** [6] - 1830:5, 1830:7, 1830:10, 1830:12, 1830:13, 1830:15

**dark** [2] - 1850:21

**date** [10] - 1758:18, 1764:22, 1766:6, 1802:16, 1803:1, 1804:2, 1804:3, 1804:5, 1862:5, 1874:15

**dated** [1] - 1769:1

**daughter** [2] - 1735:4, 1873:24

**day's** [1] - 1821:22

**day-to-day** [6] - 1782:7, 1788:13, 1794:11, 1808:2, 1823:22, 1855:25

**days** [3] - 1751:15, 1751:22, 1896:16

**de** [1] - 1874:20

**deal** [5] - 1724:2, 1731:19, 1782:7, 1852:12, 1908:18

**dealing** [3] - 1838:12, 1839:22, 1854:7

**dealings** [5] - 1790:25, 1792:2, 1854:4, 1855:8, 1861:4

**deals** [1] - 1855:23

**dealt** [2] - 1773:1, 1883:5

**debate** [1] - 1814:10

**Debora** [1] - 1779:11

**debt** [11] - 1732:17, 1739:15, 1743:23, 1744:1, 1748:14, 1748:20, 1753:2, 1753:3, 1753:9, 1901:8, 1901:11

**Decatur** [1] - 1830:19

**December** [1] - 1881:4

**decide** [6] - 1750:2, 1814:10, 1846:13,

1848:11, 1858:5, 1878:13

**decided** [5] - 1754:24, 1836:22, 1878:14, 1878:25, 1880:10

**decides** [1] - 1806:11

**deciding** [3] - 1846:18, 1848:16, 1858:12

**decision** [12] - 1732:9, 1806:4, 1812:20, 1814:7, 1825:8, 1844:25, 1869:5, 1869:9, 1869:19, 1878:1, 1880:7, 1880:24

**decisions** [1] - 1720:8

**deed** [1] - 1816:4

**deeded** [1] - 1816:19

**deemed** [2] - 1805:7, 1805:10

**defalcations** [1] - 1782:15

**defaulted** [1] - 1734:15

**defendant** [26] - 1715:8, 1716:17, 1716:22, 1721:19, 1721:23, 1731:5, 1735:2, 1742:13, 1833:18, 1846:11, 1846:16, 1848:9, 1848:14, 1848:23, 1858:7, 1858:9, 1859:8, 1892:6, 1892:9, 1892:10, 1904:16, 1904:17, 1904:18, 1907:4, 1907:20

**Defendant** [4] - 1715:17, 1715:19, 1715:20, 1721:17

**defendant's** [4] - 1722:15, 1846:10, 1882:15, 1887:15

**defendants** [18] - 1721:22, 1722:5, 1722:8, 1727:17, 1728:4, 1728:18, 1730:4, 1730:18, 1732:12, 1733:8, 1733:12, 1733:21, 1734:3, 1734:9, 1734:18, 1871:21, 1902:20, 1903:1

**defends** [1] - 1722:22

**Defense** [4] - 1871:5, 1871:11, 1871:19, 1872:3

**defense** [12] - 1721:12, 1722:21, 1723:4, 1753:21, 1865:20, 1868:12, 1871:25, 1891:19, 1897:14, 1901:8, 1903:17, 1904:9

**defenses** [2] - 1722:20, 1722:23

**definitely** [3] - 1789:8, 1834:11, 1838:11

**delay** [1] - 1719:18

**delaying** [1] - 1763:3

**deliberate** [1] - 1868:7

**deliberately** [1] - 1771:25

**deliberating** [1] - 1868:5

**deliberation** [1] - 1899:18

**deliberations** [6] - 1892:22, 1893:22, 1895:6, 1895:8, 1896:9, 1896:15

**delivered** [1] - 1818:1

**delivering** [1] - 1898:19

**Della** [1] - 1890:4

**demand** [1] - 1773:9

**demanded** [1] - 1876:12

**demanding** [1] - 1771:5

**demonstrating** [1] - 1743:22

**demonstrative** [3] - 1904:23, 1904:25, 1905:3

**denied** [1] - 1739:1

**denies** [1] - 1762:6

**deny** [2] - 1722:2, 1886:3

**Department** [4] - 1778:23, 1779:7, 1779:15, 1779:18

**department** [4] - 1803:8, 1803:9, 1859:23, 1889:5

**deposit** [1] - 1765:19

**deposited** [1] - 1765:17

**deposits** [1] - 1839:2

**DEPUTY** [17] - 1716:5, 1716:17, 1716:21, 1716:24, 1717:2, 1717:6, 1717:18, 1717:22, 1718:25, 1719:4, 1719:7, 1719:15, 1720:16, 1721:3, 1799:5, 1832:8, 1881:18

**Deputy** [3] - 1778:22, 1785:9, 1826:5

**deputy** [1] - 1820:15

**derogatory** [1] - 1761:11

**describe** [4] - 1850:19, 1860:3, 1861:6, 1906:9

**described** [8] - 1775:21, 1796:4, 1806:13, 1846:15, 1848:13, 1855:4, 1855:17, 1858:8

**describes** [2] - 1730:10, 1788:21

**designates** [1] - 1816:11

**destroyed** [2] - 1842:4, 1842:12

**destroying** [1] - 1840:19

**destruction** [1] - 1842:1

**detail** [3] - 1882:25, 1883:4, 1906:10

**detailed** [1] - 1823:5

**determine** [3] - 1720:6, 1818:14, 1863:1

**determines** [1] - 1751:24

**develop** [3] - 1758:15, 1789:5, 1792:9

**developed** [2] - 1792:10, 1809:19

**developer** [53] - 1739:14, 1741:11, 1745:19, 1745:21, 1745:25, 1746:5, 1751:16, 1751:20, 1751:22, 1751:24, 1752:5, 1758:12, 1788:6, 1788:7, 1788:9, 1790:11, 1790:15, 1792:6, 1792:7, 1793:19, 1793:21, 1793:22, 1795:3, 1800:24, 1801:2, 1801:12, 1801:21, 1802:2, 1805:11, 1805:12, 1806:11, 1806:16, 1814:5, 1814:8, 1814:12, 1814:21, 1815:2, 1815:4, 1816:17, 1816:20, 1817:3, 1818:5, 1818:7, 1819:9, 1825:7, 1827:1, 1827:14, 1838:15, 1864:20, 1869:16, 1869:20, 1869:25, 1880:25

**developer's** [6] - 1751:23, 1790:21, 1801:14, 1814:16, 1815:12, 1815:16

**developers** [33] - 1738:23, 1739:6, 1758:11, 1762:3, 1789:14, 1794:11, 1794:13, 1794:18, 1794:20, 1794:22, 1795:8, 1795:14, 1796:17, 1801:15, 1811:22, 1811:25, 1812:3, 1814:14, 1815:14, 1819:21, 1824:16, 1824:19, 1864:22, 1868:23, 1869:2, 1869:6, 1869:10, 1870:1, 1878:2, 1878:18, 1879:9, 1879:18, 1879:21

**Developers** [1] - 1753:5

**developing** [1] - 1781:25

**development** [18] - 1747:20, 1753:15, 1760:10, 1760:17, 1780:14, 1781:21, 1781:23, 1787:23, 1788:21, 1792:11,

**Development** [11] - 1743:7, 1745:13, 1750:22, 1758:13, 1758:14, 1778:23, 1781:3, 1802:14, 1807:12, 1816:23, 1879:2

**developments** [2] - 1792:15, 1869:23

**deviates** [1] - 1804:21

**diabetic** [8] - 1887:7, 1887:20, 1888:4, 1889:12, 1889:13, 1889:17, 1890:10, 1890:12

**dialogue** [2] - 1757:4, 1851:21

**DICHIARA** [1] - 1715:20

**DiChiara** [55] - 1716:25, 1717:1, 1718:22, 1723:22, 1724:14, 1724:16, 1725:2, 1725:11, 1726:4, 1735:25, 1736:2, 1736:6, 1736:7, 1737:8, 1737:15, 1746:16, 1746:23, 1759:1, 1759:3, 1774:22, 1774:24, 1775:12, 1777:13, 1825:24, 1825:25, 1829:8, 1829:11, 1831:25, 1843:10, 1843:11, 1854:13, 1854:15, 1865:14, 1865:15, 1867:3, 1867:4, 1867:7, 1867:10, 1867:19, 1891:3, 1891:24, 1891:25, 1892:4, 1892:6, 1892:9, 1892:13, 1892:15, 1893:2, 1893:11, 1893:17, 1894:18, 1902:15, 1907:17, 1909:14, 1910:2

**dictates** [1] - 1788:24

**difference** [2] - 1756:1, 1804:17

**different** [6] - 1805:21, 1827:10, 1851:5, 1872:8, 1881:5, 1888:5

**difficult** [1] - 1766:25

**difficulty** [2] - 1764:12, 1768:21

**dig** [1] - 1839:12

**diligence** [1] - 1794:23

**dinner** [7] - 1837:8, 1838:3, 1838:19, 1839:16, 1852:1, 1855:22

**dinners** [1] - 1837:10

**direct** [17] - 1734:5, 1734:20, 1740:6, 1747:22, 1755:2, 1770:23, 1785:7, 1794:19, 1821:22, 1822:13, 1866:10, 1866:16, 1883:9, 1884:17, 1884:23, 1889:12, 1892:1

**DIRECT** [11] - 1778:13, 1800:16, 1834:8, 1849:13, 1859:5, 1868:19, 1909:19, 1910:7, 1910:13, 1910:19, 1910:23

**directly** [10] - 1728:14, 1731:15, 1775:23, 1782:24, 1792:23, 1807:24, 1808:1, 1817:15, 1824:7, 1855:24

**director** [7] - 1784:16, 1792:24, 1804:9, 1819:22, 1820:4, 1820:5, 1820:15

**disagreed** [1] - 1864:20

**disagrees** [1] - 1730:1

**disbursement** [2] - 1814:20, 1818:25

**discharge** [2] - 1751:16, 1751:25

**discharged** [1] - 1752:25

**discovery** [1] - 1748:25

**discrete** [1] - 1810:4

**discretion** [1] - 1812:15

**discuss** [10] - 1721:11, 1722:9, 1724:10, 1771:7, 1790:10, 1799:2, 1799:11, 1837:21, 1881:14, 1898:11

**discussed** [8] - 1739:8, 1741:15, 1762:2, 1771:18, 1778:19, 1784:1, 1789:22

**discussing** [5] - 1717:24, 1739:15, 1771:10, 1782:3, 1827:20

**discussion** [4] - 1757:8, 1790:14, 1790:17, 1905:23

**discussions** [2] - 1751:1, 1788:7

**disparage** [1] - 1882:13

**dispute** [2] - 1877:16, 1882:2

**disputes** [1] - 1884:19

**disqualified** [1] - 1788:1

**disqualify** [2] - 1798:7, 1798:10

**disseminated** [1] - 1785:23

**distinguish** [1] - 1906:18

**distribute** [1] - 1900:7

**DISTRICT** [3] - 1715:1, 1715:1, 1715:11

**District** [4] - 1715:14, 1716:6, 1716:7, 1899:17

**divided** [1] - 1729:4

**Division** [5] - 1780:7, 1871:5, 1871:11, 1871:19, 1872:3

**division** [1] - 1780:10

**divorce** [2] - 1760:14

**doctor** [1] - 1718:21

**document** [36] - 1728:1, 1728:5, 1729:5, 1729:9, 1729:25, 1743:22, 1744:1, 1744:3, 1744:5, 1746:18, 1747:13, 1747:15, 1748:23, 1748:25, 1749:1, 1749:21, 1750:9, 1750:18, 1752:6, 1752:12, 1752:13, 1754:6, 1754:7, 1766:9, 1767:25, 1805:22, 1809:5, 1822:25, 1823:2, 1823:4, 1862:1, 1862:8, 1880:14, 1880:19, 1885:2, 1904:3

**documentation** [1] - 1727:14

**documents** [18] - 1725:21, 1727:12, 1729:4, 1732:7, 1735:9, 1744:2, 1749:1, 1752:13, 1752:14, 1752:17, 1753:2, 1760:7, 1780:22, 1840:20, 1842:12, 1879:4, 1903:23, 1903:25

**Doe** [6] - 1728:18, 1729:7, 1730:5, 1730:19, 1730:24, 1734:12

**dog** [10] - 1750:10, 1894:21, 1895:2, 1895:4, 1895:5, 1895:7, 1895:25, 1896:3, 1896:4, 1908:19

**doggie** [1] - 1895:14

**doghouse** [1] - 1895:25

**dogs** [2] - 1895:18, 1896:1

**DOI** [2] - 1779:12, 1779:13

**dollar** [3] - 1756:9, 1811:20, 1812:18

**dollars** [2] - 1732:18, 1817:13

**donations** [1] - 1838:4

**done** [23] - 1797:6, 1798:5, 1802:9, 1802:10, 1803:16, 1810:17, 1810:22, 1811:7, 1811:8, 1815:9, 1821:13, 1825:14, 1828:1, 1828:7, 1829:3, 1829:4, 1835:16, 1838:17, 1844:15,

1859:16, 1875:9, 1891:11
**door** [2] - 1762:9, 1886:3
**doubt** [2] - 1734:8, 1749:9
**down** [20] - 1749:4, 1761:25, 1763:3, 1771:25, 1772:2, 1774:18, 1776:24, 1777:1, 1777:6, 1779:21, 1799:8, 1831:3, 1833:21, 1836:15, 1845:11, 1848:25, 1857:20, 1865:18, 1881:21, 1886:4
**downstairs** [1] - 1735:22
**draft** [3] - 1897:6, 1898:17, 1905:18
**draw** [1] - 1904:4
**drawings** [2] - 1863:16, 1863:18
**dropped** [1] - 1724:5
**due** [4] - 1744:7, 1794:23, 1862:10, 1862:17
**duly** [6] - 1738:2, 1778:11, 1804:6, 1849:11, 1858:24, 1868:15
**DUNN** [3] - 1715:7, 1738:1, 1909:6
**Dunn** [99] - 1715:18, 1716:10, 1716:18, 1721:19, 1722:4, 1723:13, 1723:16, 1725:20, 1737:20, 1738:6, 1743:25, 1747:6, 1747:17, 1748:14, 1750:18, 1751:9, 1754:2, 1757:13, 1757:17, 1758:2, 1758:9, 1758:13, 1758:18, 1760:4, 1761:12, 1762:16, 1763:2, 1763:9, 1764:3, 1774:25, 1775:17, 1776:24, 1777:2, 1777:16, 1777:21, 1778:16, 1783:8, 1783:11, 1783:17, 1790:3, 1791:1, 1821:22, 1826:8, 1829:23, 1830:7, 1830:11, 1830:12, 1830:13, 1830:16, 1830:20, 1833:14, 1858:21, 1858:22, 1859:8, 1859:12, 1860:8, 1864:22, 1865:2, 1865:6, 1865:20, 1869:6, 1875:14, 1875:20, 1875:24, 1876:1, 1876:2, 1876:7, 1876:15, 1876:18, 1876:19, 1877:2, 1877:7, 1877:19, 1877:22, 1877:23, 1878:7, 1878:20, 1879:10, 1879:13, 1879:17, 1879:25, 1880:4, 1880:25, 1886:3, 1886:22, 1888:12, 1889:9, 1889:11, 1889:16, 1890:10, 1890:11, 1901:9, 1904:18, 1907:15, 1907:22, 1908:3, 1908:6
**Dunn's** [15] - 1721:8, 1721:15, 1721:17, 1721:21, 1721:25, 1723:18, 1723:19, 1725:6, 1745:16, 1757:19, 1757:21, 1759:3, 1777:23, 1777:24, 1877:12
**duration** [1] - 1894:25
**during** [32] - 1741:18, 1758:8, 1762:5, 1764:5, 1770:23, 1772:12, 1775:4, 1779:15, 1781:21, 1786:25, 1787:3, 1792:11, 1793:12, 1794:13, 1794:15, 1799:3, 1815:23, 1815:25, 1816:9, 1823:7, 1825:3, 1830:20, 1839:3, 1839:16, 1842:5, 1851:18, 1864:12, 1871:14, 1876:1, 1896:9, 1899:18
**duty** [1] - 1842:10
**Dwight** [4] - 1733:10, 1735:5, 1735:7

# E

**E-mail** [1] - 1820:9
**eager** [2] - 1717:12, 1719:23
**early** [1] - 1908:13
**easier** [2] - 1764:7, 1908:2
**easily** [1] - 1782:2
**East** [2] - 1715:14, 1715:24
**EASTERN** [1] - 1715:1
**Eastern** [2] - 1715:14, 1716:6
**eat** [1] - 1719:3
**educate** [1] - 1836:23
**educational** [3] - 1834:23, 1849:17, 1870:22
**Edwina** [1] - 1894:11
**effect** [1] - 1771:4
**effort** [1] - 1883:13
**efforts** [1] - 1852:16
**eight** [3] - 1872:1, 1890:2, 1903:6
**either** [8] - 1722:13, 1779:25, 1791:1, 1805:10, 1838:13, 1877:22, 1880:8, 1894:21
**elder** [1] - 1852:21
**elderly** [1] - 1839:15
**Element** [1] - 1906:9
**element** [1] - 1889:20
**elements** [1] - 1899:19
**eleven** [1] - 1905:7
**elicit** [2] - 1886:5, 1887:8
**elicited** [1] - 1882:10
**eliciting** [2] - 1822:9, 1901:7
**eligible** [1] - 1805:19
**elsewhere** [1] - 1836:21
**empty** [1] - 1815:3
**encourage** [1] - 1789:1
**end** [21] - 1718:2, 1725:6, 1742:8, 1743:9, 1745:20, 1759:1, 1759:2, 1763:21, 1789:7, 1811:9, 1812:23, 1814:22, 1814:25, 1822:17, 1832:4, 1847:6, 1864:8, 1864:11, 1884:23, 1896:13, 1898:10
**ending** [1] - 1770:14
**ends** [3] - 1843:9, 1847:14, 1893:6
**engage** [1] - 1727:15
**engaged** [4] - 1730:6, 1732:21, 1776:5, 1835:13
**enhanced** [1] - 1754:5
**enlarged** [1] - 1770:2
**enter** [2] - 1754:16, 1878:3
**entered** [4] - 1749:23, 1749:25, 1750:2, 1750:21
**entering** [2] - 1737:15, 1748:2
**Enterprise** [11] - 1781:6, 1781:10, 1781:22, 1781:24, 1782:4, 1788:25, 1823:13, 1823:14, 1823:16, 1823:18
**enters** [5] - 1716:2, 1719:12, 1721:2, 1737:17, 1833:11
**entire** [6] - 1752:12, 1753:13, 1759:1, 1874:10, 1883:10, 1893:10
**entirely** [1] - 1762:25
**entitled** [2] - 1775:10, 1846:7

**entity** [3] - 1758:14, 1816:20, 1823:10
**entrepreneur** [3] - 1754:13, 1783:17, 1786:11
**entrepreneur's** [1] - 1802:6
**Entrepreneurs** [2] - 1780:3, 1780:9
**entrepreneurs** [5] - 1754:4, 1783:5, 1784:8, 1786:25, 1811:18
**entry** [5] - 1765:5, 1767:1, 1767:23, 1768:7, 1768:20
**enumerated** [1] - 1905:7
**equally** [1] - 1905:16
**equals** [2] - 1767:2, 1767:5
**equity** [2] - 1732:15, 1752:6
**especially** [2] - 1721:22, 1838:1
**ESQ** [8] - 1715:13, 1715:15, 1715:16, 1715:17, 1715:19, 1715:19, 1715:20, 1715:21
**Esq** [2] - 1758:10, 1758:11
**essence** [1] - 1858:2
**essentially** [2] - 1882:5, 1887:6
**estate** [7] - 1760:20, 1775:18, 1776:6, 1838:14, 1868:23, 1873:7, 1875:18
**estimate** [5] - 1804:19, 1871:14, 1871:24, 1891:6, 1891:7
**estimates** [1] - 1742:3
**et** [2] - 1716:10, 1775:10
**evaluate** [3] - 1818:20, 1904:19
**evaluated** [2] - 1782:22, 1784:11
**evaluating** [2] - 1783:16, 1788:3
**evaluation** [5] - 1783:19, 1784:13, 1784:14, 1785:19, 1787:5
**evaluations** [1] - 1782:23
**Evans** [15] - 1716:19, 1759:6, 1778:15, 1800:14, 1821:4, 1821:21, 1831:6, 1831:21, 1833:4, 1854:13, 1859:7, 1891:9, 1899:15, 1901:7, 1902:11
**EVANS** [103] - 1715:17, 1716:19, 1718:14, 1730:24, 1742:15, 1743:13, 1745:7, 1745:9, 1745:12, 1746:2, 1746:11, 1748:21, 1748:24, 1749:11, 1749:14, 1749:20, 1749:25, 1750:4, 1750:6, 1750:12, 1753:24, 1759:7, 1760:2, 1760:3, 1761:15, 1775:13, 1777:2, 1778:14, 1798:17, 1798:20, 1798:24, 1800:17, 1821:6, 1821:12, 1821:15, 1821:18, 1822:15, 1822:21, 1822:22, 1824:6, 1825:20, 1830:2, 1830:4, 1831:1, 1831:7, 1831:10, 1831:13, 1831:24, 1833:5, 1843:12, 1847:6, 1854:14, 1858:16, 1858:19, 1858:22, 1859:6, 1865:11, 1865:20, 1868:5, 1886:18, 1889:3, 1889:8, 1889:10, 1891:10, 1893:16, 1894:5, 1894:8, 1895:18, 1895:23, 1896:3, 1897:5, 1897:19, 1898:1, 1898:9, 1898:19, 1898:25, 1899:7, 1899:16, 1899:23, 1901:23, 1902:2, 1902:12, 1902:17, 1902:23, 1902:25, 1903:3, 1903:6, 1903:8, 1903:14, 1903:24, 1904:5, 1904:11, 1904:22, 1905:5, 1905:9, 1907:15, 1907:22, 1907:25,

1908:9, 1909:10, 1909:20, 1910:4, 1910:20

**evening** [2] - 1881:11, 1881:16

**event** [7] - 1720:5, 1720:23, 1751:13, 1752:3, 1816:11, 1893:22, 1896:10

**events** [3] - 1771:7, 1856:1, 1857:2

**eventually** [1] - 1835:4

**evidence** [18] - 1734:5, 1734:18, 1734:20, 1734:22, 1735:1, 1739:19, 1747:14, 1753:23, 1764:4, 1764:5, 1841:20, 1842:1, 1846:16, 1848:14, 1858:8, 1861:24, 1889:19, 1890:11

**evidentiary** [1] - 1892:12

**ex** [1] - 1760:21

**ex-wife's** [1] - 1760:21

**exact** [2] - 1732:3, 1738:21

**Exactly** [1] - 1743:9

**exactly** [2] - 1804:13, 1898:23

**EXAMINATION** [33] - 1738:4, 1760:1, 1763:23, 1774:23, 1775:15, 1778:13, 1800:16, 1826:3, 1828:21, 1829:10, 1830:3, 1834:8, 1844:1, 1849:13, 1854:17, 1859:5, 1868:19, 1909:7, 1909:9, 1909:11, 1909:13, 1909:15, 1909:19, 1909:21, 1909:23, 1910:1, 1910:3, 1910:7, 1910:9, 1910:13, 1910:15, 1910:19, 1910:23

**examination** [20] - 1721:9, 1721:16, 1727:17, 1727:18, 1736:12, 1759:5, 1761:25, 1770:23, 1772:25, 1840:3, 1846:10, 1848:7, 1858:3, 1865:12, 1866:11, 1882:2, 1882:20, 1884:25, 1889:22, 1901:8

**examine** [1] - 1882:7

**examined** [7] - 1738:3, 1778:12, 1800:13, 1834:7, 1849:12, 1858:24, 1868:15

**examining** [1] - 1737:21

**example** [9] - 1803:22, 1812:13, 1813:5, 1815:2, 1839:12, 1863:12, 1898:25, 1899:22, 1899:23

**exceeded** [2] - 1739:2, 1880:22

**except** [1] - 1906:7

**excess** [3] - 1728:15, 1728:16, 1731:25

**exchange** [1] - 1875:23

**exciting** [1] - 1881:11

**exclusively** [1] - 1873:7

**exculpate** [1] - 1721:19

**exculpatory** [3] - 1721:21, 1722:4, 1737:7

**excuse** [9] - 1728:20, 1763:25, 1805:11, 1841:21, 1853:2, 1881:11, 1889:4, 1889:10

**excused** [6] - 1799:9, 1831:5, 1845:12, 1857:21, 1865:19, 1881:22

**exhausted** [1] - 1773:23

**Exhibit** [14] - 1739:20, 1739:22, 1747:14, 1751:3, 1753:21, 1754:3, 1764:1, 1764:4, 1765:24, 1861:24, 1862:23, 1880:15, 1911:4, 1911:6

**exhibit** [3] - 1739:21, 1739:22, 1903:10

**exhibits** [3] - 1903:10, 1903:16, 1903:18

**exist** [1] - 1743:20

**existed** [2] - 1753:3, 1753:4

**existence** [1] - 1744:1

**existing** [2] - 1730:12, 1731:6

**exists** [2] - 1743:22, 1797:21

**exits** [4] - 1720:17, 1799:6, 1832:9, 1881:19

**expanded** [2] - 1872:17, 1882:19

**expecting** [1] - 1891:10

**expedite** [1] - 1897:12

**expedited** [1] - 1718:1

**expense** [1] - 1718:5

**experience** [5] - 1806:23, 1815:14, 1886:22, 1897:15, 1899:17

**expert** [2] - 1886:21, 1887:2

**explain** [7] - 1788:18, 1792:5, 1794:1, 1795:11, 1836:16, 1898:20, 1899:9

**explains** [1] - 1741:9

**explanation** [2] - 1898:21, 1898:23

**express** [1] - 1907:5

**expressly** [1] - 1907:4

**Expressway** [1] - 1719:20

**extent** [1] - 1855:4

**extinguish** [1] - 1730:9

**extortion** [3] - 1901:2, 1901:10

**extract** [1] - 1762:10

**extremely** [1] - 1854:9

**eye** [2] - 1775:7

---

# F

**F-E-L-L-I-N** [2] - 1834:4, 1834:11

**face** [4] - 1727:22, 1729:5, 1731:25, 1852:25

**fact** [18] - 1720:1, 1725:12, 1731:23, 1763:14, 1769:15, 1772:12, 1775:21, 1828:15, 1839:14, 1848:6, 1869:25, 1882:5, 1889:13, 1892:3, 1892:4, 1902:19, 1904:14, 1905:14

**factor** [1] - 1880:24

**facts** [6] - 1731:5, 1734:6, 1734:10, 1738:20, 1844:25, 1857:13

**factual** [1] - 1737:11

**fail** [2] - 1815:14, 1815:16

**failed** [4] - 1840:8, 1842:22, 1844:19, 1857:8

**fails** [1] - 1752:3

**failure** [2] - 1814:21, 1815:4

**fair** [8] - 1762:13, 1775:4, 1839:22, 1853:25, 1854:7, 1857:16, 1882:15, 1884:24

**fairly** [1] - 1837:25

**faith** [6] - 1727:21, 1734:7, 1734:11, 1735:7, 1841:13, 1852:4

**faiths** [2] - 1851:21, 1852:5

**fall** [2] - 1733:9, 1838:1

**familiar** [8] - 1817:12, 1829:12, 1829:15, 1844:13, 1855:8, 1859:22, 1859:25, 1878:23

**families** [1] - 1876:10

**family** [17] - 1728:19, 1729:7, 1730:5, 1730:19, 1730:24, 1733:10, 1734:12, 1735:3, 1735:8, 1735:13, 1760:15, 1764:18, 1875:6, 1876:10, 1876:14, 1876:18

**far** [7] - 1717:13, 1731:24, 1753:20, 1839:22, 1868:6, 1898:16, 1899:10

**Far** [1] - 1849:16

**fates** [1] - 1856:2

**father** [3] - 1876:7, 1876:12, 1876:15

**father's** [1] - 1876:18

**faulting** [1] - 1722:14

**favors** [1] - 1825:7

**FBI** [1] - 1887:18

**fear** [3] - 1901:16, 1901:22, 1902:5

**February** [4] - 1764:22, 1765:7, 1765:10, 1871:16

**Federal** [4] - 1794:5, 1809:11, 1816:19, 1886:17

**federal** [5] - 1779:25, 1809:15, 1809:23, 1810:14

**fee** [1] - 1885:1

**fees** [4] - 1729:3, 1730:18, 1814:15, 1814:16

**fell** [1] - 1793:3

**Fellin** [6] - 1833:19, 1834:2, 1834:13, 1834:23, 1835:12, 1844:3

**FELLIN** [2] - 1834:5, 1910:6

**FELON** [1] - 1834:10

**felt** [4] - 1733:8, 1753:11, 1875:5, 1875:6

**fetch** [1] - 1894:17

**few** [12] - 1720:6, 1725:20, 1761:17, 1788:5, 1798:1, 1805:22, 1836:10, 1837:5, 1854:23, 1870:15, 1896:16, 1902:21

**fiduciary** [1] - 1842:9

**fifteen** [2] - 1745:20, 1802:2, 1874:16

**fifteen-year** [1] - 1745:20

**fifth** [1] - 1754:12

**fight** [1] - 1750:11

**figure** [1] - 1891:15

**file** [3] - 1727:6, 1736:23, 1741:6

**filed** [9] - 1742:12, 1746:19, 1746:20, 1746:21, 1746:25, 1751:14, 1879:1, 1888:19

**files** [2] - 1741:10, 1789:25

**fill** [1] - 1838:8

**filled** [4] - 1863:8, 1863:9, 1880:16, 1887:11

**filling** [2] - 1868:25, 1880:18

**final** [4] - 1742:17, 1742:19, 1848:4, 1858:16

**finally** [2] - 1789:11, 1792:6

**financial** [8] - 1789:16, 1789:17, 1790:7, 1790:11, 1790:21, 1792:8, 1796:25, 1814:21

**financials** [3] - 1796:19, 1798:4, 1877:12

**financier** [1] - 1745:20

**financiers** [1] - 1780:24

---

**financing** [26] - 1760:21, 1768:12, 1768:17, 1775:9, 1776:4, 1776:12, 1782:3, 1793:6, 1793:20, 1794:6, 1807:23, 1807:25, 1808:3, 1809:1, 1809:4, 1809:6, 1809:9, 1809:12, 1810:14, 1811:2, 1811:10, 1812:8, 1812:10, 1825:18, 1875:18, 1877:3
**fine** [13] - 1718:3, 1718:19, 1732:6, 1750:14, 1763:5, 1763:19, 1841:24, 1885:8, 1898:14, 1901:19, 1904:5, 1904:21, 1908:10
**finger** [1] - 1770:8
**fingers** [1] - 1908:11
**finish** [7] - 1731:10, 1817:4, 1822:4, 1847:9, 1867:20, 1867:24, 1908:13
**finished** [4] - 1759:4, 1808:17, 1815:10, 1867:13
**firm** [12] - 1732:7, 1764:18, 1765:13, 1766:22, 1768:19, 1872:8, 1872:12, 1872:17, 1873:1, 1873:4, 1873:6, 1877:22
**firm's** [1] - 1727:6
**firms** [1] - 1787:23
**First** [2] - 1747:19, 1785:9
**first** [53] - 1721:7, 1723:17, 1724:2, 1724:10, 1724:12, 1730:8, 1733:6, 1745:12, 1747:23, 1755:12, 1757:19, 1764:6, 1769:12, 1770:5, 1777:22, 1778:11, 1786:10, 1786:15, 1786:17, 1787:1, 1797:10, 1797:11, 1797:12, 1802:10, 1804:22, 1805:23, 1810:25, 1811:11, 1834:6, 1836:7, 1839:12, 1841:12, 1842:13, 1842:18, 1849:11, 1851:3, 1851:7, 1866:6, 1866:7, 1866:8, 1868:25, 1871:3, 1874:4, 1879:8, 1881:3, 1889:11, 1890:16, 1894:5, 1895:19, 1900:3, 1906:8, 1907:25
**first-time** [1] - 1804:22
**fiscal** [1] - 1810:15
**Five** [1] - 1807:19
**five** [16] - 1726:6, 1751:22, 1752:4, 1755:7, 1794:14, 1794:15, 1794:17, 1795:14, 1829:17, 1829:19, 1832:1, 1832:3, 1832:7, 1876:16, 1878:15, 1878:16
**five-business-day** [1] - 1752:4
**five-minute** [2] - 1832:1, 1832:3
**Fleet** [3] - 1807:17, 1808:13, 1808:15
**flipped** [1] - 1731:24
**foggy** [1] - 1889:18
**folks** [1] - 1785:7
**follow** [1] - 1840:14
**following** [8] - 1716:3, 1726:9, 1758:8, 1769:20, 1799:14, 1840:1, 1846:1, 1888:23
**follows** [6] - 1738:3, 1778:12, 1834:7, 1849:12, 1858:25, 1868:16
**food** [2] - 1838:9, 1852:1
**Fool's** [1] - 1834:18
**footer** [2] - 1908:1, 1908:5

**footnote** [1] - 1722:11
**FOR** [1] - 1715:10
**force** [3] - 1901:15, 1901:22, 1902:5
**forced** [1] - 1755:5
**foreclosing** [1] - 1733:24
**foresee** [1] - 1843:7
**forget** [1] - 1762:2
**form** [17] - 1739:24, 1805:21, 1836:22, 1839:4, 1839:21, 1853:20, 1854:6, 1862:19, 1863:20, 1878:4, 1879:6, 1882:13, 1887:10, 1888:17, 1888:20, 1888:21, 1898:21
**formal** [1] - 1779:18
**formed** [3] - 1816:20, 1868:22, 1879:1
**forming** [3] - 1846:14, 1848:12, 1858:6
**forms** [1] - 1869:1
**formulated** [1] - 1780:19
**forth** [3] - 1723:8, 1736:19, 1836:24
**forty** [1] - 1835:11
**forty-two** [1] - 1835:11
**forward** [2] - 1878:14, 1878:25
**foster** [1] - 1883:6
**Foundation** [1] - 1781:11
**four** [9] - 1734:16, 1757:1, 1770:20, 1770:25, 1870:19, 1872:2, 1873:4, 1878:24, 1880:11
**fracture** [2] - 1717:14, 1717:15
**frame** [2] - 1738:21, 1877:18
**frames** [1] - 1881:1
**Frank** [1] - 1834:4
**FRANK** [2] - 1834:5, 1910:6
**frankly** [4] - 1737:7, 1846:3, 1884:15, 1896:1
**fraud** [6] - 1734:9, 1905:24, 1906:9, 1906:14
**frauds** [1] - 1758:4
**FREEMAN** [1] - 1715:7
**Freeman** [41] - 1715:21, 1716:24, 1717:1, 1723:15, 1723:21, 1727:5, 1732:6, 1738:23, 1739:1, 1757:16, 1757:23, 1758:4, 1758:10, 1758:14, 1758:19, 1760:9, 1764:18, 1765:4, 1765:13, 1765:20, 1766:2, 1766:23, 1770:22, 1772:14, 1773:5, 1773:19, 1774:11, 1775:2, 1775:7, 1777:19, 1778:1, 1790:3, 1791:1, 1869:5, 1871:9, 1872:25, 1877:22, 1880:8, 1904:12, 1907:23, 1908:3
**fresh** [1] - 1866:4
**Frey** [1] - 1785:17
**Friday** [8] - 1868:5, 1868:7, 1892:22, 1893:1, 1893:2, 1893:12, 1893:15, 1896:17
**Fridays** [1] - 1893:22
**friend** [2] - 1744:13, 1744:17
**friendly** [1] - 1836:10
**friends** [1] - 1735:4
**frightened** [1] - 1774:2
**front** [1] - 1750:1
**fruit** [1] - 1876:8

**full** [6] - 1731:22, 1778:3, 1834:1, 1835:3, 1849:4
**full-time** [1] - 1835:3
**fully** [1] - 1736:9
**function** [2] - 1853:13, 1868:23
**fund** [4] - 1809:16, 1825:14, 1825:15, 1825:18
**Fund** [2] - 1781:3, 1807:12
**funded** [1] - 1818:17
**funder** [1] - 1819:5
**Funding** [2] - 1802:14, 1816:22
**funding** [5] - 1789:1, 1789:2, 1818:22, 1823:13, 1877:12
**fundraising** [1] - 1838:24
**funds** [10] - 1739:18, 1747:12, 1809:11, 1810:7, 1810:8, 1810:9, 1810:14, 1823:5, 1838:2, 1863:5

## G

**G-R-E-E-N-S-P-A-N** [1] - 1849:8
**gain** [1] - 1825:3
**gaps** [1] - 1838:8
**Gates** [4] - 1840:10, 1842:24, 1844:21, 1857:9
**gathers** [1] - 1808:8
**gears** [1] - 1881:7
**general** [29] - 1741:12, 1742:8, 1743:10, 1754:14, 1756:10, 1794:25, 1795:2, 1795:12, 1795:13, 1796:3, 1796:7, 1797:19, 1797:22, 1798:7, 1800:19, 1801:3, 1801:11, 1802:7, 1804:4, 1804:10, 1804:14, 1805:12, 1806:14, 1827:1, 1827:2, 1860:16, 1863:12, 1863:13, 1878:17
**generally** [1] - 1808:25
**generosity** [5] - 1839:11, 1840:7, 1842:21, 1844:18, 1857:7
**gentleman** [3] - 1872:5, 1873:2, 1875:19
**Gentlemen** [2] - 1767:10, 1792:5
**gentlemen** [10] - 1773:22, 1800:10, 1836:3, 1836:17, 1870:11, 1870:21, 1873:5, 1873:21, 1875:12, 1878:9
**George** [7] - 1760:22, 1761:5, 1761:8, 1762:1, 1762:5, 1824:12, 1829:15
**Gerald** [1] - 1717:1
**GERSHON** [3] - 1715:10, 1716:2, 1721:2
**Gershon** [1] - 1716:8
**given** [17] - 1728:16, 1729:7, 1731:13, 1755:22, 1780:20, 1787:23, 1792:14, 1805:1, 1806:2, 1846:19, 1848:17, 1853:9, 1861:18, 1862:24, 1869:25, 1882:4, 1906:7
**Glenn** [2] - 1830:5, 1830:7
**goal** [1] - 1826:20
**Gordon** [1] - 1781:18
**government** [25] - 1727:4, 1727:8, 1727:13, 1727:16, 1728:3, 1728:17, 1729:3, 1730:1, 1730:10, 1730:25, 1739:22, 1746:18, 1757:14, 1759:5,

1770:20, 1771:15, 1809:16, 1809:23, 1890:5, 1890:11, 1890:16, 1897:6, 1903:17, 1904:7, 1907:14

**Government** [22] - 1715:13, 1716:11, 1721:8, 1721:25, 1722:3, 1722:12, 1722:14, 1722:16, 1722:25, 1723:2, 1723:13, 1724:5, 1724:16, 1739:19, 1762:12, 1764:4, 1831:22, 1882:6, 1882:10, 1882:22, 1885:1, 1886:19

**Government's** [10] - 1747:14, 1751:3, 1753:21, 1754:3, 1764:1, 1861:24, 1880:15, 1882:16, 1911:4, 1911:6

**government's** [3] - 1728:22, 1730:21, 1893:5

**governments** [1] - 1779:25

**graduate** [1] - 1849:19

**graduated** [1] - 1834:24

**graduating** [1] - 1870:25

**grammar** [2] - 1835:16, 1835:18

**great** [3] - 1731:19, 1844:4, 1847:12

**GREENSPAN** [2] - 1849:10, 1910:12

**Greenspan** [3] - 1848:24, 1849:5, 1849:15

**grew** [3] - 1870:23, 1876:2, 1876:7

**grid** [2] - 1863:7, 1863:8

**grids** [1] - 1792:18

**ground** [1] - 1885:7

**group** [5] - 1776:4, 1837:17, 1851:16, 1851:20

**growing** [1] - 1876:17

**guarantee** [4] - 1741:25, 1753:1, 1811:25, 1812:1

**guarantees** [1] - 1815:12

**guess** [3] - 1836:11, 1836:19, 1879:10

**guidance** [1] - 1820:23

**guide** [1] - 1754:4

**guilt** [1] - 1734:7

**gutted** [1] - 1815:3

# H

**H-E-N-D-R-I-C-K-S-O-N** [1] - 1778:8

**Habitat** [9] - 1873:19, 1873:22, 1873:23, 1874:1, 1874:13, 1874:14, 1874:17, 1882:11, 1883:9

**half** [8] - 1742:5, 1815:9, 1866:12, 1866:23, 1867:15, 1890:20, 1891:7, 1891:23

**hall** [1] - 1894:17

**Hancock** [6] - 1755:7, 1758:11, 1758:15, 1770:24, 1775:6, 1823:22

**hand** [7] - 1777:7, 1833:21, 1839:13, 1849:1, 1862:1, 1862:4, 1898:16

**handed** [1] - 1786:18

**handled** [2] - 1760:11, 1817:21

**handles** [1] - 1838:25

**handling** [1] - 1794:11

**hands** [3] - 1756:9, 1764:8, 1808:8

**handwriting** [1] - 1764:25

**handy** [1] - 1744:10

**happy** [2] - 1898:7, 1898:9

**hard** [10] - 1742:4, 1753:14, 1811:20, 1812:18, 1817:13, 1817:22, 1817:24, 1818:4, 1821:1, 1891:22

**hard-dollar** [2] - 1811:20, 1812:18

**hardcopy** [1] - 1764:8

**hardly** [1] - 1853:1

**harmony** [1] - 1817:4

**heading** [3] - 1899:5, 1899:11, 1899:18

**headings** [4] - 1898:20, 1899:4, 1900:2, 1900:3

**healthy** [1] - 1876:21

**hear** [11] - 1723:12, 1724:7, 1732:8, 1736:18, 1757:13, 1822:11, 1842:18, 1848:21, 1873:10, 1884:8, 1890:14

**heard** [16] - 1717:16, 1723:13, 1724:8, 1737:5, 1756:17, 1756:23, 1771:12, 1777:16, 1777:17, 1848:3, 1873:8, 1873:14, 1878:2, 1880:21, 1885:2, 1885:4

**hearing** [8] - 1761:21, 1821:8, 1831:16, 1887:15, 1890:2, 1897:20, 1897:21, 1898:3

**hearsay** [1] - 1879:12

**heart** [2] - 1731:7, 1854:1

**Heidi** [2] - 1819:12, 1819:13, 1820:1, 1820:9, 1820:16

**Heights** [1] - 1835:7

**held** [10] - 1745:17, 1752:1, 1761:20, 1778:24, 1778:25, 1802:1, 1815:23, 1815:25, 1821:7, 1831:15

**help** [15] - 1756:2, 1766:9, 1766:19, 1767:7, 1794:6, 1824:16, 1835:17, 1838:25, 1839:12, 1846:13, 1848:11, 1852:22, 1858:5, 1874:4, 1876:13

**helped** [2] - 1754:22, 1877:3

**helpful** [2] - 1764:10, 1900:3

**helping** [2] - 1760:20, 1838:19

**helps** [4] - 1765:2, 1839:15, 1855:22, 1891:14

**Hempstead** [1] - 1874:18

**Hendrickson** [8] - 1777:3, 1778:3, 1778:5, 1778:15, 1800:13, 1800:18, 1828:23, 1830:5

**HENDRICKSON** [3] - 1778:10, 1800:5, 1909:18

**Herlicka** [1] - 1779:11

**hesitate** [1] - 1857:14

**High** [1] - 1870:23

**high** [4] - 1757:2, 1828:10, 1834:25, 1835:19

**higher** [2] - 1756:20, 1827:6

**highest** [1] - 1733:25

**highlight** [2] - 1740:7, 1754:11

**highly** [1] - 1721:24

**himself** [2] - 1746:10, 1776:2

**history** [1] - 1883:10

**hit** [2] - 1717:10, 1893:22

**hitting** [1] - 1876:4

**hmm** [4] - 1764:14, 1801:1, 1803:2, 1806:18

**hoc** [1] - 1860:25

**hold** [5] - 1737:8, 1739:18, 1741:18, 1747:12, 1816:7

**holiday** [1] - 1850:13

**Home** [2] - 1809:11, 1809:13

**home** [2] - 1732:14, 1735:11

**Homes** [1] - 1824:2

**homes** [2] - 1874:21, 1874:22

**honest** [5] - 1736:9, 1826:23, 1854:8, 1854:9, 1857:11

**honesty** [6] - 1839:22, 1840:7, 1842:21, 1844:18, 1854:7, 1857:7

**Honor** [91] - 1716:15, 1716:20, 1716:25, 1718:13, 1718:15, 1718:22, 1726:4, 1727:5, 1727:19, 1731:4, 1733:3, 1734:5, 1734:20, 1736:20, 1736:22, 1745:9, 1747:4, 1757:24, 1758:23, 1759:7, 1760:3, 1761:16, 1761:17, 1768:3, 1769:11, 1777:2, 1798:17, 1821:6, 1821:20, 1825:21, 1825:23, 1825:25, 1826:2, 1830:1, 1830:2, 1831:7, 1831:10, 1833:8, 1833:18, 1841:3, 1842:14, 1843:11, 1843:12, 1846:3, 1848:23, 1853:18, 1854:14, 1854:15, 1857:19, 1857:22, 1858:16, 1862:15, 1865:13, 1865:15, 1865:17, 1866:4, 1866:24, 1867:5, 1867:11, 1867:16, 1867:18, 1868:12, 1881:6, 1882:4, 1882:10, 1883:24, 1884:21, 1885:10, 1885:18, 1886:18, 1889:3, 1889:8, 1891:6, 1891:14, 1893:14, 1894:6, 1894:20, 1895:18, 1897:10, 1901:1, 1902:15, 1902:17, 1904:7, 1904:21, 1904:22, 1905:13, 1906:16, 1907:9, 1907:14, 1907:17

**HONORABLE** [1] - 1715:10

**Honorable** [1] - 1716:7

**honored** [1] - 1874:11

**hook** [1] - 1789:10

**hope** [2] - 1882:4, 1895:6

**hopefully** [3] - 1720:11, 1881:11, 1890:20

**hoping** [2] - 1719:25, 1896:16

**hospital** [8] - 1717:11, 1717:25, 1718:4, 1719:24, 1720:2, 1720:21, 1721:5, 1886:17

**Hospital** [2] - 1717:11, 1719:21

**hostile** [1] - 1752:22

**hour** [13] - 1738:19, 1866:12, 1866:14, 1866:23, 1867:15, 1890:19, 1891:7, 1891:10, 1891:16, 1891:23, 1892:1

**hours** [6] - 1718:2, 1720:1, 1720:6, 1866:15, 1890:19, 1900:5

**house** [7] - 1732:17, 1734:13, 1735:6, 1735:16, 1815:3, 1839:16, 1874:2

**houses** [1] - 1874:17

**Housing** [10] - 1778:23, 1781:2, 1785:16, 1786:12, 1787:10, 1795:25, 1802:14, 1807:12, 1816:22, 1824:13

**housing** [2] - 1874:25

**HPD** [81] - 1745:17, 1746:1, 1754:15, 1754:22, 1755:5, 1755:17, 1755:22,

1756:16, 1764:19, 1773:1, 1773:5, 1784:13, 1784:15, 1785:13, 1785:24, 1785:25, 1786:1, 1786:8, 1786:18, 1786:20, 1787:3, 1787:9, 1787:11, 1787:23, 1789:4, 1789:6, 1789:8, 1792:21, 1795:2, 1795:18, 1795:24, 1796:25, 1797:1, 1797:3, 1797:6, 1797:10, 1797:12, 1797:17, 1797:20, 1802:13, 1802:17, 1803:3, 1804:3, 1804:4, 1804:18, 1806:17, 1806:19, 1808:4, 1808:7, 1808:9, 1808:14, 1808:20, 1809:8, 1809:14, 1809:15, 1809:17, 1810:3, 1810:6, 1811:9, 1811:25, 1818:3, 1818:9, 1818:13, 1818:24, 1819:1, 1820:13, 1823:25, 1824:25, 1825:4, 1859:23, 1861:15, 1870:2, 1878:2, 1879:10, 1879:11, 1879:13, 1880:1

**HPD's** [2] - 1809:10, 1810:21

**HUD** [1] - 1809:23

**Humanity** [7] - 1873:19, 1873:22, 1873:23, 1874:13, 1874:14, 1874:17, 1882:12

**hundreds** [2] - 1752:13, 1752:17

**HYMOWITZ** [1] - 1715:7

**Hymowitz** [112] - 1715:19, 1716:21, 1716:22, 1721:23, 1723:15, 1723:20, 1727:9, 1732:6, 1736:10, 1738:23, 1739:1, 1757:15, 1757:22, 1758:3, 1758:10, 1758:13, 1758:18, 1760:16, 1762:16, 1763:2, 1763:5, 1764:17, 1765:4, 1765:13, 1765:20, 1766:2, 1766:12, 1766:23, 1767:18, 1768:11, 1768:16, 1768:20, 1769:1, 1769:16, 1770:21, 1771:7, 1771:18, 1771:21, 1771:24, 1772:14, 1773:6, 1773:13, 1773:16, 1774:10, 1775:23, 1776:2, 1776:6, 1776:9, 1776:10, 1777:19, 1777:25, 1792:3, 1833:16, 1833:19, 1835:23, 1835:24, 1836:6, 1837:1, 1837:16, 1838:10, 1838:13, 1838:22, 1839:3, 1840:8, 1840:11, 1840:16, 1840:19, 1840:23, 1842:12, 1842:16, 1842:22, 1842:25, 1844:19, 1844:22, 1848:24, 1850:17, 1851:2, 1854:5, 1855:5, 1855:15, 1857:2, 1857:7, 1857:10, 1857:11, 1866:3, 1866:9, 1867:14, 1868:13, 1868:18, 1872:12, 1872:13, 1872:14, 1872:15, 1877:22, 1879:25, 1882:2, 1882:5, 1882:17, 1883:7, 1883:18, 1885:5, 1891:19, 1891:21, 1904:18, 1907:16, 1907:21, 1907:23, 1908:4

**Hymowitz's** [10] - 1833:17, 1840:6, 1840:22, 1842:21, 1844:13, 1844:18, 1857:6, 1866:16, 1867:7, 1885:2

**hypothetical** [2] - 1757:7, 1805:23

## I

**Ian** [1] - 1781:14

**idea** [3] - 1873:6, 1878:3, 1895:22

**identified** [5] - 1735:3, 1801:24, 1805:5, 1844:9, 1850:23

**identify** [2] - 1806:18, 1899:13

**ill** [1] - 1886:15

**illicit** [1] - 1901:14

**immediate** [1] - 1811:12

**impact** [1] - 1752:16

**impeach** [1] - 1762:20

**impeaching** [1] - 1762:21

**implicitly** [1] - 1839:23

**import** [1] - 1882:13

**impression** [1] - 1894:5

**improper** [2] - 1722:3, 1899:1

**improvements** [1] - 1732:14

**inaccurate** [1] - 1899:11

**incarceration** [1] - 1886:22

**incentives** [1] - 1865:6

**incident** [1] - 1835:21, 1836:19

**incidentally** [2] - 1849:25, 1873:8

**inclination** [1] - 1896:11

**include** [3] - 1790:7, 1812:5, 1903:9

**included** [1] - 1898:20

**includes** [3] - 1852:5, 1901:6, 1901:13

**including** [6] - 1719:9, 1722:17, 1784:16, 1792:8, 1895:19, 1908:18

**income** [2] - 1794:5, 1816:19

**incomprehensible** [1] - 1734:11

**inconsistent** [4] - 1722:5, 1722:20, 1722:23, 1723:8

**incorporation** [2] - 1838:17, 1879:3

**indebtedness** [1] - 1729:22

**indeed** [2] - 1829:3, 1842:16

**independent** [1] - 1792:2

**index** [4] - 1899:13, 1899:14, 1900:4

**indicate** [3] - 1727:8, 1727:10, 1727:11

**indicated** [2] - 1735:1, 1736:10, 1756:19

**indicates** [5] - 1728:8, 1728:18, 1729:21, 1730:3, 1745:2

**indicating** [2] - 1729:4, 1765:17

**indicted** [1] - 1824:21

**indictment** [6] - 1758:5, 1772:22, 1773:1, 1825:1, 1905:6, 1905:17

**indirect** [1] - 1734:22

**individual** [12] - 1722:2, 1735:3, 1745:21, 1783:3, 1783:5, 1790:25, 1792:12, 1792:15, 1810:11, 1810:22, 1812:22, 1888:2

**individuals** [1] - 1789:24

**ineffective** [1] - 1725:12

**inference** [1] - 1904:4

**influence** [1] - 1825:8

**information** [30] - 1719:17, 1720:21, 1722:15, 1733:10, 1767:9, 1768:23, 1786:2, 1786:3, 1786:4, 1786:21, 1787:13, 1789:13, 1789:15, 1789:16, 1789:17, 1789:19, 1789:20, 1789:24, 1790:2, 1790:5, 1793:1, 1796:25, 1797:25, 1798:2, 1801:7, 1801:10, 1803:12, 1841:5, 1870:7, 1878:8

**initial** [2] - 1787:22, 1811:22

**innocent** [2] - 1905:14, 1906:18

**input** [1] - 1807:25

**inquire** [3] - 1734:23, 1736:11, 1843:13

**inquiring** [1] - 1762:23

**inside** [1] - 1819:15

**inspect** [3] - 1828:5, 1861:19, 1864:2

**inspecting** [1] - 1865:4

**inspection** [2] - 1862:20, 1864:14

**inspections** [2] - 1860:1, 1864:5

**installed** [1] - 1860:6

**instance** [1] - 1820:24

**instances** [1] - 1837:19

**instead** [3] - 1733:24, 1735:13, 1828:10

**institution** [1] - 1776:3

**institutions** [1] - 1844:9

**instruct** [3] - 1723:15, 1757:16, 1777:20

**instruction** [27] - 1721:11, 1721:12, 1722:7, 1723:3, 1723:5, 1723:9, 1724:25, 1725:1, 1725:3, 1725:5, 1725:7, 1725:9, 1725:19, 1757:9, 1758:25, 1777:11, 1777:15, 1845:4, 1846:2, 1846:4, 1846:23, 1847:6, 1848:5, 1857:23, 1858:3, 1902:18

**instructions** [2] - 1848:5, 1858:1

**instructs** [2] - 1818:22, 1899:3

**instrument** [1] - 1728:7

**insuring** [1] - 1870:7

**intake** [4] - 1886:14, 1887:10, 1888:17, 1888:21

**intend** [2] - 1885:12, 1889:20

**intended** [3] - 1840:5, 1884:16, 1900:3

**intent** [2] - 1907:4, 1907:5

**intention** [3] - 1868:22, 1869:1, 1879:4

**intentional** [1] - 1906:10

**interact** [5] - 1780:23, 1781:10, 1787:4, 1837:16, 1852:6

**interacting** [2] - 1788:25, 1853:6

**interactions** [1] - 1853:19

**interactive** [1] - 1787:6

**interacts** [1] - 1855:22

**interest** [4] - 1854:1, 1854:2, 1876:3, 1888:10

**interested** [4] - 1875:21, 1877:12, 1877:17, 1896:1

**interesting** [1] - 1876:20

**Interfaith** [18] - 1837:5, 1837:6, 1837:15, 1837:22, 1838:14, 1838:18, 1838:20, 1850:7, 1851:10, 1851:12, 1851:14, 1851:15, 1851:18, 1852:8, 1852:15, 1855:18, 1856:2, 1873:10

**interfaith** [1] - 1838:3, 1851:25, 1855:22

**intermediary** [2] - 1735:2, 1789:5

**interpret** [1] - 1745:15

**interrogation** [1] - 1890:5

**interview** [2] - 1774:1, 1890:4

**interviewed** [2] - 1755:20, 1758:7

**introduce** [1] - 1888:14

**introduced** [1] - 1889:13

**investigation** [2] - 1734:9, 1888:8

**Investigation** [3] - 1779:8, 1779:16, 1779:19

**invite** [2] - 1754:23, 1754:25
**invited** [4] - 1756:2, 756:5, 757:1
**invoice** [1] - 1744:6
**involve** [1] - 1856:1
**involved** [30] - 1722:1, 1731:15, 1734:4, 1735:15, 1768:11, 1780:3, 1807:22, 1811:20, 1835:15, 1835:20, 1836:25, 1838:22, 1845:1, 1851:5, 1851:15, 1852:16, 1852:18, 1852:19, 1855:5, 1855:11, 1855:24, 1864:7, 1870:5, 1871:20, 1873:19, 1874:5, 1875:10, 1880:25, 1890:3
**involvement** [6] - 1723:14, 1757:15, 1777:18, 1870:9, 1873:22, 1880:18
**IOLTA** [1] - 1765:20
**irresponsible** [1] - 1804:24
**Island** [2] - 1873:25, 1874:3
**issuance** [1] - 1816:18
**issue** [18] - 1721:15, 1722:10, 1736:8, 1736:18, 1749:13, 1749:15, 1788:10, 1808:10, 1866:20, 1884:25, 1889:1, 1890:12, 1893:25, 1894:5, 1895:2, 1897:11, 1899:17, 1907:11
**issued** [5] - 1786:14, 1788:12, 1794:8, 1816:15, 1816:21
**issues** [14] - 1722:17, 1724:2, 1724:3, 1724:4, 1745:14, 1782:7, 1818:24, 1854:4, 1854:5, 1879:12, 1882:1, 1888:6, 1908:18
**Italy** [1] - 1874:11
**item** [7] - 1812:14, 1813:12, 1814:2, 1818:21, 1820:21, 1820:22, 1828:13
**items** [5] - 1788:21, 1793:23, 1813:1, 1820:24, 1821:23
**itself** [3] - 1725:9, 1794:15, 1896:7

## J

**Jackie** [3] - 1823:5, 1823:6, 1823:7
**Jackson** [1] - 1835:7
**Jamaica** [2] - 1717:11, 1719:21
**January** [4] - 1765:6, 1765:10, 1862:6, 1871:17
**Jewish** [2] - 1849:20, 1852:4
**Jews** [1] - 1774:18
**job** [15] - 1755:6, 1755:7, 1755:8, 1778:21, 1795:19, 1806:24, 1828:14, 1859:14, 1859:15, 1860:10, 1860:20, 1861:7, 1861:8, 1865:7, 1871:3
**John** [5] - 1784:20, 1785:9, 1833:19, 1834:2, 1873:2
**John's** [3] - 1834:24, 1834:25, 1835:3
**joined** [2] - 1873:3, 1874:1
**joining** [1] - 1716:14
**joint** [3] - 1745:18, 1786:14, 1814:7
**joint-ownership** [1] - 1745:18
**jointly** [9] - 1840:9, 1840:10, 1840:20, 1842:23, 1842:24, 1844:20, 1844:21, 1857:9, 1857:10
**Joseph** [4] - 1803:11, 1803:12, 1858:22, 1859:2
**Joseph's** [1] - 1803:19

**JP** [1] - 1765:19
**JR** [1] - 1715:17
**judge** [4] - 1735:25, 1746:16, 1891:3, 1897:5
**Judge** [18] - 1716:2, 1721:2, 1724:14, 1724:21, 1725:2, 1725:17, 1725:24, 1774:22, 1775:12, 1777:13, 1829:8, 1840:4, 1846:5, 1890:22, 1891:25, 1892:6, 1893:3, 1899:16
**JUDGE** [1] - 1715:11
**judgment** [2] - 1857:13, 1857:15
**June** [1] - 1772:6
**Junior's** [1] - 1771:12
**juries** [1] - 1899:2
**juror** [9] - 1717:3, 1735:22, 1736:3, 1866:20, 1893:25, 1894:21, 1895:9, 1895:15, 1896:11
**Juror** [4] - 1717:4, 1719:19, 1721:5, 1897:2
**jurors** [2] - 1800:12, 1866:20
**JURY** [2] - 1715:10, 1719:14
**Jury** [11] - 1719:12, 1719:16, 1720:17, 1723:12, 1767:10, 1792:5, 1799:1, 1799:6, 1832:9, 1881:10, 1881:19
**jury** [59] - 1716:4, 1717:13, 1718:9, 1718:24, 1719:3, 1719:24, 1720:6, 1720:14, 1720:18, 1723:25, 1727:1, 1737:16, 1737:17, 1737:19, 1751:5, 1754:3, 1757:12, 1760:12, 1761:21, 1772:4, 1773:22, 1799:7, 1800:3, 1800:4, 1800:6, 1800:9, 1800:11, 1821:8, 1831:16, 1833:1, 1833:11, 1833:13, 1836:3, 1836:17, 1848:2, 1858:1, 1860:3, 1860:8, 1861:6, 1866:14, 1866:25, 1867:1, 1867:23, 1868:3, 1870:11, 1870:21, 1873:5, 1873:21, 1875:13, 1878:6, 1880:14, 1881:20, 1892:21, 1893:20, 1894:22, 1895:4, 1898:20, 1899:18, 1907:3
**jury's** [1] - 1866:17

## K

**keep** [4] - 1730:18, 1892:23, 1892:24, 1908:2
**kept** [8] - 1729:2, 1730:5, 1730:25, 1731:5, 1744:8, 1789:20, 1789:25, 1792:11
**kickback** [5] - 1743:20, 1748:20, 1758:9, 1758:19, 1901:13
**kickbacks** [1] - 1827:3
**kid** [1] - 1876:9
**kidding** [1] - 1894:20
**kids** [1] - 1835:17
**kind** [15] - 1770:15, 1785:23, 1788:20, 1792:17, 1799:3, 1812:23, 1820:23, 1853:24, 1857:15, 1873:6, 1881:16, 1888:19, 1891:22, 1896:8, 1906:19
**kindly** [1] - 1895:13
**kinds** [1] - 1882:17
**King** [1] - 1772:16
**knowing** [2] - 1803:4, 1906:10

**knowledge** [14] - 1783:25, 1801:9, 1801:12, 1804:11, 1811:24, 1818:13, 1825:2, 1879:22, 1880:24, 1883:19, 1885:3, 1886:12, 1897:17, 1907:3
**known** [2] - 1722:16, 1851:3
**knows** [2] - 1746:4, 1897:15
**kosher** [2] - 1852:1

## L

**labeled** [1] - 1729:9
**lack** [1] - 1733:11
**ladies** [10] - 1773:22, 1800:10, 1836:2, 1836:16, 1870:11, 1870:21, 1873:5, 1873:21, 1875:12, 1878:6
**Ladies** [2] - 1767:10, 1792:5
**lady** [1] - 1731:14
**language** [5] - 1770:12, 1901:12, 1905:22, 1905:24, 1907:7
**larger** [5] - 1747:15, 1851:23, 1854:1, 1854:3
**last** [18] - 1717:16, 1778:6, 1821:12, 1822:15, 1822:22, 1831:10, 1834:3, 1849:6, 1859:3, 1871:24, 1874:16
**lastly** [1] - 1905:5
**latest** [1] - 1718:11
**latter** [1] - 1774:1
**Laurie** [2] - 1785:6, 1785:12
**Law** [1] - 1870:24
**law** [8] - 1732:7, 1765:13, 1766:22, 1870:25, 1871:3, 1872:5, 1872:8, 1877:22
**law-related** [1] - 1871:3
**lawsuit** [16] - 1736:12, 1736:18, 1736:25, 1737:4, 1841:1, 1841:8, 1841:18, 1842:3, 1842:8, 1842:9, 1842:16, 1882:8, 1882:25, 1883:5, 1884:2, 1884:12
**lawyer** [2] - 1728:7, 1752:20
**lawyers** [7] - 1728:8, 1730:6, 1752:14, 1842:17, 1886:4, 1903:10, 1903:24
**lay** [1] - 1885:7
**leader** [1] - 1855:12
**leading** [5] - 1746:13, 1783:9, 1837:20, 1873:17, 1889:14
**leads** [1] - 1839:11
**league** [2] - 1836:8
**leaning** [1] - 1867:11
**learn** [2] - 1876:2, 1886:23
**learned** [1] - 1771:4
**learning** [1] - 1896:1
**least** [13] - 1718:10, 1720:9, 1722:20, 1722:23, 1727:10, 1732:7, 1798:15, 1837:18, 1852:9, 1852:11, 1864:6, 1900:6
**leave** [4] - 1736:5, 1843:1, 1904:14, 1905:4
**led** [1] - 1875:13
**Lee** [37] - 1715:19, 1716:21, 1758:10, 1760:16, 1766:12, 1767:13, 1767:18, 1770:19, 1771:7, 1837:2, 1837:6,

1837:7, 1837:11, 1839:10, 1839:18, 1840:7, 1840:15, 1840:18, 1842:22, 1845:1, 1850:17, 1851:3, 1851:14, 1852:6, 1852:9, 1852:14, 1852:15, 1852:24, 1853:6, 1853:13, 1853:19, 1853:22, 1857:11, 1868:12, 1868:18, 1868:21, 1870:11

**LEE** [1] - 1715:7
**Lee's** [2] - 1839:22, 1853:8
**leeway** [2] - 1882:9, 1884:10
**left** [5] - 1806:1, 1871:19, 1872:3, 1891:19, 1895:21
**leg** [1] - 1837:11
**legal** [11] - 1729:3, 1730:18, 1752:16, 1752:20, 1760:14, 1764:18, 1768:14, 1780:22, 1844:15, 1877:8, 1889:5
**Legal** [5] - 1871:4, 1871:5, 1871:12, 1871:19, 1872:3
**legitimate** [1] - 1901:11
**lender** [14] - 1745:2, 1752:5, 1754:16, 1789:4, 1789:6, 1789:7, 1789:8, 1807:8, 1807:9, 1807:13, 1807:15, 1807:17, 1808:4, 1808:20
**lenders** [1] - 1809:8
**lending** [6] - 1776:2, 1788:16, 1808:7, 1808:14, 1811:6, 1811:7
**length** [2] - 1722:18, 1826:15
**Lenore** [2] - 1781:18, 1781:21
**lent** [1] - 1775:23
**less** [7] - 1738:19, 1789:2, 1818:17, 1835:17, 1837:8, 1872:19, 1891:16
**letter** [9] - 1727:3, 1728:23, 1728:24, 1730:11, 1730:21, 1735:2, 1796:6, 1863:5, 1863:6
**level** [2] - 1809:18, 1810:12
**Lexington** [24] - 1739:15, 1741:14, 1741:22, 1747:20, 1748:3, 1748:13, 1749:13, 1750:22, 1750:23, 1775:5, 1790:18, 1790:22, 1793:12, 1793:15, 1795:8, 1806:25, 1808:12, 1808:19, 1809:3, 1809:6, 1811:19, 1813:6, 1822:24, 1827:10
**liable** [1] - 1888:2
**lien** [27] - 1729:23, 1732:15, 1741:3, 1741:6, 1741:10, 1741:13, 1742:12, 1742:18, 1742:20, 1743:8, 1745:2, 1746:18, 1746:19, 1746:20, 1746:21, 1746:25, 1747:7, 1747:12, 1748:15, 1749:8, 1750:13, 1751:13, 1751:20, 1751:21, 1751:23, 1752:4, 1752:7
**liens** [4] - 1740:9, 1751:16, 1751:25
**life** [3] - 1874:10, 1874:16, 1875:2
**likely** [1] - 1864:18
**limine** [4] - 1724:6, 1724:10, 1728:22, 1885:19
**limited** [4] - 1722:12, 1762:23, 1852:3, 1855:5
**limiting** [5] - 1721:11, 1721:12, 1722:7, 1723:3, 1723:5
**Lindsay** [1] - 1876:9
**line** [19] - 1751:13, 1788:21, 1812:14,

1812:22, 1812:25, 1813:12, 1814:2, 1818:17, 1818:21, 1820:3, 1820:18, 1820:21, 1820:22, 1820:24, 1821:23, 1821:25, 1828:13, 1842:11, 1863:4
**lines** [2] - 1819:25, 1820:17
**list** [27] - 1754:22, 1754:24, 1755:12, 1755:15, 1795:3, 1795:4, 1795:7, 1795:14, 1796:12, 1796:14, 1796:17, 1796:19, 1796:22, 1796:24, 1797:1, 1797:2, 1797:4, 1797:5, 1797:6, 1797:7, 1797:8, 1797:11, 1797:23, 1798:13, 1829:18, 1829:24, 1879:9
**listening** [1] - 1761:9
**litigated** [1] - 1722:18
**living** [1] - 1871:23
**LLC** [2] - 1750:22, 1879:2
**Loan** [1] - 1810:6
**loan** [16] - 1727:9, 1729:4, 1729:23, 1730:9, 1732:16, 1732:20, 1765:12, 1765:14, 1808:10, 1808:11, 1808:16, 1809:14, 1809:16, 1811:10, 1812:3, 1812:5
**located** [9] - 1744:20, 1830:19, 1840:9, 1842:23, 1844:9, 1844:10, 1844:21, 1854:24, 1857:9
**location** [1] - 1830:23
**locked** [1] - 1790:1
**lodged** [1] - 1897:16
**look** [16] - 1740:11, 1749:3, 1749:7, 1764:2, 1764:21, 1767:1, 1767:17, 1767:23, 1769:6, 1796:18, 1797:13, 1799:2, 1808:3, 1812:23, 1893:9, 1894:2
**looked** [1] - 1751:12
**looking** [10] - 1748:25, 1807:22, 1809:3, 1809:5, 1812:13, 1817:15, 1820:9, 1820:14, 1838:4, 1875:19
**looks** [4] - 1732:23, 1748:1, 1828:6, 1892:14
**LoPrimo** [2] - 1785:6, 1785:12
**LORETTA** [1] - 1715:13
**losing** [1] - 1815:5
**loss** [1] - 1794:2
**lost** [3] - 1839:16, 1866:14, 1866:15
**loud** [1] - 1740:10
**Louis** [1] - 1872:6
**low** [1] - 1816:19
**lower** [1] - 1804:21, 1804:23, 1862:4
**lowest** [8] - 1756:11, 1756:12, 1804:14, 1804:16, 1804:20, 1805:5, 1826:18, 1826:21
**lucky** [1] - 1891:11
**lugs** [1] - 1837:11
**lunch** [6] - 1798:22, 1799:11, 1800:18, 1893:18, 1896:7, 1896:8
**luncheon** [1] - 1798:18
**Lydia** [1] - 1785:17
**LYNCH** [1] - 1715:13

**M**

**ma'am** [3] - 1718:25, 1719:4, 1825:3

**Mackie** [1] - 1783:8
**Mahmood** [1] - 1733:17
**mail** [4] - 1820:9, 1905:24, 1906:9, 1906:14
**maintain** [1] - 1869:22
**majority** [1] - 1880:5
**malfeasance** [1] - 1883:5
**Malik** [3] - 1731:9, 1733:17
**man** [4] - 1783:7, 1830:5, 1857:11, 1876:17
**Man** [1] - 1874:12
**manage** [3] - 1789:18, 1792:9, 1896:7
**Management** [1] - 1780:8
**management** [4] - 1770:18, 1770:19, 1782:10, 1792:19
**manager** [9] - 1751:16, 1751:20, 1751:22, 1751:23, 1751:24, 1752:5, 1781:22, 1817:19, 1817:25
**managers** [1] - 1794:11
**Manhattan** [2] - 1872:5, 1876:8
**manner** [2] - 1792:10, 1904:19
**manpower** [1] - 1795:19
**March** [7] - 1715:7, 1733:2, 1733:12, 1734:17, 1803:18, 1803:22, 1908:20
**Marett** [8] - 1872:6, 1872:7, 1872:9, 1872:12, 1872:13, 1872:14, 1872:15
**Marie** [3] - 1777:2, 1778:5, 1800:13
**MARIE** [4] - 1715:16, 1778:10, 1800:5, 1909:18
**Mark** [2] - 1848:24, 1849:5
**MARK** [2] - 1849:10, 1910:12
**marked** [4] - 1747:14, 1751:7, 1754:1, 1765:24
**market** [1] - 1804:23
**married** [4] - 1834:17, 1849:25, 1850:15, 1870:16
**marshal** [1] - 1895:9
**Martha's** [1] - 1744:21
**material** [2] - 1787:20, 1836:20
**materials** [1] - 1860:6
**matter** [3] - 1736:24, 1798:1, 1839:14
**matters** [5] - 1760:15, 1764:19, 1768:14, 1877:8, 1893:2
**Maurice** [1] - 1716:23
**maximum** [1] - 1891:6
**MCR** [7] - 1740:4, 1740:5, 1752:22, 1753:5, 1753:6, 1753:11, 1860:23
**MDC** [3] - 1886:16, 1887:7, 1889:5
**mean** [25] - 1732:2, 1737:5, 1765:9, 1788:8, 1795:17, 1801:12, 1808:7, 1816:3, 1817:14, 1829:4, 1839:6, 1882:24, 1883:6, 1883:11, 1886:2, 1890:24, 1895:9, 1895:13, 1897:24, 1903:10, 1903:25, 1904:1, 1904:3, 1908:7
**meaning** [5] - 1795:18, 1795:24, 1860:19, 1860:20, 1904:3
**means** [7] - 1729:22, 1804:18, 1810:21, 1895:4, 1903:12, 1903:17, 1903:24
**meant** [5] - 1730:7, 1731:5, 1813:9, 1883:11, 1903:20

VB        OCR        CRR

**mechanic's** [20] - 1740:9, 1741:3, 1741:6, 1741:10, 1741:13, 1742:12, 1742:18, 1742:20, 1743:8, 1745:2, 1746:19, 1746:20, 1746:21, 1746:25, 1747:7, 1747:12, 1748:15, 1749:8, 1750:13, 1751:13

**mechanical** [1] - 1715:25

**mediator** [1] - 1852:20

**medical** [16] - 1885:15, 1886:16, 1886:19, 1887:10, 1888:1, 1888:11, 1888:12, 1888:18, 1888:19, 1888:20, 1889:1, 1889:2, 1889:6, 1889:16, 1889:18, 1890:11

**medication** [1] - 1897:22

**medium** [1] - 1898:7

**meet** [4] - 1779:13, 1792:16, 1798:23, 1861:12

**meeting** [18] - 1760:23, 1761:3, 1761:4, 1762:5, 1779:22, 1783:15, 1783:19, 1784:22, 1785:19, 1785:22, 1785:23, 1785:25, 1786:1, 1836:13, 1836:22, 1837:20, 1861:3, 1863:23

**meetings** [6] - 1788:7, 1792:18, 1792:25, 1851:21, 1855:17, 1855:24

**member** [4] - 1851:4, 1870:25, 1873:1, 1882:11

**Members** [4] - 1719:16, 1723:12, 1799:1, 1881:10

**members** [10] - 1737:18, 1757:12, 1764:18, 1779:12, 1781:12, 1833:13, 1848:2, 1853:23, 1858:1, 1879:5

**membership** [1] - 1873:9

**memo** [5] - 1765:5, 1767:1, 1767:23, 1768:7, 1769:17

**memory** [3] - 1889:18, 1889:23, 1889:24

**men** [1] - 1850:22

**mentioned** [8] - 1768:11, 1771:9, 1771:21, 1771:23, 1771:24, 1851:10, 1855:12, 1877:2

**mere** [3] - 1905:14, 1905:21

**merely** [1] - 1806:5

**message** [1] - 1717:19

**met** [23] - 1761:2, 1761:6, 1778:17, 1779:1, 1779:4, 1779:7, 1779:11, 1779:15, 1826:10, 1836:7, 1836:12, 1837:1, 1844:5, 1844:7, 1851:2, 1854:21, 1859:10, 1859:13, 1860:8, 1860:10, 1864:23, 1876:15, 1877:2

**method** [3] - 1782:18, 1782:21, 1819:4

**Metropolis** [1] - 1758:12

**Michael** [8] - 1715:21, 1716:24, 1758:10, 1760:9, 1770:19, 1871:8, 1872:25, 1879:15

**MICHAEL** [1] - 1715:7

**microphone** [1] - 1883:3

**middle** [3] - 1864:9, 1877:20, 1881:5

**might** [14] - 1718:15, 1760:12, 1776:14, 1803:13, 1805:7, 1829:24, 1838:16, 1838:25, 1855:20, 1867:23, 1893:23, 1896:16, 1908:9

**Mike** [2] - 1775:2, 1869:5

**million** [10] - 1732:18, 1732:19, 1741:23, 1741:24, 1741:25, 1742:5, 1756:9, 1828:11, 1828:12

**mind** [2] - 1752:16, 1846:3

**mine** [1] - 1862:4

**minimal** [1] - 1788:8

**minimum** [2] - 1776:14, 1829:19

**minority** [1] - 1737:7

**minute** [6] - 1736:4, 1777:10, 1832:1, 1832:3, 1853:2

**minutes** [10] - 1720:20, 1720:24, 1726:6, 1779:21, 1832:7, 1867:15, 1883:9, 1891:1, 1891:4

**misappropriating** [2] - 1840:17, 1840:23

**misconduct** [1] - 1883:1

**missing** [3] - 1727:25, 1729:12, 1899:15

**misunderstanding** [1] - 1796:15

**mixing** [1] - 1881:1

**model** [1] - 1875:7

**modification** [1] - 1822:23

**modified** [2] - 1864:13, 1864:17

**Mohney** [1] - 1779:11

**mom** [1] - 1875:9

**moment** [9] - 1721:13, 1722:9, 1726:3, 1727:25, 1740:8, 1751:9, 1771:15, 1836:15, 1902:14

**momentarily** [1] - 1735:23

**moments** [1] - 1857:23

**Monday** [2] - 1896:15, 1896:25

**money** [53] - 1729:6, 1732:14, 1733:17, 1735:13, 1735:17, 1739:10, 1743:10, 1744:7, 1752:10, 1752:21, 1753:1, 1753:16, 1762:1, 1763:4, 1771:5, 1775:23, 1776:1, 1789:1, 1789:2, 1808:8, 1809:10, 1809:11, 1809:14, 1809:15, 1809:18, 1809:20, 1809:22, 1809:23, 1810:3, 1811:22, 1813:5, 1814:3, 1814:5, 1815:1, 1815:5, 1818:1, 1818:23, 1824:15, 1824:19, 1825:7, 1826:21, 1835:17, 1838:8, 1840:8, 1840:17, 1840:23, 1842:22, 1844:19, 1857:8, 1865:6, 1901:6, 1901:13

**monies** [3] - 1739:14, 1752:25, 1775:10

**month** [4] - 1776:11, 1776:16, 1837:18, 1864:6

**monthly** [5] - 1741:17, 1837:18, 1851:21, 1864:12

**months** [7] - 1732:4, 1734:15, 1734:16, 1770:25, 1788:5, 1851:7, 1871:22

**Morgan** [1] - 1765:19

**morning** [23] - 1716:15, 1716:16, 1716:20, 1716:25, 1718:2, 1718:11, 1719:13, 1719:14, 1719:18, 1737:18, 1738:7, 1738:8, 1866:4, 1866:6, 1866:8, 1881:12, 1887:7, 1896:6, 1896:21, 1906:25, 1907:10, 1908:11, 1908:17

**Morris** [2] - 1717:5, 1719:19

**mortgage** [44] - 1727:7, 1728:4, 1728:5, 1728:10, 1728:13, 1728:14, 1728:16, 1728:17, 1729:6, 1729:8, 1729:10, 1729:13, 1729:19, 1730:7, 1730:8, 1730:12, 1730:20, 1731:6, 1731:15, 1731:16, 1731:18, 1731:20, 1731:23, 1731:25, 1733:3, 1733:7, 1733:18, 1733:22, 1734:9, 1734:14, 1767:12, 1767:13, 1767:15, 1775:21, 1775:22, 1776:16, 1776:19, 1841:2, 1875:16, 1875:21, 1875:24, 1877:10

**Mortgage** [3] - 1729:9, 1809:13, 1810:6

**most** [8] - 1780:21, 1850:22, 1852:18, 1853:23, 1864:18, 1876:10, 1899:16, 1901:5

**mostly** [2] - 1838:19, 1874:23

**motion** [3] - 1724:6, 1724:10, 1736:12

**motions** [1] - 1885:19

**motive** [1] - 1888:14

**move** [11] - 1747:2, 1748:5, 1751:2, 1770:3, 1812:21, 1814:2, 1814:8, 1814:9, 1814:11, 1822:8, 1908:12

**moved** [1] - 1814:5

**multi** [1] - 1756:9

**multi-million-dollar** [1] - 1756:9

**multiple** [3] - 1809:5, 1815:19, 1842:14

**must** [1] - 1879:11

**mutual** [2] - 1851:22, 1852:23

## N

**name** [22] - 1728:10, 1770:14, 1778:4, 1778:6, 1778:15, 1785:5, 1796:18, 1834:1, 1834:3, 1835:6, 1849:4, 1849:5, 1849:6, 1859:1, 1859:2, 1859:3, 1859:7, 1868:17, 1872:6, 1873:2, 1875:8, 1892:5

**named** [4] - 1758:12, 1783:8, 1830:5, 1890:12

**names** [2] - 1795:9, 1829:20

**Nassau** [7] - 1844:12, 1850:6, 1855:3, 1855:6, 1874:13, 1874:19, 1874:22

**natural** [1] - 1870:19

**nature** [2] - 1788:23, 1798:6

**Naushan** [2] - 1715:22, 1716:14

**near** [1] - 1876:9

**necessarily** [2] - 1743:18, 1903:11

**necessary** [3] - 1751:25, 1838:8, 1893:3

**neck** [1] - 1717:12

**need** [19] - 1725:15, 1726:1, 1743:8, 1752:15, 1761:17, 1763:6, 1763:17, 1767:24, 1768:1, 1799:10, 1804:20, 1817:10, 1838:9, 1839:13, 1844:24, 1881:24, 1901:13, 1901:18

**needed** [5] - 1728:15, 1764:15, 1793:23, 1805:8, 1903:15

**needs** [3] - 1854:3, 1895:7, 1896:15

**negative** [1] - 1755:19

**negligence** [1] - 1842:10

**negotiated** [2] - 1749:14, 1758:19

**negotiations** [2] - 1760:6, 1852:19

**neighborhood** [3] - 1735:12, 1742:5,

1754:13

**Neighborhood** [26] - 1780:3, 1780:8, 1781:2, 1785:15, 1786:12, 1787:4, 1787:7, 1787:10, 1787:19, 1795:24, 1802:14, 1807:11, 1812:1, 1816:1, 1816:4, 1816:7, 1816:16, 1816:22, 1817:19, 1817:25, 1819:1, 1819:20, 1823:9, 1823:12, 1823:15, 1824:2

**NEP** [24] - 1738:22, 1738:24, 1755:7, 1782:9, 1782:18, 1789:19, 1790:25, 1792:6, 1792:24, 1794:13, 1797:19, 1798:14, 1802:6, 1804:9, 1807:1, 1814:14, 1819:13, 1819:15, 1823:6, 1823:9, 1825:5, 1830:20, 1878:15, 1878:16

**nervous** [1] - 1866:17

**net** [3] - 1879:20, 1880:21, 1880:22

**networking** [2] - 1873:15, 1882:12

**never** [12] - 1744:25, 1789:17, 1826:10, 1830:13, 1844:5, 1844:7, 1854:2, 1854:21, 1887:21, 1889:12, 1889:19, 1906:3

**nevertheless** [1] - 1869:12

**NEW** [1] - 1715:1

**new** [3] - 1754:21, 1827:17, 1894:19

**New** [34] - 1715:5, 1715:14, 1715:15, 1716:7, 1743:6, 1744:2, 1744:7, 1744:8, 1744:11, 1745:13, 1753:5, 1765:15, 1765:19, 1778:22, 1789:10, 1796:8, 1796:10, 1810:9, 1824:13, 1834:14, 1835:7, 1844:10, 1844:11, 1844:14, 1849:16, 1849:23, 1855:2, 1855:9, 1859:23, 1870:13, 1870:24, 1874:19

**newly** [1] - 1780:19

**news** [1] - 1721:4

**newspaper** [1] - 1801:6

**newspapers** [3] - 1799:2, 1878:20, 1881:15

**next** [16] - 1740:13, 1757:10, 1759:8, 1766:12, 1767:17, 1791:3, 1813:15, 1837:20, 1843:15, 1845:13, 1847:15, 1856:5, 1867:21, 1876:23, 1895:7, 1900:10

**nicely** [1] - 1896:11

**NICHOLAS** [1] - 1715:21

**night** [1] - 1889:7

**NINA** [3] - 1715:10, 1716:2, 1721:2

**Nina** [1] - 1716:7

**Noah** [1] - 1779:11

**nominate** [1] - 1806:16

**non** [2] - 1852:1, 1904:25

**non-demonstrative** [1] - 1904:25

**non-kosher** [1] - 1852:1

**nondenominational** [1] - 1874:25

**none** [1] - 1772:18

**nonprofit** [1] - 1745:3

**nonrefundable** [1] - 1885:1

**normal** [3] - 1735:16, 1752:23, 1812:25

**normally** [3] - 1761:11, 1896:3, 1906:7

**not-for-profit** [2] - 1745:18, 1811:11

**notation** [1] - 1769:17

**note** [4] - 1775:25, 1776:15, 1894:1, 1894:2

**notes** [1] - 1728:17

**nothing** [12] - 1725:11, 1731:21, 1732:7, 1732:12, 1755:25, 1761:16, 1762:6, 1822:1, 1825:20, 1830:1, 1831:1, 1865:11, 1881:11, 1895:25, 1907:15, 1907:16

**notice** [1] - 1751:15

**notified** [2] - 1793:15, 1804:3

**NPHDFC** [28] - 1754:15, 1780:25, 1781:5, 1784:11, 1785:7, 1785:18, 1786:5, 1786:9, 1786:15, 1789:7, 1789:9, 1795:18, 1796:25, 1797:17, 1807:11, 1807:20, 1811:8, 1815:24, 1816:20, 1817:7, 1817:21, 1818:2, 1818:4, 1818:24, 1819:23, 1823:8, 1823:14, 1825:15

**number** [17] - 1733:1, 1753:10, 1755:23, 1766:1, 1766:13, 1766:18, 1769:6, 1769:10, 1769:13, 1769:14, 1784:16, 1787:25, 1792:7, 1797:17, 1815:17, 1850:12

**Number** [4] - 1717:4, 1719:19, 1721:5, 1897:3

**numbers** [2] - 1769:12, 1908:1

**NY** [1] - 1715:24

**NYC** [1] - 1809:13

---

# O

**o'clock** [1] - 1881:13

**O'Neil** [1] - 1721:18

**oath** [1] - 1737:23

**object** [5] - 1750:8, 1822:5, 1841:13, 1894:10, 1897:17

**objected** [3] - 1750:6, 1750:7, 1822:3

**objection** [29] - 1742:15, 1743:13, 1745:7, 1746:8, 1748:6, 1748:22, 1750:11, 1753:24, 1762:22, 1763:15, 1783:9, 1821:20, 1839:19, 1853:4, 1853:11, 1853:15, 1862:15, 1865:9, 1873:16, 1873:18, 1874:8, 1876:5, 1894:7, 1894:8, 1901:24, 1902:11, 1902:12, 1904:6, 1907:20

**objections** [4] - 1747:1, 1898:18, 1907:24, 1907:25

**obligation** [1] - 1725:22

**obtain** [9] - 1727:14, 1735:9, 1752:10, 1752:21, 1901:15, 1901:21, 1901:23, 1902:1, 1902:3

**obtained** [4] - 1730:4, 1732:10, 1765:13, 1768:17

**obtaining** [1] - 1768:12

**obviously** [4] - 1746:9, 1876:21, 1880:10, 1893:4, 1902:21, 1907:7

**occasion** [8] - 1783:2, 1794:21, 1805:18, 1820:18, 1821:3, 1869:15, 1871:24, 1877:7

**occasions** [5] - 1805:22, 1852:24, 1853:6, 1853:8, 1853:13

**Occupancy** [4] - 1816:14, 1816:15, 1816:18, 1817:5

**occurred** [3] - 1732:5, 1840:1, 1846:1

**occurs** [1] - 1716:3

**Oceanside** [10] - 1835:20, 1835:21, 1844:10, 1849:23, 1849:24, 1850:8, 1851:3, 1851:7, 1851:23, 1854:24

**October** [1] - 1738:9

**Odd** [2] - 1770:16, 1770:17

**odd** [2] - 1770:18, 1875:3

**OF** [3] - 1715:1, 1715:3, 1715:10

**offer** [6] - 1727:20, 1748:7, 1750:8, 1865:6, 1886:18, 1891:6

**offered** [5] - 1756:2, 1764:4, 1764:5, 1835:3, 1841:19

**offering** [1] - 1727:16

**office** [7] - 1789:25, 1801:14, 1803:19, 1810:13, 1810:19, 1810:22, 1824:20, 1878:21

**officer** [2] - 1850:4

**offices** [2] - 1789:20, 1790:1

**official** [4] - 1804:2, 1885:13, 1898:5, 1898:7

**often** [7] - 1775:7, 1792:14, 1792:16, 1837:15, 1837:23, 1852:6, 1864:4

**old** [2] - 1834:15, 1870:14

**omitted** [1] - 1805:21

**omnibus** [2] - 1810:1, 1810:12

**once** [10] - 1787:15, 1787:16, 1796:24, 1812:8, 1818:24, 1837:18, 1844:16, 1852:11, 1859:13, 1864:6

**one** [79] - 1726:3, 1727:25, 1729:19, 1736:8, 1741:5, 1745:1, 1748:13, 1749:6, 1752:13, 1754:11, 1755:17, 1756:4, 1758:17, 1764:6, 1766:18, 1767:23, 1769:4, 1780:9, 1784:11, 1796:4, 1802:15, 1803:24, 1807:18, 1809:1, 1809:17, 1810:1, 1810:18, 1811:1, 1811:4, 1811:5, 1811:7, 1811:15, 1819:8, 1821:14, 1823:3, 1823:9, 1823:13, 1825:12, 1828:19, 1829:8, 1833:14, 1837:24, 1839:9, 1839:12, 1840:12, 1841:25, 1842:2, 1842:11, 1842:15, 1843:1, 1847:2, 1851:16, 1853:23, 1857:5, 1863:17, 1864:23, 1866:2, 1866:20, 1868:23, 1869:2, 1870:19, 1873:25, 1879:4, 1880:5, 1880:25, 1882:23, 1883:8, 1885:15, 1892:23, 1897:7, 1901:1, 1902:14, 1902:19, 1907:22, 1907:23, 1908:3, 1908:6, 1908:7

**One** [3] - 1734:23, 1754:12, 1908:6

**ones** [1] - 1805:14

**ongoing** [2] - 1767:12, 1813:1

**online** [1] - 1850:11

**open** [18] - 1716:1, 1720:18, 1721:1, 1727:1, 1747:3, 1750:16, 1762:9, 1763:22, 1799:7, 1800:3, 1803:21, 1805:24, 1822:19, 1832:6, 1833:1, 1848:1, 1868:10, 1881:20

**opened** [6] - 1803:1, 1804:3, 1805:13,

1872:5, 1886:2, 1890:8

**opening** [15] - 1802:1, 1802:8, 1802:10, 1802:15, 1802:17, 1802:20, 1802:22, 1802:25, 1803:5, 1803:16, 1803:17, 1803:18, 1804:1, 1804:2, 1804:5

**openings** [1] - 1806:5

**opens** [1] - 1802:17

**operate** [1] - 1739:5

**operated** [2] - 1722:1, 1758:14

**opinion** [19] - 1839:4, 1839:7, 1839:21, 1840:6, 1840:15, 1840:18, 1841:22, 1841:23, 1842:20, 1844:17, 1846:14, 1847:4, 1847:5, 1848:12, 1853:20, 1854:6, 1857:6, 1858:6, 1864:24

**opportunity** [14] - 1719:11, 1721:16, 1756:7, 1796:17, 1805:1, 1806:2, 1821:21, 1821:24, 1838:12, 1839:4, 1839:21, 1873:15, 1882:12, 1890:6

**opposed** [1] - 1880:13

**opposition** [2] - 1883:15, 1883:17

**ops** [1] - 1876:9

**option** [1] - 1897:1

**options** [1] - 1752:20

**ordained** [1] - 1849:19

**order** [9] - 1744:2, 1744:11, 1765:18, 1774:7, 1809:16, 1827:3, 1833:3, 1833:15, 1857:13

**Order** [2] - 1744:7, 1745:13

**organization** [3] - 1820:11, 1820:14, 1824:10

**organizations** [1] - 1850:5

**original** [6] - 1744:4, 1749:1, 1754:5, 1786:9, 1786:15, 1796:24

**originally** [1] - 1851:17

**origination** [1] - 1836:18

**otherwise** [2] - 1873:17, 1906:8

**ought** [1] - 1841:9

**outcome** [1] - 1826:12, 1888:9

**outgrowth** [1] - 1837:23

**outlining** [1] - 1780:14

**outset** [1] - 1868:22

**outside** [12] - 1716:3, 1720:18, 1727:1, 1786:6, 1799:7, 1808:7, 1808:13, 1820:13, 1831:8, 1831:11, 1833:1, 1881:20

**outstanding** [3] - 1744:6, 1753:8, 1793:23

**overall** [1] - 1746:3

**overboard** [1] - 1906:19

**overruled** [8] - 1743:14, 1745:8, 1746:8, 1747:1, 1862:16, 1873:18, 1874:9, 1876:6

**overrun** [1] - 1812:24, 1820:25

**overruns** [4] - 1813:4, 1814:24, 1815:10, 1821:1

**oversaw** [3] - 1756:16, 1782:6, 1788:13

**overseeing** [1] - 1794:14

**oversight** [4] - 1782:8, 1782:12, 1817:16, 1819:24

**owed** [7] - 1739:10, 1739:14, 1744:2, 1752:11, 1765:10, 1901:9, 1902:7

**own** [7] - 1718:1, 1745:14, 1794:23, 1808:9, 1818:9, 1852:21, 1882:5

**owned** [10] - 1817:7, 1840:9, 1840:10, 1840:20, 1842:23, 1842:24, 1844:20, 1844:22, 1857:9, 1857:10

**owner** [15] - 1739:25, 1741:11, 1745:3, 1745:16, 1745:21, 1745:23, 1746:4, 1746:5, 1746:10, 1746:13, 1746:14, 1835:4, 1835:9, 1861:17, 1880:5

**owners** [1] - 1879:9

**ownership** [2] - 1745:18, 1817:8

**owns** [2] - 1744:11, 1817:6

## P

**p.m** [3] - 1738:12, 1738:16, 1886:16

**package** [5] - 1795:16, 1796:1, 1801:16, 1801:25, 1802:23

**packages** [4] - 1801:13, 1802:3, 1802:5, 1805:15

**packet** [1] - 1795:22

**pad** [1] - 1827:3

**page** [44] - 1726:9, 1727:25, 1728:17, 1728:20, 1728:22, 1728:24, 1729:16, 1729:18, 1729:19, 1730:10, 1740:6, 1740:13, 1747:22, 1750:18, 1754:7, 1759:8, 1769:20, 1791:3, 1799:14, 1813:15, 1843:15, 1845:13, 1847:15, 1856:5, 1862:22, 1862:23, 1863:1, 1876:23, 1888:23, 1900:10, 1901:2, 1902:17, 1903:6, 1904:16, 1905:5, 1905:8, 1905:10, 1905:18, 1905:21, 1905:23, 1908:1, 1908:4, 1908:6, 1908:7

**PAGE** [1] - 1909:3

**Page** [1] - 1908:7

**pages** [2] - 1752:13, 1908:3

**paid** [15] - 1728:13, 1732:11, 1739:17, 1741:5, 1743:1, 1743:11, 1769:15, 1772:1, 1814:14, 1814:16, 1814:18, 1814:19, 1818:10, 1838:6

**paint** [2] - 1741:4, 1741:8

**painters** [1] - 1741:4

**paper** [1] - 1784:4

**papers** [2] - 1735:19, 1736:20

**paperwork** [1] - 1817:5

**paragraph** [3] - 1748:15, 1751:9, 1905:9

**Paralegal** [1] - 1715:22

**parcel** [1] - 1746:2

**part** [25] - 1722:21, 1729:13, 1746:2, 1748:19, 1770:5, 1770:19, 1774:1, 1782:9, 1784:9, 1784:10, 1784:13, 1788:17, 1790:24, 1797:19, 1807:1, 1820:10, 1859:19, 1862:22, 1862:24, 1870:5, 1870:9, 1899:19, 1901:17, 1901:18, 1904:11

**participants** [2] - 1785:13, 1788:4

**participate** [4] - 1760:6, 1790:12, 1790:14, 1790:17

**participated** [3] - 1784:21, 1785:15, 1792:25

**participating** [2] - 1754:9, 1754:13

**participation** [1] - 1865:7

**particular** [14] - 1742:20, 1755:14, 1755:24, 1789:21, 1790:11, 1790:20, 1809:20, 1811:18, 1820:24, 1823:3, 1860:3, 1861:8, 1876:3, 1878:16

**particularly** [1] - 1809:4, 1864:22, 1877:13

**parties** [6] - 1754:9, 1776:10, 1776:18, 1829:2, 1863:23, 1863:25

**Partner** [1] - 1802:14

**partners** [3] - 1758:10, 1762:6, 1763:11

**Partnership** [23] - 1781:2, 1785:15, 1786:12, 1787:4, 1787:8, 1787:10, 1787:19, 1795:24, 1807:12, 1812:1, 1816:1, 1816:5, 1816:7, 1816:16, 1816:22, 1817:19, 1818:1, 1819:1, 1819:21, 1823:9, 1823:12, 1823:15, 1824:13

**party** [6] - 1742:23, 1743:1, 1743:3, 1754:13, 1786:6, 1812:7

**pass** [2] - 1810:1, 1893:25

**passes** [2] - 1745:19, 1853:1

**Passover** [1] - 1850:12, 1850:13

**past** [4] - 1837:9, 1849:21, 1850:6, 1874:12

**patient** [1] - 1822:6

**Paul** [1] - 1874:20

**pause** [3] - 1740:12, 1771:16, 1894:4

**Pause** [8] - 1717:23, 1724:23, 1728:2, 1734:25, 1737:14, 1751:11, 1800:8, 1831:9

**pay** [19] - 1733:7, 1741:7, 1743:18, 1743:23, 1751:20, 1751:21, 1752:4, 1753:16, 1765:18, 1776:11, 1827:3, 1840:8, 1842:22, 1842:23, 1844:19, 1844:20, 1857:8

**paying** [3] - 1732:17, 1751:24, 1824:9

**payment** [23] - 1729:24, 1739:9, 1739:13, 1741:12, 1742:19, 1746:17, 1747:7, 1751:23, 1752:7, 1752:19, 1758:20, 1765:9, 1765:12, 1767:18, 1776:14, 1805:20, 1818:5, 1862:8, 1862:17, 1863:2, 1870:2, 1901:11, 1901:14

**payments** [15] - 1731:17, 1745:4, 1745:5, 1747:10, 1758:9, 1767:15, 1775:22, 1776:8, 1776:14, 1819:25, 1820:14, 1901:15, 1901:21, 1902:4, 1902:8

**pays** [1] - 1732:19

**peak** [1] - 1794:13

**Penna** [1] - 1890:4

**people** [31] - 1731:21, 1733:7, 1755:11, 1757:1, 1761:9, 1776:4, 1784:16, 1785:4, 1788:1, 1790:4, 1796:12, 1797:8, 1797:17, 1798:5, 1798:14, 1824:9, 1829:18, 1836:23, 1839:13, 1851:20, 1852:3, 1852:5, 1853:24, 1854:8, 1856:2, 1861:15, 1874:1, 1875:18, 1880:1, 1887:9, 1890:3

**people's** [2] - 1874:21, 1874:22

**per** [1] - 1776:11
**percent** [14] - 1741:19, 1742:4, 1804:21, 1804:23, 1815:4, 1818:16, 1818:18, 1828:6, 1828:9, 1828:11, 1829:3, 1838:7
**percentage** [5] - 1818:20, 1827:25, 1828:13, 1863:1
**percentages** [3] - 1818:15, 1827:22, 1863:6
**perfectly** [1] - 1901:11
**perform** [1] - 1852:24
**performed** [1] - 1853:13
**performing** [1] - 1806:24
**perhaps** [9] - 1783:14, 1796:19, 1805:20, 1828:5, 1831:13, 1885:6, 1894:20, 1908:1, 1908:2
**period** [14] - 1745:18, 1745:19, 1745:20, 1752:4, 1758:9, 1815:20, 1815:23, 1815:25, 1816:9, 1825:4, 1851:18, 1868:2, 1877:21, 1896:25
**periodic** [1] - 1765:9
**permanent** [9] - 1807:8, 1808:10, 1809:1, 1809:16, 1811:2, 1811:9, 1812:10, 1825:18
**permissible** [1] - 1882:19
**permitted** [4] - 1762:8, 1870:1, 1882:17, 1884:4
**person** [21] - 1728:5, 1732:18, 1732:20, 1734:14, 1782:12, 1782:15, 1808:3, 1823:18, 1833:14, 1853:24, 1854:9, 1855:16, 1880:5, 1886:9, 1886:13, 1886:21, 1887:4, 1887:8, 1887:12, 1888:1, 1892:5
**personal** [5] - 1741:25, 1815:12, 1825:3, 1886:21, 1897:17
**personally** [3] - 1768:20, 1769:16, 1895:16
**personnel** [2] - 1785:14, 1785:18
**persons** [2] - 1781:20, 1801:19
**phase** [6] - 1809:3, 1811:4, 1811:5, 1811:7, 1811:15, 1827:17
**phases** [6] - 1808:22, 1811:2, 1811:22, 1815:19, 1827:11, 1827:14
**phone** [3] - 1720:11, 1839:15, 1878:7
**phrase** [1] - 1811:9
**physical** [2] - 1885:25, 1887:2
**physically** [1] - 1890:4
**pick** [8] - 1795:15, 1795:20, 1795:21, 1796:1, 1801:16, 1801:25, 1802:3, 1805:14
**picked** [1] - 1801:14
**pickup** [1] - 1801:24
**piece** [2] - 1744:18, 1821:12
**PINTO** [1] - 1715:21
**pinto** [1] - 1717:1
**place** [9] - 1730:15, 1737:6, 1741:4, 1762:13, 1771:12, 1772:6, 1835:10, 1855:16, 1881:7
**places** [1] - 1800:21
**placing** [1] - 1875:21
**plan** [1] - 1725:20

**plans** [2] - 1754:16, 1860:7
**play** [8] - 1762:8, 1762:10, 1763:17, 1784:10, 1788:6, 1788:12, 1788:13, 1788:17, 1860:13
**played** [4] - 1772:4, 1772:9, 1782:8, 1784:9
**playing** [1] - 1763:15
**Plaza** [2] - 1715:14, 1715:24
**plus** [5] - 1730:24, 1730:25, 1767:2, 1767:5, 1880:25
**pocket** [1] - 1839:12
**point** [23] - 1720:8, 1722:24, 1725:16, 1726:2, 1727:21, 1734:7, 1743:18, 1745:1, 1748:15, 1750:4, 1750:12, 1754:12, 1756:23, 1764:11, 1773:18, 1836:2, 1850:19, 1885:7, 1886:4, 1896:9, 1899:9, 1902:24, 1904:9
**points** [2] - 1747:8, 1876:4
**portion** [9] - 1728:13, 1749:6, 1762:7, 1762:10, 1762:11, 1862:1, 1862:4, 1862:9, 1892:12
**portions** [3] - 1771:11, 1772:4, 1772:9
**Posa** [10] - 1716:13, 1732:22, 1737:1, 1826:1, 1828:25, 1865:16, 1883:2, 1884:10, 1889:10, 1908:14
**POSA** [84] - 1715:16, 1716:13, 1718:13, 1727:19, 1731:4, 1732:2, 1732:24, 1733:2, 1733:6, 1733:16, 1733:23, 1734:5, 1734:20, 1734:23, 1735:1, 1735:11, 1735:20, 1736:5, 1736:8, 1736:16, 1736:19, 1746:6, 1783:9, 1821:20, 1822:5, 1826:2, 1826:4, 1828:17, 1830:1, 1841:3, 1842:1, 1862:15, 1865:9, 1865:17, 1866:14, 1868:1, 1873:16, 1874:8, 1876:5, 1882:4, 1882:24, 1883:4, 1883:16, 1884:3, 1884:21, 1885:8, 1885:10, 1885:25, 1886:10, 1886:13, 1887:6, 1887:17, 1888:17, 1888:21, 1889:1, 1889:4, 1889:9, 1890:18, 1891:22, 1892:2, 1892:5, 1892:19, 1894:13, 1897:10, 1897:14, 1897:23, 1898:4, 1898:12, 1901:1, 1901:5, 1901:19, 1901:21, 1901:25, 1902:4, 1902:9, 1904:7, 1904:9, 1904:21, 1905:2, 1906:16, 1907:14, 1907:24, 1908:15, 1909:22
**posed** [2] - 1724:17, 1777:16
**position** [4] - 1736:19, 1778:24, 1778:25, 1835:3
**possibilities** [1] - 1808:20
**possibility** [2] - 1717:25, 1756:9
**possible** [11] - 1786:24, 1787:2, 1803:24, 1804:1, 1814:4, 1831:25, 1878:9, 1890:24, 1895:15, 1896:12, 1896:17
**possibly** [4] - 1864:15, 1885:15, 1892:6, 1892:9
**post** [1] - 1772:17
**post-arrest** [1] - 1772:17
**potential** [1] - 1722:8

**power** [4] - 1720:3, 1745:5, 1746:20, 1746:24
**practice** [4] - 1743:24, 1872:5, 1872:7, 1872:9
**practicing** [1] - 1876:12
**pre** [5] - 1795:3, 1795:6, 1796:22, 1797:14, 1809:3
**pre-approved** [4] - 1795:3, 1795:6, 1796:22, 1797:14
**pre-phase** [1] - 1809:3
**predecessor** [1] - 1837:15
**predictably** [1] - 1733:9
**prefatory** [1] - 1763:1
**prefer** [2] - 1893:3, 1908:8
**preference** [2] - 1866:3, 1866:21
**prejudice** [1] - 1722:8
**prejudicial** [1] - 1899:12
**prepared** [6] - 1766:6, 1786:3, 1786:4, 1829:1, 1868:1, 1879:3
**presence** [9] - 1716:3, 1720:18, 1727:1, 1799:7, 1833:1, 1841:7, 1881:20, 1905:15, 1905:21
**present** [7] - 1800:3, 1800:9, 1833:15, 1855:21, 1858:18, 1890:4, 1890:11
**Present** [1] - 1715:22
**presented** [1] - 1889:16
**presenting** [2] - 1833:17, 1857:12
**presently** [3] - 1778:21, 1779:24, 1851:13
**Preservation** [1] - 1778:23
**president** [4] - 1850:6, 1850:7, 1851:14, 1874:12
**presiding** [1] - 1716:8
**press** [1] - 1907:10
**presumably** [2] - 1729:3, 1735:11
**pretty** [3] - 1806:15, 1817:23, 1852:10
**previously** [3] - 1738:2, 1755:2, 1762:8
**price** [7] - 1732:11, 1753:13, 1757:2, 1757:6, 1826:21
**Primo** [1] - 1785:11
**primus** [1] - 1842:15
**principle** [1] - 1880:13
**Prisons** [10] - 1885:14, 1886:8, 1886:20, 1887:4, 1887:11, 1887:19, 1887:20, 1888:16, 1889:19, 1890:7
**private** [17] - 1754:15, 1760:20, 1760:21, 1770:18, 1776:4, 1776:12, 1776:18, 1776:19, 1780:23, 1800:22, 1801:4, 1801:5, 1801:10, 1807:19, 1808:13, 1835:18, 1875:18
**probative** [1] - 1721:24
**problem** [11] - 1717:3, 1717:7, 1718:22, 1720:7, 1793:17, 1793:19, 1793:21, 1793:22, 1887:12, 1897:3
**problems** [5] - 1793:13, 1793:15, 1793:25, 1885:15, 1908:11
**procedure** [5] - 1885:14, 1886:20, 1886:23, 1887:9, 1890:7
**procedures** [1] - 1897:16
**proceed** [4] - 1747:4, 1810:19, 1810:21, 1834:12

**Proceed** [2] - 1825:13, 1825:16
**Proceedings** [1] - 1715:25
**proceedings** [3] - 1717:23, 1724:23, 1831:9
**proceeds** [1] - 1901:14
**process** [38] - 1727:6, 1735:9, 1745:17, 1755:10, 1756:1, 1756:5, 1784:9, 1785:19, 1787:6, 1787:13, 1788:3, 1789:18, 1789:21, 1789:22, 1795:12, 1797:4, 1800:22, 1800:24, 1800:25, 1801:3, 1801:4, 1801:5, 1801:21, 1802:5, 1802:7, 1805:6, 1806:13, 1818:2, 1825:17, 1826:15, 1826:17, 1826:23, 1827:4, 1827:20, 1868:25, 1869:13, 1878:4
**processed** [1] - 1898:10
**processing** [1] - 1897:22
**produced** [1] - 1715:25
**professional** [2] - 1864:24, 1886:19
**proffer** [1] - 1840:2
**proffered** [2] - 1724:20, 1853:17
**proficient** [1] - 1859:25
**profit** [3] - 1745:18, 1753:15, 1811:11
**program** [31] - 1738:22, 1780:6, 1780:15, 1780:19, 1780:20, 1782:6, 1782:9, 1783:18, 1784:17, 1786:22, 1788:13, 1788:19, 1788:20, 1790:25, 1794:10, 1794:14, 1795:1, 1797:19, 1802:6, 1807:1, 1807:3, 1807:18, 1812:16, 1814:14, 1819:14, 1825:5, 1830:21, 1878:8, 1878:23, 1880:4
**Program** [1] - 1780:4
**programmatic** [1] - 1810:20
**Programs** [2] - 1780:8, 1780:9
**programs** [4] - 1780:9, 1824:23, 1824:25, 1855:25
**progress** [12] - 1783:3, 1792:12, 1792:17, 1793:1, 1793:2, 1793:12, 1860:5, 1860:20, 1861:7, 1861:9, 1864:24
**progression** [1] - 1784:5
**project** [80] - 1739:16, 1740:1, 1741:4, 1741:7, 1741:14, 1741:19, 1741:23, 1742:8, 1742:17, 1743:10, 1746:3, 1748:3, 1748:17, 1750:24, 1751:14, 1752:25, 1754:16, 1756:8, 1758:15, 1758:20, 1763:4, 1770:25, 1771:25, 1773:6, 1775:6, 1788:10, 1788:11, 1788:12, 1788:23, 1788:24, 1789:2, 1792:17, 1792:19, 1792:23, 1793:2, 1793:3, 1794:6, 1804:19, 1807:6, 1807:8, 1807:14, 1807:22, 1808:3, 1808:17, 1808:19, 1808:22, 1809:6, 1809:22, 1810:11, 1810:16, 1810:23, 1810:25, 1811:18, 1812:23, 1813:1, 1813:6, 1814:24, 1815:1, 1815:2, 1817:19, 1817:25, 1827:11, 1827:15, 1828:6, 1859:15, 1860:5, 1860:11, 1860:13, 1864:4, 1864:7, 1864:9, 1864:10, 1869:7, 1869:17, 1869:20, 1878:16, 1879:7, 1879:8

**projects** [21] - 1755:24, 1773:1, 1773:5, 1775:5, 1776:6, 1781:21, 1781:23, 1781:24, 1782:1, 1782:3, 1783:3, 1794:5, 1808:2, 1810:4, 1810:17, 1817:13, 1851:6, 1860:14, 1870:3, 1878:2
**promptly** [1] - 1881:12
**proof** [5] - 1748:8, 1750:9, 1796:5, 1846:21, 1848:19
**proper** [2] - 1728:9, 1762:15
**properly** [1] - 1792:8
**properties** [2] - 1760:21, 1875:19
**property** [28] - 1729:24, 1731:18, 1731:19, 1731:22, 1731:24, 1732:9, 1732:15, 1732:24, 1733:24, 1744:18, 1744:20, 1744:21, 1760:21, 1765:14, 1816:8, 1816:19, 1816:25, 1817:7, 1840:9, 1840:20, 1840:24, 1842:23, 1844:20, 1857:9, 1863:13, 1865:4, 1875:20, 1875:22
**propose** [2] - 1723:9, 1725:10
**proposed** [1] - 1723:1
**prosecution** [4] - 1846:9, 1846:12, 1848:6, 1848:10
**prosecutors** [1] - 1779:4
**prospective** [2] - 1754:4, 1786:25
**protect** [3] - 1789:13, 1789:19, 1789:23
**prove** [1] - 1753:2
**proved** [1] - 1907:5
**provide** [6] - 1728:6, 1795:2, 1811:11, 1811:25, 1812:1, 1877:3
**provided** [5] - 1727:24, 1728:13, 1729:3, 1732:20, 1825:16
**provides** [1] - 1751:19
**provision** [3] - 1741:11, 1749:10, 1752:10
**public** [8] - 1800:22, 1800:24, 1800:25, 1801:3, 1801:7, 1801:11, 1826:21, 1856:1
**publicly** [2] - 1801:7, 1805:17
**publish** [5] - 1751:4, 1754:2, 1809:2, 1850:9, 1850:11
**published** [4] - 1739:21, 1850:12, 1861:23, 1878:19, 1878:20
**publishing** [1] - 1822:22
**purchaser** [1] - 1734:2
**purporting** [1] - 1865:2
**purpose** [7] - 1762:23, 1783:15, 1826:17, 1846:20, 1848:18, 1870:7, 1906:17
**purposes** [3] - 1723:17, 1757:18, 1777:22
**pursuant** [2] - 1752:5, 1757:8
**put** [24] - 1732:15, 1735:21, 1736:19, 1749:7, 1750:1, 1752:15, 1757:13, 1763:25, 1769:9, 1801:6, 1803:25, 1815:1, 1836:20, 1851:24, 1855:22, 1866:8, 1866:24, 1877:9, 1885:3, 1891:25, 1906:20, 1907:6, 1908:5, 1908:7
**putative** [1] - 1878:17

**puts** [1] - 1741:13

## Q

**qualification** [2] - 1789:23, 1869:1
**qualifications** [9] - 1783:22, 1784:12, 1785:20, 1785:22, 1800:22, 1800:23, 1878:17, 1878:19, 1880:16
**qualified** [2] - 1886:21, 1887:1
**quality** [1] - 1798:6
**quarterly** [1] - 1814:18
**Queens** [3] - 1870:23, 1874:24, 1874:25
**questioned** [3] - 1738:20, 1772:19, 1772:22
**questioning** [1] - 1731:7
**questions** [45] - 1723:1, 1723:2, 1723:6, 1723:13, 1724:17, 1725:16, 1727:9, 1727:20, 1746:9, 1757:10, 1757:13, 1758:22, 1764:9, 1774:21, 1775:12, 1776:22, 1777:16, 1777:17, 1822:1, 1822:15, 1825:23, 1825:25, 1828:17, 1829:7, 1830:2, 1839:24, 1840:5, 1841:10, 1842:15, 1843:10, 1845:3, 1845:8, 1846:9, 1846:13, 1846:15, 1854:12, 1854:23, 1857:17, 1882:17, 1884:2, 1884:11, 1887:10, 1889:14, 1898:18
**quickly** [2] - 1750:18, 1897:11
**quite** [5] - 1766:7, 1812:2, 1812:5, 1836:21, 1846:3
**quote** [2] - 1827:22, 1887:7

## R

**Rabbi** [6] - 1848:24, 1849:5, 1849:15, 1849:25, 1853:3, 1853:3, 1854:19
**RABBI** [2] - 1849:10, 1910:12
**rabbi** [4] - 1849:20, 1849:22, 1849:24, 1853:10
**rabbinical** [1] - 1850:5
**Rabbinical** [1] - 1850:6
**racial** [1] - 1761:11
**raise** [4] - 1777:7, 1833:21, 1835:17, 1849:1
**raised** [4] - 1722:11, 1748:17, 1749:12, 1882:7
**raising** [2] - 1750:4, 1838:2
**range** [2] - 1890:20, 1891:23
**Rappaport** [1] - 1873:2
**Rashid** [2] - 1744:12, 1744:13
**rate** [2] - 1776:12, 1776:13
**rates** [2] - 1776:12, 1782:4
**rather** [4] - 1724:10, 1766:19, 1847:9, 1852:20
**ray** [4] - 1717:12, 1717:13, 1717:17, 1718:16
**re** [3] - 1827:17, 1864:2, 1883:18
**re-apply** [1] - 1827:17
**re-certifications** [1] - 1883:18
**re-inspect** [1] - 1864:2
**reach** [1] - 1760:22
**reached** [2] - 1760:25, 1761:1

**read** [22] - 1723:8, 1729:24, 1733:1, 1740:8, 1740:10, 1741:2, 1751:9, 1752:2, 1752:12, 1754:20, 1764:24, 1765:2, 1765:17, 1767:24, 1772:18, 1774:10, 1784:4, 1840:4, 1881:14, 1890:7, 1902:2, 1904:13

**reading** [2] - 1768:21, 1907:25

**reads** [5] - 1741:14, 1751:18, 1752:8, 1754:18, 1765:21

**ready** [6] - 1724:24, 1737:19, 1810:23, 1897:8, 1908:14, 1908:15

**real** [7] - 1760:20, 1775:18, 1776:6, 1838:14, 1868:23, 1873:7, 1875:18

**realign** [1] - 1812:25

**realistically** [1] - 1891:12

**realize** [2] - 1757:9, 1805:25

**reallocating** [1] - 1823:19

**reallocation** [1] - 1823:4

**really** [35] - 1782:6, 1784:11, 1788:24, 1789:3, 1789:4, 1797:5, 1797:7, 1822:10, 1823:9, 1825:14, 1828:11, 1833:24, 1833:25, 1837:2, 1838:18, 1844:24, 1851:6, 1852:9, 1854:1, 1855:10, 1855:23, 1857:14, 1876:16, 1882:21, 1884:1, 1887:17, 1892:7, 1893:17, 1896:1, 1896:17, 1898:5, 1902:7

**reason** [9] - 1731:13, 1783:24, 1805:6, 1806:19, 1808:23, 1808:25, 1841:19, 1887:25, 1893:20

**reasonable** [2] - 1734:8, 1789:5

**reasons** [4] - 1806:22, 1839:9, 1869:4, 1869:15

**rebuts** [1] - 1883:7

**rebuttal** [6] - 1885:12, 1885:15, 1885:17, 1890:21, 1892:15, 1892:16

**rec** [3] - 1862:9, 1863:24, 1864:1

**recantation** [1] - 1886:20

**receive** [5] - 1752:19, 1792:23, 1825:7, 1862:19, 1863:7

**received** [15] - 1717:19, 1727:12, 1751:3, 1753:25, 1754:6, 1786:15, 1789:14, 1789:17, 1817:1, 1874:6, 1874:18, 1875:15, 1878:7, 1878:8, 1889:2

**receiving** [1] - 1816:14

**recent** [3] - 1727:3, 1852:18, 1899:16

**recently** [1] - 1850:4

**Recess** [2] - 1720:25, 1726:7

**recess** [4] - 1798:18, 1799:3, 1832:3, 1832:10

**recitals** [1] - 1729:17

**recognize** [2] - 1754:5, 1861:25

**recollection** [14] - 1749:2, 1760:14, 1766:10, 1767:11, 1768:24, 1772:18, 1772:21, 1785:8, 1817:2, 1872:19, 1887:1, 1887:12, 1889:23, 1889:24

**recommend** [1] - 1754:14

**recommendations** [4] - 1784:12, 1787:9, 1819:19, 1819:20

**recommended** [3] - 1787:10, 1801:19, 1806:20

**recommending** [1] - 1801:15

**recommends** [1] - 1846:5

**reconcile** [1] - 1809:7

**record** [14] - 1761:20, 1769:9, 1769:12, 1778:4, 1818:8, 1818:9, 1821:7, 1822:1, 1822:9, 1831:15, 1834:1, 1849:4, 1885:21, 1889:6

**recorded** [6] - 1715:25, 1762:19, 1802:9, 1804:7, 1806:7, 1806:8

**recording** [2] - 1762:7, 1763:9

**records** [6] - 1744:8, 1842:4, 1884:25, 1888:15, 1889:6

**recover** [1] - 1815:12

**RECROSS** [2] - 1775:15, 1909:15

**RECROSS-EXAMINATION** [2] - 1775:15, 1909:15

**recruit** [2] - 1780:23, 1783:5

**redacted** [1] - 1722:13

**redaction** [1] - 1722:18

**redirect** [4] - 1746:15, 1775:13, 1843:5, 1843:7

**REDIRECT** [2] - 1830:3, 1910:3

**refer** [1] - 1859:23

**reference** [1] - 1772:13

**references** [4] - 1798:1, 1798:3, 1798:4, 1809:9

**referring** [6] - 1728:21, 1729:13, 1745:22, 1772:16, 1797:7, 1881:4

**reflect** [1] - 1774:13

**reflected** [1] - 1812:4

**regard** [11] - 1731:16, 1770:21, 1772:17, 1836:15, 1837:14, 1841:7, 1852:2, 1858:3, 1880:11, 1884:13, 1905:15

**regarding** [5] - 1723:14, 1727:9, 1757:15, 1777:18, 1779:1, 1779:4, 1779:8, 1845:5, 1848:6, 1858:2, 1873:9, 1875:24, 1882:2, 1884:19, 1884:24

**regards** [2] - 1780:16, 1780:17

**regular** [4] - 1797:18, 1837:25, 1852:10

**rehab** [2] - 1815:4, 1816:11

**rehabilitate** [3] - 1807:3, 1813:6, 1815:19

**rehabilitation** [1] - 1754:17

**reinforce** [1] - 1749:15

**reiterate** [1] - 1750:12

**reject** [2] - 1755:3, 1820:2

**rejected** [1] - 1804:24

**related** [6] - 1747:19, 1752:25, 1775:18, 1840:20, 1840:25, 1871:3

**relating** [1] - 1748:3

**relation** [3] - 1739:25, 1744:3, 1779:25

**relationship** [4] - 1744:23, 1753:17, 1795:6, 1839:3

**relative** [3] - 1745:16, 1811:5, 1823:22

**relatively** [1] - 1792:16

**relax** [1] - 1720:6

**release** [1] - 1818:23

**released** [4] - 1718:18, 1721:5, 1743:19, 1819:7

**relevance** [3] - 1748:8, 1821:21, 1821:25

**relevant** [2] - 1745:25, 1887:5

**relief** [1] - 1896:3

**relieved** [3] - 1896:5

**religious** [1] - 1745:14

**relocated** [1] - 1815:8

**relocating** [2] - 1813:9, 1813:13

**remainder** [1] - 1812:21

**remaining** [3] - 1721:6, 1729:6, 1894:21

**remains** [1] - 1816:21

**remedying** [1] - 1853:14

**remember** [14] - 1738:17, 1738:19, 1741:20, 1760:19, 1760:25, 1783:15, 1787:22, 1788:1, 1799:1, 1808:5, 1814:19, 1864:4, 1881:14

**remembered** [1] - 1886:24

**remind** [3] - 1725:7, 1737:19, 1800:12

**remove** [2] - 1899:6, 1900:1

**removing** [1] - 1899:7

**rental** [2] - 1807:3, 1813:6

**rented** [1] - 1830:15

**repairs** [1] - 1874:22

**repay** [1] - 1811:10

**repayment** [1] - 1812:6

**repeat** [3] - 1758:24, 1777:15, 1891:17

**repetition** [1] - 1847:12

**replace** [1] - 1743:5

**report** [4] - 1780:12, 1782:24, 1785:7, 1863:21

**reported** [7] - 1717:8, 1780:21, 1782:14, 1784:18, 1784:19, 1806:7, 1820:7

**Reporter** [1] - 1715:23

**reporter** [1] - 1778:7

**reporting** [2] - 1717:8, 1820:11

**reports** [3] - 1792:14, 1792:19, 1792:23

**represent** [7] - 1768:16, 1773:10, 1778:15, 1859:8, 1877:7, 1877:21, 1903:19

**representation** [1] - 1871:20

**representative** [2] - 1851:13, 1852:20

**representatives** [1] - 1779:13

**represented** [3] - 1779:16, 1830:10, 1877:23

**representing** [4] - 1775:2, 1877:17, 1877:19, 1878:23

**reputation** [3] - 1840:22, 1841:20, 1847:4

**request** [15] - 1751:20, 1751:23, 1783:21, 1784:11, 1800:21, 1800:23, 1810:13, 1810:18, 1861:18, 1861:20, 1878:17, 1878:19, 1880:15, 1898:12

**requested** [2] - 1797:25, 1863:2

**requests** [1] - 1869:1

**require** [1] - 1867:20

**required** [7] - 1840:8, 1842:22, 1844:19, 1857:8, 1864:3, 1897:22, 1904:17

**requirement** [1] - 1796:7

**requirements** [3] - 1796:3, 1859:25, 1879:18

**requisition** [25] - 1739:14, 1742:17,

1742:19, 1742:21, 1817:12, 1817:24, 1818:2, 1818:3, 1818:6, 1819:6, 1819:8, 1819:10, 1819:11, 1827:20, 1829:1, 1829:2, 1829:4, 1861:12, 1861:13, 1861:21, 1863:23, 1864:2, 1864:13, 1864:16, 1865:3

**requisitions** [1] - 1741:16, 1741:18, 1817:14, 1817:17, 1817:20, 1817:21, 1818:13, 1827:21, 1860:15, 1870:2, 1870:6

**reside** [1] - 1735:5

**resist** [1] - 1864:16

**resolve** [2] - 1722:8, 1897:12

**respect** [4] - 1721:22, 1721:25, 1723:3, 1903:22

**respected** [1] - 1853:23

**respectfully** [3] - 1730:13, 1885:4, 1905:16

**respond** [3] - 1771:20, 1795:16, 1896:13

**response** [4] - 1762:13, 1773:15, 1882:15, 1889:22

**responses** [2] - 1789:23, 1828:25

**responsibilities** [3] - 1782:10, 1860:4, 1860:21

**responsibility** [8] - 1780:11, 1780:20, 1803:3, 1817:16, 1820:2, 1823:25, 1860:18, 1870:5

**Responsible** [1] - 1804:18

**responsible** [18] - 1782:9, 1782:12, 1782:15, 1784:7, 1788:15, 1788:25, 1794:10, 1804:16, 1804:20, 1805:6, 1805:7, 1805:10, 1812:7, 1825:1, 1825:4, 1826:18, 1888:4, 1888:9

**rest** [6] - 1719:2, 1735:8, 1735:18, 1804:23, 1821:18, 1866:23

**Restaurant** [1] - 1771:13

**restaurant** [1] - 1772:7

**Restoration** [3] - 1740:4, 1752:22, 1860:23

**restrict** [1] - 1749:6

**restricted** [1] - 1724:17

**restroom** [1] - 1736:2

**rests** [1] - 1865:20

**result** [5] - 1739:5, 1824:22, 1875:23, 1878:12, 1880:7

**results** [1] - 1718:16

**resumed** [1] - 1800:5

**retainage** [7] - 1741:20, 1742:3, 1742:9, 1742:13, 1743:12, 1743:19, 1752:1

**return** [6] - 1719:23, 1802:19, 1803:4, 1805:8, 1805:9, 1812:16

**returned** [2] - 1802:5, 1802:16

**review** [17] - 1719:11, 1752:14, 1783:3, 1786:16, 1786:17, 1787:24, 1790:24, 1795:18, 1797:15, 1802:11, 1810:22, 1818:3, 1819:16, 1824:22, 1860:14, 1863:16, 1863:18

**reviewed** [5] - 1749:21, 1783:1, 1795:25, 1797:23, 1801:20

**reviewing** [2] - 1782:18, 1784:7

**reviews** [2] - 1786:10, 1802:15

**revised** [1] - 1805:17

**revision** [1] - 1805:19

**revisit** [1] - 1897:11

**RFQ** [5] - 1786:14, 1787:21, 1800:21, 1881:3, 1881:5

**Rhode** [2] - 1873:25, 1874:3

**Richards** [17] - 1715:22, 1716:14, 1758:8, 1758:16, 1758:17, 1762:10, 1774:12, 1774:14, 1774:17, 1885:13, 1885:23, 1886:6, 1886:25, 1887:14, 1888:6, 1888:13, 1897:15

**Richards's** [1] - 1723:7

**Richardson** [1] - 1890:1

**Ride** [5] - 1717:8, 1717:9, 1718:4, 1718:7, 1719:19

**right-hand** [2] - 1862:1, 1862:4

**rights** [1] - 1772:19

**Riopelle** [1] - 1716:23

**rip** [2] - 1735:8, 1735:10

**rip-off** [1] - 1735:10

**rise** [8] - 1716:5, 1720:16, 1721:3, 1734:6, 1734:10, 1799:5, 1832:8, 1881:18

**risk** [3] - 1793:25, 1794:2, 1814:21

**Robert** [6] - 1716:19, 1716:23, 1735:4, 1778:15, 1859:7

**ROBERT** [2] - 1715:17, 1715:19

**Rockaway** [1] - 1849:16

**Rodney** [2] - 1744:12, 1744:13

**role** [15] - 1745:16, 1780:6, 1782:8, 1788:6, 1788:12, 1788:14, 1819:15, 1851:10, 1851:12, 1851:19, 1860:13, 1869:12, 1869:22, 1875:7, 1880:9

**roles** [2] - 1722:2, 1754:12, 1781:20

**Roles** [1] - 1754:8

**rolling** [1] - 1898:8

**room** [6] - 1719:3, 1720:6, 1720:14, 1890:5, 1894:22, 1895:4

**Round** [2] - 1807:1, 1807:19

**round** [14] - 1738:22, 1738:24, 1739:7, 1755:7, 1794:13, 1794:15, 1794:17, 1798:14, 1814:14, 1878:15, 1878:16, 1878:24, 1880:11

**routinely** [1] - 1887:9

**rule** [1] - 1721:7

**Rule** [1] - 1882:18

**ruled** [5] - 1736:9, 1736:14, 1736:15, 1737:1, 1883:20

**rules** [1] - 1885:7

**rulings** [1] - 1719:10

**run** [2] - 1764:12, 1894:16

**Rylona** [1] - 1781:16

## S

**sale** [4] - 1733:23, 1733:24, 1734:1, 1735:15

**Sand** [1] - 1846:5

**Sandy** [1] - 1839:16

**satisfactory** [1] - 1723:10

**satisfied** [2] - 1722:7, 1722:12

**satisfy** [7] - 1728:14, 1728:16, 1729:6, 1730:7, 1730:8, 1730:19, 1731:6

**Saturday** [1] - 1874:16

**savings** [5] - 1812:13, 1812:14, 1812:15, 1812:18, 1812:22

**say-so** [1] - 1755:13

**scenarios** [1] - 1815:11

**schedule** [2] - 1793:3, 1814:20

**schedules** [2] - 1792:18, 1833:15

**scheduling** [1] - 1897:2

**scheme** [1] - 1722:1

**scholarship** [1] - 1835:17

**School** [2] - 1870:23, 1870:24

**school** [10] - 1835:1, 1835:16, 1835:18, 1835:19, 1836:10, 1870:25, 1875:9, 1876:11

**Scignano** [1] - 1736:11

**scope** [6] - 1853:17, 1882:16, 1882:19, 1884:2, 1890:9, 1897:19

**screen** [5] - 1749:7, 1754:8, 1754:14, 1763:25, 1861:25

**screened** [4] - 1754:24, 1786:17, 1786:20, 1787:7

**screening** [6] - 1786:13, 1787:1, 1787:3, 1787:19, 1787:22, 1788:3

**script** [2] - 1765:2, 1769:7

**scrutinize** [1] - 1870:6

**sealed** [2] - 1756:15, 1801:10

**seat** [1] - 1881:25

**seated** [5] - 1717:2, 1719:15, 1737:22, 1777:9, 1800:6, 1833:12, 1833:23, 1849:3

**second** [7] - 1723:18, 1727:25, 1734:24, 1757:20, 1777:23, 1901:17, 1905:9

**secondly** [1] - 1745:15

**seconds** [1] - 1723:23

**section** [10] - 1740:7, 1741:11, 1747:8, 1749:8, 1751:19, 1751:14, 1899:2, 1904:15, 1905:23

**sections** [1] - 1764:12

**secure** [4] - 1729:21, 1729:24, 1760:20, 1852:16

**secured** [2] - 1767:13, 1775:25

**see** [50] - 1718:11, 1720:2, 1720:4, 1720:9, 1720:20, 1724:19, 1736:23, 1739:22, 1747:15, 1747:17, 1747:18, 1754:10, 1763:13, 1764:8, 1764:22, 1765:6, 1765:25, 1766:3, 1766:14, 1767:4, 1770:8, 1775:7, 1795:18, 1798:5, 1799:4, 1799:12, 1812:23, 1830:7, 1830:13, 1831:7, 1834:24, 1835:24, 1837:15, 1837:24, 1842:19, 1850:17, 1852:9, 1853:25, 1861:25, 1866:15, 1867:22, 1881:12, 1883:12, 1883:16, 1892:20, 1892:24, 1896:19, 1897:1, 1906:24, 1907:25

**seed** [2] - 1812:3, 1812:5

**seeing** [2] - 1717:25, 1863:7

**seeking** [1] - 1731:23

**seem** [2] - 1793:17, 1793:22

**Segal** [1] - 1876:8
**select** [6] - 1800:23, 1801:3, 1804:4, 1804:6, 1805:14, 1806:19
**selected** [16] - 1787:11, 1787:15, 1787:16, 1788:6, 1792:6, 1792:7, 1794:25, 1795:2, 1796:21, 1796:23, 1801:2, 1804:10, 1804:15, 1806:9, 1827:13, 1827:14
**selecting** [4] - 1755:11, 1784:7, 1801:13, 1802:7
**selection** [5] - 1784:22, 1794:22, 1795:12, 1800:19, 1824:16
**selects** [1] - 1806:11
**self** [1] - 1854:2
**selflessness** [3] - 1839:5, 1839:8, 1853:21
**sell** [4] - 1731:19, 1732:9, 1732:17
**sells** [3] - 1732:18, 1733:12, 1733:16
**semiannually** [1] - 1814:18
**Seminary** [1] - 1849:20
**Semitic** [1] - 1836:20
**send** [6] - 1818:3, 1818:4, 1819:9, 1830:7, 1895:8, 1895:12
**senior** [3] - 1728:4, 1874:23, 1874:24
**SENIOR** [1] - 1715:11
**sense** [6] - 1727:13, 1730:14, 1730:16, 1730:17, 1855:21, 1891:18
**sensible** [1] - 1846:5
**sensitive** [1] - 1836:24
**sent** [3] - 1786:9, 1830:13, 1886:17
**sentence** [1] - 1903:9
**sentencing** [1] - 1893:18
**separate** [4] - 1760:9, 1760:16, 1764:19, 1819:8
**September** [2] - 1760:22, 1838:2
**sequence** [2] - 1766:13, 1767:17
**Sercarz** [15] - 1716:22, 1716:23, 1736:21, 1750:4, 1750:6, 1775:18, 1825:22, 1833:6, 1833:16, 1841:18, 1865:23, 1884:7, 1886:2, 1895:24, 1906:22
**SERCARZ** [121] - 1715:19, 1716:22, 1718:15, 1718:18, 1723:22, 1724:1, 1724:5, 1724:9, 1724:12, 1726:3, 1727:5, 1727:20, 1727:24, 1728:3, 1728:22, 1728:25, 1729:2, 1729:10, 1729:15, 1729:17, 1729:19, 1729:21, 1730:3, 1730:13, 1730:17, 1731:10, 1731:12, 1732:6, 1736:22, 1737:3, 1737:5, 1737:11, 1748:7, 1750:8, 1761:17, 1761:24, 1762:21, 1763:1, 1763:11, 1763:20, 1763:24, 1763:25, 1768:3, 1769:11, 1770:1, 1771:14, 1774:20, 1822:11, 1825:23, 1828:19, 1828:22, 1829:7, 1831:12, 1831:20, 1833:8, 1833:18, 1834:9, 1839:24, 1840:13, 1841:7, 1841:11, 1841:21, 1842:13, 1843:3, 1843:6, 1845:6, 1845:9, 1846:2, 1846:8, 1846:22, 1847:3, 1847:5, 1847:8, 1847:11, 1848:23, 1849:14, 1850:23, 1853:18,

1854:11, 1857:19, 1857:22, 1865:13, 1865:24, 1866:2, 1866:7, 1866:12, 1866:21, 1867:16, 1867:18, 1868:12, 1868:20, 1881:6, 1881:9, 1882:10, 1883:2, 1883:20, 1883:24, 1884:8, 1884:13, 1884:15, 1884:22, 1885:17, 1891:5, 1891:14, 1893:14, 1894:7, 1894:20, 1902:14, 1905:13, 1905:20, 1906:5, 1906:13, 1906:24, 1907:9, 1907:16, 1907:20, 1909:12, 1909:24, 1910:8, 1910:14, 1910:24
**series** [1] - 1764:5
**serve** [3] - 1835:19, 1869:20, 1880:12
**served** [1] - 1837:9
**serves** [1] - 1852:1
**service** [2] - 1851:25, 1874:11
**services** [5] - 1852:11, 1852:25, 1853:8, 1889:7
**session** [3] - 1716:7, 1718:12, 1720:10
**SESSION** [1] - 1799:15
**set** [10] - 1723:7, 1760:23, 1761:3, 1761:4, 1776:18, 1788:18, 1812:9, 1822:15, 1863:18
**settings** [1] - 1761:12
**seven** [7] - 1749:5, 1755:16, 1795:14, 1829:18, 1902:17, 1904:11
**several** [3] - 1782:1, 1785:4, 1895:18
**severance** [2] - 1722:11, 1722:13
**severely** [1] - 1883:12
**shaken** [1] - 1761:25
**shaking** [1] - 1763:3
**shall** [2] - 1751:21, 1858:20
**share** [2] - 1735:13, 1744:18
**shared** [3] - 1785:20, 1793:1
**shareholders** [1] - 1737:8
**sheet** [13] - 1732:24, 1788:20, 1788:24, 1802:8, 1802:18, 1803:15, 1804:8, 1806:8, 1820:23, 1897:6, 1907:19, 1907:22, 1907:23
**sheets** [3] - 1803:19, 1900:7, 1907:22
**shell** [1] - 1876:17
**shifting** [1] - 1821:23
**shirt** [1] - 1850:21
**shock** [8] - 1887:8, 1887:20, 1888:4, 1889:12, 1889:13, 1889:17, 1890:10, 1890:12
**shocked** [1] - 1846:25
**shopped** [1] - 1876:18
**short** [8] - 1733:24, 1736:2, 1795:3, 1831:25, 1885:6, 1890:24, 1892:18, 1892:19
**shorter** [1] - 1749:6
**shortfall** [1] - 1852:25
**shortfalls** [1] - 1853:14
**shortly** [2] - 1716:14, 1837:4
**show** [17] - 1734:7, 1739:19, 1748:16, 1749:7, 1754:2, 1764:3, 1764:6, 1764:13, 1765:23, 1765:24, 1766:1, 1766:9, 1766:10, 1771:3, 1861:23, 1862:23, 1887:10
**showed** [4] - 1753:16, 1753:21,

1769:13, 1770:21
**showing** [2] - 1725:20, 1809:10
**shown** [1] - 1772:22, 1775:17
**shows** [1] - 1731:12
**Sicignano** [12] - 1737:3, 1840:13, 1841:1, 1882:8, 1882:25, 1883:5, 1884:2, 1884:12
**Sicignanos** [1] - 1737:7
**Side** [10] - 1761:20, 1761:23, 1763:21, 1821:7, 1821:10, 1822:17, 1831:15, 1831:18, 1832:4, 1847:14
**side** [6] - 1754:8, 1761:19, 1821:4, 1839:25, 1840:1, 1843:9, 1846:1, 1885:6
**Side-bar** [9] - 1761:20, 1761:23, 1763:21, 1821:7, 1821:10, 1822:17, 1831:15, 1831:18, 1832:4
**side-bar** [1] - 1885:6
**sidebar** [2] - 1748:10, 1751:2
**Sidebar** [2] - 1745:11, 1866:1
**sides** [1] - 1852:22
**sign** [11] - 1749:17, 1749:19, 1752:14, 1752:15, 1752:17, 1782:23, 1860:14, 1863:20, 1863:24, 1865:3, 1870:1
**signatory** [1] - 1731:15
**signature** [6] - 1747:23, 1747:25, 1750:19, 1818:7, 1861:25, 1862:3
**signed** [6] - 1728:9, 1780:21, 1818:13, 1819:6, 1862:5, 1883:16
**significance** [2] - 1902:19, 1904:13
**significant** [1] - 1753:14
**significantly** [1] - 1732:10
**signing** [2] - 1728:7, 1863:22
**similar** [2] - 1776:5, 1823:2
**simplest** [2] - 1901:2, 1901:5
**simply** [5] - 1899:19, 1903:10, 1903:17, 1903:24, 1904:16
**single** [2] - 1842:15, 1884:11
**sister** [5] - 1840:9, 1840:16, 1842:23, 1844:20, 1857:9
**sit** [3] - 1777:6, 1833:20, 1848:25
**site** [8] - 1860:4, 1860:18, 1861:3, 1861:7, 1861:8, 1863:20, 1863:25, 1864:23
**sites** [4] - 1792:9, 1792:10, 1859:15, 1860:10
**sitting** [2] - 1836:4, 1894:22
**situation** [4] - 1752:22, 1809:17, 1867:3, 1881:4
**six** [5] - 1738:22, 1739:7, 1752:17, 1755:16, 1871:22
**sixty** [1] - 1870:15
**sixty-three** [1] - 1870:15
**size** [1] - 1755:25
**skeptical** [1] - 1895:14
**skills** [2] - 1838:14, 1874:3
**slow** [1] - 1836:15
**slowed** [3] - 1770:25, 1771:25, 1772:2
**small** [4] - 1748:18, 1753:10, 1753:13, 1895:19
**smaller** [1] - 1765:23

**SML** [16] - 1745:25, 1750:22, 1758:14, 1760:7, 1760:10, 1760:17, 1790:15, 1806:25, 1827:13, 1860:11, 1863:14, 1868:22, 1870:6, 1878:4, 1879:2, 1879:9

**smokers** [1] - 1895:11

**SNL** [1] - 1740:5

**soccer** [1] - 1875:8

**Society** [4] - 1871:4, 1871:6, 1871:12, 1871:20

**soft** [3] - 1813:4, 1817:22, 1821:2

**sold** [6] - 1731:18, 1731:24, 1732:3, 1732:24, 1735:11, 1735:14

**solely** [1] - 1807:20

**someone** [11] - 1732:10, 1732:19, 1792:24, 1797:1, 1820:19, 1853:25, 1879:11, 1888:10, 1888:11, 1888:14, 1897:16

**sometime** [1] - 1877:15

**sometimes** [3] - 1861:16, 1895:11, 1899:2

**somewhat** [1] - 1884:16

**somewhere** [3] - 1735:12, 1742:4, 1812:15

**son** [2] - 1735:5, 1836:8

**sons** [2] - 1728:10, 1836:9

**Sons** [1] - 1874:11

**soon** [1] - 1720:11

**sophisticated** [1] - 1728:5

**sore** [1] - 1876:4

**Sorry** [1] - 1844:6

**sorry** [14] - 1720:13, 1733:3, 1733:16, 1734:15, 1734:23, 1736:7, 1747:22, 1764:16, 1781:1, 1823:11, 1863:6, 1892:2, 1905:20, 1906:5

**sort** [5] - 1805:8, 1811:12, 1876:21, 1877:16, 1891:17

**sought** [1] - 1771:22

**sound** [1] - 1875:3

**sounds** [6] - 1847:12, 1857:12, 1893:19, 1897:20, 1898:1, 1902:10

**source** [2] - 1809:12, 1810:7

**sources** [4] - 1808:8, 1809:6, 1809:9, 1810:14

**Sources** [1] - 1809:4

**South** [1] - 1870:19

**Southern** [1] - 1899:17

**speaking** [3] - 1738:15, 1738:17, 1835:24

**Special** [5] - 1715:22, 1758:7, 1885:13, 1886:5, 1888:6

**specific** [5] - 1748:16, 1846:11, 1848:8, 1900:1, 1907:5

**specifically** [2] - 1802:6, 1878:11

**spell** [6] - 1778:6, 1834:3, 1849:6, 1859:1, 1859:3, 1868:17

**spelled** [1] - 1787:21

**spend** [2] - 1811:22, 1884:3

**spent** [2] - 1874:10, 1883:9

**spoken** [3] - 1717:9, 1879:20, 1879:25

**sponsor** [2] - 1751:16, 1752:5

**St** [4] - 1834:24, 1834:25, 1835:3, 1874:20

**staff** [10] - 1779:12, 1781:12, 1782:22, 1782:23, 1785:24, 1785:25, 1787:4, 1803:14, 1886:16

**stage** [3] - 1734:10, 1781:21, 1825:14

**stagger** [2] - 1808:21, 1808:23

**stake** [1] - 1826:12

**stamp** [2] - 1739:22, 1765:17

**stand** [4] - 1737:20, 1800:13, 1868:13, 1904:1

**standard** [1] - 1739:24

**stands** [1] - 1768:7

**start** [11] - 1737:19, 1788:11, 1835:14, 1838:2, 1866:4, 1866:16, 1867:14, 1867:23, 1867:24, 1868:1, 1881:13

**started** [9] - 1738:17, 1738:18, 1807:6, 1807:19, 1835:1, 1868:25, 1871:16, 1872:21, 1873:23

**starting** [1] - 1834:25

**starts** [2] - 1794:8, 1904:15

**Starzecki** [22] - 1739:17, 1742:23, 1743:1, 1743:4, 1743:7, 1743:11, 1744:2, 1744:6, 1747:25, 1748:2, 1750:23, 1752:10, 1752:19, 1756:4, 1756:20, 1758:20, 1824:7, 1824:9, 1829:12, 1861:1, 1861:4, 1883:8

**Starzecki's** [4] - 1740:3, 1750:19, 1756:17, 1756:23

**state** [5] - 1778:3, 1834:1, 1849:4, 1859:1, 1868:17, 1885:3

**State** [3] - 1779:4, 1779:25, 1874:19

**statement** [14] - 1721:9, 1721:24, 1722:13, 1722:17, 1730:4, 1762:19, 1762:21, 1772:17, 1774:12, 1775:4, 1779:18, 1790:3, 1885:24, 1886:3

**statements** [13] - 1722:4, 1722:6, 1723:8, 1723:13, 1723:16, 1757:14, 1757:17, 1774:9, 1777:17, 1777:21, 1786:2, 1790:8, 1886:1

**STATES** [3] - 1715:1, 1715:3, 1715:11

**states** [2] - 1728:6, 1747:19

**States** [6] - 1715:5, 1715:13, 1715:16, 1716:6, 1716:9, 1874:19

**status** [2] - 1790:21, 1792:14

**statute** [1] - 1901:10

**statutory** [1] - 1901:25

**stay** [2] - 1892:21, 1894:25

**stayed** [2] - 1830:15, 1872:9

**stenographic** [1] - 1779:21

**stenography** [1] - 1715:25

**step** [9] - 1720:22, 1776:24, 1799:8, 1831:3, 1845:11, 1857:20, 1865:18, 1880:8, 1881:21

**stepped** [1] - 1852:21

**steps** [3] - 1777:1, 1806:13, 1888:3

**Steve** [3] - 1830:7, 1869:6, 1879:15

**STEVENSON** [3] - 1715:7, 1738:1, 1909:6

**Stevenson** [13] - 1715:18, 1716:10, 1716:17, 1758:9, 1758:13, 1758:18,

1778:16, 1783:8, 1783:11, 1783:17, 1859:8, 1875:14, 1875:20

**still** [6] - 1731:5, 1737:23, 1792:21, 1796:17, 1797:21, 1817:7

**stipulate** [1] - 1850:23

**Stipulation** [1] - 1903:14

**stipulations** [2] - 1903:3, 1903:16

**Stipulations** [2] - 1903:9, 1903:22

**stop** [3] - 1725:15, 1742:13, 1895:8

**store** [2] - 1876:8, 1876:18

**stories** [2] - 1784:4, 1876:20

**straightened** [1] - 1746:6

**straightforward** [2] - 1854:9, 1854:10

**straw** [1] - 1734:1

**Street** [2] - 1770:24, 1830:19

**stretch** [1] - 1889:23

**struck** [1] - 1836:9

**students** [2] - 1874:2, 1874:4

**study** [2] - 1850:11

**stuff** [1] - 1883:6

**Stuy** [3] - 1739:25, 1740:5, 1790:15

**Stuyvesant** [3] - 1775:6, 1824:1, 1860:11

**subcontractor** [8] - 1739:11, 1739:15, 1739:16, 1739:17, 1741:3, 1741:10, 1741:13, 1742:12

**subject** [6] - 1721:20, 1751:1, 1754:14, 1776:17, 1782:5, 1875:11

**submit** [13] - 1730:13, 1762:9, 1795:5, 1795:14, 1796:17, 1797:12, 1801:22, 1802:13, 1803:13, 1803:21, 1804:20, 1885:4, 1905:16

**submits** [1] - 1802:23

**submitted** [13] - 1746:18, 1784:12, 1786:2, 1795:9, 1796:24, 1797:16, 1797:25, 1802:25, 1803:1, 1804:7, 1804:22, 1817:25, 1818:6

**submitting** [1] - 1829:1

**Subotovsky** [2] - 1859:19, 1859:22

**subpoenaed** [1] - 1826:7

**subs** [1] - 1743:24

**subsequent** [5] - 1731:8, 1733:23, 1734:8, 1735:14, 1767:14

**substantive** [6] - 1905:17, 1906:1, 1906:8, 1906:14, 1906:20, 1907:3

**subtract** [3] - 1730:22, 1731:2, 1841:9

**subtracts** [1] - 1841:9

**subvert** [1] - 1827:4

**sudden** [1] - 1734:14

**sued** [3] - 1840:16, 1840:19, 1840:23

**Suffolk** [1] - 1850:7

**suggest** [6] - 1731:25, 1755:19, 1802:2, 1899:7, 1901:12, 1908:1

**suggested** [1] - 1754:23

**suggesting** [2] - 1732:20, 1903:15

**suggestion** [3] - 1718:1, 1718:8, 1901:1

**suggests** [1] - 1727:12

**suit** [1] - 1850:21

**sum** [3] - 1828:14, 1867:20, 1908:14

**summary** [2] - 1786:3, 1786:4

**summation** [2] - 1890:17, 1890:18

**summations** [13] - 1867:24, 1867:25, 1890:15, 1892:24, 1893:4, 1893:6, 1893:8, 1893:9, 1893:11, 1896:19, 1896:20, 1896:24, 1904:25

**summers** [1] - 1874:21

**summing** [1] - 1868:1

**superficial** [1] - 1772:25

**superiors** [1] - 1784:17

**supervises** [1] - 1886:14

**supervisors** [1] - 1782:22

**supplies** [2] - 1838:4, 1838:9

**suppose** [1] - 1841:12

**supposed** [2] - 1776:8, 1801:10

**supposedly** [2] - 1846:11, 1848:8

**suppression** [5] - 1887:15, 1890:2, 1897:20, 1897:21, 1898:2

**surety** [2] - 1796:6, 1805:8

**surprised** [2] - 1804:12, 1878:21

**Susannah** [2] - 1715:22, 1716:14

**suspect** [2] - 1809:24, 1895:23

**sustained** [5] - 1783:10, 1839:20, 1853:5, 1853:12, 1865:10

**switch** [1] - 1858:20

**sworn** [7] - 1738:3, 1777:8, 1778:11, 1833:22, 1834:6, 1858:24, 1868:15

**sworn/affirmed** [1] - 1849:12

**synagogue** [5] - 1852:7, 1852:17, 1852:25, 1853:14, 1855:20

**syndicating** [1] - 1794:2

**syndication** [2] - 1793:18, 1794:1

---

## T

**table** [1] - 1836:4

**tabulate** [2] - 1802:11, 1805:24

**tabulating** [1] - 1804:6

**tabulation** [10] - 1802:8, 1802:18, 1803:14, 1803:19, 1803:22, 1804:8, 1805:2, 1806:5, 1806:7, 1806:8

**tag** [1] - 1752:15

**takeouts** [1] - 1809:8

**talks** [1] - 1809:5

**tape** [4] - 1762:7, 1763:9, 1763:15, 1763:18

**taping** [1] - 1761:8

**tax** [11] - 1794:2, 1794:4, 1794:5, 1794:9, 1808:22, 1816:19, 1816:21, 1817:1, 1817:5, 1817:9, 1817:10

**taxes** [1] - 1790:7

**taxi** [1] - 1718:5

**teach** [2] - 1874:1, 1874:4

**team** [6] - 1762:3, 1781:13, 1782:19, 1789:18, 1794:14, 1836:8

**teenagers** [1] - 1874:21

**telephone** [1] - 1761:9

**temple** [1] - 1836:20

**ten** [13] - 1720:19, 1720:23, 1741:19, 1741:25, 1742:4, 1744:10, 1782:2, 1782:3, 1795:20, 1804:21, 1806:1, 1874:16, 1905:6

**tenants** [3] - 1813:9, 1813:13, 1815:8

**tend** [2] - 1838:8, 1895:20

**term** [5] - 1788:20, 1788:23, 1820:23, 1901:6, 1901:13

**terms** [7] - 1761:11, 1804:18, 1806:24, 1812:10, 1852:12, 1884:15, 1885:11

**terrible** [1] - 1837:13

**testified** [25] - 1738:3, 1738:8, 1744:13, 1746:7, 1746:17, 1746:21, 1755:23, 1758:2, 1761:24, 1764:17, 1770:24, 1778:12, 1825:10, 1826:15, 1827:10, 1834:7, 1849:12, 1858:25, 1868:16, 1885:5, 1887:14, 1889:22, 1890:1, 1897:20, 1897:21

**testifies** [1] - 1736:10

**testify** [8] - 1755:2, 1866:3, 1885:23, 1887:25, 1889:17, 1903:1, 1904:12, 1904:17

**testifying** [3] - 1721:18, 1826:7, 1840:21

**testimony** [43] - 1721:15, 1721:17, 1721:21, 1722:16, 1723:7, 1723:19, 1725:6, 1749:23, 1756:17, 1756:19, 1756:23, 1756:25, 1757:21, 1758:3, 1759:1, 1759:3, 1764:6, 1777:24, 1784:2, 1784:21, 1786:13, 1804:12, 1809:7, 1821:22, 1845:5, 1846:6, 1846:19, 1848:17, 1858:13, 1867:8, 1873:8, 1873:10, 1873:14, 1880:21, 1882:13, 1882:15, 1889:12, 1903:4, 1903:14, 1904:10, 1904:15, 1904:19, 1904:20

**Thanksgiving** [9] - 1837:8, 1837:9, 1837:10, 1838:3, 1839:16, 1851:24, 1851:25, 1876:13

**THE** [357] - 1715:10, 1716:5, 1716:16, 1716:17, 1716:21, 1716:24, 1717:2, 1717:3, 1717:6, 1717:7, 1717:18, 1717:20, 1717:22, 1717:24, 1718:17, 1718:20, 1718:23, 1718:25, 1719:1, 1719:4, 1719:5, 1719:7, 1719:8, 1719:13, 1719:14, 1719:15, 1719:16, 1720:16, 1720:19, 1721:3, 1721:4, 1723:24, 1724:3, 1724:7, 1724:11, 1724:13, 1724:15, 1724:19, 1724:22, 1724:24, 1725:8, 1725:14, 1725:18, 1725:22, 1725:25, 1726:5, 1727:2, 1727:16, 1727:23, 1728:20, 1728:24, 1729:1, 1729:8, 1729:11, 1729:16, 1729:18, 1729:20, 1730:1, 1730:10, 1730:16, 1730:21, 1731:2, 1731:11, 1732:22, 1733:1, 1733:5, 1733:14, 1733:20, 1734:3, 1734:17, 1734:22, 1735:10, 1735:18, 1735:21, 1736:1, 1736:3, 1736:6, 1736:14, 1736:17, 1736:21, 1736:25, 1737:4, 1737:10, 1737:13, 1737:15, 1737:18, 1737:22, 1737:24, 1739:12, 1743:14, 1745:8, 1745:10, 1745:22, 1746:8, 1746:15, 1746:22, 1747:1, 1747:5, 1748:6, 1748:9, 1748:11, 1748:22, 1749:3, 1749:9, 1749:12, 1749:17, 1749:19, 1749:23, 1750:1, 1750:5, 1750:7,

1750:15, 1751:3, 1751:6, 1753:25, 1757:11, 1757:25, 1758:24, 1759:2, 1759:4, 1761:19, 1762:25, 1763:8, 1763:13, 1763:19, 1768:4, 1769:9, 1770:4, 1776:23, 1776:25, 1777:4, 1777:5, 1777:6, 1777:9, 1777:10, 1777:14, 1778:3, 1778:5, 1778:6, 1778:8, 1778:9, 1783:10, 1798:16, 1798:18, 1798:21, 1798:25, 1799:1, 1799:5, 1799:8, 1799:10, 1800:4, 1800:6, 1800:10, 1821:4, 1821:11, 1821:14, 1821:16, 1822:3, 1822:7, 1822:16, 1822:20, 1825:22, 1825:24, 1826:1, 1828:18, 1828:20, 1829:9, 1831:2, 1831:4, 1831:6, 1831:14, 1831:19, 1831:23, 1832:2, 1832:7, 1832:8, 1833:2, 1833:6, 1833:10, 1833:12, 1833:13, 1833:20, 1833:23, 1833:24, 1833:25, 1834:2, 1834:3, 1834:4, 1839:20, 1839:25, 1840:2, 1840:12, 1840:25, 1841:2, 1841:6, 1841:10, 1841:15, 1841:17, 1841:25, 1842:2, 1842:7, 1842:9, 1842:18, 1843:1, 1843:4, 1843:8, 1843:10, 1843:14, 1845:4, 1845:7, 1845:10, 1846:4, 1846:9, 1846:24, 1847:1, 1847:4, 1847:9, 1847:13, 1848:2, 1848:25, 1849:3, 1849:5, 1849:6, 1849:8, 1849:9, 1850:25, 1851:8, 1851:9, 1853:2, 1853:5, 1853:12, 1853:16, 1854:13, 1854:16, 1857:18, 1857:20, 1857:25, 1858:18, 1858:20, 1859:1, 1859:2, 1859:3, 1859:4, 1862:16, 1865:10, 1865:12, 1865:14, 1865:16, 1865:18, 1865:21, 1865:25, 1866:5, 1866:10, 1866:19, 1866:25, 1867:6, 1867:9, 1867:12, 1867:17, 1867:22, 1868:3, 1868:6, 1868:11, 1868:17, 1868:18, 1873:17, 1874:9, 1876:6, 1881:8, 1881:10, 1881:18, 1881:21, 1881:23, 1882:21, 1883:14, 1883:17, 1883:22, 1883:25, 1884:6, 1884:9, 1884:14, 1884:18, 1885:9, 1885:22, 1886:7, 1886:11, 1887:3, 1887:14, 1888:15, 1888:20, 1890:14, 1890:21, 1890:23, 1891:2, 1891:9, 1891:11, 1891:20, 1891:24, 1892:7, 1892:10, 1892:14, 1892:16, 1892:20, 1893:8, 1893:13, 1893:19, 1894:12, 1894:14, 1894:24, 1895:22, 1895:24, 1896:8, 1896:23, 1897:7, 1897:13, 1897:24, 1898:11, 1898:13, 1898:23, 1899:5, 1899:8, 1899:21, 1899:25, 1901:4, 1901:17, 1901:20, 1901:24, 1902:7, 1902:10, 1902:13, 1902:16, 1902:21, 1902:24, 1903:1, 1903:5, 1903:7, 1903:13, 1903:21, 1904:2, 1904:6, 1904:8, 1904:12, 1904:24, 1905:3, 1905:8, 1905:11, 1905:19, 1906:2, 1906:6, 1906:15, 1906:21, 1907:1, 1907:12, 1907:18, 1908:5, 1908:10, 1908:16

**Theological** [1] - 1849:20
**thereafter** [4] - 1837:4, 1877:8, 1877:15, 1880:14
**therefore** [4] - 1721:24, 1846:18, 1848:16, 1901:9
**they've** [2] - 1851:24, 1888:11
**third** [6] - 1742:23, 1743:1, 1743:3, 1751:13, 1866:16, 1869:16
**third-party** [3] - 1742:23, 1743:1, 1743:3
**thirty** [3] - 1751:15, 1872:1, 1872:2
**thirty-eight** [1] - 1872:1
**thirty-four** [1] - 1872:2
**Thomas** [5] - 1728:9, 1733:10, 1734:12, 1735:3, 1735:13
**Thomases** [1] - 1732:12
**thoughts** [1] - 1897:2
**thousand** [2] - 1767:2, 1767:5
**three** [14] - 1754:7, 1781:20, 1836:12, 1850:3, 1850:16, 1869:2, 1870:15, 1871:17, 1872:21, 1879:4, 1879:8, 1880:3, 1880:22, 1887:13
**three-year** [1] - 1871:17
**throughout** [1] - 1837:25
**throughs** [3] - 1864:5, 1864:12, 1864:23
**Thursday** [6] - 1867:24, 1868:4, 1893:7, 1893:12, 1896:21, 1896:25
**ticket** [1] - 1774:15
**tie** [1] - 1850:21
**timely** [2] - 1792:10, 1794:2
**timing** [1] - 1885:11
**Timothy** [2] - 1803:10, 1803:12
**title** [6] - 1745:17, 1815:20, 1815:23, 1816:7, 1816:21, 1816:25
**today** [8] - 1758:2, 1778:17, 1821:19, 1825:10, 1826:7, 1863:7, 1865:22, 1866:15
**together** [19] - 1719:6, 1738:24, 1739:6, 1744:18, 1744:24, 1744:25, 1786:14, 1788:24, 1836:10, 1836:23, 1837:3, 1851:20, 1851:24, 1855:23, 1856:3, 1876:22, 1877:9, 1885:3, 1908:2
**Tom** [1] - 1785:17
**tomorrow** [20] - 1867:6, 1867:13, 1867:20, 1867:21, 1867:24, 1868:2, 1868:9, 1881:12, 1891:13, 1891:15, 1892:12, 1893:6, 1893:23, 1896:14, 1896:22, 1896:23, 1906:25, 1907:10, 1908:11, 1908:17
**took** [8] - 1717:10, 1719:21, 1737:6, 1771:12, 1772:6, 1788:5, 1815:3, 1901:25
**top** [6] - 1728:6, 1809:18, 1861:9, 1902:17, 1905:21, 1908:6
**topics** [1] - 1882:7
**TORRES** [1] - 1715:23
**total** [5] - 1741:19, 1787:25, 1794:18, 1810:17, 1862:9
**totally** [1] - 1860:2
**touch** [2] - 1720:10, 1720:15
**tough** [1] - 1767:24

**toward** [1] - 1776:14
**towards** [3] - 1864:9, 1895:13, 1895:20
**Town** [1] - 1874:18
**town** [6] - 1836:19, 1836:20, 1836:21, 1836:22, 1851:16
**track** [1] - 1792:17
**trade** [2] - 1805:20, 1853:20
**train** [1] - 1894:16
**training** [1] - 1754:6
**transaction** [4] - 1727:9, 1730:6, 1734:17, 1877:3
**transactions** [7] - 1728:12, 1730:15, 1731:8, 1732:5, 1760:20, 1775:19, 1776:5
**TRANSCRIPT** [1] - 1715:10
**transcript** [1] - 1715:25
**Transcription** [1] - 1715:25
**transfer** [1] - 1816:25
**transfers** [1] - 1816:4
**travels** [1] - 1717:7
**treasurer** [1] - 1838:25
**treated** [1] - 1722:22
**treatments** [1] - 1815:17
**TRIAL** [1] - 1715:10
**trial** [23] - 1716:9, 1722:18, 1722:24, 1723:14, 1723:19, 1741:16, 1744:14, 1748:18, 1757:15, 1757:21, 1777:18, 1777:24, 1826:13, 1866:17, 1880:21, 1885:11, 1887:25, 1888:9, 1891:13, 1892:12, 1897:12, 1902:22, 1903:25
**tried** [2] - 1735:17, 1771:3
**trips** [1] - 1875:9
**trouble** [2] - 1732:16, 1793:6
**true** [12] - 1731:5, 1738:12, 1738:15, 1738:22, 1746:24, 1753:15, 1758:7, 1783:7, 1804:9, 1846:16, 1848:13, 1858:8
**truncated** [1] - 1857:23
**trust** [1] - 1839:23
**trusted** [1] - 1853:24
**trusting** [1] - 1755:22
**truthfully** [1] - 1825:10
**try** [10] - 1721:19, 1789:5, 1833:8, 1864:23, 1865:3, 1866:7, 1874:3, 1890:7, 1906:24, 1908:17
**trying** [10] - 1731:2, 1733:24, 1735:9, 1749:15, 1801:18, 1822:5, 1842:4, 1842:14, 1871:23, 1883:13
**Tuesday** [1] - 1715:7
**turn** [3] - 1732:17, 1765:16, 1831:21
**turned** [3] - 1732:10, 1875:20, 1876:17
**turning** [1] - 1754:7
**TV** [1] - 1881:15
**twenty** [3] - 1804:23, 1867:15, 1872:9
**twice** [1] - 1896:4
**Two** [1] - 1906:11
**two** [42] - 1723:17, 1724:17, 1727:17, 1728:10, 1728:18, 1728:20, 1728:22, 1728:24, 1730:11, 1732:23, 1733:15, 1734:15, 1750:18, 1757:18, 1767:2, 1767:5, 1777:22, 1830:2, 1832:1,

1833:8, 1834:22, 1835:11, 1836:12, 1836:14, 1839:14, 1862:23, 1866:15, 1870:19, 1874:24, 1885:12, 1885:15, 1886:4, 1888:3, 1890:19, 1893:2, 1906:9, 1907:22, 1908:3, 1908:7, 1908:8
**two-minute** [1] - 1832:1
**type** [4] - 1748:12, 1782:7, 1796:6, 1907:6
**typical** [2] - 1820:21, 1820:22

# U

**U.S** [2] - 1779:1, 1889:14
**ultimately** [2] - 1789:10, 1808:4
**undecided** [1] - 1867:10
**under** [17] - 1722:25, 1729:17, 1737:23, 1747:11, 1748:16, 1758:12, 1762:8, 1774:9, 1779:24, 1780:9, 1814:2, 1824:23, 1851:1, 1882:18, 1890:19, 1901:10, 1907:9
**under-utilized** [1] - 1814:2
**underlying** [3] - 1735:9, 1738:20, 1870:6
**undermine** [1] - 1883:13
**undermines** [1] - 1887:17
**understood** [1] - 1743:17
**underwriter** [2] - 1819:13, 1819:15
**undisputed** [1] - 1746:4
**unfortunately** [2] - 1720:3, 1874:14
**unique** [1] - 1852:2
**UNITED** [3] - 1715:1, 1715:3, 1715:11
**United** [6] - 1715:5, 1715:13, 1715:16, 1716:6, 1716:9, 1874:19
**units** [1] - 1788:22
**University** [5] - 1834:24, 1834:25, 1835:3, 1849:19, 1873:24
**unless** [7] - 1724:4, 1732:13, 1736:23, 1886:20, 1893:3, 1893:4, 1899:25
**unredacted** [2] - 1721:9, 1721:24
**untoward** [2] - 1731:21, 1732:1
**unusual** [1] - 1893:25
**unworthy** [1] - 1882:14
**up** [57] - 1725:1, 1726:1, 1729:4, 1730:25, 1732:15, 1735:24, 1737:19, 1749:7, 1760:23, 1764:13, 1768:6, 1769:18, 1770:3, 1770:25, 1771:3, 1795:15, 1795:20, 1795:21, 1796:1, 1801:14, 1801:16, 1801:25, 1802:3, 1805:14, 1810:3, 1819:9, 1822:3, 1822:4, 1835:2, 1835:9, 1836:9, 1837:20, 1838:2, 1840:14, 1843:4, 1867:20, 1868:1, 1868:21, 1870:23, 1872:5, 1874:3, 1874:14, 1876:2, 1876:7, 1876:17, 1878:9, 1881:1, 1883:7, 1884:9, 1885:6, 1889:19, 1890:8, 1890:12, 1908:14, 1908:18
**upper** [1] - 1766:1
**uproar** [1] - 1836:21
**upwards** [1] - 1890:2
**utilized** [1] - 1814:2

## V

**vacationed** [1] - 1744:24
**valid** [5] - 1901:8, 1901:11, 1901:15, 1901:21, 1902:4
**validly** [1] - 1902:7
**valuable** [1] - 1756:8
**value** [1] - 1731:22
**Van** [1] - 1719:20
**variety** [1] - 1851:5
**various** [4] - 1788:21, 1808:22, 1810:17, 1856:2
**vary** [1] - 1808:21
**VButlerRPR@aol.com** [1] - 1715:24
**vegetable** [1] - 1876:8
**vehicle** [1] - 1823:13
**vendor** [2] - 1796:8, 1796:10
**venture** [1] - 1878:10
**verb** [1] - 1901:25
**verdict** [3] - 1897:6, 1900:7, 1907:19
**verified** [1] - 1827:25
**version** [4] - 1737:6, 1765:3, 1769:7, 1885:2
**versus** [1] - 1716:9
**vetted** [4] - 1795:15, 1795:17, 1795:21, 1795:25
**vetting** [1] - 1797:4
**victim** [1] - 1827:8
**Victor** [10] - 1717:8, 1717:17, 1717:24, 1718:3, 1718:24, 1720:13, 1720:14, 1720:21, 1832:2, 1893:25
**VICTORIA** [1] - 1715:23
**view** [5] - 1859:15, 1861:9, 1864:24, 1899:1, 1899:3
**vigorously** [1] - 1882:7
**Vincent** [1] - 1874:20
**Vineyard** [1] - 1744:21
**violence** [3] - 1901:16, 1901:22, 1902:5
**visit** [3] - 1783:8, 1783:11, 1830:23
**visited** [1] - 1783:23
**visits** [1] - 1794:23
**volumes** [1] - 1850:12
**volunteer** [4] - 1835:13, 1838:5, 1838:7, 1839:10
**volunteering** [1] - 1838:19
**volunteerism** [1] - 1882:14
**Volunteers** [1] - 1835:14

## W

**wait** [8] - 1718:10, 1720:9, 1743:4, 1743:7, 1752:23, 1752:24, 1847:9, 1867:21
**waiter** [1] - 1835:2
**waiting** [3] - 1717:20, 1735:22, 1831:21
**walk** [9] - 1818:19, 1861:8, 1861:10, 1862:7, 1863:17, 1864:5, 1864:12, 1864:20, 1864:23
**walk-through** [3] - 1818:19, 1863:17, 1864:20
**walk-throughs** [3] - 1864:5, 1864:12, 1864:23

**walked** [1] - 1818:14
**Walter** [1] - 1804:9
**Walters** [18] - 1762:1, 1763:3, 1771:4, 1780:11, 1782:13, 1782:24, 1783:7, 1783:13, 1784:1, 1784:24, 1785:9, 1786:24, 1790:10, 1820:6, 1820:7, 1821:24, 1824:18, 1882:11
**Walters's** [2] - 1820:11, 1820:13
**wants** [3] - 1721:12, 1884:10, 1897:4
**Warren** [3] - 1784:20, 1784:21, 1785:9
**waste** [1] - 1750:3
**watch** [1] - 1881:15
**Watson** [1] - 1781:16
**Wayne** [1] - 1783:8
**wearing** [3] - 1761:5, 1850:20, 1850:21
**Wednesday** [3] - 1868:9, 1896:21, 1908:20
**week** [3] - 1852:11, 1866:16, 1895:7
**weekends** [1] - 1876:11
**weekly** [2] - 1850:11, 1852:9
**weeks** [3] - 1798:1, 1839:14, 1870:15
**weight** [3] - 1846:18, 1848:16, 1858:12
**welcome** [1] - 1894:11
**Wendell** [16] - 1762:1, 1771:4, 1780:11, 1780:21, 1782:13, 1783:13, 1790:10, 1804:9, 1820:6, 1820:7, 1820:11, 1820:13, 1820:15, 1821:24, 1824:18, 1882:11
**whatsoever** [1] - 1826:12
**whereby** [1] - 1827:2
**wherewithal** [2] - 1790:11, 1795:19
**whimpering** [1] - 1895:21
**whining** [1] - 1895:21
**white** [1] - 1850:21
**whole** [8] - 1722:1, 1748:17, 1821:25, 1826:17, 1875:2, 1884:3, 1891:12, 1901:3
**wife** [2] - 1835:14, 1875:6
**wife's** [1] - 1760:21
**wilful** [1] - 1906:10
**willing** [1] - 1732:15
**win** [1] - 1797:11
**winning** [1] - 1824:10
**wire** [4] - 1758:4, 1761:5, 1905:24, 1906:14
**wish** [1] - 1734:23
**withdraw** [3] - 1771:14, 1841:4, 1841:24
**withdrawn** [3] - 1761:15, 1824:6, 1872:12
**withheld** [1] - 1742:19
**withhold** [11] - 1739:9, 1739:13, 1741:12, 1745:4, 1745:5, 1746:17, 1746:24, 1747:7, 1747:9, 1747:10, 1748:17
**withholding** [1] - 1722:15
**WITNESS** [18] - 1737:24, 1776:25, 1777:5, 1778:5, 1778:8, 1798:25, 1831:4, 1833:24, 1834:2, 1834:4, 1849:5, 1849:8, 1850:25, 1851:9, 1859:2, 1859:4, 1868:18, 1909:3
**witness** [62] - 1721:23, 1737:20, 1738:2,

1746:9, 1747:13, 1761:24, 1762:4, 1777:1, 1777:8, 1777:15, 1778:11, 1800:12, 1809:2, 1821:13, 1821:14, 1822:22, 1825:21, 1831:7, 1831:10, 1831:22, 1833:4, 1833:7, 1833:14, 1833:22, 1834:6, 1841:14, 1845:8, 1845:10, 1845:12, 1846:10, 1846:13, 1846:20, 1847:2, 1847:10, 1848:3, 1848:8, 1848:11, 1848:17, 1848:22, 1849:2, 1849:11, 1857:21, 1858:2, 1858:4, 1858:6, 1858:13, 1858:16, 1865:11, 1865:19, 1866:2, 1866:5, 1882:6, 1889:14, 1889:16, 1891:16, 1891:17, 1891:25, 1892:2, 1892:3, 1892:4, 1897:18
**Witness** [4] - 1799:9, 1831:5, 1881:22, 1904:15
**witnesses** [19] - 1727:18, 1822:9, 1831:21, 1865:22, 1867:4, 1867:9, 1867:11, 1873:9, 1882:23, 1884:5, 1884:12, 1884:16, 1884:19, 1885:12, 1885:16, 1885:18, 1891:18, 1894:17, 1904:20
**Witnesseth** [1] - 1729:17
**woman** [1] - 1834:19, 1834:20, 1839:15
**word** [3] - 1733:11, 1762:2, 1770:14
**words** [4] - 1828:5, 1885:1, 1889:12, 1889:13
**workings** [1] - 1823:22
**works** [2] - 1795:12, 1898:6
**worksheet** [2] - 1822:23
**World** [8] - 1743:6, 1744:2, 1744:7, 1744:8, 1744:11, 1745:13, 1753:5
**worth** [4] - 1821:22, 1879:20, 1880:21, 1880:23
**wrap** [1] - 1890:7
**writing** [1] - 1764:9
**written** [3] - 1751:15, 1769:6, 1898:21
**wrongdoing** [1] - 1732:21
**wrongful** [3] - 1901:15, 1901:22, 1902:4
**wrote** [2] - 1758:16, 1774:12
**Wyck** [1] - 1719:20

## X

**X-ray** [4] - 1717:12, 1717:13, 1717:17, 1718:16

## Y

**year** [8] - 1745:20, 1810:15, 1836:14, 1838:1, 1851:24, 1853:1, 1871:17, 1871:22
**Year** [1] - 1874:12
**years** [27] - 1732:23, 1733:15, 1744:10, 1834:18, 1835:5, 1835:11, 1835:14, 1835:21, 1835:22, 1836:10, 1836:11, 1836:12, 1837:5, 1837:11, 1849:21, 1851:6, 1871:14, 1872:1, 1872:2, 1872:10, 1872:21, 1874:17, 1874:25, 1876:16, 1887:13
**yesterday** [10] - 1722:11, 1722:21,

1723:1, 1724:18, 1725:23, 1738:8,
1739:8, 1753:22, 1831:11, 1866:15
**YORK** [1] - 1715:1
**York** [26] - 1715:5, 1715:14, 1715:15,
1716:7, 1765:15, 1765:19, 1778:22,
1789:10, 1796:8, 1796:10, 1810:9,
1824:13, 1834:14, 1835:7, 1844:10,
1844:11, 1844:14, 1849:16, 1849:23,
1855:2, 1855:9, 1859:23, 1870:13,
1870:24, 1874:19
**young** [2] - 1731:14, 1836:23
**yourself** [5] - 1739:11, 1744:2, 1751:10,
1785:1, 1785:8
**yourselves** [1] - 1879:9
**youth** [1] - 1883:10

VB        OCR        CRR