1912

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,      : 11-CR-00683(NG)
                               :
                               :
                               :
        -against-              : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
STEVENSON DUNN, LEE HYMOWITZ   : Wednesday, March 26, 2014
AND MICHAEL FREEMAN,           : 9:45 a.m.
                               :
        Defendant.             :
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NINA GERSHON
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:  LORETTA E. LYNCH, ESQ.
                        United States Attorney
                     Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                     BY:  ANTHONY M. CAPOZZOLO, ESQ.
                        CRISTINA MARIE POSA, ESQ.
                        Assistant United States Attorney

For the Defendant:   BY:ROBERT A. EVANS, JR., ESQ.
Stevenson Dunn

For the Defendant:   BY:MAURICE H. SERCARZ, ESQ.
Lee Hymowitz            ROBERT CALIENDO, ESQ.

For the Defendant:   BY:GERALD J. DICHIARA, ESQ.
Michael Freeman         NICHOLAS PINTO, ESQ.

Also Present:           Naushan Richards, Special Agent
                        Susannah Apuzzo, Paralegal

Court Reporter:      VICTORIA A. TORRES BUTLER, CRR
                     225 Cadman Plaza East / Brooklyn, NY 11201
                     **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

VB      OCR      CRR

Side-Bar                                                  1913

1          (In open court.)

2          (Judge NINA GERSHON enters the courtroom.)

3          (The following occurs outside the presence of the

4   jury.)

5          THE COURTROOM DEPUTY:  All rise.

6          United States District Court for the Eastern

7   District of New York is now in session, the Honorable Nina

8   Gershon is now presiding.

9          THE COURT:  I would like to first call in Juror

10  Number 1 and advise her that I am not going to allow her to

11  bring her dog.  She will have to make other arrangements.

12         (Side-bar conference held on the record out of the

13  hearing of the courtroom.)

14

15         (Side-bar.)

16         THE COURT:  Hi, how are you?

17         THE JUROR:  Good.

18         THE COURT:  Good.  I just wanted to tell that you I

19  read your letter --

20         THE JUROR:  Yes.

21         THE COURT:  -- and we're not in a position to

22  accommodate the dog.

23         THE JUROR:  Okay.

24         THE COURT:  She sounds very sweet, I'm sorry.

25         THE JUROR:  Are we going to know when this is going

```
                    Proceedings                    1914
```

1   to be wrapped up?

2          THE COURT:  We're moving along very well, but we

3   will be continuing into next week, that is clear.

4          THE JUROR:  Into the majority of the week?

5          THE COURT:  I can't, there is no way to predict.

6          THE JUROR:  Okay.

7          THE COURT:  So, I wanted to tell you as soon as

8   possible.

9          THE JUROR:  To make arrangements.

10          THE COURT:  To give you a chance to make a call and

11   make whatever arrangements you need to make.  I appreciate

12   that very, very much.

13          THE JUROR:  Thank you, thanks.

14          THE COURT:  Okay.

15          (Side-bar end.)

16

17          (In open court.)

18          THE COURT:  All right, the juror seems fine with

19   that resolution and I think we need to wait for Mr. Dunn.

20          MR. EVANS:  Let me go see if he's outside.

21          (Pause in the proceedings.)

22          THE COURTROOM DEPUTY:  Criminal cause for a trial,

23   United States versus Stevenson Dunn, et al.

24          May I have the appearances for the Government,

25   please.

```
                        Proceedings                    1915
```

1          MS. POSA:  Good morning, Your Honor.

2          Cristina Posa, Anthony Capozzolo, Special Agent

3    Naushan Richards and Susannah Apuzzo for the Government.

4          THE COURTROOM DEPUTY:  For Stevenson Dunn.

5          MR. EVANS:  The offices of Evans and Al-Shabazz by

6    Robert Anthony Evans.

7          Good morning, Your Honor.

8          THE COURTROOM DEPUTY:  For Lee Hymowitz.

9          MR. SERCARZ:  For the defendant Hymowitz, Sercarz &

10   Riopelle by Maurice Sercarz and Robert Caliendo.

11         THE COURTROOM DEPUTY:  For Michael Freeman.

12         MR. DiCHIARA:  Nicholas Pinto and Gerald DiChiara

13   for Mr. Freeman.

14         Good morning, Your Honor.

15         THE COURTROOM DEPUTY:  Please, be seated.

16         THE COURT:  Good morning, Counsel.

17         Victor, are all the jurors here?

18         THE COURTROOM DEPUTY:  Yes, Judge.

19         THE COURT:  All of our jurors are present, so unless

20   there is something that needs to be done before they come in,

21   perhaps we can put off any other issues until after we're done

22   unless they are very brief.

23         One issue was that I understand Mr. DiChiara asked

24   for the repetition in the main charge of the statement

25   regarding Pre-Trial statements by Mr. Dunn.  I see no one has

Proceedings                                            1916

1    any objection to doing that, so I think we should put it after

2    the section called prior inconsistent statements.  We will

3    have another heading called Mr. Dunn's prior statements

4    regarding Mr. Hymowitz and Mr. Freeman.

5              Is that acceptable to everyone?

6              MR. DiCHIARA:  That's fine, Judge.

7              MR. SERCARZ:  Yes.

8              MR. EVANS:  That's acceptable.

9              MS. POSA:  Fine.

10             THE COURT:  All right.

11             And Mr. Sercarz, did you have any other thoughts

12   about your request regarding mere presence?

13             MR. SERCARZ:  No, Your Honor.

14             I would just like the record to reflect that I have

15   made the request that the mere presence charge and the mere

16   association charge be put in a place where it indicates that

17   it applies both to substantive and the conspiracy charges.  We

18   did not find case law specifically addressing the issue.

19             THE COURT:  Ms. Posa, the Government is still

20   opposed to that?

21             MS. POSA:  Yes, Your Honor.

22             THE COURT:  My concern, frankly, is that it is

23   likely to be confusing and may have a contrary effect to what

24   you are asking for, and I certainly don't think it is

25   required.

VB        OCR        CRR

Proceedings                                              1917

1         So, I am going to deny that request.

2         THE COURTROOM DEPUTY:  Shall I bring in the jurors?

3         THE COURT:  Yes, let's bring the jurors in.

4         Mr. Hymowitz can resume the stand.

5         While we're bringing them in, there is something

6    that I can alert you to.

7         With respect to the cooperation agreements in the

8    charge I had in brackets reduced charges or didn't pursue

9    other charges.  I think the cooperation agreement simply

10   provides that the Government will not pursue other charges and

11   there are no reductions of charges, so I struck the section

12   that says reduced charges.

13        If you want to take a look at the cooperation

14   agreements and tell me if you have any problem with that, let

15   me know.  If not, it is going to go in that way.

16        (Witness resumes stand.)

17

18        (Continued on following page.)

19

20

21

22

23

24

25

VB        OCR        CRR

1  L E E    H Y M O W I T Z,

2       called as a witness, having been previously duly

3       sworn, was examined and testified as follows:

4            THE COURTROOM DEPUTY:  All rise.

5            (Jury enters.)

6            THE COURTROOM DEPUTY:  Thank you, please be seated.

7            Please, be advised that you are still under oath.

8            THE COURT:  All right, Members of the Jury, we are

9  continuing with the direct testimony of Mr. Hymowitz by

10 Mr. Sercarz.

11 DIRECT EXAMINATION (Continuing)

12 BY MR. SERCARZ:

13 Q    Lee, before we move forward, there were a couple of

14 questions I neglected to ask you concerning your background

15 and employment experience.

16       You testified yesterday about having formed a

17 partnership with several individuals Marret, Mr. Freeman,

18 Mr. Rappaport.  At one point was there a gentleman named

19 Mr. Weiss with whom you were also in partnership?

20 A    Yes, the firm was Weiss, Hymowitz & Freeman.

21 Q    Did there come a time during the course of your various

22 partnerships when you gained commercial banking experience?

23 A    Yes.  Mr. Weiss owned a bank by the name of Royal

24 Mortgage Bankers and that would be in the early to mid-'90s.

25 Mr. Weiss and his partner, Mr. Scaringi were what I considered

Hymowitz - direct - Sercarz                1919

1    older gentlemen at the time, probably my age, and they were

2    sort of semi-retired and I oversaw the commercial side of the

3    bank.

4    Q    What exactly did you do?  What does that mean when you

5    oversaw the commercial side of the bank?

6    A    Any potential loans that would come in, I would review.

7    I would go over the numbers, make a determination whether we

8    thought the bank should invest in those mortgages.

9    Q    By the way, are you employed at the present time?

10   A    Yes, I am.

11   Q    What do you do?

12   A    I am vice president of business affairs for an

13   international corporation.

14   Q    What is the name of that corporation?

15   A    Fortune Group.

16   Q    What do they do?

17   A    We have several different types of businesses throughout

18   the United States, Mexico, China.  The major business that

19   they have is metal and plastic recovery.  Like, for example,

20   in Sandy from all the flooding, all the telephone wires and

21   stuff, we have national contracts with like, Verizon, AT & T

22   and Sprint, we recover all the bad wire, separate it and sell

23   it off.

24         They have another company that manufactures soda and

25   coffee machines.  And the newest venture which we've gone

VB          OCR          CRR

1   into, which is very exciting for me, is aqua farming and

2   hydroponics.  They are growing fish in factories and then

3   using the waste water to grow vegetables indoors.

4   Q    More to the point, what is it that you do for them?

5   A    I am sort of a Jack-of-all-trades.  It's a family-owned

6   business and my job is to just make sure that whatever we're

7   doing sort of goes forward.

8             They are busy with the making of money so, for

9   example, we are constantly buying businesses.  The last

10   year-and-a-half or so I've made certain that we've had a new

11   employee handbook that's been -- for everyone in our company.

12             I've been one to oversee us getting in compliance

13   with Obamacare.

14             All of our employees used to get paid on different

15   days.  I hired the company Paychex so that everyone in the

16   company could get paid on a regular basis.

17             I oversee their real estate.  We own probably

18   twenty-five pieces of real estate throughout the

19   United States.

20             If we get sued, it's my job to hire Counsel

21   throughout the United States to, you know, handle the cases.

22             Pretty much just about everything.

23   Q    All right.  Now, to get back to where we were yesterday,

24   we talked a little bit about the request for qualifications

25   that was submitted by the SML the first time around and you

Hymowitz - direct - Sercarz                    1921

1    mentioned that there was a decision later on to re-apply for

2    an SML which you would be listed as among the developers?

3    A    Yes.

4    Q    Do you recall that?

5    A    Yes.

6    Q    Tell us when that happened.

7    A    That was in 2003 going, I guess, somewhere -- I seem to

8    remember June or July of 2003.

9    Q    What was the outcome of your effort to apply yet again to

10   be among the three developers on the SML projects?

11   A    About six months after we applied we were denied.

12   Q    Again, when you say we were denied, are you talking about

13   the SML having been denied the right to bid on -- to be

14   included in projects or you were denied the right to join them

15   as a developer?

16   A    The whole group was denied.

17   Q    All right.  And what was the outcome of that?  What was

18   the upshot of that?

19   A    We did not go forward with that sixth round.

20   Q    Just so that I'm clear and we don't lose the time frame,

21   the earlier request for qualifications in which you were not

22   listed as a developer is the one that was used to select

23   developers on the Bed-Stuy --

24   A    No.

25   Q    -- projects?

VB        OCR        CRR

1   A    No.

2   Q    All right.  Just to straighten me out, how is it then

3   that the SML was selected on the Bedford Stuyvesant project?

4   A    That was a separate RFQ which came out in 2002.  There

5   was an RFQ that came out December of 1999, which was round

6   five.  That was the NEP program.

7             Then, in 2002, there was another RFQ and that would

8   be for the approval for what I called Bushwick cluster and

9   Grove cluster and the Bedford-Stuy cluster and I think Hancock

10  might have been approved for that as well.

11  Q    Okay.  Let me turn your attention, just briefly to the

12  projects on which the SML worked.

13            With regard to the Lexington Avenue project, do you

14  recall approximately when it began?

15  A    The, probably the group was approved probably sometime in

16  mid-2000, I would guess, because the application went in

17  probably late 2000 because I think, if I remember looking at

18  some documents, the application had to be in by March of 2000.

19  So, probably late 2000 they were approved.

20  Q    All right.  At the end of day, did the SML receive a

21  developer's fee for that project, if you recall?

22  A    I have no knowledge that they received any fees.

23  Q    And your role was as Counsel; is that correct?

24  A    Yes.

25  Q    With regard to the Bed-Stuy project, was the selection of

Hymowitz - direct - Sercarz                    1923

1    a contractor conducted by sealed bids?

2    A    I was not involved in that process at all.  I know what

3    I've heard -- according to the RFQ, yes.

4    Q    But you were not directly and personally involved in the

5    process of selecting a contractor --

6    A    No, not at all.

7    Q    -- is that correct?

8         Did you therefore, see any indication that the

9    general contractors were inflating their bids on that project?

10   A    No.

11   Q    Did you see any indication that the bidding process was

12   rigged in any way on that project?

13   A    No.

14   Q    I want to talk to you about your relationship with

15   Mr. Starzecki.

16        Do you remember when you first met Mr. Bogdan

17   Starzecki?

18   A    I probably first met Mr. Starzecki when we were getting

19   ready for the closing of round five.

20   Q    Round five is the Bedford Stuyvesant project?

21   A    No, the first project, the NEP project.

22   Q    That's the Lexington Avenue project?

23   A    Yes.

24   Q    And can you put an approximate date on that for the

25   Ladies and Gentlemen of the Jury?

Hymowitz - direct - Sercarz                    1924

1    A    Probably in 2001.

2    Q    Just to remind the jury, he was the general contractor on

3    Lexington; correct?

4    A    Yes.

5    Q    And in the course of his general duties as contractor and

6    your duties and Counsel to the developer, did you have

7    occasion to speak with Mr. Starzecki?

8    A    Yes.

9    Q    Can you estimate for the Ladies and Gentlemen of the Jury

10   on the Lexington project how often you used to run into one

11   another?

12   A    I would have spoken to him a lot getting ready for the

13   closing to make sure that he had his insurances in place, that

14   whatever paperwork he needed for the closing was in order and

15   then, after that, it was not unusual to see him at our office

16   from time to time.

17   Q    During those meetings, did you discuss things other than

18   the work that needed to be done on the HPD project?

19   A    I did not discuss any work with him with regard to the

20   NEP project.

21        Mr. Starzecki learned that I was very much involved

22   in private real estate development and whenever we were either

23   at a closing or he would drop in to the office to see Michael

24   for whatever he needed to do, he would drop into my office to

25   say hi and just find out what I was up to.

VB      OCR      CRR

Hymowitz - direct - Sercarz                    1925

1   Q    Did those conversations continue throughout the Lexington

2   project?

3   A    Yes.

4   Q    Did they continue during the bidding process for the

5   Bedford Stuyvesant project?

6   A    I don't know what the bidding process was for the

7   Bed-Stuy process.  During the first project there were at

8   least three phases to that project.

9   Q    First project meaning the Lexington?

10  A    NEP Lexington Avenue, yes.

11  Q    All right.

12  A    There were three phases to it so we had to do at least

13  three closings.  So during those years I had, you know, to be

14  involved with them at least on those three closings as well.

15  Q    During those closings, did the subject of your, I'm going

16  to call it outside work, your private work, come up?

17  A    Always.

18  Q    Did he talk to you about them, your work?

19  A    Yes, I'm sorry.

20  Q    Did he make any requests of you?

21  A    Early on, the first few years, no.  We just talked about

22  general.

23  Q    Did the tone of those conversations change?

24  A    Several years later, yes, they did.

25  Q    All right.  Give us a time frame.

1    A    I would say three to six months before the Bed-Stuy

2    closing his interest became much more acute.

3    Q    Do you recall whether or not he made any specific

4    requests of you?

5    A    The conversations started to become more of I'm tired of

6    doing City work, it's too cumbersome, I don't get paid, I'd

7    like to branch out more into non-City work.

8    Q    And in connection with that, did he ask you to do

9    anything for him?

10   A    Not initially.  As we got closer to the Bed-Stuy closing

11   the answer is yes, he was starting to ask me to see if I could

12   assist him in getting outside work.

13   Q    Now, during the period 2006 and 2007, were you involved

14   in a variety of quote, unquote outside projects, private

15   projects?

16   A    Yes.  Almost all of my time was spent doing outside

17   development work for clients.

18   Q    We've heard testimony from Mr. Starzecki regarding the

19   Lutheran Synod.

20            Do you recall that testimony?

21   A    Yes.

22   Q    Tell the Ladies and Gentlemen of the Jury what it was

23   that the Lutheran Synod was doing that required real estate

24   development work?

25   A    Sometime in 2006 I was approached by a law firm that we

Case 1:11-cr-00683-NG   Document 275-2   Filed 07/25/14   Page 16 of 280 PageID #: 1829

1   had a common client that I was friendly with.  They were the

2   attorneys for the Lutheran Synod.  Lutheran Synod probably has

3   about two or 300 churches in the northeast and they asked me

4   if I would be interested in being a real estate consultant to

5   the Synod.

6   Q    Let me just stop you there to make the point --

7   A    Sure.

8   Q    -- or ask the question.

9        The time the Lutheran Synod approached you, they

10  were already represented by Counsel; is that correct?

11  A    Yes, the firm of Capell Barnett.

12  Q    C-A-P-E-L-L?

13  A    Yes.

14  Q    All right.

15  A    Mr. Capell had been Synod's attorney probably for

16  thirty years.

17  Q    And you just indicated that they wanted you to be a real

18  estate advisor; is that correct?

19  A    Yes.

20  Q    That would have been a nonlegal piece of work; is that

21  correct?

22  A    Correct.

23  Q    What did they want you to do for them?

24  A    The church, the Synod, had many, many churches in areas

25  throughout the City in particular, some on Long Island that

VB      OCR      CRR

1    for no better term would be underperforming.  The size of the

2    congregation had gotten so small that the congregants could

3    not afford to keep the church going, so the church was looking

4    for alternatives as to what to do with church property.

5    Q    Were they seeking your guidance?

6    A    Yes.

7    Q    On what to do with church property?

8    A    Yes.

9    Q    Did you ever discuss that work with Mr. Starzecki?

10   A    Oh, absolutely.

11   Q    Just briefly, were you also involved in projects at

12   Albany and Herkimer in Brooklyn?

13   A    Yes, there were two projects there.

14   Q    All right.  Were you involved as a lawyer, as a real

15   estate advisor or both?

16   A    In that situation, I would have been both.

17   Q    All right.  What were they doing over there?  What was

18   that project about, just briefly?

19   A    The first project I was involved with was on Herkimer,

20   right down the street from, I think that's Brooklyn Hospital.

21   Clients wanted to build six three-family homes there.  They

22   did not have any skills in that area.  They retained, they

23   retained me.  I got them bank financing for the project.  They

24   had already had a builder in place.

25            And what I did after closing on the construction

Hymowitz - direct - Sercarz                    1929

1   loan, my job would be to come to the site on a fairly regular

2   basis to make certain that the builder was doing what he was

3   supposed to do and then, after the project was built, I did

4   the closings on the homes.

5   Q    Do you recall whether the subject of that project came up

6   in any of your conversations with Mr. Starzecki?

7   A    It was a small project and possibly in just passing.  And

8   that was in 2004.

9   Q    Were you engaged in any real estate development projects

10  on Staten Island?

11  A    I still had another project with the same people in

12  Brooklyn.

13  Q    I'm sorry, go ahead and tell us about that one.

14  A    The clients had a very large piece of property which

15  their business was operating out of and that was starting in

16  about 2005.  They were interested in developing that property

17  and building a high-rise condominium.

18          They retained my services to assist them in doing

19  that and that, I know for certain, that I spoke to

20  Mr. Starzecki about.

21  Q    Were you retained as a real estate advisor, as a lawyer

22  or in some other capacity?

23  A    In all of those capacities.

24  Q    All right.  Were you involved in 2005-2006-2007 in any

25  real estate development projects on Staten Island?

1    A     Yes.

2    Q     Again, briefly, tell the Ladies and Gentlemen of the Jury

3    what that was about.

4    A     There was a gentleman in Staten Island who owned seven

5    acres of land on the water in Staten Island.  I had met him in

6    2001 for the purposes of giving him mortgages to develop his

7    property.  He had a marina there, we lent him some money to

8    build a marina.

9          We lent him some money to build a restaurant on the

10   property and, as a result of that, we became friendly.  He

11   asked me to get involved with him to help him develop a major

12   project there.

13   Q     As a lawyer, as a real estate advisor or in some

14   additional capacity?

15   A     Up to that point, I was not his attorney, he had separate

16   Counsel.  In 2006 I took over both being -- assisting him in

17   developing.  And then, all of the work that would be involved

18   in developing that was legal, I would have done that as well.

19   Q     Without going into the detail, were there other real

20   estate projects in which you were involved, either as an

21   attorney, as a developer or in some other capacity in 2006 and

22   2007?

23   A     The answer is yes.  My whole practice was representing

24   owners of real estate, developers.  So, yes.

25   Q     And did you discuss these projects in 2006 and in 2007

Hymowitz - direct - Sercarz                    1931

1    with Bogdan Starzecki when you encountered him either at your

2    office or at a closing or elsewhere?

3    A     Sure, many times.

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

Hymowitz - direct - Sercarz                    1932

1   BY MR. SERCARZ:   (Continued)

2   Q    Did there come a time in January of 2007 when you

3   received a telephone call from your partner Mike Freeman?

4   A    Yes.

5   Q    All right.  By the way, before we get there, did

6   Mr. Starzecki at any time prior to January 2nd of 2007 speak

7   to you specifically about retaining you in connection with

8   outside work?

9   A    Yes.

10  Q    What did he say to you as best you recall?

11  A    It was actually at the Bed-Stuy closing in 2006.

12           MS. POSA:  Objection.

13           THE COURT:  Sustained.

14           MR. SERCARZ:  May we approach?

15           THE COURT:  Yes.

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25

```
                          Side Bar                    1933

1            (The following occurred at side bar.)

2            MR. SERCARZ:  I offered it not for the truth of the

3    matter asserted, but for the effect on the listener, in this

4    case, Mr. Hymowitz, and I'm willing to accept an instruction

5    to that effect.

6            MS. POSA:  We would ask for an instruction to that

7    effect.

8            THE COURT:  What instruction would you like me to

9    give?

10           MS. POSA:  Simply what he's going to say regarding

11   Mr. Starzecki's alleged statement should not be considered for

12   its truth, but for the effect that it may have had on

13   Mr. Hymowitz.

14           THE COURT:  Okay.

15           (Side bar ends.)

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25
```

1              (In open court.)

2              THE COURT:  Members of the jury, again, I am going

3    to give you an instruction about testimony that you are going

4    to hear.  The attorney, Mr. Sercarz, is asking questions of

5    Mr. Hymowitz as to conversations that Mr. Hymowitz said he had

6    with Mr. Starzecki.

7              I will allow Mr. Hymowitz to testify about those

8    conversations, but I want you to understand that the comments

9    by Mr. Starzecki are not being offered for their truth and

10   should not be considered by you for their truth.  You should

11   consider them only with respect to what effect they may or may

12   not have had on Mr. Hymowitz who is testifying.

13   BY MR. SERCARZ:

14   Q    As best you can recall, recount for the jury the

15   conversation that you had with Mr. Starzecki at the Bed-Stuy

16   closing.

17   A    As usual at these closings, there's a tremendous amount

18   of downtime.  There are documents that have to be signed from

19   HPD, from the bank, from HUD, and there's a lot of time lapses

20   in between getting all the different parties in.  So there's

21   always a lot of time for us to sit around and talk.

22             During one of those conversations, I don't remember

23   the exact words, but it was something to the effect that I

24   need to get you to start working for me, something to that

25   effect.

Hymowitz - direct - Sercarz                    1935

1   Q    Is that the gist of the conversation?  Was there much

2   more to it than that?

3   A    No.  I said whenever you're ready.  That was basically

4   it.

5   Q    Now, did there come a time in or about early 2007 when

6   you received a telephone call from your partner Mike Freeman?

7   A    Yes.

8   Q    At the time you received the call, were you in the

9   office?

10  A    Yes.

11  Q    Was Mike Freeman in the office or was he out of the

12  office?

13  A    Out of the office.

14  Q    Please tell the ladies and gentlemen of the jury what

15  Mr. Freeman said to you during that conversation.

16  A    Mr. Freeman told me that --

17           MS. POSA:  Objection.

18           THE COURT:  Sustained.

19           MR. SERCARZ:  Your Honor, I would like the same

20  instruction, same purpose.

21           MS. POSA:  Your Honor, may we have a very brief side

22  bar?

23           THE COURT:  Yes.

24           (Continued on next page.)

25

Side Bar                          1936

1          (The following occurred at side bar.)

2          MS. POSA:  Mr. Sercarz just said the last statement

3   was going to be for the effect on the listener.  There's no

4   effect on the listener.  He testified to Mr. Starzecki's

5   statement so that is the end.  So I would like to have a

6   proffer on what the effect to the listener might be here.

7          MR. SERCARZ:  My pleasure.

8          The Court and the government will no doubt recall

9   that Mr. Starzecki testified that he had a conversation with

10  Mike Freeman in early 2007 in which he said, I want to put

11  money in your firm.  That was his version of the conversation.

12         There's no testimony in this case that my client

13  spoke to Mr. Starzecki.  My client did speak to Mike Kramer

14  and the conversation that he had with Mike Kramer was

15  Mr. Starzecki wants to retain our firm, $100,000, for a year.

16  Mr. Hymowitz is going to testify that in response to that,

17  and --

18         THE COURT:  That this was what Freeman said to him?

19         MR. SERCARZ:  Yes.  And in response to that, my

20  client drew up the retainer agreement or at least some form of

21  the retainer agreement that comes into evidence.

22         THE COURT:  Counsel, the traditional way this

23  happens, when it's hearsay, is that the question you ask is

24  did you get a phone call, yes, I did, and did you do anything

25  after you got the phone call, not getting in hearsay which is

CMH       OCR       RMR       CRR       FCRR

Side Bar                                    1937

1   what you did with Mr. Starzecki.  The government said an

2   instruction is okay, but normally we don't give instructions

3   and then let all the hearsay in.  That's not the way it is

4   done and this is a co-defendant.

5         MR. SERCARZ:  With all due respect, Your Honor, I

6   would make the observation that I don't know as I stand here

7   whether what Mr. Freeman said to Mr. Hymowitz on the phone was

8   true, whether it was an accurate recounting of what he had

9   heard from Mr. Starzecki.

10        THE COURT:  So why should we present this to the

11  jury?

12        MR. SERCARZ:  Because, because it goes to my

13  client's state of mind.  My client undertook certain conduct

14  based on what he heard.

15        THE COURT:  What I have just proposed is sufficient

16  based --

17        MR. SERCARZ:  I'll do it your way.

18        THE COURT:  I think my way is the fair way.

19        MR. SERCARZ:  And that's the way I will do it.  I

20  don't want to be in that mythical doghouse, Your Honor.

21        MS. POSA:  With Edwina.

22        (Side bar ends.)

23        (Continued on next page.)

24

25

1   BY MR. SERCARZ:

2   Q    Mr. Hymowitz, we were at the point where would were

3   discussing the fact that you received a telephone call from

4   Mr. Freeman in early 2007 and Mr. Freeman was out of the

5   office.  Do you recall that?

6   A    Yes.

7   Q    Don't tell me what was said in that conversation.  After

8   speaking to Mr. Freeman and in response to that conversation,

9   did you do something?

10  A    Yes.

11  Q    What did you do?

12  A    I started to prepare a retainer.

13  Q    What did you understand the terms of the retainer to be?

14  A    That MCR Restoration was retaining our firm for one year

15  and they were going to pay us $100,000.

16  Q    And for what purpose were they, were they retaining your

17  firm?

18  A    I knew what Mr. Starzecki had asked me to do and also I

19  knew that we would do whatever legal work that we could do

20  that would not be a conflict with me getting him any possible

21  bids on jobs.

22  Q    I'd like to show you what is already in evidence as

23  Government's Exhibit 600.

24         MR. SERCARZ:  If I could have some help, Victor.

25         (Exhibit published.)

1    Q     Before I go about asking you about this document, how did

2    you go about drafting the retainer in response to the limited

3    amount of information that you had?

4    A     I went into the computers and I found a template that

5    Mr. Freeman would use normally for his client's retainers.

6    Q     All right.  Why one of Mr. Freeman's templates rather

7    than one of yours?

8    A     I do almost no work that I prepare retainers for.  As a

9    transactional attorney, all of my legal work is on a fixed

10   numbers.  Sort of the way I can explain it is if someone is

11   going to buy a house or sell a house, you know, they call an

12   attorney and say how much does it cost to do my closing and

13   you're given a number and that's it.  It's not hourly.  It's

14   nothing like that except I'm doing much larger work.  I'm

15   representing people buying and selling apartment houses,

16   shopping centers, office buildings.  We negotiate an upfront

17   price and that's what I do the work for.

18   Q     I call your attention to Government's Exhibit 600 which

19   is in evidence.

20         Do you recall drafting any portion of this document?

21   A     The only portions that I am positive that I did at this

22   point would be the $100,000 and the one year.

23   Q     Do you remember when it was that you drafted what

24   eventually became the retainer agreement?

25   A     It was late morning of January 2nd.

Hymowitz - direct - Sercarz                    1940

1    Q    January 2, 2007?

2    A    Yes.

3    Q    The date that appears on the front?

4    A    Yes.

5    Q    How do you recall that it occurred on January 2, 2007?

6    A    That holiday season was a very unusual season for me.  My

7    wife being a first grade school teacher, we usually take off

8    about ten days because she's off for Christmas through New

9    Year's.  Instead, that Christmas, one of my clients had to

10   close a $39 million construction loan and I had to work

11   through the holidays and we closed it on December 27th so I

12   didn't get a vacation.  And after the closing, I left the

13   closing, had all the files, several trans files sent back to

14   the office, and when I got back after the holiday, they were

15   sitting back on the side of my desk and later that morning, I

16   received a phone call.

17   Q    You have a recollection of the files in your office at

18   the time you received the call, is that the idea?

19   A    Yes.

20   Q    And do you recall about how much time you spent drafting

21   this document?

22   A    Between the phone call and the drafting, it couldn't have

23   taken more than 10 to 15 minutes.

24   Q    Let me show you page two of the document.

25        The top paragraph makes reference to the payment of

CMH      OCR      RMR      CRR      FCRR

1    disbursements.  Do you see this language?  Directly as they

2    are incurred, or to reimburse our firm for all costs advanced

3    and expenses incurred, that are directly related to the

4    performance of the legal services undertaken.

5           Do you see that paragraph?

6    A    Yes.

7    Q    These include such out-of-pocket expenses as service of

8    process, filing fees, travel, messengers and other such costs

9    and disbursements incurred on your behalf.

10   A    Yes.

11   Q    Would there ever have been service of process in

12   connection with the retainer agreement you had in mind?

13   A    Not what I was going to be involved with, no.

14   Q    Does it appear that this was language you drafted or that

15   this was from what I will call the Freeman template?

16   A    That's definitely from the template.

17   Q    All right.  The next paragraph.  There is the possibility

18   that the services of experts may be required for the proper

19   representation in your matters.  The fees and costs due and

20   payable for the services of such experts will be payable by

21   you in advance.  No expenses of this type, however, will be

22   incurred without your prior approval.

23          Did the document that you were drafting and the work

24   that you planned to do contemplate the use of experts of any

25   kind?

Hymowitz - direct - Sercarz                1942

1   A     No.

2   Q     The next paragraph, the language about, Statements of

3   your account will be sent to you on a regular basis and at

4   least every 60 days.  The statements will reflect the amount

5   of time spent on your case, and the sums due and owing to this

6   office in the event your retainer has been exhausted.

7           Did this paragraph and the language that followed

8   reflect your customary billing practices?

9   A     No, I never billed out on an hourly basis.  I never sent

10  bills.

11  Q     With regard to the next paragraph, Disbursements are to

12  be paid directly, or reimbursed to our firm if we advance them

13  on your behalf, upon your receipt of our bill for the same.

14  Disbursements are not legal fees and are not deductible from

15  your retainer.

16          Did the work you were planning on doing for

17  Mr. Starzecki contemplate disbursements?

18  A     No.  This is all part of the template.

19  Q     The next paragraph.  Billable rates set forth in this

20  agreement will not increase during the period we represent

21  you, even in the event of a general increase in this firm's

22  rates.  In addition, this retainer agreement can only be

23  amended by a subsequent written agreement signed by each of

24  us.

25          Did the retainer agreement which you were drafting

Hymowitz - direct - Sercarz                 1943

1   contemplate an hourly rate or other structured fee rate other

2   than the $100,000 which is referred to at the front of the

3   document?

4   A    No.

5   Q    Is this part of the template?

6   A    Yes.

7   Q    The next two paragraphs, Affording the client the right

8   to contact the office and to keep regularly apprised of the

9   status of your matters, is this something that you drafted or

10  was this part of the template as well?

11  A    This is all part of the template.

12  Q    All right.  With regard to page one, the paragraph, It is

13  agreed that our firm will represent your corporation for all

14  legal services required in the 2007-year, is that something

15  you drafted?

16  A    Probably.

17  Q    But you have no precise recollection?

18  A    No, not at all.

19  Q    Is that correct?

20  A    Not at all.

21  Q    And the next paragraph.  A retainer in the amount of

22  $100,000 is hereby requested.  This retainer will be credited

23  to your account and will be applied against legal fees

24  incurred on your behalf.

25        Did you draft that?

Hymowitz - direct - Sercarz                    1944

1    A    I didn't draft the paragraph.  I just put the number in.

2    Q    Do you have any specific recollection of whether you

3    included the language, This retainer is nonrefundable?

4    A    No, not at all.

5    Q    Again, in total, how much time do you estimate you spent

6    in taking the template and incorporating language?

7    A    Ten or 15 minutes, the whole thing.

8    Q    Had you had any conversation with Bob Starzecki regarding

9    the precise terms of this retainer before at Mike's request

10   you put together your version of the draft?

11   A    No.

12   Q    What do you recall doing with the draft when you got

13   done?

14   A    Putting it in Michael's office.

15   Q    And why did you do that?

16   A    It was not a finished product and I had not spoken to the

17   clients so I didn't know all the terms.

18   Q    Is that the last you recall seeing of that document?

19   A    I never saw the retainer again, no.

20   Q    Incidentally, in your firm, when checks come in in the

21   mail, who opens the mail?

22   A    The secretaries.

23   Q    And by the way, I should make it clear I'm talking about

24   approximately 2006, 2007.

25   A    Correct.

Hymowitz - direct - Sercarz                    1945

1    Q    The secretaries?

2    A    Yes.

3    Q    And when there are checks that need to be deposited into

4    the bank, whose responsibility is that?

5    A    The secretaries'.

6    Q    Do you have any recollection of receiving a check on

7    January 31st of 2007 made payable to Haymowitz,

8    H-A-Y-M-O-W-I-T-Z, and Freeman, in the amount of $34,5000?

9    A    No.  The first time I heard of that was when I spoke to

10   FELA Agent Richards.

11   Q    In the aftermath of having drafted the retainer, did you

12   recommend Mr. Starzecki on any private jobs?

13   A    Yes.

14   Q    Mr. Starzecki testified to having received a package in

15   connection with the Lutheran Synod.  Do you recall that

16   testimony?

17   A    Yes.

18   Q    Do you know what he was referring to?

19   A    Yes.

20   Q    Tell the ladies and gentlemen of the jury what he was

21   referring to.

22   A    That particular incident was the Lutheran Synod had

23   decided to demolish a church on 119th Street in Manhattan.  We

24   were going to build a new church on the basement and first

25   floor and I think mezzanine and then build condos above it.

1   We had a full set of building plans approved by the Building

2   Department and I called Bob Starzecki up to see whether he was

3   interested in bidding.  He came running down to the office

4   immediately.  I gave him a set of plans.

5   Q    Did Mr. Starzecki, to your knowledge, bid on that part of

6   the project?

7   A    No, he did not.  There was a bidding process not as

8   formal as what we referred here but our little committee sent

9   out I think about five different builders.  I told Bob that he

10  had two weeks to get me back numbers.  He never did that and

11  maybe a month or so later, he returned the plans.

12  Q    Were there other instances in which you recommended

13  Mr. Starzecki on projects in which he had some involvement?

14  A    Yes, Lutheran Synod.  Again, there was a demolition that

15  had to be done of a church and that was before these set of

16  plans that Mr. Starzecki had mentioned.  I had called Bob up

17  and I said, Bob, we have a small demolition project that needs

18  to be done, I've got some other quotes, this would be an

19  excellent opportunity for you to come in, hopefully come in

20  with a good bid and then you can be recognized by the Synod

21  and possibly get other work from them.

22  Q    Did that conversation result in a successful bid by

23  Mr. Starzecki?

24  A    No.  Actually his bid, if I recall correctly, was about

25  25 percent higher than the other bid that I had and we gave it

1   to somebody else.

2   Q    Were there other conversations, without telling me what

3   was said, involving real estate development projects other

4   than the Lutheran Synod?

5   A    Sure.  All of the other projects that we had just

6   discussed, they were in different phases of development and

7   the development process is a long process.  It takes very, you

8   know, months.  You interview architects, you get plans.

9            I would speak to Bob at different times about these

10  projects.  I know on the Brooklyn project, the condominium

11  project in Brooklyn, we were up to the point where what, what

12  I do is what I call crunch numbers.  I have to prepare numbers

13  to decide what the cost of the projects are, what we can sell

14  the project for and what the anticipated profit is.  So what I

15  need to do is get numbers from builders as to what they would

16  envision the cost of building would be per square foot.  So I

17  spoke to Bob and he gave me some numbers on that and I plugged

18  those into my projections.

19  Q    Did any of the conversations you had with Mr. Starzecki

20  or the bids that he made after January of 2007 result in any,

21  the generation of any legal work for your firm?

22  A    No.

23  Q    As a result, were there any billing records or records of

24  account that would have been sent to Mr. Starzecki in

25  connection with this retainer?

Hymowitz - direct - Sercarz                    1948

1   A     Not from me.

2   Q     By the way, can you tell the ladies and gentlemen of the

3   jury what the state of the economy was in real estate

4   development work in New York during the latter part of 2007

5   and 2008?

6   A     I sort of have to back up.  2006 and 2007, the real

7   estate market was as strong as it's ever been and then

8   starting towards the very end of 2007, beginning of 2008, the

9   bottom dropped out.  It was all that Fannie Mae, Freddie

10  Mac -- real estate just stopped completely.  Property values

11  went down probably 20, 30 percent almost immediately.

12  Q     When do you last recall speaking to Mr. Starzecki?

13  A     Probably early 2008 and that's because at the end of

14  2007, I left the New York office and probably around November

15  of 2008, one of our clients had some business difficulties.

16  He owned a bank out in Long Island and he had some trouble

17  with his partners and asked me to come out and assist him.  So

18  from late 2007 until the end of 2009, I only came back into

19  the City from time to time to handle, you know, some of my

20  clients, but I would say other than three or possibly four

21  days a month, I spent working out of Long Island doing banking

22  stuff.

23        MR. SERCARZ:  Your Honor, may we approach very

24  quickly?

25        THE COURT:  Yes.

```
                          Side Bar                      1949

  1            (The following occurred at side bar.)

  2            MR. SERCARZ:  I intend, I intend to ask Mr. Hymowitz

  3   a series of questions about the telephone calls, the tapes of

  4   which are in evidence.  For ease of examination, I'd like to

  5   be permitted to use the transcripts to ask the questions even

  6   though they're not in evidence.  Just making sure.

  7            THE COURT:  They're only not in evidence because you

  8   didn't want them to be in evidence.

  9            MR. SERCARZ:  And I don't.

 10            THE COURT:  If you want them to be in evidence,

 11   they're in evidence.

 12            MR. SERCARZ:  In any event, if there's no objection,

 13   I'd like to use the transcripts.

 14            THE COURT:  I assume there's no problem.

 15            MS. POSA:  The transcripts that are marked, right?

 16            MR. SERCARZ:  Your transcripts.

 17            (Side bar ends.)

 18            (Continued on next page.)

 19

 20

 21

 22

 23

 24

 25
```

Hymowitz - direct - Sercarz                1950

1    BY MR. SERCARZ:

2    Q    Mr. Hymowitz, I'd now like to ask you a series of

3    questions about the telephone calls that were recorded by the

4    government in October of 2011.  All right?

5    A    Okay.

6    Q    And just by way of reminder, you say you last spoke to

7    Mr. Starzecki in 2008, is that correct?

8    A    Yes, probably about three and a half years before I had

9    that phone conversation with him.

10   Q    All right.  And the events that were discussed in this

11   telephone call occurred in or about early 2007, is that

12   correct?

13   A    No -- oh, this?  Yes.  January 2nd, yes.

14   Q    And in the interim, you had actually moved out of your

15   office for a period of time and worked at the office of a

16   client, is that correct?

17   A    Yes, from the end of 2007 until all of 2008 and all of

18   2009.

19   Q    All right.  And had the Hymowitz & Freeman law firm

20   actually moved its offices in 2011 as well?

21   A    We moved our offices, I think, June of 2011.  We moved

22   from the office that we're in for about 30 years.  We moved a

23   few blocks over.  They turned our building into a condo.

24   Q    All right.  I'm going to call your attention to

25   Government's Exhibit 5 and to the transcript which is

Hymowitz - direct - Sercarz                    1951

1    Government's Exhibit 5T and the transcript is an aid, as I

2    understand it.

3              (Exhibit published.)

4    Q    All right.  With regard to clip A of that conversation,

5    I'm going to call your attention to a line that I've

6    highlighted where Mr. Starzecki asks you:  Do you remember we

7    did have that retainer with you guys a while ago?  And you

8    answered:  No.

9              When Mr. Starzecki first called you, did you have

10   any recollection of the retainer agreement?

11   A    No.  I mean, I hadn't spoken to him in years and just

12   didn't ring a bell to me.

13   Q    All right.  And under clip B -- let me just take it out

14   of the binder and make it easier.

15             When Mr. Starzecki said to you:  Well, this is

16   basically what they are telling me.  And the retainer, it is

17   for real estate deal.  They are saying that there need to be

18   some kind of detailed invoice how the fees were disbursed.

19             When he used the word "real estate" to you in this

20   conversation, did this suggest to you that he was talking

21   about the Bedford-Stuyvesant project?

22   A    No.  It suggested what I just discussed with you.

23             (Continued on next page.)

24

25

Hymowitz - direct - Sercarz                1952

1   BY MR. SERCARZ:

2   Q    In clip C, in response to questions about documentation,

3   do you recall saying, Once an invoice is paid, it's just

4   ripped out of the book appear disposed of, so we don't keep

5   any of those types of things?

6   A    Yes.

7   Q    Were you testifying as to your general practice, or as to

8   what you did with regard to any billing information generated

9   by this retainer?

10  A    That's what I generally did.

11  Q    And the best of your recollection, was there ever any

12  bill information generated by this retainer?

13  A    No.

14  Q    Again, the reason why is?

15  A    There was nothing to bill for.

16  Q    Now, do you recall that thereafter, you had a

17  conversation with Special Agent Richards on the same day,

18  October 3, 2011?

19  A    Yes, I did.

20  Q    Do you recall acknowledging, in your conversation with

21  Agent Richards, "Back then, I remember being asked to prepare

22  a retainer agreement.  I did that, and we have a check.  What

23  I told Bob is that they don't keep records with regard to

24  billing once things are paid.  We send a bill, and we have a

25  book, like a looseleaf.  Once it's paid, we rip it out of the

Hymowitz - direct - Sercarz                    1953

1   book and dispose of it.  I don't have any.  I said to him, I

2   don't know how to come up with preparing a document that would

3   be able to break anything down.  I have no clue."

4           Do you see that.

5   A    Yes.

6   Q    Were you speaking to Agent Richards about that particular

7   agreement, or about your general practice in the firm, at

8   least when it comes to the first few sentences?

9   A    It's my general practice in the firm.

10  Q    With regard to the statement that you made --  "I don't

11  know how to come up with preparing a document that would be

12  able to break anything down.  I have no clue" -- to what were

13  you referring at that time?

14  A    Bob had asked me to prepare some sort of documents to

15  assist him with the IRS, and I didn't want to prepare

16  something that was inaccurate, so I told him I had no clue how

17  to help him out.

18  Q    Later on in the conversation, the following ensued:  "So,

19  your records" -- this is Agent Richards --  "you don't have

20  any kind of documentation?  I know from just being in this

21  line of work that attorneys are to keep records for a certain

22  number of years after they..."

23          And you interrupted and said:  "Not billing

24  records?"

25          Agent Richards said:  "No."

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1       And you said:  "As far as I know, if we're supposed

2  to, we never did."

3       Do you see that sentence.

4  A    Yes.

5  Q    Was it your general practice, with regard to your bills

6  in or about 2007, that once an invoice was paid, it was ripped

7  out of the looseleaf --

8  A    Yes.

9  Q    -- and that those were the only billing records that

10 were kept until they were ripped out?

11 A    For me, yes.

12 Q    That was your practice?

13 A    Yes.

14 Q    Is that correct?

15 A    Yes.

16 Q    You're not talking about Mr. Freeman's practice, you are

17 talking about your practice?

18 A    Mr. Freeman has a totally different practice than I do.

19       Also, what you have to understand, since most of my

20 work are things like closings and things of that nature, I

21 typically get paid at the end of the closing from a bank.

22 There's a closing statement that we do at the bank.  There's a

23 checklist that is handed out at the closing.  The client

24 approves all of the checks.  He signs the bottom of the check

25 list, and my fee is on that.  It's just a flat fee, as we

Hymowitz - direct - Sercarz                1955

1    discussed before.

2    Q    All right.  I want to deal with some odds and ends that

3    have arisen in the testimony?

4         There was testimony regarding a conversation that

5    you had with Wendell Walters.

6    A    Yes.

7    Q    Concerning a loan?

8    A    Yes.

9    Q    Do you recall that?

10   A    Yes, very much.

11   Q    And that conversation took place in or about 2002 or

12   2003; is that correct?

13   A    2003, I believe.

14   Q    I believe Mr. Walters testified that he called at the

15   suggestion of Stevenson Dunn.  Do you recall that?

16   A    Yes.

17   Q    Now, when you spoke to Mr. Walters, did he tell you that

18   he was borrowing -- seeking to borrow money on his own behalf?

19   A    No.  He told me --

20             MS. POSA:  Objection.

21             THE COURT:  Sustained.

22             MR. SERCARZ:  May we approach?

23             (Sidebar.)

24             MR. SERCARZ:  Mr. Walters put a version of this

25   conversation -- the government, through the testimony of

1    Mr. Walters, put a version of this conversation on the record,

2    and my client has a different recollection.

3            It is not being offered for the truth.  I submit

4    that under these unique circumstances, I should be allowed to

5    obtain my client's best recollection of what was said.  If I

6    can't do that, I'll ask the questions about his impression,

7    your Honor.  But I think in this instance, I should be allowed

8    to do it.

9            MS. POSA:  If he's trying to bring this in as a

10   prior consistent statement, there is an obligation to confront

11   the witness.  Mr. Walters was not confronted by you about the

12   content of this conversation.  He was not able to rebut it in

13   terms of it being inconsistent.

14           MR. SERCARZ:  The rules of prior inconsistent

15   statements apply when the same witness has offered a version

16   of the conversation which is different on a prior occasion.

17   This is not a prior inconsistent statement by Mr. Walters.

18   This is someone else's recollection of the same conversation.

19   I don't believe the same rules apply.

20           MS. POSA:  You're not bringing --

21           THE COURT:  Excuse me.  Is there any nonhearsay way

22   that this statement of what Walters said to your client can

23   come in?  You had Walter on the stand.  You were free to

24   cross-examine him any way you wanted to.  I don't understand

25   how your client can put on what he wants to say.

Hymowitz - direct - Sercarz                1957

1        MR. SERCARZ:  Because Walter was speaking to him.

2   He has a different recollection of the conversation, your

3   Honor.  And just as Walter was allowed to testify to a prior

4   out-of-court conversation that he allegedly had with my

5   client --

6        THE COURT:  It was an admission by your client, and

7   it's not hearsay under our rules.

8        MR. SERCARZ:  Most respectfully, our version of the

9   conversation would make it clear that there was no admission.

10  There was no wrongdoing.

11       THE COURT:  It's an admission by a defendant.  The

12  term "admission" really has nothing to do with its culpability

13  or not.  It can be offered by the government against him if

14  they want to argue it shows culpability.

15       MR. SERCARZ:  From an evidentiary standpoint --

16       THE COURT:  That's what we're talking about,

17  evidence.

18       MR. SERCARZ:  I don't see any difference between

19  this and Mr. Dunn being permitted to testify as to what he did

20  or did not say to the agent, when the agent offers it as an

21  admission, but he has the same opportunity to say, I recall

22  saying that.  I never said that, or something else.

23       THE COURT:  Your client can say what he said.  You

24  can ask him anything you want about what he said to Walters.

25  I just don't think that under the Rules of Evidence, you're

Hymowitz - direct - Sercarz                1958

1    entitled to get his version of what Walters said to him.  You

2    had Walters on the stand, and that's it.

3              MR. SERCARZ:  So my record is clear, and I will

4    abide by the Court's ruling, I'm not offering for the truth of

5    the matter asserted of what Walters said.  Okay.

6              (In open court.)

7    BY MR. SERCARZ:

8    Q    After you spoke with Mr. Walters -- was it over the

9    phone, by the way?

10   A    Yes.

11   Q    -- without telling us what was said, did you form an

12   impression as to what it was that Mr. Walters wanted?

13   A    Yes.

14   Q    What was your impression as to what Mr. Walters wanted?

15   A    He was seeking a --

16             MS. POSA:  Objection.

17             THE COURT:  Overruled.

18   A    He was seeking a loan for a friend of his to renovate a

19   brownstone in Harlem.

20   Q    During the course of this conversation, what did you say

21   to Mr. Walters?

22   A    I told Mr. Walter I would call one of my clients who

23   owned property in Harlem, and see whether he was interested in

24   funding the loan.

25   Q    If I understand you correctly, you did not offer to fund

1   the loan, but you offered to have one of your clients do that;

2   is that correct?

3   A    That's correct.

4   Q    And the understanding that you had was that Mr. Walters

5   was seeking the money for a friend, not on his own behalf; is

6   that correct?

7   A    That's correct.  The property was owned in an LLC at the

8   time.

9   Q    Did you indeed, in the aftermath of that call, contact

10  those of your clients that you felt might be interested in

11  loaning money?

12  A    Yes, I did.

13  Q    Did they discuss with you the terms under which they

14  would be willing to make such a loan?

15  A    Yes, they did.

16  Q    Do you recall anything about those terms?

17  A    The exact terms I don't recall at this point, but

18  typically, it would be a one-year loan, and probably in the

19  vicinity of twelve to sixteen percent.

20  Q    Why would the interest rate be so high?

21  A    That is actually a standard rate for nonbank loans.  But

22  more importantly, when -- going back to 2003 in Harlem, there

23  were a tremendous amount of boarded-up brownstones still.  It

24  was just the beginning of the renaissance, and banks do not

25  lend money on buildings that are not in good shape.  So, the

1    only way that someone can really renovate their building is

2    either to apply for a special federal program, or to get

3    private money.

4         Federal programs take many, many months to apply for

5    and obtain.  Lots of paperwork.  If you own a building and

6    it's empty, you have the costs of real estate taxes,

7    insurance, heat, all of those types of things mounting up.  If

8    you have a mortgage on the property from the time you bought

9    it, you are paying interest on it.

10        On a private loan, you would speak to me today.  If

11   I had a client that was interested, the client would drive by

12   the property, say, Yes, we would order a title report; next

13   week, you would have your money.  So, even though the interest

14   rate is high, when you take away all of those costs -- bank

15   points, bank legal, all of those types of things -- the

16   interest rate really isn't that much higher than a bank loan.

17   Q    Did you offer Wendell Walters any sort of a special rate

18   on that mortgage different from the one that your clients were

19   quoting to you?

20   A    No, not at all.  In fact, he was offended at the rate.

21   Q    Mr. Walters testified that you were present at a meeting

22   at the end of the Lexington project involving budget issues.

23   Do you recall that testimony?

24   A    Yes.  But it was not the end.  It was the beginning.

25   Q    Fair enough.  Of the three members of the SML

Hymowitz - direct - Sercarz                1961

1   Corporation, who was it that had the most experience with

2   regard to budget issues?

3   A    I was really the only one who had experience in that

4   field.

5   Q    In order for you as counsel to be permitted to attend a

6   meeting at which budget issues were discussed, did you have to

7   acquire special permission?

8   A    Yes.

9   Q    Was that permission granted in order for you to attend

10  those meetings?

11  A    I'm sure it was.  I went to several of the meetings.

12  Q    With regard to the Lexington Avenue project, to the best

13  of your knowledge, did Stevenson Dunn work as a subcontractor

14  for Mr. Starzecki on the Lexington project?

15  A    I found out about it at some point.  I think it was well

16  after, not while he was doing the work.

17  Q    We saw as an exhibit in this courtroom an e-mail exchange

18  between you and a gentleman by the name of Magidson.

19       Do you recall that?

20  A    Yes.

21  Q    For the sake of moving things along, I'm not going to put

22  it to you right now, but do you recall the subject matter?

23  A    Yes.

24  Q    Do you remember which of the three projects was the

25  source of that e-mail exchange?

Hymowitz - direct - Sercarz                    1962

1   A     That was the Bed/Stuy project.

2   Q     All right.  What was going on at the time that those

3   e-mails were sent back and forth?  Just briefly, where were

4   you in terms of the project?

5   A     On the Bed/Stuy project, I did the construction loan

6   closing, and that was my last involvement in the project until

7   the project went into default.  And when I say "default," I

8   think just the time frame in which the mortgage had to be

9   repaid had passed.

10         At that point, as Mr. Magidson said, for the first

11  time, I came in at that point.  And what typically takes place

12  when a mortgage goes into default is, you try to have a

13  workout of the problem.  And I got back involved.

14         I was speaking with somebody at the Enterprise -- I

15  have no idea at this point -- and we were trying to work out a

16  budget to go forward.  One of the critical items was the

17  insurance payment.  We had well over thirteen buildings whose

18  insurance was running out, and whoever I was speaking to had

19  promised if I got the insurance broker to send the bill, they

20  would take care of the payment.  I had the insurance broker do

21  that, and the payment was not forthcoming.

22  Q     Do you recall that the argument referenced in those

23  e-mails dealt with insurance?

24  A     Yes.

25  Q     Do you recall that you, in your e-mail to Mr. Magidson,

Hymowitz - direct - Sercarz                    1963

1   referenced the fact that you had made representations

2   regarding the fact that the Enterprise would pay off the

3   insurance broker?

4   A    Yes.

5   Q    You felt that those representation were not being

6   honored; do you recall that?

7   A    Yes.

8   Q    And in response to that, Mr. Magidson began his e-mail by

9   saying, in words or substance -- and I'm sure the government

10  can put it on the screen when they examine you -- I'm not sure

11  whether you are acting as the partner or on your own behalf;

12  do you recall that response to the e-mail?

13  A    Yes.

14  Q    Did you make any effort to deceive Mr. Magidson as to

15  your role in connection with that project?

16  A    Not at all.  Everyone knew my relationship to Michael as

17  his law partner.

18  Q    Now, in connection with the Hancock cluster, the

19  government put on the screen the opinion letter of counsel.

20  Do you recall that?

21  A    Yes.

22  Q    And you were the attorney and you signed that letter; is

23  that correct?

24  A    Yes.

25  Q    And among the other things you represented was that you

Hymowitz - direct - Sercarz                    1964

1    had no ownership interest, no direct ownership interest in the

2    SML; do you recall that?

3    A    That's correct.

4    Q    The government then showed you a bank signature card.  I

5    believe it's Government Exhibit 522.

6              MR. SERCARZ:  Would the government have a hard copy

7    in court, by any chance?  If not, we can put it up on the

8    computer.  Thank you.

9    Q    I would like you to take a look at this for me, if you

10   can.

11             THE COURT:  Look at the screen, please.  It's not

12   on.

13             THE WITNESS:  Here we go.

14   Q    Now, do you recall when you signed this card as vice

15   president?  And here is your signature below.

16   A    Yes.

17   Q    Being vice president makes you an officer; is that

18   correct?

19   A    Correct.

20   Q    Of the SML?

21   A    Yes.

22   Q    Do you recall what the requirement of the bank was with

23   regard to how many people had to sign checks from the SML?

24   A    If I could just correct you.  It was for Bedford

25   Stuyvesant, not for Hancock, like you said.

1  Q    I'm sorry?

2        Do you recall how many individuals had to sign

3  checks?

4  A    The reason that I signed is that at that time, Michael

5  and Steve wanted two people to sign for any checks that were

6  greater than $1,000.

7  Q    Was this a bank requirement, or was this something

8  Michael and Steve want?

9  A    Michael and Steve.

10        As a result of that, Steve was always doing a lot of

11  traveling, and we envisioned times that perhaps Steve or

12  Michael would not be available and that checks might have to

13  be signed.  So, I was put on as a vice president, because they

14  both relied on me.  I had never signed any checks.

15  Q    Do you see the line on the business signature card next

16  to the typewritten statement, "Number of signatures required"?

17  A    Yes.

18  Q    And can you read for the ladies and gentlemen of the jury

19  what that says?

20  A    "One signature under thousand dollars; two signatures

21  over a thousand dollars."

22

23  Q    With regard to the Hancock cluster, did Stevenson Dunn

24  ever discuss with you any effort by George Armstrong and

25  Wendell Walters to extort money from him or the SML?

Hymowitz - direct - Sercarz                    1966

1   A    No, not at all.

2            MR. SERCARZ:  Your Honor, before the next line of

3   questioning, I think I need to approach for some ground rules.

4            THE COURT:  All right.  Why don't we take our

5   morning recess now.

6            Members of the jury, you can step out.

7            Remember not to discuss the case.

8            (Jury excused.)

9            THE COURT:  Counsel, we'll take ten minutes.

10           (Recess taken.)

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                               1967

1      (In open court.)

2      (Judge NINA GERSHON enters the courtroom.)

3      THE COURTROOM DEPUTY:  All rise.

4      THE COURT:  Can we begin?

5      MR. SERCARZ:  Your Honor.

6      THE COURT:  Yes.

7      MR. SERCARZ:  The defendant's two character

8  witnesses were asked hypothetical questions which clearly

9  emanated from a dispute involving the family names Sicignano.

10  The Government has told me they have a rebuttal character

11  witness, Dorothy Sicignano, who they intend to call.

12      Under those circumstances I would request that I be

13  permitted to inquire of this witness regarding the

14  circumstances surrounding the dispute with Sicignano at this

15  stage rather than having to await some rebuttal character

16  evidence and call my client back to the witness stand.  I

17  think enough of it is on the record so that it is within the

18  proper scope of the direct examination.

19      That's my application.

20      MR. CAPOZZOLO:  The witnesses were asked the

21  question, they said no.  That has a certain evidentiary

22  impact.  I can't assume that those facts are true and I

23  couldn't argue that to the jury right now.

24      If Mr. Hymowitz wants to get into the underlying

25  facts about it, then that, to me, opens the door about those

VB      OCR      CRR

Proceedings                          1968

1   facts and if the character witness testifies, should be able

2   to talk about it.

3          I had planned to call Mrs. Sicignano simply to say

4   you've known him related to a real estate property, for how

5   many years, and have you formed an opinion about his

6   truthfulness.

7          At that point, if Mr. Sercarz did not do what he is

8   planning on doing, I would be stuck with that and in front of

9   the jury we would not make any argument about the underlying

10  lawsuit, just simply to say the character witnesses don't know

11  about that, that demonstrates that the value of that evidence

12  may be not complete and therefore, when the defendants argue

13  it is not in their nature to commit the crime, they may not be

14  able to truly say that and that the evidence doesn't have that

15  value.

16         But if Mr. Hymowitz wants to talk about the

17  underlying facts, then that opens the door to it and changes

18  what the Government would be able to do in our position.

19         THE COURT:  All right.  And you are saying that you

20  are proffering the character witness?  And the basis for her

21  knowledge, his character is what?

22         MR. CAPOZZOLO:  Her opinion is that for 20 years

23  she's been in an ongoing business relationship with

24  Mr. Hymowitz involving a property called 510 Gates Avenue and

25  that during the course of that, she's had opportunity to deal

Proceedings                        1969

1   with him face-to-face, have conversations with him and based

2   on those interactions and other related interactions with

3   people involving that, that she's formed an opinion about his

4   truthfulness.

5              THE COURT:  Which is?

6              MR. CAPOZZOLO:  Not good.  She does not find him

7   either truthful or generous.

8              THE COURT:  And that's it?

9              MR. CAPOZZOLO:  My understanding of the rules, I

10  understand, limits me to that.  I am not allowed to get into

11  with a character witness the underlying facts.

12             MR. SERCARZ:  I also understand the Government is

13  not seeking cross-examination my client regarding that

14  relationship under 404(b).  They have made no application to

15  be allowed to do so.

16             MR. CAPOZZOLO:  When a defendant testifies, it's not

17  404(b), it would be 608, I believe, as matters of

18  truthfulness.  If Mr. Hymowitz, if he wants to question about

19  it, my only point --

20             THE COURT:  No, Mr. Sercarz has asked whether if he

21  foregoes asking his client about it on direct, does that mean

22  you will also forego asking him about it on cross, and we can

23  get to things of greater materiality to this case, in my

24  opinion.

25             MR. CAPOZZOLO:  My understanding is that the rule

Proceedings                                    1970

1   would allow some question about it, but we're stuck with the

2   answer and that it would only be for impeachment.

3          If Mr. Hymowitz would be testifying on direct as to

4   the truth of the matter, that then changes its value.  This is

5   a little weird, but that's the way the character evidence

6   rules are and I had planned, as tempting as it would be with

7   Mrs. Sicignano, to limit her testimony to very brief because

8   of those rules.

9          MR. SERCARZ:  Your Honor, I am not going to go into

10  it now.  I will see what the cross-examination brings and if

11  necessary, I will make applications to recall witnesses and

12  the like, but I'm with you, I'm happy to get on to more

13  material things.

14         THE COURT:  Let me just make sure I understand so we

15  don't have to stop again, to see what exactly Mr. Capozzolo is

16  proposing that he would ask of Mr. Hymowitz.

17         MR. CAPOZZOLO:  It would be Ms. Posa.

18         THE COURT:  Ms. Posa.

19         MS. POSA:  Again, Your Honor, I'm simply doing this

20  under Rule 608(b).  He is testifying and his credibility

21  should be tested just as the credibility of any witness should

22  be, so I would simply ask very few questions:  Isn't it true

23  that you and Mr. Freeman are majority owners of 510

24  Gates Avenue?

25         You entered in 20-year lease with the former

VB        OCR        CRR

```
                        Proceedings                    1971
```

1   nonprofit led by a Henry Guerrero?

2         Isn't it true that Miracle Makers went out of

3   business?

4         They failed to pay 1.4 million in property taxes yet

5   after that default you and Mr. Freeman sold that property back

6   to Mr. Guerrero.

7         You did this against the wishes of the minority

8   shareholders.

9         And you made the $5 million mortgage rather than

10  selling the property outright so as to benefit all of the

11  shareholders.

12        MR. DiCHIARA:  May I just interject for a minute?

13        This is obviously impeachment material of

14  Mr. Hymowitz and I hope that the Court instructs the

15  Government and their witnesses to leave Mr. Freeman out of

16  this.

17        MS. POSA:  That's fine, Your Honor, I agree with

18  that.

19        It's just that Mr. Hymowitz can't take the stand and

20  expect his credibility to not be subject to attack.  That's

21  our job.

22        THE COURT:  Mr. Sercarz, did you want to say

23  something about it?

24        MR. SERCARZ:  Your Honor, there's a long shaggy-dog

25  story that goes along with this.  We don't feel that the

Proceedings                                   1972

1   defendant did anything wrong, that he acted improperly, that

2   he failed to live up to his fiduciary responsibilities to the

3   minority shareholders.  I don't know if you even want to hear

4   the whole explanation now.

5              I respectfully submit that while they have a witness

6   who has complained, there isn't -- is not -- a good faith

7   basis for the inquiry.

8              MS. POSA:  Mr. Hymowitz can say no to every one of

9   those questions then I will have to accept it and keep rolling

10  and if that ends up hurting us because's denied everything,

11  then so be it.  But we certainly have a good faith basis.  We

12  have a sworn complaint.  And most of these facts are in the

13  public record.

14             THE COURT:  Counsel, let me consider this, I wanted

15  to hear what it was before, but Mr. Sercarz, is your position

16  that regardless of what I may rule with regard to whether the

17  Government can do what they're proposing to do, you don't

18  intend to ask your client anything about it on the rest of

19  your examination?

20             MR. SERCARZ:  Not on the direct examination of my

21  witness, that's correct.

22             THE COURT:  You don't intend to ask him anything

23  about it.

24             All right, so let's conclude the direct and I will

25  consider what I am going to allow.

VB        OCR        CRR

Hymowitz - direct - Sercarz                    1973

1              MR. SERCARZ:  Yes, Your Honor.

2              MS. POSA:  Thank you, Your Honor.

3              THE COURT:  Put the witness back on the stand.

4              (Pause in the proceedings.)

5              THE COURTROOM DEPUTY:  All rise.

6              (Jury enters.)

7              THE COURTROOM DEPUTY:  Thank you, please be seated.

8    DIRECT EXAMINATION

9    BY MR. SERCARZ:  (Continuing)

10   Q    Mr. Hymowitz, you've testified a little bit about the

11   general billing practices of your part of the firm --

12   A    Yes.

13   Q    -- do you recall that testimony?

14        Were there ever any instances in which a client

15   requested that rather than billing at a flat fee you

16   accommodate them by using some other form of billing

17   arrangement?

18   A    Yes.

19   Q    And on those occasions, would you accommodate them?

20   A    Sure.

21   Q    All right.  Throughout the entire period that you worked

22   on the HPD projects, did you ever solicit a bribe or a

23   kickback from anybody?

24   A    No.

25   Q    Did you ever receive a payment from anybody that you knew

Hymowitz - direct - Sercarz                    1974

1   to be a bribe payment or a kickback payment?

2   A    No.

3   Q    Did you conspire with anyone to solicit or receive bribes

4   or kickbacks?

5   A    No.

6   Q    Did you know he that Bob Starzecki or MCR were making

7   payments to Marcus Garvey based on bogus or inflated invoices?

8   A    No.

9   Q    Were either of the checks received by your firm from MCR

10  kickback payments?

11  A    No.

12  Q    Did you know that Mr. Starzecki was inflating his

13  requisitions for payment to hide the kickbacks?

14  A    No.

15  Q    Did you knowingly participate in a scheme to defraud HPD

16  or the others who provided financing on HPD projects?

17  A    No.

18  Q    Did you intend to defraud HPD or the private lenders?

19  A    No.

20  Q    Did you engage in unlawful financial transactions with

21  the proceeds of what you knew to be a fraud scheme?

22  A    No.

23           MR. SERCARZ:  I have no further questions.

24           THE COURT:  Mr. DiChiara.

25           MR. DiCHIARA:  I have no questions, Your Honor.

Hymowitz - cross - Posa                              1975

1          THE COURT:  Mr. Evans.

2          MR. EVANS:  No cross.

3          THE COURT:  Ms. Posa.

4          MS. POSA:  Yes, Your Honor.

5          MR. SERCARZ:  Your Honor, I apologize one more

6   question.

7          THE COURT:  All right.

8          MR. SERCARZ:  May I ask it from here?

9          THE COURT:  Sure.

10  Q    We heard testimony that after those phone calls that have

11  been offered into evidence a letter was sent to Agent Richards

12  who was acting as the accountant for MCR.

13         Do you recall those conversations?

14  A    Yes.

15  Q    And the reference to that letter?

16  A    Yes.

17  Q    Did you send that letter to Agent Richards?

18  A    No, the first time I saw it was in court.

19         MR. SERCARZ:  Thank you.

20  CROSS EXAMINATION

21  BY MS. POSA:

22  Q    Good morning, Mr. Hymowitz.

23  A    Hello.

24  Q    Mr. Hymowitz, you've been practicing law for a very long

25  time; is that right?

VB        OCR        CRR

1   A    Yes.

2   Q    I believe you testified yesterday it's been about

3   thirty-eight years; correct?

4   A    Yes.

5   Q    You were admitted to the New York State bar in 1976; is

6   that right?

7   A    Yes.

8   Q    And you've been a member of the New York State bar that

9   entire time; correct?

10  A    Correct.

11  Q    You never withdrew from the practice of law; did you?

12  A    I'm retired now.

13  Q    You've never let your law license lapse; have you?

14  A    As of this year.

15  Q    Okay.  When did you stop working at Hymowitz & Freeman?

16  A    The new job that I have started about a year-and-a-half

17  ago.

18  Q    So, as of at least 2012, you were still employed by the

19  law firm of Hymowitz & Freeman?

20  A    No.

21  Q    When did you leave Hymowitz & Freeman?

22  A    I think January 2012.

23  Q    And was the firm dissolved or you just quit?

24  A    I just quit.

25  Q    I believe you graduated from New York Law School in 1976,

Hymowitz - cross - Posa                    1977

1    is that your testimony?

2    A    Sounds like approximately the right date, yes.

3    Q    And you testified yesterday that you went straight to

4    work for the Legal Aid Society; is that right?

5    A    From law school, yes.

6    Q    You worked there as a criminal defense lawyer; correct?

7    A    Yes.

8    Q    You were defending the indigent; correct?

9    A    Correct.

10   Q    In other words, people who could not afford an attorney,

11   you represented them because they have the Constitutional

12   right to Counsel; is that correct?

13   A    Sure.

14   Q    And I believe you testified yesterday that the motive for

15   your community work is that you feel blessed; correct?

16   A    That's true.

17   Q    And what better way to give back than to represent people

18   who can't afford a lawyer; right?

19   A    That's certainly one way.

20   Q    You testified yesterday that you worked at Legal Aid from

21   about 1976 to 1975; is that correct?

22        THE COURT:  Ms. Posa.

23   Q    I'm sorry, 1979.

24   A    Three years I worked there, yes.

25   Q    And after you left, is your testimony that you went into

Hymowitz - cross - Posa                    1978

1    private practice?

2    A    Yes.

3    Q    You started focusing more on real estate; is that

4    correct?

5    A    Correct.

6              MS. POSA:  I believe in your testimony, let me get

7    the draft transcript here, page 1871, tell me if this reflects

8    your testimony.

9              QUESTION:  What is your best estimate of the last

10   occasion on which you did any criminal defense work?

11             ANSWER:  I'm an attorney for 38 years, so I'll say

12   thirty-four years ago.

13   Q    Was that your testimony?

14   A    That's, yeah, I believe that was correct, yes.

15   Q    That's not true; is it, Mr. Hymowitz?

16   A    As far as I know it is.  Maybe I've handled one or two

17   criminal cases in between, but nothing special.

18   Q    Nothing special?

19   A    I don't think so.

20   Q    Nothing that you would remember?

21   A    Criminal cases?

22   Q    Correct.

23   A    Other than perhaps traffic ticket or something for

24   someone, I can't remember anything.

25   Q    Mr. Hymowitz, isn't it a fact that you represented a

Hymowitz - cross - Posa                          1979

1  Mr. Joseph Candiano in a New York State criminal case in the

2  early 1990s?

3  A    That name doesn't refresh my recollection about anything.

4  Q    The title of that case was people of the State of

5  New York versus Capaldo, Kamen, Lefkowitz, Savarese, Candiano,

6  Filancia and Rech.

7          Does that refresh your recollection?

8  A    Not at all.

9  Q    Would perhaps seeing a published opinion that refers to

10  you as Counsel refresh your recollection?

11  A    Okay.

12          MS. POSA:  May I show this to the witness only?

13          THE COURT:  Yes.

14  Q    Do you see the title?

15  A    No.

16  Q    Do you have it yet?

17  A    No.

18          THE COURT:  How about now?

19          THE WITNESS:  No.

20  Q    Do you see it now, sir?

21  A    Yes.

22  Q    Do you have it now?

23  A    Yes, I do.

24  Q    Does the title refresh your recollection?

25  A    Not at all.

Hymowitz - cross - Posa                    1980

1   Q    What about this paragraph here where it lists Counsel?

2   A    I see my name there, yes.  I have no recollection of the

3   case at all.

4           When is this from?

5   Q    You can read the date right there.

6   A    1991.

7   Q    This was 153-count indictment; was it not, Mr. Hymowitz?

8   A    I have no recollection of this matter at all.

9   Q    So, you're saying that you forgot representing a

10  defendant in an eight-defendant case on 153-count indictment

11  involving allegations of organized crime and enterprise

12  corruption?  That's your testimony?

13  A    Yes, I have to tell you, I don't ever remember

14  representing someone on a 153-count indictment.

15  Q    Are you saying that maybe this was reported incorrectly

16  when it says that you represented him?

17          MR. SERCARZ:  Objection.

18          THE COURT:  Sustained.

19          THE WITNESS:  I'm sorry I have --

20          THE COURT:  The objection was sustained.

21          Another question, please.

22  Q    Isn't it also a fact that you represented a Mr. Bruce

23  Griffith in Federal criminal case in Southern District of

24  New York in 1996?

25  A    Our firm did that, yes.

Hymowitz - cross - Posa                    1981

1    Q    You actually appeared on his behalf; did you not?

2    A    I'm sure I did once in a while.  He was a commercial

3    client.

4    Q    And that was a Federal income tax fraud charge; right?

5    A    Correct.

6    Q    Criminal case?

7    A    Yes.

8    Q    And did you not also represent a defendant right here in

9    the Eastern District in 2000 named Kent Vecchio?

10   A    I don't think so.  I might have appeared on behalf of the

11   firm for Mr. Freeman, but I don't remember that.

12   Q    Would seeing the docket refresh your recollection?

13   A    I'm going accept what you said.

14   Q    And Mr. Vecchio was charged with conspiracy to defraud

15   the United States of America?

16   A    I have no knowledge.

17   Q    Mr. Hymowitz, do you know what ECF is?

18   A    Who?

19   Q    ECF?

20   A    No.

21   Q    Electronic court filing?

22   A    No, I do not.

23   Q    You've never used it before?

24   A    I don't think so.

25   Q    So, you don't know that the Government can look up all of

1    the dockets in which you've appeared; do you?

2    A    Oh, I'm sure they can.

3    Q    When you testified yesterday, you had no idea that we

4    could have just gone and looked it up to disprove your

5    testimony; did you?

6    A    I have had the understanding from you that you look up

7    everything.

8    Q    You've known Mr. Dunn for about 15 years how; correct?

9    A    Since 1998.

10   Q    Sixteen years?

11   A    Whatever that is, yes.

12   Q    And you testified yesterday that you struck up a

13   friendship because he had had memories of your father's store;

14   correct?

15   A    Correct.

16

17              (Continued on following page.)

18

19

20

21

22

23

24

25

Hymowitz - cross - Posa                          1983

1   BY MS. POSA:   (Continuing)

2   Q    And when you met him, I believe you testified that he was

3   unable to get bank loans, is that correct?

4   A    Correct.

5   Q    You heard Mr. Dunn testify that you and others loaned him

6   money through mortgages, is that correct?

7   A    Correct.

8   Q    I believe Mr. Dunn called it private financing.  Is that

9   how you would call it?

10  A    Yes.

11  Q    And you and Mr. Freeman provided similar financing for a

12  number of other people, correct?

13  A    Over the years, we've done that many times, yes.

14  Q    And I believe you testified today that you charged a 12

15  to 16 percent interest rate, is that right?

16  A    All different types of interest rates.

17  Q    But your testimony today was that that was a common

18  interest rate, right?

19  A    For individuals, yes.

20  Q    And you haven't called any of those people to testify

21  about your generosity, have you?

22            MR. SERCARZ:  Objection.

23            THE COURT:  Overruled.

24  A    No.

25  Q    Going back to Mr. Dunn, you helped him finance the

1  purchase of property at 144 Decatur Street back in 1988.  Do

2  you recall that?

3  A    Yes.

4  Q    And in return for that mortgage, he assigned all the

5  rents on that property to you and the other people in your

6  investment group, is that right?

7  A    That's standard, yes.

8  Q    And this same group, that included yourself and your wife

9  and a few others, gave Dunn another mortgage in 1999, is that

10 right?

11 A    Possibly, yes.

12 Q    For $150,000, is that correct?

13 A    I don't know how much property.

14 Q    334 Marcus Garvey Boulevard, 320 Quincy, 546 Monroe

15 Street and 654 Putnam?

16 A    Yes.

17 Q    In 2002, you personally gave Mr. Dunn another mortgage,

18 isn't that right?

19 A    I have no recollection but if you say so, yes.

20 Q    Do the addresses 334 Marcus Garvey and 654 Putnam refresh

21 your recollection?

22 A    Those are the same buildings.

23 Q    But there was another mortgage put on top of it, wasn't

24 there?

25 A    As I said, if you said so, yes, I have no recollection to

Hymowitz - cross - Posa                                    1985

1    that.

2    Q    Would seeing the mortgage documents refresh your

3    recollection?

4    A    I'm not disputing it.

5    Q    That was for $90,000?

6    A    Once again, I'm not disputing it.  I gave him many loans.

7    Q    So just to be clear, you were not acting as his attorney

8    on those transactions, right?

9    A    No.

10   Q    You were loaning him the money, correct?

11   A    Correct.

12   Q    Now, Mr. Dunn also testified that you and he and

13   Mr. Freeman had a management company together, is that

14   correct?

15   A    I was not an owner of a management company.

16   Q    So you were not a member of the Odd Couple management

17   company?

18   A    I don't believe so.

19   Q    Mr. Dunn additionally testified that at times, you or

20   your firm represented him in your capacity as lawyers, is that

21   testimony correct?

22   A    Yes.

23   Q    And so he made periodic payments for the legal expenses

24   he incurred with you and your partner, correct?

25   A    Yes.

Hymowitz - cross - Posa                    1986

1   Q    He would pay along the way as you rendered those

2   services, correct?

3   A    Probably more from Michael's work than my work.  My work

4   was mostly getting him financing with banks so I would get

5   paid at the closing.

6   Q    You testified that you were personally close to Mr. Dunn,

7   right?

8   A    Yes.

9   Q    I believe you called yourselves friends?

10  A    That's fair to say, yes.

11  Q    And you and Mr. Freeman were working in the same office

12  until you said you went to Long Island, is that correct?

13  A    Yes.

14  Q    Was that a two lawyer law firm in this period in the

15  2000's?

16  A    No.  There -- at that point, there, we had an entire

17  floor.  There were about 14 attorneys, not partners, but 14

18  attorneys that shared the space.

19  Q    That shared the space, but were they members of Hymowitz

20  & Freeman?

21  A    No.

22  Q    Fair to say that you saw Mr. Freeman on a fairly frequent

23  basis in the 2000's?

24  A    Sure.

25  Q    You testified yesterday that you initially intended to be

Hymowitz - cross - Posa                    1987

1   part of SML Development in round five of NEP before the

2   Lexington Avenue project.  Am I understanding that correctly?

3   A    Correct.

4   Q    And, in fact, SML means Stevenson, Michael and Lee, does

5   it not?

6   A    Correct.

7   Q    But then Mr. Dunn spoke to Wendell Walters about the

8   threshold requirements for developers to be accepted in the

9   program, is that correct?

10  A    No, you're mistaken.  You are going to 2003, not 2000.

11  Q    Okay.  It was still the same project, was it not, NEP?

12  A    Different round.

13  Q    Right.  But the requirements were the same, were they

14  not?

15  A    I don't know if they were the same.

16  Q    You testified yesterday at transcript page 1880 that the

17  community board in Bed-Stuy where this project was to be

18  located wanted Mr. Dunn to be the majority owner.  Is that

19  your testimony?

20  A    Correct.

21  Q    And that was Community Board 3, correct?

22  A    I don't know which community board.

23  Q    Does the name Sherronie Perry, the housing committee's

24  chair, ring a bell?

25  A    I would not know.

Hymowitz - cross - Posa                    1988

1    Q    Would seeing an e-mail on the matter refresh your
2    recollection?
3    A    Pardon me?
4    Q    Would seeing an e-mail on this matter refresh your
5    recollection?
6    A    I had no connection with the community board at all.
7    Q    But you were somehow aware that they had an issue and
8    they required Mr. Dunn to be the majority owner, right?
9    A    Mr. Dunn advised us of that and through HPD.
10   Q    I'm sorry.  Mr. Dunn told HPD who then told you?
11   A    No.  Mr. Dunn was advised by HPD that the community board
12   had a problem.
13   Q    And what was that problem, if you recall?
14   A    That Mr. Dunn had to be the majority shareholder.
15   Q    And why was that?
16   A    It's a different place and a different time, but in 2000,
17   they did not two white people and one black person to be
18   approved on a project in Bedford-Stuyvesant.  That's what I
19   was told.
20   Q    Leaving aside the race issue, you are aware that the
21   purpose of the Neighborhood Entrepreneurs Program was to
22   empower local real estate developers, right?
23   A    Correct.
24   Q    And this asset cap that we've heard a lot about, that
25   wasn't just bureaucratic red tape, was it?

Hymowitz - cross - Posa                                    1989

1   A      I'm sure it wasn't.

2   Q      They had a programmatic reason, correct?

3   A      You would have to ask them but those were the rules.

4   Q      Would you disagree with Mr. Walters' testimony that the

5   purpose was to keep out large real estate developers and

6   empower local developers?

7              MR. SERCARZ:  Objection as to form.

8              THE COURT:  Sustained.

9              MS. POSA:  Can I ask him if he would agree?

10             THE COURT:  No.

11             MS. POSA:  I don't understand it.

12             THE COURT:  Sustained as to form.  Ask it another

13  way.

14  Q      You heard Mr. Walters testify that the purpose of the

15  Neighborhood Entrepreneur Program was to empower entrepreneurs

16  in the neighborhood, correct?

17  A      Correct.

18  Q      And would you disagree with his testimony?

19  A      No.

20  Q      So when you removed yourself from SML Development, you

21  were really just subverting the purpose of the program,

22  weren't you?

23  A      Absolutely not.

24  Q      You weren't trying to just sneak in when you knew it was

25  meant to be for people in the neighborhood?

Hymowitz - cross - Posa                          1990

1  A    Not at all.  I knew that I could do a better job and be

2  more useful to the company as an attorney because I had prior

3  experience around or than being a principal.

4  Q    You testified about how many different hats you wore,

5  correct?

6  A    If needed, yes.

7  Q    It seems to me based on your direct testimony that you

8  were simultaneously a real estate developer and a real estate

9  attorney and a banker and investor, would that be correct?

10  A    Yes, but nothing to do with HPD.

11  Q    So you were able to isolate yourself for that part of

12  your practice, correct?

13  A    I'm not understanding what you're asking.

14  Q    Well, in your practice generally, you were doing all

15  sorts of things all at the same time, but when it came to HPD,

16  is your testimony that you were able to isolate yourself

17  solely as counsel and you had no role in the business aspect

18  of it?

19  A    That was basically all I was needed for and that's what I

20  did.  When there came a time that I was needed to help with

21  the budgeting, I was asked to come to meetings and I assisted

22  with budgeting.

23  Q    And you said you needed special permission for that?

24  A    Yes.

25  Q    And who had to grant you that permission?

1   A    It depended on which project we were on.  Whenever Steve

2   or Michael said that I was coming to a meeting, because I was

3   the attorney, they would think that we were going to be

4   discussing legal issues so they would want their attorney

5   present.  So we would have to -- if I was there for a

6   budgetary reason, Steve or Mike would have to tell them that

7   it has nothing to do with law and that we're bringing him here

8   just to discuss budgetary reasons.

9   Q    Who would they have to tell this to?

10  A    Whether it was the Enterprise or HPD, I don't know.

11  Q    You were admitted to the New York State Bar in 1976,

12  correct?

13  A    Correct.

14  Q    And lawyers in New York State are required to submit

15  attorney registration forms every two years, is that correct?

16  A    Correct.

17  Q    Which means that in 38 years, you've probably submitted

18  them well over 15 times, right?

19  A    Yes.

20  Q    And it's very important to fill these out correctly,

21  right?

22  A    Yes.

23  Q    Your license to practice law literally depends on it,

24  does it not?

25  A    I'm sure it does.

Hymowitz - cross - Posa                          1992

1    Q    I'm going to show you what's been marked for

2    identification as Government Exhibit 605.

3              MS. POSA:  I'm going to show this to the witness

4    only.

5    Q    Do you recognize this form, sir?

6    A    Yes.

7    Q    What is it?

8    A    The attorney registration form.

9    Q    And is that your name on it?

10   A    Yes.

11   Q    Is that your signature on this page?

12   A    Yes, it is.

13   Q    And the date is March 3, 2004, is that correct?

14   A    Yes.

15   Q    Is this another attorney registration form?

16   A    Yes, it is.

17   Q    And is that your signature, sir?

18   A    Yes, it is.

19   Q    And the date?

20   A    April 12, '06.

21   Q    Another registration form?

22   A    Yes.

23   Q    Also your name?

24   A    Yes.

25   Q    Is that again your signature?

Hymowitz - cross - Posa                                  1993

1    A    Yes.

2    Q    The date?

3    A    February 28, '08.

4    Q    Another form?

5    A    Yes.

6    Q    Your name?

7    A    Yes, it is.

8    Q    Your signature?

9    A    Yes.

10   Q    The date?

11   A    March 3rd of '10.

12   Q    Last one.  Attorney registration form, New York State?

13   A    Yes.

14   Q    Your name?

15   A    Yes, it is.

16   Q    And is that your signature on the last page?

17   A    Yes.

18   Q    That date, April 19, 2012?

19   A    That's what it looks like, yes.

20        MS. POSA:  Your Honor, the government moves to admit

21   Government Exhibit 605.

22        MR. SERCARZ:  No objection.

23        THE COURT:  Received.

24        (So marked.)

25        MS. POSA:  I'm going to mark it so I don't forget.

Hymowitz - cross - Posa                    1994

1    Q    Each time you sign these forms --

2             MS. POSA:  If I may publish.

3             (Exhibit published.)

4    Q    You signed an affirmation that, The statements contained

5    herein are true and correct to the best of my knowledge and

6    belief, correct?

7    A    Correct.

8    Q    And that affirmation appears on every single one of these

9    forms?

10   A    I don't know but I'll accept that as true, yes.

11   Q    And each time -- if I could just read this Section D

12   here.

13             In accordance with Section 603.15, 1st Department,

14   or Section 691.12, 2nd Department, of the rules of the

15   Appellate Division, I affirm that I have read, and am in

16   compliance with Section 1200.46 of the joint rules of the

17   Appellate Division, DR -- and correct me if I'm wrong, but

18   that stands for Disciplinary Rule -- 9-102 of the Lawyer's

19   Code of Professional Responsibility governing the conduct of

20   attorneys, which requires an attorney to preserve the identity

21   of funds and property entrusted to him or her and to maintain

22   certain records relative thereto.

23             You signed that in each of those forms, did you not?

24   A    Yes.

25   Q    And this rule refers to the 1st Department.  That's just

Hymowitz - cross - Posa                    1995

1   Manhattan, right?

2   A    Yes.

3   Q    Which is where your law firm Hymowitz & Freeman was

4   located?

5   A    Correct.

6   Q    So no doubt that these rules apply to you, correct?

7   A    Correct.

8   Q    Bear with me for a little bit more legalese.

9        There's a reference to this specific rule, 603.15.

10  A    I don't see that.

11  Q    I'm sorry.  Right there.  (Indicating.)

12  A    Oh, okay.

13  Q    Would you agree that this is the text of that rule?

14       The financial records required to be maintained

15  pursuant to Rule 1.15 of the Rules of Professional Conduct

16  shall be made available for inspection, copying and

17  determination of compliance with court rules to a duly

18  authorized representative of the court pursuant to the

19  issuance on a randomly selected basis of a notice or subpoena

20  by the Departmental Disciplinary Committee.

21  A    Yes.

22  Q    And in terms of that reference to Rule .15, would you

23  agree that that particular rule requires that a lawyer shall

24  "maintain for seven years after the events that they record

25  copies of all statements to clients or other persons showing

Hymowitz - cross - Posa                    1996

1   the disbursement of funds to them or on their behalf" --

2              MR. SERCARZ:  Objection.

3   Q     -- "copies of all bills rendered to clients" --

4              THE COURT:  Sorry.  You have an objection?

5              MR. SERCARZ:  Yes.

6              THE COURT:  Overruled.

7   Q     -- "and copies of all records showing payments to

8   lawyers, investigators or other persons not in the lawyer's

9   regular employ for services rendered or performed"?

10  A     If you're asking my understanding of it?

11  Q     Yes.

12  A     My understanding was that that had to do with our escrow

13  and our IOLA accounts.

14  Q     So are you disputing that the rule actually says that a

15  lawyer shall maintain billing records for seven years?

16  A     I'm not disputing anything.  I'm just telling you what I

17  thought my understanding of it was.

18  Q     When you signed this at least 15 times over the past

19  38 years?

20  A     I can only tell you what my understanding was.

21  Q     You had a legal secretary at Hymowitz & Freeman, right?

22  A     We had a part-time secretary for Michael during that

23  period of time and I had a part-time paralegal.

24  Q     Did you have a woman named Barbara Valente working for

25  you?

Hymowitz - cross - Posa                          1997

1   A    Part time.

2   Q    But she worked for you for about 25 years, correct?

3   A    Correct.

4   Q    She was a good employee, right?

5   A    Sure.

6   Q    Conscientious, correct?

7   A    I'm sure she was.

8   Q    Well, you were the one paying her paycheck.

9   A    As I said, the answer is yes, but she was Michael's

10  secretary.

11  Q    Did you ever receive some kind of ethical complaint about

12  her?

13  A    No, not at all.

14  Q    And part of her responsibility was to type bills for

15  clients, was it not?

16  A    Yes.

17  Q    And would it be fair to say that when you had to give a

18  bill, you would provide her with a detailed description of the

19  work you performed?

20  A    Barbara, as I said, mostly worked for Michael.

21  Q    So if Barbara had said that she also worked for you,

22  you're saying she would have been lying?

23  A    No, not at all.  She mostly worked for Michael.

24  Q    But she also worked for you, correct?

25  A    If there was any time left over, correct.

1   Q    And she typed up bills for you, did she not?

2   A    I'm sure from time to time.

3   Q    You're sure she did?

4   A    Yes.

5   Q    And you needed to provide some kind of description of

6   your services in order to justify your bills, did you not?

7   A    Yes.

8   Q    Sometimes clients dispute their bills, don't they?

9   A    I'm sure occasionally.

10  Q    And, I mean, everybody complains the lawyers charge too

11  much, don't they?  Not uncommon?

12  A    I don't know how to respond to that.

13  Q    Well, would you agree that it's important to keep track

14  of your bills?

15  A    Yes.

16  Q    In case somebody calls you and you need to have proof

17  that you actually did the work, right?

18  A    As I told you that almost all of my work was fixed sums,

19  so there was really no discussion.

20  Q    Is it not also important to keep bills for tax purposes?

21  A    The payments would be in a computer and the computer

22  printout would go to our accountants.

23  Q    So you did have a computer that could generate bills,

24  right, or records of billing?

25  A    Payments.

Hymowitz - cross - Posa                                    1999

1    Q    Okay.  And you also use e-mail just in your practice?

2    A    Oh, sure.

3    Q    You have filing cabinets in your office?

4    A    Yes.

5    Q    And you also have a storage account or you also had a

6    storage account with a company called Iron Mountain, correct?

7    A    Correct.

8    Q    And that is a place where you can store files and records

9    off site, correct?

10   A    Correct.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

```
                         Side Bar                      2000
```

1   BY MS. POSA:

2   Q    Would you be surprised to know that in 25 years of

3   working at your firm, Mrs. Valente never once saw you keep

4   track of your notes in a looseleaf notebook?

5            MR. SERCARZ:  Objection, Your Honor, to the form of

6   the question.

7            THE COURT:  Sustained.

8   Q    Would it be accurate to say that Mrs. Valente never once

9   in 25 years saw you keeping track of your bills in a looseleaf

10  notebook?

11           MR. SERCARZ:  Objection.  May I be heard?

12           THE COURT:  Sustained.  Yes.  Come to the side.

13           (The following occurred at side bar.)

14           MR. SERCARZ:  First of all, a witness cannot be

15  asked questions regarding the truth of another witness'

16  statements.  Second, this witness is not in a position to

17  testify regarding the memory of the other witness.  I object

18  to the form.

19           THE COURT:  She is not a witness.  I mean she has

20  not been a witness.

21           MS. POSA:  Okay.  That's fine.  I'll move on.

22           THE COURT:  Okay.

23           (Side bar ends.)

24           (Continued on next page.)

25

1   BY MS. POSA:

2   Q    Mr. Sercarz just showed you a transcript of Government

3   Exhibit 16 in which you stated that it was your firm's

4   practice to, quote, "Once an invoice is paid, it's just ripped

5   out of the book and disposed of."

6              Do you recall that?

7   A    That was my practice, yes.

8   Q    That's not what you actually said, was it?

9   A    What do you mean?

10  Q    Did you not say it was our practice?

11  A    I think that's what the transcript says but that's what

12  my practice was, yes.

13  Q    I just want to make sure I'm getting this right.

14             So this is your conversation with Special Agent

15  Richards.  This is in evidence as Government Exhibit 16.

16             (Exhibit published.)

17  Q    You said, Not billing records.  And then you said, As far

18  as I know, if we're supposed to, we never did.  We're not a

19  big firm.

20             So you were talking about your whole firm, right,

21  not just you?

22  A    The answer is I was taking about myself.  If I used the

23  wrong wording, I'm sorry, but I can only tell you what I did.

24  Q    Even when you said, We've got ourselves a looseleaf, that

25  was just the royal "we"?

Hymowitz - cross - Posa                                2002

1  A    We do have a looseleaf and it sat in the secretarial area

2  for years.

3  Q    Okay.  So when you said "we" as to the looseleaf, that

4  was your firm, but when you said, We never kept bills, that

5  was just you, is that right?

6  A    I never kept bills, yes.

7  Q    You just testified that in Christmastime in 2006, you

8  were involved in a $39 million real estate closing, isn't that

9  right?

10 A    Correct.

11 Q    You're saying you don't have a single bill of that deal

12 today?

13 A    No.  What you have to understand is at the closing, the

14 bank attorney sends around a list of checks that need to be

15 paid at the closing.  The client signs off on that list which

16 includes my check and there's a closing statement for the

17 closing but not a bill.

18 Q    So what is it that you're ripping out of the looseleaf

19 and throwing away, is it the closing statement?

20 A    No.  There are occasions where clients will ask me to do

21 some minor things like open a corporation or something like

22 that which is just a small fee and I will bill them after I

23 open up the company.  When I get the check, then I just rip it

24 up.

25 Q    What is it that you rip up?

Hymowitz - cross - Posa                                    2003

1   A    The small bill that, a copy of the bill that I sent for
2   incorporation.
3   Q    So when you do your bills, you just literally scribble it
4   on a little piece of paper, it's handwritten --
5   A    No.
6   Q    -- you keep a carbon copy, you send it out and you just
7   throw it away?
8   A    No.  It would be a one paragraph bill that would say
9   incorporation, $1,500, filing fees, $500, total due, $2,000.
10  The client gets sent the bill.  I put a copy of it into the
11  red looseleaf binder.  When the check comes in, I have it, I
12  rip it out.
13  Q    Are these one paragraph statements for lack of a better
14  word, are they typewritten or are they handwritten?
15  A    Typewritten.
16  Q    On an actual typewriter or on a computer?
17  A    On a computer.
18  Q    And are they not saved on the computer or do you actually
19  delete the file as well?
20  A    I don't know.
21  Q    I'm just confused because I can see throwing out, if all
22  you have is a hard copy and you through it out, you don't have
23  it.  But it's also saved on the computer, wouldn't you have
24  it?
25  A    The answer, maybe.  I don't know.

CMH     OCR     RMR     CRR     FCRR

Hymowitz - cross - Posa                            2004

1   Q     But you told Special Agent Richards, quote, you have no

2   billing records, isn't that right?

3   A     We do not save -- when I say "we," I do not save bills

4   once I get paid.  If they are in the computer, I certainly

5   wouldn't know how to get them out.

6   Q     You've never used a computer before?

7   A     No, I always use a computer.

8   Q     Let's go back quickly to the topic of the lawyers rules

9   of conduct.

10         Are you familiar generally with what's known as

11  conflict of interest rules?

12  A     Yes.

13  Q     And basically that means that you can't represent people

14  on two different sides of a deal or two different sides of a

15  litigation, is that right?

16  A     Correct.

17  Q     In fact, before you take in any new clients, you probably

18  ran what's known as a conflicts check, right?

19  A     No.

20  Q     So you would just take people in without any regard as to

21  whether or not it would pose a conflict to your existing

22  clients?

23  A     I don't know that I've ever run a conflict check.

24  Q     But you do understand that the ethical rules, the most

25  basic rule for a lawyer, for an attorney is that you have an

Hymowitz - cross - Posa                              2005

1   ongoing duty of loyalty to your clients, isn't that right?

2   A    Of course.

3   Q    So, for example, if party A and party B enter in a

4   contract, you can only represent A or B.  You can't represent

5   both, can you?

6   A    It depends on what the situation is and it also depends

7   on whether you have the approval of the parties.

8   Q    Well, you talked briefly about this deal, proposed deal

9   with Lutheran Synod, correct?

10  A    Correct.

11  Q    And you testified, the term you used was that you served

12  them as a real estate consultant, is that correct?

13  A    Correct.

14  Q    And then you also talked with Bob Starzecki about

15  representing him in that development, is that right?

16  A    About representing him in that development and allowing

17  him to bid on a project.

18  Q    So what would happen if it came that Bob would need to

19  sue Lutheran to get back pay?

20  A    I'm sorry?

21  Q    If it came that Starzecki got the project and he had to

22  sue the Lutheran Synod, you would really be in a pickle

23  wouldn't you?

24  A    No, you're wrong.

25  Q    Because you advocated for both of them?

Hymowitz - cross - Posa                                    2006

1    A    No, I would not have represented him.

2    Q    Not formally?

3    A    He would have had other counsel to represent him.

4    Q    Because he certainly did have other counsel in that time

5    period, didn't he?

6    A    I have no idea.

7    Q    Well, you testified that Bogdan Starzecki said, at the

8    Bed-Stuy closing said, I need to get you to start working for

9    me.  Do you remember that testimony?  It was just this

10   morning.

11   A    Yes.

12   Q    And you --

13   A    Not with that emphasis but, yes, I did say something like

14   that, yes.

15   Q    And you were representing SML at that closing, right?

16   A    Yes.

17   Q    And did Bogdan Starzecki not already have an attorney of

18   his own at that closing?

19   A    Not at all.

20   Q    He was not represented by an attorney?

21   A    No.

22   Q    You heard him testify that he had an attorney named Chris

23   Georgoulis in this time period, did he not?

24   A    Yes, he did, but there was no attorney at the closing.

25   Q    So your testimony is that he had this multi-million

Hymowitz - cross - Posa                              2007

1   dollar deal, no attorney representing him at all, is that

2   right?

3   A     That's correct.  All he would do is come to the closing,

4   sign his documents with regard to building plans,

5   specifications, general conditions, and he would leave.

6   Q     So when he testified that he did, in fact, have an

7   attorney working for him on his real estate deals, you're

8   saying that was inaccurate?

9   A     No, you're not understanding what I'm saying.  There was

10  no attorney.  When he was at any of the closings, the SML

11  closings, he never had an attorney present.

12  Q     I'm not saying physically present, but did he not have an

13  attorney representing him in the negotiations of these

14  contracts?

15  A     Not at all.

16  Q     Multi-million dollar contracts, no lawyer?

17  A     Absolutely not.

18  Q     Pro se?

19  A     Yes.

20  Q     I'm going to go back to Government Exhibit 600 which was

21  that retainer agreement that we've talked about quite a lot.

22  Do you recall?  Do you recall that?

23  A     I certainly do.

24  Q     Now, in Mr. Sercarz's opening statement, he told the

25  jury:  Please note that it is unsigned.  This document was

CMH        OCR        RMR        CRR        FCRR

Hymowitz - cross - Posa                                    2008

1  clearly a hastily prepared draft which was meant to be talking

2  points in a discussion of work that was going to be done for

3  Bogdan Starzecki.

4          That's your testimony essentially, right?

5          MR. SERCARZ:  Object.

6          THE COURT:  Overruled.

7  Q    Do you disagree with Mr. Sercarz's opening statement?

8  A    No, my testimony was what I said earlier.

9  Q    So your testimony is that it was just a draft, correct?

10 A    Correct.

11 Q    And you're testifying now that you just relied on Michael

12 Freeman's template, is that right?

13 A    Correct.

14 Q    When you were in these recordings, you were on multiple

15 recordings over multiple days, correct?

16 A    I think there was just two on the same day.

17         MR. SERCARZ:  May we approach?

18         THE COURT:  All right.

19         (Continued on next page.)

20

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

```
                          Side Bar                        2009

 1              (The following occurred at side bar.)

 2              MR. SERCARZ:  The government has been very careful

 3   with me about keeping me to those conversations that have been

 4   admitted.  If the government is going to go into other

 5   conversations, and they may, I'd like an offer of proof.

 6              THE COURT:  What conversations?

 7              MR. SERCARZ:  She just asked about multiple

 8   conversations over multiple days.

 9              MS. POSA:  There were.

10              MR. SERCARZ:  The only conversations that are in

11   evidence concerning my client are the two on the same day.

12              THE COURT:  Oh, I see.

13              MS. POSA:  So I apologize for that.  I'm just going

14   to say at any point, did you ever mention that it was Michael

15   Freeman who did that retainer agreement.

16              MR. SERCARZ:  I have no objection to that question,

17   but just while we are here so I don't make a pest out of

18   myself --

19              THE COURT:  Yes.

20              MR. SERCARZ:  -- I would like a standing objection

21   to any question by Ms. Posa that asks whether or not any

22   witness is telling the truth or lying.  That's inappropriate.

23              MS. POSA:  Okay.  I was asking about his own

24   statement.

25              THE COURT:  Okay.  All right.
```

1            (In open court.)

2    BY MS. POSA:

3    Q    At any point in your conversation with Mr. Bogdan

4    Starzecki or Special Agent Richards which are now in evidence,

5    did you ever say, Retainer agreement, that's what Michael

6    Freeman would have done, not me?

7            Did you or did you not?

8    A    I'm not sure what you're referring to.  I'd like you --

9    Q    In those conversations, did you at any point say that it

10   was Michael Freeman who prepared the retainer agreement or,

11   I'm sorry, prepared the template?

12   A    I told FBI Richards that I was preparing a retainer based

13   on a conversation with Mr. Freeman.

14   Q    I believe what you said was that you were asked to

15   prepare a retainer?

16   A    Correct.

17   Q    But you didn't say that you weren't familiar with

18   retainer agreements because that was really Mr. Freeman's

19   bailiwick, he was in charge of the templates, right?

20   A    Why would I say that to him?

21   Q    I'm going to show you something.

22           MS. POSA:  If I can just show this to the witness

23   for demonstrative purposes.

24   Q    Do you recognize this type of object?

25   A    Yes, I do.

Hymowitz - cross - Posa                              2011

1   Q     What is it?

2   A     A stamp.

3   Q     It says "Draft" on it?

4   A     Yes, it does.

5              MS. POSA:  Can we show this to the jury just for

6   demonstrative purposes?

7              THE COURT:  Yes.

8              (Published.)

9   Q     It says "Draft"?

10  A     Yes, it does.

11  Q     It stamps "Draft" on documents, right?

12  A     Yes, it does.

13  Q     This is a type of stamp that lawyers all over the country

14  keep in their law firms, isn't it?

15  A     I'm sure they do.

16  Q     I'm sure you had some in your office, didn't you?

17  A     Not in my desk, no.

18  Q     The purpose of such a stamp is to prevent people from

19  signing contracts that are still in draft form, isn't it?

20             MR. SERCARZ:  Objection.

21             THE COURT:  Overruled.

22  A     Yes.

23  Q     But it never occurred to you to draft, to have stamped

24  "draft" or even write that on this retainer that you allegedly

25  gave Mr. Freeman, right?

Hymowitz - cross - Posa                              2012

1    A    I wasn't sending it out so there was no purpose to do

2    that.

3    Q    It would have prevented him from sending it to the client

4    if that's what you're saying he did, right?

5              MR. SERCARZ:  Objection to the form of that

6    question.

7              THE COURT:  Overruled.

8    A    There was no reason for me to believe that that document

9    was going anyplace.

10   Q    Well, you said that you usually don't draft retainer

11   agreements, right?

12   A    Very few.

13   Q    That's why you're relying on Mr. Freeman's alleged

14   template, is that right?

15   A    No.  It was because he had spoken to Mr. Starzecki and I

16   wanted to try and get a document that he was accustomed to.

17   Q    You didn't work for Mr. Freeman, did you?

18   A    No.

19   Q    You're partners, right?

20   A    Yes.

21   Q    And in fact, you were the senior partner in the firm

22   because you came on first, isn't that right?

23   A    No such thing as senior partner in our firm.

24   Q    But you were full partners, correct, you weren't his

25   associate?

Hymowitz - cross - Posa                              2013

1    A     Correct.

2    Q     So wasn't it strange that he's asking you to do something

3    based on a conversation that he had?

4    A     No, you have to know Mr. Freeman.  When he has something

5    he wants done, it needs to get done immediately.

6    Q     It had to get done immediately the day after New Year's,

7    right?

8    A     Correct.

9    Q     There was a lot of urgency?

10   A     Everything that has to do with Mr. Freeman's practice is

11   an emergency.

12   Q     Although Mr. Starzecki didn't actually sign that until

13   February 26th, isn't that right?

14   A     That's what I heard, yes.

15   Q     So when he made this alleged request, you didn't say,

16   Hey, Mike, I'm exhausted, I just worked through Christmas, did

17   a $39 million deal, do your own retainer agreement?  Nothing

18   like that?

19   A     I would never do that, no.

20   Q     You didn't say, How am I supposed to do a retainer

21   agreement when I don't even know what this was about, did you?

22   A     I did the retainer agreement based on our conversations

23   to the best of my ability.

24                 (Continued on next page.)

25

CMH      OCR      RMR      CRR      FCRR

Hymowitz - cross - Posa                    2014

1    (CONTINUING)

2    Q    Are you familiar with the rule of professional

3    responsibility that bans nonrefundable retainer agreements?

4    A    I am now.

5    Q    And when you saw this in Mr. Freeman's template, you

6    didn't say what the heck, this is totally improper?

7    A    I have no recollection of seeing that.

8    Q    But do you recall exactly which parts you filled in and

9    which parts you did not fill in?

10   A    The only parts that I can tell you for sure I filled in

11   was the one-year $100,000.

12   Q    And your eyes just glazed over the rest; is that your

13   testimony?

14   A    No, not at all.

15   Q    You read the rest; correct?

16   A    I'm sure I did.

17   Q    So, you would have read the reference to nonrefundable?

18   A    I have no idea whether it was there or not at the time.

19   Q    Is it not in the document we just saw?  I'll show you

20   Government's Exhibit --

21   A    It's there now, yes.  I have no recollection of it.

22   Q    Are you saying that document is inaccurate or it doesn't

23   represent what was done at the time?

24   A    I can't tell you for sure whether it's the exact same

25   document I prepared or not.

Hymowitz - cross - Posa                    2015

1   Q    I thought you just testified that it was.

2   A    I'm not understanding what you're saying.  I prepared a

3   draft, I put it put it on Michael's desk.  That's the last I

4   saw of it.

5   Q    Now, you know now that Mr. Starzecki paid $134,500 to

6   Hymowitz & Freeman; is that right?

7   A    I learned about the 34,500, I think, from FBI Agent

8   Richards or Mr. Starzecki on October 3rd of 2011.

9   Q    And your testimony is that you never did actually any

10  work for that money; is that right?

11  A    That's not what I said.

12  Q    Did you do any work for that money?

13  A    The work that I did was to try to get Mr. Starzecki bids

14  on construction projects.

15  Q    All right.  This is why I'm confused.  You are the one

16  who's trying to do the work, but it's Mr. Freeman who's asking

17  you to do the retainer; is that right?

18  A    As I said, Mr. Freeman was out of the office, he wanted

19  me to get a retainer prepared and that's what I did.

20  Q    For the work that you were supposed to be doing?

21  A    I don't know whether Mr. Freeman intended to do any of

22  the work.

23  Q    So, you were saying that you were paid $1000,000 to put

24  in a good word on a couple bids; is that your testimony?

25  A    To be able to speak to all the people that I knew in the

1    construction business or developers who were having projects

2    to come on-line to see whether I can get an opportunity for

3    Mr. Starzecki to bid.

4    Q    So, he was paying you not for legal services rendered but

5    to basically be his promoter if you will; is that right?

6    A    Okay, that's a good enough term.

7    Q    A hundred thousand dollars?

8    A    Actually that's a very small fee if he was to get, for

9    example, a $39 million construction loan.

10   Q    But he didn't get anything like that from your work; did

11   he?

12   A    No.  Unfortunately, the real estate business died at the

13   end of the year.

14   Q    So, he paid a hundred thousand dollars for nothing; is

15   that your testimony?

16   A    No.

17   Q    No actual results; right?

18   A    It wasn't meant to be results.  Based on the years that

19   he knew me, he felt comfortable that I would be able to get

20   him bids.  Once I get him bids it's up to him to bid a good

21   enough number to get the job.

22   Q    So your testimony is that you did know at the time that

23   you did receive a hundred thousand dollars; correct?

24   A    Yes.

25   Q    And after the market collapsed and you weren't able to

1    get him any work, it never occurred to you to give him the

2    money back; is that right?

3    A    No.

4    Q    That doesn't sound very generous; does it?

5    A    It has nothing to do with being generous.  I performed as

6    best I could and it didn't work out.

7    Q    Let me show you Government's Exhibit 602.  This is in

8    evidence.

9         Your testimony is that you did not prepare this

10   letter; is that right?

11   A    Absolutely.

12   Q    So, where it says that the amounts received for you were

13   for services provided to you and your company, are you saying

14   that's true or not true?

15   A    Your payments to our firm... that's true.

16   Q    Mr. Hymowitz, when you spoke to Bogdan Starzecki in 2011,

17   he had been under indictment for more than two years; is that

18   correct?

19   A    I have no idea.

20   Q    You knew that you were speaking to somebody who was under

21   criminal indictment; did you not?

22   A    Absolutely not.

23   Q    That's why you were so cautious about asking him whether

24   it was a civil or criminal case?

25   A    I don't think I asked him.  I think I asked

Hymowitz - cross - Posa                                    2018

1  Agent Richards because of the type of questions he continued

2  to ask me and since he was the accountant representing with

3  the IRS.

4  Q    Mr. Hymowitz, we've heard a lot in this trial about the

5  bidding process for construction contracts; is that correct?

6  A    Yes.

7  Q    And based on your extensive experience in real estate,

8  would you agree that the whole purpose of bidding is to get

9  the lowest responsible bid?

10 A    Absolutely.

11 Q    To use the power of competition to drive down costs for

12 those who are actually paying for the contract?

13 A    Absolutely.

14 Q    Both private and public, right?

15 A    Yes.

16 Q    And you heard Anne Marie Hendrickson testify yesterday;

17 right?

18 A    Yes.

19 Q    Is it fair to say she doesn't have a dog in that fight;

20 right?

21 A    I'm sure not.

22        MR. SERCARZ:  Objection, Your Honor.

23        THE COURT:  Overruled.

24 Q    Are you aware of any motive she might have to testify

25 falsely?

Hymowitz - cross - Posa                          2019

1   A    No.

2   Q    You heard her testify that bidding high or padding a bid

3   to take a kickback into account would victimize HPD; did you

4   not?

5   A    Correct.

6   Q    And ultimately the people of New York City would pay the

7   price?

8   A    Yes.

9   Q    You also heard Peter Spina say the same thing regarding

10  Department of Housing Urban Development in the Federal

11  Government; correct?

12          MR. SERCARZ:  Your Honor, I object to this line of

13  questioning.  My clients's being asked to adopt testimony of

14  others.

15          MS. POSA:  I'm refreshing his recollection as to

16  that testimony.

17          THE COURT:  You are entitled to ask if he agrees.

18          Go ahead.

19  Q    Would you agree or disagree with Ms. Hendrickson's

20  testimony that padding bids would victimize New York City?

21  A    I agree, sure.

22  Q    And would you agree or disagree with Mr. Spina's

23  testimony that padding bids would victimize the Federal

24  Government?

25  A    True.

Hymowitz - cross - Posa                    2020

1    Q    I'm going to go back to Government's Exhibit 630.

2              MS. POSA:  Sorry, one second.

3              (Pause in the proceedings.)

4    Q    Actually, you know what?  I think you remember it now, I

5    will do it from memory.

6              That was an E-mail from Dan Magidson from Enterprise

7    during that?

8    A    Yeah, sure.

9    Q    And he wanted to know whether you were acting as a lawyer

10   or as a partner in that project; is that correct?

11   A    Correct.

12   Q    Okay.  You never responded to that E-mail; right?

13   A    I thought it was just very silly of what he said.

14   Q    Never said hey, I've got special permission to talk about

15   budget matters; did you?

16   A    They knew that I had been working for weeks with the

17   Enterprise on a budget.

18   Q    But you never actually said that to him; did you?

19   A    Why would I?

20   Q    Let me go back now to the signature card that we've

21   talked a lot about.  Government's Exhibit 552.

22             So it's your testimony that Mr. Dunn and Mr. Freeman

23   asked you to put your name on this?

24   A    Yes.

25   Q    Is that right?

Hymowitz - cross - Posa                              2021

1    A    Yes.

2    Q    Did they ask you to identify yourself as vice president?

3    A    We just made up a title.

4    Q    You just made up a title?

5    A    Yes.  Members or owners, vice president would be someone

6    that's just an employee.

7    Q    Are you familiar with the concept of a power of attorney?

8    A    Yes.

9    Q    And that is something, if I understand correctly, that

10   allows somebody else to sign on your behalf; correct?

11   A    Yes.

12   Q    So, they could have simply given you power of attorney

13   without labeling you the vice president; isn't that right?

14   A    It would have been much harder to write a check to get

15   approved by the bank.  And this document went to the

16   Enterprise and to HPD.

17   Q    Is that right?

18   A    As far as I know, HPD and Enterprise got all banking

19   resolutions.

20   Q    Did you attach this to your attorney opinion letter that

21   you sent to HUD saying that you had no financial interest in

22   SML Bed-Stuy?

23   A    I did not have a financial interest based on this.  I

24   have no shares of stock, I have no membership interest, there

25   is no side letters or understandings.

1   Q    Did you let them know that hey, maybe I don't have a

2   financial interest but, just so you're aware, I have

3   identified myself as the vice president in the past?

4   A    They had this document.

5   Q    You're saying HUD had this document?

6   A    I don't know if HUD did.  Enterprise or HPD for sure did.

7   Q    Have you even any evidence in this case that they had

8   these documents?

9   A    I didn't know that I would have to do that.

10  Q    You obviously have no obligation.  Do you recall giving

11  it to them?

12  A    I believe that was a criteria of the program, that

13  banking resolutions copies were given to either HPD or the

14  bank.

15  Q    Is this a banking resolution or a signature card?

16  A    This is a signature card.

17  Q    So, you see here where it says business entity

18  certification?

19  A    Where are we pointing to?

20  Q    Sorry.  Right here.

21  A    Yes.

22  Q    And it says the undersigned is authorized to certify the

23  names, titles and signatures of authorized signers?

24  A    Yes.

25  Q    That means that Mr. Freeman is actually certifying the

Hymowitz - cross - Posa                    2023

1    truthfulness of this document; wasn't he, as to the names, the

2    signatures and the title?

3    A    Sure.

4    Q    The title that you quote, just made up; is that right?

5    A    That's, that was the title that I was given, yes.

6    Q    Do you often just make up stuff that you put on documents

7    that go to banks?

8    A    It's not unusual for an attorney to also sign on some

9    other capacity.  Yesterday you showed Mr. Dunn documents, Alex

10   Avitabile who's the attorney for the Enterprise signed

11   documents as secretary.  It's not that unusual.

12   Q    What I'm saying is, you put the term vice president down?

13   A    Correct.

14   Q    Your testimony is that you were, in fact, not the vice

15   president; correct?

16   A    That's not what I'm saying.

17   Q    Were you the vice president of SML?

18   A    I was given a title of vice president.

19   Q    I'm not asking with about your title.  Were you, in fact,

20   the vice president of SML Bed-Stuy or were you not?

21   A    I'm not understanding what you're trying to say.

22   Q    Were you the vice president of SML Bed-Stuy or not?

23   A    At that point, yes.

24   Q    The day you signed the signature card?

25   A    Correct.

Proceedings                                                    2024

1   Q     And at no other time, ever?

2   A     Only for the purposes of signing checks, if needed to be.

3   And I never had to sign any checks.

4   Q     Mr. Hymowitz, isn't it true that you are a majority owner

5   of a property located at 510 Gates Avenue in Brooklyn?

6   A     I don't own any shares of stock in that company.

7               THE COURT:  Counsel, let's take our luncheon recess

8   now, we're moving to another area, all right?

9               MS. POSA:  All right.

10              THE COURT:  So, Members of the Jury, please return

11  at a quarter of 2:00 and we'll continue at that point.

12  Remember not to discuss the case in any way.

13              Thank you.  Quarter to 2:00.

14              THE COURTROOM DEPUTY:  All rise.

15              (Jury exits.)

16              (In open court; outside the presence of the jury.)

17              (Witness excused.)

18              THE COURT:  All right, you may be seated.

19              Ms. Posa, were you getting to the questions that

20  were subject to an objection regarding the lawsuit?

21              MS. POSA:  Yes, I'm sorry, Your Honor, I thought the

22  issue had been resolved but if I went too quickly, I

23  apologize.

24              THE COURT:  All right.

25              In my view, you should not be permitted to ask those

VB        OCR        CRR

Proceedings                               2025

1   questions.  I will allow the character witness to be asked the

2   one question that Mr. Capozzolo has proposed, if you choose to

3   put in a rebuttal character witness, but I have insufficient

4   basis for you to ask questions of this witness regarding that.

5            So, are you going to have anything more?

6            MS. POSA:  Yes, Your Honor.

7            THE COURT:  How much more?

8            MS. POSA:  Not very much.  I do have to confer with

9   Mr. Capozzolo for a minute, but pretty quick, I think.

10            THE COURT:  All right, then, at 1:45 we will

11   reconvene.

12            MS. POSA:  Your Honor, I want to be clear; I will be

13   able to inquire as to the personal benefits he's derived from

14   his charitable work; correct?  That's not off-limits.

15            THE COURT:  No, that is not off-limits.

16            MS. POSA:  Okay.  Thank you.

17

18            (Continued on following page with AFTERNOON

19   SESSION.)

20

21

22

23

24

25

Proceedings                           2026

1                    AFTERNOON SESSION

2              (In open court.)

3              (Judge NINA GERSHON enters the courtroom.)

4              (The following occurs outside the presence of the

5    jury.)

6              THE COURTROOM DEPUTY:  All rise.

7              Thank you, please be seated.

8              THE COURT:  Counsel, before we begin, let me just

9    read you another juror note that I received, which I think is

10   not a problem.

11             I am respectfully asking for consideration to be

12   absent on April 11th.

13             ALL:  So do we.

14             THE COURT:  Very good.  I was going to say, I hope

15   that this note doesn't make Counsel feel that need to go into

16   April 10th, but anyway, I don't need to go into it, I suppose.

17   You can see it if you like, it is from Juror Number 3, it has

18   to do with an event.

19             So, with your permission, maybe I can just send her

20   a note back saying April 11th will not be a problem.

21             Is there any opposition to that?

22             MR. EVANS:  No, Your Honor.

23             MR. SERCARZ:  No.

24             MR. DiCHIARA:  No.

25             MS. POSA:  None, Your Honor.

1        THE COURT:  All right, so let's get some special

2    juror note paper and send it in, all right?

3        Are we ready, then?  The jurors are all back?

4        THE COURTROOM DEPUTY:  Yes, Judge.

5        THE COURT:  All right, then let's bring them in.

6        THE COURTROOM DEPUTY:  Will do, Judge.

7        (Pause in the proceedings.)

8        THE COURTROOM DEPUTY:  All rise.

9        (Jury enters.)

10        THE COURTROOM DEPUTY:  Thank you, please be seated.

11        (Witness resumes stand.)

12        MS. POSA:

13        THE COURT:  Ms. Posa, you may continue.

14        MS. POSA:  Thank you.

15   CROSS EXAMINATION (Continuing)

16   BY MS. POSA:

17   Q    Mr. Hymowitz, just to go back over your testimony from

18   before lunch, is it correct you testified that in your real

19   estate work you would usually just be paid at the closing?

20   A    Mostly, yes.

21   Q    And your practice was to get paid in a lump of sum and

22   not to actually break down your costs; is that right?

23   A    On most of the stuff.

24        THE COURT:  Excuse me, Mr. Hymowitz, is there a

25   green light on your microphone?

1      THE WITNESS:  Yes.

2      THE COURT:  Is it on?

3      THE WITNESS:  Yes, I think so.

4      THE COURT:  Victor, we need the microphone, please.

5      Thank you.

6      All right, go ahead, please.

7  Q    Sorry, we'll just start all over because I think it was

8  hard to hear.

9           I believe you testified before the break that your

10 practice was usually just to get paid at the closing on your

11 real estate deals; is that right?

12 A    Any closing that took place at a bank I would get paid

13 from the proceeds of the closing, yes.

14 Q    And you testified on direct examination this morning that

15 generally your practice was to bill in a lump of sum whereas

16 Mr. Freeman, based on the type of work he did, would be more

17 hourly; is that correct?

18 A    I believe Mr. Freeman billed almost exclusively hourly

19 and most of my work would be, as I said, at closings I would

20 get lump sum payments.

21 Q    And is that why when Special Agent Richards asked you for

22 an itemized breakdown, you said one would not be available?

23 A    I'm not understanding what you're asking me.

24 Q    Do you recall when you were speaking to Special Agent

25 Richards he asked you for a breakdown of the services that you

Hymowitz - cross - Posa                    2029

1    provided to Mr. Starzecki?

2    A    Correct.

3    Q    And you responded quote, an itemized breakdown, no.

4    A    That's because there was no billing for Mr. Starzecki.

5    Q    And because your practice is not to provide an itemized

6    breakdown in real estate work; right?

7    A    No, because there was a lump sum for all of the work.

8    There would being absolutely no reason for me to keep records

9    of any specific time or billing for any particular item that

10   would have been done in that year.  If I did one hour's worth

11   of work or I did a thousand hours worth of work, the fee would

12   be the same, so there's no reason to keep any billing records.

13   Q    Did you keep billing records for Lutheran Synod?

14   A    Yes.

15   Q    You did?

16   A    Yes.

17   Q    And did those include itemized breakdowns?

18   A    Yes.

19   Q    And how is it that you kept billing records for them and

20   not for Mr. Starzecki?

21   A    As I just said, Mr. Starzecki was a lump sum payment for

22   the year and Lutheran Synod was a different arrangement.

23   Q    Did you not testify earlier that usually your practice

24   was to rip something out of a book after it had been paid?

25   A    Correct.

1  Q    And presumably, Lutheran Synod paid their bills; correct?

2  A    Yes, they did.

3  Q    So, did you maintain those billing records or not?

4  A    For the Lutheran church, I probably did.

5  Q    In fact, I'm going to show you Government's Exhibit 642.

6  A    Yes.

7  Q    Look through it for a minute.

8  A    Mm-hmm.

9  Q    Are those bills for Hymowitz & Freeman to Lutheran Synod?

10 A    Yes, from me to Lutheran Synod, yes.

11 Q    And that's for the services that you rendered for them?

12 A    I don't know if it's all of them, but a lot of them, yes.

13        MS. POSA:   The Government moves to admit

14 Government's Exhibit 642.

15        MR. SERCARZ:   No objection.

16        THE COURT:   Received.

17        (Government's Exhibit 642 was received in evidence.)

18        MS. POSA:   I'm going to show you a few of these

19 pages, if we could please publish these to the jury.

20        THE COURT:   Yes.

21 Q    Is this what you would call an itemized breakdown, sir?

22 A    Yes.

23 Q    And did you prepare this bill?

24 A    Probably the handwritten bill, yes.

25 Q    Do you know who prepared the typewritten version of it?

Hymowitz - cross - Posa                    2031

1   A      Probably my paralegal.

2   Q      And the date here is January 31st, 2007; right?

3   A      Correct.

4   Q      About the same month at least as that retainer agreement

5   for Bogdan Starzecki; right?

6   A      Right.

7   Q      And you list meetings, phones calls, meetings, calls,

8   E-mails, E-mails, meeting, speaking; correct?

9   A      Yes.

10  Q      So, this goes into quite a lot of detail about the type

11  of work you were doing for them; right?

12  A      Correct.

13  Q      And you said that you were doing similar work for

14  Mr. Starzecki in that you were making calls and trying get

15  bids for him; right?

16  A      No, that's totally different work.

17  Q      You were not making calls and getting bids for

18  Mr. Starzecki?

19  A      No, this -- you're confusing two different types of work.

20  Q      Please, enlighten us, sir.

21  A      Pardon me?

22  Q      Please, explain to us.

23  A      The Lutheran Synod, I was retained as a construction

24  consultant, real estate consultant.  The way I was getting

25  paid hourly, so I had to keep records.  That's the only way

1    that I could get paid.

2         With regard to Bob Starzecki, we had a lump sum

3    agreement for all of the work that I'd perform in one year's

4    time for the law firm, whatever we did as I just said, if it

5    was an hour's worth of work or a thousand hours worth of work,

6    the payment was the same.  There was no reason to keep records

7    for Mr. Starzecki.

8         In the same respect if I did a real estate closing,

9    if I spend ten hours at a closing or a hundred hours at the

10   closing, it was one fee.  There would be no hourly records.

11   Q    So, I'm actually not talking about your fee arrangement.

12   I'm talking about the actual work you did.

13        You testified that you made calls for Mr. Starzecki;

14   right?

15   A    Absolutely.

16   Q    You reached out to people; correct?

17   A    Absolutely.

18   Q    Did you send E-mails for him; right?

19   A    I'm sure I did.

20   Q    You set up meetings; correct?

21   A    One or two, yes.

22   Q    So, when you did that type of work for Lutheran Synod,

23   they got itemized bills, but when you did the same type of

24   work for Mr. Starzecki, it was just a lump sum; is that right?

25        Again I'm not talking about your agreement.  I'm

1  talking about the work you were doing.

2  A    I'm not understanding why what I just said you're not

3  understanding me.

4  Q    I'm not saying I don't understand it.  I'm saying that

5  very similar types of work, one scenario you break it down

6  hourly, the other scenario for Bob Starzecki it's just a lump

7  sum.

8             Do I understand that correctly?

9  A    Correct.  One I'm getting paid hourly and one I'm not.

10 Q    What makes you choose between getting paid hourly or in a

11 lump sum?

12 A    I prefer to get paid in a lump sum.  The only reason that

13 I got paid hourly with the Lutheran Synod is because they did

14 not have an idea of how much work they needed me to do.  Once

15 they decided to go forward with the construction at

16 119th Street, the hourly changed to a lump sum.  I got paid

17 $11,000 a month.

18 Q    Sometimes you make that decision because it's what's in

19 the best interest of the client; right?

20 A    It's an agreement between myself and the clients,

21 correct.

22 Q    For example, in this bill dated August 19th, 2008, it's

23 written --

24 A    I don't have it on here.

25             MS. POSA:  I'm sorry, can we please show that to the

1    witness as well?

2             THE COURTROOM DEPUTY:  Has this been admitted?

3             MS. POSA:  Yes, it's been admitted.

4    Q    All right.  Do you see where it says all billing as of

5    July 1st, 2008, will be done on an hourly basis at $400 an

6    hour in that I do not believe our monthly agreement is cost

7    efficient for the church at this time?

8             Was that your statement, sir?

9    A    Yes.

10   Q    So, you were doing what was most cost efficient for the

11   church?

12   A    They were a good client and yes, absolutely.

13   Q    I guess that meant Bob Starzecki was not a good client

14   because you were willing to take a hundred thousand dollars

15   from him for basically no work?

16   A    As I told you, we had an arrangement for one year,

17   $100,000.  I can't say it more times.

18   Q    One more thing I want to point out to you.  So, this is a

19   bill dated May 17th, 2007?

20   A    Okay.

21   Q    Do you see the stamp up here that said second request?

22   A    Correct.

23   Q    That's to emphasize this is your second request for

24   payment; right?

25   A    Correct.

1   Q    So, you did have stamps when it came time for demanding

2   money; right?

3   A    I did not have them.  That would be the paralegal or

4   secretary, not me.

5   Q    Can you just give us one second?

6            THE COURT:  Yes.

7            (Pause in the proceedings.)

8   Q    Sorry, Mr. Capozzolo pointed something out to me.

9            To go back to this last page where you said as of

10  July 1st, 2008, you're going to start billing on an hourly

11  basis.

12  A    Yes.

13  Q    You still did those breakdowns even when it was not

14  hourly; right?

15  A    No.

16  Q    Well, this itemized breakdown was from January 31st,

17  2007; right?

18  A    It's all for work in 2006.

19  Q    And that other letter was for work in 2008?

20  A    Correct.

21  Q    So, you were, in fact, doing a breakdown even before you

22  went on an hourly basis; right?

23  A    No.  I started working for the Synod in the summer of

24  2006 at $400 an hour.  Later on, when the project was ready to

25  start construction, we switched to $11,000 a month as a flat

Hymowitz - cross - Posa                                2036

1  fee.  When the real estate market died in 2008 it was

2  inappropriate for me to be charging $11,000 a month because I

3  was not doing anywhere close to $11,000 a month for the

4  church, so I wrote them that letter and I told them I was

5  going back to $400 an hour, which would be a lot cheaper for

6  the church.

7  Q    Okay.  It doesn't say that you were going back to that

8  arrangement; right?  It just says that this is what you're

9  doing.

10          I'll move on.

11 A    Okay.

12 Q    Mr. Hymowitz, you testified yesterday that you are a

13 blessed man; right?

14 A    Yes.

15 Q    You have a large and successful family?

16 A    Yes.

17 Q    You testified that your daughter went to an Ivy League

18 school?

19 A    Correct.

20 Q    And it sounds like you've been honored by many charitable

21 organizations; is that correct?

22 A    Yes, that's true.

23 Q    You testified about getting a certificate from Congress,

24 remember that?

25 A    Correct.

Hymowitz - cross - Posa                                        2037

1    Q    Now, your charitable work has also allowed you to meet

2    some very prominent people; isn't that right?

3    A    I'm sure.

4    Q    In fact, in 2009, Nassau County executive Tom Suozzi put

5    out a press release praising you for your work for Habitat for

6    Humanity; is that right?

7    A    I didn't know that, but very possible, sure.  I think I

8    was either the vice president or president for Habitat for

9    Humanity at the time.

10   Q    And that's the same Tom Suozzi who ran for governor in

11   2006; right?

12   A    I think so, yes.

13   Q    And the same Tom Suozzi who was Chairman of the New York

14   State Commission on Property Tax Relief; isn't that right?

15   A    I don't know that.

16   Q    Well, is it fair to say that there are few things more

17   important to people in real estate than property taxes?

18   A    I don't know.

19   Q    Let me show you Government's Exhibit in evidence 550,

20   this is just one page from it.

21        Is that your signature on the check?

22   A    Yes.

23   Q    And did you date that, I believe that's April 9th, 2007?

24   A    Correct.

25   Q    From your attorney-at-law account?

Hymowitz - cross - Posa                    2038

1    A    That's our operating account, yes.

2    Q    And that was shortly after you got the hundred thousand

3    check from Bogdan Starzecki; right?

4    A    It was tax time.

5              MR. SERCARZ:  We'll stipulate that the check was

6    dated March 2nd.

7              THE COURT:  March 2nd?  It says April 9th.

8    Q    The check from Bogdan Starzecki was March 2nd, 2005,

9    right?

10             THE COURT:  Oh, thank you.

11   A    Every year we wrote out the check to our pension fund.

12   Q    And you wrote that out of the same account, the

13   attorneys-at-law operating account, that you received the

14   check from Mr. Starzecki into; right?

15   A    Sure.

16   Q    Now, this is another page from Government's Exhibit 550

17   in evidence.

18   A    You have to make it clearer, please.

19   Q    I think it sometimes just needs a minute, maybe not.

20             And is that your signature?

21   A    Yes, it is.

22   Q    Dated April 19th, 2007?

23   A    Correct.

24   Q    Couple days after April 15th, tax time; right?

25   A    Correct.

Hymowitz - cross - Posa                    2039

1   Q    And again, this is a check to the Hymowitz & Freeman

2   money market plan, is that the handwriting?

3   A    That's another pension fund, yes.

4   Q    And again, this was the same bank account that you used

5   to receive the check from Bogdan Starzecki, right?

6   A    Yes, it is, and we do that every April for as long as

7   we've been in practice.

8   Q    Mr. Hymowitz, is it correct that two times during your

9   testimony, both on direct and cross, you stated unequivocally

10  that you did not sign any checks for SML Bed-Stuy?

11  A    That's correct.  That's my belief at this time, yes.

12  Q    That's not true; is it?

13  A    Best of my recollection, it's true.

14  Q    Is it true or not true?

15  A    To the best of my recollection, I have no idea that I've

16  signed checks.

17  Q    I'm going to show you Government's Exhibit 641.

18  A    Okay.

19       I stand corrected, I signed a few checks.

20       MS. POSA:  The Government moves to admit

21  Government's Exhibit 641 into evidence.

22       MR. SERCARZ:  No objection.

23       THE COURT:  Received.

24       (Government's Exhibit 641 was received in evidence.)

25       MS. POSA:  Victoria, could I ask you just to read

1    back for us; right before lunch, where Mr. Hymowitz talked

2    about not having signed any checks.

3              MR. SERCARZ:  Objection.

4              THE COURT:  Sustained.

5              MS. POSA:  I just want to make sure that what he

6    said was I did not sign checks versus I don't recall.

7              MR. SERCARZ:  I object.

8              THE COURT:  Counsel, the evidence is in the record.

9              You can proceed.

10   Q    Well, isn't it true that you said you did not sign any

11   checks?  You didn't say I don't remember; did you?

12   A    I think you're correct.

13   Q    You said that you were vice president of SML Bed-Stuy in

14   name only; correct?

15   A    I said I was vice president for the purposes going on the

16   signature card in the event I needed to sign checks.

17   Q    Which you said you never actually had to sign; right?

18   A    That was my best recollection, correct.

19   Q    Let's look at some of these checks you signed for SML

20   Bed-Stuy you say you forgot.

21             July 2nd, looks like 2008, based on this.  That was

22   to Michael Freeman; right?

23   A    Yes.

24   Q    For $23,395?

25   A    Yes.

Hymowitz - cross - Posa                        2041

1    Q    And that's your signature?

2    A    Yes, it is.

3    Q    And this was from October 17th, 2006; correct?

4    A    Yes.

5    Q    To MCR?

6    A    Yes.

7    Q    Your signature?

8    A    Yes.

9    Q    Almost $7,000?

10   A    To MCR, yes.

11   Q    February 1st, 2007; is that correct?

12   A    Yes.

13   Q    Is that your signature?

14   A    Yes, it is.

15   Q    To Hymowitz and Freeman?

16   A    Yes.

17   Q    And that was for about $957?

18   A    Correct.

19   Q    I'd like you to look at this one, Lee Hymowitz?

20   A    Yes.

21   Q    $23,398?

22   A    Correct.

23   Q    Your signature?

24   A    Yes.

25   Q    July 2nd, 2008?

Hymowitz - redirect - Sercarz                    2042

1    A    Yes.

2    Q    Let me go back to the one I showed you for Mr. Freeman.

3    Same exact date; isn't it?

4    A    Yes.

5    Q    Precisely the same amount?

6    A    Correct.

7    Q    Your testimony is that you were not partners with

8    Mr. Freeman in this?

9    A    I was not partners with Mr. Freeman, no.

10            MS. POSA:  No further questions.

11            MR. SERCARZ:  May I see the Exhibits that you showed

12   my client.

13   REDIRECT EXAMINATION

14   BY MR. SERCARZ:

15   Q    You were asked some questions regarding the electronic

16   case filing system and whether or not you appeared on certain

17   criminal cases.

18            Do you recall that questioning?

19   A    Yes.

20   Q    You were asked about a gentleman named Kent Vecchio.

21            Do you recall that?

22   A    Yes.

23   Q    I'd like to show you --

24            MR. SERCARZ:  Is this in evidence?  I don't want to

25   do this the wrong way.

Hymowitz - redirect - Sercarz                    2043

1          MS. POSA:  It's not.

2          MR. SERCARZ:  All right.

3   Q    Does this refresh your recollection as to who

4   Mr. Vecchio's lawyer was?  Please, tell the Ladies and

5   Gentlemen of the Jury.

6   A    Michael Freeman.

7          MS. POSA:  May I see that?

8   Q    The Government showed you a document in the case of the

9   People of the State of New York versus Capaldo, et al.

10         Do you recall being shown such a document?

11  A    Yes.

12  Q    You were asked whether or not you had any participation

13  in this case.

14         Do you recall that?

15  A    Yes.

16  Q    I'd like to read from the document that the Government

17  showed you under the heading Counsel, the attorney

18  for Capaldo.

19         THE COURT:  Is it in evidence?

20         MR. SERCARZ:  No, I offer it in evidence as

21  Defendant Hymowitz's Exhibit, what are we up to -- D, E?

22         MR. EVANS:  You're up to D.

23         MR. SERCARZ:  Your Honor, may I put a tab on it when

24  I'm done?

25         THE COURT:  Yes.

1          MS. POSA:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit Hymowitz D was received in

4    evidence.)

5          MR. SERCARZ:  Can we have it put up on the screen?

6          MS. POSA:  Would you please move it out a little bit

7    so we can see the rest of it?

8          Thank you.

9    Q    I just want to call your attention to the particular

10   section under the heading Counsel.  The attorney for

11   Mr. Capaldo was Lawrence Hochheiser, Esq.

12         Other attorneys involved in the matter were Joseph

13   Gentile, Esq. for the defendant Paul Kamen; George A. Farkas

14   for the defendant Aaron Lefkowitz, Harold Borg, Esq. for the

15   defendant Salvatore Savarese and Lee Hymowitz, Esq. for the

16   defendant Joseph Candiano and it goes on to list others.

17         Do you see that?

18   A    Yes.

19   Q    Do you recall the manner in which you were involved to

20   use the language of this heading on behalf of Mr. Candiano?

21   A    I have no recollection of this matter at all.

22   Q    To your knowledge, when an attorney appears in court on

23   behalf of a client for a routine adjournment, is the attorney

24   required to file a notice of appearance?

25   A    Yes.

Hymowitz - redirect - Sercarz                          2045

1    Q    And would his name then appear on an electronic case

2    filing with regard to that case?

3    A    I have no idea.

4    Q    You were asked questions about mortgage rates?

5    A    Yes.

6    Q    Am I correct that in the private mortgage lending

7    business, among the factors that influence the rate are the

8    value of the collateral?

9    A    Of course.

10   Q    The duration of the loan?

11   A    Yes.

12   Q    Other factors affecting the risk; is that correct?

13   A    Sure.

14   Q    Would those factors have influenced the price that your

15   clients were prepared to charge to Wendell Walters, or whoever

16   was borrowing money in connection with his transaction in

17   Bedford Stuyvesant, in 2002 for an unimproved piece of

18   property?

19   A    It was in Harlem.

20   Q    I'm sorry, Harlem?

21   A    The answer is yes.

22   Q    All right.  The Government asked you whether or not it's

23   not essential for you to keep bills for tax purposes.

24        Do you recall that question?

25   A    Yes.

1   Q    Are taxes paid by lawyers on the amount of money billed

2   or on the amount of money received?

3   A    Received.

4   Q    The Government asked you whether you conduct conflict

5   searches before taking on every case.

6             Do you recall that question?

7   A    Yes.  Yes.

8   Q    All right.  In the course of your practice, when you run

9   across an instance when you feel there is a conflict of

10  interest, what do you do about it?

11  A    We would back out of the situation.

12

13             (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Hymowitz - redirect - Sercarz                    2047

1   EXAMINATION CONTINUES

2   BY  MR. SERCARZ:

3   Q    Now, in connection with Mr. Starzecki and the work that

4   was performed for the Lutheran Synod, did you tell us that

5   Mr. Starzecki was already -- withdrawn.

6              In connection with Mr. -- withdrawn.

7              In connection with the work that you did for the

8   Lutheran Synod, you told us you were hired as a real estate

9   advisor, is that correct?

10  A    Yes.

11  Q    The Lutheran Synod was already represented by counsel, am

12  I correct?

13  A    Correct.

14  Q    You referred to them on your direct examination, am I

15  correct?

16  A    Yes.

17  Q    The name of the firm is Capell, C A P E L L, Barnett and

18  there are a bunch of other names that go after that?

19  A    Matalon and Schoenfeld, yes.

20  Q    Mr. Starzecki was represented, according to the

21  government, by a gentleman named Georgoulis.

22             Do you recall that testimony?

23  A    Yes.

24  Q    Would that have precluded him from hiring you to do a

25  real estate closing or other work in connection with services

1    performed for the Lutheran Synod?

2    A    No, of course not.

3    Q    If the Lutheran Synod consented to having you participate

4    in a closing as Mr. Starzecki's lawyer, would there have been

5    any conflict of interest?

6    A    No, of course not.

7    Q    With regard to this issue of title, you mentioned that

8    recently you left the practice of law with Mr. Freeman, is

9    that correct?

10   A    Yes.

11   Q    And you went to work for a -- what you referred to, I

12   believe, as a multinational company, am I correct?

13   A    Yes.

14   Q    And in connection with your work there, you were given a

15   title, weren't you?

16   A    Correct.

17   Q    What's the name of your title?

18   A    Vice President of Business Affairs.

19   Q    That's for your first job in connection with that office,

20   am I correct?

21   A    Yes.

22   Q    Are you aware of who the United States Attorney is for

23   the Eastern District of New York?

24   A    No.

25   Q    Would it surprise you to learn that every other lawyer

GR        OCR        CM        CRR        CSR

Hymowitz - redirect - Sercarz                    2049

1    who works under the United States Attorney has the title

2    Assistant United States Attorney?

3    A    That wouldn't surprise me, no.

4    Q    That would include the two at this table, am I correct?

5    A    Yes.

6    Q    Do you know how many agents there are that work for the

7    Federal Bureau of Investigation?

8    A    No.

9    Q    Do you know what the title is for each and every one of

10   those agents?

11   A    No.

12   Q    Would it surprise you to learn that the title for each

13   and every one of those agents is Special Agent?

14   A    No.

15   Q    Do you know what is special about any one particular

16   agent as opposed to another?

17   A    No.

18   Q    No disrespect, Agent Richards.

19   A    No idea.

20   Q    You were asked about the use of a stamp that says draft

21   on it.

22        Do you recall that?

23   A    Yes.

24   Q    And would it be fair to say that the use of a stamp that

25   says draft on it is to distinguish documents that are in final

1  form from those that are not, am I correct?

2  A    That would be true, yes.

3  Q    Would it also be fair to say that in the practice of law,

4  or indeed in any other practice, another way to distinguish a

5  document that is in final form from one that is not is whether

6  or not there is a signature at the bottom of the document?

7  A    That's correct.

8  Q    At the time you put the draft on Michael Freeman's desk,

9  was the document signed?

10  A    No.

11  Q    With regard to the retainer agreement, how much time did

12  you say you spent on this document?

13  A    Between the phone call and the document, ten or

14  15 minutes.

15  Q    How many years ago did you prepare this document?

16  A    Seven years ago.

17  Q    At the time were you aware that this document would

18  become the subject of court proceedings?

19  A    No.

20       It's the worst ten minutes or 15 minutes of my life,

21  quite frankly.

22  Q    Did you ever speak to Bogdan Starzecki about the payments

23  to the law firm of Hymowitz and Freeman?

24  A    Mr. Starzecki and I never spoke about money ever.

25  Q    That would be other than the occasions when he insisted

Hymowitz - redirect - Sercarz                 2051

1  on retaining your firm, is that correct?

2  A    We didn't talk about any specific type of money, just

3  that he wanted to use my services.

4  Q    After speaking to Michael Freeman, was it your belief you

5  were being retained?

6  A    Yes.

7  Q    Was it your belief you were being retained to get

8  Mr. Starzecki bids?

9  A    My understanding is he wanted me to get him access to

10 bids in the private sector whenever I could.

11 Q    And that the agreement might also cover any ancillary

12 legal work that went along with that; is that correct?

13 A    Yes.

14 Q    The government offered into evidence Exhibit 642, which

15 are a series of bills in connection with the Lutheran Church.

16 The retainer agreement, I don't want to go dig it up,

17 Exhibit 600, was dated January 2, 2007.

18         Do you recall that?

19 A    Yes.

20 Q    Government Exhibit 600?

21 A    Yes.

22 Q    All right.  In January of 2007 -- I'm sorry -- thank

23 you -- in January of 2007, you were clearly doing work for the

24 Lutheran Synod, isn't that correct?

25 A    Actually, I started July of '06.

GR     OCR     CM     CRR     CSR

Hymowitz - redirect - Sercarz                2052

1   Q    This bill makes it clear, that you were performing work

2   in January of 2007, am I correct?

3   A    Yes, sure.

4   Q    It included meetings with Howie Capell and Robert

5   Barnett, am I correct?

6   A    Yes.

7   Q    Remind the jury who Howie Capell and Robert Barnett are?

8   A    They are the attorneys for the Lutheran Synod.

9   Q    It included meetings with Gary Mills, am I correct?

10  A    Yes.

11  Q    Incidentally, Mr. Mills has a title to, doesn't he?

12  A    Yes.

13  Q    He is the Reverend Gary Mills, am I correct?

14  A    Yes.

15       He is the business head of the Lutheran Synod.

16  Q    The work you were doing for the Lutheran Synod was real

17  estate advisory work, am I correct?

18  A    Yes.

19  Q    You billed, among other things, for calling title

20  companies, like Ridge Abstract, am I correct?

21  A    Yes.

22  Q    You billed for preparing projections, am I correct?

23  A    Correct.

24  Q    Projections as to what?  Please tell the ladies and

25  gentlemen of the jury the kind of work you were doing.

GR      OCR      CM      CRR      CSR

Hymowitz - redirect - Sercarz                    2053

1  A     That's what I was trying to explain before.  One of the

2  things that I do to determine whether a project is viable is

3  what I said before.  I crunch numbers and that's to prepare

4  projections.  I try to find out what the cost of a project

5  would be, what the sales price would be, and then I can tell,

6  in this case the Lutheran Synod, that if we go forward with

7  the project, we are going to get the church built for free, we

8  are going to end up having a couple of million dollars in

9  profit, which the church can then hold and support that local

10 church for many years to come.

11 Q     Do you recall in connection with your work for the

12 Lutheran Church a gentleman by the name of Rodrigo?

13 A     Yes.

14 Q     What did he do?

15 A     He was the architect for the project.

16 Q     The architect might have some interest or ability in

17 helping choose a general contractor for a job, isn't that

18 correct?

19 A     That's true, yes.

20 Q     Among the items you billed for were letters to Rodrigo,

21 am I correct?

22 A     Yes.

23 Q     Meetings with Gary Mills and conversations with Rodrigo

24 and his partners, isn't that correct?

25 A     Correct, yes.

GR      OCR      CM      CRR      CSR

1    Q    Phone conversations together with Gary Mills and the

2    architect, Rodrigo, am I correct?

3    A    Yes.  Yes.  I'm sorry.

4    Q    All occurring at the end of 2006, am I correct?

5    A    Yes.

6    Q    All occurring at the time or shortly within the timeframe

7    of the closing on the Bedford Stuyvesant project, am I

8    correct?

9    A    Right before it, yes.

10   Q    All occurring at about the time when Bogdan Starzecki was

11   begging you to get him -- get him private work, isn't that

12   correct?

13   A    Yes.

14   Q    Do you recall who Bob Garcia was?

15   A    Bob Garcia was a possible builder for the project.

16   Q    From the firm of Fox and Garcia?

17   A    Yes.

18   Q    Is that correct?

19   A    Yes.

20   Q    These are among the people that were bidding for

21   construction work on that job, isn't that correct?

22   A    That's true, yes.

23   Q    When you got off the phone with Michael Freeman in early

24   2007, according to the best of your recollection, January 2nd,

25   it was your belief that you were being retained on behalf of

Hymowitz - recross - Posa                    2055

1    Bob Starzecki to help him to get bids on projects such as the

2    ones reflected in these bills, isn't that correct?

3    A    That's correct.

4    Q    And did you perform in accordance with your contract?

5    A    Yes; I got him two bids.

6    Q    Were there other instances in which you attempted to get

7    him bids?

8    A    I -- as I said before, we had numerous projects that I

9    was working on.  I had many connections with bankers, mortgage

10   brokers, other attorneys.  The real estate market was very,

11   very hot at the time and a lot of people were looking for good

12   builders, good architects.  So it was very easy for me when I

13   was with people like that to say, if you are looking for a

14   good builder, I have somebody, if you are interested.

15   Q    When the hundred-thousand-dollar check came in to the

16   Hymowitz and Freeman account, did you believe that that check

17   was a retainer payment or that that check was a kickback

18   payment in connection for the HPD project?

19   A    A retainer agreement.

20            MR. SERCARZ:  Thank you.

21            MS. POSA:  May I have just a few more questions?

22            THE COURT:  Go ahead.

23            MS. POSA:  Your Honor, first I would like to move

24   the two criminal dockets that Mr. Sercarz just showed to

25   Mr. Hymowitz into evidence.

GR      OCR      CM      CRR      CSR

Hymowitz - recross - Posa                    2056

1          MR. SERCARZ:  No objection.

2          THE COURT:  I thought one came in.

3          MS. POSA:  One did.  There are two more.

4          THE COURT:  Two more.  All right.

5          MS. POSA:  I am marking them government exhibits 900

6    and 901.

7          THE COURT:  Okay.

8          (Marked in evidence.)

9    RECROSS-EXAMINATION

10   BY MS. POSA:

11   Q    Mr. Sercarz just showed you the docket for Kent Vecchio,

12   correct?

13   A    Yes.

14   Q    And he said it refreshed your recollection to the fact

15   that he Michael Freeman's client, is that right?

16   A    Yes.

17   Q    What is it about this that makes you think that it was

18   just Michael Freeman who represented him?

19   A    Because now that I am thinking about it, Kent Vecchio was

20   a client of Michael for a long time.

21   Q    Seeing your own name reminded you that it was

22   Mr. Freeman?

23   A    No.  I just saw Mr. Freeman's name.  You're asking me

24   things from many, many years ago.  So it's not that easy to

25   just recall.

Hymowitz - recross - Posa                              2057

1   Q    He also said that even if you represent somebody in an

2   adjournment or other routine matter your name is automatically

3   on the docket, right?

4   A    That's my recollection from when I used to do criminal

5   work, yes.

6   Q    Would you say that the date of somebody's guilty plea is

7   a routine matter for them?

8   A    No.

9   Q    Did you not represent Mr. Vecchio when he pled guilty?

10  A    I have no recollection of that.

11  Q    Do you see this entry, cause for pleading, that means it

12  is a guilty plea, right?

13  A    I don't know that that's true or not.

14  Q    Why don't you read the rest of the entry.

15  A    If I'm looking, this is from 26 years ago.

16  Q    What's that?

17  A    Is this from like 26 years ago, isn't it?  Sixteen years

18  ago?

19  Q    Twenty-six years ago?

20  A    How many years ago?  Sixteen years ago.  I'm sorry.

21  Q    Right.

22       Do you have any reason to believe that this would

23  not be accurate, that you represented Mr. Vecchio at his

24  guilty plea?

25  A    If that's what it says, that's what I did.

GR      OCR      CM      CRR      CSR

Hymowitz - recross - Posa                    2058

1   Q    And you also represented Bruce Griffith at his guilty

2   plea, isn't that right?

3   A    That I did, yes.  He was a friend and he was a good

4   client.

5   Q    That's Government Exhibit 900, change of plea hearing,

6   defendant present with attorney Lee Hymowitz, correct?

7   A    That's from 18 years ago.

8   Q    You seem to have no trouble remembering it yesterday when

9   you said unequivocally that you have done no criminal defense

10  work for 34 years, right?

11  A    You have refreshed my recollection.

12  Q    Just so I am clear, it has been a little hard to follow

13  this, you are saying --

14       MR. SERCARZ:  I object to the comment.  Move it be

15  stricken.

16       THE COURT:  Yes.

17       MS. POSA:  I'm sorry.

18       THE COURT:  The jury is directed to disregard any

19  comment from counsel.

20       Counsel, just ask questions.

21       MS. POSA:  I apologize.

22  Q    One of the parts of your representation of Bogdan

23  Starzecki was to help him get a bid with Lutheran Synod, is

24  that right?

25  A    I was supposed to try to get him bids wherever I could

GR      OCR      CM      CRR      CSR

Hymowitz - recross - Posa                    2059

1   get him bids in the private sector.

2   Q    Did that include Lutheran Synod?

3   A    Surely.

4   Q    And this was occurring at the exact same time that you

5   were working for Lutheran Synod as a real estate consultant,

6   correct?

7   A    Correct.

8   Q    Now, Bogdan Starzecki's best interest would be to

9   maximize the amount of money that he got, correct?

10  A    Not if he wanted the job.

11  Q    I said, his best interest would be to get as much money

12  as he could, not the biggest bid, but to get as much money as

13  he could, right?

14  A    I'm not understanding what you're asking.  For someone to

15  win a bid they have to have the lowest best bid, not the

16  highest bid.

17  Q    Are you saying that a private contractor doesn't have an

18  interest in trying to get paid as much as possible?

19  A    Not if he's -- not if it's in a competitive bid.  He's

20  going to have to sharpen his pencil and come in with the

21  absolute best price he can come up with.

22  Q    That's why there was no conflict between representing

23  Bogdan Starzecki, the possible bidder, and Lutheran Synod, the

24  people who would be getting the bid?

25  A    I was part of a committee of probably a half a dozen

GR      OCR      CM      CRR      CSR

1  people along with an architect that would review all the bids

2  and make a decision.

3  Q    So you would have been reviewing the same bid on behalf

4  of Lutheran Synod that you were trying to help Bogdan

5  Starzecki win, is that right?

6  A    I would not be the one reviewing it.  The architect would

7  be the one reviewing the bid, making the decisions after

8  advising the committee.

9  Q    You just said you were on that committee, right?

10 A    As an advisor, yes.

11 Q    So you would be reviewing Mr. Starzecki's bid?

12 A    If you want to say it that way.

13 Q    Your client's bid?

14 A    Yes.

15         MS. POSA:  No further questions.

16         MR. SERCARZ:  Nothing further.

17         Thank you.

18         MR. DiCHIARA:  Nothing.

19         MR. EVANS:  No questions.

20         THE COURT:  Thank you.

21         You may step down.

22         THE WITNESS:  Thank you.

23         (Witness steps down.)

24         MR. SERCARZ:  The defendant Hymowitz calls Charlotte

25 Lee.  We will get her, Your Honor.

Lee - direct - Sercarz                    2061

1          THE COURT:  All right.  Before you sit down, would

2     you raise your right hand?

3          (The witness is duly sworn/affirmed by court.)

4          THE COURT:  Have a seat and please say your name and

5     spell it for the court reporter.

6          THE WITNESS:  Okay.  My name is Charlotte Lee.  It's

7     C H A R L O T T E, and my last name is Lee, L E E.

8          MR. SERCARZ:  May I inquire, Your Honor?

9          THE COURT:  Yes.

10    DIRECT EXAMINATION

11    BY MR. SERCARZ:

12    Q    Good afternoon, Ms. Lee.

13    A    Hi.

14    Q    Please tell the ladies and gentlemen of the jury what you

15    do for a living.

16    A    I'm currently a coach, an executive coach.

17         I started my life as an investment banker from 1980

18    to '98 and then I left in '98 to start my own firm.

19         Then in 2007 I joined a consulting firm that has 250

20    offices in 85 countries and I'm one of the senior vice

21    presidents in the New York office.

22    Q    Tell me about the firm that you had before you became a

23    vice president of this large firm.

24         By the way, the name of the firm is Lee Hecht

25    Harrison, is that correct?

1  A    Yes.  No relation.  The Lee is not me.

2  Q    Nor is it my client, is that right?

3  A    Right.

4  Q    We are dealing with that on the record.

5  A    Right.  Nothing to do with me.

6  Q    Okay.  And Hecht is H E C H T, is that correct?

7  A    Correct.  And Harrison.

8  Q    Please.

9  A    So the company I did before I worked on two things.  One

10 was strategic planning and the other was coaching.  I did it

11 both in the not-for-profit sector and the for profit corporate

12 sector.  So it's coaching people who want to be promoted and

13 people who want to get jobs.  That's on the coaching side.

14         And strategic planning was for the United Way and

15 nature conservancy companies that are non-profits that want to

16 grow or get more money in and then I worked with several of

17 them, including Habitat.

18 Q    In connection with your business work, have you ever

19 appeared on television?

20 A    For work I was on CNBC.

21 Q    Have you also appeared on Bloomberg Radio and NPR?

22 A    Yes.  That's radio and then -- but not -- that wasn't TV.

23 But yes.

24 Q    Have you been interviewed by the Wall Street Journal in

25 connection with your work?

1    A    Yes, I have.  I have.

2              There is a lot of unemployment and so I get called a

3    lot by the Wall Street Journal, the New York Times, Financial

4    Times and other newspapers, to talk about unemployment and how

5    to get Americans back to work, frankly.

6    Q    Do you know Lee Hymowitz?

7    A    I do.

8    Q    Please point him out for the ladies and gentlemen of the

9    jury.

10   A    He's sitting in the middle of the long table on the end.

11   Q    Can you tell the ladies and gentlemen of the jury how it

12   is that you came to be acquainted with my client Lee Hymowitz?

13   A    Sure.

14             One of the non-profits I worked with starting in

15   1998 was an organization called Habitat For Humanity which

16   builds houses for folks who are working Americans but can't

17   afford to get a house on their own.  And so we raised money

18   and we buy the land, we buy the sheetrock and we put these

19   homes up.

20             And Lee and I met because he was friends with the

21   president before me, who was a nun and they met in an

22   interfaith meeting.  She brought him to the board meeting and

23   I met him there.  And we worked together on many, many, many

24   homes during the years that I have known him, for almost

25   15 years.

Lee - direct - Sercarz                    2064

1   Q    Did he assist you in any administrative way in addition

2   to the work he actually did on the homes?

3   A    Yes.

4         That's actually why he's pretty unusual.  Most

5   people just want to work on the house and build and come on

6   Saturdays and hit with a hammer, which is fine.  But Lee did

7   both jobs.  He was volunteer on the site and he also did

8   volunteer work as a board member and as a committee member and

9   as a copresident with me as well.

10  Q    Can you give the ladies and gentlemen of the jury an idea

11  of the timeframe during which you were in contact with Lee for

12  the work on Habitat for Humanity?

13  A    Sure.  I'd say, it was --

14        THE COURT:  Just a moment.  I think we need a

15  recess.

16        MR. SERCARZ:  Need a break?

17        THE COURT:  Yes.  We need an afternoon recess.  I'm

18  sorry to interrupt in the middle of your answer.

19        THE WITNESS:  Okay.

20        THE COURT:  We will take ten minutes.

21        Thank you.

22        (Continued on next page.)

23

24

25

Lee - direct - Sercarz                    2065

1          (The following occurred in the absence of the jury.)

2          THE WITNESS:  Should I stay here?

3          THE COURT:  No.  You can leave the witness stand and

4    come back in ten minutes.

5          THE WITNESS:  Okay.

6          THE COURT:  All right, counsel, ten minutes.

7          (Recess taken.)

8          (The following occurred in absence of the jury. )

9          THE COURT:  All right.  Shall we bring in the jury?

10   Counsel, is everyone here?  Can we bring in the jury?

11         MR. SERCARZ:  I'm sorry, Your Honor.  I didn't hear

12   Your Honor.

13         THE COURT:  Can we bring in the jury?

14         MR. SERCARZ:  Yes.

15         THE COURT:  Okay.  Have a seat, counsel.

16         Counsel, come to the side, please.

17         (Side bar.)

18         THE COURT:  Apropos of our talk, I don't want

19   anybody to make any jokes about dogs or someone mentioned the

20   name of the dog.  Don't say it because this juror is very

21   sincere about her connection to the dog.  I don't want her to

22   think that any of us is treating this in the slightest way

23   frivolously.

24         Okay.  We have another problem.  Juror number five,

25   just apparently threw up in the bathroom.  All of the other

GR      OCR      CM      CRR      CSR

Lee - direct - Sercarz                    2066

1    jurors are helping him.  We've offered him a ginger ale.  He's

2    ready to come in.  They're all lined up.  But Victor told me

3    we should all be aware that he is not feeling well.  So that's

4    why we had to take the break.

5           If he's okay, some temporary thing, I don't know,

6    what he ate at lunch, and we can go ahead.  If not, we'll have

7    to stop.  I just want to let you know.

8           MR. SERCARZ:  Fine.

9           There is a stomach virus going around.  We have

10   heard a lot about it.

11          Your Honor, if the Court wishes to tell him that if

12   he just puts his hand up we'll stop right where we are.  If he

13   has to leave again, I'm good with that.  I don't have much to

14   do with this -- much more to do with this witness anyway.

15          THE COURT:  All right.  We may be able to stop and

16   come back, we don't know, if he takes a recess.  We will see.

17   We have very willing jurors.

18          MR. CAPOZZOLO:  Maybe this is helpful with the

19   schedule.  Mr. DiChiara and I have talked.  It doesn't appear

20   Mr. Freeman is going to put on case.  It looks like the rest

21   of the case would be this witness and then the government

22   would put on Mr. Sicignano and then Agent Richards and then

23   assuming there is no further --

24          THE COURT:  Your request to put on the Bureau of

25   Prisons person, you are withdrawing that?

GR      OCR      CM      CRR      CSR

Lee - direct - Sercarz                    2067

1          MS. POSA:  It's really to expedite matters.

2          THE COURT:  I wouldn't allow it anyway, if it makes

3     you feel better.

4          MR. SERCARZ:  With regard to Agent Richards, if I

5     understand the law correctly, he can testify provided that his

6     testimony does not involve extrinsic evidence of a collateral

7     matter.

8          THE COURT:  Like what?

9          MR. SERCARZ:  Well, that's my point really.  We

10    would like to know ahead of time which aspects of Mr. Dunn's

11    denial he is going to be impeaching.  If it goes to the heart

12    of the case, then it seems to me he's permitted to do it.  If

13    it purely deals with collateral stuff, he may not be permitted

14    to do it.

15         THE COURT:  I don't know what you are talking about.

16         MR. SERCARZ:  I am dealing in the abstract.  I don't

17    know how much they have in store for Agent Richards.

18         MS. POSA:  I can give a proffer.  He is short.

19         He is going to testify about Mr. Dunn's condition,

20    the fact that the statement that he made as he read it earlier

21    was accurate.  He is going to testify about the two additional

22    statements that are now in evidence.

23         I think that's it.

24         THE COURT:  Okay.

25         MR. EVANS:  Your Honor, I have a difficulty with

Lee - direct - Sercarz                    2068

1    that because I am not sure --

2              THE COURT:  With what?

3              MR. EVANS:  With Agent Richards coming back on to

4    the stand to say fundamentally what he's had an opportunity to

5    say on the case already.  He can't testify to clarify the

6    issue which I thought the government was concerned about,

7    which is that Mr. Dunn said he didn't recall.  Agent Richards

8    is not a medical professional.  He didn't undertake any

9    medical examination.

10             We plowed this field in May of 2013.  I looked at

11   that testimony last night.  Mr. Dunn didn't testify in that

12   hearing and I looked at the testimony he gave on direct and on

13   cross and what he said was, I don't have a clear recollection

14   of that or I was befogged I think was the last thing he said

15   about it.

16             I don't know how anything Agent Richards can say is

17   substantive to the issue of Mr. Dunn's memory or recollection.

18             THE COURT:  I disagree.  I will allow the agent to

19   testify on that subject.

20             MR. EVANS:  What's -- what can he testify to about

21   Mr. Dunn's recollection?

22             THE COURT:  He'll testify as he did at the

23   suppression hearing, I assume.

24             MS. POSA:  Mr. Dunn essentially called him a liar.

25             MR. EVANS:  No.  Mr. Dunn didn't mention him.

Lee - direct - Sercarz                    2069

1          MS. POSA:  He didn't say any of those things, which

2     means what Mr. Richards was testifying about was fictional.

3     He has a right to say he did say those things.

4          THE COURT:  No.  We are talking about him talking

5     about the condition.

6          MR. EVANS:  We are talking about the condition.  If

7     they are going to talk about his condition and limit it to

8     Agent Richards' perception of his condition?

9          THE COURT:  That's what he is going to talk about.

10         MS. POSA:  You can cross-examine him.

11         MR. EVANS:  I will.

12         MS. POSA:  I'm sure you will.

13         THE COURT:  Let's bring in the jury.

14         (Continued on next page, in open court.)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; outside the presence of the jury.)

2              THE COURT:  Ms. Lee, would you take the witness

3    stand again, please.

4              THE CLERK:  All rise.

5              (Jury enters.)

6              THE CLERK:  Thank you.  Please be seated.

7              MR. SERCARZ:  Your Honor, may I have the last

8    question reread since I was interrupted?

9              THE COURT:  Yes.  Of course.

10             (Record read.)

11   BY MR. SERCARZ:  (Continuing)

12   Q    Please.

13   A    From 2000 to -- I started in 1998.  I met him a year

14   later.  So maybe 1999 to 2008.  Something like that.

15   Q    Now, there was a period in there where you were on the

16   board of directors of Habitat for Humanity, correct?

17   A    Yes.

18   Q    Were you both on the board at the same time?

19   A    Yes.

20   Q    When was that?

21   A    During that time frame.

22   Q    All right.  And was there a period during which you were

23   the president or chief executive officer?

24   A    I was.  I was the president for eight years during that

25   time period.

Lee - direct - Sercarz                    2071

1    Q    All right.  Did Mr. Hymowitz ever become president?

2    A    Yes.  We were -- I was president and then we were

3    co-presidents for a year, and then he was president the

4    following year and we flip-flopped and I was the co-president.

5    Q    Fine.  During the course of your relationship with

6    Mr. Hymowitz, did you have an opportunity to observe him and

7    to discuss with him budget issues and the like?

8    A    Tons.  It's a big problem with not-for-profits because

9    we're all volunteers and it's fundraising basically, not

10   completely, but it's about $100,000 that you have to raise

11   each year to put up a house in Nassau County which we raised

12   together.  And we had governance issues and policy issues and

13   real estate and getting the land and getting people to come to

14   the gala and getting people to come to the lunch and getting

15   people to join the board and getting other board members to

16   work because a lot of the time, you have 15 people on the

17   board, but there would be three or four of us, frankly, you

18   know, doing a lot of the work.  And it was me and Lee and, you

19   know, one or two other people.

20   Q    During the course of your relationship with Mr. Hymowitz,

21   have you been able to form an opinion of his character for

22   honesty and fair dealing?

23   A    Absolutely.  We spent an enormous amount of time

24   together.

25   Q    What is your opinion?

CMH        OCR        RMR        CRR        FCRR

Lee - direct - Sercarz                    2072

1   A     And he is one of the most wonderful people I know and I

2   know a lot of people.  He's incredibly selfless.  So no matter

3   what I say -- I'd call from work and say, We've got a problem

4   on the site, you know, and I can't get out.  Can you get out?

5   Yes.  Can you go Saturday?  Yes.  The woman that was donating

6   lunch couldn't get to the site, he'd run off and buy pizza for

7   everybody on the site.

8           It was constantly.  It was all the time and it was

9   not just about time and money and talent, but it was the

10  attitude all the time, constantly.  I couldn't have done it

11  without him actually, frankly.

12  Q    I just want to break that answer up.  Forgive me for

13  being a lawyer about this, but I'm inquiring as to your

14  opinion regarding two different character traits.  Let me tell

15  you what they are and we'll go one at a time.

16  A    Okay.

17  Q    One is honesty and fair dealing and the other is

18  selflessness or generosity.  Okay?

19          With regard to the character trait of honesty and

20  fair dealing, do you have an opinion on his character for

21  that?

22  A    Big time.  I think we work with a very difficult

23  constituency.  I think there's a ton of time when we're

24  working with the Nassau County people, police officers, a

25  variety of folks, in what we do as board members of Habitat

Lee - cross - Capozzolo                    2073

1    for Humanity and it's a worldwide organization that has very

2    strict rules about what you can and cannot do in order to be a

3    habitat affiliate and I have utmost respect and know that Lee

4    was honest in everything we did.

5            And we did a lot of things with, like running a

6    small company.  It's a nonprofit, but we're basically running

7    a small company.  And I feel 100 percent that he was

8    constantly honest and, I just -- I'm not going to waiver from

9    that.  I don't have more to say.  If there's something else,

10   you should ask me.

11   Q    Have you also been able to form an opinion regarding his

12   character for generosity, selflessness?

13   A    Yeah, that's pretty much off the charts.  He and my

14   brother get the award for that.  I have never seen anybody

15   give of themselves constantly and to strangers.  The people

16   who get the Habitat homes are strangers to us.  We don't know

17   them.  And he's the same way with me as he is with them.  So

18   whether he's buying us all pizza or them, it doesn't matter.

19   That's just what, kind of what Lee does.

20           MR. SERCARZ:  Thank you very much.  The government

21   may have some questions.

22   CROSS-EXAMINATION

23   BY MR. CAPOZZOLO:

24   Q    Good afternoon.

25   A    Hi.

CMH        OCR        RMR        CRR        FCRR

Lee - cross - Capozzolo                              2074

1   Q     Very few questions.

2   A     Okay.

3   Q     Is Habitat for Humanity in Nassau County, correct?

4   A     Yes.

5   Q     In the course of your dealings with Mr. Hymowitz --

6               THE COURT:  Can we get --

7               MR. CAPOZZOLO:  I'm sorry.

8               THE COURT:  Thank you.

9   Q     In the course of your dealings with Mr. Hymowitz, were

10  you at all involved in his business, real estate activities?

11  A     No.

12  Q     Were you familiar with any of his legal work that he

13  performed in New York City?

14  A     No.

15  Q     Any of his dealings with any City governments in New York

16  City?

17  A     No.

18              MR. CAPOZZOLO:  Thank you very much.

19              THE WITNESS:  Sorry.  Am I free to go?

20              THE COURT:  Yes, you are.  Unless, Mr. Sercarz, do

21  you have anything else?

22              MR. SERCARZ:  No.

23              THE COURT:  Thank you.  You may step down.

24              THE WITNESS:  Thank you.

25              (Witness steps down.)

D. Sicignano - direct - Capozzolo          2075

1           MR. SERCARZ:  Defendant Hymowitz rests, Your Honor.

2           MR. DiCHIARA:  Your Honor, Mr. Freeman has chosen to

3      rest.

4           MR. CAPOZZOLO:  The government calls Dorothy

5      Sicignano.

6           THE CLERK:  Good afternoon.  Before you sit down,

7      I'm going to ask you to raise your right hand.

8           THE WITNESS:  Sure.

9           (Witness sworn.)

10          THE CLERK:  Thank you.  Please be seated.

11          Please state your full name for the record.

12          THE WITNESS:  Dorothy Anne Sicignano.

13          THE COURT:  Can we get the spelling of your last

14     name?

15          THE WITNESS:  S-I-C-I-G-N-A-N-O.

16          THE CLERK:  Thank you.

17          MR. CAPOZZOLO:  May I proceed, Your Honor?

18          THE COURT:  Yes.

19     DOROTHY SICIGNANO    ,

20          called as a witness, having been first duly sworn,

21          was examined and testified as follows:

22     DIRECT EXAMINATION

23     BY MR. CAPOZZOLO:

24     Q    Good afternoon, Ms. Sicignano.  How are you?

25     A    Fine.  Thank you.

D. Sicignano - direct - Capozzolo          2076

1   Q    And what part of the City do you currently live?

2   A    New York City.

3   Q    Which Borough?

4   A    Manhattan.

5   Q    And how long have you been living in New York City?

6   A    Probably going on 22 years.

7   Q    And do you know Lee Hymowitz?

8   A    Yes, I do.

9   Q    And can you just point him out for us?

10  A    He's there.  (Indicating.)

11        MR. SERCARZ:  We stipulate to the identification.

12  Q    Ms. Sicignano, how long have you known Mr. Hymowitz?

13  A    I would say 27 years.

14  Q    And in the course of your relationship with Mr. Hymowitz,

15  is part of that relation centered on a piece of real estate

16  property that you jointly own with Mr. Hymowitz?

17  A    Yes.

18  Q    And is it correct that you are a minority shareholder in

19  that piece of property?

20  A    Yes.

21  Q    What percentage do you own?

22  A    I own eight and a quarter percent.

23  Q    And approximately how much does Mr. Hymowitz own to your

24  knowledge?

25  A    Thirty-three percent.

D. Sicignano - direct - Capozzolo          2077

1    Q     And have you had an opportunity during the course of your

2    joint ownership of this property to interact with

3    Mr. Hymowitz?

4    A     Yes, I have.

5    Q     And over what period of time?

6    A     In the past five years.

7    Q     And what about --

8    A     More so.

9    Q     More so in the past five years?

10   A     Yes.  Our original tenant had left.

11   Q     How was it that you originally came into the possession

12   of the share that you have in this property?

13   A     I inherited it from my late mother.

14   Q     And did she also -- was she also someone who had contact

15   with Mr. Hymowitz?

16   A     I, I, I don't think so.

17   Q     What about your father?

18   A     Yes.

19   Q     Was your father involved in the obtaining of the

20   property?

21   A     Yes.

22   Q     And the property is located at 510 Gates Avenue, is that

23   correct?

24   A     Yes, it is, in Bedford-Stuyvesant, Brooklyn.

25   Q     So what I want to ask you now is from the time you've

D. Sicignano - direct - Capozzolo                    2078

1   known Mr. Hymowitz and interacted him, have you formed an

2   opinion about his character for honesty?

3   A    Yes, I have.

4   Q    And what is that?

5   A    Mr. Hymowitz lies with impunity.  He is also a predator

6   in my opinion.

7   Q    And with respect to if there's an issue involving money

8   and Mr. Hymowitz's honesty about money, what would be your

9   opinion?

10  A    It's Mr. Hymowitz's way or no way.

11  Q    And in the same regard, if you had -- have you had an

12  opportunity to form an opinion about Mr. Hymowitz's character

13  for generosity, have you had an opportunity to form an opinion

14  of that based on your years of knowing Mr. Hymowitz?

15  A    Yes, he's very generous with my money.

16  Q    To you or to --

17  A    Not to me though.  To cover various --

18  Q    I don't want to get into the details.

19  A    Okay.  Okay.

20  Q    But when you say he's very generous with your money, does

21  that mean he gives it to you, that he's generous to you or

22  not?

23  A    No.

24            MR. CAPOZZOLO:  I have no other questions.

25

D. Sicignano - cross - Sercarz                    2079

1    CROSS-EXAMINATION

2    BY MR. SERCARZ:

3    Q    Ms. Sicignano, your first name is Dorothy, is that

4    correct?

5    A    Yes, it is.

6    Q    People also know you by the name Bebe, is that correct?

7    A    Yes, they do.

8    Q    Your opinion of my client Mr. Hymowitz is based on your

9    own dealings with him with regard to this Gates Avenue

10   project, am I correct?

11   A    Yes.

12   Q    Okay.  With regard to Gates Avenue, just by way of

13   background, Gene Sicignano was your dad, am I correct?

14   A    Yes, he is, sir.

15   Q    He is.  He's still alive?

16   A    Yes, he is, sir.  He's 86 years old.

17   Q    I'm sorry?

18   A    He's 86 years old.  He's a retired court officer, a

19   veteran of World War II and a man with an high school

20   equivalency diploma.

21   Q    Thank you.

22             And he and Mr. Hymowitz and Mr. Freeman and a law

23   partner of theirs name Lou Marett together purchased some

24   properties, is that correct?

25   A    My father is -- he never was a shareholder in 510 Gates

D. Sicignano - cross - Sercarz                2080

1   Avenue.

2   Q    Well, the properties that were purchased were all put in

3   the names of the wives of those who purchased them?

4   A    Yes, that's correct.

5   Q    Your mom was a shareholder?

6   A    Yes.

7   Q    Am I right?

8   A    Yes, sir.

9   Q    And they each had more or less, the wives I'm talking

10  about, a one quarter interest in these properties, is that

11  correct?

12  A    Well, the 510 Gates Avenue, my mother's share was

13  22 percent.

14  Q    Okay.  The property was leased to a not-for-profit, am I

15  correct?

16  A    Yes, sir.

17  Q    And that not-for-profit lost its funding, am I correct?

18  A    I was told by Mr. Hymowitz to come to his office for a

19  meeting.

20  Q    Well, let me ask you this because I would like to try and

21  keep the answers confined to the questions.  If you don't know

22  the answer, just say I don't know.  If I'm wrong, tell me, but

23  my question is do you know --

24  A    To the best of my knowledge, they went bust.

25  Q    Okay.  And as a result, the property couldn't pay its

D. Sicignano - cross - Sercarz                    2081

1   real estate taxes and it wasn't generating any money for the

2   investments, is that correct?

3   A    Well, Mr. Hymowitz was the property manager for the

4   property and from what I was told by him, the not-for-profit

5   did not pay their taxes in ten years and it was very funny

6   that we now owe $2.2 million in real estate tax and when I

7   asked Mr. Hymowitz why this was never checked on, I got

8   answers for who --

9   Q    Let me hold up.  The government can elicit information if

10  it's appropriate.

11  A    Okay.

12  Q    I just want to know whether after the not-for-profit

13  left, the property stood vacant for a while, is that correct?

14  A    That's correct.

15  Q    All right.  Now, when the property stood vacant, somebody

16  came in to manage the property, am I correct?

17  A    What do you mean, to manage it?

18  Q    Well, your dad came in to take care of the property while

19  it was vacant, isn't that correct?

20  A    No.  I had no knowledge -- until they hired -- I found

21  out that Mr. Hymowitz hired my father to repair the roof of

22  510 Gates Avenue.  An 82-year old man is not a roofer.  And I

23  got a call from my dad one day, he --

24  Q    Don't tell us about the telephone calls.

25  A    Okay.  Sure.

D. Sicignano - cross - Sercarz                    2082

1    Q    I'm leaving --

2    A    I'm sorry.  This is very limited and confusing so I would

3    like to do it properly.

4    Q    If you're confused about anything, try and let me know.

5    Okay?

6    A    Okay.

7    Q    The company 510 Gates Avenue Corporation also had an

8    accountant, am I correct?

9    A    Correct.

10   Q    And the accountant was indeed your family's accountant,

11   isn't that correct?

12   A    He's my accountant.

13   Q    Okay.

14   A    Not my family's.

15   Q    Okay.  And he was one of the people charged with looking

16   after the money here, am I right?

17   A    I assume he just -- to my knowledge, he just does our tax

18   return.  He's not in charge of distributing the money that

19   comes in to the corporation or anything of that nature.

20   Q    Efforts were made to either rent or sell that property,

21   am I correct?

22   A    I personally brought an offer in the table to

23   Mr. Hymowitz.

24   Q    And it would be fair to say that you're not happy with

25   the way that Mr. Hymowitz chose to dispose of this property,

D. Sicignano - cross - Sercarz                2083

1   isn't that correct?

2   A    Correct.

3   Q    Okay.  You've said that Mr. Hymowitz was a predator.  Was

4   that your word?  I want to get the word right.

5   A    That's correct, sir.

6   Q    And that he was dishonest, is that correct?

7   A    Well, he has lied to me.

8   Q    Okay.

9   A    That's dishonesty.

10  Q    And what other bad things did you say about Mr. Hymowitz?

11  A    That's all.

12  Q    And this opinion that you have of Mr. Hymowitz's

13  character, this is something that you've recognized for a

14  while, am I correct?

15  A    Yes.

16  Q    You'd agree with me, would you not, that somebody who's a

17  predator and a liar and an untrustworthy person should never

18  serve in a responsible position for a company that's managing

19  a property, am I right?

20  A    I don't understand what you mean.  Could you explain the

21  last part.

22  Q    Well, a person like the one you're describing should

23  never be on the board of directors or the managing partner of

24  a company whose job it is to manage property to the benefit of

25  both the majority and the minority shareholders, am I right?

D. Sicignano - cross - Sercarz                    2084

1   A    Yes.

2   Q    Okay.  And, therefore, given your strong feelings about

3   Mr. Hymowitz, you would never have been in favor of

4   Mr. Hymowitz being elected to any position of authority in

5   connection with 510 Gates Avenue Corporation, am I right?

6   A    That's true.

7   Q    Okay.  I'd like to show you an e-mail.  I'm going to mark

8   it Hymowitz Exhibit E for identification.

9            MR. SERCARZ:  Witness only.

10           THE COURT:  There's nothing coming up.

11           THE WITNESS:  I see it, Your Honor.

12  Q    Now, am I correct that this e-mail was written by you?

13  A    Yes, sir.

14  Q    That it was written to Lou Marett who was one of the

15  individuals whose wives had a share in that property?

16  A    That's correct.

17  Q    Pardon?

18  A    That's correct.

19           MR. SERCARZ:  I offer it into evidence as Hymowitz

20  Exhibit E.

21  A    This is called sarcasm, sir.

22           THE COURT:  I don't have the document.  Is there any

23  objection to it?

24           Counsel, you have to show the document.  If you are

25  offering it into evidence, you have to show it to the other

1   side.

2         MR. SERCARZ:  He's seen it.  May we approach with

3   the document, Your Honor.  Would that help?

4         THE COURT:  I can't get it up here.

5         MR. SERCARZ:  Would you rather I put it back on the

6   screen?

7         THE COURT:  No, it doesn't matter.

8         Is there any objection to it?

9   MR. CAPOZZOLO:  Yes.

10        (The following occurred at side bar.)

11        MR. CAPOZZOLO:  My objection is that the proper

12  foundation is to ask did she write an e-mail that states the

13  following.  I think she's going to say yes and her explanation

14  was sarcasm so the document doesn't need to come in.  I don't

15  think she's denying she said it.  I think that's what the

16  point was.  Mr. Sercarz has to show her and let her see is

17  she'll say yes, I sent it.  That's all.

18        MR. SERCARZ:  All right.

19        THE COURT:  All right.

20        MR. SERCARZ:  Thank you.

21        (Side bar ends.)

22        (Continued on next page.)

23

24

25

CMH      OCR      RMR      CRR      FCRR

Sicignano - cross - Sercarz                     2086

1   BY MR. SERCARZ:

2   Q    Ms. Sicignano, if I can ask you one more question before

3   we start discussing the document, how is your relationship

4   with Lou merit I?

5   A    I have no contact with Lou Marett.

6   Q    None at all?

7   A    That's correct.

8   Q    Do you correspond with Mr. Marett?

9   A    Not lately.  I have a power of attorney that I gave to my

10  boyfriend so he had been doing that.

11  Q    But you certainly don't have a close personal

12  relationship with Mr. Marett, is that correct?

13  A    I like, I like Lou.  I have nothing personal against him.

14  Q    Okay.  Isn't it a fact that on November 27, 2012, you

15  sent an e-mail to Lou Marett in which you stated and I quote,

16  I will propose at the next shareholders meeting that we elect

17  Lee and his wife a majority shareholder back to the

18  corporation, at least he gets it, thanks for all of your help?

19  A    That was meant in sarcasm.

20  Q    Well, let's talk about this notion that this was meant in

21  sarcasm.

22        It was addressed to Mr. Marett, am I correct?

23  A    Yes.

24  Q    And the gentleman with whom you have no personal

25  relationship, is that correct?

CMH      OCR      RMR      CRR      FCRR

Sicignano - cross - Sercarz                    2087

1    A    Well, he --

2    Q    Is that correct?

3    A    As of right now, I have no relationship with him.

4    Q    You had a relationship with him?

5    A    Well, yes.

6    Q    Excuse me.  You've got to let me finish.

7              THE COURT:  No.  You have to let her finish her

8    answer.  Then you can ask another question.

9    A    Yes.  At the time, I was having a relationship with Lou

10   Marett.

11   Q    And you felt your relationship was such that you could

12   engage in sarcasm, is that correct?

13   A    Yes.

14   Q    Do you recall the e-mail that Mr. Marett sent to you and

15   your brother that elicited this e-mail?

16   A    No, sir.  I don't recall.

17   Q    Would it refresh your memory if I told you that

18   Mr. Marett wrote an e-mail saying:  Actually, Raymond, I

19   wanted to have an informational meeting to see what everyone

20   thought.  We don't have to determine the future direction of

21   anything.  Please turn down the vitriol.  We are on the same

22   team.  I am mostly concerned with the meeting with DOF re

23   taxes which should be soon.  Signed, Louis Marett, attorney at

24   law.

25   A    Yes.

Sicignano - cross - Sercarz                    2088

1   Q    Do you recall that that's the e-mail that you got?

2   A    I do now.

3   Q    And did you feel at the time that that invited a

4   sarcastic response?

5   A    Yes.

6   Q    You're angry at my client, am I correct?

7   A    I don't deny that, yes.

8   Q    You're not happy with the disposition of the building, am

9   I correct?

10  A    I'm not happy.

11  Q    Okay.  It turns out that my client did sell the building,

12  am I correct?

13  A    That's what I was told.

14  Q    And it is based upon this financial transaction, and this

15  one alone, that you are basing my, your opinion of my client's

16  character for honesty and fair dealing, is that right?

17  A    No.  I base it back from 27 years ago when my father

18  first brought him another deal who brought his partner at the

19  time another deal and then somehow your client took my

20  family's shares away from us and took over that whole deal as

21  though he had anything to do with it.

22  Q    So you feel that 27 years ago, Mr. Hymowitz engaged in a

23  theft from your family, that's what you believe?

24  A    He engaged in an immoral act, I would like to call it

25  that, and yes, I have a long memory.

Sicignano - cross - Sercarz                    2089

1   Q     But yet, your father's memory apparently isn't that long

2   because he was willing to go into partnership with

3   Mr. Hymowitz, Mr. Marett, Mr. Freeman and others, isn't that

4   correct?

5   A     Well, sadly --

6   Q     Isn't that correct?

7   A     I guess, yes, that's correct.

8              MR. SERCARZ:  I have no further questions of this

9   witness.

10             MR. CAPOZZOLO:  Mr. DiChiara, no cross?

11             MR. DiCHIARA:  I have no cross.

12  REDIRECT EXAMINATION

13  BY MR. CAPOZZOLO:

14  Q     You're a minority shareholder of this 510 Gates Avenue,

15  correct?

16  A     Yes, sir.

17  Q     Were you allowed to attend board meetings?

18  A     They never had a board meeting at the time until about

19  two thousand and, I believe 2011.

20  Q     And you had -- how did you find out that the board had

21  taken actions if you weren't present at these meetings?

22  A     I would have to ask for information, you know.

23  Q     They didn't --

24  A     We had -- I can't remember the exact year.  Mr. Hymowitz

25  was in charge of everything.  There were no meetings.  There

CMH      OCR      RMR      CRR      FCRR

Sicignano - cross - Sercarz                 2090

1   was no information given.  Then when Mr. Hymowitz and

2   Mr. Freeman got indicted --

3   Q    I only want to talk about Mr. Hymowitz.

4   A    I'm sorry.

5   Q    With regard to Mr. Hymowitz?

6   A    When he got indicted --

7   Q    Let me ask the questions.  Okay.

8        MR. CAPOZZOLO:  Because if I can lead, Judge.

9        THE COURT:  Yes.  Yes.

10       MR. CAPOZZOLO:  I just want to be clear.

11       THE COURT:  Just listen to the question and then

12  answer it.

13       THE WITNESS:  Yes, Your Honor.

14  Q    Mr. Hymowitz did not invite you to attend any meetings at

15  which important decisions about the property were decided, is

16  that correct?

17  A    That's correct.

18  Q    The building was sold, correct, recently?

19  A    Correct.

20  Q    And do you know who it was sold to?

21  A    A not-for-profit named Paul J. Cooper.

22  Q    And is there a person whose office who is related to Paul

23  J. Cooper, the chief financial officer, does he operate out of

24  an office at 510 Gates Avenue currently?

25  A    Yes, he does.

Sicignano - cross - Sercarz                2091

1   Q     You've seen him there personally yourself, correct?

2   A     Yes.

3   Q     What is Mr. Guerrero's role with regard to the prior

4   tenant, the one that failed to pay the $2 million in property

5   taxes?

6   A     Mr. Guerrero was the CFO of the former tenant and when I

7   objected that we do another deal with someone who they, who I

8   was told by Mr. Hymowitz failed to pay the taxes, I -- my

9   reply to Mr. Hymowitz, he said it would be okay, I said you

10  brought a fox into our /HEPB house.

11  Q     Now, I want to ask you another question.  So Mr. Guerrero

12  was related to the nonprofit that didn't pay the $2 million in

13  taxes, correct?

14  A     Correct.  And he was the chief financial officer.

15          MR. SERCARZ:  Your Honor, may we approach?

16          THE COURT:  Yes.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

```
                      Side Bar                        2092
```

1          (The following occurred at side bar.)

2          MR. SERCARZ:  I have a right on cross-examination to

3    test the basis for the witness' view of, or opinion of the

4    defendant's character.

5          THE COURT:  And you went pretty far in doing that.

6    It took me a while before I figured out where you were going.

7          MR. SERCARZ:  Okay.  The government has a right to

8    respond in that regard, but does not have a right to draw out

9    all the facts of this case.

10          THE COURT:  I think you have opened the door to

11    this.  It was very, as I say, it was a long time.  They didn't

12    object before I got anything and the bias on the part of this

13    witness in the kind of questions you were asking, so I think

14    the government is okay.  But I'd like it to end soon.  We

15    don't need the trial to end on essentially collateral

16    material.

17          MR. CAPOZZOLO:  I only have a little bit more.

18          THE COURT:  Good.

19          (Side bar ends.)

20          MR. CAPOZZOLO:  May I proceed, Your Honor?

21          THE COURT:  Yes.

22          (Continued on next page.)

23

24

25

Sicignano - redirect - Capozzolo                2093

1   BY MR. CAPOZZOLO:

2   Q    I just want to focus your attention on particular things.

3   Please excuse my leading.

4   A    Okay.

5   Q    With regard to Mr. Hymowitz, was he aware that

6   Mr. Guerrero was involved with both Miracle Makers and Paul J.

7   Cooper, the current tenant of 510 Gates?

8   A    Yes.

9   Q    Did you make Mr. Hymowitz aware of why Mr. Guerrero was

10  no longer associated with Miracle Makers?

11  A    I showed him an article that appeared in the New York

12  Times.

13  Q    And in that article, is it correct that it disclosed that

14  Mr. Guerrero had been --

15          MR. SERCARZ:  Objection.  This is hearsay.

16          THE COURT:  Sustained, yes.

17  Q    What was the information in the article that you

18  communicated to Mr. Hymowitz about Mr. Guerrero's fitness to

19  manage money?

20  A    He had -- he was a questionable character.

21  Q    Was he still employed by Miracle Makers or was he fired?

22  A    He was fired.

23  Q    The current tenant that bought the building, were they

24  required to put even a down payment down?

25  A    No, Mr. Hymowitz did not obtain a down payment.

1   Q     And the buyer that you brought, the buyer that you

2   brought to the, to potentially buy the property, would they

3   have been able to, were they going to get a bank loan or were

4   they going to get private financing to pay for the property?

5   A     I brought the Commissioner of Housing at the time to tour

6   the building and he wanted to make an offer of $100 a square

7   foot which was $3.3 million at the time.

8   Q     So the City was going to buy the property?

9   A     Yes.  Yes.

10  Q     And if the City had brought the property, would you have

11  gotten paid your interest in the property?

12  A     Correct.

13  Q     The sale that took place with Mr. Guerrero, have you

14  received any proceeds of that sale?

15  A     Yes, I have.

16  Q     What's the amount of the proceeds?

17  A     Oh, it's a mortgage.  We, 510 Gates Avenue Corporation

18  holds a mortgage.

19  Q     And there was no down payment on that mortgage?

20  A     There was no down payment.

21  Q     So the only thing you're receiving now --

22  A     Are mortgage payments when the tenant feels like paying

23  the mortgage.

24  Q     And that's my next question.  Has the tenant made

25  consistent mortgage payments?

Sicignano - redirect - Capozzolo                    2095

1    A    No, they have not.

2    Q    And this, again, is -- and that to your knowledge is

3    being managed by Mr. Guerrero, correct?

4    A    Yes, he's the chief financial officer.

5    Q    Mr. Sercarz questions about why you were upset with

6    Mr. Hymowitz in dealing with your father, I think that you,

7    that there was something more you wanted to say about what

8    your understanding was of what Mr. Hymowitz did with regard to

9    your father and regard to the ownership shares as they turned

10   out many, many years ago.

11   A    From what I understand, the original ownership is

12   supposed to be -- can I say Mr. Freeman's name?

13   Q    No, just explain.

14   A    Okay.

15             THE WITNESS:  I'm sorry, Your Honor.

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

Sicignano - recross - Sercarz                2096

1    (CONTINUING)

2    Q    No, just explain, what was Mr. Hymowitz share going to be

3    and what was your father's share going to be?

4    A    Equal shares; a third, a third and a third.

5    Q    And did it end up that way?

6    A    No, it did not.

7    Q    What was your father's percentage, just your father's

8    percentage that came up later?

9    A    For Gates Avenue, 22 percent.

10   Q    And again, your father wasn't a lawyer; right?

11   A    My father has a high school equivalency diploma, he's a

12   retired court officer and a veteran of World War II.

13            MR. CAPOZZOLO:  No other questions.

14   RECROSS EXAMINATION

15   BY MR. SERCARZ:

16            MR. SERCARZ:  Just a couple.

17   Q    You have brought a lawsuit; am I correct?

18   A    That is correct.

19   Q    All right.  And you are seeking to vindicate your rights

20   an obtain money for what you feel is his behavior?

21   A    I am seeking to liquidate the asset which is the property

22   510 Gates Avenue to bust the corporation so we're no longer in

23   business together.

24   Q    And what is it that you want to derive from that lawsuit?

25   A    I want to derive some money and also, not to be in

                    Sicignano - recross - Sercarz          2097

1    business with these people.

2              MR. SERCARZ:  Thank you very much, no further

3    questions.

4              THE COURT:  Anything else?

5              MR. CAPOZZOLO:  No.

6              THE COURT:  Thank you, you may step down.

7              THE WITNESS:  Thank you, Your Honor.

8              (Witness excused.)

9              MS. POSA:  Your Honor, is it all right if we call

10   Special Agent Richards as our last witness?  I think it's

11   going to be very quick if the jury can bear with us.

12             THE COURT:  How is the jury holding up?

13             THE JURY:  All right.

14             THE COURT:  All right, good.

15             MS. POSA:  The Government calls Special Agent

16   Naushan Richards.

17             (Witness resumes stand.)

18

19             (Continued on following page.)

20

21

22

23

24

25

S.A. Richards - direct - Posa                    2098

1   S. A.   N A U S H A N   R I C H A R D S,

2        called as a witness, having been previously duly

3        sworn, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. POSA:

6   Q    Good afternoon, Agent Richards.

7   A    Good afternoon.

8   Q    I'm sorry, Special Agent Richards.

9             Let me take you back to the night of Mr. Stevenson

10  Dunn's arrest on October 5th, 2011.

11  A    Yes.

12  Q    Now, you testified about that previously; correct?

13  A    Yes, I have.

14  Q    About what time was he arrested?

15  A    A little after 8:00 o'clock.

16  Q    And that was outside Junior's Restaurant in Brooklyn?

17  A    8:00 o'clock in the evening.

18  Q    I'm sorry?

19  A    Outside of Junior's Restaurant, yes.

20  Q    How many arrests would you say you've made in your career

21  as an FBI agent, by the way?

22             MR. EVANS:  Objection.

23             THE COURT:  Overruled.

24  A    Over a hundred?

25  Q    What did you observe Mr. Dunn's physical condition to be

S.A. Richards - direct - Posa                2099

1    when he was arrested?

2    A    He was in good physical condition.  He was fine.

3    Q    Did you ask him any questions about medication when he

4    was arrested?

5    A    Yes, I did.

6    Q    What did you ask him?

7    A    I asked him if he took any medication on a daily basis,

8    on a routine basis that he needed.

9    Q    And what was your purpose in asking him this?

10   A    When we make arrests, it's a routine question for us to

11   ask because when we turn over custody to the marshals or to

12   the Bureau of Prisons, one of the things they ask because if

13   we don't have the medication that they need for a 24-hour

14   period, they won't accept custody and therefore, that would

15   force us to either stay with them or somehow get them into a

16   hospital bed if needed overnight.  So, it's a routine question

17   that we ask because we won't be able to remand the body if we

18   don't have one day's worth of medication.

19   Q    And what did he say when you asked him if he needed

20   medication?

21   A    He told me that he has medication, he's a diabetic and he

22   had medication in the box or in the vehicle.

23   Q    And did you look for it?

24   A    I had agents that were assisting on the arrest look in

25   the vehicle, yes.

S.A. Richards - direct - Posa                    2100

1    Q    Were they able to find it right there at the spot at

2    Junior's?

3    A    No, they were not.

4    Q    Did you then transport Mr. Dunn back to 26 Federal Plaza?

5    A    Yes, I did.

6    Q    Now, without saying what you may have talked about in the

7    car, how was his demeanor on that ride?

8              MR. EVANS:  Objection.

9              THE COURT:  Overruled.

10   A    He was talkative, he was inquisitive, he wanted to know

11   what was going on, why he was in the car.

12             MS. POSA:  I'm going to, just to refresh your

13   recollection, read his testimony from transcript page 1660.

14             I had just returned from a trip in Florida.  Because

15   of rushing to the airport I did not medicate myself in the

16   morning so I decided when I would meet Mr. Armstrong in the

17   afternoon, as I always did when I met him, I would go into the

18   bathroom in Junior's, inject myself an then we would have a

19   bite to eat.

20   Q    Did Mr. Dunn complain of being hungry in the car ride?

21   A    No, he did not.

22   Q    Did he say that he needed his insulin injection?

23   A    No.

24   Q    Did he have any insulin pens on his person when he was

25   arrested?

1  A    No.

2  Q    Eventually, you got to 26 Federal Plaza; right?

3  A    Yes.

4  Q    Did there come a time when he was interviewed?

5  A    Yes.

6  Q    And approximately what time was that?

7  A    8:45.

8  Q    Who all was in the room when Mr. Dunn was being

9  interviewed?

10 A    Myself and Special Agent Joe de la Pena of the Department

11 of Labor at that time.

12 Q    And can you tell us about your conversation you had

13 during that interview?

14 A    Well, the very first thing that we discussed was his

15 Advice of Rights.  I took the form, the written Advice of

16 Rights form.

17 Q    Government's Exhibit 624?

18 A    Yes.  I read the form to him.  I put the time that I read

19 it and started the Advice of Rights, then I turned it over to

20 him for him to review it.

21        And during the time that he was reviewing it, he

22 asked me if he could talk to Lee Hymowitz, to which I replied,

23 no, you can't talk to Lee because he's going to be arrested

24 tomorrow.

25        And then he said to me how about Mike Freeman.  And

1    I said no, you'll see him tomorrow, also.

2         And then at that point he gobbled up the form, he

3    grabbed it closer to him.  He said something to the effect Oh,

4    I see where this is going --

5         MR. EVANS:  Objection.

6         THE COURT:  Overruled.

7    A    I see where this is going, the black guy's not going to

8    take the fall for those two Jewish attorneys or I'm not going

9    to take the fall for those two Jewish attorneys while he was

10   signing the form and then handed the form back to us and we

11   proceeded to go forward with the interview.

12   Q    Now, I believe he had testified, transcript page 1661,

13   that he was already one hour into the interview before he

14   actually signed that Advice of Rights.

15        Do you recall him testifying to that effect?

16   A    Yes, I do.

17   Q    Is that accurate?

18   A    No, it was not.

19   Q    After he signed it, did he proceed to make the statement

20   that you had read earlier?

21   A    Yes.

22   Q    I'm not going to ask you to repeat all of it but there

23   are two additional statements that you can now testify about.

24        MS. POSA:  Your Honor, the Government moves to admit

25   the entire Exhibit of Mr. Dunn's post-arrest statement as

                    S.A. Richards - direct - Posa          2103

1   Government's Exhibit 903.

2            THE COURT:  Counsel, I think let's discuss whether

3   the actual Exhibit is going to be admitted after we excuse the

4   jury, unless there is no objection to it.

5            MR. SERCARZ:  There is.  I think we should talk

6   about it.

7            THE COURT:  Yes, I think we need to talk about it.

8            So, ask the questions you need to ask.

9            MS. POSA:  Can I just elicit the two statements that

10  we had discussed prior.

11           THE COURT:  Yes.

12           MS. POSA:  All right.  May I just show this to the

13  witness?

14           THE COURTROOM DEPUTY:  Yes.

15  Q    I'm sorry, can you see it Special Agent Richards?

16  A    Yes.

17  Q    Would you please start reading on the first paragraph the

18  sentence beginning during this time to the end of that

19  paragraph, if you can see it?

20  A    Okay.

21           During this time period of the kickback payments

22  Dunn, along with partners Lee Hymowitz, Esq. and Michael

23  Freeman, Esq. were the Hancock developers and Armstrong was a

24  contractor/developer under his company name Metropolis

25  Development Corporation.  Dunn, Hymowitz and Freeman operated

S.A. Richards - direct - Posa                2104

1  SML Development, which was the entity they used to develop the

2  Hancock project.

3  Q    Okay.  I'm going to turn your attention to page three.

4        Would you please start reading from where I am

5  pointing, where it says it was Dunn and then to the end of

6  that paragraph.

7  A    Yes.

8        It was Dunn, Hymowitz and Freeman who had

9  collectively negotiated a $300,000 kickback payment from

10  Starzecki in connection with this project.  Starzecki has yet

11  to pay the remaining kickback balance of approximately $75,000

12  to Dunn, Hymowitz and Freeman.  Dunn said that he had to put

13  approximately 20,000 of the $75,000 kickback payment from

14  Starzecki into the actual security budget of the HPD

15  neighborhood project.

16  Q    Now again, I am going ask you about his demeanor during

17  this interview.  What was it like?

18  A    His demeanor was fine.

19        MR. EVANS:  Objection.

20        THE COURT:  Overruled.

21  A    Very much like it was when he was testifying except for

22  the fact that he was more animated in explaining his position

23  to me.

24  Q    Did he appear to be, to use his term, befogged?

25  A    No.

VB        OCR        CRR

S.A. Richards - direct - Posa                2105

1    Q    And what makes you say that?

2    A    He was giving me detailed statements that were very

3    similar and in congruence with what I had known to be --

4           THE COURT:  Agent Richards, I don't want to know

5    about your investigation.

6           THE WITNESS:   Okay.

7    A    His, he was detailed, he was consistent and coherent.

8    Q    Was he sweating profusely?

9    A    No.

10   Q    Was he complaining of exhaustion?

11   A    No.

12   Q    Did he appear to be confused?

13   A    Absolutely not.

14   Q    Did you ever offer him any food or drink during this

15   interview?

16   A    Yes, I offered it in the beginning.  I recall that I said

17   there's a Dunkin' Donuts across the street, can I get you, you

18   know, water, a sandwich or a bagel, something from

19   Dunkin' Donuts, coffee, anything.  He said no.  And I believe

20   a couple times during the interview I asked if he needed

21   anything.

22   Q    At any point during that interview, did he ask for his

23   medication for his diabetes?

24   A    No, he did not.

25   Q    At any point in time did he express any sentiments about

S.A. Richards - direct - Posa                    2106

1   being in physical distress or not feeling well?

2   A    No.

3   Q    Did there come a time when you tried to wrap up this

4   interview?

5   A    Yes, there were several times during that interview that

6   I was trying to end it because we had a busy day set up, you

7   know, the next morning and I would try to get up from the

8   table and leave and he repeatedly, at least half a dozen times

9   said to me, you know, on different occasions, Officer Shaun

10  please, sit down, I'm not done talking.

11  Q    And do you recall that he also referred to you as Officer

12  Shaun during his testimony?

13  A    Yes.

14  Q    Are you an officer?

15  A    No.

16  Q    It's unusual for people to call you that; right?

17  A    Yes.

18  Q    Was the interview eventually concluded?

19  A    Yes, it was.

20  Q    And do you know what happened next with Mr. Dunn?

21  A    Yes, he completed his arrest processing where they

22  fingerprinted him -- and when I say they, the members of my

23  team that were in custody of him and were responsible for

24  taking him to the MDC to lodge him overnight.

25            So, they finished the fingerprinting, they finished

S.A. Richards - direct - Posa                2107

1    the photographing and any of the arrest package paperwork

2    that's needed to remand somebody to the marshals or to the

3    Bureau of Prisons.

4    Q    Are you aware of whether or not he was fed before he went

5    in to the -- by MDC you're talking about Metropolitan

6    Detention Center?

7    A    Yes, that's correct.

8    Q    That is the Federal detention center here in Brooklyn?

9    A    Yes.

10   Q    Was he fed before he went in to custody at the MDC?

11   A    Yes, I was told and I did instruct the team members that

12   took him to the MDC to go down to his vehicle and with his

13   help and assistance, find his medication.  And I was told by

14   those agents that they did find the medication and that there

15   was, I believe, Chinese food in the car and they gave him the

16   Chinese food, he ate it and then they transported him to the

17   MDC for lodging.

18   Q    And was he, in fact, lodged overnight at the MDC or did

19   they turn him away and make him go to the hospital because he

20   was in a diabetic episode?

21        MR. EVANS:  Objection to form.

22        THE COURT:  Sustained.

23   Q    What happened when he got to the MDC?

24   A    He was remanded to the Bureau of Prisons, their custody

25   and lodged overnight.

```
                        Proceedings                    2108

 1           MS. POSA:  No further questions.

 2           MR. SERCARZ:  Can we approach?

 3           THE COURT:  Yes.

 4           (Side-bar conference held on the record out of the

 5      hearing of the jury.)

 6

 7           (Side-bar.)

 8           MR. SERCARZ:  Your Honor I request that you give the

 9      instruction again that you gave when Agent Richards first

10      testified to the effect that the statements that he made

11      regarding this post-arrest interview are admissible against

12      Dunn alone and cannot be considered as to Hymowitz and

13      Freeman.

14           MS. POSA:  No objection.

15           THE COURT:  Just brief like that, not the whole long

16      statement.

17           MR. SERCARZ:  That will do.

18           THE COURT:  Okay.

19           Anything else?

20           MR. EVANS:  No.

21           THE COURT:  Okay.

22           (Side-bar end.)

23

24           (In open court.)

25           THE COURT:  Members of the Jury, I just want to
```

S.A. Richards - cross - Evans                    2109

1    remind you of the instruction I gave you earlier; that any

2    statements that you find that Mr. Dunn made prior or after his

3    arrest that been have just been testified to by the agent can

4    be used only against Mr. Dunn and you may not use any

5    statements against defendants Hymowitz or Freeman.

6            Mr. Evans.

7    CROSS EXAMINATION

8    BY MR. EVANS:

9    Q    Agent Richards, you arranged the time, date and location

10   of Mr. Dunn's arrest; isn't that correct?

11   A    Through a cooperating witness, yes.

12   Q    So, you wrote the script that George Armstrong used to

13   arrange this meeting, yes?

14   A    Yes.

15   Q    You decided the location, yes?

16   A    That's correct.

17   Q    You outlined the conversation for Mr. Armstrong; yes?

18   A    There wasn't much conversation, but yes, I told him we

19   needed to have a meeting, he needs to have Stevenson Dunn show

20   up for another payment.

21   Q    And you instructed Mr. Armstrong to mislead Mr. Dunn a

22   month before to set this up, yes?

23           MS. POSA:  Objection, Your Honor, scope.

24           THE COURT:  Overruled.

25   A    I don't know that it was a month, but yes, a week or two,

S.A. Richards - cross - Evans                2110

1    maybe a month.

2    Q    The last phone call was September 27th to arrange this;

3    correct?

4    A    I believe so.

5    Q    You listened to the conversation that Mr. Armstrong had

6    with Mr. Dunn; didn't you?

7    A    Yes.

8    Q    You tape-recorded it; didn't you?

9    A    Yes.

10   Q    And was Mr. Armstrong working on your instructions when

11   he led Mr. Dunn to believe that there would be contact early

12   in the morning of October 5th to arrange the time, date and

13   location?

14   A    I never had him contact him or make him set a meeting for

15   the morning.  The plan was always in the evening.

16   Q    You heard Mr. Dunn testify that he missed his morning

17   dosage on the morning of his arrest; yes?

18   A    Yes.

19   Q    Did you believe that testimony?

20   A    No.

21   Q    And what basis did you have for unbelieving that

22   testimony?

23   A    Mr. Dunn drove the vehicle to the meeting.  If he missed

24   his dosage, in all likelihood he couldn't drive his car.

25   Q    And based on what information do you make that conclusion

S.A. Richards - cross - Evans                    2111

1    on, Agent?

2    A    I watched Mr. Dunn park his vehicle, parallel park which

3    is not easy.  I watched him get out of his vehicle, get into

4    the cooperator's vehicle and I spent 45 minutes in an

5    interview with Mr. Dunn.

6    Q    Is that medical information?

7    A    It's an observation.

8    Q    I asked you if you had any medical information on which

9    to base your conclusion?

10   A    I had information from him.

11            MR. EVANS:  I'm going to ask that the Court strike

12   the witness's answer and ask the witness to answer my

13   question.

14            THE COURT:  Please, answer the question that is put

15   to you.

16   A    Medical from a doctor?  No.

17   Q    Are you trained as an emergency medical technician?

18   A    No, I am not.

19   Q    Are you trained as a paramedic?

20   A    No.

21   Q    Do you know what kind of diabetes Mr. Dunn has?

22   A    No.

23   Q    Do you know anything about the efficacy of insulin pens

24   and medication for diabetics?

25   A    No.

S.A. Richards - cross - Evans                    2112

1  Q    You don't have any medical information at all on which to
2  base that conclusion; do you?
3  A    No.
4  Q    And when you testified that you had agents search his
5  vehicle, you testified previously about that; didn't you?
6  A    Yes.
7  Q    And when you testified previously, you took an oath,
8  right?
9  A    Yes.
10  Q    You swore to tell the truth; right?
11  A    Yes.
12  Q    You prepared for that testimony; correct?
13  A    Yes.
14  Q    And you said in that testimony that you were going to
15  search the vehicle for safety; is that correct?
16  A    That's correct.
17  Q    If he was out of the vehicle and you were away from the
18  vehicle, whose safety were searching for, sir?
19  A    Everybody that was there on the scene.
20  Q    Everybody who?
21  A    Agents.
22  Q    Okay.
23  A    Subject's investigation, people that were going to get
24  into that car and transport it back to 26 Federal Plaza.  It's
25  a common practice to do a protective sweep before we step into

S.A. Richards - cross - Evans                    2113

1    any area we don't control.

2    Q    Was he making furtive actions?

3    A    No, he did not.

4    Q    Was he acting suspiciously?

5    A    No.

6    Q    Had you watched him put anything dangerous in his

7    vehicle?

8    A    No.

9    Q    But he happened to say that something might be in his

10   glove compartment?

11   A    He indicated that his medicine case hi was in the glove

12   compartment.

13   Q    What kind of medication were you looking for, Agent?

14   A    I was looking for pills.

15   Q    You were looking for pills.  Did he tell you to look for

16   pills?

17   A    I believe so.

18   Q    You believe so?

19   A    Yes.

20   Q    You said you offered him food and water when you first

21   arrived; is that correct?

22   A    When I sat down in the interview room, yes.

23   Q    Did you sit down when you first arrived at the interview

24   room?

25   A    No.

S.A. Richards - cross - Evans                2114

1   Q    So, it wasn't when you first got to the interview room
2   then; was it?
3   A    It was when I first got to the interview room.
4   Q    It was when you first got to the interview room?
5   A    Yes.
6   Q    How long had he been in the interview room before you
7   first got there?
8   A    Two or three minutes.
9   Q    Who was in charge of him at that time, if you know?
10  A    I don't remember which agent.
11  Q    And you testified that you personally transported
12  Mr. Dunn from the scene of his arrest outside of Junior's to
13  26 Federal Plaza; is that correct?
14  A    Yes.
15  Q    And during the time that he was in your vehicle, was
16  there another agent or agents the vehicle with you?
17  A    Yes, Special Agent Ian Thomas.
18  Q    And did you or Special Agent Ian Thomas provide Mr. Dunn
19  with his Miranda warnings?
20  A    No, we did not.
21  Q    Did you question him?
22  A    I questioned him.
23  Q    But you didn't provide his Miranda warnings in the car?
24  A    No.
25  Q    Is there a reason you didn't?

Side-Bar                                                   2115

1   A     Yeah, because it was not an interrogation, it was a

2   two-way conversation between Mr. Dunn and myself --

3   Q     And when you were --

4   A     -- he asked me a question --

5             THE COURT:  Counsel, I think that we're going

6   beyond.

7   Q     When he asked you, when you were having this two-way

8   conversation --

9             THE COURT:  Counsel, come to the side and give me a

10  proffer as to where you're going.

11            (Side-bar conference held on the record out of the

12  hearing of the jury.)

13

14            (Side-bar.)

15            THE COURT:  The conversation has been suppressed and

16  I don't know where you're going with this.

17            MR. EVANS:  He testified in his rebuttal direct that

18  he observed my client's demeanor.

19            He just testified that he was driving the vehicle

20  and there was another agent there.

21            I want to ask how did he observe his demeanor, I

22  want to ask if he was handcuffed, how did he observe his

23  demeanor while you're driving and talking.

24            MS. POSA:  What does that have to do with the

25  Miranda waiver?

VB        OCR        CRR

Side-Bar                              2116

1          MR. EVANS:  His testimony was that he observed his

2   demeanor in the vehicle, that's what you asked him in the car.

3          THE COURT:  So ask him about how he observed his

4   demeanor, but I don't want you going into suppressed

5   conversations.

6          MR. EVANS:  I am not going to go into the other

7   statement.

8          THE COURT:  Thank you.

9          MR. EVANS:  But I wanted to go into the

10  circumstances regarding his observation.

11         THE COURT:  Well, I don't want to belabor the whole

12  issue here.

13         MR. EVANS:  I didn't want him to re-testify but I

14  want to establish that he's testified about demeanor, he was

15  in no direct position to observe him.

16         THE COURT:  So, ask him that.

17         MR. EVANS:  I will, but I had to lay the foundation

18  that he was in the car.

19         THE COURT:  There is no foundation coming in on the

20  conversation that I suppressed.  Period.

21         MR. EVANS:  I won't talk about the conversation.

22         THE COURT:  Good.  Thank you.

23         (Side-bar end.)

24

25         (In open court.)

VB       OCR       CRR

S.A. Richards - cross - Evans                    2117

1    BY MR. EVANS:

2    Q    During the transport of Mr. Dunn from Brooklyn to

3    Manhattan, were you driving the vehicle?

4    A    Yes, I was.

5    Q    You just testified that you observed my client's

6    demeanor.  Was he sitting in the front seat next to you?

7    A    No.

8    Q    Was he sitting behind you?

9    A    He was sitting in the rear seat on the passenger side.

10   Q    So, how were you able to observe his demeanor while

11   operating the vehicle?

12   A    I could look at him in the rearview mirror.

13   Q    Okay.  And during the course of your interrogation with

14   my client, was he handcuffed?

15   A    He was cuffed at one point to the, there's a table and

16   there's a bar that's relatively level with the table and at

17   one point I know he was cuffed.

18   Q    Was he cuffed during the entirety of the interrogation?

19   A    Very possible.

20   Q    And you heard my client testify that he has diabetes;

21   correct?

22   A    Yes.

23   Q    Do you have any medical information that you've obtained

24   since is his arrest that would contradict what he told you?

25   A    No.

S.A. Richards - cross - Evans                    2118

1    Q    Do you have any reason to believe that he's misleading

2    you when he says he does have diabetes?

3    A    No.

4    Q    Were you present for the entire arrest, interrogation and

5    processing of Mr. Dunn?

6    A    I was present up until the point that the interview was

7    done and then they finished the rest of the processing and

8    transported him to MDC but as far as the arrest, the interview

9    interrogation except for those two or three minutes it took me

10   to take my gear back to my desk area, I was, I was with him or

11   in the vicinity of where he was at all times.

12

13                  (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Richards - cross - Evans                    2119

1   EXAMINATION CONTINUES

2   BY  MR. EVANS:

3   Q    Were you with him after 9:40 that evening?

4   A    No, I was not.

5   Q    Do you know what time they finished processing him?

6   A    I would have to look at my arrest log but I believe it

7   was 11:30, 11:40 maybe, 12:00.

8   Q    So it's at least two hours after you left him, correct?

9   A    Within that timeframe, yes.

10  Q    And when you testified about him going to the vehicle,

11  did you go to the vehicle with him directly?

12  A    No, I did not.

13  Q    Did someone else do that?

14  A    Yes.  The agents --

15  Q    They reported that to you?

16  A    Yes.

17  Q    Who reported to you that they went with Mr. Dunn down to

18  the vehicle?

19  A    I don't know if I heard directly from Agent Granatstein

20  or if I heard it through Joe Della Penna but I was told that

21  he went to the vehicle and that they were able to get whatever

22  they needed to be able to lodge him for the next -- overnight.

23  Because during the interview --

24  Q    I'm sorry.

25  A    We -- we had --

GR     OCR     CM     CRR     CSR

Richards - cross - Evans                    2120

1          THE COURT:  Wait.

2          Do you have the answer to your question?

3          MR. EVANS:  Yes.

4          THE COURT:  All right.  Then move on.

5    Q    Isn't it true, Agent, that Mr. Dunn wasn't administered

6    his medication until the following morning?

7    A    I don't know.

8    Q    Isn't it true, that agents who reported to you reached

9    out to Mr. Dunn's son to help in acquiring his medication?

10   A    I was told that.

11   Q    Isn't it true that in -- withdrawn.

12          So you don't know for certain that he was provided

13   his medication, is that correct?

14   A    I know that I was informed that they found medication in

15   the vehicle and he took a dose before he went to the MDC for

16   lodging.

17   Q    Did anybody write that down anywhere?

18   A    No.

19   Q    Did you personally provide Mr. Dunn any food?

20   A    No, I did not.

21   Q    So you're only relying on the reports of others?

22   A    Yes .

23   Q    Did those other people write reports and sign them and

24   turn them in?

25   A    They had the arrest log and they filled out the portion

Richards - cross - Evans                    2121

1    that effectively turned him over to the Bureau of Prisons at

2    MDC.  So if he wasn't fit for confinement, they wouldn't have

3    been able to fill that out.

4    Q    I asked you if you had reports signed by your agents?

5    A    That's a report, yes.  They initialed when they dropped

6    him off to the MDC and they initialed when they picked him up

7    the next morning, yes.

8    Q    Okay.  And do I -- withdrawn.

9         Did you write the statement that you read to the

10   jury on the form you called the 302?

11   A    No.

12        I was a coauthor on that.

13   Q    Who was the other coauthor?

14   A    Special Agent Joe Della Penna.

15   Q    Did you take notes yourself during this interview?

16   A    No; Joe did.

17   Q    Who wrote the report?

18   A    Joe authored it but I reviewed it and coauthored it.  But

19   he physically typed it in.

20   Q    He typed it.

21        Did he use your notes?

22   A    They were our notes.

23   Q    So the statement that you are referring to is really a

24   report, correct?

25   A    No.

GR      OCR      CM      CRR      CSR

1   Q    Did you have Mr. Dunn write out a statement?

2   A    No.

3          Mr. Dunn told --

4   Q    Thank you.  You have answered my question.

5          Did you have Mr. Dunn sign your notes?

6   A    No.

7   Q    Did you have Mr. Dunn initial your notes?

8   A    No.

9   Q    Did you videotape this interview?

10  A    No.

11  Q    Did you audiotape the interview?

12  A    No.

13  Q    You audio-taped the phone call between George Armstrong

14  and Mr. Dunn, correct?

15  A    That's correct.

16  Q    But you didn't audiotape this interview?

17  A    No.

18  Q    How long after this interrogation did you coauthor this

19  report?

20  A    I believe it was within 15 days before it was finalized.

21  Q    It wasn't the next day?

22  A    No.

23  Q    When Mr. Dunn asked to speak to Lee Hymowitz, do you

24  recall your testimony about that a moment ago?

25  A    Yes.

Richards - cross - Evans                    2123

1   Q    You knew Lee Hymowitz was an attorney, correct?

2   A    Yes, I did.

3   Q    And when Mr. Dunn subsequently asked to speak to Mike

4   Freeman, you knew Mike Freeman was an attorney, correct?

5   A    Yes.

6   Q    Did you stop the interview when he asked to speak to Lee

7   Hymowitz?

8   A    No.

9         MS. POSA:  Objection, Your Honor.

10        THE COURT:  Sustained.

11        Counsel, move to something that is pertinent to this

12  subject matter, please.

13  Q    Did you offer Mr. Dunn assistance of assigned counsel?

14        MS. POSA:  Objection.

15        THE COURT:  Sustained, counsel.

16  Q    You have testified that Mr. Dunn was calling you Officer

17  Sean, is that correct?

18  A    That's correct.

19  Q    How would he know your first name?

20  A    I introduced myself to him.

21  Q    And it is your testimony that he was calling out for you

22  Officer Sean, Officer Sean, like that?

23  A    Officer Sean, please sit down.  I'm not done talking.

24  Q    Almost childlike?

25  A    No.

GR      OCR      CM      CRR      CSR

2124

1       MR. EVANS:  Nothing further.

2       Thank you.

3       MS. POSA:  Nothing further for this witness.

4       The government rests, again.

5       THE COURT:  Thank you.

6       You play step down.

7       (Witness steps down.)

8       THE COURT:  All right.  Members of the jury, we have

9  just finished the government's rebuttal case.  That means that

10  the evidentiary portion of this trial is complete.  Let me

11  tell you what our schedule is going forward.

12       Tomorrow we will hear the closing arguments of the

13  attorneys.  The way that works is that because the government

14  has the burden of proof, they will go first and then we will

15  hear from each of the defense attorneys, and then the

16  government will have a short opportunity for rebuttal.

17       Then, when that is concluded, and that may not

18  be -- well, we hope that we will be able to conclude all of

19  that tomorrow, but if not, we will conclude that on Monday

20  morning and at that point I will instruct you on the law that

21  you are to apply in this case and then you will begin your

22  deliberations.  That is our schedule.

23       Please keep in mind -- as I say, I hope you will be

24  deliberating by Monday lunchtime.  Keep in mind that if you

25  are deliberating, you will not be permitted to leave the

1    courthouse over the lunch period.  We will ask you to keep

2    deliberating over lunch, just to speed things along, and we

3    will provide lunch to you.  Victor will come in and provide

4    the menu or however -- it's already done?

5            THE CLERK:  Yes.

6            THE COURT:  You have taken care of it.

7            You will have a fine lunch, I hope, and you will be

8    able to proceed expeditiously.

9            All right.  So that's the schedule.  I just wanted

10   you to be aware of that.

11           All right.  With that, I will excuse you now for

12   once again a long weekend -- oh, no.  You are coming back.  I

13   forgot about tomorrow, you see.  Well, you can see where my

14   heart is.  I have to be here tomorrow too.  Okay.  It has been

15   a long day.

16           We will see you tomorrow morning for the closing

17   arguments of counsel.  We will start promptly, I hope, at

18   10:00 o'clock.

19           Thank you.  Good night.

20           Remember not to discuss the case at this point, not

21   until I send you out for your deliberations.

22               (The following occurred in the absence of the jury.)

23           THE COURT:  All right.  Counsel, have a seat.  I

24   just want to talk to you about a couple of things.

25           I believe we have concluded all of our issues

2126

1    regarding the charge.

2            Let me just ask one question of the government.  It

3    relates to the aiding and abetting charges.

4            With respect to three of the things that at the

5    moment are in the charge, state law bribery, federal bribery,

6    and extortion, I am asking whether or not it is really

7    appropriate to charge aiding and abetting.  To have aiding and

8    abetting there has to be somebody else who did the crime and

9    then you say that the defendant on trial aided and abetted

10   that person.  I am not clear how you could have that with

11   respect to those three crimes.  I understand the other crimes

12   charged.

13           MS. POSA:  That's correct, Your Honor.  That's fine.

14           THE COURT:  That's fine, meaning we should take

15   those three out?

16           MS. POSA:  Yes.

17           THE COURT:  Okay.  I will ask my clerk to take care

18   of that.

19           MR. EVANS:  Your Honor, what page is that?

20           THE COURT:  Let's see.  What page is that?  Can

21   anybody help me?

22           THE LAW CLERK:  64.

23           THE COURT:  All right.  Page 64 of the draft that

24   you have.

25           I should tell you, the pagination and all will

GR    OCR    CM    CRR    CSR

2127

1    change and, of course, there may be cosmetic changes to what

2    you have.  We are also adding the charge that was requested.

3           Okay.  So we have to -- Count Eleven was extortion.

4    So we will take that out.

5           Federal bribery?  Count Ten is the federal bribery,

6    I believe.

7           Counsel, please confirm this for me.

8           MS. POSA:  Yes.  One second, Your Honor.  I am just

9    checking.

10          THE COURT:  The state law bribery is a racketeering

11   act.  Then I can take out on page 77 the entire paragraph

12   regarding aiding and abetting under New York State law.

13   Correct?

14          MS. POSA:  Yes, Your Honor.  I just want to check

15   the counts.

16          THE COURT:  Okay.

17          MS. POSA:  I think Count Twelve is extortion.

18          THE COURT:  We don't have a Count Twelve.

19          MS. POSA:  All right.

20          THE COURT:  That I know of.

21          MS. POSA:  I'm sorry.

22          THE COURT:  Also in the indictment, page 75 on the

23   state law bribery, I am going to take out the reference to

24   section 20, which is the aiding and abetting section.

25          MS. POSA:  Fine with the government.

2128

1          THE COURT:  I didn't hear you.

2          MS. POSA:  That's fine with us.

3          THE COURT:  All right.  Mr. Evans?

4          MR. EVANS:  That's perfectly okay.

5          THE COURT:  Okay.  So we are taking those sections

6   out.

7          Okay.  Then we had the character witnesses.  It is

8   just one defendant, right, who has character witness?

9          MS. POSA:  That is correct.

10         THE COURT:  So we will say instead of some, we will

11   say one of the defendants has called witnesses who gave their

12   opinions, et cetera.

13         I don't know that we need to refer to the

14   government's character witness on this.

15         MS. POSA:  Can you tell us what page that is?

16         THE COURT:  Page 83 of the draft.

17         MR. SERCARZ:  Your Honor, I would like some

18   language, given that the government called a rebuttal

19   character witness, to the effect that just as a defense

20   character witness can't be considered for an opinion as to

21   whether the defendant is not guilty, rebuttal witness can't be

22   considered -- her testimony cannot be considered an opinion as

23   to the defendant's guilt.

24         THE COURT:  Right.  Maybe we can do this a little

25   quicker.  What if we do it this way?  One of the defendants

Case 1:11-cr-00683-NG   Document 275-2   Filed 07/25/14   Page 218 of 280 PageID #: 2031

2129

1   has called witnesses who have given their opinions of his

2   character.  The government has also called such a witness.

3   The testimony of character witnesses, and then we can just go

4   on with the rest of it.

5              MR. SERCARZ:  In other words, the term character

6   witnesses is not to be taken by you as the witness' opinion,

7   et cetera?

8              THE COURT:  Right.  As to whether the defendant is

9   guilty or not guilty.

10             MR. EVANS:  Your Honor, should we add a sentence to

11  say that it is not required to call the character witness and

12  it is not a deficit of Mr. Freeman or Mr. Dunn that they

13  didn't?

14             MS. POSA:  I think that's covered by the burden of

15  proof which says that the defense doesn't have any obligation

16  to call anybody ever.

17             THE COURT:  I don't know that we would want to

18  single out character witnesses.  They are also not required to

19  call any other kind of witnesses.  I think it is fine the way

20  it is.

21             Does anybody else want to be heard on that?

22  Anything else regarding the charge?

23             MR. EVANS:  The Court will add an index when it is

24  completed, I think you said?

25             THE COURT:  Yes.  It is a little bit of a computer

2130

1  difficulty.  We are trying to get it done.  I think we have it

2  now.  My clerks are smiling.

3          MS. POSA:  Do you think -- would it be possible to

4  get an electronic copy of it?

5          THE COURT:  When it is done?

6          MS. POSA:  Yes.

7          THE COURT:  I don't know when it is going -- you

8  mean tonight?

9          MS. POSA:  No.

10         THE COURT:  I haven't --

11         MS. POSA:  Not tonight.

12         THE COURT:  You mean eventually?

13         MS. POSA:  Yes.  It just makes it a little easier,

14  more searchable that way.

15         THE COURT:  We can do that.

16         MS. POSA:  Thank you.

17         MR. EVANS:  Your Honor, did the defense counsel

18  answer your query from the first thing this morning about the

19  cooperating agreements?

20         THE COURT:  No.

21         MR. EVANS:  I reviewed the two.  The one for

22  Mr. Starzecki, which I entered as Dunn Exhibit H --

23         THE COURT:  Let me just find the page.

24         Okay.  Page 85.  The way I have it reading now, the

25  government agreed not to pursue other charges.

GR      OCR      CM      CRR      CSR

2131

1          MR. EVANS:  As to Mr. Starzecki, I reviewed that
2     over the lunch hour and it only says that he would get
3     substantial assistance and they wouldn't recommend a specific
4     sentence.  There is no promise, and he consents to forfeiture.
5          THE COURT:  Right.  It does say the government
6     agrees not to pursue other charges.
7          MR. EVANS:  Right.
8          THE COURT:  Does everybody agree with that?
9          MS. POSA:  I mean, for the crimes specified in the
10    coverage paragraph.  I don't want to make it too complicated.
11         THE COURT:  I understand.  But the point, there is
12    no reduction of charges.
13         MS. POSA:  Right.
14         THE COURT:  Okay.  Unless I hear something from
15    somebody, I am taking that as consent.
16         MR. EVANS:  As to Mr. Walters, his agreement
17    specifically in paragraph two calls for a two-level reduction.
18         THE COURT:  That's a guidelines.
19         MR. EVANS:  Okay.  And the government excused six or
20    eight charges.
21         THE COURT:  When you say excused, you are talking
22    about agreed not to pursue other charges, correct?
23         MR. EVANS:  Yes.
24         THE COURT:  Okay.
25         MR. EVANS:  Or did they remove charges,

GR       OCR       CM       CRR       CSR

1    Mr. Capozzolo, that he had already been indicted for?

2              THE COURT:  I don't think so.

3              MS. POSA:  He pled guilty to Count One, which was

4    racketeering, and in that count all those racketeering acts

5    covered the substantive charges and then --

6              THE COURT:  Maybe they did reduce charges then.

7              MR. EVANS:  Because I believe they excused the

8    extortion, the bribery, the money laundering and the money

9    laundering conspiracy, the wire fraud and the wire fraud

10   conspiracy.

11             MS. POSA:  He wasn't charged with extortion and it's

12   very difficult because he was charged with all of those things

13   within the RICO conspiracy.

14             THE COURT:  I know.  His exposure still is limited

15   to whatever the RICO statute is.  There is not an addition.

16             So I should say -- why don't I just leave it in?  To

17   reduced charges and/or, and if the jury really wants to know,

18   they can look at the agreement.  They are in evidence.  Okay?

19             MS. POSA:  That sounds right.

20             THE COURT:  Any objection to that?

21             MR. DiCHIARA:  Judge, is that on behalf of Starzecki

22   and Walters?

23             THE COURT:  Use the microphone.

24             MR. DiCHIARA:  Is that on behalf of both

25   cooperators, Starzecki and Walters?

2133

1           THE COURT:  Yes.

2           MR. DiCHIARA:  Okay.

3           THE COURT:  Okay.  Anything else on the charge?

4           MR. EVANS:  Nothing from me, Your Honor.

5           MS. POSA:  Not from the government, Your Honor.

6           MR. SERCARZ:  No.

7           THE COURT:  Then I have a couple of questions that I

8    want to go over with you.

9           We have to check the defendants testifying.  Let's

10   just make sure we get that right.

11          On page seven, okay, we do have one defendant who

12   did not testify.  So I will leave in the sentence at the top

13   of the page that you may not attach any significance to the

14   fact that defendant did not testify.

15          Okay?

16          Let me find the witness testimony section.  That is

17   page 79 and that will read, in a criminal case, the defendant

18   cannot be required to testify but in this case defendant Dunn

19   and the defendant Hymowitz have chosen to do so.  You are to

20   evaluate their testimony in the same manner that you evaluate

21   the testimony of the other witnesses.

22          MR. SERCARZ:  Your Honor, would the Court insert

23   language in connection with those two defendants who did

24   testify that the fact that they testified does not shift the

25   burden of proof?

2134

1          THE COURT:  Does anybody else want to be heard on

2     that?

3          MS. POSA:  We don't object.  It's already pretty

4     clear I think at the beginning where it says the burden never

5     shifts.

6          THE COURT:  Let's see if we can put it --

7          MS. POSA:  Page six of our version.

8          THE COURT:  I think there might be a better way to

9     do it.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GR       OCR       CM       CRR       CSR

2135

1          THE COURT:  Okay.  On page six where we have the

2    burden of proof, that says:  Throughout this trial, the burden

3    never shifts.  The defendants do not have to prove their

4    innocence.  Indeed, they need not submit any evidence at all.

5    This principle applies even where they do offer evidence on

6    their own behalf, or something like that.

7          MR. SERCARZ:  Thank you, Your Honor.

8          MS. POSA:  That sounds good.

9          THE COURT:  Okay.

10         Okay.  So if there is nothing else on the charge, I

11   have a couple of questions that I want to address with you

12   regarding summations and I want to ask you to inform me so we

13   do not have any problems tomorrow about anything that you may

14   think may be close to the line.  I really hate to have an

15   objection in the middle of the summation so if there is

16   anything that you have any doubts about, I want you to let me

17   know.

18         So first, we will start with the things that I

19   recall that came up during the trial that have to be

20   addressed.

21         I think we are clear on this, but this has to do

22   with something that came up during the testimony of

23   Mr. Starzecki about Habitat for Humanity and whether he was

24   able to use his contacts at charitable functions to get

25   business.

2136

1          I believe I ruled at that time, transcript page 679

2    and 702, that the government, of course, can argue that the

3    mere fact that you are charitable does not mean you are

4    innocent and that from the evidence, if the charitable

5    activities may also have been useful professionally, but that

6    the government is not permitted to argue that because

7    Mr. Starzecki had certain intent with respect to his

8    charitable activities, that that somehow means that

9    Mr. Hymowitz had the same intent with respect to his.

10          MS. POSA:  We agree.

11          THE COURT:  Okay.  And then the government in their

12    letter of March 17th asks that, on page five, that the

13    defendants be precluded from arguing about the propriety of

14    the retainer agreement and their billing practices in

15    summation.

16          Now, as things have turned out, the issues regarding

17    the agreement are somewhat different than we perhaps thought

18    they would be initially so let's just talk about whether there

19    is anything else, what it is exactly, if the government still

20    wants to try to limit the defense, what exactly you want to

21    limit them to and let's hear about that.

22          MS. POSA:  I think maybe we would have to -- if we

23    can get a proffer from the defense about what they intend to

24    argue about it.

25          THE COURT:  That may make sense.

2137

1          Do you have the letter, Mr. Sercarz?

2          MR. SERCARZ:  The retainer letter itself?

3          THE COURT:  No.  No.  The letter from the

4    government.  The March 17th letter from the government

5    addressed largely issues about character testimony, but at the

6    very end of the letter, it addressed the issue of asking me to

7    preclude the defense from making certain arguments regarding

8    the retainer agreement given that I had not let them put in

9    the disciplinary rules.

10         MS. POSA:  I think now, Your Honor, it's probably

11   moot because all the stuff about the retainer agreement and

12   professional rules, well, I guess at least concerning billing

13   records, now that's all out in the open and that's in

14   evidence.

15         THE COURT:  Right, but I just want to make sure that

16   there is nothing that is going to be said by the defense that

17   you are going to object to and let's let it all hang out here.

18         MR. SERCARZ:  I don't, I don't intend to argue that

19   the retainer agreement was in an appropriate form, that it

20   passed muster under the disciplinary rules.

21         THE COURT:  Right.  You are just going to argue it

22   is a draft or that Mr. Hymowitz -- well, you are going to

23   argue from his testimony.

24         MR. SERCARZ:  I think the use that I will make of

25   the retainer agreement is that it evinces his intent to seek

2138

1   bids on private jobs on behalf of the client rather than to

2   cover up a kickback payment.

3           If I had to put it in one sentence as to what I'm

4   going to say about the agreement, I'm not here to support the

5   notion that that agreement passes muster under the

6   disciplinary rules.  To the extent that the government is

7   seeking to use this as evidence that it was a sham retainer

8   agreement to disguise a kickback payment, I intend vigorously

9   to dispute that.  Does that help?

10          THE COURT:  What about the billing, about keeping

11  records?

12          MR. SERCARZ:  In that regard --

13          THE COURT:  I mean, the government, the argument in

14  the letter is that you should be precluded from arguing that

15  the explanations by the defense are consistent with the way

16  other lawyers operate and I am assuming you are not going to

17  argue that.  Is that a fair assumption?

18          MR. SERCARZ:  I will confine my arguments to the

19  defendant's own billing practices as he did when he testified.

20          THE COURT:  Okay.

21          MR. SERCARZ:  But just to make sure I'm not in the

22  proverbial doghouse which only I seem to inhabit, I do, I do

23  want to argue -- let me see if I can phrase this in a way

24  that's consistent with my thoughts because I'm kind of

25  tired -- I want to argue first that as the defendant

2139

1  understood his agreement with Mr. Starzecki, there was no need

2  for any billing records, but that's something that arises

3  separate and apart from the language of the agreement and

4  arises from my client's testimony regarding the understanding

5  he had based on his conversation with Mr. Freeman.  So I don't

6  see that as being controversial.

7          THE COURT:  All right.  And then Mr. DiChiara, is

8  there anything that you propose to argue about the agreement?

9          MR. DiCHIARA:  I don't see anything that I would

10  argue that would get into the, whether it's ethical or not

11  ethical with regard to the retainer agreement, Your Honor.

12          THE COURT:  All right.  Then I need to hear from the

13  government what you intend to say about the agreement or the

14  billing records.

15          MS. POSA:  I mean, I don't think we're going to --

16  we'll abandon the argument about the nonrefundable retainer

17  agreement.  We spent so much time briefing it, it kind of

18  seems to sad to say goodbye, but we're going to do that now.

19          THE COURT:  Okay.

20          MS. POSA:  Happily.

21          THE COURT:  So you are saying what you are

22  abandoning is the argument that a nonrefundable retainer

23  agreement would be a violation of the disciplinary rules?

24          MS. POSA:  Right.

25          THE COURT:  Okay.  So that won't come into this case

CMH        OCR        RMR        CRR        FCRR

1   at all.  Certainly, if you don't raise it, the defense isn't

2   going to raise it.  Okay.

3           And then billing records, it may be slightly

4   different.

5           MS. POSA:  As to the billing records, what we're

6   seeking to impeach is Mr. Hymowitz's statements on tape and on

7   the stand that he would just throw away records and we would

8   like to do that.  One way would be to say as a lawyer, he

9   certified that he knew that was not permissible, but that's

10  about it for that.

11          MR. SERCARZ:  I didn't hear the end of Ms. Posa's

12  sentence.  I'm sorry.

13          THE COURT:  Why don't you come up?  It will wake you

14  up.

15          MR. SERCARZ:  I could use it also, Your Honor.

16          MR. EVANS:  Can Mr. Dunn be excused to use the

17  restroom?

18          THE COURT:  If you don't mind him not being here.

19  He has to waive his presence or do you want --

20          MR. EVANS:  Yes.

21          THE COURT:  All right.

22          MS. POSA:  I think, at most, I'm just going to say

23  that one of the reasons why we know Mr. Hymowitz was not

24  honest in his conversations or on the stand is because lawyers

25  are required to keep billing records for seven years so why

2141

1    would he be throwing them out as soon as they're paid.  That's

2    about it.

3           MR. SERCARZ:  Isn't the only basis for that the very

4    disciplinary rules that the Court decided to exclude, Your

5    Honor?

6           MS. POSA:  I think they're all in now.

7           THE COURT:  I think it comes from his testimony that

8    he acknowledged these rules.

9           MR. DiCHIARA:  Judge, the problem --

10          THE COURT:  I think.

11          MR. SERCARZ:  He said, he said right or wrong, that

12    he thought that those records referred to the escrow accounts.

13          I mean, the government has free rein to say it's

14    implausible, it doesn't make sense, but I don't think that

15    they should adopt a formulation that indicates that this is

16    the state of the law because, frankly, I think the law as I

17    have learned it from Mr. Ross is a little bit more

18    complicated.

19          MR. DiCHIARA:  Judge, I have to inject one thing.

20    My understanding of his testimony was that there were no

21    billing records because there was a retainer, so he never sent

22    them billing records.

23          Now, I don't know of any regulation that requires

24    you to have to create billing records.  If billing records are

25    created, you must, you have to hold them, but there's no

CMH      OCR      RMR      CRR      FCRR

2142

1    regulation that says you must create billing records and so

2    his testimony is that there are no billing records.  I think

3    it would be wrong for the government to say he's violating

4    something if he had no obligation to make the billing record

5    in the first place.

6              MS. POSA:  The issue is just impeaching his

7    credibility on the stand and also in the tapes.  On the tapes,

8    he said, As a general practice, I throw away billing records.

9    As we brought out in his direct testimony, under the

10   professional responsibility rules, you can't do that.

11             So, what we're saying for a lot of other reasons as

12   well is that that's implausible.  We're not talking about

13   these -- we all agree that there's no billing records for

14   Bogdan Starzecki for different reasons.  That's just one more

15   reason why his statements particularly on the tape about

16   ripping things out of a looseleaf we think are not plausible.

17   It's a small point, but it's in evidence already.

18             MR. SERCARZ:  The argument that it allegedly

19   violates the disciplinary rules doesn't add or subtract from

20   the government's opportunity to impeach or the inferences that

21   they seek to draw, and it is taking what I have been told is a

22   complicated issue and oversimplifying it, with all due

23   respect.

24             We don't have, we -- the Court resolved, after a lot

25   of consideration, that we weren't going to have the back and

2143

1    forth about what constitutes a billing record for purposes of

2    the disciplinary rules, can a billing record be created after

3    the fact, is an invoice the only form of a billing record

4    which qualifies under the rules of professional

5    responsibility.

6              So, for the reasons I just gave and Mr. DiChiara's

7    reason, I don't think the government should avail itself of

8    that argument.

9              THE COURT:  I had like to remember exactly what the

10   testimony was today from Mr. Hymowitz.  What did you ask him

11   with respect to the billing records?

12             MS. POSA:  Well, we showed him the signed biannual

13   certifications that he signed.

14             THE COURT:  Right.

15             MS. POSA:  We admitted those into evidence.  Those

16   reference the rules.  We read the rules to him and he

17   acknowledged that that's what they were and he said that he

18   thought that they didn't apply.

19             THE COURT:  Could I have the document?  Because I

20   believe what you did was not really go back to the

21   disciplinary rules.

22             MS. POSA:  I read them.

23             THE COURT:  No.  You read what was in the

24   certification.

25             MS. POSA:  But that references the rules and I read

2144

1  the rules themselves.

2          THE COURT:  Could I see the certification, please?

3          MR. EVANS:  Your Honor, I don't have a dog in this

4  fight about the disciplinary rules, but I would point out that

5  the disciplinary rules and the Code of Professional

6  Responsibility in New York State has changed significantly in

7  the last ten years with the adoption of the code and the

8  standard and away from New York's own treatment of it and

9  there are all kinds of new responsibilities and delineations.

10          I just hear counsel and the U.S. Attorney talking

11  about the rules as if they're written in stone and they have

12  changed significantly.

13          THE COURT:  I just want to know what was in the

14  testimony because I think anything that came out in the

15  testimony would be fair game, but my recollection is that if

16  we were dealing with a direction about what was in the

17  disciplinary rules, then that would have come from me or from

18  a witness and it would have come with the limiting

19  instruction.  There was none requested and I think it's

20  because what was read to the witness that he responded to is

21  right there in the certification and it was not the

22  disciplinary rules as such.

23          May I see it, please?

24          MS. POSA:  I read the certification but then I read

25  the rules that are referenced there because they're not on the

1    face of the certification.

2              THE COURT:  And the rule that you read was what?

3              MS. POSA:  Now I don't have them in front of me so I

4    can't say.  It was the one for the 1st Department and then

5    that one references I think it's professional responsibility

6    Rule 1.15, so then I read that.

7              THE COURT:  Which said that they had to --

8              MS. POSA:  They had to keep all billing records for

9    seven years.

10             THE COURT:  And what did he say?

11             MS. POSA:  He acknowledged that's the rule and he

12   thought it didn't apply.  That's fine.  That's a question for

13   the jury.  I really believe that under Old Chief, we have a

14   right to present our case based on the evidence that's already

15   in the record the way we see fit and if Mr. Sercarz doesn't

16   agree with our interpretation, then he can argue that in his

17   summation.

18             MR. SERCARZ:  But the mere asking of a question does

19   not put an item into evidence.

20             THE COURT:  No, but if the witness, if the witness

21   agreed that that is what the rule says, then he is bound by

22   that.  No?  Did he?  I think he did.

23             MS. POSA:  He did.

24             MR. SERCARZ:  My recollection is not that he agreed

25   with what was said, but that he said, I thought those

1    regulations applied to my escrow account.  That was my

2    recollection of the testimony.

3             THE COURT:  Right.  So why can't it just go in that

4    way?  The government was saying --

5             MR. SERCARZ:  The government is now seeking to say

6    it's a rule, the client has it wrong, it doesn't apply just to

7    his escrow account, and based on this rule, which you can now

8    consider because I put it in the form of a question to a

9    witness, the defendant violated the rule and, therefore, has

10   engaged in a sham.

11            MS. POSA:  That's not --

12            MR. SERCARZ:  I don't think you can do that.

13            MS. POSA:  That's what we've been saying from the

14   very beginning as exactly what we do not plan to say.  We plan

15   to say he signed the certifications.  He knew the rules.

16            When he said that he didn't keep any billing

17   records, it's patently untrue, in addition to the fact that

18   the rules -- we can see from those Lutheran Synod records that

19   he kept very detailed records and he also testified that he

20   still had those in his possession long seven years after.

21   That doesn't make any sense.

22            What he said on tape was we don't keep any billing

23   records.  He didn't specify escrow.  This is just a way of

24   impeaching his statements, but I guarantee, and you are

25   welcome to ask for a side bar, if I get up there and say

2147

1    Mr. Hymowitz violated the rules, therefore, he committed a

2    crime, that will be stricken immediately, but I won't say it.

3         THE COURT:  Let's hear it again, your formulation,

4    insofar as your dealing with the rules.

5         MS. POSA:  I'm basically going to say you heard a

6    lot of reasons why you should not believe Mr. Hymowitz's

7    testimony or his statements on the tape.  One of them is that

8    when he said that he doesn't keep any billing records and he

9    throws them out as soon as they're paid is the fact that that

10   would have violated the very rules that he's certified that he

11   read.

12        MR. SERCARZ:  Bingo.  I object.

13        MS. POSA:  It would have violated.

14        MR. SERCARZ:  I object.

15        MS. POSA:  I'm not saying that he did violate it.

16        MR. SERCARZ:  I object.

17        MS. POSA:  I just feel like Mr. Hymowitz opened the

18   door when he testified.  We had briefed this and so

19   scrupulously tried to stay away from it and he got up there

20   and he has a right to be confronted with what he acknowledged

21   and certified.

22        MR. SERCARZ:  I didn't open the door.  You asked

23   this line of questions on cross-examination which is not

24   defense counsel opening the door on the direct.  I didn't go

25   into the attorney's certifications.  I didn't read him any

1    rules.  I didn't try and get him to take his conduct and

2    accommodate it within the rules.  I did nothing of the kind

3    that would have opened the door to a discussion about whether

4    or not my client's conduct violated the disciplinary rules.  I

5    didn't.

6         THE COURT:  My only concern is that we not get to

7    the point where we have the issue of violating the rules

8    because we would need a limiting instruction, I think, and I

9    never gave one and one wasn't requested in the way this came

10   out.  I had proposed one if we were going to go the other

11   route.

12        So I would like to see if the government has any

13   other way that they can present this other than using it

14   directly as, that the violation of the rules suggest that,

15   suggests something about his culpability.

16        MS. POSA:  I think Mr. Capozzolo has something to

17   add.

18        THE COURT:  Okay.

19        MR. CAPOZZOLO:  Judge, this is what we're seeking.

20        Mr. Hymowitz, in discussing whether or not he had

21   bills in the recorded conversations, made a general statement

22   that he never keeps bills.  He testified that he did keep some

23   bills and acknowledged that he has to keep them, certain bills

24   related to his ethical rules.

25        THE COURT:  That's so far so good, I think.

2149

1          MR. CAPOZZOLO:  Yes.  And we are saying, ladies and

2    gentlemen of the jury --

3          MR. SERCARZ:  Not objectionable, but in my view

4    contrary to what he said on the witness stand.  That's neither

5    here nor there.

6          MR. CAPOZZOLO:  Ladies and gentlemen of the jury,

7    you should not accept the defendant's testimony because when

8    he was telling Agent Richards we don't keep any bills, he was

9    merely using that as a ruse to push off providing any detailed

10   records about this so-called legal agreement with Starzecki

11   that's not true.

12         MR. SERCARZ:  That's fine.

13         MR. CAPOZZOLO:  That's all we're saying.

14         THE COURT:  Okay.

15         MR. SERCARZ:  That's fine.

16         THE COURT:  Okay.  I think the way you are saying it

17   is fine.  We just do not want to go back to the original

18   formation that was at issue in the beginning of this case.

19         MR. SERCARZ:  No.

20         MS. POSA:  Right.

21         THE COURT:  But be very careful.  I would urge

22   Ms. Posa to sit down and write it.  Everything else, you can

23   do contemporaneously, but I think this, carefully write it

24   down and if you have any questions, we can go over it first

25   thing in the morning.

CMH        OCR        RMR        CRR        FCRR

2150

1          Okay.  Anything else?

2          MR. SERCARZ:  With regard to my summation, Your

3     Honor --

4          THE COURT:  Yes.

5          MR. SERCARZ:  -- I have no intention of arguing that

6     the excerpts are selective because of the rules of evidence.

7          THE COURT:  Right.

8          MR. SERCARZ:  That was the problem on the opening.

9     I've been chastened and I'm well aware of that, but I do have

10    a question.

11         THE COURT:  Okay.

12         MR. SERCARZ:  The Court urged us all to be

13    consistent in referring to certain conduct as unlawful

14    financial transactions rather than money laundering.

15         THE COURT:  Correct.

16         MR. SERCARZ:  My client is charged with unlawful

17    financial transactions.

18         THE COURT:  Monetary transactions, they're called.

19         MR. SERCARZ:  Fine.  Under 1957.

20         THE COURT:  Right.

21         MR. SERCARZ:  When it comes time to describe what

22    Mr. Starzecki did with Mr. Koczon, that kind of conduct is a

23    little bit different.  It would have been prosecuted under a

24    different section of the law.  That's a 1956 --

25         MS. POSA:  He actually did plead guilty and he pled

2151

1   guilty to the same statute for money laundering.

2          MR. SERCARZ:  All right.  I guess this leads to the

3   question am I bound, when I refer to what it is that Starzecki

4   did with Mr. Koczon to again say that he engaged in an

5   unlawful monetary or financial transactions when the conduct

6   in which he engaged certainly comes closer to what a jury

7   would understand to be money laundering.

8          MS. POSA:  Your Honor, we think what they did is

9   classic money laundering.  I think what's good for the goose

10  is good for the gander.

11         THE COURT:  Let me just ask you, was that a

12  reduction in the charge for Mr. Starzecki?

13         MS. POSA:  No.  Mr. Starzecki, he pled to a whole

14  bunch of things he had never been charged with in his

15  information.  That was not a break.  One of the things he pled

16  guilty to was he engaged in unlawful monetary transactions.

17  That was a new charge.  And the reason why we did it that way

18  was to make sure that he had the same charges that were faced

19  by the defendants.

20         THE COURT:  Well, I really think I already ruled on

21  this when it came up and I do not think I should make any

22  change now.

23         MR. SERCARZ:  Very well.  Then I'll avoid the term

24  money laundering --

25         THE COURT:  Right.

2152

1          MR. SERCARZ:  -- in talking about Mr. Koczon.

2          THE COURT:  Frankly, I do not think it would be

3    helpful for your client either, but that is a different

4    question.

5          Okay.  Anything else?

6          MR. SERCARZ:  There's something else but not

7    relating to the summation.

8          THE COURT:  Okay.  Go ahead.

9          MR. SERCARZ:  I have a motion pending with you to

10   dismiss the charges.  The Court has reserved.  And now that

11   all the evidence is in, I would renew the motion to dismiss.

12         I know the Court doesn't want to hear lengthy

13   argument on it.  I will point out that the government called

14   Anne Marie --

15         THE COURT:  No.

16         MS. POSA:  No, we didn't.

17         MR. SERCARZ:  That Mr. Dunn called Anne Marie

18   Hendrickson but the government elicited from Ms. Hendrickson

19   some things about the billing process, among them the fact

20   that what people are certifying to when they file their

21   certifications is the estimate of what portion of the job is

22   complete.

23         Indeed, I got up then on, I don't know whether it's

24   redirect -- recross, I guess, because I wasn't the lawyer who

25   called the witness and said, in other words, if the estimate

1    of the percentage of each line item complete is accurate, then

2    is the requisition accurate.  She said yes.

3           THE COURT:  But the government had also asked a

4    slightly different question so each one of you can argue what

5    you want to the jury --

6           MR. SERCARZ:  The point here has always been that in

7    order for a defendant in this case to be guilty, it is not

8    enough that the government establish that the defendant

9    receive a kickback because not all kickbacks result in

10   inflated requisitions for payment, indeed, especially not in

11   this case where Mr. Starzecki is making money by lying about

12   the amount that the laborers are being paid.

13          MS. POSA:  Actually -- I'm sorry.

14          MR. SERCARZ:  Therefore, I respectfully submit there

15   must be some evidence in the case that the defendant whose

16   guilt or innocence you are considering knew that the

17   requisitions were inflated.  And as to my client,

18   Mr. Hymowitz, I renew the argument that there simply is no

19   such evidence.

20          THE COURT:  All right.  Counsel, I think I -- go

21   ahead.

22          MR. DiCHIARA:  You reserved on that, Judge, and I

23   just want for the record that I join in Mr. Sercarz's

24   application because I think it equally applies to Mr. Freeman.

25          THE COURT:  Any motions from Mr. Dunn?

2154

1          MR. EVANS:  We'll renew our motion for dismissal as

2    to Mr. Dunn and without lengthy argument, I will just say that

3    I don't believe in its case in chief that the people of the

4    U.S. Attorney's Office brought forth evidence of one single

5    requisition which they say was inflated, nor did they bring

6    Mr. Armstrong as to the extortion who they said was being

7    threatened.

8          THE COURT:  All right.  Did the government want to

9    respond to that?

10         MR. CAPOZZOLO:  Judge, by your statements, I know

11   you're aware that our theory is the bid amount was inflated

12   so, therefore, 20 percent of the higher number is a higher

13   number.

14         The only factual thing I wanted to state is I

15   believe Bed-Stuy contracts never said it's not a prevailing

16   wage job.  So the stealing from the workers' salaries did not

17   apply to that particular project.

18         THE COURT:  All right.  Counsel, I will reserve on

19   all Rule 29 motions and we will go to the jury and we will see

20   what happens.

21         MR. EVANS:  Thank you.

22         MR. SERCARZ:  Thank you, Your Honor.

23         THE COURT:  And I would like to see whether or not

24   we can get --

25         MR. DiCHIARA:  Judge, one last thing.  In going over

1   some of my cross-examination last night of Mr. Starzecki, I

2   noticed that the stenographer had put the name "Wolitz" when

3   it should have been "Walters" so we'll go through that and

4   bring out the relevant section.

5           THE COURT:  Okay.  That should get corrected.

6           MR. EVANS:  I should just --

7           THE COURT:  Why don't you let all counsel know.  If

8   all counsel are in agreement, I would authorize you to get in

9   touch with the court reporter as long as you are all in

10  agreement on it.

11          MR. DiCHIARA:  Okay.

12          THE COURT:  And Mr. Evans?

13          MR. EVANS:  I expect my close will be less than the

14  hour that I reserved.  Probably more like 45 minutes, Your

15  Honor.

16          THE COURT:  Okay.  And because what I am trying to

17  see is whether or not we could get everything done tomorrow

18  because if summations are long, we may have to take recesses

19  even in the middle of summations if they are too long, but we

20  certainly need to take recesses in between.  So I just ask you

21  to do the best you can so we can move this along.

22          MS. POSA:  And we should all be expected to close

23  and also rebut tomorrow, right?  There's no question that some

24  people should think about maybe waiting until Monday.

25          THE COURT:  No.  No.  I want everything done

2156

1    tomorrow if at all possible.  So, no.  That is exactly my

2    point.

3              MS. POSA:  Great.

4              THE COURT:  All right.  I will return these

5    documents.

6              MS. POSA:  Thank you, Your Honor.

7              THE COURT:  All right.  Then have a good night.

8              MS. POSA:  Wait.  Your Honor, there is one thing.

9              THE COURT:  Yes.

10             MS. POSA:  It's Mr. Dunn's post-arrest statement

11   that we tried to offer in evidence.

12             MR. SERCARZ:  Yes.

13             MS. POSA:  I think it's his statement.  It comes in

14   as a statement of a party opponent and mainly, just because

15   it's easier for the jury if they want to review it rather than

16   having to do a read back of the testimony, just give it to

17   them.

18             MR. SERCARZ:  I would respectfully object.

19             THE COURT:  Sustained.

20             MR. SERCARZ:  Thank you, Your Honor.

21             MS. POSA:  Okay.

22             (Matter adjourned to March 27, 2014 at 9:30 a.m.)

23

24

25

2157

1                              I N D E X

2

3    WITNESS                                                PAGE

4

5      L E E   H Y M O W I T Z

6         DIRECT EXAMINATION (Continuing) BY

7         MR. SERCARZ                                      1918

8         CROSS EXAMINATION

9         BY MS. POSA                                      1975

10        REDIRECT EXAMINATION

11        BY MR. SERCARZ                                   2042

12        RECROSS-EXAMINATION

13        BY MS. POSA                                      2056

14

15   CHARLOTTE LEE                                         2061

16        DIRECT EXAMINATION

17        BY MR. SERCARZ                                   2061

18        CROSS-EXAMINATION

19        BY MR. CAPOZZOLO                                 2073

20

21   DOROTHY SICIGNANO                                     2075

22        DIRECT EXAMINATION

23        BY MR. CAPOZZOLO                                 2075

24        CROSS-EXAMINATION

25        BY MR. SERCARZ                                   2079

                          VB      OCR      CRR

2158

1        REDIRECT EXAMINATION

2        BY MR. CAPOZZOLO                          2089

3        RECROSS EXAMINATION

4        BY MR. SERCARZ                            2096

5

6    S.  A.   N A U S H A N    R I C H A R D S

7        DIRECT EXAMINATION

8        BY MS. POSA                               2098

9        CROSS EXAMINATION

10       BY MR. EVANS                              2109

11

12

13                    E X H I B I T S

14

15

16    Government's Exhibit 605                     1993

17

18    Government's Exhibit 642                     2030

19

20    Government's Exhibit 641                     2039

21

22    Defendant's Exhibit Hymowitz D              2044

23

24    Government's Exhibits 900 and 901           2056

25

VB       OCR       CRR

## $

**$1,000** [1] - 1965:6
**$1,500** [1] - 2003:9
**$100** [1] - 2094:6
**$100,000** [8] - 1936:15, 1938:15, 1939:22, 1943:22, 2014:11, 2034:17, 2071:10
**$1000,000** [1] - 2015:23
**$11,000** [4] - 2033:17, 2035:25, 2036:2, 2036:3
**$134,500** [1] - 2015:5
**$150,000** [1] - 1984:12
**$2,000** [1] - 2003:9
**$23,395** [1] - 2040:24
**$23,398** [1] - 2041:21
**$300,000** [1] - 2104:9
**$34,5000** [1] - 1945:8
**$39** [4] - 1940:10, 2002:8, 2013:17, 2016:9
**$400** [3] - 2034:5, 2035:24, 2036:5
**$500** [1] - 2003:9
**$7,000** [1] - 2041:9
**$75,000** [2] - 2104:11, 2104:13
**$90,000** [1] - 1985:5
**$957** [1] - 2041:17

## '

**'06** [2] - 1992:20, 2051:25
**'08** [1] - 1993:3
**'10** [1] - 1993:11
**'98** [2] - 2061:18

## /

**/HEPB** [1] - 2091:10

## 1

**1** [1] - 1913:10
**1.15** [2] - 1995:15, 2145:6
**1.4** [1] - 1971:4
**10** [1] - 1940:23
**100** [1] - 2073:7
**10:00** [1] - 2125:18
**10th** [1] - 2026:16
**11-CR-00683(NG** [1] - 1912:3
**11201** [2] - 1912:15, 1912:24
**119th** [2] - 1945:23, 2033:16
**11:30** [1] - 2119:7
**11:40** [1] - 2119:7
**11th** [2] - 2026:12, 2026:20
**12** [2] - 1983:14, 1992:20
**1200.46** [1] - 1994:16
**12:00** [1] - 2119:7
**14** [2] - 1986:17
**144** [1] - 1984:1
**15** [11] - 1940:23, 1944:7, 1982:8, 1991:18, 1995:22, 1996:18, 2050:14, 2050:20, 2063:25, 2071:16, 2122:20
**153-count** [3] - 1980:7, 1980:10, 1980:14

**15th** [1] - 2038:24
**16** [3] - 1983:15, 2001:3, 2001:15
**1660** [1] - 2100:13
**1661** [1] - 2102:12
**17th** [4] - 2034:19, 2041:3, 2136:12, 2137:4
**18** [1] - 2058:7
**1871** [1] - 1978:7
**1880** [1] - 1987:16
**19** [1] - 1993:18
**1918** [1] - 2157:7
**1956** [1] - 2150:24
**1957** [1] - 2150:19
**1975** [2] - 1977:21, 2157:9
**1976** [4] - 1976:5, 1976:25, 1977:21, 1991:11
**1979** [1] - 1977:23
**1980** [1] - 2061:17
**1988** [1] - 1984:1
**1990s** [1] - 1979:2
**1991** [1] - 1980:6
**1993** [1] - 2158:16
**1996** [1] - 1980:24
**1998** [3] - 1982:9, 2063:15, 2070:13
**1999** [3] - 1922:5, 1984:9, 2070:14
**19th** [2] - 2033:22, 2038:22
**1:45** [1] - 2025:10
**1st** [6] - 1994:13, 1994:25, 2034:5, 2035:10, 2041:11, 2145:4

## 2

**2** [5] - 1940:1, 1940:5, 2051:17, 2091:4, 2091:12
**2.2** [1] - 2081:6
**20** [4] - 1948:11, 1968:22, 2127:24, 2154:12
**20,000** [1] - 2104:13
**20-year** [1] - 1970:25
**2000** [7] - 1922:17, 1922:18, 1922:19, 1981:9, 1987:10, 1988:16, 2070:13
**2000's** [2] - 1986:15, 1986:23
**2001** [2] - 1924:1, 1930:6
**2002** [5] - 1922:4, 1922:7, 1955:11, 1984:17, 2045:17
**2003** [6] - 1921:7, 1921:8, 1955:12, 1955:13, 1959:22, 1987:10
**2004** [2] - 1929:8, 1992:13
**2005** [2] - 1929:16, 2038:8
**2005-2006-2007** [1] - 1929:24
**2006** [14] - 1926:13, 1926:25, 1930:16, 1930:21, 1930:25, 1932:11, 1944:24, 1948:6, 2002:7, 2035:18, 2035:24, 2037:11, 2041:3, 2054:4
**2007** [33] - 1926:13, 1930:22, 1930:25, 1932:2, 1932:6, 1935:5, 1936:10, 1938:4, 1940:1, 1940:5, 1944:24, 1945:7, 1947:20, 1948:4, 1948:6, 1948:8, 1948:14, 1948:18, 1950:11, 1950:17, 1954:6, 2031:2, 2034:19, 2035:17, 2037:23, 2038:22, 2041:11, 2051:17, 2051:22, 2051:23, 2052:2, 2054:24, 2061:19
**2007-year** [1] - 1943:14
**2008** [14] - 1948:5, 1948:8, 1948:13, 1948:15, 1950:7, 1950:17, 2033:22, 2034:5, 2035:10, 2035:19, 2036:1, 2040:21, 2041:25, 2070:14
**2009** [3] - 1948:18, 1950:18, 2037:4
**2011** [8] - 1950:4, 1950:20, 1950:21, 1952:18, 2015:8, 2017:16, 2089:19, 2098:10
**2012** [4] - 1976:18, 1976:22, 1993:18, 2086:14
**2013** [1] - 2068:10
**2014** [2] - 1912:7, 2156:22
**2030** [1] - 2158:18
**2039** [1] - 2158:20
**2042** [1] - 2157:11
**2044** [1] - 2158:22
**2056** [2] - 2157:13, 2158:24
**2061** [2] - 2157:15, 2157:17
**2073** [1] - 2157:19
**2075** [2] - 2157:21, 2157:23
**2079** [1] - 2157:25
**2089** [1] - 2158:2
**2096** [1] - 2158:4
**2098** [1] - 2158:8
**2109** [1] - 2158:10
**22** [3] - 2076:6, 2080:13, 2096:9
**225** [1] - 1912:24
**24-hour** [1] - 2099:13
**25** [4] - 1946:25, 1997:2, 2000:2, 2000:9
**250** [1] - 2061:19
**26** [7] - 1912:7, 2057:15, 2057:17, 2100:4, 2101:2, 2112:24, 2114:13
**26th** [1] - 2013:13
**27** [5] - 2076:13, 2086:14, 2088:17, 2088:22, 2156:22
**271** [1] - 1912:14
**27th** [2] - 1940:11, 2110:2
**28** [1] - 1993:3
**29** [2] - 2154:19
**2:00** [2] - 2024:11, 2024:13
**2nd** [10] - 1932:6, 1939:25, 1950:13, 1994:14, 2038:6, 2038:7, 2038:8, 2040:21, 2041:25, 2054:24

## 3

**3** [4] - 1952:18, 1987:21, 1992:13, 2026:17
**3.3** [1] - 2094:7
**30** [2] - 1948:11, 1950:22
**300** [1] - 1927:3
**302** [1] - 2121:10
**31st** [3] - 1945:7, 2031:2, 2035:16
**320** [1] - 1984:14
**334** [2] - 1984:14, 1984:20
**34** [1] - 2058:10
**34,500** [1] - 2015:7
**38** [3] - 1978:11, 1991:17, 1996:19

**3rd** [2] - 1993:11, 2015:8

**4**

**404(b** [1] - 1969:17
**404(b)** [1] - 1969:14
**45** [2] - 2111:4, 2155:14

**5**

**5** [2] - 1950:25, 1971:9
**510** [14] - 1968:24, 1970:23, 2024:5, 2077:22, 2079:25, 2080:12, 2081:22, 2082:7, 2084:5, 2089:14, 2090:24, 2093:7, 2094:17, 2096:22
**522** [1] - 1964:5
**546** [1] - 1984:14
**550** [2] - 2037:19, 2038:16
**552** [1] - 2020:21
**5T** [1] - 1951:1
**5th** [2] - 2098:10, 2110:12

**6**

**60** [1] - 1942:4
**600** [5] - 1938:23, 1939:18, 2007:20, 2051:17, 2051:20
**602** [1] - 2017:7
**603.15** [2] - 1994:13, 1995:9
**605** [3] - 1992:2, 1993:21, 2158:16
**608** [1] - 1969:17
**608(b)** [1] - 1970:20
**624** [1] - 2101:17
**630** [1] - 2020:1
**64** [2] - 2126:22, 2126:23
**641** [4] - 2039:17, 2039:21, 2039:24, 2158:20
**642** [5] - 2030:5, 2030:14, 2030:17, 2051:14, 2158:18
**654** [2] - 1984:15, 1984:20
**679** [1] - 2136:1
**691.12** [1] - 1994:14

**7**

**702** [1] - 2136:2
**75** [1] - 2127:22
**77** [1] - 2127:11
**79** [1] - 2133:17

**8**

**82-year** [1] - 2081:22
**83** [1] - 2128:16
**85** [2] - 2061:20, 2130:24
**86** [2] - 2079:16, 2079:18
**8:00** [2] - 2098:15, 2098:17
**8:45** [1] - 2101:7

**9**

**9-102** [1] - 1994:18
**900** [3] - 2056:5, 2058:5, 2158:24
**901** [2] - 2056:6, 2158:24

**903** [1] - 2103:1
**9:30** [1] - 2156:22
**9:40** [1] - 2119:3
**9:45** [1] - 1912:7
**9th** [2] - 2037:23, 2038:7

**A**

**a.m** [2] - 1912:7, 2156:22
**Aaron** [1] - 2044:14
**abandon** [1] - 2139:16
**abandoning** [1] - 2139:22
**abetted** [1] - 2126:9
**abetting** [5] - 2126:3, 2126:7, 2126:8, 2127:12, 2127:24
**abide** [1] - 1958:4
**ability** [2] - 2013:23, 2053:16
**able** [25] - 1953:3, 1953:12, 1956:12, 1968:1, 1968:14, 1968:18, 1990:11, 1990:16, 2015:25, 2016:19, 2016:25, 2025:13, 2066:15, 2071:21, 2073:11, 2094:3, 2099:17, 2100:1, 2117:10, 2119:21, 2119:22, 2121:3, 2124:18, 2125:8, 2135:24
**absence** [2] - 2065:1, 2065:8, 2125:22
**absent** [1] - 2026:12
**absolute** [1] - 2059:21
**absolutely** [13] - 1928:10, 1989:23, 2007:17, 2017:11, 2017:22, 2018:10, 2018:13, 2029:8, 2032:15, 2032:17, 2034:12, 2071:23, 2105:13
**Abstract** [1] - 2052:20
**abstract** [1] - 2067:16
**accept** [6] - 1933:4, 1972:9, 1981:13, 1994:10, 2099:14, 2149:7
**acceptable** [2] - 1916:5, 1916:8
**accepted** [1] - 1987:8
**access** [1] - 2051:9
**accommodate** [4] - 1913:22, 1973:16, 1973:19, 2148:2
**accordance** [2] - 1994:13, 2055:4
**according** [3] - 1923:3, 2047:20, 2054:24
**account** [14] - 1942:3, 1943:23, 1947:24, 1999:5, 1999:6, 2019:3, 2037:25, 2038:1, 2038:12, 2038:13, 2039:4, 2055:16, 2146:1, 2146:7
**accountant** [6] - 1975:12, 2018:2, 2082:8, 2082:10, 2082:12
**accountants** [1] - 1998:22
**accounts** [2] - 1996:13, 2141:12
**accurate** [7] - 1937:8, 2000:8, 2057:23, 2067:21, 2102:17, 2153:1, 2153:2
**accustomed** [1] - 2012:16
**acknowledged** [5] - 2141:8, 2143:17, 2145:11, 2147:20, 2148:23
**acknowledging** [1] - 1952:20
**acquainted** [1] - 2063:12
**acquire** [1] - 1961:7
**acquiring** [1] - 2120:9
**acres** [1] - 1930:5

**act** [2] - 2088:24, 2127:11
**acted** [1] - 1972:1
**acting** [5] - 1963:11, 1975:12, 1985:7, 2020:9, 2113:4
**actions** [2] - 2089:21, 2113:2
**activities** [3] - 2074:10, 2136:5, 2136:8
**acts** [1] - 2132:4
**actual** [5] - 2003:16, 2016:17, 2032:12, 2103:3, 2104:14
**acute** [1] - 1926:2
**add** [4] - 2129:10, 2129:23, 2142:19, 2148:17
**adding** [1] - 2127:2
**addition** [4] - 1942:22, 2064:1, 2132:15, 2146:17
**additional** [3] - 1930:14, 2067:21, 2102:23
**additionally** [1] - 1985:19
**address** [1] - 2135:11
**addressed** [4] - 2086:22, 2135:20, 2137:5, 2137:6
**addresses** [1] - 1984:20
**addressing** [1] - 1916:18
**adjourned** [1] - 2156:22
**adjournment** [2] - 2044:23, 2057:2
**administered** [1] - 2120:5
**administrative** [1] - 2064:1
**admissible** [1] - 2108:11
**admission** [5] - 1957:6, 1957:9, 1957:11, 1957:12, 1957:21
**admit** [4] - 1993:20, 2030:13, 2039:20, 2102:24
**admitted** [7] - 1976:5, 1991:11, 2009:4, 2034:2, 2034:3, 2103:3, 2143:15
**adopt** [2] - 2019:13, 2141:15
**adoption** [1] - 2144:7
**advance** [2] - 1941:21, 1942:12
**advanced** [1] - 1941:2
**Advice** [4] - 2101:15, 2101:19, 2102:14
**advise** [1] - 1913:10
**advised** [3] - 1918:7, 1988:9, 1988:11
**advising** [1] - 2060:8
**advisor** [6] - 1927:18, 1928:15, 1929:21, 1930:13, 2047:9, 2060:10
**advisory** [1] - 2052:17
**advocated** [1] - 2005:25
**Affairs** [1] - 2048:18
**affairs** [1] - 1919:12
**affecting** [1] - 2045:12
**affiliate** [1] - 2073:3
**affirm** [1] - 1994:15
**affirmation** [2] - 1994:4, 1994:8
**afford** [4] - 1928:3, 1977:10, 1977:18, 2063:17
**Affording** [1] - 1943:7
**aftermath** [2] - 1945:11, 1959:9
**afternoon** [8] - 2061:12, 2064:17, 2073:24, 2075:6, 2075:24, 2098:6, 2098:7, 2100:17
**AFTERNOON** [2] - 2025:18, 2026:1
**age** [1] - 1919:1

**agent** [9] - 1957:20, 2049:16, 2068:18, 2098:21, 2109:3, 2114:10, 2114:16, 2115:20

**Agent** [43] - 1912:22, 1915:2, 1945:10, 1952:17, 1952:21, 1953:6, 1953:19, 1953:25, 1975:11, 1975:17, 2001:14, 2004:1, 2010:4, 2015:7, 2018:1, 2028:21, 2028:24, 2049:13, 2049:18, 2066:22, 2067:4, 2067:17, 2068:3, 2068:7, 2068:16, 2069:8, 2097:10, 2097:15, 2098:6, 2098:8, 2101:10, 2103:15, 2105:4, 2108:9, 2109:9, 2111:1, 2113:13, 2114:17, 2114:18, 2119:19, 2120:5, 2121:14, 2149:8

**agents** [11] - 2049:6, 2049:10, 2049:13, 2099:24, 2107:14, 2112:4, 2112:21, 2114:16, 2119:14, 2120:8, 2121:4

**ago** [17] - 1951:7, 1976:17, 1978:12, 2050:15, 2050:16, 2056:24, 2057:15, 2057:17, 2057:18, 2057:19, 2057:20, 2058:7, 2088:17, 2088:22, 2095:10, 2122:24

**agree** [14] - 1971:17, 1989:9, 1995:13, 1995:23, 1998:13, 2018:8, 2019:19, 2019:21, 2019:22, 2083:16, 2131:8, 2136:10, 2142:13, 2145:16

**agreed** [5] - 1943:13, 2130:25, 2131:22, 2145:21, 2145:24

**agreement** [49] - 1917:9, 1936:20, 1936:21, 1939:24, 1941:12, 1942:20, 1942:22, 1942:23, 1942:25, 1951:10, 1952:22, 1953:7, 2007:21, 2009:15, 2010:5, 2010:10, 2013:17, 2013:21, 2013:22, 2031:4, 2032:3, 2032:25, 2033:20, 2034:6, 2050:11, 2051:11, 2051:16, 2055:19, 2131:16, 2132:18, 2136:14, 2136:17, 2137:8, 2137:11, 2137:19, 2137:25, 2138:4, 2138:5, 2138:8, 2139:1, 2139:3, 2139:8, 2139:11, 2139:13, 2139:17, 2139:23, 2149:10, 2155:8, 2155:10

**agreements** [6] - 1917:7, 1917:14, 2010:18, 2012:11, 2014:3, 2130:19

**agrees** [2] - 2019:17, 2131:6

**ahead** [9] - 1929:13, 2019:18, 2028:6, 2055:22, 2066:6, 2067:10, 2152:8, 2153:21

**aid** [1] - 1951:1

**Aid** [2] - 1977:4, 1977:20

**aided** [1] - 2126:9

**aiding** [5] - 2126:3, 2126:7, 2127:12, 2127:24

**airport** [1] - 2100:15

**al** [2] - 1914:23, 2043:9

**Al** [1] - 1915:5

**Al-Shabazz** [1] - 1915:5

**Albany** [1] - 1928:12

**ale** [1] - 2066:1

**alert** [1] - 1917:6

**Alex** [1] - 2023:9

**alive** [1] - 2079:15

**ALL** [1] - 2026:13

**allegations** [1] - 1980:11

**alleged** [3] - 1933:11, 2012:13, 2013:15

**allegedly** [3] - 1957:4, 2011:24, 2142:18

**allow** [7] - 1913:10, 1934:7, 1970:1, 1972:25, 2025:1, 2067:2, 2068:18

**allowed** [7] - 1956:4, 1956:7, 1957:3, 1969:10, 1969:15, 2037:1, 2089:17

**allowing** [1] - 2005:16

**allows** [1] - 2021:10

**almost** [8] - 1926:16, 1939:8, 1948:11, 1998:18, 2028:18, 2041:9, 2063:24, 2123:24

**alone** [2] - 2088:15, 2108:12

**alternatives** [1] - 1928:4

**amended** [1] - 1942:23

**America** [1] - 1981:15

**AMERICA** [1] - 1912:3

**Americans** [2] - 2063:5, 2063:16

**amount** [14] - 1934:17, 1939:3, 1942:4, 1943:21, 1945:8, 1959:23, 2042:5, 2046:1, 2046:2, 2059:9, 2071:23, 2094:16, 2153:12, 2154:11

**amounts** [1] - 2017:12

**ancillary** [1] - 2051:11

**AND** [1] - 1912:7

**angry** [1] - 2088:6

**animated** [1] - 2104:22

**Anne** [4] - 2018:16, 2075:12, 2152:14, 2152:17

**ANSWER** [1] - 1978:11

**answer** [17] - 1926:11, 1930:23, 1970:2, 1997:9, 2001:22, 2003:25, 2045:21, 2064:18, 2072:12, 2080:22, 2087:8, 2090:12, 2111:12, 2111:14, 2120:2, 2130:18

**answered** [2] - 1951:8, 2122:4

**answers** [2] - 2080:21, 2081:8

**Anthony** [2] - 1915:2, 1915:6

**ANTHONY** [1] - 1912:15

**anticipated** [1] - 1947:14

**anyplace** [1] - 2012:9

**anyway** [3] - 2026:16, 2066:14, 2067:2

**apart** [1] - 2139:3

**apartment** [1] - 1939:15

**apologize** [4] - 1975:5, 2009:13, 2024:23, 2058:21

**appear** [6] - 1941:14, 1952:4, 2045:1, 2066:19, 2104:24, 2105:12

**appearance** [1] - 2044:24

**appearances** [1] - 1914:24

**appeared** [7] - 1981:1, 1981:10, 1982:1, 2042:16, 2062:19, 2062:21, 2093:11

**Appellate** [2] - 1994:15, 1994:17

**application** [5] - 1922:16, 1922:18, 1967:19, 1969:14, 2153:24

**applications** [1] - 1970:11

**applied** [3] - 1921:11, 1943:23, 2146:1

**applies** [3] - 1916:17, 2135:5, 2153:24

**apply** [12] - 1921:1, 1921:9, 1956:15, 1956:19, 1960:2, 1960:4, 1995:6,

2124:21, 2143:18, 2145:12, 2146:6, 2154:17

**appreciate** [1] - 1914:11

**apprised** [1] - 1943:8

**approach** [8] - 1932:14, 1948:23, 1955:22, 1966:3, 2008:17, 2085:2, 2091:15, 2108:2

**approached** [2] - 1926:25, 1927:9

**appropriate** [3] - 2081:10, 2126:7, 2137:19

**approval** [3] - 1922:8, 1941:22, 2005:7

**approved** [6] - 1922:10, 1922:15, 1922:19, 1946:1, 1988:18, 2021:15

**approves** [1] - 1954:24

**approximate** [1] - 1923:24

**April** [10] - 1992:20, 1993:18, 2026:12, 2026:16, 2026:20, 2037:23, 2038:7, 2038:22, 2038:24, 2039:6

**apropos** [1] - 2065:18

**Apuzzo** [2] - 1912:22, 1915:3

**aqua** [1] - 1920:1

**architect** [5] - 2053:15, 2053:16, 2054:2, 2060:1, 2060:6

**architects** [1] - 1947:8, 2055:12

**area** [5] - 1928:22, 2002:1, 2024:8, 2113:1, 2118:10

**areas** [1] - 1927:24

**argue** [16] - 1957:14, 1967:23, 1968:12, 2136:2, 2136:6, 2136:24, 2137:18, 2137:21, 2137:23, 2138:17, 2138:23, 2138:25, 2139:8, 2139:10, 2145:16, 2153:4

**arguing** [3] - 2136:13, 2138:14, 2150:5

**argument** [10] - 1962:22, 1968:9, 2138:13, 2139:16, 2139:22, 2142:18, 2143:8, 2152:13, 2153:18, 2154:2

**arguments** [4] - 2124:12, 2125:17, 2137:7, 2138:18

**arisen** [1] - 1955:3

**arises** [2] - 2139:2, 2139:4

**Armstrong** [10] - 1965:24, 2100:16, 2103:23, 2109:12, 2109:17, 2109:21, 2110:5, 2110:10, 2122:13, 2154:6

**arrange** [3] - 2109:13, 2110:2, 2110:12

**arranged** [1] - 2109:9

**arrangement** [5] - 1973:17, 2029:22, 2032:11, 2034:16, 2036:8

**arrangements** [3] - 1913:11, 1914:9, 1914:11

**arrest** [16] - 2098:10, 2099:24, 2102:25, 2106:21, 2107:1, 2108:11, 2109:3, 2109:10, 2110:17, 2114:12, 2117:24, 2118:4, 2118:8, 2119:6, 2120:25, 2156:10

**arrested** [5] - 2098:14, 2099:1, 2099:4, 2100:25, 2101:23

**arrests** [2] - 2098:20, 2099:10

**arrived** [2] - 2113:21, 2113:23

**article** [3] - 2093:11, 2093:13, 2093:17

**aside** [1] - 1988:20

**aspect** [1] - 1990:17

aspects [1] - 2067:10
asserted [2] - 1933:3, 1958:5
asset [2] - 1988:24, 2096:21
assigned [2] - 1984:4, 2123:13
assist [5] - 1926:12, 1929:18, 1948:17, 1953:15, 2064:1
assistance [3] - 2107:13, 2123:13, 2131:3
Assistant [2] - 1912:16, 2049:2
Assisted [1] - 1912:25
assisted [1] - 1990:21
assisting [2] - 1930:16, 2099:24
associate [1] - 2012:25
associated [1] - 2093:10
association [1] - 1916:16
assume [4] - 1949:14, 1967:22, 2068:23, 2082:17
assuming [2] - 2066:23, 2138:16
assumption [2] - 2138:17
AT [1] - 1919:21
ate [2] - 2066:6, 2107:16
attach [2] - 2021:20, 2133:13
attack [1] - 1971:20
attempted [1] - 2055:6
attend [4] - 1961:5, 1961:9, 2089:17, 2090:14
attention [7] - 1922:11, 1939:18, 1950:24, 1951:5, 2044:9, 2093:2, 2104:3
attitude [1] - 2072:10
attorney [45] - 1927:15, 1930:15, 1930:21, 1934:4, 1939:9, 1939:12, 1963:22, 1977:10, 1978:11, 1985:7, 1990:2, 1990:9, 1991:3, 1991:4, 1991:15, 1992:8, 1992:15, 1993:12, 1994:20, 2002:14, 2004:25, 2006:17, 2006:20, 2006:22, 2006:24, 2007:1, 2007:7, 2007:10, 2007:11, 2007:13, 2021:7, 2021:12, 2021:20, 2023:8, 2023:10, 2037:25, 2043:17, 2044:10, 2044:22, 2044:23, 2058:6, 2086:9, 2087:23, 2123:1, 2123:4
Attorney [6] - 1912:13, 1912:16, 2048:22, 2049:1, 2049:2, 2144:10
attorney's [1] - 2147:25
Attorney's [1] - 2154:4
attorney-at-law [1] - 2037:25
attorneys [13] - 1927:2, 1953:21, 1986:17, 1986:18, 1994:20, 2038:13, 2044:12, 2052:8, 2055:10, 2102:8, 2102:9, 2124:13, 2124:15
attorneys-at-law [1] - 2038:13
audio [1] - 2122:13
audio-taped [1] - 2122:13
audiotape [2] - 2122:11, 2122:16
August [1] - 2033:22
authored [1] - 2121:18
authority [1] - 2084:4
authorize [1] - 2155:8
authorized [3] - 1995:18, 2022:22, 2022:23

automatically [1] - 2057:2
avail [1] - 2143:7
available [3] - 1965:12, 1995:16, 2028:22
Avenue [21] - 1922:13, 1923:22, 1925:10, 1961:12, 1968:24, 1970:24, 1987:2, 2024:5, 2077:22, 2079:9, 2079:12, 2080:1, 2080:12, 2081:22, 2082:7, 2084:5, 2089:14, 2090:24, 2094:17, 2096:9, 2096:22
Avitabile [1] - 2023:10
avoid [1] - 2151:23
await [1] - 1967:15
award [1] - 2073:14
aware [13] - 1988:7, 1988:20, 2018:24, 2022:2, 2048:22, 2050:17, 2066:3, 2093:5, 2093:9, 2107:4, 2125:10, 2150:9, 2154:11

## B

background [2] - 1918:14, 2079:13
bad [2] - 1919:22, 2083:10
bagel [1] - 2105:18
bailiwick [1] - 2010:19
balance [1] - 2104:11
bank [23] - 1918:23, 1919:3, 1919:5, 1919:8, 1928:23, 1934:19, 1945:4, 1948:16, 1954:21, 1954:22, 1960:14, 1960:15, 1960:16, 1964:4, 1964:22, 1965:7, 1983:3, 2002:14, 2021:15, 2022:14, 2028:12, 2039:4, 2094:3
banker [2] - 1990:9, 2061:17
bankers [1] - 2055:9
Bankers [1] - 1918:24
banking [5] - 1918:22, 1948:21, 2021:18, 2022:13, 2022:15
banks [3] - 1959:24, 1986:4, 2023:7
bans [1] - 2014:3
bar [28] - 1913:12, 1913:15, 1914:15, 1933:1, 1933:15, 1935:22, 1936:1, 1937:22, 1949:1, 1949:17, 1976:5, 1976:8, 2000:13, 2000:23, 2009:1, 2065:17, 2085:10, 2085:21, 2092:1, 2092:19, 2108:4, 2108:7, 2108:22, 2115:11, 2115:14, 2116:23, 2117:16, 2146:25
Bar [1] - 1991:11
Barbara [3] - 1996:24, 1997:20, 1997:21
Barnett [4] - 1927:11, 2047:17, 2052:5, 2052:7
base [3] - 2088:17, 2111:9, 2112:2
based [20] - 1937:14, 1937:16, 1969:1, 1974:7, 1990:7, 2010:12, 2013:3, 2013:22, 2016:18, 2018:7, 2021:23, 2028:16, 2040:21, 2078:14, 2079:8, 2088:14, 2110:25, 2139:5, 2145:14, 2146:7
basement [1] - 1945:24
basic [1] - 2004:25
basing [1] - 2088:15
basis [18] - 1920:16, 1929:2, 1942:3,

1942:9, 1968:20, 1972:7, 1972:11, 1986:23, 1995:19, 2025:4, 2034:5, 2035:11, 2035:22, 2092:3, 2099:7, 2099:8, 2110:21, 2141:3
bathroom [2] - 2065:25, 2100:18
bear [2] - 1995:8, 2097:11
Bebe [1] - 2079:6
became [4] - 1926:2, 1930:10, 1939:24, 2061:22
because's [1] - 1972:10
become [3] - 1926:5, 2050:18, 2071:1
bed [1] - 2099:16
Bed [16] - 1921:23, 1922:25, 1925:7, 1926:1, 1926:10, 1932:11, 1934:15, 1987:17, 2006:8, 2021:22, 2023:22, 2023:22, 2039:10, 2040:13, 2040:20, 2154:15
Bed-Stuy [16] - 1921:23, 1922:25, 1925:7, 1926:1, 1926:10, 1932:11, 1934:15, 1987:17, 2006:8, 2021:22, 2023:20, 2023:22, 2039:10, 2040:13, 2040:20, 2154:15
Bed/Stuy [1] - 1962:1, 1962:5
Bedford [10] - 1922:3, 1922:9, 1923:20, 1925:5, 1951:21, 1964:24, 1988:18, 2045:17, 2054:7, 2077:24
Bedford-Stuy [1] - 1922:9
Bedford-Stuyvesant [3] - 1951:21, 1988:18, 2077:24
befogged [2] - 2068:14, 2104:24
BEFORE [1] - 1912:10
began [2] - 1922:14, 1963:8
begging [1] - 2054:11
begin [3] - 1967:4, 2026:8, 2124:21
beginning [8] - 1948:8, 1959:24, 1960:24, 2103:18, 2105:16, 2134:4, 2146:14, 2149:18
behalf [18] - 1941:9, 1942:13, 1943:24, 1955:18, 1959:5, 1963:11, 1981:1, 1981:10, 1996:1, 2021:10, 2044:20, 2044:23, 2054:25, 2060:3, 2132:21, 2132:24, 2135:6, 2138:7
behavior [1] - 2096:20
behind [1] - 2117:8
belabor [1] - 2116:11
belief [5] - 1994:6, 2039:11, 2051:4, 2051:7, 2054:25
bell [1] - 1951:12, 1987:24
below [1] - 1964:15
benefit [2] - 1971:10, 2083:24
benefits [1] - 2025:13
best [20] - 1932:10, 1934:14, 1952:11, 1956:5, 1961:12, 1978:9, 1994:5, 2013:23, 2017:6, 2033:19, 2039:13, 2039:15, 2040:18, 2054:24, 2059:8, 2059:11, 2059:15, 2059:21, 2080:24, 2155:21
better [6] - 1928:1, 1977:17, 1990:1, 2003:13, 2067:3, 2134:8
between [12] - 1934:20, 1940:22, 1957:18, 1961:18, 1978:17, 2033:10,

2033:20, 2050:13, 2059:22, 2115:2, 2122:13, 2155:20

**beyond** [1] - 2115:6

**biannual** [1] - 2143:12

**bias** [1] - 2092:12

**bid** [23] - 1921:13, 1946:5, 1946:20, 1946:22, 1946:24, 1946:25, 2005:17, 2016:3, 2016:20, 2018:9, 2019:2, 2058:23, 2059:12, 2059:15, 2059:16, 2059:19, 2059:24, 2060:3, 2060:7, 2060:11, 2060:13, 2154:11

**bidder** [1] - 2059:23

**bidding** [9] - 1923:11, 1925:4, 1925:6, 1946:3, 1946:7, 2018:5, 2018:8, 2019:2, 2054:20

**bids** [21] - 1923:1, 1923:9, 1938:21, 1947:20, 2015:13, 2015:24, 2016:20, 2019:20, 2019:23, 2031:15, 2031:17, 2051:8, 2051:10, 2055:1, 2055:5, 2055:7, 2058:25, 2059:1, 2060:1, 2138:1

**big** [3] - 2001:19, 2073:4, 2072:22

**biggest** [1] - 2059:12

**bill** [19] - 1942:13, 1952:12, 1952:15, 1952:24, 1962:19, 1997:18, 2002:11, 2002:17, 2002:22, 2003:1, 2003:8, 2003:10, 2028:15, 2030:23, 2030:24, 2033:22, 2034:19, 2052:1

**billable** [1] - 1942:19

**billed** [6] - 1942:9, 2028:18, 2046:1, 2052:19, 2052:22, 2053:20

**billing** [48] - 1942:8, 1947:23, 1952:8, 1952:24, 1953:23, 1954:9, 1973:11, 1973:15, 1973:16, 1996:15, 1998:24, 2001:17, 2004:2, 2029:4, 2029:9, 2029:12, 2029:13, 2029:19, 2030:3, 2034:4, 2035:10, 2136:14, 2137:12, 2138:10, 2138:19, 2139:2, 2139:14, 2140:3, 2140:5, 2140:25, 2141:21, 2141:22, 2141:24, 2142:1, 2142:2, 2142:4, 2142:8, 2142:13, 2143:1, 2143:2, 2143:3, 2143:11, 2145:8, 2146:16, 2146:22, 2147:8, 2152:19

**bills** [26] - 1942:10, 1954:5, 1996:3, 1997:14, 1998:1, 1998:6, 1998:8, 1998:14, 1998:20, 1998:23, 2000:9, 2002:4, 2002:6, 2003:3, 2004:3, 2030:1, 2030:9, 2032:23, 2045:23, 2051:15, 2055:2, 2148:21, 2148:22, 2148:23, 2149:8

**binder** [2] - 1951:14, 2003:11

**bingo** [1] - 2147:12

**bit** [8] - 1920:24, 1973:10, 1995:8, 2044:6, 2092:17, 2129:25, 2141:17, 2150:23

**bite** [1] - 2100:19

**black** [2] - 1988:17, 2102:7

**blessed** [2] - 1977:15, 2036:13

**blocks** [1] - 1950:23

**Bloomberg** [1] - 2062:21

**board** [16] - 1987:17, 1987:22, 1988:6,

1988:11, 2063:22, 2064:8, 2070:16, 2070:18, 2071:15, 2071:17, 2072:25, 2083:23, 2089:17, 2089:18, 2089:20

**Board** [1] - 1987:21

**boarded** [1] - 1959:23

**boarded-up** [1] - 1959:23

**Bob** [18] - 1944:8, 1946:2, 1946:9, 1946:16, 1946:17, 1947:9, 1947:17, 1952:23, 1953:14, 1974:6, 2005:14, 2005:18, 2032:2, 2033:6, 2034:13, 2054:14, 2054:15, 2055:1

**body** [1] - 2099:17

**Bogdan** [18] - 1923:16, 1931:1, 2006:7, 2006:17, 2008:3, 2010:3, 2017:16, 2031:5, 2038:3, 2038:8, 2039:5, 2050:22, 2054:10, 2058:22, 2059:8, 2059:23, 2060:4, 2142:14

**bogus** [1] - 1974:7

**book** [5] - 1952:4, 1952:25, 1953:1, 2001:5, 2029:24

**Borg** [1] - 2044:14

**Borough** [1] - 2076:3

**borrow** [1] - 1955:18

**borrowing** [2] - 1955:18, 2045:16

**bottom** [3] - 1948:9, 1954:24, 2050:6

**bought** [2] - 1960:8, 2093:23

**Boulevard** [1] - 1984:14

**bound** [2] - 2145:21, 2151:3

**box** [1] - 2099:22

**boyfriend** [1] - 2086:10

**brackets** [1] - 1917:8

**branch** [1] - 1926:7

**break** [9] - 1953:3, 1953:12, 2027:22, 2028:9, 2033:5, 2064:16, 2066:4, 2072:12, 2151:15

**breakdown** [7] - 2028:22, 2028:25, 2029:3, 2029:6, 2030:21, 2035:16, 2035:21

**breakdowns** [2] - 2029:17, 2035:13

**bribe** [2] - 1973:22, 1974:1

**bribery** [7] - 2126:5, 2127:5, 2127:10, 2127:23, 2132:8

**bribes** [1] - 1974:3

**brief** [4] - 1915:22, 1935:21, 1970:7, 2108:15

**briefed** [1] - 2147:18

**briefing** [1] - 2139:17

**briefly** [6] - 1922:11, 1928:11, 1928:18, 1930:2, 1962:3, 2005:8

**bring** [11] - 1913:11, 1917:2, 1917:3, 1956:9, 2027:5, 2065:9, 2065:10, 2065:13, 2069:13, 2154:5, 2155:4

**bringing** [3] - 1917:5, 1956:20, 1991:7

**brings** [1] - 1970:10

**broker** [3] - 1962:19, 1962:20, 1963:3

**brokers** [1] - 2055:10

**Brooklyn** [13] - 1912:5, 1912:15, 1912:24, 1928:12, 1928:20, 1929:12, 1947:10, 1947:11, 2024:5, 2077:24, 2098:16, 2107:8, 2117:2

**brother** [2] - 2073:14, 2087:15

**brought** [12] - 2063:22, 2082:22, 2088:18, 2091:10, 2094:1, 2094:2, 2094:5, 2094:10, 2096:17, 2142:9, 2154:4

**brownstone** [1] - 1958:19

**brownstones** [1] - 1959:23

**Bruce** [2] - 1980:22, 2058:1

**budget** [8] - 1960:22, 1961:2, 1961:6, 1962:16, 2020:15, 2020:17, 2071:7, 2104:14

**budgetary** [2] - 1991:6, 1991:8

**budgeting** [2] - 1990:21, 1990:22

**build** [6] - 1928:21, 1930:8, 1930:9, 1945:24, 1945:25, 2064:5

**builder** [4] - 1928:24, 1929:2, 2054:15, 2055:14

**builders** [3] - 1946:9, 1947:15, 2055:12

**building** [12] - 1929:17, 1946:1, 1947:16, 1950:23, 1960:1, 1960:5, 2007:4, 2088:8, 2088:11, 2090:18, 2093:23, 2094:6

**Building** [1] - 1946:1

**buildings** [4] - 1939:16, 1959:25, 1962:17, 1984:22

**builds** [1] - 2063:16

**built** [2] - 1929:3, 2053:7

**bunch** [2] - 2047:18, 2151:14

**burden** [6] - 2124:14, 2129:14, 2133:25, 2134:4, 2135:2

**Bureau** [6] - 2049:7, 2066:24, 2099:12, 2107:3, 2107:24, 2121:1

**bureaucratic** [1] - 1988:25

**Bushwick** [1] - 1922:8

**Business** [1] - 2048:18

**business** [19] - 1919:12, 1919:18, 1920:6, 1929:15, 1948:15, 1965:15, 1968:23, 1971:3, 1990:17, 2016:1, 2016:12, 2022:17, 2045:7, 2052:15, 2062:18, 2074:10, 2096:23, 2097:1, 2135:25

**businesses** [2] - 1919:17, 1920:9

**bust** [2] - 2080:24, 2096:22

**busy** [2] - 1920:8, 2106:6

**BUTLER** [1] - 1912:23

**buy** [6] - 1939:11, 2063:18, 2072:6, 2094:2, 2094:8

**buyer** [2] - 2094:1

**buying** [3] - 1920:9, 1939:15, 2073:18

**BY** [44] - 1912:15, 1912:17, 1918:12, 1932:1, 1934:13, 1938:1, 1950:1, 1952:1, 1958:7, 1973:9, 1975:21, 1983:1, 2000:1, 2001:1, 2010:2, 2027:16, 2042:14, 2047:2, 2056:10, 2061:11, 2070:11, 2073:23, 2075:23, 2079:2, 2086:1, 2089:13, 2093:1, 2096:15, 2098:5, 2109:8, 2117:1, 2119:2, 2157:6, 2157:9, 2157:11, 2157:13, 2157:17, 2157:19, 2157:23, 2157:25, 2158:2, 2158:4, 2158:8, 2158:10

**BY:GERALD** [1] - 1912:20

Case 1:11-cr-00683-NG   Document 275-2   Filed 07/25/14   Page 253 of 280 PageID #: 2066
All Word // USA v Stevenson Dunn, et al.

6

**BY:MAURICE** [1] - 1912:19

# C

**cabinets** [1] - 1999:3
**Cadman** [2] - 1912:14, 1912:24
**CALIENDO** [1] - 1912:19
**Caliendo** [1] - 1915:10
**Candiano** [4] - 1979:1, 1979:5, 2044:16, 2044:20
**cannot** [5] - 2000:14, 2073:2, 2108:12, 2128:22, 2133:18
**cap** [1] - 1988:24
**capacities** [1] - 1929:23
**capacity** [5] - 1929:22, 1930:14, 1930:21, 1985:20, 2023:9
**Capaldo** [4] - 1979:5, 2043:9, 2043:18, 2044:11
**Capell** [5] - 1927:11, 1927:15, 2047:17, 2052:4, 2052:7
**CAPELL** [1] - 1927:12
**CAPOZZOLO** [35] - 1912:15, 1967:20, 1968:22, 1969:6, 1969:9, 1969:16, 1969:25, 1970:17, 2066:18, 2073:23, 2074:7, 2074:18, 2075:4, 2075:17, 2075:23, 2078:24, 2085:9, 2085:11, 2089:10, 2089:13, 2090:8, 2090:10, 2092:17, 2092:20, 2093:1, 2096:13, 2097:5, 2148:19, 2149:1, 2149:6, 2149:13, 2154:10, 2157:19, 2157:23, 2158:2
**Capozzolo** [7] - 1915:2, 1970:15, 2025:2, 2025:9, 2035:8, 2132:1, 2148:16
**car** [9] - 2100:7, 2100:11, 2100:20, 2107:15, 2110:24, 2112:24, 2114:23, 2116:2, 2116:18
**carbon** [1] - 2003:6
**card** [8] - 1964:4, 1964:14, 1965:15, 2020:20, 2022:15, 2022:16, 2023:24, 2040:16
**care** [4] - 1962:20, 2081:18, 2125:6, 2126:17
**career** [1] - 2098:20
**careful** [2] - 2009:2, 2149:21
**carefully** [1] - 2149:23
**case** [41] - 1916:18, 1933:4, 1936:12, 1942:5, 1966:7, 1969:23, 1979:1, 1979:4, 1980:3, 1980:10, 1980:23, 1981:6, 1998:16, 2017:24, 2022:7, 2024:12, 2042:16, 2043:8, 2043:13, 2045:1, 2045:2, 2046:5, 2053:6, 2066:20, 2066:21, 2067:12, 2068:5, 2092:9, 2113:11, 2124:9, 2124:21, 2125:20, 2133:17, 2133:18, 2139:25, 2145:14, 2149:18, 2153:7, 2153:11, 2153:15, 2154:3
**cases** [4] - 1920:21, 1978:17, 1978:21, 2042:17
**CAUSE** [1] - 1912:10
**cautious** [1] - 2017:23
**Center** [1] - 2107:6

**center** [1] - 2107:8
**centered** [1] - 2076:15
**centers** [1] - 1939:16
**certain** [13] - 1920:10, 1929:2, 1929:19, 1937:13, 1953:21, 1967:21, 1994:22, 2042:16, 2120:12, 2136:7, 2137:7, 2148:23, 2150:13
**certainly** [10] - 1916:24, 1972:11, 1977:19, 2004:4, 2006:4, 2007:23, 2086:11, 2140:1, 2151:6, 2155:20
**certificate** [1] - 2036:23
**certification** [6] - 2022:18, 2143:24, 2144:2, 2144:21, 2144:24, 2145:1
**certifications** [4] - 2143:13, 2146:15, 2147:25, 2152:21
**certified** [3] - 2140:9, 2147:10, 2147:21
**certify** [1] - 2022:22
**certifying** [2] - 2022:25, 2152:20
**cetera** [2] - 2128:12, 2129:7
**CFO** [1] - 2091:6
**chair** [1] - 1987:24
**Chairman** [1] - 2037:13
**chance** [2] - 1914:10, 1964:7
**change** [4] - 1925:23, 2058:5, 2127:1, 2151:22
**changed** [3] - 2033:16, 2144:6, 2144:12
**changes** [3] - 1968:17, 1970:4, 2127:1
**character** [33] - 1967:7, 1967:10, 1967:15, 1968:1, 1968:10, 1968:20, 1968:21, 1969:11, 1970:5, 2025:1, 2025:3, 2071:21, 2072:14, 2072:19, 2072:20, 2073:12, 2078:2, 2078:12, 2083:13, 2088:16, 2092:4, 2093:20, 2128:7, 2128:8, 2128:14, 2128:19, 2128:20, 2129:2, 2129:3, 2129:5, 2129:11, 2129:18, 2137:5
**charge** [20] - 1915:24, 1916:15, 1916:16, 1917:8, 1981:4, 1998:10, 2010:19, 2045:15, 2082:18, 2089:25, 2114:9, 2126:1, 2126:5, 2126:7, 2127:2, 2129:22, 2133:3, 2135:10, 2151:12, 2151:17
**charged** [8] - 1981:14, 1983:14, 2082:15, 2126:12, 2132:11, 2132:12, 2150:16, 2151:14
**charges** [18] - 1916:17, 1917:8, 1917:9, 1917:10, 1917:11, 1917:12, 2126:3, 2130:25, 2131:6, 2131:12, 2131:20, 2131:22, 2131:25, 2132:5, 2132:6, 2132:17, 2151:18, 2152:10
**charging** [1] - 2036:2
**charitable** [7] - 2025:14, 2036:20, 2037:1, 2135:24, 2136:3, 2136:4, 2136:8
**Charlotte** [2] - 2060:24, 2061:6
**CHARLOTTE** [1] - 2157:15
**charts** [1] - 2073:13
**chastened** [1] - 2150:9
**cheaper** [1] - 2036:5
**check** [22] - 1945:6, 1952:22, 1954:24, 2002:16, 2002:23, 2003:11, 2004:18,

2004:23, 2021:14, 2037:21, 2038:3, 2038:5, 2038:8, 2038:11, 2038:14, 2039:1, 2039:5, 2055:15, 2055:16, 2055:17, 2127:14, 2133:9
**checked** [1] - 2081:7
**checking** [1] - 2127:9
**checklist** [1] - 1954:23
**checks** [20] - 1944:20, 1945:3, 1954:24, 1964:23, 1965:3, 1965:5, 1965:12, 1965:14, 1974:9, 2002:14, 2024:2, 2024:3, 2039:10, 2039:16, 2039:19, 2040:2, 2040:6, 2040:11, 2040:16, 2040:19
**chief** [5] - 2070:23, 2090:23, 2091:14, 2095:4, 2154:3
**Chief** [1] - 2145:13
**childlike** [1] - 2123:24
**China** [1] - 1919:18
**Chinese** [2] - 2107:15, 2107:16
**choose** [2] - 2025:2, 2033:10, 2053:17
**chose** [1] - 2082:25
**chosen** [2] - 2072:5, 2133:19
**Chris** [1] - 2006:22
**Christmas** [3] - 1940:8, 1940:9, 2013:16
**Christmastime** [1] - 2002:7
**church** [16] - 1927:24, 1928:3, 1928:4, 1928:7, 1945:23, 1945:24, 1946:15, 2030:4, 2034:7, 2034:11, 2036:4, 2036:6, 2053:7, 2053:9, 2053:10
**Church** [2] - 2051:15, 2053:12
**churches** [2] - 1927:3, 1927:24
**circumstances** [4] - 1956:4, 1967:12, 1967:14, 2116:10
**City** [14] - 1926:6, 1926:7, 1927:25, 1948:19, 2019:6, 2019:20, 2074:13, 2074:15, 2074:16, 2076:1, 2076:2, 2076:5, 2094:8, 2094:10
**civil** [1] - 2017:24
**clarify** [1] - 2068:5
**classic** [1] - 2151:9
**clear** [14] - 1914:3, 1921:20, 1944:23, 1957:9, 1958:3, 1985:7, 2025:12, 2052:1, 2058:12, 2068:13, 2090:10, 2126:10, 2134:4, 2135:21
**clearer** [1] - 2038:18
**clearly** [3] - 1967:8, 2008:1, 2051:23
**CLERK** [7] - 2070:4, 2070:6, 2075:6, 2075:10, 2075:16, 2125:5, 2126:22
**clerk** [1] - 2126:17
**clerks** [1] - 2130:2
**client** [47] - 1927:1, 1936:12, 1936:13, 1936:20, 1937:13, 1943:7, 1950:16, 1954:23, 1956:2, 1956:22, 1956:25, 1957:5, 1957:6, 1957:23, 1960:11, 1967:16, 1969:13, 1969:21, 1972:18, 1973:14, 1981:3, 2002:15, 2003:10, 2009:11, 2012:3, 2039:13, 2034:12, 2034:13, 2042:12, 2044:23, 2056:15, 2056:20, 2058:4, 2062:2, 2063:12, 2079:8, 2088:6, 2088:11, 2088:19, 2117:14, 2117:20, 2138:1, 2146:6,

2150:16, 2152:3, 2153:17

**client's** [9] - 1937:13, 1939:5, 1956:5, 2060:13, 2088:15, 2115:18, 2117:5, 2139:4, 2148:4

**clients** [21] - 1926:17, 1928:21, 1929:14, 1940:9, 1944:17, 1948:15, 1948:20, 1958:22, 1959:1, 1959:10, 1960:18, 1995:25, 1996:3, 1997:15, 1998:8, 2002:20, 2004:17, 2004:22, 2005:1, 2033:20, 2045:15

**clients's** [1] - 2019:13

**clip** [3] - 1951:4, 1951:13, 1952:2

**close** [7] - 1940:10, 1986:6, 2036:3, 2086:11, 2135:14, 2155:13, 2155:22

**closed** [1] - 1940:11

**closer** [3] - 1926:10, 2102:3, 2151:6

**closing** [41] - 1923:19, 1924:13, 1924:14, 1924:23, 1926:2, 1926:10, 1928:25, 1931:2, 1932:11, 1934:16, 1939:12, 1940:12, 1940:13, 1954:21, 1954:22, 1954:23, 1962:6, 1986:5, 2002:8, 2002:13, 2002:15, 2002:16, 2002:17, 2002:19, 2006:8, 2006:15, 2006:18, 2006:24, 2007:3, 2027:19, 2028:10, 2028:12, 2028:13, 2032:8, 2032:9, 2032:10, 2047:25, 2048:4, 2054:7, 2124:12, 2125:16

**closings** [9] - 1925:13, 1925:14, 1925:15, 1929:4, 1934:17, 1954:20, 2007:10, 2007:11, 2028:19

**clue** [3] - 1953:3, 1953:12, 1953:16

**cluster** [5] - 1922:8, 1922:9, 1963:18, 1965:23

**CNBC** [1] - 2062:20

**co** [3] - 1937:4, 2071:3, 2071:4

**co-defendant** [1] - 1937:4

**co-president** [1] - 2071:4

**co-presidents** [1] - 2071:3

**coach** [2] - 2061:16

**coaching** [3] - 2062:10, 2062:12, 2062:13

**coauthor** [3] - 2121:12, 2121:13, 2122:18

**coauthored** [1] - 2121:18

**Code** [2] - 1994:19, 2144:5

**code** [1] - 2144:7

**coffee** [2] - 1919:25, 2105:19

**coherent** [1] - 2105:7

**collapsed** [1] - 2016:25

**collateral** [4] - 2045:8, 2067:6, 2067:13, 2092:15

**collectively** [1] - 2104:9

**comfortable** [1] - 2016:19

**coming** [5] - 1991:2, 2068:3, 2084:10, 2116:19, 2125:12

**comment** [2] - 2058:14, 2058:19

**comments** [1] - 1934:8

**commercial** [4] - 1918:22, 1919:2, 1919:5, 1981:2

**Commission** [1] - 2037:14

**Commissioner** [1] - 2094:5

**commit** [1] - 1968:13

**committed** [1] - 2147:1

**committee** [5] - 1946:8, 2059:25, 2060:8, 2060:9, 2064:8

**Committee** [1] - 1995:20

**committee's** [1] - 1987:23

**common** [3] - 1927:1, 1983:17, 2112:25

**communicated** [1] - 2093:18

**Community** [1] - 1987:21

**community** [5] - 1977:15, 1987:17, 1987:22, 1988:6, 1988:11

**companies** [2] - 2052:20, 2062:15

**company** [20] - 1919:24, 1920:11, 1920:15, 1920:16, 1985:13, 1985:15, 1985:17, 1990:2, 1999:6, 2002:23, 2017:13, 2024:6, 2048:12, 2062:9, 2073:6, 2073:7, 2082:7, 2083:18, 2083:24, 2103:24

**compartment** [2] - 2113:10, 2113:12

**competition** [1] - 2018:11

**competitive** [1] - 2059:19

**complain** [1] - 2100:20

**complained** [1] - 1972:6

**complaining** [1] - 2105:10

**complains** [1] - 1998:10

**complaint** [2] - 1972:12, 1997:11

**complete** [4] - 1968:12, 2124:10, 2152:22, 2153:1

**completed** [2] - 2106:21, 2129:24

**completely** [2] - 1948:10, 2071:10

**compliance** [3] - 1920:12, 1994:16, 1995:17

**complicated** [3] - 2131:10, 2141:18, 2142:22

**computer** [12] - 1964:8, 1998:21, 1998:23, 2003:16, 2003:17, 2003:18, 2003:23, 2004:4, 2004:6, 2004:7, 2129:25

**Computer** [1] - 1912:25

**Computer-Assisted** [1] - 1912:25

**computers** [1] - 1939:4

**concept** [1] - 2021:7

**concern** [2] - 1916:22, 2148:6

**concerned** [2] - 2068:6, 2087:22

**concerning** [4] - 1918:14, 1955:7, 2009:11, 2137:12

**conclude** [3] - 1972:24, 2124:18, 2124:19

**concluded** [3] - 2106:18, 2124:17, 2125:25

**conclusion** [3] - 2110:25, 2111:9, 2112:2

**condition** [7] - 2067:19, 2069:5, 2069:6, 2069:7, 2069:8, 2098:25, 2099:2

**conditions** [1] - 2007:5

**condo** [1] - 1950:23

**condominium** [2] - 1929:17, 1947:10

**condos** [1] - 1945:25

**Conduct** [1] - 1995:15

**conduct** [9] - 1937:13, 1994:19, 2004:9, 2046:4, 2148:1, 2148:4, 2150:13,

2150:22, 2151:5

**conducted** [1] - 1923:1

**confer** [1] - 2025:8

**conference** [3] - 1913:12, 2108:4, 2115:11

**confine** [1] - 2138:18

**confined** [1] - 2080:21

**confinement** [1] - 2121:2

**confirm** [1] - 2127:7

**conflict** [8] - 1938:20, 2004:11, 2004:21, 2004:23, 2046:4, 2046:9, 2048:5, 2059:22

**conflicts** [1] - 2004:18

**confront** [1] - 1956:10

**confronted** [2] - 1956:11, 2147:20

**confused** [4] - 2003:21, 2015:15, 2082:4, 2105:12

**confusing** [3] - 1916:23, 2031:19, 2082:2

**congregants** [1] - 1928:2

**congregation** [1] - 1928:2

**Congress** [1] - 2036:23

**congruence** [1] - 2105:3

**connection** [24] - 1926:8, 1932:7, 1941:12, 1945:15, 1947:25, 1963:15, 1963:18, 1988:6, 2045:16, 2047:3, 2047:6, 2047:7, 2047:25, 2048:14, 2048:19, 2051:15, 2053:11, 2055:18, 2062:18, 2062:25, 2065:21, 2084:5, 2104:10, 2133:23

**connections** [1] - 2055:9

**conscientious** [1] - 1997:6

**consent** [1] - 2131:15

**consented** [1] - 2048:3

**consents** [1] - 2131:4

**conservancy** [1] - 2062:15

**consider** [4] - 1934:11, 1972:14, 1972:25, 2146:8

**consideration** [2] - 2026:11, 2142:25

**considered** [7] - 1918:25, 1933:11, 1934:10, 2108:12, 2128:20, 2128:22

**considering** [1] - 2153:16

**consistent** [6] - 1956:10, 2094:25, 2105:7, 2138:15, 2138:24, 2150:13

**conspiracy** [5] - 1916:17, 1981:14, 2132:9, 2132:10, 2132:13

**conspire** [1] - 1974:3

**constantly** [5] - 1920:9, 2072:8, 2072:10, 2073:8, 2073:15

**constituency** [1] - 2072:23

**constitutes** [1] - 2143:1

**Constitutional** [1] - 1977:11

**construction** [11] - 1928:25, 1940:10, 1962:5, 2015:14, 2016:1, 2016:9, 2018:5, 2031:23, 2033:15, 2035:25, 2054:21

**consultant** [5] - 1927:4, 2005:12, 2031:24, 2059:5

**consulting** [1] - 2061:19

**contact** [7] - 1943:8, 1959:9, 2064:11, 2077:14, 2086:5, 2110:11, 2110:14

**contacts** [1] - 2135:24
**contained** [1] - 1994:4
**contemplate** [3] - 1941:24, 1942:17, 1943:1
**contemporaneously** [1] - 2149:23
**content** [1] - 1956:12
**continue** [4] - 1925:1, 1925:4, 2024:11, 2027:13
**continued** [4] - 1951:23, 2013:24, 2018:1, 2095:16
**Continued** [23] - 1917:18, 1931:5, 1932:1, 1932:16, 1933:16, 1935:24, 1937:23, 1949:18, 1966:11, 1982:17, 1999:11, 2000:24, 2008:19, 2025:18, 2046:13, 2064:22, 2069:14, 2085:22, 2091:17, 2092:22, 2097:19, 2118:13, 2134:10
**CONTINUES** [2] - 2047:1, 2119:1
**continuing** [3] - 1914:3, 1918:9, 1973:9
**CONTINUING** [2] - 2014:1, 2096:1
**Continuing** [5] - 1918:11, 1983:1, 2027:15, 2070:11, 2157:6
**contract** [3] - 2005:4, 2018:12, 2055:4
**contractor** [6] - 1923:1, 1923:5, 1924:2, 1924:5, 2053:17, 2059:17
**contractor/developer** [1] - 2103:24
**contractors** [1] - 1923:9
**contracts** [6] - 1919:21, 2007:14, 2007:16, 2011:19, 2018:5, 2154:15
**contradict** [1] - 2117:24
**contrary** [2] - 1916:23, 2149:4
**control** [1] - 2113:1
**controversial** [1] - 2139:6
**conversation** [41] - 1934:15, 1935:1, 1935:15, 1936:9, 1936:11, 1936:14, 1938:7, 1938:8, 1944:8, 1946:22, 1950:9, 1951:4, 1951:20, 1952:17, 1952:20, 1953:18, 1955:4, 1955:11, 1955:25, 1956:1, 1956:12, 1956:16, 1956:18, 1957:2, 1957:4, 1957:9, 1958:20, 2001:14, 2010:3, 2010:13, 2013:3, 2101:12, 2109:17, 2109:18, 2110:5, 2115:2, 2115:8, 2115:15, 2116:20, 2116:21, 2139:5
**conversations** [23] - 1925:1, 1925:23, 1926:5, 1929:6, 1934:5, 1934:8, 1934:22, 1947:2, 1947:19, 1969:1, 1975:13, 2009:3, 2009:5, 2009:6, 2009:8, 2009:10, 2010:9, 2013:22, 2053:23, 2054:1, 2116:5, 2140:24, 2148:21
**Cooper** [3] - 2090:21, 2090:23, 2093:7
**cooperating** [2] - 2109:11, 2130:19
**cooperation** [3] - 1917:7, 1917:9, 1917:13
**cooperator's** [1] - 2111:4
**cooperators** [1] - 2132:25
**copies** [4] - 1995:25, 1996:3, 1996:7, 2022:13
**copresident** [1] - 2064:9
**copy** [6] - 1964:6, 2003:1, 2003:6,

2003:10, 2003:22, 2130:4
**copying** [1] - 1995:16
**corporate** [1] - 2062:11
**corporation** [7] - 1919:13, 1919:14, 1943:13, 2002:21, 2082:19, 2086:18, 2096:22
**Corporation** [5] - 1961:1, 2082:7, 2084:5, 2094:17, 2103:25
**correct** [270] - 1922:23, 1923:7, 1924:3, 1927:10, 1927:18, 1927:21, 1927:22, 1943:19, 1944:25, 1950:7, 1950:12, 1950:16, 1954:14, 1955:12, 1959:2, 1959:3, 1959:6, 1959:7, 1963:23, 1964:3, 1964:18, 1964:19, 1964:24, 1972:21, 1976:3, 1976:9, 1976:10, 1977:6, 1977:8, 1977:9, 1977:12, 1977:15, 1977:21, 1978:4, 1978:5, 1978:14, 1978:22, 1981:5, 1982:8, 1982:14, 1982:15, 1983:3, 1983:4, 1983:6, 1983:7, 1983:12, 1984:12, 1985:10, 1985:11, 1985:14, 1985:21, 1985:24, 1986:2, 1986:12, 1987:3, 1987:6, 1987:9, 1987:20, 1987:21, 1988:23, 1989:2, 1989:16, 1989:17, 1990:5, 1990:9, 1990:12, 1991:12, 1991:13, 1991:15, 1991:16, 1992:13, 1994:5, 1994:6, 1994:7, 1994:17, 1995:5, 1995:6, 1995:7, 1997:2, 1997:3, 1997:6, 1997:24, 1997:25, 1999:6, 1999:7, 1999:9, 1999:10, 2002:10, 2004:16, 2005:9, 2005:10, 2005:12, 2005:13, 2007:3, 2008:9, 2008:10, 2008:13, 2008:15, 2010:16, 2012:24, 2013:1, 2013:8, 2014:15, 2016:23, 2017:18, 2018:5, 2019:5, 2019:11, 2020:10, 2020:11, 2021:10, 2023:13, 2023:15, 2023:25, 2025:14, 2027:18, 2028:17, 2029:2, 2029:25, 2030:1, 2031:3, 2031:8, 2031:12, 2032:16, 2032:20, 2033:9, 2033:21, 2034:22, 2034:25, 2035:20, 2036:19, 2036:21, 2036:25, 2037:24, 2038:23, 2038:25, 2039:8, 2039:11, 2040:12, 2040:14, 2040:18, 2041:3, 2041:11, 2041:18, 2041:22, 2042:6, 2045:6, 2045:12, 2047:9, 2047:12, 2047:13, 2047:15, 2048:9, 2048:12, 2048:16, 2048:20, 2049:4, 2050:1, 2050:7, 2051:1, 2051:12, 2051:24, 2052:2, 2052:5, 2052:9, 2052:13, 2052:17, 2052:20, 2052:22, 2052:23, 2053:18, 2053:21, 2053:24, 2053:25, 2054:2, 2054:4, 2054:8, 2054:12, 2054:18, 2054:21, 2055:2, 2055:3, 2056:12, 2058:6, 2059:6, 2059:7, 2059:9, 2061:25, 2062:6, 2062:7, 2070:16, 2074:3, 2076:18, 2077:23, 2079:4, 2079:6, 2079:10, 2079:13, 2079:24, 2080:4, 2080:11, 2080:15, 2080:17, 2081:2, 2081:13, 2081:14, 2081:16, 2081:19, 2082:8, 2082:9, 2082:11, 2082:21, 2083:1, 2083:2, 2083:5,

2083:6, 2083:14, 2084:12, 2084:16, 2084:18, 2086:7, 2086:12, 2086:22, 2086:25, 2087:2, 2087:12, 2088:6, 2088:9, 2088:12, 2089:4, 2089:6, 2089:7, 2089:15, 2090:16, 2090:17, 2090:18, 2090:19, 2091:1, 2091:13, 2091:14, 2093:13, 2094:12, 2095:3, 2096:17, 2096:18, 2098:12, 2107:7, 2109:10, 2109:16, 2110:3, 2112:12, 2112:15, 2112:16, 2113:21, 2114:13, 2117:21, 2119:8, 2120:13, 2121:24, 2122:14, 2122:15, 2123:1, 2123:4, 2123:17, 2123:18, 2126:13, 2127:13, 2128:9, 2131:22, 2150:15
**corrected** [2] - 2039:19, 2155:5
**correctly** [7] - 1946:24, 1958:25, 1987:2, 1991:20, 2021:9, 2033:8, 2067:5
**correspond** [1] - 2086:8
**corruption** [1] - 1980:12
**cosmetic** [1] - 2127:1
**cost** [6] - 1939:12, 1947:13, 1947:16, 2034:6, 2034:10, 2053:4
**costs** [7] - 1941:2, 1941:8, 1941:19, 1960:6, 1960:14, 2018:11, 2027:22
**Counsel** [19] - 1915:16, 1920:20, 1922:23, 1924:6, 1927:10, 1930:16, 1972:14, 1977:12, 1979:10, 1980:1, 2024:7, 2026:8, 2026:15, 2040:8, 2043:17, 2044:10, 2103:2, 2115:5, 2115:9
**counsel** [28] - 1936:22, 1961:5, 1963:19, 1966:9, 1990:17, 2006:3, 2006:4, 2047:11, 2058:19, 2058:20, 2065:6, 2065:10, 2065:15, 2065:16, 2084:24, 2123:11, 2123:13, 2123:15, 2125:17, 2125:23, 2127:7, 2130:17, 2144:10, 2147:24, 2153:20, 2154:18, 2155:7, 2155:8
**Count** [5] - 2127:3, 2127:5, 2127:17, 2127:18, 2132:3
**count** [1] - 2132:4
**countries** [1] - 2061:20
**country** [1] - 2011:13
**counts** [1] - 2127:15
**County** [4] - 2037:4, 2071:11, 2072:24, 2074:3
**Couple** [1] - 1985:16
**couple** [9] - 1918:13, 2015:24, 2038:24, 2053:8, 2096:16, 2105:20, 2125:24, 2133:7, 2135:11
**course** [19] - 1918:21, 1924:5, 1958:20, 1968:25, 2005:2, 2045:9, 2046:8, 2048:2, 2048:6, 2070:9, 2071:5, 2071:20, 2074:5, 2074:9, 2076:14, 2077:1, 2117:13, 2127:1, 2136:2
**COURT** [313] - 1912:1, 1913:9, 1913:16, 1913:18, 1913:21, 1913:24, 1914:2, 1914:5, 1914:7, 1914:10, 1914:14, 1914:18, 1915:16, 1915:19, 1916:10, 1916:19, 1916:22, 1917:3, 1918:8,

1932:13, 1932:15, 1933:8, 1933:14, 1934:2, 1935:18, 1935:23, 1936:18, 1936:22, 1937:10, 1937:15, 1937:18, 1948:25, 1949:7, 1949:10, 1949:14, 1955:21, 1956:21, 1957:6, 1957:11, 1957:16, 1957:23, 1958:17, 1964:11, 1966:4, 1966:9, 1967:4, 1967:6, 1968:19, 1969:5, 1969:8, 1969:20, 1970:14, 1970:18, 1971:22, 1972:14, 1972:22, 1973:3, 1974:24, 1975:1, 1975:3, 1975:7, 1975:9, 1977:22, 1979:13, 1979:18, 1980:18, 1980:20, 1983:23, 1989:8, 1989:10, 1989:12, 1993:23, 1996:4, 1996:6, 2000:7, 2000:12, 2000:19, 2000:22, 2008:6, 2008:18, 2009:6, 2009:12, 2009:19, 2009:25, 2011:7, 2011:21, 2012:7, 2018:23, 2019:17, 2024:7, 2024:10, 2024:18, 2024:24, 2025:7, 2025:10, 2025:15, 2026:8, 2026:14, 2027:1, 2027:5, 2027:13, 2027:24, 2028:2, 2028:4, 2030:16, 2030:20, 2035:6, 2038:7, 2038:10, 2039:23, 2040:4, 2040:8, 2043:19, 2043:25, 2044:2, 2055:22, 2056:2, 2056:4, 2056:7, 2058:16, 2058:18, 2060:20, 2061:1, 2061:4, 2061:9, 2064:14, 2064:17, 2064:20, 2065:3, 2065:6, 2065:9, 2065:13, 2065:15, 2065:18, 2066:15, 2066:24, 2067:2, 2067:8, 2067:15, 2067:24, 2068:2, 2068:18, 2068:22, 2069:4, 2069:9, 2069:13, 2070:2, 2070:9, 2074:6, 2074:8, 2074:20, 2074:23, 2075:13, 2075:18, 2084:10, 2084:22, 2085:4, 2085:7, 2085:19, 2087:7, 2090:9, 2090:11, 2091:16, 2092:5, 2092:10, 2092:18, 2092:21, 2093:16, 2097:4, 2097:6, 2097:12, 2097:14, 2098:23, 2100:9, 2102:6, 2103:2, 2103:7, 2103:11, 2104:20, 2105:4, 2107:22, 2108:3, 2108:15, 2108:18, 2108:21, 2108:25, 2109:24, 2111:14, 2115:5, 2115:9, 2115:15, 2116:3, 2116:8, 2116:11, 2116:16, 2116:19, 2116:22, 2120:1, 2120:4, 2123:10, 2123:15, 2124:5, 2124:8, 2125:6, 2125:23, 2126:14, 2126:17, 2126:20, 2126:23, 2127:10, 2127:16, 2127:18, 2127:20, 2127:22, 2128:1, 2128:3, 2128:5, 2128:10, 2128:16, 2128:24, 2129:8, 2129:17, 2129:25, 2130:5, 2130:7, 2130:10, 2130:12, 2130:15, 2130:20, 2130:23, 2131:5, 2131:8, 2131:11, 2131:14, 2131:18, 2131:21, 2131:24, 2132:2, 2132:6, 2132:14, 2132:20, 2132:23, 2133:1, 2133:3, 2133:7, 2134:1, 2134:6, 2134:8, 2135:1, 2135:9, 2136:11, 2136:25, 2137:3, 2137:15, 2137:21, 2138:10, 2138:13, 2138:20, 2139:7, 2139:12, 2139:19, 2139:21, 2139:25, 2140:13, 2140:18, 2140:21, 2141:7,

2141:10, 2143:9, 2143:14, 2143:19, 2143:23, 2144:2, 2144:13, 2145:2, 2145:7, 2145:10, 2145:20, 2146:3, 2147:3, 2148:6, 2148:18, 2148:25, 2149:14, 2149:16, 2149:21, 2150:4, 2150:7, 2150:11, 2150:15, 2150:18, 2150:20, 2151:11, 2151:20, 2151:25, 2152:2, 2152:8, 2152:15, 2153:3, 2153:20, 2153:25, 2154:8, 2154:18, 2154:23, 2155:5, 2155:7, 2155:12, 2155:16, 2155:25, 2156:4, 2156:7, 2156:9, 2156:19
**Court's** [1] - 1958:4
**courthouse** [1] - 2125:1
**Courthouse** [1] - 1912:5
**courtroom** [5] - 1913:2, 1913:13, 1961:17, 1967:17, 1967:2, 2026:3
**COURTROOM** [21] - 1913:5, 1914:22, 1915:4, 1915:8, 1915:11, 1915:15, 1915:18, 1917:2, 1918:4, 1918:6, 1967:3, 1973:5, 1973:7, 2024:14, 2026:6, 2027:4, 2027:6, 2027:8, 2027:10, 2034:2, 2103:14
**cover** [3] - 2051:11, 2078:17, 2138:2
**coverage** [1] - 2131:10
**covered** [2] - 2129:14, 2132:5
**create** [2] - 2141:24, 2142:1
**created** [2] - 2141:25, 2143:2
**credibility** [4] - 1970:20, 1970:21, 1971:20, 2142:7
**credited** [1] - 1943:22
**crime** [4] - 1968:13, 1980:11, 2126:8, 2147:2
**crimes** [3] - 2126:11, 2131:9
**criminal** [15] - 1914:22, 1977:6, 1978:10, 1978:17, 1978:21, 1979:1, 1980:23, 1981:6, 2017:21, 2017:24, 2042:17, 2055:24, 2057:4, 2058:9, 2133:17
**CRIMINAL** [1] - 1912:10
**Cristina** [1] - 1915:2
**CRISTINA** [1] - 1912:16
**criteria** [1] - 2022:12
**critical** [1] - 1962:16
**cross** [13] - 1956:24, 1969:13, 1969:22, 1970:10, 1975:2, 2039:9, 2068:13, 2069:10, 2089:10, 2089:11, 2092:2, 2147:23, 2155:1
**CROSS** [9] - 1975:20, 2027:15, 2073:22, 2079:1, 2079:7, 2157:8, 2157:18, 2157:24, 2158:9
**CROSS-EXAMINATION** [4] - 2073:22, 2079:1, 2157:18, 2157:24
**cross-examination** [5] - 1969:13, 1970:10, 2092:2, 2147:23, 2155:1
**cross-examine** [2] - 1956:24, 2069:10
**CRR** [1] - 1912:23
**crunch** [2] - 1947:12, 2053:3
**cuffed** [3] - 2117:15, 2117:17, 2117:18
**culpability** [3] - 1957:12, 1957:14, 2148:15

**cumbersome** [1] - 1926:6
**current** [2] - 2093:7, 2093:23
**custody** [5] - 2099:11, 2099:14, 2106:23, 2107:10, 2107:24
**customary** [1] - 1942:8

# D

**dad** [3] - 2079:13, 2081:18, 2081:23
**daily** [1] - 2099:7
**Dan** [1] - 2020:6
**dangerous** [2] - 2113:6
**date** [15] - 1923:24, 1940:3, 1977:2, 1980:5, 1992:13, 1992:19, 1993:2, 1993:10, 1993:18, 2031:2, 2037:23, 2042:3, 2057:6, 2109:9, 2110:12
**dated** [5] - 2033:22, 2034:19, 2038:6, 2038:22, 2051:17
**daughter** [1] - 2036:17
**day's** [1] - 2099:18
**days** [8] - 1920:15, 1940:8, 1942:4, 1948:21, 2008:15, 2009:8, 2038:24, 2122:20
**de** [1] - 2101:10
**deal** [9] - 1951:17, 1955:2, 1968:25, 2002:11, 2004:14, 2005:8, 2007:1, 2013:17, 2088:18, 2088:19, 2088:20, 2091:7
**dealing** [9] - 2062:4, 2067:16, 2071:22, 2072:17, 2072:20, 2088:16, 2095:6, 2144:16, 2147:4
**dealings** [4] - 2074:5, 2074:9, 2074:15, 2079:9
**deals** [3] - 2007:7, 2028:11, 2067:13
**dealt** [1] - 1962:23
**Decatur** [1] - 1984:1
**deceive** [1] - 1963:14
**December** [2] - 1922:5, 1940:11
**decide** [1] - 1947:13
**decided** [6] - 1945:23, 2033:15, 2090:15, 2100:16, 2109:15, 2141:4
**decision** [3] - 1921:1, 2033:18, 2060:2
**decisions** [2] - 2060:7, 2090:15
**deductible** [1] - 1942:14
**default** [4] - 1962:7, 1962:12, 1971:5
**defendant** [30] - 1912:8, 1915:9, 1937:4, 1957:11, 1969:16, 1972:1, 1980:10, 1981:8, 2044:13, 2044:14, 2044:15, 2044:16, 2058:6, 2060:24, 2075:1, 2126:9, 2128:8, 2128:21, 2129:8, 2133:11, 2133:14, 2133:17, 2133:18, 2133:19, 2138:25, 2146:9, 2153:7, 2153:8, 2153:15
**Defendant** [4] - 1912:17, 1912:19, 1912:20, 2043:21
**defendant's** [3] - 1967:7, 2092:4, 2128:23, 2138:19, 2149:7
**Defendant's** [2] - 2044:3, 2158:22
**defendants** [9] - 1968:12, 2109:5, 2128:11, 2128:25, 2133:9, 2133:23, 2135:3, 2136:13, 2151:19
**defending** [1] - 1977:8

**defense** [14] - 1977:6, 1978:10, 2058:9, 2124:15, 2128:19, 2129:15, 2130:17, 2136:20, 2136:23, 2137:7, 2137:16, 2138:15, 2140:1, 2147:24

**deficit** [1] - 2129:12

**definitely** [1] - 1941:16

**defraud** [3] - 1974:15, 1974:18, 1981:14

**delete** [1] - 2003:19

**deliberating** [3] - 2124:24, 2124:25, 2125:2

**deliberations** [2] - 2124:22, 2125:21

**delineations** [1] - 2144:9

**Della** [2] - 2119:20, 2121:14

**demanding** [1] - 2035:1

**demeanor** [11] - 2100:7, 2104:16, 2104:18, 2115:18, 2115:21, 2115:23, 2116:2, 2116:4, 2116:14, 2117:6, 2117:10

**demolish** [1] - 1945:23

**demolition** [2] - 1946:14, 1946:17

**demonstrates** [1] - 1968:11

**demonstrative** [2] - 2010:23, 2011:6

**denial** [1] - 2067:11

**denied** [6] - 1921:11, 1921:12, 1921:13, 1921:14, 1921:16, 1972:10

**deny** [2] - 1917:1, 2088:7

**denying** [1] - 2085:15

**Department** [7] - 1946:2, 1994:13, 1994:14, 1994:25, 2019:10, 2101:10, 2145:4

**Departmental** [1] - 1995:20

**depended** [1] - 1991:1

**deposited** [1] - 1945:3

**DEPUTY** [21] - 1913:5, 1914:22, 1915:4, 1915:8, 1915:11, 1915:15, 1915:18, 1917:2, 1918:4, 1918:6, 1967:3, 1973:5, 1973:7, 2024:14, 2026:6, 2027:4, 2027:6, 2027:8, 2027:10, 2034:2, 2103:14

**derive** [2] - 2096:24, 2096:25

**derived** [1] - 2025:13

**describe** [1] - 2150:21

**describing** [1] - 2083:22

**description** [2] - 1997:18, 1998:5

**desk** [5] - 1940:15, 2011:17, 2015:3, 2050:8, 2118:10

**detail** [2] - 1930:19, 2031:10

**detailed** [6] - 1951:18, 1997:18, 2105:2, 2105:7, 2146:19, 2149:9

**details** [1] - 2078:18

**Detention** [1] - 2107:6

**detention** [1] - 2107:8

**determination** [2] - 1919:7, 1995:17

**determine** [2] - 2053:2, 2087:20

**develop** [3] - 1930:6, 1930:11, 2104:1

**developer** [5] - 1921:15, 1921:22, 1924:6, 1930:21, 1990:8

**developer's** [1] - 1922:21

**developers** [10] - 1921:2, 1921:10, 1921:23, 1930:24, 1987:8, 1988:22, 1989:5, 1989:6, 2016:1, 2103:23

**developing** [3] - 1929:16, 1930:17, 1930:18

**Development** [5] - 1987:1, 1989:20, 2019:10, 2103:25, 2104:1

**development** [7] - 1924:22, 1926:17, 1926:24, 1929:9, 1929:25, 1947:3, 1947:6, 1947:7, 1948:4, 2005:15, 2005:16

**diabetes** [4] - 2105:23, 2111:21, 2117:20, 2118:2

**diabetic** [2] - 2099:21, 2107:20

**diabetics** [1] - 2111:24

**DICHIARA** [1] - 1912:20

**DiChiara** [23] - 1915:12, 1915:23, 1916:6, 1971:12, 1974:24, 1974:25, 2026:24, 2060:18, 2066:19, 2075:2, 2089:10, 2089:11, 2132:21, 2132:24, 2133:2, 2139:7, 2139:9, 2141:9, 2141:19, 2153:22, 2154:25, 2155:11

**DiChiara's** [2] - 2143:6

**died** [2] - 2016:12, 2036:1

**difference** [1] - 1957:18

**different** [30] - 1919:17, 1920:14, 1934:20, 1946:9, 1947:6, 1947:9, 1954:18, 1956:2, 1956:16, 1957:2, 1960:18, 1983:16, 1987:12, 1988:16, 1990:4, 2004:14, 2029:22, 2031:16, 2031:19, 2072:14, 2106:9, 2136:17, 2140:4, 2142:14, 2150:23, 2150:24, 2152:3, 2153:4

**difficult** [2] - 2072:22, 2132:12

**difficulties** [1] - 1948:15

**difficulty** [2] - 2067:25, 2130:1

**dig** [1] - 2051:16

**diploma** [2] - 2079:20, 2096:11

**direct** [16] - 1918:9, 1964:1, 1967:18, 1969:21, 1970:3, 1972:20, 1972:24, 1990:7, 2028:14, 2039:9, 2047:14, 2068:12, 2115:17, 2116:15, 2142:9, 2147:24

**DIRECT** [9] - 1918:11, 1973:8, 2061:10, 2075:22, 2098:4, 2157:6, 2157:16, 2157:22, 2158:7

**directed** [1] - 2058:18

**direction** [2] - 2087:20, 2144:16

**directly** [7] - 1923:4, 1941:1, 1941:3, 1942:12, 2119:11, 2119:19, 2148:14

**directors** [2] - 2070:16, 2083:23

**disagree** [5] - 1989:4, 1989:18, 2008:7, 2019:19, 2019:22, 2068:18

**disbursed** [1] - 1951:18

**disbursement** [1] - 1996:1

**disbursements** [4] - 1941:1, 1941:9, 1942:14, 1942:17

**Disbursements** [1] - 1942:11

**Disciplinary** [2] - 1994:18, 1995:20

**disciplinary** [13] - 2137:9, 2137:20, 2138:6, 2139:23, 2141:4, 2142:19, 2143:2, 2143:21, 2144:4, 2144:5, 2144:17, 2144:22, 2148:4

**disclosed** [1] - 2093:13

**discuss** [12] - 1924:17, 1924:19, 1928:9, 1930:25, 1959:13, 1965:24, 1966:7, 1991:8, 2024:12, 2071:7, 2103:2, 2125:20

**discussed** [7] - 1947:6, 1950:10, 1951:22, 1955:1, 1961:6, 2101:14, 2103:10

**discussing** [4] - 1938:3, 1991:4, 2086:3, 2148:20

**discussion** [3] - 1998:19, 2008:2, 2148:3

**disguise** [1] - 2138:8

**dishonest** [1] - 2083:6

**dishonesty** [1] - 2083:9

**dismiss** [2] - 2152:10, 2152:11

**dismissal** [1] - 2154:1

**dispose** [2] - 1953:1, 2082:20

**disposed** [2] - 1952:4, 2001:5

**disposition** [1] - 2088:8

**disprove** [1] - 1982:4

**dispute** [4] - 1967:9, 1967:14, 1998:8, 2138:9

**disputing** [4] - 1985:4, 1985:6, 1996:14, 1996:16

**disregard** [1] - 2058:18

**disrespect** [1] - 2049:18

**dissolved** [1] - 1976:23

**distinguish** [2] - 2049:25, 2050:4

**distress** [1] - 2106:1

**distributing** [1] - 2082:18

**DISTRICT** [3] - 1912:1, 1912:1, 1912:11

**District** [6] - 1912:14, 1913:6, 1913:7, 1980:23, 1981:9, 2048:23

**Division** [2] - 1994:15, 1994:17

**docket** [3] - 1981:12, 2056:11, 2057:3

**dockets** [1] - 1982:1, 2055:24

**doctor** [1] - 2111:16

**document** [35] - 1939:1, 1939:20, 1940:21, 1940:24, 1941:23, 1943:3, 1944:18, 1953:2, 1953:11, 2007:25, 2012:8, 2012:16, 2014:19, 2014:22, 2014:25, 2021:15, 2022:4, 2022:5, 2023:1, 2043:8, 2043:10, 2043:16, 2050:5, 2050:6, 2050:9, 2050:12, 2050:13, 2050:15, 2050:17, 2084:22, 2084:24, 2085:3, 2085:14, 2086:3, 2143:19

**documentation** [2] - 1952:2, 1953:20

**documents** [12] - 1922:18, 1934:18, 1953:14, 1985:2, 2007:4, 2011:11, 2022:8, 2023:6, 2023:9, 2023:11, 2049:25, 2156:5

**DOF** [1] - 2087:22

**dog** [7] - 1913:11, 1913:22, 1971:24, 2018:19, 2065:20, 2065:21, 2144:3

**doghouse** [2] - 1937:20, 2138:22

**dogs** [1] - 2065:19

**dollar** [3] - 2007:1, 2007:16, 2055:15

**dollars** [7] - 1965:20, 1965:21, 2016:7, 2016:14, 2016:23, 2034:14, 2053:8

**donating** [1] - 2072:5

**done** [28] - 1915:20, 1915:21, 1924:18, 1930:18, 1937:4, 1944:13, 1946:15, 1946:18, 1983:13, 2008:2, 2010:6, 2013:5, 2013:6, 2014:23, 2029:10, 2034:5, 2043:24, 2058:9, 2072:10, 2106:10, 2118:7, 2123:23, 2125:4, 2130:1, 2130:5, 2155:17, 2155:25
**Donuts** [2] - 2105:17, 2105:19
**door** [7] - 1967:25, 1968:17, 2092:10, 2147:18, 2147:22, 2147:24, 2148:3
**DOROTHY** [2] - 2075:19, 2157:21
**Dorothy** [4] - 1967:11, 2075:4, 2075:12, 2079:3
**dosage** [2] - 2110:17, 2110:24
**dose** [1] - 2120:15
**doubt** [2] - 1936:8, 1995:6
**doubts** [1] - 2135:16
**down** [33] - 1928:20, 1946:3, 1948:11, 1953:3, 1953:12, 2018:11, 2023:12, 2027:22, 2033:5, 2060:21, 2060:23, 2061:1, 2074:23, 2074:25, 2075:6, 2087:21, 2093:24, 2093:25, 2094:19, 2094:20, 2097:6, 2106:10, 2107:12, 2113:22, 2113:23, 2119:17, 2120:17, 2123:23, 2124:6, 2124:7, 2149:22, 2149:24
**downtime** [1] - 1934:18
**dozen** [2] - 2059:25, 2106:8
**DR** [1] - 1994:17
**draft** [18] - 1943:25, 1944:1, 1944:10, 1944:12, 1978:7, 2008:1, 2008:9, 2011:19, 2011:23, 2011:24, 2012:10, 2015:3, 2049:20, 2049:25, 2050:8, 2126:23, 2128:16, 2137:22
**Draft** [3] - 2011:3, 2011:9, 2011:11
**drafted** [5] - 1939:23, 1941:14, 1943:9, 1943:15, 1945:11
**drafting** [6] - 1939:2, 1939:20, 1940:20, 1940:22, 1941:23, 1942:25
**draw** [2] - 2092:8, 2142:21
**drew** [1] - 1936:20
**drink** [1] - 2105:14
**drive** [3] - 1960:11, 2018:11, 2110:24
**driving** [3] - 2115:19, 2115:23, 2117:3
**drop** [2] - 1924:23, 1924:24
**dropped** [2] - 1948:9, 2121:5
**drove** [1] - 2110:23
**due** [5] - 1937:5, 1941:19, 1942:5, 2003:9, 2142:22
**duly** [5] - 1918:2, 1995:17, 2061:3, 2075:20, 2098:2
**Dunkin'** [2] - 2105:17, 2105:19
**Dunn** [77] - 1912:18, 1914:19, 1914:23, 1915:4, 1915:25, 1955:15, 1957:19, 1961:13, 1965:23, 1982:8, 1983:5, 1983:8, 1983:25, 1984:9, 1984:17, 1985:12, 1985:19, 1986:6, 1987:7, 1987:18, 1988:8, 1988:9, 1988:10, 1988:11, 1988:14, 2020:22, 2023:9, 2068:7, 2068:11, 2068:24, 2068:25, 2100:4, 2100:20, 2101:8, 2103:22,

2103:25, 2104:5, 2104:8, 2104:12, 2106:20, 2108:12, 2109:2, 2109:4, 2109:19, 2109:21, 2110:6, 2110:11, 2110:16, 2110:23, 2111:2, 2111:5, 2111:21, 2114:12, 2114:18, 2115:2, 2117:2, 2118:5, 2119:17, 2120:5, 2120:19, 2122:1, 2122:3, 2122:5, 2122:7, 2122:14, 2122:23, 2123:3, 2123:13, 2123:16, 2129:12, 2130:22, 2133:18, 2140:16, 2152:17, 2153:25, 2154:2
**DUNN** [1] - 1912:7
**Dunn's** [11] - 1916:3, 2067:10, 2067:19, 2068:17, 2068:21, 2098:10, 2098:25, 2102:25, 2109:10, 2120:9, 2156:10
**duration** [1] - 2045:10
**during** [42] - 1918:21, 1924:17, 1925:4, 1925:7, 1925:13, 1925:15, 1926:13, 1934:22, 1935:15, 1942:20, 1948:4, 1958:20, 1968:25, 1996:22, 2020:7, 2039:8, 2063:24, 2064:11, 2070:21, 2070:22, 2070:24, 2071:5, 2071:20, 2077:1, 2101:13, 2101:21, 2103:18, 2103:21, 2104:16, 2105:14, 2105:20, 2105:22, 2106:5, 2106:12, 2114:15, 2117:2, 2117:13, 2117:18, 2119:23, 2121:15, 2135:19, 2135:22
**duties** [2] - 1924:5, 1924:6
**duty** [1] - 2005:1

# E

**E-mail** [2] - 2020:6, 2020:12
**e-mail** [16] - 1961:17, 1961:25, 1962:25, 1963:8, 1963:12, 1988:1, 1988:4, 1999:1, 2084:7, 2084:12, 2085:12, 2086:15, 2087:14, 2087:15, 2087:18, 2088:1
**E-mails** [3] - 2031:8, 2032:18
**e-mails** [2] - 1962:3, 1962:23
**early** [9] - 1918:4, 1925:21, 1935:5, 1936:10, 1938:4, 1948:13, 1950:11, 1979:2, 2054:23, 2110:11
**ease** [1] - 1949:4
**easier** [3] - 1951:14, 2130:13, 2156:15
**East** [2] - 1912:14, 1912:24
**EASTERN** [1] - 1912:1
**Eastern** [4] - 1912:14, 1913:6, 1981:9, 2048:23
**easy** [3] - 2055:12, 2056:24, 2111:3
**eat** [1] - 2100:19
**ECF** [2] - 1981:17, 1981:19
**economy** [1] - 1948:3
**Edwina** [1] - 1937:21
**effect** [15] - 1916:23, 1933:3, 1933:5, 1933:7, 1933:12, 1934:11, 1934:23, 1934:25, 1936:3, 1936:4, 1936:6, 2102:3, 2102:15, 2108:10, 2128:19
**effectively** [1] - 2121:1
**efficacy** [1] - 2111:23
**efficient** [2] - 2034:7, 2034:10
**effort** [3] - 1921:9, 1963:14, 1965:24

**efforts** [1] - 2082:20
**eight** [5] - 1976:3, 1980:10, 2070:24, 2076:22, 2131:20
**eight-defendant** [1] - 1980:10
**either** [11] - 1924:22, 1930:20, 1931:1, 1960:2, 1969:7, 1974:9, 2022:13, 2037:8, 2082:20, 2099:15, 2152:3
**elect** [1] - 2086:16
**elected** [1] - 2084:4
**electronic** [4] - 1981:21, 2042:15, 2045:1, 2130:4
**Eleven** [1] - 2127:3
**elicit** [2] - 2081:9, 2103:9
**elicited** [2] - 2087:15, 2152:18
**elsewhere** [1] - 1931:2
**emanated** [1] - 1967:9
**emergency** [2] - 2013:11, 2111:17
**emphasis** [1] - 2006:13
**emphasize** [1] - 2034:23
**employ** [1] - 1996:9
**employed** [3] - 1919:9, 1976:18, 2093:21
**employee** [3] - 1920:11, 1997:4, 2021:6
**employees** [1] - 1920:14
**employment** [1] - 1918:15
**empower** [3] - 1988:22, 1989:6, 1989:15
**empty** [1] - 1960:6
**encountered** [1] - 1931:1
**end** [24] - 1914:15, 1922:20, 1936:5, 1948:8, 1948:13, 1948:18, 1950:17, 1954:21, 1960:22, 1960:24, 2016:13, 2053:8, 2054:4, 2063:10, 2092:14, 2092:15, 2096:5, 2103:18, 2104:5, 2106:6, 2108:22, 2116:23, 2137:6, 2140:11
**ends** [8] - 1933:15, 1937:22, 1949:17, 1955:2, 1972:10, 2000:23, 2085:21, 2092:19
**engage** [2] - 1974:20, 2087:12
**engaged** [7] - 1929:9, 2088:22, 2088:24, 2146:10, 2151:4, 2151:6, 2151:16
**enlighten** [1] - 2031:20
**enormous** [1] - 2071:23
**ensued** [1] - 1954:24
**enter** [1] - 2005:3
**entered** [2] - 1970:25, 2130:22
**Enterprise** [6] - 1962:14, 1963:2, 1991:10, 2020:6, 2020:17, 2021:16, 2021:18, 2023:10
**enterprise** [2] - 1980:11, 2022:6
**enters** [7] - 1913:2, 1918:5, 1967:2, 1973:6, 2026:3, 2027:9, 2070:5
**entire** [6] - 1973:21, 1976:9, 1986:16, 2102:25, 2118:4, 2127:11
**entirety** [1] - 2117:18
**entitled** [2] - 1958:1, 2019:17
**entity** [2] - 2022:17, 2104:1
**Entrepreneur** [1] - 1989:15
**Entrepreneurs** [1] - 1988:21
**entrepreneurs** [1] - 1989:15

**entrusted** [1] - 1994:21
**entry** [2] - 2057:11, 2057:14
**envision** [1] - 1947:16
**envisioned** [1] - 1965:11
**episode** [1] - 2107:20
**equal** [1] - 2096:4
**equally** [1] - 2153:24
**equivalency** [2] - 2079:20, 2096:11
**escrow** [5] - 1996:12, 2141:12, 2146:1, 2146:7, 2146:23
**especially** [1] - 2153:10
**ESQ** [8] - 1912:13, 1912:15, 1912:16, 1912:17, 1912:19, 1912:19, 1912:20, 1912:21
**Esq** [6] - 2044:11, 2044:13, 2044:14, 2044:15, 2103:22, 2103:23
**essential** [1] - 2045:23
**essentially** [3] - 2008:4, 2068:24, 2092:15
**establish** [2] - 2116:14, 2153:8
**estate** [48] - 1920:17, 1920:18, 1924:22, 1926:23, 1927:4, 1927:18, 1928:15, 1929:9, 1929:21, 1929:25, 1930:13, 1930:20, 1930:24, 1947:3, 1948:3, 1948:7, 1948:10, 1951:17, 1951:19, 1960:6, 1968:4, 1978:3, 1988:22, 1989:5, 1990:8, 2002:8, 2005:12, 2007:7, 2016:12, 2018:7, 2027:19, 2028:11, 2029:6, 2031:24, 2032:8, 2036:1, 2037:17, 2047:8, 2047:25, 2052:17, 2055:10, 2059:5, 2071:13, 2074:10, 2076:15, 2081:1, 2081:6
**estimate** [5] - 1924:9, 1944:5, 1978:9, 2152:21, 2152:25
**et** [4] - 1914:23, 2043:9, 2128:12, 2129:7
**ethical** [5] - 1997:11, 2004:24, 2139:10, 2139:11, 2148:24
**evaluate** [2] - 2133:20
**EVANS** [55] - 1912:17, 1914:20, 1915:5, 1916:8, 1975:2, 2026:22, 2043:22, 2060:19, 2067:25, 2068:3, 2068:20, 2068:25, 2069:6, 2069:11, 2098:22, 2100:8, 2102:5, 2104:19, 2107:21, 2108:20, 2109:8, 2111:11, 2115:17, 2116:1, 2116:6, 2116:9, 2116:13, 2116:17, 2116:21, 2117:1, 2119:2, 2120:3, 2124:1, 2126:19, 2128:4, 2129:10, 2129:23, 2130:17, 2130:21, 2131:1, 2131:7, 2131:16, 2131:19, 2131:23, 2131:25, 2132:7, 2133:4, 2140:16, 2140:20, 2144:3, 2154:1, 2154:21, 2155:6, 2155:13, 2158:10
**Evans** [6] - 1915:5, 1915:6, 1975:1, 2109:6, 2128:3, 2155:12
**evening** [3] - 2098:17, 2110:15, 2119:3
**event** [5] - 1942:6, 1942:21, 1949:12, 2026:18, 2040:16
**events** [2] - 1950:10, 1995:24
**eventually** [4] - 1939:24, 2101:2, 2106:18, 2130:12

**Evidence** [1] - 1957:25
**evidence** [53] - 1936:21, 1938:22, 1939:19, 1949:4, 1949:6, 1949:7, 1949:8, 1949:10, 1949:11, 1957:17, 1967:16, 1968:11, 1968:14, 1970:5, 1975:11, 2001:15, 2009:11, 2010:4, 2017:8, 2022:7, 2030:17, 2037:19, 2038:17, 2039:21, 2039:24, 2040:8, 2042:24, 2043:19, 2043:20, 2044:4, 2051:14, 2055:25, 2056:8, 2067:6, 2067:22, 2084:19, 2084:25, 2132:18, 2135:4, 2135:5, 2136:4, 2137:14, 2138:7, 2142:17, 2143:15, 2145:14, 2145:19, 2150:6, 2152:11, 2153:15, 2153:19, 2154:4, 2156:11
**evidentiary** [3] - 1957:15, 1967:21, 2124:10
**evinces** [1] - 2137:25
**exact** [6] - 1934:23, 1959:17, 2014:24, 2042:3, 2059:4, 2089:24
**exactly** [8] - 1919:4, 1970:15, 2014:8, 2136:19, 2136:20, 2143:9, 2146:14, 2156:1
**EXAMINATION** [28] - 1918:11, 1973:8, 1975:20, 2027:15, 2042:13, 2047:1, 2056:9, 2061:10, 2073:22, 2075:22, 2079:1, 2089:12, 2096:14, 2098:4, 2109:7, 2119:1, 2157:6, 2157:8, 2157:10, 2157:12, 2157:16, 2157:18, 2157:22, 2157:24, 2158:1, 2158:3, 2158:7, 2158:9
**examination** [12] - 1949:4, 1967:18, 1969:13, 1970:10, 1972:19, 1972:20, 2028:14, 2047:14, 2068:9, 2092:2, 2147:23, 2155:1
**examine** [3] - 1956:24, 1963:10, 2069:10
**examined** [3] - 1918:3, 2075:21, 2098:3
**example** [5] - 1919:19, 1920:9, 2005:3, 2016:9, 2033:22
**excellent** [1] - 1946:19
**except** [3] - 1939:14, 2104:21, 2118:9
**excerpts** [1] - 2150:6
**exchange** [2] - 1961:17, 1961:25
**exciting** [1] - 1920:1
**exclude** [1] - 2141:4
**exclusively** [1] - 2028:18
**excuse** [6] - 1956:21, 2027:24, 2087:6, 2093:3, 2103:3, 2125:11
**excused** [7] - 1966:8, 2024:17, 2097:8, 2131:19, 2131:21, 2132:7, 2140:16
**executive** [3] - 2037:4, 2061:16, 2070:23
**exhausted** [2] - 1942:6, 2013:16
**exhaustion** [1] - 2105:10
**Exhibit** [40] - 1938:23, 1939:18, 1950:25, 1951:1, 1964:5, 1992:2, 1993:21, 2001:3, 2001:15, 2001:16, 2007:20, 2014:20, 2017:7, 2020:1, 2020:21, 2030:5, 2030:14, 2030:17, 2037:19, 2038:16, 2039:17, 2039:21,

2039:24, 2043:21, 2044:3, 2051:14, 2051:17, 2051:20, 2058:5, 2084:8, 2084:20, 2101:17, 2102:25, 2103:1, 2103:3, 2130:22, 2158:16, 2158:18, 2158:20, 2158:22
**exhibit** [4] - 1938:25, 1951:3, 1961:17, 1994:3
**Exhibits** [2] - 2042:11, 2158:24
**exhibits** [1] - 2056:5
**existing** [1] - 2004:21
**exits** [1] - 2024:15
**expect** [2] - 1971:20, 2155:13
**expected** [2] - 2155:22
**expedite** [1] - 2067:1
**expeditiously** [2] - 2125:8
**expenses** [4] - 1941:3, 1941:7, 1941:21, 1985:23
**experience** [6] - 1918:15, 1918:22, 1961:1, 1961:3, 1990:3, 2018:7
**experts** [2] - 1941:18, 1941:20, 1941:24
**explain** [6] - 1939:10, 2031:22, 2053:1, 2083:20, 2095:13, 2096:2
**explaining** [2] - 2104:22
**explanation** [2] - 1972:4, 2085:13
**explanations** [1] - 2138:15
**exposure** [1] - 2132:14
**express** [1] - 2105:25
**extensive** [1] - 2018:7
**extent** [1] - 2138:6
**extort** [1] - 1965:25
**extortion** [6] - 2126:6, 2127:3, 2127:17, 2132:8, 2132:11, 2154:6
**extrinsic** [1] - 2067:6
**eyes** [1] - 2014:12

### F

**face** [3] - 1969:1, 2145:1
**face-to-face** [1] - 1969:1
**faced** [1] - 2151:18
**fact** [27] - 1938:3, 1960:20, 1963:1, 1963:2, 1978:25, 1980:22, 1987:4, 2004:17, 2007:6, 2012:21, 2023:14, 2023:19, 2030:5, 2035:21, 2037:4, 2056:14, 2067:20, 2086:14, 2104:22, 2107:18, 2133:14, 2133:24, 2136:3, 2143:3, 2146:17, 2147:9, 2152:19
**factories** [1] - 1920:2
**factors** [3] - 2045:7, 2045:12, 2045:14
**facts** [7] - 1967:22, 1967:25, 1968:1, 1968:17, 1969:11, 1972:12, 2092:9
**factual** [1] - 2154:14
**failed** [4] - 1971:4, 1972:2, 2091:4, 2091:8
**fair** [16] - 1937:18, 1960:25, 1986:10, 1986:22, 1997:17, 2018:19, 2037:16, 2049:24, 2050:3, 2071:22, 2072:17, 2072:20, 2082:24, 2088:16, 2138:17, 2144:15
**fairly** [2] - 1929:1, 1986:22
**faith** [2] - 1972:6, 1972:11

**fall** [2] - 2102:8, 2102:9
**falsely** [1] - 2018:25
**familiar** [5] - 2004:10, 2010:17, 2014:2, 2021:7, 2074:12
**family** [5] - 1920:5, 1928:21, 1967:9, 2036:15, 2088:23
**family's** [3] - 2082:10, 2082:14, 2088:20
**family-owned** [1] - 1920:5
**Fannie** [1] - 1948:9
**far** [7] - 1954:1, 1978:16, 2001:17, 2021:18, 2092:5, 2118:8, 2148:25
**Farkas** [1] - 2044:13
**farming** [1] - 1920:1
**father** [9] - 2077:17, 2077:19, 2079:25, 2081:21, 2088:17, 2095:6, 2095:9, 2096:10, 2096:11
**father's** [5] - 1982:13, 2089:1, 2096:3, 2096:7
**favor** [1] - 2084:3
**FBI** [3] - 2010:12, 2015:7, 2098:21
**February** [3] - 1993:3, 2013:13, 2041:11
**fed** [2] - 2107:4, 2107:10
**federal** [5] - 1960:2, 1960:4, 2126:5, 2127:5
**Federal** [10] - 1980:23, 1981:4, 2019:10, 2019:23, 2049:7, 2100:4, 2101:2, 2107:8, 2112:24, 2114:13
**fee** [11] - 1922:21, 1943:1, 1954:25, 1973:15, 2002:22, 2016:8, 2029:11, 2032:10, 2032:11, 2036:1
**feelings** [1] - 2084:2
**fees** [7] - 1922:22, 1941:8, 1941:19, 1942:14, 1943:23, 1951:18, 2003:9
**FELA** [1] - 1945:10
**felt** [4] - 1959:10, 1963:5, 2016:19, 2087:11
**few** [11] - 1925:21, 1950:23, 1953:8, 1970:22, 1984:9, 2012:12, 2030:18, 2037:16, 2039:19, 2055:21, 2074:1
**fictional** [1] - 2069:2
**fiduciary** [1] - 1972:2
**field** [2] - 1961:4, 2068:10
**fight** [2] - 2018:19, 2144:4
**figured** [1] - 2092:6
**Filancia** [1] - 1979:6
**file** [3] - 2003:19, 2044:24, 2152:20
**files** [4] - 1940:13, 1940:17, 1999:8
**filing** [6] - 1941:8, 1981:21, 1999:3, 2003:9, 2042:16, 2045:2
**fill** [3] - 1991:20, 2014:9, 2121:3
**filled** [3] - 2014:8, 2014:10, 2120:25
**final** [2] - 2049:25, 2050:5
**finalized** [1] - 2122:20
**finance** [1] - 1983:25
**Financial** [1] - 2063:3
**financial** [12] - 1974:20, 1995:14, 2021:21, 2021:23, 2022:2, 2088:14, 2090:23, 2091:14, 2095:4, 2150:14, 2150:17, 2151:5
**financing** [6] - 1928:23, 1974:16, 1983:8, 1983:11, 1986:4, 2094:4

**fine** [22] - 1914:18, 1916:6, 1916:9, 1971:17, 2000:21, 2064:6, 2066:8, 2071:5, 2075:25, 2099:2, 2104:18, 2125:7, 2126:13, 2126:14, 2127:25, 2128:2, 2129:19, 2145:12, 2149:12, 2149:15, 2149:17, 2150:19
**fingerprinted** [1] - 2106:22
**fingerprinting** [1] - 2106:25
**finish** [2] - 2087:6, 2087:7
**finished** [6] - 1944:16, 2106:25, 2118:7, 2119:5, 2124:9
**fired** [2] - 2093:21, 2093:22
**firm** [40] - 1918:20, 1926:25, 1927:11, 1936:11, 1936:15, 1938:14, 1938:17, 1941:2, 1942:12, 1943:13, 1944:20, 1947:21, 1950:19, 1953:7, 1953:9, 1973:11, 1974:9, 1976:19, 1976:23, 1980:25, 1981:11, 1985:20, 1986:14, 1995:3, 2000:3, 2001:19, 2001:20, 2002:4, 2012:21, 2012:23, 2032:4, 2047:17, 2050:23, 2051:1, 2054:16, 2061:18, 2061:19, 2061:22, 2061:23, 2061:24
**firm's** [2] - 1942:21, 2001:3
**firm..** [1] - 2017:15
**firms** [1] - 2011:14
**First** [1] - 2000:14
**first** [38] - 1913:9, 1920:25, 1923:16, 1923:18, 1923:21, 1925:7, 1925:9, 1925:21, 1928:19, 1940:7, 1945:9, 1945:24, 1951:9, 1953:8, 1962:10, 1975:18, 2012:22, 2048:19, 2055:23, 2075:20, 2079:3, 2088:18, 2101:14, 2103:17, 2108:9, 2113:20, 2113:23, 2114:1, 2114:3, 2114:4, 2114:7, 2123:19, 2124:14, 2130:18, 2135:18, 2138:25, 2142:5, 2149:24
**fish** [1] - 1920:2
**fit** [2] - 2121:2, 2145:15
**fitness** [1] - 2093:18
**five** [10] - 1920:18, 1922:6, 1923:19, 1923:20, 1946:9, 1987:1, 2065:24, 2077:6, 2077:9, 2136:12
**fixed** [2] - 1939:9, 1998:18
**flat** [3] - 1954:25, 1973:15, 2035:25
**flip** [1] - 2071:4
**flip-flopped** [1] - 2071:4
**flooding** [1] - 1919:20
**floor** [2] - 1945:25, 1986:17
**flopped** [1] - 2071:4
**Florida** [1] - 2100:14
**focus** [1] - 2093:2
**focusing** [1] - 1978:3
**folks** [2] - 2063:16, 2072:25
**follow** [1] - 2058:12
**followed** [1] - 1942:7
**following** [23] - 1913:3, 1917:18, 1931:5, 1933:1, 1936:1, 1949:1, 1953:18, 1982:17, 2000:13, 2009:1, 2025:18, 2026:4, 2046:13, 2065:1, 2065:8, 2071:4, 2085:10, 2085:13,

2092:1, 2097:19, 2118:13, 2120:6, 2125:22
**follows** [3] - 1918:3, 2075:21, 2098:3
**food** [5] - 2105:14, 2107:15, 2107:16, 2113:20, 2120:19
**foot** [2] - 1947:16, 2094:7
**FOR** [1] - 1912:10
**force** [1] - 2099:15
**forego** [1] - 1969:22
**foregoes** [1] - 1969:21
**forfeiture** [1] - 2131:4
**forget** [1] - 1993:25
**forgive** [1] - 2072:12
**forgot** [3] - 1980:9, 2040:20, 2125:13
**form** [32] - 1936:20, 1958:11, 1973:16, 1989:7, 1989:12, 1992:5, 1992:8, 1992:15, 1992:21, 1993:4, 1993:12, 2000:5, 2000:18, 2011:19, 2012:5, 2050:1, 2050:5, 2071:21, 2073:11, 2078:12, 2078:13, 2101:15, 2101:16, 2101:18, 2102:2, 2102:10, 2107:21, 2121:10, 2137:19, 2143:3, 2146:8
**formal** [1] - 1946:8
**formally** [1] - 2006:2
**formation** [1] - 2149:18
**formed** [4] - 1918:16, 1968:5, 1969:3, 2078:1
**former** [2] - 1970:25, 2091:6
**forms** [4] - 1991:15, 1994:1, 1994:9, 1994:23
**formulation** [2] - 2141:15, 2147:3
**forth** [4] - 1942:19, 1962:3, 2143:1, 2154:4
**forthcoming** [1] - 1962:21
**Fortune** [1] - 1919:15
**forward** [8] - 1918:13, 1920:7, 1921:19, 1962:16, 2033:15, 2053:6, 2102:11, 2124:11
**foundation** [3] - 2085:12, 2116:17, 2116:19
**four** [3] - 1948:20, 1978:12, 2071:17
**Fox** [1] - 2054:16
**fox** [1] - 2091:10
**frame** [4] - 1921:20, 1925:25, 1962:8, 2070:21
**frankly** [7] - 1916:22, 2050:21, 2063:5, 2071:17, 2072:11, 2141:16, 2152:2
**fraud** [4] - 1974:21, 1981:4, 2132:9
**Freddie** [1] - 1948:9
**free** [4] - 1956:23, 2053:7, 2074:19, 2141:13
**Freeman** [83] - 1912:21, 1915:11, 1915:13, 1916:4, 1918:17, 1918:20, 1932:3, 1935:6, 1935:11, 1935:15, 1935:16, 1936:10, 1936:18, 1937:7, 1938:4, 1938:8, 1939:5, 1941:15, 1945:8, 1950:19, 1954:18, 1970:23, 1971:5, 1971:15, 1976:15, 1976:19, 1976:21, 1981:11, 1983:11, 1985:13, 1986:11, 1986:20, 1986:22, 1995:3, 1996:21, 2009:15, 2010:6, 2010:10,

All Word // USA v Stevenson Dunn, et al.

14

2010:13, 2011:25, 2012:17, 2013:4, 2015:6, 2015:16, 2015:18, 2015:21, 2020:22, 2022:25, 2028:16, 2028:18, 2030:9, 2039:1, 2040:22, 2041:15, 2042:2, 2042:8, 2042:9, 2043:6, 2048:8, 2050:23, 2051:4, 2054:23, 2055:16, 2056:18, 2056:22, 2066:20, 2075:2, 2079:22, 2089:3, 2090:2, 2101:25, 2103:23, 2103:25, 2104:8, 2104:12, 2108:13, 2109:5, 2123:4, 2129:12, 2139:5, 2153:24

**FREEMAN** [1] - 1912:7

**Freeman's** [11] - 1939:6, 1954:16, 2008:12, 2010:18, 2012:13, 2013:10, 2014:5, 2050:8, 2056:15, 2056:23, 2095:12

**frequent** [1] - 1986:22

**friend** [3] - 1958:18, 1959:5, 2058:3

**friendly** [2] - 1927:1, 1930:10

**friends** [2] - 1986:9, 2063:20

**friendship** [1] - 1982:13

**frivolously** [1] - 2055:23

**front** [5] - 1940:3, 1943:2, 1968:8, 2117:6, 2145:3

**full** [3] - 1946:1, 2012:24, 2075:11

**functions** [1] - 2135:24

**fund** [3] - 1958:25, 2038:11, 2039:3

**fundamentally** [1] - 2068:4

**funding** [2] - 1958:24, 2080:17

**fundraising** [1] - 2071:9

**funds** [2] - 1994:21, 1996:1

**funny** [1] - 2081:5

**furtive** [1] - 2113:2

**future** [1] - 2087:20

## G

**gained** [1] - 1918:22

**gala** [1] - 2071:14

**game** [1] - 2144:15

**gander** [1] - 2151:10

**Garcia** [3] - 2054:14, 2054:15, 2054:16

**Garvey** [3] - 1974:7, 1984:14, 1984:20

**Gary** [4] - 2052:9, 2052:13, 2053:23, 2054:1

**Gates** [17] - 1968:24, 1970:24, 2024:5, 2077:22, 2079:9, 2079:12, 2079:25, 2080:12, 2081:22, 2082:7, 2084:5, 2089:14, 2090:24, 2093:7, 2094:17, 2096:9, 2096:22

**gear** [1] - 2118:10

**Gene** [1] - 2079:13

**general** [14] - 1923:9, 1924:2, 1924:5, 1925:22, 1942:21, 1952:7, 1953:7, 1953:9, 1954:5, 1973:11, 2007:5, 2053:17, 2142:8, 2148:21

**generally** [4] - 1952:10, 1990:14, 2004:10, 2028:15

**generate** [1] - 1998:23

**generated** [2] - 1952:8, 1952:12

**generating** [1] - 2081:1

**generation** [1] - 1947:21

**generosity** [4] - 1983:21, 2072:18, 2073:12, 2078:13

**generous** [6] - 1969:7, 2017:4, 2017:5, 2078:15, 2078:20, 2078:21

**Gentile** [1] - 2044:13

**gentleman** [7] - 1918:18, 1930:4, 1961:18, 2042:20, 2047:21, 2053:12, 2086:24

**gentlemen** [12] - 1919:1, 1935:14, 1945:20, 1948:2, 1965:18, 2052:25, 2061:14, 2063:8, 2063:11, 2064:10, 2149:2, 2149:6

**Gentlemen** [5] - 1923:25, 1924:9, 1926:22, 1930:2, 2043:5

**George** [4] - 1965:24, 2044:13, 2109:12, 2122:13

**Georgoulis** [2] - 2006:23, 2047:21

**Gerald** [1] - 1915:12

**Gershon** [1] - 1913:8

**GERSHON** [4] - 1912:10, 1913:2, 1967:2, 2026:3

**ginger** [1] - 2066:1

**gist** [1] - 1935:1

**given** [11] - 1939:13, 2021:12, 2022:13, 2023:5, 2023:18, 2048:14, 2084:2, 2090:1, 2128:18, 2129:1, 2137:8

**glazed** [1] - 2014:12

**glove** [2] - 2113:10, 2113:11

**gobbled** [1] - 2102:2

**goodbye** [1] - 2139:18

**goose** [1] - 2151:9

**governance** [1] - 2071:12

**governing** [1] - 1994:19

**Government** [29] - 1912:13, 1914:24, 1915:3, 1916:19, 1917:10, 1964:5, 1967:10, 1968:18, 1969:12, 1971:15, 1972:17, 1981:25, 1992:2, 1993:21, 2001:2, 2001:15, 2007:20, 2019:11, 2019:24, 2030:13, 2039:20, 2043:8, 2043:16, 2045:22, 2046:4, 2051:20, 2058:5, 2097:15, 2102:24

**government** [53] - 1936:8, 1937:1, 1950:4, 1955:25, 1957:13, 1963:9, 1963:19, 1964:4, 1964:6, 1969:20, 2009:2, 2009:4, 2047:21, 2051:14, 2056:5, 2066:21, 2068:6, 2073:20, 2075:4, 2081:9, 2092:7, 2092:14, 2124:4, 2124:13, 2124:16, 2126:2, 2127:25, 2128:18, 2129:2, 2130:25, 2131:5, 2131:19, 2133:5, 2136:2, 2136:6, 2136:11, 2136:19, 2137:4, 2138:6, 2138:13, 2139:13, 2141:13, 2142:3, 2143:7, 2146:4, 2146:5, 2148:12, 2152:13, 2152:18, 2153:3, 2153:8, 2154:8

**government's** [3] - 2124:9, 2128:14, 2142:20

**Government's** [22] - 1938:23, 1939:18, 1950:25, 1951:1, 2014:20, 2017:7, 2020:1, 2020:21, 2030:5, 2030:14,

2030:17, 2037:19, 2038:16, 2039:17, 2039:21, 2039:24, 2101:17, 2103:1, 2158:16, 2158:18, 2158:20, 2158:24

**governments** [1] - 2074:15

**governor** [1] - 2037:10

**grabbed** [1] - 2102:3

**grade** [1] - 1940:7

**graduated** [1] - 1976:25

**Granatstein** [1] - 2119:19

**grant** [1] - 1990:25

**granted** [1] - 1961:9

**great** [1] - 2156:3

**greater** [2] - 1965:6, 1969:23

**green** [1] - 2027:25

**Griffith** [2] - 1980:23, 2058:1

**ground** [1] - 1966:3

**group** [4] - 1921:16, 1922:15, 1984:6, 1984:8

**Group** [1] - 1919:15

**Grove** [1] - 1922:9

**grow** [2] - 1920:3, 2062:16

**growing** [1] - 1920:2

**guarantee** [1] - 2146:24

**Guerrero** [9] - 1971:1, 1971:6, 2091:6, 2091:11, 2093:6, 2093:9, 2093:14, 2094:13, 2095:3

**Guerrero's** [2] - 2091:3, 2093:18

**guess** [7] - 1921:7, 1922:16, 2034:13, 2089:7, 2137:12, 2151:2, 2152:24

**guidance** [1] - 1928:5

**guidelines** [1] - 2131:18

**guilt** [2] - 2128:23, 2153:16

**guilty** [13] - 2057:6, 2057:9, 2057:12, 2057:24, 2058:1, 2128:21, 2129:9, 2132:3, 2150:25, 2151:1, 2151:16, 2153:7

**guys** [1] - 1951:7

## H

**Habitat** [10] - 2037:5, 2037:8, 2062:17, 2063:15, 2064:12, 2070:16, 2072:25, 2073:16, 2074:3, 2135:23

**habitat** [1] - 2073:3

**half** [5] - 1920:10, 1950:8, 1976:16, 2059:25, 2106:8

**hammer** [1] - 2064:6

**Hancock** [6] - 1922:9, 1963:18, 1964:25, 1965:23, 2103:23, 2104:2

**hand** [3] - 2061:2, 2066:12, 2075:7

**handbook** [1] - 1920:11

**handcuffed** [2] - 2115:22, 2117:14

**handed** [1] - 1954:23, 2102:10

**handle** [2] - 1920:21, 1948:19

**handled** [1] - 1978:16

**handwriting** [1] - 2039:2

**handwritten** [3] - 2003:4, 2003:14, 2030:24

**hang** [1] - 2137:17

**happily** [1] - 2139:20

**happy** [4] - 1970:12, 2082:24, 2088:8,

2088:10

**hard** [4] - 1964:6, 2003:22, 2028:8, 2058:12

**harder** [1] - 2021:14

**Harlem** [5] - 1958:19, 1958:23, 1959:22, 2045:19, 2045:20

**Harold** [1] - 2044:14

**Harrison** [2] - 2061:25, 2062:7

**hastily** [1] - 2008:1

**hate** [1] - 2135:14

**hats** [1] - 1990:4

**Haymowitz** [1] - 1945:7

**HAYMOWITZ** [1] - 1945:8

**head** [1] - 2052:15

**heading** [4] - 1916:3, 2043:17, 2044:10, 2044:20

**hear** [15] - 1934:4, 1972:3, 1972:15, 2028:8, 2065:11, 2124:12, 2124:15, 2128:1, 2131:14, 2136:21, 2139:12, 2140:11, 2144:10, 2147:3, 2152:12

**heard** [24] - 1923:3, 1926:18, 1937:9, 1937:14, 1945:9, 1975:10, 1983:5, 1988:24, 1989:14, 2000:11, 2006:22, 2013:14, 2018:4, 2018:16, 2019:2, 2019:9, 2066:10, 2110:16, 2117:20, 2119:19, 2119:20, 2129:21, 2134:1, 2147:5

**hearing** [6] - 1913:13, 2058:5, 2068:12, 2068:23, 2108:5, 2115:12

**hearsay** [5] - 1936:23, 1936:25, 1937:3, 1957:7, 2093:15

**heart** [2] - 2067:11, 2125:14

**heat** [1] - 1960:7

**Hecht** [2] - 2061:24, 2062:6

**heck** [1] - 2014:6

**held** [3] - 1913:12, 2108:4, 2115:11

**hello** [1] - 1975:23

**help** [13] - 1930:11, 1938:24, 1953:17, 1990:20, 2055:1, 2058:23, 2060:4, 2085:3, 2086:18, 2107:13, 2120:9, 2126:21, 2138:9

**helped** [1] - 1983:25

**helpful** [2] - 2066:18, 2152:3

**helping** [2] - 2053:17, 2066:1

**Hendrickson** [3] - 2018:16, 2152:18

**Hendrickson's** [1] - 2019:19

**Henry** [1] - 1971:1

**hereby** [1] - 1943:22

**herein** [1] - 1994:5

**Herkimer** [2] - 1928:12, 1928:19

**hi** [5] - 1913:16, 1924:25, 2061:13, 2073:25, 2113:11

**hide** [1] - 1974:13

**high** [6] - 1929:17, 1959:20, 1960:14, 2019:2, 2079:19, 2096:11

**high-rise** [1] - 1929:17

**higher** [4] - 1946:25, 1960:16, 2154:12

**highest** [1] - 2059:16

**highlighted** [1] - 1951:6

**hire** [1] - 1920:20

**hired** [4] - 1920:15, 2047:8, 2081:20,

---

2081:21

**hiring** [1] - 2047:24

**hit** [1] - 2064:6

**hmm** [1] - 2030:8

**Hochheiser** [1] - 2044:11

**hold** [3] - 2053:9, 2081:9, 2141:25

**holding** [1] - 2097:12

**holds** [1] - 2094:18

**holiday** [2] - 1940:6, 1940:14

**holidays** [1] - 1940:11

**homes** [6] - 1928:21, 1929:4, 2063:19, 2063:24, 2064:2, 2073:16

**honest** [3] - 2073:4, 2073:8, 2140:24

**honesty** [6] - 2071:22, 2072:17, 2072:19, 2078:2, 2078:8, 2088:16

**Honor** [79] - 1915:1, 1915:7, 1915:14, 1916:13, 1916:21, 1935:19, 1935:21, 1937:5, 1937:20, 1948:23, 1956:7, 1957:3, 1966:2, 1967:5, 1970:9, 1970:19, 1971:17, 1971:24, 1973:1, 1973:2, 1974:25, 1975:4, 1975:5, 1993:20, 2000:5, 2018:22, 2019:12, 2024:21, 2025:6, 2025:12, 2026:22, 2026:25, 2043:23, 2055:23, 2060:25, 2061:8, 2065:11, 2065:12, 2066:11, 2067:25, 2070:7, 2075:1, 2075:2, 2075:17, 2084:11, 2085:3, 2090:13, 2091:15, 2092:20, 2095:15, 2097:7, 2097:9, 2102:24, 2108:8, 2109:23, 2123:9, 2126:13, 2126:19, 2127:8, 2127:14, 2128:17, 2129:10, 2130:17, 2133:4, 2133:5, 2133:22, 2135:7, 2137:10, 2139:11, 2140:15, 2141:5, 2144:3, 2150:3, 2151:8, 2154:22, 2155:15, 2156:6, 2156:8, 2156:20

**HONORABLE** [1] - 1912:10

**Honorable** [1] - 1913:7

**honored** [2] - 1963:6, 2036:20

**hope** [6] - 1971:14, 2026:14, 2124:18, 2124:23, 2125:7, 2125:17

**hopefully** [1] - 1946:19

**Hospital** [1] - 1928:20

**hospital** [2] - 2099:16, 2107:19

**hot** [1] - 2055:11

**hour** [6] - 2034:6, 2035:24, 2036:5, 2102:13, 2131:2, 2155:14

**hour's** [2] - 2029:10, 2032:5

**hourly** [16] - 1939:13, 1942:9, 1943:1, 2028:17, 2028:18, 2031:25, 2032:10, 2033:6, 2033:9, 2033:10, 2033:13, 2033:16, 2034:5, 2035:10, 2035:14, 2035:22

**hours** [5] - 2029:11, 2032:5, 2032:9, 2119:8

**house** [6] - 1939:11, 2063:17, 2064:5, 2071:11, 2091:10

**houses** [2] - 1939:15, 2063:16

**housing** [1] - 1987:23

**Housing** [2] - 2019:10, 2094:5

**Howie** [2] - 2052:4, 2052:7

**HPD** [19] - 1924:18, 1934:19, 1973:22,

---

1974:15, 1974:16, 1974:18, 1988:9, 1988:10, 1988:11, 1990:10, 1990:15, 1991:10, 2019:3, 2021:16, 2021:18, 2022:6, 2022:13, 2055:18, 2104:14

**HUD** [4] - 1934:19, 2021:21, 2022:5, 2022:6

**Humanity** [7] - 2037:6, 2037:9, 2063:15, 2064:12, 2070:16, 2073:1, 2074:3, 2135:23

**hundred** [8] - 2016:7, 2016:14, 2016:23, 2032:9, 2034:14, 2038:2, 2055:15, 2098:24

**hundred-thousand-dollar** [1] - 2055:15

**hungry** [1] - 2100:20

**hurting** [1] - 1972:10

**hydroponics** [1] - 1920:2

**Hymowitz** [129] - 1912:19, 1915:8, 1915:9, 1916:4, 1917:4, 1918:9, 1918:20, 1933:4, 1933:13, 1934:5, 1934:7, 1934:12, 1936:16, 1937:7, 1938:2, 1949:2, 1950:2, 1950:19, 1967:24, 1968:16, 1968:24, 1969:18, 1970:3, 1970:16, 1971:14, 1971:19, 1972:8, 1973:10, 1975:22, 1975:24, 1976:15, 1976:19, 1976:21, 1978:15, 1978:25, 1980:7, 1981:17, 1986:19, 1995:3, 1996:21, 2015:6, 2017:16, 2018:4, 2024:4, 2027:17, 2027:24, 2030:9, 2036:12, 2039:1, 2039:8, 2040:1, 2041:15, 2041:19, 2044:3, 2044:15, 2050:23, 2055:16, 2055:25, 2058:6, 2060:24, 2063:6, 2063:12, 2071:1, 2071:6, 2071:20, 2074:5, 2074:9, 2075:1, 2076:7, 2076:12, 2076:14, 2076:16, 2076:23, 2077:3, 2077:15, 2078:1, 2078:5, 2078:14, 2079:8, 2079:22, 2080:18, 2081:3, 2081:7, 2081:21, 2082:23, 2082:25, 2083:3, 2083:10, 2084:3, 2084:4, 2084:8, 2084:19, 2088:22, 2089:3, 2089:24, 2090:1, 2090:3, 2090:5, 2090:14, 2091:8, 2091:9, 2093:5, 2093:9, 2093:18, 2093:25, 2095:6, 2095:8, 2096:2, 2101:22, 2103:22, 2103:25, 2104:8, 2104:12, 2108:12, 2109:5, 2122:23, 2123:1, 2123:7, 2133:19, 2136:9, 2137:22, 2140:23, 2143:10, 2147:1, 2147:17, 2148:20, 2153:18, 2158:22

**HYMOWITZ** [1] - 1912:7

**Hymowitz's** [7] - 2043:21, 2078:8, 2078:10, 2078:12, 2083:12, 2140:6, 2147:6

**hypothetical** [1] - 1967:8

---

**I**

**Ian** [2] - 2114:17, 2114:18

**idea** [11] - 1940:18, 1962:15, 1982:3, 2006:6, 2014:18, 2017:19, 2033:14, 2039:15, 2045:3, 2049:19, 2064:10

**identification** [3] - 1992:2, 2076:11,

2084:8

**identified** [1] - 2022:3
**identify** [1] - 2021:2
**identity** [1] - 1994:20
**II** [2] - 2079:19, 2096:12
**immediately** [5] - 1946:4, 1948:11, 2013:5, 2013:6, 2147:2
**immoral** [1] - 2088:24
**impact** [1] - 1967:22
**impeach** [2] - 2140:6, 2142:20
**impeaching** [3] - 2067:11, 2142:6, 2146:24
**impeachment** [2] - 1970:2, 1971:13
**implausible** [2] - 2141:14, 2142:12
**important** [5] - 1991:20, 1998:13, 1998:20, 2037:17, 2090:15
**importantly** [1] - 1959:22
**impression** [3] - 1956:6, 1958:12, 1958:14
**improper** [1] - 2014:6
**improperly** [1] - 1972:1
**impunity** [1] - 2078:5
**inaccurate** [3] - 1953:16, 2007:8, 2014:22
**inappropriate** [2] - 2009:22, 2036:2
**incident** [1] - 1945:22
**incidentally** [2] - 1944:20, 2052:11
**include** [4] - 1941:7, 2029:17, 2049:4, 2059:2
**included** [5] - 1921:14, 1944:3, 1984:8, 2052:4, 2052:9
**includes** [1] - 2002:16
**including** [1] - 2062:17
**income** [1] - 1981:4
**inconsistent** [4] - 1916:2, 1956:13, 1956:14, 1956:17
**incorporating** [1] - 1944:6
**incorporation** [2] - 2003:2, 2003:9
**incorrectly** [1] - 1980:15
**increase** [2] - 1942:20, 1942:21
**incredibly** [1] - 2072:2
**incurred** [6] - 1941:2, 1941:3, 1941:9, 1941:22, 1943:24, 1985:24
**indeed** [6] - 1959:9, 2050:4, 2082:10, 2135:4, 2152:23, 2153:10
**index** [1] - 2129:23
**indicated** [2] - 1927:17, 2113:11
**indicates** [2] - 1916:16, 2141:15
**indicating** [1] - 1995:11
**Indicating** [1] - 2076:10
**indication** [2] - 1923:8, 1923:11
**indicted** [3] - 2090:2, 2090:6, 2132:1
**indictment** [7] - 1980:7, 1980:10, 1980:14, 2017:17, 2017:21, 2127:22
**indigent** [1] - 1977:8
**individuals** [4] - 1918:17, 1965:2, 1983:19, 2084:15
**indoors** [1] - 1920:3
**inferences** [1] - 2142:20
**inflated** [5] - 1974:7, 2153:10, 2153:17, 2154:5, 2154:11

**inflating** [2] - 1923:9, 1974:12
**influence** [1] - 2045:7
**influenced** [1] - 2045:14
**inform** [1] - 2135:12
**information** [14] - 1939:3, 1952:8, 1952:12, 2081:9, 2089:22, 2090:1, 2093:17, 2110:25, 2111:6, 2111:8, 2111:10, 2112:1, 2117:23, 2151:15
**informational** [1] - 2087:19
**informed** [1] - 2120:14
**inhabit** [1] - 2138:22
**inherited** [1] - 2077:13
**initial** [1] - 2122:7
**initialed** [2] - 2121:5, 2121:6
**inject** [2] - 2100:18, 2141:19
**injection** [1] - 2100:22
**innocence** [2] - 2135:4, 2153:16
**innocent** [1] - 2136:4
**inquire** [3] - 1967:13, 2025:13, 2061:8
**inquiring** [1] - 2072:13
**inquiry** [1] - 1972:7
**inquisitive** [1] - 2100:10
**insert** [1] - 2133:22
**insisted** [1] - 2050:25
**insofar** [1] - 2147:4
**inspection** [1] - 1995:16
**instance** [2] - 1956:7, 2046:9
**instances** [3] - 1946:12, 1973:14, 2055:6
**instead** [2] - 1940:9, 2128:10
**instruct** [2] - 2107:11, 2124:20
**instructed** [1] - 2109:21
**instruction** [10] - 1933:4, 1933:6, 1933:8, 1934:3, 1935:20, 1937:2, 2108:9, 2109:1, 2144:19, 2148:8
**instructions** [2] - 1937:2, 2110:10
**instructs** [1] - 1971:14
**insufficient** [1] - 2025:3
**insulin** [3] - 2100:22, 2100:24, 2111:23
**insurance** [7] - 1960:7, 1962:17, 1962:18, 1962:19, 1962:20, 1962:23, 1963:3
**insurances** [1] - 1924:13
**intend** [10] - 1949:2, 1967:11, 1972:18, 1972:22, 1974:18, 2136:23, 2137:18, 2138:8, 2139:13
**intended** [2] - 1986:25, 2015:21
**intent** [3] - 2136:7, 2136:9, 2137:25
**intention** [1] - 2150:5
**interact** [1] - 2077:2
**interacted** [1] - 2078:1
**interactions** [2] - 1969:2
**interest** [24] - 1926:2, 1959:20, 1960:9, 1960:13, 1960:16, 1964:1, 1983:15, 1983:16, 1983:18, 2004:1, 2021:23, 2021:24, 2022:2, 2033:19, 2046:10, 2048:5, 2053:16, 2059:8, 2059:11, 2059:18, 2080:10, 2094:11
**interested** [7] - 1927:4, 1929:16, 1946:3, 1958:23, 1959:10, 1960:11, 2055:14

**interfaith** [1] - 2063:22
**interim** [1] - 1950:14
**interject** [1] - 1971:12
**international** [1] - 1919:13
**interpretation** [2] - 2145:16
**interrogation** [6] - 2115:1, 2117:13, 2117:18, 2118:4, 2118:9, 2122:18
**interrupt** [1] - 2064:18
**interrupted** [2] - 1953:23, 2070:8
**interview** [27] - 1947:8, 2101:13, 2102:11, 2102:13, 2104:17, 2105:15, 2105:20, 2105:22, 2106:4, 2106:5, 2106:18, 2108:11, 2111:5, 2113:22, 2113:23, 2114:1, 2114:3, 2114:4, 2114:6, 2118:6, 2118:8, 2119:23, 2121:15, 2122:9, 2122:11, 2122:16, 2123:6
**interviewed** [3] - 2062:24, 2101:4, 2101:9
**introduced** [1] - 2123:20
**invest** [1] - 1919:8
**investigation** [2] - 2105:5, 2112:23
**Investigation** [1] - 2049:7
**investigators** [1] - 1996:8
**investment** [2] - 1984:6, 2061:17
**investments** [1] - 2081:2
**investor** [1] - 1990:9
**invite** [1] - 2090:14
**invited** [1] - 2088:3
**invoice** [5] - 1951:18, 1952:3, 1954:6, 2001:4, 2143:3
**invoices** [1] - 1974:7
**involve** [1] - 2067:6
**involved** [20] - 1923:2, 1923:4, 1924:21, 1925:14, 1926:13, 1928:11, 1928:14, 1928:19, 1929:24, 1930:11, 1930:17, 1930:20, 1941:13, 1962:13, 2002:8, 2044:12, 2044:19, 2074:10, 2077:19, 2093:6
**involvement** [2] - 1946:13, 1962:6
**involving** [7] - 1947:3, 1960:22, 1967:9, 1968:24, 1969:3, 1980:11, 2078:7
**IOLA** [1] - 1996:13
**Iron** [1] - 1999:6
**IRS** [2] - 1953:15, 2018:3
**Island** [8] - 1927:25, 1929:10, 1929:25, 1930:4, 1930:5, 1948:16, 1948:21, 1986:12
**isolate** [2] - 1990:11, 1990:16
**issuance** [1] - 1995:19
**issue** [15] - 1915:23, 1916:18, 1988:7, 1988:20, 2024:22, 2048:7, 2068:6, 2068:17, 2078:7, 2116:12, 2137:6, 2142:6, 2142:22, 2148:7, 2149:18
**issues** [11] - 1915:21, 1960:22, 1961:2, 1961:6, 1991:4, 2071:7, 2071:12, 2125:25, 2136:16, 2137:5
**item** [3] - 2029:9, 2145:19, 2153:1
**itemized** [7] - 2028:22, 2029:3, 2029:5, 2029:17, 2030:21, 2032:23, 2035:16
**items** [2] - 1962:16, 2053:20

**itself** [2] - 2137:2, 2143:7
**Ivy** [1] - 2036:17

## J

**Jack** [1] - 1920:5
**Jack-of-all-trades** [1] - 1920:5
**January** [16] - 1932:2, 1932:6, 1939:25, 1940:1, 1940:5, 1945:7, 1947:20, 1950:13, 1976:22, 2031:2, 2035:16, 2051:17, 2051:22, 2051:23, 2052:2, 2054:24
**Jewish** [2] - 2102:8, 2102:9
**job** [14] - 1920:6, 1920:20, 1929:1, 1971:21, 1976:16, 1990:1, 2016:21, 2048:19, 2053:17, 2054:21, 2059:10, 2083:24, 2152:21, 2154:16
**jobs** [5] - 1938:21, 1945:12, 2062:13, 2064:7, 2138:1
**Joe** [5] - 2101:10, 2119:20, 2121:14, 2121:16, 2121:18
**join** [3] - 1921:14, 2071:15, 2153:23
**joined** [1] - 2061:19
**joint** [2] - 1994:16, 2077:2
**jointly** [1] - 2076:16
**jokes** [1] - 2065:19
**Joseph** [3] - 1979:1, 2044:12, 2044:16
**Journal** [2] - 2062:24, 2063:3
**JR** [1] - 1912:17
**judge** [6] - 2132:21, 2141:9, 2141:19, 2148:19, 2154:10, 2154:25
**Judge** [9] - 1913:2, 1915:18, 1916:6, 1967:2, 2026:3, 2027:4, 2027:6, 2090:8, 2153:22
**JUDGE** [1] - 1912:11
**July** [6] - 1921:8, 2034:5, 2035:10, 2040:21, 2041:25, 2051:25
**June** [2] - 1921:8, 1950:21
**Junior's** [5] - 2098:16, 2098:19, 2100:2, 2100:18, 2114:12
**JUROR** [8] - 1913:17, 1913:20, 1913:23, 1913:25, 1914:4, 1914:6, 1914:9, 1914:13
**Juror** [2] - 1913:9, 2026:17
**juror** [5] - 1914:18, 2026:9, 2027:2, 2065:20, 2065:24
**jurors** [7] - 1915:17, 1915:19, 1917:2, 1917:3, 2027:3, 2066:1, 2066:17
**Jury** [12] - 1918:5, 1918:8, 1923:25, 1924:9, 1926:22, 1930:2, 1973:6, 2024:10, 2024:15, 2027:9, 2043:5, 2108:25
**JURY** [2] - 1912:10, 2097:13
**jury** [49] - 1913:4, 1924:2, 1934:2, 1934:14, 1935:14, 1937:11, 1945:20, 1948:3, 1965:18, 1966:6, 1966:8, 1967:23, 1968:9, 2007:25, 2011:5, 2024:16, 2026:5, 2030:19, 2052:7, 2052:25, 2058:18, 2061:14, 2063:9, 2063:11, 2064:10, 2065:1, 2065:8, 2065:9, 2065:10, 2065:13, 2069:13, 2070:1, 2070:5, 2097:11, 2097:12,

2103:4, 2108:5, 2115:12, 2121:10, 2124:8, 2125:22, 2132:17, 2145:13, 2149:2, 2149:6, 2151:6, 2153:5, 2154:19, 2156:15
**justify** [1] - 1998:6

## K

**Kamen** [2] - 1979:5, 2044:13
**keep** [30] - 1928:3, 1943:8, 1952:4, 1952:23, 1953:21, 1972:9, 1989:5, 1998:13, 1998:20, 2000:3, 2003:6, 2011:14, 2029:8, 2029:12, 2029:13, 2031:25, 2032:6, 2045:23, 2080:21, 2124:23, 2124:24, 2125:1, 2140:25, 2145:8, 2146:16, 2146:22, 2147:8, 2148:22, 2148:23, 2149:8
**keeping** [3] - 2000:9, 2009:3, 2138:10
**keeps** [1] - 2148:22
**Kent** [4] - 1981:9, 2042:20, 2056:11, 2056:19
**kept** [5] - 1954:10, 2002:4, 2002:6, 2029:19, 2146:19
**kickback** [12] - 1973:23, 1974:1, 1974:10, 2019:3, 2055:17, 2103:21, 2104:9, 2104:11, 2104:13, 2138:2, 2138:8, 2153:9
**kickbacks** [3] - 1974:4, 1974:13, 2153:9
**kind** [15] - 1941:25, 1951:18, 1953:20, 1997:11, 1998:5, 2052:25, 2073:19, 2092:13, 2111:21, 2113:13, 2129:19, 2138:24, 2139:17, 2148:2, 2150:22
**kinds** [1] - 2144:9
**knowing** [1] - 2078:14
**knowingly** [1] - 1974:15
**knowledge** [12] - 1922:22, 1946:5, 1961:13, 1968:21, 1981:16, 1994:5, 2044:22, 2076:24, 2080:24, 2081:20, 2082:17, 2095:2
**known** [8] - 1968:4, 1982:8, 2004:10, 2004:18, 2063:24, 2076:12, 2078:1, 2105:3
**Koczon** [2] - 2150:22, 2151:4, 2152:1
**Kramer** [2] - 1936:13, 1936:14

## L

**labeling** [1] - 2021:13
**Labor** [1] - 2101:11
**laborers** [1] - 2153:12
**lack** [1] - 2003:13
**ladies** [11] - 1935:14, 1945:20, 1948:2, 1965:18, 2052:24, 2061:14, 2063:8, 2063:11, 2064:10, 2149:1, 2149:6
**Ladies** [5] - 1923:25, 1924:9, 1926:22, 1930:2, 2043:4
**land** [3] - 1930:5, 2063:18, 2071:13
**language** [10] - 1941:1, 1941:14, 1942:2, 1942:7, 1944:3, 1944:6, 2044:20, 2128:18, 2133:23, 2139:3
**lapse** [1] - 1976:13
**lapses** [1] - 1934:19

**large** [4] - 1929:14, 1989:5, 2036:15, 2061:23
**largely** [1] - 2137:5
**larger** [1] - 1939:14
**last** [22] - 1920:9, 1936:2, 1944:18, 1948:12, 1950:6, 1962:6, 1978:9, 1993:12, 1993:16, 2015:3, 2035:9, 2061:7, 2068:11, 2068:14, 2070:7, 2075:13, 2083:21, 2097:10, 2110:2, 2144:7, 2154:25, 2155:1
**late** [5] - 1922:17, 1922:19, 1939:25, 1948:18, 2077:13
**lately** [1] - 2086:9
**latter** [1] - 1948:4
**laundering** [7] - 2132:8, 2132:9, 2150:14, 2151:1, 2151:7, 2151:9, 2151:24
**law** [31] - 1916:18, 1926:25, 1950:19, 1963:17, 1975:24, 1976:11, 1976:13, 1976:19, 1977:5, 1986:14, 1991:7, 1991:23, 1995:3, 2011:14, 2032:4, 2037:25, 2038:13, 2048:8, 2050:3, 2050:23, 2067:5, 2079:22, 2087:24, 2124:20, 2126:5, 2127:10, 2127:12, 2127:23, 2141:16, 2150:24
**LAW** [1] - 2126:22
**Law** [1] - 1976:25
**Lawrence** [1] - 2044:11
**lawsuit** [4] - 1968:10, 2024:20, 2096:17, 2096:24
**lawyer** [18] - 1928:14, 1929:21, 1930:13, 1977:6, 1977:18, 1986:14, 1995:23, 1996:15, 2004:25, 2007:16, 2020:9, 2043:4, 2048:4, 2048:25, 2072:13, 2096:10, 2140:8, 2152:24
**Lawyer's** [1] - 1994:18
**lawyer's** [1] - 1996:8
**lawyers** [9] - 1985:20, 1991:14, 1996:8, 1998:10, 2004:8, 2011:13, 2046:1, 2138:16, 2140:24
**lay** [1] - 2116:17
**lead** [1] - 2090:8
**leading** [1] - 2093:3
**leads** [1] - 2151:2
**League** [1] - 2036:17
**learn** [2] - 2048:25, 2049:12
**learned** [3] - 1924:21, 2015:7, 2141:17
**lease** [1] - 1970:25
**leased** [1] - 2080:14
**least** [13] - 1925:8, 1925:12, 1925:14, 1936:20, 1942:4, 1953:8, 1976:18, 1996:18, 2031:4, 2086:18, 2106:8, 2119:8, 2137:12
**leave** [9] - 1971:15, 1976:21, 2007:5, 2065:3, 2066:13, 2106:8, 2124:25, 2132:16, 2133:12
**leaving** [2] - 1988:20, 2082:1
**led** [2] - 1971:1, 2110:11
**LEE** [2] - 1912:7, 2157:15
**Lee** [30] - 1912:19, 1915:8, 1918:13, 1987:4, 2041:19, 2044:15, 2058:6,

2060:25, 2061:6, 2061:7, 2061:12, 2061:24, 2062:1, 2063:6, 2063:12, 2063:20, 2064:6, 2064:11, 2070:2, 2071:18, 2073:3, 2073:19, 2076:7, 2086:17, 2101:22, 2101:23, 2103:22, 2122:23, 2123:1, 2123:6

**Lefkowitz** [2] - 1979:5, 2044:14

**left** [9] - 1940:12, 1948:14, 1977:25, 1997:25, 2048:8, 2061:18, 2077:10, 2081:13, 2119:8

**Legal** [2] - 1977:4, 1977:20

**legal** [16] - 1930:18, 1938:19, 1939:9, 1941:4, 1942:14, 1943:14, 1943:23, 1947:21, 1960:15, 1985:23, 1991:4, 1996:21, 2016:4, 2051:12, 2074:12, 2149:10

**legalese** [1] - 1995:8

**lend** [1] - 1959:25

**lenders** [1] - 1974:18

**lending** [1] - 2045:6

**lengthy** [2] - 2152:12, 2154:2

**lent** [2] - 1930:7, 1930:9

**less** [2] - 2080:9, 2155:13

**letter** [17] - 1913:19, 1963:19, 1963:22, 1975:11, 1975:15, 1975:17, 2017:10, 2021:20, 2035:19, 2036:4, 2136:12, 2137:1, 2137:2, 2137:3, 2137:4, 2137:6, 2138:14

**letters** [2] - 2021:25, 2053:20

**level** [2] - 2117:16, 2131:17

**Lexington** [11] - 1922:13, 1923:22, 1924:3, 1924:10, 1925:1, 1925:9, 1925:10, 1960:22, 1961:12, 1961:14, 1987:2

**liar** [2] - 2068:24, 2083:17

**license** [2] - 1976:13, 1991:23

**lied** [1] - 2083:7

**lies** [1] - 2078:5

**life** [2] - 2050:20, 2061:17

**light** [1] - 2027:25

**likelihood** [1] - 2110:24

**likely** [1] - 1916:23

**limit** [4] - 1970:7, 2069:7, 2136:20, 2136:21

**limited** [3] - 1939:2, 2082:2, 2132:14

**limiting** [2] - 2144:18, 2148:8

**limits** [3] - 1969:10, 2025:14, 2025:15

**line** [9] - 1951:5, 1953:21, 1965:15, 1966:2, 2016:2, 2019:12, 2135:14, 2147:23, 2153:1

**lined** [1] - 2066:2

**liquidate** [1] - 2096:21

**list** [5] - 1954:25, 2002:14, 2002:15, 2031:7, 2044:16

**listed** [2] - 1921:2, 1921:22

**listen** [1] - 2090:11

**listened** [1] - 2110:5

**listener** [4] - 1933:3, 1936:3, 1936:4, 1936:6

**lists** [1] - 1980:1

**literally** [2] - 1991:23, 2003:3

**litigation** [1] - 2004:15

**live** [2] - 1972:2, 2076:1

**living** [2] - 2061:15, 2076:5

**LLC** [1] - 1959:7

**loan** [14] - 1929:1, 1940:10, 1955:7, 1958:18, 1958:24, 1959:1, 1959:14, 1959:18, 1960:10, 1960:16, 1962:5, 2016:9, 2045:10, 2094:3

**loaned** [1] - 1983:5

**loaning** [2] - 1959:11, 1985:10

**loans** [4] - 1919:6, 1959:21, 1983:3, 1985:6

**local** [2] - 1988:22, 1989:6, 2053:9

**located** [4] - 1987:18, 1995:4, 2024:5, 2077:22

**location** [3] - 2109:9, 2109:15, 2110:13

**lodge** [2] - 2106:24, 2119:22

**lodged** [2] - 2107:18, 2107:25

**lodging** [2] - 2107:17, 2120:16

**log** [2] - 2119:6, 2120:25

**look** [14] - 1917:13, 1964:9, 1964:11, 1981:25, 1982:6, 2030:7, 2040:19, 2041:19, 2099:23, 2099:24, 2113:15, 2117:12, 2119:6, 2132:18

**looked** [3] - 1982:4, 2068:10, 2068:12

**looking** [9] - 1922:17, 1928:3, 2055:11, 2055:13, 2057:15, 2082:15, 2113:13, 2113:14, 2113:15

**looks** [3] - 1993:19, 2040:21, 2066:20

**looseleaf** [10] - 1952:25, 1954:7, 2000:4, 2000:9, 2001:24, 2002:1, 2002:3, 2002:18, 2003:11, 2142:16

**LORETTA** [1] - 1912:13

**lose** [1] - 1921:20

**lost** [1] - 2080:17

**Lou** [7] - 2079:23, 2084:14, 2086:4, 2086:5, 2086:13, 2086:15, 2087:9

**Louis** [2] - 2087:23

**lowest** [2] - 2018:9, 2059:15

**loyalty** [1] - 2005:1

**lump** [11] - 2027:21, 2028:15, 2028:20, 2029:7, 2029:21, 2032:2, 2032:24, 2033:6, 2033:11, 2033:12, 2033:16

**lunch** [10] - 2027:18, 2040:1, 2066:6, 2071:14, 2072:6, 2125:1, 2125:2, 2125:3, 2125:7, 2131:2

**luncheon** [1] - 2024:7

**lunchtime** [1] - 2124:24

**Lutheran** [39] - 1926:19, 1926:23, 1927:2, 1927:9, 1945:15, 1945:22, 1946:14, 1947:4, 2005:9, 2005:19, 2005:22, 2029:13, 2029:22, 2030:1, 2030:4, 2030:9, 2030:10, 2031:23, 2032:22, 2033:13, 2047:4, 2047:8, 2047:11, 2048:1, 2048:3, 2051:15, 2051:24, 2052:8, 2052:15, 2052:16, 2053:6, 2053:12, 2058:23, 2059:2, 2059:5, 2059:23, 2060:4, 2146:18

**lying** [3] - 1997:22, 2009:22, 2153:11

**LYNCH** [1] - 1912:13

**M**

**Mac** [1] - 1948:10

**machines** [1] - 1919:25

**Mae** [1] - 1948:9

**Magidson** [6] - 1961:18, 1962:10, 1962:25, 1963:8, 1963:14, 2020:6

**mail** [20] - 1944:21, 1961:17, 1961:25, 1962:25, 1963:8, 1963:12, 1988:1, 1988:4, 1999:1, 2020:6, 2020:12, 2084:7, 2084:12, 2085:12, 2086:15, 2087:14, 2087:15, 2087:18, 2088:1

**mails** [5] - 1962:3, 1962:23, 2031:8, 2032:18

**main** [1] - 1915:24

**maintain** [4] - 1994:21, 1995:24, 1996:15, 2030:3

**maintained** [1] - 1995:14

**major** [2] - 1919:18, 1930:11

**majority** [8] - 1914:4, 1970:23, 1987:18, 1988:8, 1988:14, 2024:4, 2083:25, 2086:17

**Makers** [1] - 1971:2, 2093:6, 2093:10, 2093:21

**man** [3] - 2036:13, 2079:19, 2081:22

**manage** [4] - 2081:16, 2081:17, 2083:24, 2093:19

**managed** [1] - 2095:3

**management** [3] - 1985:13, 1985:15, 1985:16

**manager** [1] - 2081:3

**managing** [2] - 2083:18, 2083:23

**Manhattan** [4] - 1945:23, 1995:1, 2076:4, 2117:3

**manner** [2] - 2044:19, 2133:20

**manufactures** [1] - 1919:24

**March** [10] - 1912:7, 1922:18, 1992:13, 1993:11, 2038:6, 2038:7, 2038:8, 2136:12, 2137:4, 2156:22

**Marcus** [3] - 1974:7, 1984:14, 1984:20

**Marett** [12] - 2079:23, 2084:14, 2086:5, 2086:8, 2086:12, 2086:15, 2086:22, 2087:10, 2087:14, 2087:18, 2087:23, 2089:3

**Marie** [3] - 2018:16, 2152:14, 2152:17

**MARIE** [1] - 1912:16

**marina** [2] - 1930:7, 1930:8

**mark** [2] - 1993:25, 2084:7

**marked** [4] - 1949:15, 1992:1, 1993:24, 2056:8

**market** [5] - 1948:7, 2016:25, 2036:1, 2039:2, 2055:10

**marking** [1] - 2056:5

**Marret** [1] - 1918:17

**marshals** [2] - 2099:11, 2107:2

**Matalon** [1] - 2047:19

**material** [3] - 1970:13, 1971:13, 2092:16

**materiality** [1] - 1969:23

**matter** [17] - 1933:3, 1958:5, 1961:22, 1970:4, 1980:8, 1988:1, 1988:4, 2044:12, 2044:21, 2057:2, 2057:7,

2067:7, 2072:2, 2073:18, 2085:7, 2123:12, 2156:22

**matters** [5] - 1941:19, 1943:9, 1969:17, 2020:15, 2067:1

**Maurice** [1] - 1915:10

**maximize** [1] - 2059:9

**MCR** [6] - 1938:14, 1974:6, 1974:9, 1975:12, 2041:5, 2041:10

**MDC** [11] - 2106:24, 2107:5, 2107:10, 2107:12, 2107:17, 2107:18, 2107:23, 2118:8, 2120:15, 2121:2, 2121:6

**mean** [16] - 1919:4, 1951:11, 1969:21, 1998:10, 2000:19, 2001:9, 2078:21, 2081:17, 2083:20, 2130:8, 2130:12, 2131:9, 2136:3, 2138:13, 2139:15, 2141:13

**meaning** [2] - 1925:9, 2126:14

**means** [8] - 1987:4, 1991:17, 2004:13, 2022:25, 2057:11, 2069:2, 2124:9, 2136:8

**meant** [6] - 1989:25, 2008:1, 2016:18, 2034:13, 2086:19, 2086:20

**mechanical** [1] - 1912:25

**medical** [8] - 2068:8, 2068:9, 2111:6, 2111:8, 2111:16, 2111:17, 2112:1, 2117:23

**medicate** [1] - 2100:15

**medication** [16] - 2099:3, 2099:7, 2099:13, 2099:18, 2099:20, 2099:21, 2099:22, 2105:23, 2107:13, 2107:14, 2111:24, 2113:13, 2120:6, 2120:9, 2120:13, 2120:14

**medicine** [1] - 2113:11

**meet** [2] - 2037:1, 2100:16

**meeting** [15] - 1960:21, 1961:6, 1991:2, 2031:8, 2063:22, 2080:19, 2086:16, 2087:19, 2087:22, 2089:18, 2109:13, 2109:19, 2110:14, 2110:23

**meetings** [14] - 1924:17, 1961:10, 1961:11, 1990:21, 2031:7, 2032:20, 2052:4, 2052:9, 2053:23, 2089:17, 2089:21, 2089:25, 2090:14

**member** [4] - 1976:8, 1985:16, 2064:8

**members** [10] - 1934:2, 1960:25, 1966:6, 1986:19, 2021:5, 2071:15, 2072:25, 2106:22, 2107:11, 2124:8

**Members** [3] - 1918:8, 2024:10, 2108:25

**membership** [1] - 2021:24

**memories** [1] - 1982:13

**memory** [6] - 2000:17, 2020:5, 2068:17, 2087:17, 2088:25, 2089:1

**mention** [2] - 2009:14, 2068:25

**mentioned** [4] - 1921:1, 1946:16, 2048:7, 2065:19

**menu** [1] - 2125:4

**mere** [5] - 1916:12, 1916:15, 2136:3, 2145:18

**merely** [1] - 2149:9

**merit** [1] - 2086:4

**messengers** [1] - 1941:8

**met** [9] - 1923:16, 1923:18, 1930:5,

1983:2, 2063:20, 2063:21, 2063:23, 2070:13, 2100:17

**metal** [1] - 1919:19

**Metropolis** [1] - 2103:24

**Metropolitan** [1] - 2107:5

**Mexico** [1] - 1919:18

**mezzanine** [1] - 1945:25

**MICHAEL** [1] - 1912:7

**Michael** [26] - 1912:21, 1915:11, 1924:23, 1963:16, 1965:4, 1965:8, 1965:9, 1965:12, 1987:4, 1991:2, 1996:22, 1997:20, 1997:23, 2008:11, 2009:14, 2010:5, 2010:10, 2040:22, 2043:6, 2050:8, 2051:4, 2054:23, 2056:15, 2056:18, 2056:20, 2103:22

**Michael's** [4] - 1944:14, 1986:3, 1997:9, 2015:3

**microphone** [3] - 2027:25, 2028:4, 2132:23

**mid-'90s** [1] - 1918:24

**mid-2000** [1] - 1922:16

**middle** [4] - 2063:10, 2064:18, 2135:15, 2155:19

**might** [10] - 1922:10, 1936:6, 1959:10, 1965:12, 1981:10, 2018:24, 2051:11, 2053:16, 2113:9, 2134:8

**Mike** [11] - 1932:3, 1935:6, 1935:11, 1936:10, 1936:13, 1936:14, 1991:6, 2013:16, 2101:25, 2123:3, 2123:4

**Mike's** [1] - 1944:9

**million** [13] - 1940:10, 1971:4, 1971:9, 2002:8, 2006:25, 2007:16, 2013:17, 2016:9, 2053:8, 2081:6, 2091:4, 2091:12, 2094:7

**Mills** [5] - 2052:9, 2052:11, 2052:13, 2053:23, 2054:1

**mind** [5] - 1937:13, 1941:12, 2124:23, 2124:24, 2140:18

**minor** [1] - 2002:21

**minority** [5] - 1971:7, 1972:3, 2076:18, 2083:25, 2089:14

**minute** [4] - 1971:12, 2025:9, 2030:7, 2038:19

**minutes** [13] - 1940:23, 1944:7, 1966:9, 2050:14, 2050:20, 2064:20, 2065:4, 2065:6, 2111:4, 2114:8, 2118:9, 2155:14

**Miracle** [4] - 1971:2, 2093:6, 2093:10, 2093:21

**Miranda** [3] - 2114:19, 2114:23, 2115:25

**mirror** [1] - 2117:12

**mislead** [1] - 2109:21

**misleading** [1] - 2118:1

**missed** [2] - 2110:16, 2110:23

**mistaken** [1] - 1987:10

**mom** [1] - 2080:5

**moment** [3] - 2064:14, 2122:24, 2126:5

**Monday** [3] - 2124:19, 2124:24, 2155:24

**monetary** [3] - 2150:18, 2151:5, 2151:16

**money** [47] - 1920:8, 1930:7, 1930:9,

1936:11, 1955:18, 1959:5, 1959:11, 1959:25, 1960:3, 1960:13, 1965:25, 1983:6, 1985:10, 2015:10, 2015:12, 2017:2, 2035:2, 2039:2, 2045:16, 2046:1, 2046:2, 2050:24, 2051:2, 2059:9, 2059:11, 2059:12, 2062:16, 2063:17, 2072:9, 2078:7, 2078:8, 2078:15, 2078:20, 2081:1, 2082:16, 2082:18, 2093:19, 2096:20, 2096:25, 2132:8, 2150:14, 2151:1, 2151:7, 2151:9, 2151:24, 2153:11

**Monroe** [1] - 1984:14

**month** [10] - 1946:11, 1948:21, 2031:4, 2033:17, 2035:25, 2036:2, 2036:3, 2109:22, 2109:25, 2110:1

**monthly** [1] - 2034:6

**months** [4] - 1921:11, 1926:1, 1947:8, 1960:4

**moot** [1] - 2137:11

**morning** [22] - 1915:1, 1915:7, 1915:14, 1915:16, 1939:25, 1940:15, 1966:5, 1975:22, 2006:10, 2028:14, 2100:16, 2106:7, 2110:12, 2110:15, 2110:16, 2110:17, 2120:6, 2121:7, 2124:20, 2125:16, 2130:18, 2149:25

**mortgage** [19] - 1960:8, 1960:18, 1962:8, 1962:12, 1971:9, 1984:4, 1984:9, 1984:17, 1984:23, 1985:2, 2045:4, 2045:6, 2055:9, 2094:17, 2094:18, 2094:19, 2094:22, 2094:23, 2094:25

**Mortgage** [1] - 1918:24

**mortgages** [3] - 1919:8, 1930:6, 1983:6

**most** [11] - 1954:19, 1957:8, 1961:1, 1972:12, 2004:24, 2027:23, 2028:19, 2034:10, 2064:4, 2072:1, 2140:22

**mostly** [5] - 1986:4, 1997:20, 1997:23, 2027:20, 2087:22

**mother** [1] - 2077:13

**mother's** [1] - 2080:12

**motion** [3] - 2152:9, 2152:11, 2154:1

**motions** [2] - 2153:25, 2154:19

**motive** [1] - 1977:14, 2018:24

**Mountain** [1] - 1999:6

**mounting** [1] - 1960:7

**move** [9] - 1918:13, 2000:21, 2036:10, 2044:6, 2055:23, 2058:14, 2120:4, 2123:11, 2155:21

**moved** [5] - 1950:14, 1950:20, 1950:21, 1950:22

**moves** [4] - 1993:20, 2030:13, 2039:20, 2102:24

**moving** [4] - 1914:2, 1961:21, 2024:8

**multi** [2] - 2006:25, 2007:16

**multi-million** [2] - 2006:25, 2007:16

**multinational** [1] - 2048:12

**multiple** [4] - 2008:14, 2008:15, 2009:7, 2009:8

**must** [3] - 2141:25, 2142:1, 2153:15

**muster** [2] - 2137:20, 2138:5

**mythical** [1] - 1937:20

# N

**name** [33] - 1918:23, 1919:14, 1961:18, 1979:3, 1980:2, 1987:23, 1992:9, 1992:23, 1993:6, 1993:14, 2020:23, 2040:14, 2045:1, 2047:17, 2048:17, 2053:12, 2056:21, 2056:23, 2057:2, 2061:4, 2061:6, 2061:7, 2061:24, 2065:20, 2075:11, 2075:14, 2079:3, 2079:6, 2079:23, 2095:12, 2103:24, 2123:19, 2155:2
**named** [7] - 1918:18, 1981:9, 1996:24, 2006:22, 2042:20, 2047:21, 2090:21
**names** [5] - 1967:9, 2022:23, 2023:1, 2047:18, 2080:3
**Nassau** [4] - 2037:4, 2071:11, 2072:24, 2074:3
**national** [1] - 1919:21
**nature** [4] - 1954:20, 1968:13, 2062:15, 2082:19
**Naushan** [3] - 1912:22, 1915:3, 2097:16
**necessary** [1] - 1970:11
**need** [28] - 1914:11, 1914:19, 1934:24, 1945:3, 1947:15, 1951:17, 1966:3, 1998:16, 2002:14, 2005:18, 2006:8, 2026:15, 2026:16, 2028:4, 2064:14, 2064:16, 2064:17, 2085:14, 2092:15, 2099:13, 2103:7, 2103:8, 2128:13, 2135:4, 2139:1, 2139:12, 2148:8, 2155:20
**needed** [19] - 1924:14, 1924:18, 1924:24, 1990:6, 1990:19, 1990:20, 1990:23, 1998:5, 2024:2, 2033:14, 2040:16, 2099:8, 2099:16, 2099:19, 2100:22, 2105:20, 2107:2, 2109:19, 2119:22
**needs** [4] - 1915:20, 1946:17, 2013:5, 2038:19, 2109:19
**neglected** [1] - 1918:14
**negotiate** [1] - 1939:16
**negotiated** [1] - 2104:9
**negotiations** [1] - 2007:13
**Neighborhood** [2] - 1988:21, 1989:15
**neighborhood** [3] - 1989:16, 1989:25, 2104:15
**NEP** [6] - 1922:6, 1923:21, 1924:20, 1925:10, 1987:1, 1987:11
**never** [42] - 1942:9, 1944:19, 1946:10, 1954:2, 1957:22, 1965:14, 1976:11, 1976:13, 1981:23, 2000:3, 2000:8, 2001:18, 2002:4, 2002:6, 2004:6, 2007:11, 2011:23, 2013:19, 2015:9, 2017:1, 2020:12, 2020:14, 2020:18, 2024:3, 2040:17, 2050:24, 2073:14, 2079:25, 2081:7, 2083:17, 2083:23, 2084:3, 2089:18, 2110:14, 2134:4, 2135:3, 2141:21, 2148:9, 2148:22, 2151:14, 2154:15
**new** [6] - 1920:10, 1945:24, 1976:16, 2004:17, 2144:9, 2151:17
**NEW** [1] - 1912:1
**New** [32] - 1912:5, 1912:14, 1912:15, 1913:7, 1940:8, 1948:4, 1948:14, 1976:5, 1976:8, 1976:25, 1979:1, 1979:5, 1980:24, 1991:11, 1991:14, 1993:12, 2013:6, 2019:6, 2019:20, 2037:13, 2043:9, 2048:23, 2061:21, 2063:3, 2074:13, 2074:15, 2076:2, 2076:5, 2093:11, 2127:12, 2144:6, 2144:8
**newest** [1] - 1919:25
**newspapers** [1] - 2063:4
**next** [36] - 1914:3, 1932:16, 1933:16, 1935:24, 1937:23, 1941:17, 1942:2, 1942:11, 1942:19, 1943:7, 1943:21, 1949:18, 1951:23, 1960:12, 1965:15, 1966:2, 1966:11, 1999:11, 2000:24, 2008:19, 2013:24, 2064:22, 2069:14, 2085:22, 2086:16, 2091:17, 2092:22, 2094:24, 2095:16, 2106:7, 2106:20, 2117:6, 2119:22, 2121:7, 2122:21, 2134:10
**Nicholas** [1] - 1915:12
**NICHOLAS** [1] - 1912:21
**night** [5] - 2068:11, 2098:9, 2125:19, 2155:1, 2156:7
**Nina** [1] - 1913:7
**NINA** [4] - 1912:10, 1913:2, 1967:2, 2026:3
**non** [3] - 1926:7, 2062:15, 2063:14
**non-City** [1] - 1926:7
**non-profits** [2] - 2062:15, 2063:14
**nonbank** [1] - 1959:21
**none** [3] - 2026:25, 2086:6, 2144:19
**nonhearsay** [1] - 1956:21
**nonlegal** [1] - 1927:20
**nonprofit** [3] - 1971:1, 2073:6, 2091:12
**nonrefundable** [5] - 1944:3, 2014:3, 2014:17, 2139:16, 2139:22
**normally** [2] - 1937:2, 1939:5
**northeast** [1] - 1927:3
**not-for-profit** [6] - 2062:11, 2080:14, 2080:17, 2081:4, 2081:12, 2090:21
**not-for-profits** [1] - 2071:8
**note** [5] - 2007:25, 2026:9, 2026:15, 2026:20, 2027:2
**notebook** [2] - 2000:4, 2000:10
**notes** [5] - 2000:4, 2121:15, 2121:21, 2121:22, 2122:5, 2122:7
**nothing** [22] - 1939:14, 1952:15, 1957:12, 1978:17, 1978:18, 1978:20, 1990:10, 1991:7, 2013:17, 2016:14, 2017:5, 2060:16, 2060:18, 2062:5, 2084:10, 2086:13, 2124:1, 2124:3, 2133:4, 2135:10, 2137:16, 2148:2
**notice** [2] - 1995:19, 2044:24
**noticed** [1] - 2155:2
**notion** [2] - 2086:20, 2138:5
**November** [2] - 1948:14, 2086:14
**NPR** [1] - 2062:21
**Number** [3] - 1913:10, 1965:16, 2026:17
**number** [8] - 1939:13, 1944:1, 1953:22, 1983:12, 2016:21, 2065:24, 2154:12, 2154:13
**numbers** [8] - 1919:7, 1939:10, 1946:10, 1947:12, 1947:15, 1947:17, 2053:3
**numerous** [1] - 2055:8
**nun** [1] - 2063:21
**NY** [1] - 1912:24

# O

**o'clock** [3] - 2098:15, 2098:17, 2125:18
**oath** [2] - 1918:7, 2112:7
**Obamacare** [1] - 1920:13
**object** [13] - 2000:17, 2008:5, 2010:24, 2019:12, 2040:7, 2058:14, 2092:12, 2134:3, 2137:17, 2147:12, 2147:14, 2147:16, 2156:18
**objected** [1] - 2091:7
**objection** [42] - 1916:1, 1932:12, 1935:17, 1949:12, 1955:20, 1958:16, 1980:17, 1980:20, 1983:22, 1989:7, 1993:22, 1996:2, 1996:4, 2000:5, 2000:11, 2009:16, 2009:20, 2011:20, 2012:5, 2018:22, 2024:20, 2030:15, 2039:22, 2040:3, 2044:1, 2056:1, 2084:23, 2085:8, 2085:11, 2093:15, 2098:22, 2100:8, 2102:5, 2103:4, 2104:19, 2107:21, 2108:14, 2109:23, 2123:9, 2123:14, 2132:20, 2135:15
**objectionable** [1] - 2149:3
**obligation** [3] - 1956:10, 2022:10, 2129:15, 2142:4
**observation** [3] - 1937:6, 2111:7, 2116:10
**observe** [6] - 2071:6, 2098:25, 2115:21, 2115:22, 2116:15, 2117:10
**observed** [4] - 2115:18, 2116:1, 2116:3, 2117:5
**obtain** [4] - 1956:5, 1960:5, 2093:25, 2096:20
**obtained** [1] - 2117:23
**obtaining** [1] - 2077:19
**obviously** [2] - 1971:13, 2022:10
**occasion** [3] - 1924:7, 1956:16, 1978:10
**occasionally** [1] - 1998:9
**occasions** [4] - 1973:19, 2002:20, 2050:25, 2106:9
**occurred** [14] - 1933:1, 1936:1, 1940:5, 1949:1, 1950:11, 2000:13, 2009:1, 2011:23, 2017:1, 2065:1, 2065:8, 2085:10, 2092:1, 2125:22
**occurring** [4] - 2054:4, 2054:6, 2054:10, 2059:4
**occurs** [2] - 1913:3, 2026:4
**October** [6] - 1950:4, 1952:18, 2015:8, 2041:3, 2098:10, 2110:12
**Odd** [1] - 1985:16
**odds** [1] - 1955:2
**OF** [3] - 1912:1, 1912:3, 1912:10
**off-limits** [2] - 2025:14, 2025:15
**offended** [1] - 1960:20
**offer** [11] - 1958:25, 1960:17, 2009:5,

2043:20, 2082:22, 2084:19, 2094:6, 2105:14, 2123:13, 2135:5, 2156:11

**offered** [11] - 1933:2, 1934:9, 1956:3, 1956:15, 1957:13, 1959:1, 1975:11, 2051:14, 2066:1, 2105:16, 2113:20

**offering** [2] - 1958:4, 2084:25

**offers** [1] - 1957:20

**Office** [1] - 2154:4

**office** [29] - 1924:15, 1924:23, 1924:24, 1931:2, 1935:9, 1935:11, 1935:12, 1935:13, 1938:5, 1939:16, 1940:14, 1940:17, 1942:6, 1943:8, 1944:14, 1946:3, 1948:14, 1950:15, 1950:22, 1986:11, 1999:3, 2011:16, 2015:18, 2048:19, 2061:21, 2080:18, 2090:22, 2090:24

**Officer** [6] - 2106:9, 2106:11, 2123:16, 2123:22, 2123:23

**officer** [8] - 1964:17, 2070:23, 2079:18, 2090:23, 2091:14, 2095:4, 2096:12, 2106:14

**officers** [1] - 2072:24

**offices** [4] - 1915:5, 1950:20, 1950:21, 2061:20

**often** [2] - 1924:10, 2023:6

**old** [3] - 2079:16, 2079:18, 2081:22

**Old** [1] - 2145:13

**older** [1] - 1919:1

**on-line** [1] - 2016:2

**Once** [2] - 1952:3, 2001:4

**once** [11] - 1952:24, 1952:25, 1954:6, 1981:2, 1985:6, 2000:3, 2000:8, 2004:4, 2016:20, 2033:14, 2125:12

**One** [2] - 1965:20, 2132:3

**one** [102] - 1915:23, 1915:25, 1918:18, 1920:12, 1921:22, 1924:10, 1929:13, 1934:22, 1938:14, 1939:6, 1939:7, 1939:22, 1940:9, 1943:12, 1948:15, 1958:22, 1959:1, 1959:18, 1960:18, 1961:3, 1962:16, 1972:8, 1975:5, 1977:19, 1978:16, 1988:17, 1993:12, 1994:8, 1997:8, 2003:8, 2003:13, 2014:11, 2015:15, 2020:2, 2025:2, 2028:22, 2029:10, 2032:3, 2032:10, 2032:21, 2033:5, 2033:9, 2034:16, 2034:18, 2035:5, 2037:20, 2041:19, 2042:2, 2049:9, 2049:13, 2049:15, 2050:5, 2053:1, 2056:2, 2056:3, 2058:22, 2060:6, 2060:7, 2061:20, 2062:9, 2063:14, 2071:19, 2072:1, 2072:15, 2072:17, 2080:10, 2081:23, 2082:15, 2083:22, 2084:14, 2086:2, 2088:15, 2091:4, 2099:12, 2099:18, 2102:13, 2117:15, 2117:17, 2126:2, 2127:8, 2128:8, 2128:11, 2128:25, 2130:21, 2133:11, 2138:3, 2140:8, 2140:23, 2141:19, 2142:14, 2145:4, 2145:5, 2147:7, 2148:9, 2148:10, 2151:15, 2153:4, 2154:4, 2154:25, 2156:8

**one-year** [2] - 1959:18, 2014:11

**ones** [1] - 2055:2

**ongoing** [2] - 1968:23, 2005:1

**open** [16] - 1913:1, 1914:17, 1934:1, 1958:6, 1967:1, 2002:21, 2002:23, 2010:1, 2024:16, 2026:4, 2069:14, 2070:1, 2108:24, 2116:25, 2137:13, 2147:22

**opened** [3] - 2092:10, 2147:17, 2148:3

**opening** [4] - 2007:24, 2008:7, 2147:24, 2150:8

**opens** [3] - 1944:21, 1967:25, 1968:17

**operate** [2] - 2090:23, 2138:16

**operated** [1] - 2103:25

**operating** [4] - 1929:15, 2038:1, 2038:13, 2117:11

**opinion** [24] - 1963:19, 1968:5, 1968:22, 1969:3, 1969:24, 1979:9, 2021:20, 2071:21, 2071:25, 2072:14, 2072:20, 2073:11, 2078:2, 2078:6, 2078:9, 2078:12, 2078:13, 2079:8, 2083:12, 2088:15, 2092:3, 2128:20, 2128:22, 2129:6

**opinions** [2] - 2128:12, 2129:1

**opponent** [1] - 2156:14

**opportunity** [11] - 1946:19, 1957:21, 1968:25, 2016:2, 2068:4, 2071:6, 2077:1, 2078:12, 2078:13, 2124:16, 2142:20

**opposed** [2] - 1916:20, 2049:16

**opposition** [1] - 2026:21

**order** [7] - 1924:14, 1960:12, 1961:5, 1961:9, 1998:6, 2073:2, 2153:7

**organization** [2] - 2063:15, 2073:1

**organizations** [1] - 2036:21

**organized** [1] - 1980:11

**original** [3] - 2077:10, 2095:11, 2149:17

**originally** [1] - 2077:11

**ourselves** [1] - 2001:24

**out-of-court** [1] - 1957:4

**out-of-pocket** [1] - 1941:7

**outcome** [2] - 1921:9, 1921:17

**outlined** [1] - 2109:17

**outright** [1] - 1971:10

**outside** [13] - 1913:3, 1914:20, 1925:16, 1926:12, 1926:14, 1926:16, 1932:8, 2024:16, 2026:4, 2070:1, 2098:16, 2098:19, 2114:12

**overnight** [5] - 2099:16, 2106:24, 2107:18, 2107:25, 2119:22

**overruled** [5] - 1958:17, 1983:23, 1996:6, 2008:6, 2011:21, 2012:7

**Overruled** [6] - 2018:23, 2098:23, 2100:9, 2102:6, 2104:20, 2109:24

**oversaw** [2] - 1919:2, 1919:5

**oversee** [2] - 1920:12, 1920:17

**oversimplifying** [1] - 2142:22

**owe** [1] - 2081:6

**owing** [1] - 1942:5

**own** [20] - 1920:17, 1955:18, 1959:5, 1960:5, 1963:11, 2006:18, 2009:23, 2013:17, 2024:6, 2056:21, 2061:18,

2063:17, 2076:16, 2076:21, 2076:22, 2076:23, 2079:9, 2135:6, 2138:19, 2144:8

**owned** [6] - 1918:23, 1920:5, 1930:4, 1948:16, 1958:23, 1959:7

**owner** [4] - 1985:15, 1987:18, 1988:8, 2024:4

**owners** [3] - 1930:24, 1970:23, 2021:5

**ownership** [5] - 1964:1, 2077:2, 2095:9, 2095:11

## P

**package** [2] - 1945:14, 2107:1

**padding** [3] - 2019:2, 2019:20, 2019:23

**PAGE** [1] - 2157:3

**page** [53] - 1917:18, 1931:5, 1932:16, 1933:16, 1935:24, 1937:23, 1940:24, 1943:12, 1949:18, 1951:23, 1966:11, 1978:7, 1982:17, 1987:16, 1992:11, 1993:16, 1999:11, 2000:24, 2008:19, 2013:24, 2025:18, 2035:9, 2037:20, 2038:16, 2046:13, 2064:22, 2069:14, 2085:22, 2091:17, 2092:22, 2095:16, 2097:19, 2100:13, 2102:12, 2104:3, 2118:13, 2126:19, 2126:20, 2126:23, 2127:11, 2127:22, 2128:15, 2128:16, 2130:23, 2130:24, 2133:11, 2133:13, 2133:17, 2134:7, 2134:10, 2135:1, 2136:1, 2136:12

**pages** [1] - 2030:19

**pagination** [1] - 2126:25

**paid** [35] - 1920:14, 1920:16, 1926:6, 1942:12, 1952:3, 1952:24, 1952:25, 1954:6, 1954:21, 1986:5, 2001:4, 2002:15, 2004:4, 2015:5, 2015:23, 2016:14, 2027:19, 2027:21, 2028:10, 2028:12, 2029:24, 2030:1, 2031:25, 2032:1, 2033:9, 2033:10, 2033:12, 2033:13, 2033:16, 2046:1, 2059:18, 2094:11, 2141:1, 2147:9, 2153:12

**paper** [2] - 2003:4, 2027:2

**paperwork** [3] - 1924:14, 1960:5, 2107:1

**paragraph** [19] - 1940:25, 1941:5, 1941:17, 1942:2, 1942:7, 1942:11, 1942:19, 1943:12, 1943:21, 1944:1, 1980:1, 2003:8, 2003:13, 2103:17, 2103:19, 2104:6, 2127:11, 2131:10, 2131:17

**paragraphs** [1] - 1943:7

**Paralegal** [1] - 1912:22

**paralegal** [3] - 1996:23, 2031:1, 2035:3

**parallel** [1] - 2111:2

**paramedic** [1] - 2111:19

**pardon** [3] - 1988:3, 2031:21, 2084:17

**park** [2] - 2111:2

**part** [18] - 1942:18, 1943:5, 1943:10, 1943:11, 1946:5, 1948:4, 1973:11, 1987:1, 1990:11, 1996:22, 1996:23, 1997:1, 1997:14, 2059:25, 2076:1, 2076:15, 2083:21, 2092:12

**part-time** [2] - 1996:22, 1996:23
**participate** [2] - 1974:15, 2048:3
**participation** [1] - 2043:12
**particular** [9] - 1927:25, 1945:22, 1953:6, 1995:23, 2029:9, 2044:9, 2049:15, 2093:2, 2154:17
**particularly** [1] - 2142:15
**parties** [2] - 1934:20, 2005:7
**partner** [12] - 1918:25, 1932:3, 1935:6, 1963:11, 1963:17, 1985:24, 2012:21, 2012:23, 2020:10, 2079:23, 2083:23, 2088:18
**partners** [8] - 1948:17, 1986:17, 2012:19, 2012:24, 2042:7, 2042:9, 2053:24, 2103:22
**partnership** [3] - 1918:17, 1918:19, 2089:2
**partnerships** [1] - 1918:22
**parts** [4] - 2014:8, 2014:9, 2014:10, 2058:22
**party** [3] - 2005:3, 2156:14
**passed** [2] - 1962:9, 2137:20
**passenger** [1] - 2117:9
**passes** [1] - 2138:5
**passing** [1] - 1929:7
**past** [4] - 1996:18, 2022:3, 2077:6, 2077:9
**patently** [1] - 2146:17
**Paul** [4] - 2044:13, 2090:21, 2090:22, 2093:6
**Pause** [5] - 1914:21, 1973:4, 2020:3, 2027:7, 2035:7
**pay** [13] - 1938:15, 1963:2, 1971:4, 1986:1, 2005:19, 2019:6, 2080:25, 2081:5, 2091:4, 2091:8, 2091:12, 2094:4, 2104:11
**payable** [3] - 1941:20, 1945:7
**paycheck** [1] - 1997:8
**Paychex** [1] - 1920:15
**paying** [5] - 1960:9, 1997:8, 2016:4, 2018:12, 2094:22
**payment** [23] - 1940:25, 1962:17, 1962:20, 1962:21, 1973:25, 1974:1, 1974:13, 2029:21, 2032:6, 2034:24, 2055:17, 2055:18, 2093:24, 2093:25, 2094:19, 2094:20, 2104:9, 2104:13, 2109:20, 2138:2, 2138:8, 2153:10
**payments** [12] - 1974:7, 1974:10, 1985:23, 1996:7, 1998:21, 1998:25, 2017:15, 2028:20, 2050:22, 2094:22, 2094:25, 2103:21
**Pena** [1] - 2101:10
**pencil** [1] - 2059:20
**pending** [1] - 2152:9
**Penna** [2] - 2119:20, 2121:14
**pens** [2] - 2100:24, 2111:23
**pension** [2] - 2038:11, 2039:3
**people** [47] - 1929:11, 1939:15, 1964:23, 1965:5, 1969:3, 1977:10, 1977:17, 1979:4, 1983:12, 1983:20, 1984:5, 1988:17, 1989:25, 2004:13,

2004:20, 2011:18, 2015:25, 2019:6, 2032:16, 2037:2, 2037:17, 2054:20, 2055:11, 2055:13, 2059:24, 2060:1, 2062:12, 2062:13, 2064:5, 2071:13, 2071:14, 2071:15, 2071:16, 2071:19, 2072:1, 2072:2, 2072:24, 2073:15, 2079:6, 2082:15, 2097:1, 2106:16, 2112:23, 2120:23, 2152:20, 2154:3, 2155:24
**People** [1] - 2043:9
**per** [1] - 1947:16
**percent** [10] - 1946:25, 1948:11, 1959:19, 1983:15, 2073:7, 2076:22, 2076:25, 2080:13, 2096:9, 2154:12
**percentage** [4] - 2076:21, 2096:7, 2096:8, 2153:1
**perception** [1] - 2069:8
**perfectly** [1] - 2128:4
**perform** [2] - 2032:3, 2055:4
**performance** [1] - 1941:4
**performed** [6] - 1996:9, 1997:19, 2017:5, 2047:4, 2048:1, 2074:13
**performing** [1] - 2052:1
**perhaps** [5] - 1915:21, 1965:11, 1978:23, 1979:9, 2136:17
**period** [16] - 1926:13, 1942:20, 1950:15, 1973:21, 1986:14, 1996:23, 2006:5, 2006:23, 2070:15, 2070:22, 2070:25, 2077:5, 2099:14, 2103:21, 2116:20, 2125:1
**periodic** [1] - 1985:23
**permissible** [1] - 2140:9
**permission** [6] - 1961:7, 1961:9, 1990:23, 1990:25, 2020:14, 2026:19
**permitted** [9] - 1949:5, 1957:19, 1961:5, 1967:13, 2024:25, 2067:12, 2067:13, 2124:25, 2136:6
**Perry** [1] - 1987:23
**person** [7] - 1988:17, 2066:25, 2083:17, 2083:22, 2090:22, 2100:24, 2126:10
**personal** [4] - 2025:13, 2086:11, 2086:13, 2086:24
**personally** [7] - 1923:4, 1984:17, 1986:6, 2082:22, 2091:1, 2114:11, 2120:19
**persons** [2] - 1995:25, 1996:8
**pertinent** [1] - 2123:11
**pest** [1] - 2009:17
**Peter** [1] - 2019:9
**phases** [3] - 1925:8, 1925:12, 1947:6
**phone** [13] - 1936:24, 1936:25, 1937:7, 1940:16, 1940:22, 1950:9, 1958:9, 1975:10, 2050:13, 2054:1, 2054:23, 2110:2, 2122:13
**phones** [1] - 2031:7
**photographing** [1] - 2107:1
**phrase** [1] - 2138:23
**physical** [3] - 2098:25, 2099:2, 2106:1
**physically** [2] - 2007:12, 2121:19
**picked** [1] - 2121:6
**pickle** [1] - 2005:22

**piece** [6] - 1927:20, 1929:14, 2003:4, 2045:17, 2076:15, 2076:19
**pieces** [1] - 1920:18
**pills** [3] - 2113:14, 2113:15, 2113:16
**PINTO** [1] - 1912:21
**Pinto** [1] - 1915:12
**pizza** [2] - 2072:6, 2073:18
**place** [10] - 1916:16, 1924:13, 1928:24, 1955:11, 1962:11, 1988:16, 1999:8, 2028:12, 2094:13, 2142:5
**plan** [2] - 2039:2, 2110:15, 2146:14
**planned** [3] - 1941:24, 1968:3, 1970:6
**planning** [4] - 1942:16, 1968:8, 2062:10, 2062:14
**plans** [6] - 1946:1, 1946:4, 1946:11, 1946:16, 1947:8, 2007:4
**plastic** [1] - 1919:19
**plausible** [1] - 2142:16
**play** [1] - 2124:6
**Plaza** [6] - 1912:14, 1912:24, 2100:4, 2101:2, 2112:24, 2114:13
**plea** [5] - 2057:6, 2057:12, 2057:24, 2058:2, 2058:5
**plead** [1] - 2150:25
**pleading** [1] - 2057:11
**pleasure** [1] - 1936:7
**pled** [5] - 2057:9, 2132:3, 2150:25, 2151:13, 2151:15
**plowed** [1] - 2068:10
**plugged** [1] - 1947:17
**pocket** [1] - 1941:7
**point** [40] - 1918:18, 1920:4, 1927:6, 1930:15, 1938:2, 1939:22, 1947:11, 1959:17, 1961:15, 1962:10, 1962:11, 1962:15, 1968:7, 1969:19, 1986:16, 2009:14, 2010:3, 2010:9, 2023:23, 2024:11, 2034:18, 2063:8, 2067:9, 2076:9, 2085:16, 2102:2, 2105:22, 2105:25, 2117:15, 2117:17, 2118:6, 2124:20, 2125:20, 2131:11, 2142:17, 2144:4, 2148:7, 2152:13, 2153:6, 2156:2
**pointed** [1] - 2035:8
**pointing** [2] - 2022:19, 2104:5
**points** [2] - 1960:15, 2008:2
**police** [1] - 2072:24
**policy** [1] - 2071:12
**portion** [4] - 1939:20, 2120:25, 2124:10, 2152:21
**portions** [1] - 1939:21
**POSA** [161] - 1912:16, 1915:1, 1916:9, 1916:21, 1932:12, 1933:6, 1933:10, 1935:17, 1935:21, 1936:2, 1937:21, 1949:15, 1955:20, 1956:9, 1956:20, 1958:16, 1970:19, 1971:17, 1972:8, 1973:2, 1975:4, 1975:21, 1978:6, 1979:12, 1983:1, 1989:9, 1989:11, 1992:3, 1993:20, 1993:25, 1994:2, 2000:1, 2000:21, 2001:1, 2009:9, 2009:13, 2009:23, 2010:2, 2010:22, 2011:5, 2019:15, 2020:2, 2024:9,

2024:21, 2025:6, 2025:8, 2025:12, 2025:16, 2026:25, 2027:12, 2027:14, 2027:16, 2030:13, 2030:18, 2033:25, 2034:3, 2039:20, 2039:25, 2040:5, 2042:10, 2043:1, 2043:7, 2044:1, 2044:6, 2055:21, 2055:23, 2056:3, 2056:5, 2056:10, 2058:17, 2058:21, 2060:15, 2067:1, 2067:18, 2068:24, 2069:1, 2069:10, 2069:12, 2097:9, 2097:15, 2098:5, 2100:12, 2102:24, 2103:9, 2103:12, 2108:1, 2108:14, 2109:23, 2115:24, 2123:9, 2123:14, 2124:3, 2126:13, 2126:16, 2127:8, 2127:14, 2127:17, 2127:19, 2127:21, 2127:25, 2128:2, 2128:9, 2128:15, 2129:14, 2130:3, 2130:6, 2130:9, 2130:11, 2130:13, 2130:16, 2131:9, 2131:13, 2132:3, 2132:11, 2132:19, 2133:5, 2134:3, 2134:7, 2135:8, 2136:10, 2136:22, 2137:10, 2139:15, 2139:20, 2139:24, 2140:5, 2140:22, 2141:6, 2142:6, 2143:12, 2143:15, 2143:22, 2143:25, 2144:24, 2145:3, 2145:8, 2145:11, 2145:23, 2146:11, 2146:13, 2147:5, 2147:13, 2147:15, 2147:17, 2148:16, 2149:20, 2150:25, 2151:8, 2151:13, 2152:16, 2153:13, 2155:22, 2156:3, 2156:6, 2156:8, 2156:10, 2156:13, 2156:21, 2157:9, 2157:13, 2158:8

**Posa** [10] - 1915:2, 1916:19, 1970:17, 1970:18, 1975:3, 1977:22, 2009:21, 2024:19, 2027:13, 2149:22

**Posa's** [1] - 2140:11

pose [1] - 2004:21

**position** [8] - 1913:21, 1968:18, 1972:15, 2000:16, 2083:18, 2084:4, 2104:22, 2116:15

**positive** [1] - 1939:21

**possession** [2] - 2077:11, 2146:20

**possibility** [1] - 1941:17

**possible** [9] - 1914:8, 1938:20, 2037:7, 2054:15, 2059:18, 2059:23, 2117:19, 2130:3, 2156:1

**possibly** [4] - 1929:7, 1946:21, 1948:20, 1984:11

**post** [3] - 2102:25, 2108:11, 2156:10

**post-arrest** [3] - 2102:25, 2108:11, 2156:10

**potential** [1] - 1919:6

**potentially** [1] - 2094:2

**power** [4] - 2018:11, 2021:7, 2021:12, 2086:9

**practice** [32] - 1930:23, 1952:7, 1953:7, 1953:9, 1954:5, 1954:12, 1954:16, 1954:17, 1954:18, 1976:11, 1978:1, 1990:12, 1990:14, 1991:23, 1999:1, 2001:4, 2001:7, 2001:10, 2001:12, 2013:10, 2027:21, 2028:10, 2028:15, 2029:5, 2029:23, 2039:7, 2046:8, 2048:8, 2050:3, 2050:4, 2112:25, 2142:8

**practices** [4] - 1942:8, 1973:11, 2136:14, 2138:19

**practicing** [1] - 1975:24

**praising** [1] - 2037:5

**Pre** [1] - 1915:25

**Pre-Trial** [1] - 1915:25

**precise** [2] - 1943:17, 1944:9

**precisely** [1] - 2042:5

**preclude** [1] - 2137:7

**precluded** [3] - 2047:24, 2136:13, 2138:14

**predator** [3] - 2078:5, 2083:3, 2083:17

**predict** [1] - 1914:5

**prefer** [1] - 2033:12

**prepare** [11] - 1938:12, 1939:8, 1947:12, 1952:21, 1953:14, 1953:15, 2010:15, 2017:9, 2030:23, 2050:15, 2053:3

**prepared** [9] - 2008:1, 2010:10, 2010:11, 2014:25, 2015:2, 2015:19, 2030:25, 2045:15, 2112:12

**preparing** [4] - 1953:2, 1953:11, 2010:12, 2052:22

**presence** [7] - 1913:3, 1916:12, 1916:15, 2024:16, 2026:4, 2070:1, 2140:19

**present** [13] - 1915:19, 1919:9, 1937:10, 1960:21, 1991:5, 2007:11, 2007:12, 2058:6, 2089:21, 2118:4, 2118:6, 2145:14, 2148:13

**Present** [1] - 1912:22

**preserve** [1] - 1994:20

**president** [26] - 1919:12, 1964:15, 1964:17, 1965:13, 2021:2, 2021:5, 2021:13, 2022:3, 2023:12, 2023:15, 2023:17, 2023:18, 2023:20, 2023:22, 2037:8, 2040:13, 2040:15, 2061:23, 2063:21, 2070:23, 2070:24, 2071:1, 2071:2, 2071:3, 2071:4

**President** [1] - 2048:18

**presidents** [2] - 2061:21, 2071:3

**presiding** [1] - 1913:8

**press** [1] - 2037:5

**presumably** [1] - 2030:1

**pretty** [6] - 1920:22, 2025:9, 2064:4, 2073:13, 2092:5, 2134:3

**prevailing** [1] - 2154:15

**prevent** [1] - 2011:18

**prevented** [1] - 2012:3

**previously** [5] - 1918:2, 2098:2, 2098:12, 2112:5, 2112:7

**price** [5] - 1939:17, 2019:7, 2045:14, 2053:5, 2059:21

**principal** [1] - 1990:3

**principle** [1] - 2135:5

**printout** [1] - 1998:22

**Prisons** [5] - 2066:25, 2099:12, 2107:3, 2107:24, 2121:1

**private** [17] - 1924:22, 1925:16, 1926:14, 1945:12, 1960:3, 1960:10, 1974:18, 1978:1, 1983:8, 2018:14, 2045:6, 2051:10, 2054:11, 2059:1,

2059:17, 2094:4, 2138:1

**pro** [1] - 2007:18

**problem** [12] - 1917:14, 1949:14, 1962:13, 1988:12, 1988:13, 2026:10, 2026:20, 2065:24, 2071:8, 2072:3, 2141:9, 2150:8

**problems** [1] - 2135:13

**proceed** [5] - 2040:9, 2075:17, 2092:20, 2102:19, 2125:8

**proceeded** [1] - 2102:11

**Proceedings** [1] - 1912:25

**proceedings** [6] - 1914:21, 1973:4, 2020:3, 2027:7, 2035:7, 2050:18

**proceeds** [4] - 1974:21, 2028:13, 2094:14, 2094:16

**process** [13] - 1923:2, 1923:5, 1923:11, 1925:4, 1925:6, 1925:7, 1941:8, 1941:11, 1946:7, 1947:7, 2018:5, 2152:19

**processing** [4] - 2106:21, 2118:5, 2118:7, 2119:5

**produced** [1] - 1912:25

**product** [1] - 1944:16

**Professional** [3] - 1994:19, 1995:15, 2144:5

**professional** [6] - 2014:2, 2068:8, 2137:12, 2142:10, 2144:3, 2145:5

**professionally** [1] - 2136:5

**proffer** [4] - 1936:6, 2067:18, 2115:10, 2136:23

**proffering** [1] - 1968:20

**profit** [9] - 1947:14, 2053:9, 2062:11, 2080:14, 2080:17, 2081:4, 2081:12, 2090:21

**profits** [3] - 2062:15, 2063:14, 2071:8

**profusely** [1] - 2105:8

**program** [5] - 1926:9, 1960:2, 1987:9, 1989:21, 2022:12

**Program** [2] - 1988:21, 1989:15

**programmatic** [1] - 1989:2

**programs** [1] - 1960:4

**project** [62] - 1922:3, 1922:13, 1922:21, 1922:25, 1923:9, 1923:12, 1923:20, 1923:21, 1923:22, 1924:10, 1924:18, 1924:20, 1925:2, 1925:5, 1925:7, 1925:8, 1925:9, 1928:18, 1928:19, 1928:23, 1929:3, 1929:5, 1929:7, 1929:11, 1930:12, 1946:6, 1946:17, 1947:10, 1947:11, 1947:14, 1951:21, 1960:22, 1961:12, 1961:14, 1962:1, 1962:4, 1962:5, 1962:6, 1962:7, 1963:15, 1987:2, 1987:11, 1987:17, 1988:18, 1991:1, 2005:17, 2005:21, 2020:10, 2035:24, 2053:2, 2053:4, 2053:7, 2053:15, 2054:7, 2054:15, 2055:18, 2079:10, 2104:2, 2104:10, 2104:15, 2154:17

**projections** [4] - 1947:18, 2052:22, 2052:24, 2053:4

**projects** [24] - 1921:10, 1921:14, 1921:25, 1922:12, 1926:14, 1926:15,

1928:11, 1928:13, 1929:9, 1929:25, 1930:20, 1930:25, 1946:13, 1947:3, 1947:5, 1947:10, 1947:13, 1961:24, 1973:22, 1974:16, 2015:14, 2016:1, 2055:1, 2055:8

**prominent** [1] - 2037:2
**promise** [1] - 2131:4
**promised** [1] - 1962:19
**promoted** [1] - 2062:12
**promoter** [1] - 2016:5
**promptly** [1] - 2125:17
**proof** [6] - 1998:16, 2009:5, 2124:14, 2129:15, 2133:25, 2135:2
**proper** [3] - 1941:18, 1967:18, 2085:11
**properly** [1] - 2082:3
**properties** [3] - 2079:24, 2080:2, 2080:10
**Property** [1] - 2037:14
**property** [50] - 1928:4, 1928:7, 1929:14, 1929:16, 1930:7, 1930:10, 1948:10, 1958:23, 1959:7, 1960:8, 1960:12, 1968:4, 1968:24, 1971:4, 1971:5, 1971:10, 1984:1, 1984:5, 1984:13, 1994:21, 2024:5, 2037:17, 2045:18, 2076:16, 2076:19, 2077:2, 2077:12, 2077:20, 2077:22, 2080:14, 2080:25, 2081:3, 2081:4, 2081:13, 2081:15, 2081:16, 2081:18, 2082:20, 2082:25, 2083:19, 2083:24, 2084:15, 2090:15, 2091:4, 2094:2, 2094:4, 2094:8, 2094:10, 2094:11, 2096:21
**propose** [2] - 2086:16, 2139:8
**proposed** [4] - 1937:15, 2005:8, 2025:2, 2148:10
**proposing** [2] - 1970:16, 1972:17
**propriety** [1] - 2136:13
**prosecuted** [1] - 2150:23
**protective** [1] - 2112:25
**prove** [1] - 2135:3
**proverbial** [1] - 2138:22
**provide** [8] - 1997:18, 1998:5, 2029:5, 2114:18, 2114:23, 2120:19, 2125:3
**provided** [6] - 1974:16, 1983:11, 2017:13, 2029:1, 2067:5, 2120:12
**provides** [1] - 1917:10
**providing** [1] - 2149:9
**public** [2] - 1972:13, 2018:14
**publish** [1] - 1994:2, 2030:19
**published** [6] - 1938:25, 1951:3, 1979:9, 1994:3, 2001:16, 2011:8
**purchase** [1] - 1984:1
**purchased** [3] - 2079:23, 2080:2, 2080:3
**purely** [1] - 2067:13
**purpose** [10] - 1935:20, 1938:16, 1988:21, 1989:5, 1989:14, 1989:21, 2011:18, 2012:1, 2018:8, 2099:9
**purposes** [8] - 1930:6, 1998:20, 2010:23, 2011:6, 2024:2, 2040:15, 2045:23, 2143:1
**pursuant** [2] - 1995:15, 1995:18

**pursue** [5] - 1917:8, 1917:10, 2130:25, 2131:6, 2131:22
**push** [1] - 2149:9
**put** [47] - 1915:21, 1916:1, 1916:16, 1923:24, 1936:10, 1944:1, 1944:10, 1955:24, 1956:1, 1956:25, 1961:21, 1963:10, 1963:19, 1964:7, 1965:13, 1973:3, 1984:23, 2003:10, 2015:3, 2015:23, 2020:23, 2023:6, 2023:12, 2025:3, 2037:4, 2043:23, 2044:5, 2050:8, 2063:18, 2066:20, 2066:22, 2066:24, 2071:11, 2080:2, 2085:5, 2093:24, 2101:18, 2104:12, 2111:14, 2113:6, 2134:6, 2137:8, 2138:3, 2145:19, 2146:8, 2155:2
**Putnam** [2] - 1984:15, 1984:20
**puts** [1] - 2066:12
**putting** [1] - 1944:14

# Q

**qualifications** [2] - 1920:24, 1921:21
**qualifies** [1] - 2143:4
**quarter** [4] - 2024:11, 2024:13, 2076:22, 2080:10
**query** [1] - 2130:18
**QUESTION** [1] - 1978:9
**questionable** [1] - 2093:20
**questioned** [1] - 2114:22
**questioning** [3] - 1966:3, 2019:13, 2042:18
**questions** [41] - 1918:14, 1934:4, 1949:3, 1949:5, 1950:3, 1952:2, 1956:6, 1967:8, 1970:22, 1972:9, 1974:23, 1974:25, 2000:15, 2018:1, 2024:19, 2025:1, 2025:4, 2042:10, 2042:15, 2045:4, 2055:21, 2058:20, 2060:15, 2060:19, 2073:21, 2074:1, 2078:24, 2080:21, 2089:8, 2090:7, 2092:13, 2095:5, 2096:13, 2097:3, 2099:3, 2103:8, 2108:1, 2133:7, 2135:11, 2147:23, 2149:24
**quick** [2] - 2025:9, 2097:11
**quicker** [1] - 2128:25
**quickly** [3] - 1948:24, 2004:8, 2024:22
**Quincy** [1] - 1984:14
**quit** [2] - 1976:23, 1976:24
**quite** [3] - 2007:21, 2031:10, 2050:21
**quote** [6] - 1926:14, 2001:4, 2004:1, 2023:4, 2029:3, 2086:15
**quotes** [1] - 1946:18
**quoting** [1] - 1960:19

# R

**race** [1] - 1988:20
**racketeering** [3] - 2127:10, 2132:4
**Radio** [1] - 2062:21
**radio** [1] - 2062:22
**raise** [5] - 2061:2, 2071:10, 2075:7, 2140:1, 2140:2
**raised** [2] - 2063:17, 2071:11

**ran** [2] - 2004:18, 2037:10
**randomly** [1] - 1995:19
**Rappaport** [1] - 1918:18
**rate** [11] - 1943:1, 1959:20, 1959:21, 1960:14, 1960:16, 1960:17, 1960:20, 1983:15, 1983:18, 2045:7
**rates** [4] - 1942:19, 1942:22, 1983:16, 2045:4
**rather** [8] - 1939:6, 1967:15, 1971:9, 1973:15, 2085:5, 2138:1, 2150:14, 2156:15
**Raymond** [1] - 2087:18
**re** [3] - 1921:1, 2087:22, 2116:13
**re-apply** [1] - 1921:1
**re-testify** [1] - 2116:13
**reached** [2] - 2032:16, 2120:8
**read** [31] - 1913:19, 1965:18, 1980:5, 1994:11, 1994:15, 2014:15, 2014:17, 2026:9, 2039:25, 2043:16, 2057:14, 2067:20, 2070:10, 2100:13, 2101:18, 2102:20, 2121:9, 2133:17, 2143:16, 2143:22, 2143:23, 2143:25, 2144:20, 2144:24, 2145:2, 2145:6, 2147:11, 2147:25, 2156:16
**reading** [5] - 2103:17, 2104:4, 2130:24
**ready** [6] - 1923:19, 1924:12, 1935:3, 2027:3, 2035:24, 2066:2
**real** [48] - 1920:17, 1920:18, 1924:22, 1926:23, 1927:4, 1927:17, 1928:14, 1929:9, 1929:21, 1929:25, 1930:13, 1930:19, 1930:24, 1947:3, 1948:3, 1948:6, 1948:10, 1951:17, 1951:19, 1960:6, 1968:4, 1978:3, 1988:22, 1989:5, 1990:8, 2002:8, 2005:12, 2007:7, 2016:12, 2018:7, 2027:18, 2028:11, 2029:6, 2031:24, 2032:8, 2036:1, 2037:17, 2047:8, 2047:25, 2052:16, 2055:10, 2059:5, 2071:13, 2074:10, 2076:15, 2081:1, 2081:6
**really** [17] - 1957:12, 1960:1, 1960:16, 1961:3, 1989:21, 1998:19, 2005:22, 2010:18, 2067:1, 2067:9, 2121:23, 2126:6, 2132:17, 2135:14, 2143:20, 2145:13, 2151:20
**rear** [1] - 2117:9
**rearview** [1] - 2117:12
**reason** [15] - 1952:14, 1965:4, 1989:2, 1991:6, 2012:8, 2029:8, 2029:12, 2032:6, 2033:12, 2057:22, 2114:25, 2118:1, 2142:15, 2143:7, 2151:17
**reasons** [6] - 1991:8, 2140:23, 2142:11, 2142:14, 2143:6, 2147:6
**rebut** [2] - 1956:12, 2155:23
**rebuttal** [8] - 1967:10, 1967:15, 2025:3, 2115:17, 2124:9, 2124:16, 2128:18, 2128:21
**receipt** [1] - 1942:13
**receive** [7] - 1922:20, 1973:25, 1974:3, 1997:11, 2016:23, 2039:5, 2153:9
**Received** [1] - 2030:16, 2039:23
**received** [20] - 1922:22, 1932:3, 1935:6,

1935:8, 1938:3, 1940:16, 1940:18, 1945:14, 1974:9, 1993:23, 2017:12, 2026:9, 2030:17, 2038:13, 2039:24, 2044:2, 2044:3, 2046:2, 2046:3, 2094:14

**receiving** [2] - 1945:6, 2094:21

**recently** [2] - 2048:8, 2090:18

**recess** [6] - 1966:5, 2024:7, 2064:15, 2064:17, 2065:7, 2066:16

**Recess** [1] - 1966:10

**recesses** [2] - 2155:18, 2155:20

**Rech** [1] - 1979:6

**recognize** [2] - 1992:5, 2010:24

**recognized** [2] - 1946:20, 2083:13

**recollection** [43] - 1940:17, 1943:17, 1944:2, 1945:6, 1951:10, 1952:11, 1956:2, 1956:5, 1956:18, 1957:2, 1979:3, 1979:7, 1979:10, 1979:24, 1980:2, 1980:8, 1981:12, 1984:19, 1984:21, 1984:25, 1985:3, 1988:2, 1988:5, 2014:7, 2014:21, 2019:15, 2039:13, 2039:15, 2040:18, 2043:3, 2044:21, 2054:24, 2056:14, 2057:4, 2057:10, 2058:11, 2068:13, 2068:17, 2068:21, 2100:13, 2144:15, 2145:24, 2146:2

**recommend** [2] - 1945:12, 2131:3

**recommended** [1] - 1946:12

**reconvene** [1] - 2025:11

**Record** [1] - 2070:10

**record** [18] - 1913:12, 1916:14, 1956:1, 1958:3, 1967:17, 1972:13, 1995:24, 2040:8, 2062:4, 2075:11, 2108:4, 2115:11, 2142:4, 2143:1, 2143:2, 2143:3, 2145:15, 2153:23

**recorded** [4] - 1912:25, 1950:3, 2110:8, 2148:21

**recordings** [2] - 2008:14, 2008:15

**records** [48] - 1947:23, 1952:23, 1953:19, 1953:21, 1953:24, 1954:9, 1994:22, 1995:14, 1996:7, 1996:15, 1998:24, 1999:8, 2001:17, 2004:2, 2029:8, 2029:12, 2029:13, 2029:19, 2030:3, 2031:25, 2032:6, 2032:10, 2137:13, 2138:11, 2139:2, 2139:14, 2140:3, 2140:5, 2140:7, 2140:25, 2141:12, 2141:21, 2141:22, 2141:24, 2142:1, 2142:2, 2142:8, 2142:13, 2143:11, 2145:8, 2146:17, 2146:18, 2146:19, 2146:23, 2147:8, 2149:10

**recount** [1] - 1934:14

**recounting** [1] - 1937:8

**recover** [1] - 1919:22

**recovery** [1] - 1919:19

**recross** [1] - 2152:24

**RECROSS** [4] - 2056:9, 2096:14, 2157:12, 2158:3

**RECROSS-EXAMINATION** [2] - 2056:9, 2157:12

**red** [2] - 1988:25, 2003:11

**REDIRECT** [4] - 2042:13, 2089:12,

2157:10, 2158:1

**redirect** [1] - 2152:24

**reduce** [1] - 2132:6

**reduced** [3] - 1917:8, 1917:12, 2132:17

**reduction** [3] - 2131:12, 2131:17, 2151:12

**reductions** [1] - 1917:11

**refer** [2] - 2128:13, 2151:3

**reference** [7] - 1940:25, 1975:15, 1995:9, 1995:22, 2014:17, 2127:23, 2143:16

**referenced** [3] - 1962:22, 1963:1, 2144:25

**references** [2] - 2143:25, 2145:5

**referred** [6] - 1943:2, 1946:8, 2047:14, 2048:11, 2106:11, 2141:12

**referring** [6] - 1945:18, 1945:21, 1953:13, 2010:8, 2121:23, 2150:13

**refers** [2] - 1979:9, 1994:25

**reflect** [3] - 1916:14, 1942:4, 1942:8

**reflected** [1] - 2055:2

**reflects** [1] - 1978:7

**refresh** [12] - 1979:3, 1979:7, 1979:10, 1979:24, 1981:12, 1984:20, 1985:2, 1988:1, 1988:4, 2043:3, 2087:17, 2100:12

**refreshed** [2] - 2056:14, 2058:11

**refreshing** [1] - 2019:15

**regard** [35] - 1922:13, 1922:25, 1924:19, 1942:11, 1943:12, 1951:4, 1952:8, 1952:23, 1953:10, 1954:5, 1961:2, 1961:12, 1964:23, 1965:23, 1972:16, 2004:20, 2007:4, 2032:2, 2045:2, 2048:7, 2050:11, 2067:4, 2072:19, 2078:11, 2079:9, 2079:12, 2090:5, 2091:3, 2092:8, 2093:5, 2095:8, 2095:9, 2138:12, 2139:11, 2150:2

**regarding** [27] - 1915:25, 1916:4, 1916:12, 1926:18, 1933:10, 1944:8, 1955:4, 1963:2, 1967:13, 1969:13, 2000:15, 2000:17, 2019:9, 2024:20, 2025:4, 2042:15, 2072:14, 2073:11, 2108:11, 2116:10, 2126:1, 2127:12, 2129:22, 2135:12, 2136:16, 2137:7, 2139:4

**regardless** [1] - 1972:16

**registration** [5] - 1991:15, 1992:8, 1992:15, 1992:21, 1993:12

**regular** [4] - 1920:16, 1929:1, 1942:3, 1996:9

**regularly** [1] - 1943:8

**regulation** [2] - 2141:23, 2142:1

**regulations** [1] - 2146:1

**reimburse** [1] - 1941:2

**reimbursed** [1] - 1942:12

**rein** [1] - 2141:13

**related** [6] - 1941:3, 1968:4, 1969:2, 2090:22, 2091:12, 2148:24

**relates** [1] - 2126:3

**relating** [1] - 2152:7

**relation** [2] - 2062:1, 2076:15

**relationship** [14] - 1923:14, 1963:16, 1968:23, 1969:14, 2071:5, 2071:20, 2076:14, 2086:3, 2086:12, 2086:25, 2087:3, 2087:4, 2087:9, 2087:11

**relative** [1] - 1994:22

**relatively** [1] - 2117:16

**release** [1] - 2037:5

**relevant** [1] - 2155:4

**relied** [2] - 1965:14, 2008:11

**Relief** [1] - 2037:14

**relying** [2] - 2012:13, 2120:21

**remaining** [1] - 2104:11

**remand** [2] - 2099:17, 2107:2

**remanded** [1] - 2107:24

**remember** [22] - 1921:8, 1922:17, 1923:16, 1934:22, 1939:23, 1951:6, 1952:21, 1961:24, 1966:7, 1978:20, 1978:24, 1980:13, 1981:11, 2006:9, 2020:4, 2024:12, 2036:24, 2040:11, 2089:24, 2114:10, 2125:20, 2143:9

**remembering** [1] - 2058:8

**remind** [3] - 1924:2, 2052:7, 2109:1

**reminded** [1] - 2056:21

**reminder** [1] - 1950:6

**remove** [1] - 2131:25

**removed** [1] - 1989:20

**renaissance** [1] - 1959:24

**rendered** [5] - 1986:1, 1996:3, 1996:9, 2016:4, 2030:11

**renew** [2] - 2152:11, 2153:18, 2154:1

**renovate** [2] - 1958:18, 1960:1

**rent** [1] - 2082:20

**rents** [1] - 1984:5

**repaid** [1] - 1962:9

**repair** [1] - 2081:21

**repeat** [1] - 2102:22

**repeatedly** [1] - 2106:8

**repetition** [1] - 1915:24

**replied** [1] - 2101:22

**reply** [1] - 2091:9

**report** [5] - 1960:12, 2121:5, 2121:17, 2121:24, 2122:19

**reported** [4] - 1980:15, 2119:15, 2119:17, 2120:8

**reporter** [2] - 2061:5, 2155:9

**Reporter** [1] - 1912:23

**reports** [3] - 2120:21, 2120:23, 2121:4

**represent** [11] - 1942:20, 1943:13, 1977:17, 1981:8, 2004:13, 2005:4, 2006:3, 2014:23, 2057:1, 2057:9

**representation** [3] - 1941:19, 1963:5, 2058:22

**representations** [1] - 1963:1

**representative** [1] - 1995:18

**represented** [14] - 1927:10, 1963:25, 1977:11, 1978:25, 1980:16, 1980:22, 1985:20, 2006:1, 2006:20, 2047:11, 2047:20, 2056:18, 2057:23, 2058:1

**representing** [11] - 1930:23, 1939:15, 1980:9, 1980:14, 2005:15, 2005:16, 2006:15, 2007:1, 2007:13, 2018:2,

VB      OCR      CRR

2059:22

**request** [12] - 1916:12, 1916:15, 1917:1, 1920:24, 1921:21, 1944:9, 1967:12, 2013:15, 2034:21, 2034:23, 2066:24, 2108:8

**requested** [5] - 1943:22, 1973:15, 2127:2, 2144:19, 2148:9

**requests** [2] - 1925:20, 1926:4

**required** [14] - 1916:25, 1926:23, 1941:18, 1943:14, 1965:16, 1988:8, 1991:14, 1995:14, 2044:24, 2093:24, 2129:11, 2129:18, 2133:18, 2140:25

**requirement** [2] - 1964:22, 1965:7

**requirements** [2] - 1987:8, 1987:13

**requires** [3] - 1994:20, 1995:23, 2141:23

**requisition** [2] - 2153:2, 2154:5

**requisitions** [3] - 1974:13, 2153:10, 2153:17

**reread** [1] - 2070:8

**reserve** [1] - 2154:18

**reserved** [3] - 2152:10, 2153:22, 2155:14

**resolution** [2] - 1914:19, 2022:15

**resolutions** [2] - 2021:19, 2022:13

**resolved** [2] - 2024:22, 2142:24

**respect** [12] - 1917:7, 1934:11, 1937:5, 2032:8, 2073:3, 2078:7, 2126:4, 2126:11, 2136:7, 2136:9, 2142:23, 2143:11

**respectfully** [5] - 1957:8, 1972:5, 2026:11, 2153:14, 2156:18

**respond** [2] - 1998:12, 2092:8, 2154:9

**responded** [3] - 2020:12, 2029:3, 2144:20

**response** [8] - 1936:16, 1936:19, 1938:8, 1939:2, 1952:2, 1963:8, 1963:12, 2088:4

**responsibilities** [2] - 1972:2, 2144:9

**responsibility** [6] - 1945:4, 1997:14, 2014:3, 2142:10, 2143:5, 2145:5

**Responsibility** [2] - 1994:19, 2144:6

**responsible** [3] - 2018:9, 2083:18, 2106:23

**rest** [9] - 1972:18, 2014:12, 2014:15, 2044:7, 2057:14, 2066:20, 2075:3, 2118:7, 2129:4

**Restaurant** [2] - 2098:16, 2098:19

**restaurant** [1] - 1930:9

**Restoration** [1] - 1938:14

**restroom** [1] - 2140:17

**rests** [2] - 2075:1, 2124:4

**result** [7] - 1930:10, 1946:22, 1947:20, 1947:23, 1965:10, 2080:25, 2153:9

**results** [2] - 2016:17, 2016:18

**resume** [1] - 1917:4

**resumes** [3] - 1917:16, 2027:11, 2097:17

**retain** [1] - 1936:15

**retained** [8] - 1928:22, 1928:23, 1929:18, 1929:21, 2031:23, 2051:5,

2051:7, 2054:25

**Retainer** [1] - 2010:5

**retainer** [54] - 1936:20, 1936:21, 1938:12, 1938:13, 1939:2, 1939:24, 1941:12, 1942:6, 1942:15, 1942:22, 1942:25, 1943:21, 1943:22, 1944:3, 1944:9, 1944:19, 1945:11, 1947:25, 1951:7, 1951:10, 1951:16, 1952:9, 1952:12, 1952:22, 2007:21, 2009:15, 2010:10, 2010:12, 2010:15, 2010:18, 2011:24, 2012:10, 2013:17, 2013:20, 2013:22, 2014:3, 2015:17, 2015:19, 2031:4, 2050:11, 2051:16, 2055:17, 2055:19, 2136:14, 2137:2, 2137:8, 2137:11, 2137:19, 2137:25, 2138:7, 2139:11, 2139:16, 2139:22, 2141:21

**retainers** [2] - 1939:5, 1939:8

**retaining** [4] - 1932:7, 1938:14, 1938:16, 2051:1

**retired** [4] - 1919:2, 1976:12, 2079:18, 2096:12

**return** [4] - 1984:4, 2024:10, 2082:18, 2156:4

**returned** [2] - 1946:11, 2100:14

**Reverend** [1] - 2052:13

**review** [4] - 1919:6, 2060:1, 2101:20, 2156:15

**reviewed** [3] - 2121:18, 2130:21, 2131:1

**reviewing** [5] - 2060:3, 2060:6, 2060:7, 2060:11, 2101:21

**RFQ** [4] - 1922:4, 1922:5, 1922:7, 1923:3

**Richards** [35] - 1912:22, 1915:3, 1945:10, 1952:17, 1952:21, 1953:6, 1953:19, 1953:25, 1975:11, 1975:17, 2001:15, 2004:1, 2010:4, 2010:12, 2015:8, 2018:1, 2028:21, 2028:25, 2049:18, 2066:22, 2067:4, 2067:17, 2068:3, 2068:7, 2068:16, 2069:2, 2097:10, 2097:16, 2098:6, 2098:8, 2103:15, 2105:4, 2108:9, 2109:9, 2149:8

**Richards'** [1] - 2069:8

**RICO** [2] - 2132:13, 2132:15

**ride** [2] - 2100:7, 2100:20

**Ridge** [1] - 2052:20

**rigged** [1] - 1923:12

**rights** [1] - 2096:19

**Rights** [4] - 2101:15, 2101:16, 2101:19, 2102:14

**ring** [1] - 1951:12, 1987:24

**Riopelle** [1] - 1915:10

**rip** [5] - 1952:25, 2002:23, 2002:25, 2003:12, 2029:24

**ripped** [4] - 1952:4, 1954:6, 1954:10, 2001:4

**ripping** [2] - 2002:18, 2142:16

**rise** [9] - 1913:5, 1918:4, 1929:17, 1967:3, 1973:5, 2024:14, 2026:6, 2027:8, 2070:4

**risk** [1] - 2045:12

**Robert** [4] - 1915:6, 1915:10, 2052:4, 2052:7

**ROBERT** [2] - 1912:17, 1912:19

**Rodrigo** [4] - 2053:12, 2053:20, 2053:23, 2054:2

**role** [4] - 1922:23, 1963:15, 1990:17, 2091:3

**rolling** [1] - 1972:9

**roof** [1] - 2081:21

**roofer** [1] - 2081:22

**room** [7] - 2101:8, 2113:22, 2113:24, 2114:1, 2114:3, 2114:4, 2114:6

**Ross** [1] - 2141:17

**round** [6] - 1921:19, 1922:5, 1923:19, 1923:20, 1987:1, 1987:12

**route** [1] - 2148:11

**routine** [6] - 2044:23, 2057:2, 2057:7, 2099:8, 2099:10, 2099:16

**royal** [1] - 2001:25

**Royal** [1] - 1918:23

**rule** [15] - 1969:25, 1972:16, 1994:25, 1995:9, 1995:13, 1995:23, 1996:14, 2004:25, 2014:2, 2145:2, 2145:11, 2145:21, 2146:6, 2146:7, 2146:9

**Rule** [6] - 1970:20, 1994:18, 1995:15, 1995:22, 2145:6, 2154:19

**ruled** [2] - 2136:1, 2151:20

**rules** [50] - 1956:14, 1956:19, 1957:7, 1966:3, 1969:9, 1970:6, 1970:8, 1989:3, 1994:14, 1994:16, 1995:6, 1995:17, 2004:8, 2004:11, 2004:24, 2073:2, 2137:9, 2137:12, 2137:20, 2138:6, 2139:23, 2141:4, 2141:8, 2142:10, 2142:19, 2143:2, 2143:4, 2143:16, 2143:21, 2143:25, 2144:1, 2144:4, 2144:5, 2144:11, 2144:17, 2144:22, 2144:25, 2146:15, 2146:18, 2147:1, 2147:4, 2147:10, 2148:1, 2148:2, 2148:4, 2148:7, 2148:14, 2148:24, 2150:6

**Rules** [2] - 1957:25, 1995:15

**ruling** [1] - 1958:4

**run** [4] - 1924:10, 2004:23, 2046:8, 2072:6

**running** [4] - 1946:3, 1962:18, 2073:5, 2073:6

**ruse** [1] - 2149:9

**rushing** [1] - 2100:15

## S

**S-I-C-I-G-N-A-N-O** [1] - 2075:15

**sad** [1] - 2139:18

**sadly** [1] - 2089:5

**safety** [2] - 2112:15, 2112:18

**sake** [1] - 1961:21

**salaries** [1] - 2154:16

**sale** [2] - 2094:13, 2094:14

**sales** [1] - 2053:5

**Salvatore** [1] - 2044:15

**sandwich** [1] - 2105:18

**Sandy** [1] - 1919:20
**sarcasm** [5] - 2084:21, 2085:14, 2086:19, 2086:21, 2087:12
**sarcastic** [1] - 2088:4
**sat** [2] - 2002:1, 2113:22
**Saturday** [1] - 2072:5
**Saturdays** [1] - 2064:6
**Savarese** [2] - 1979:5, 2044:15
**save** [2] - 2004:3
**saved** [2] - 2003:18, 2003:23
**saw** [10] - 1944:19, 1961:17, 1975:18, 1986:22, 2000:3, 2000:9, 2014:5, 2014:19, 2015:4, 2056:23
**Scaringi** [1] - 1918:25
**scenario** [2] - 2033:5, 2033:6
**scene** [2] - 2112:19, 2114:12
**schedule** [4] - 2066:19, 2124:11, 2124:22, 2125:9
**scheme** [2] - 1974:15, 1974:21
**Schoenfeld** [1] - 2047:19
**School** [1] - 1976:25
**school** [5] - 1940:7, 1977:5, 2036:18, 2079:19, 2096:11
**scope** [2] - 1967:18, 2109:23
**screen** [5] - 1963:10, 1963:19, 1964:11, 2044:5, 2085:6
**scribble** [1] - 2003:3
**script** [1] - 2109:12
**scrupulously** [1] - 2147:19
**se** [1] - 2007:18
**sealed** [1] - 1923:1
**Sean** [4] - 2123:17, 2123:22, 2123:23
**search** [2] - 2112:4, 2112:15
**searchable** [1] - 2130:14
**searches** [1] - 2046:5
**searching** [1] - 2112:18
**season** [2] - 1940:6
**seat** [5] - 2061:4, 2065:15, 2117:6, 2117:9, 2125:23
**seated** [8] - 1915:15, 1918:6, 1973:7, 2024:18, 2026:7, 2027:10, 2070:6, 2075:10
**second** [6] - 2000:16, 2020:2, 2034:21, 2034:23, 2035:5, 2127:8
**secretarial** [1] - 2002:1
**secretaries** [2] - 1944:22, 1945:1
**secretaries'** [1] - 1945:5
**secretary** [5] - 1996:21, 1996:22, 1997:10, 2023:11, 2035:4
**Section** [4] - 1994:11, 1994:13, 1994:14, 1994:16
**section** [8] - 1916:2, 1917:11, 2044:10, 2127:24, 2133:16, 2150:24, 2155:4
**sections** [1] - 2128:5
**sector** [4] - 2051:10, 2059:1, 2062:11, 2062:12
**security** [1] - 2104:14
**see** [58] - 1914:20, 1915:25, 1923:8, 1923:11, 1924:15, 1924:23, 1926:11, 1941:1, 1941:5, 1946:2, 1953:4, 1954:3, 1957:18, 1958:23, 1965:15,

1970:10, 1970:15, 1979:14, 1979:20, 1980:2, 1995:10, 2003:21, 2009:12, 2016:2, 2022:17, 2026:17, 2034:4, 2034:21, 2042:11, 2043:7, 2044:7, 2044:17, 2057:11, 2066:16, 2084:11, 2085:16, 2087:19, 2102:1, 2102:4, 2102:7, 2103:15, 2103:19, 2125:13, 2125:16, 2126:20, 2134:6, 2138:23, 2139:6, 2139:9, 2144:2, 2144:23, 2145:15, 2146:18, 2148:12, 2154:19, 2154:23, 2155:17
**seeing** [8] - 1944:18, 1979:9, 1981:12, 1985:2, 1988:1, 1988:4, 2014:7, 2056:21
**seek** [2] - 2137:25, 2142:21
**seeking** [12] - 1928:5, 1955:18, 1958:15, 1958:18, 1959:5, 1969:13, 2096:19, 2096:21, 2138:7, 2140:6, 2146:5, 2148:19
**seem** [3] - 1921:7, 2058:8, 2138:22
**select** [1] - 1921:22
**selected** [2] - 1922:3, 1995:19
**selecting** [1] - 1923:5
**selection** [1] - 1922:25
**selective** [1] - 2150:6
**selfless** [1] - 2072:2
**selflessness** [2] - 2072:18, 2073:12
**sell** [5] - 1919:22, 1939:11, 1947:13, 2082:20, 2088:11
**selling** [2] - 1939:15, 1971:10
**semi** [1] - 1919:2
**semi-retired** [1] - 1919:2
**send** [8] - 1952:24, 1962:19, 1975:17, 2003:6, 2026:19, 2027:2, 2032:18, 2125:21
**sending** [2] - 2012:1, 2012:3
**sends** [1] - 2002:14
**SENIOR** [1] - 1912:11
**senior** [3] - 2012:21, 2012:23, 2061:20
**sense** [3] - 2136:25, 2141:14, 2146:21
**sent** [14] - 1940:13, 1942:3, 1942:9, 1946:8, 1947:24, 1962:3, 1975:11, 2003:1, 2003:10, 2021:21, 2085:17, 2086:15, 2087:14, 2141:21
**sentence** [7] - 1954:3, 2103:18, 2129:10, 2131:4, 2133:12, 2138:3, 2140:12
**sentences** [1] - 1953:8
**sentiments** [1] - 2105:25
**separate** [4] - 1919:22, 1922:4, 1930:15, 2139:3
**September** [1] - 2110:2
**SERCARZ** [174] - 1912:19, 1915:9, 1916:7, 1916:13, 1918:12, 1932:1, 1932:14, 1933:2, 1934:13, 1935:19, 1936:7, 1936:19, 1937:5, 1937:12, 1937:17, 1937:19, 1938:1, 1938:24, 1948:23, 1949:2, 1949:9, 1949:12, 1949:16, 1950:1, 1952:1, 1955:22, 1955:24, 1956:14, 1957:1, 1957:8, 1957:15, 1957:18, 1958:3, 1958:7,

1964:6, 1966:2, 1967:5, 1967:7, 1969:12, 1970:9, 1971:24, 1972:20, 1973:1, 1973:9, 1974:23, 1975:5, 1975:8, 1975:19, 1980:17, 1983:22, 1989:7, 1993:22, 1996:2, 1996:5, 2000:5, 2000:11, 2000:14, 2008:5, 2008:17, 2009:2, 2009:7, 2009:10, 2009:16, 2009:20, 2011:20, 2012:5, 2018:22, 2019:12, 2026:23, 2030:15, 2038:5, 2039:22, 2040:3, 2040:7, 2042:11, 2042:14, 2042:24, 2043:2, 2043:20, 2043:23, 2044:5, 2047:2, 2055:20, 2056:1, 2058:14, 2060:16, 2060:24, 2061:8, 2061:11, 2064:16, 2065:11, 2065:14, 2066:8, 2067:4, 2067:9, 2067:16, 2070:7, 2070:11, 2073:20, 2074:22, 2075:1, 2076:11, 2079:2, 2084:9, 2084:19, 2085:2, 2085:5, 2085:18, 2085:20, 2086:1, 2089:8, 2091:15, 2092:2, 2092:7, 2093:15, 2096:15, 2096:16, 2097:2, 2103:5, 2108:2, 2108:8, 2108:17, 2128:17, 2129:5, 2133:6, 2133:22, 2135:7, 2137:2, 2137:18, 2137:24, 2138:12, 2138:18, 2138:21, 2140:11, 2140:15, 2141:3, 2141:11, 2142:18, 2145:18, 2145:24, 2146:5, 2146:12, 2147:12, 2147:14, 2147:16, 2147:22, 2149:3, 2149:12, 2149:15, 2149:19, 2150:2, 2150:5, 2150:8, 2150:12, 2150:16, 2150:19, 2150:21, 2151:2, 2151:23, 2152:1, 2152:6, 2152:9, 2152:17, 2153:6, 2153:14, 2154:22, 2156:12, 2156:18, 2156:20, 2157:7, 2157:11, 2157:17, 2157:25, 2158:4
**Sercarz** [18] - 1915:9, 1915:10, 1916:11, 1918:10, 1934:4, 1936:2, 1968:7, 1969:20, 1971:22, 1972:15, 2001:2, 2055:24, 2056:11, 2074:20, 2085:16, 2095:5, 2137:1, 2145:15
**Sercarz's** [3] - 2007:24, 2008:7, 2153:23
**series** [3] - 1949:3, 1950:2, 2051:15
**serve** [1] - 2083:18
**served** [1] - 2005:11
**service** [2] - 1941:7, 1941:11
**services** [14] - 1929:18, 1941:4, 1941:18, 1941:20, 1943:14, 1986:2, 1996:9, 1998:6, 2016:4, 2017:13, 2028:25, 2030:11, 2047:25, 2051:3
**SESSION** [2] - 2025:19, 2026:1
**session** [1] - 1913:7
**set** [8] - 1942:19, 1946:1, 1946:4, 1946:15, 2032:20, 2106:6, 2109:22, 2110:14
**seven** [8] - 1930:4, 1995:24, 1996:15, 2050:16, 2133:11, 2140:25, 2145:9, 2146:20
**several** [7] - 1918:17, 1919:17, 1925:24, 1940:13, 1961:11, 2062:16, 2106:5
**Shabazz** [1] - 1915:5
**shaggy** [1] - 1971:24
**shaggy-dog** [1] - 1971:24

**shall** [5] - 1917:2, 1995:16, 1995:23, 1996:15, 2065:9
**sham** [2] - 2138:7, 2146:10
**shape** [1] - 1959:25
**share** [5] - 2077:12, 2080:12, 2084:15, 2096:2, 2096:3
**shared** [2] - 1986:18, 1986:19
**shareholder** [6] - 1988:14, 2076:18, 2079:25, 2080:5, 2086:17, 2089:14
**shareholders** [5] - 1971:8, 1971:11, 1972:3, 2083:25, 2086:16
**shares** [5] - 2021:24, 2024:6, 2088:20, 2095:9, 2096:4
**sharpen** [1] - 2059:20
**Shaun** [2] - 2106:9, 2106:12
**sheetrock** [1] - 2063:18
**Sherronie** [1] - 1987:23
**shift** [1] - 2133:24
**shifts** [2] - 2134:5, 2135:3
**shopping** [1] - 1939:16
**short** [2] - 2067:18, 2124:16
**shortly** [2] - 2038:2, 2054:6
**show** [22] - 1938:22, 1940:24, 1979:12, 1992:1, 1992:3, 2010:21, 2010:22, 2011:5, 2014:19, 2017:7, 2030:5, 2030:18, 2033:25, 2037:19, 2039:17, 2042:23, 2084:7, 2084:24, 2084:25, 2085:16, 2103:12, 2109:19
**showed** [11] - 1964:4, 2001:2, 2023:9, 2042:2, 2042:11, 2043:8, 2043:17, 2055:24, 2056:11, 2093:11, 2143:12
**showing** [2] - 1995:25, 1996:7
**shown** [1] - 2043:10
**shows** [1] - 1957:14
**Sicignano** [13] - 1967:9, 1967:11, 1967:14, 1968:3, 1970:7, 2066:22, 2075:5, 2075:12, 2075:24, 2076:12, 2079:3, 2079:13, 2086:2
**SICIGNANO** [2] - 2075:19, 2157:21
**side** [19] - 1919:2, 1919:5, 1933:1, 1935:21, 1936:1, 1940:15, 1949:1, 2000:12, 2000:13, 2009:1, 2021:25, 2062:13, 2065:16, 2085:1, 2085:10, 2092:1, 2115:9, 2117:9, 2146:25
**Side** [16] - 1913:12, 1913:15, 1914:15, 1933:15, 1937:22, 1949:17, 2000:23, 2065:17, 2085:21, 2092:19, 2108:4, 2108:7, 2108:22, 2115:11, 2115:14, 2116:23
**Side-bar** [9] - 1913:12, 1913:15, 1914:15, 2108:4, 2108:7, 2108:22, 2115:11, 2115:14, 2116:23
**Sidebar** [1] - 1955:23
**sides** [2] - 2004:14
**sign** [16] - 1964:23, 1965:2, 1965:5, 1994:1, 2007:4, 2013:12, 2021:10, 2023:8, 2024:3, 2039:10, 2040:6, 2040:10, 2040:16, 2040:17, 2120:23, 2122:5
**signature** [21] - 1964:4, 1964:15, 1965:15, 1965:20, 1992:11, 1992:17,

1992:25, 1993:8, 1993:16, 2020:20, 2022:15, 2022:16, 2023:24, 2037:21, 2038:20, 2040:16, 2041:1, 2041:7, 2041:13, 2041:23, 2050:6
**signatures** [4] - 1965:16, 1965:20, 2022:23, 2023:2
**signed** [24] - 1934:18, 1942:23, 1963:22, 1964:14, 1965:4, 1965:13, 1965:14, 1994:4, 1994:23, 1996:18, 2023:10, 2023:24, 2039:16, 2039:19, 2040:2, 2040:19, 2050:9, 2087:23, 2102:14, 2102:19, 2121:4, 2143:12, 2143:13, 2146:15
**signers** [1] - 2022:23
**significance** [1] - 2133:13
**significantly** [2] - 2144:6, 2144:12
**signing** [3] - 2011:19, 2024:2, 2102:10
**signs** [2] - 1954:24, 2002:15
**silly** [1] - 2020:13
**similar** [4] - 1983:11, 2031:13, 2033:5, 2105:3
**simply** [8] - 1917:9, 1933:10, 1968:3, 1968:10, 1970:19, 1970:22, 2021:12, 2153:18
**simultaneously** [1] - 1990:8
**sincere** [1] - 2065:21
**single** [4] - 1994:8, 2002:11, 2129:18, 2154:4
**sit** [7] - 1934:21, 2061:1, 2075:6, 2106:10, 2113:23, 2123:23, 2149:22
**site** [6] - 1929:1, 1999:9, 2064:7, 2072:4, 2072:6, 2072:7
**sitting** [5] - 1940:15, 2063:10, 2117:6, 2117:8, 2117:9
**situation** [3] - 1928:16, 2005:6, 2046:11
**six** [7] - 1921:11, 1926:1, 1928:21, 2057:19, 2131:19, 2134:7, 2135:1
**sixteen** [4] - 1959:19, 1982:10, 2057:17, 2057:20
**sixth** [1] - 1921:19
**size** [1] - 1928:1
**skills** [1] - 1928:22
**slightest** [1] - 2065:22
**slightly** [2] - 2140:3, 2153:4
**small** [9] - 1928:2, 1929:7, 1946:17, 2002:22, 2003:1, 2016:8, 2073:6, 2073:7, 2142:17
**smiling** [1] - 2130:2
**SML** [25] - 1920:25, 1921:2, 1921:10, 1921:13, 1922:3, 1922:12, 1922:20, 1960:25, 1964:2, 1964:20, 1964:23, 1965:25, 1987:1, 1987:4, 1989:20, 2006:15, 2007:10, 2021:22, 2023:17, 2023:20, 2023:22, 2039:10, 2040:13, 2049:10, 2104:1
**sneak** [1] - 1989:24
**so-called** [1] - 2149:10
**Society** [1] - 1977:4
**soda** [1] - 1919:24
**sold** [3] - 1971:5, 2090:18, 2090:20
**solely** [1] - 1990:17

**solicit** [2] - 1973:22, 1974:3
**someone** [11] - 1917:10, 1956:18, 1960:1, 1978:24, 1980:14, 2021:5, 2059:14, 2065:19, 2077:14, 2091:7, 2119:13
**sometime** [2] - 1922:15, 1926:25
**sometimes** [3] - 1998:8, 2033:18, 2038:19
**somewhat** [1] - 2136:17
**somewhere** [1] - 1921:7
**son** [1] - 2120:9
**soon** [5] - 1914:7, 2087:23, 2092:14, 2141:1, 2147:9
**sorry** [38] - 1913:24, 1925:19, 1929:13, 1965:1, 1977:23, 1980:19, 1988:10, 1995:11, 1996:4, 2001:23, 2005:20, 2010:11, 2020:2, 2022:20, 2024:21, 2028:7, 2033:25, 2035:8, 2045:20, 2051:22, 2054:3, 2057:20, 2058:17, 2064:18, 2065:11, 2074:7, 2074:19, 2079:17, 2082:2, 2090:4, 2095:15, 2098:8, 2098:18, 2103:15, 2119:24, 2127:21, 2140:12, 2153:13
**sort** [7] - 1919:2, 1920:5, 1920:7, 1939:10, 1948:6, 1953:14, 1960:17
**sorts** [1] - 1990:15
**sound** [1] - 2017:4
**sounds** [5] - 1913:24, 1977:2, 2036:20, 2132:19, 2135:8
**source** [1] - 1961:25
**Southern** [1] - 1980:23
**space** [2] - 1986:18, 1986:19
**speaking** [10] - 1938:8, 1948:12, 1953:6, 1957:1, 1962:14, 1962:18, 2017:20, 2028:24, 2031:8, 2051:4
**Special** [16] - 1912:22, 1915:2, 1952:17, 2001:14, 2004:1, 2010:4, 2028:21, 2028:24, 2049:13, 2097:10, 2097:15, 2098:8, 2101:10, 2103:15, 2114:17, 2114:18
**special** [10] - 1960:2, 1960:17, 1961:7, 1978:17, 1978:18, 1990:23, 2020:14, 2027:1, 2049:15, 2121:14
**specific** [6] - 1926:3, 1944:2, 1995:9, 2029:9, 2051:2, 2131:3
**specifically** [3] - 1916:18, 1932:7, 2131:17
**specifications** [1] - 2007:5
**specified** [1] - 2131:9
**specify** [1] - 2146:23
**speed** [1] - 2125:2
**spell** [1] - 2061:5
**spelling** [1] - 2075:13
**spend** [1] - 2032:9
**spent** [9] - 1926:16, 1940:20, 1942:5, 1944:5, 1948:21, 2050:12, 2071:23, 2111:4, 2139:17
**Spina** [1] - 2019:9
**Spina's** [1] - 2019:22
**spoken** [4] - 1924:12, 1944:16, 1951:11, 2012:15

**spot** [1] - 2100:1
**Sprint** [1] - 1919:22
**square** [2] - 1947:16, 2094:6
**stage** [1] - 1967:15
**stamp** [6] - 2011:2, 2011:13, 2011:18, 2034:21, 2049:20, 2049:24
**stamped** [1] - 2011:23
**stamps** [2] - 2011:11, 2035:1
**stand** [18] - 1917:4, 1917:16, 1937:6, 1956:23, 1958:2, 1967:16, 1971:19, 1973:3, 2027:11, 2039:19, 2065:3, 2068:4, 2070:3, 2097:17, 2140:7, 2140:24, 2142:7, 2149:4
**standard** [3] - 1959:21, 1984:7, 2144:8
**standing** [1] - 2009:20
**standpoint** [1] - 1957:15
**stands** [1] - 1994:18
**start** [11] - 1934:24, 2006:8, 2028:7, 2035:10, 2035:25, 2061:18, 2086:3, 2103:17, 2104:4, 2125:17, 2135:18
**started** [9] - 1926:5, 1938:12, 1976:16, 1978:3, 2035:23, 2051:25, 2061:17, 2070:23, 2101:19
**starting** [4] - 1926:11, 1929:15, 1948:8, 2063:14
**Starzecki** [98] - 1923:15, 1923:17, 1923:18, 1924:7, 1924:21, 1926:18, 1928:9, 1926:9, 1929:20, 1931:1, 1932:6, 1934:6, 1934:9, 1934:15, 1936:9, 1936:13, 1936:15, 1937:1, 1937:9, 1938:18, 1942:17, 1944:8, 1945:12, 1945:14, 1946:2, 1946:5, 1946:13, 1946:16, 1946:23, 1947:19, 1947:24, 1948:12, 1950:7, 1951:6, 1951:9, 1951:15, 1961:14, 1974:6, 1974:12, 2005:14, 2005:21, 2006:7, 2006:17, 2008:3, 2010:4, 2012:15, 2013:12, 2015:5, 2015:8, 2015:13, 2016:3, 2017:16, 2029:1, 2029:4, 2029:20, 2029:21, 2031:5, 2031:14, 2031:18, 2032:2, 2032:7, 2032:13, 2032:24, 2033:6, 2034:13, 2038:3, 2038:8, 2038:14, 2039:5, 2047:3, 2047:5, 2047:20, 2050:22, 2050:24, 2051:8, 2054:10, 2055:1, 2058:23, 2059:23, 2060:5, 2104:10, 2104:14, 2130:22, 2131:1, 2132:21, 2132:25, 2135:23, 2136:7, 2139:1, 2142:14, 2149:10, 2150:22, 2151:3, 2151:12, 2151:13, 2153:11, 2155:1
**Starzecki's** [5] - 1933:11, 1936:4, 2048:4, 2059:8, 2060:11
**State** [11] - 1976:5, 1976:8, 1979:1, 1979:4, 1991:11, 1991:14, 1993:12, 2037:14, 2043:9, 2127:12, 2144:6
**state** [8] - 1937:13, 1948:3, 2075:11, 2126:5, 2127:10, 2127:23, 2141:16, 2154:14
**statement** [28] - 1915:24, 1933:11, 1936:2, 1936:5, 1953:10, 1954:22, 1956:10, 1956:17, 1956:22, 1965:16,

2002:16, 2002:19, 2007:24, 2008:7, 2009:24, 2034:8, 2067:20, 2102:19, 2102:25, 2108:16, 2116:7, 2121:9, 2121:23, 2122:1, 2148:21, 2156:10, 2156:13, 2156:14
**Statements** [1] - 1942:2
**statements** [21] - 1915:25, 1916:2, 1916:3, 1942:4, 1956:15, 1994:4, 1995:25, 2000:16, 2003:13, 2067:22, 2102:23, 2103:9, 2105:2, 2108:10, 2109:2, 2109:5, 2140:6, 2142:15, 2146:24, 2147:7, 2154:10
**Staten** [4] - 1929:10, 1929:25, 1930:4, 1930:5
**STATES** [3] - 1912:1, 1912:3, 1912:11
**states** [1] - 2085:12
**States** [12] - 1912:5, 1912:13, 1912:16, 1913:6, 1914:23, 1919:18, 1920:19, 1920:21, 1981:15, 2048:22, 2049:1, 2049:2
**status** [1] - 1943:9
**statute** [2] - 2132:15, 2151:1
**stay** [3] - 2065:2, 2099:15, 2147:19
**stealing** [1] - 2154:16
**stenographer** [1] - 2155:2
**stenography** [1] - 1912:25
**step** [6] - 1966:6, 2060:21, 2074:23, 2097:6, 2112:25, 2124:6
**steps** [3] - 2060:23, 2074:25, 2124:7
**Steve** [7] - 1965:5, 1965:8, 1965:9, 1965:10, 1965:11, 1991:1, 1991:6
**STEVENSON** [1] - 1912:7
**Stevenson** [9] - 1912:18, 1914:23, 1915:4, 1955:15, 1961:13, 1965:23, 1987:4, 2098:9, 2109:19
**still** [13] - 1916:19, 1918:7, 1929:11, 1959:23, 1976:18, 1987:11, 2011:19, 2035:13, 2079:15, 2093:21, 2132:14, 2136:19, 2146:20
**stipulate** [2] - 2038:5, 2076:11
**stock** [2] - 2021:24, 2024:6
**stomach** [1] - 2066:9
**stone** [1] - 2144:11
**stood** [2] - 2081:13, 2081:15
**stop** [7] - 1927:6, 1970:15, 1976:15, 2066:7, 2066:12, 2066:15, 2123:6
**stopped** [1] - 1948:10
**storage** [2] - 1999:5, 1999:6
**store** [3] - 1982:13, 1999:8, 2067:17
**story** [1] - 1971:25
**straight** [1] - 1977:3
**straighten** [1] - 1922:2
**strange** [1] - 2013:2
**strangers** [2] - 2073:15, 2073:16
**strategic** [2] - 2062:10, 2062:14
**street** [2] - 1928:20, 2105:17
**Street** [6] - 1945:23, 1984:1, 1984:15, 2033:16, 2062:24, 2063:3
**stricken** [2] - 2058:15, 2147:2
**strict** [1] - 2073:2
**strike** [1] - 2111:11

**strong** [2] - 1948:7, 2084:2
**struck** [2] - 1917:11, 1982:12
**structured** [1] - 1943:1
**stuck** [2] - 1968:8, 1970:1
**stuff** [6] - 1919:21, 1948:22, 2023:6, 2027:23, 2067:13, 2137:11
**Stuy** [17] - 1921:23, 1922:9, 1922:25, 1925:7, 1926:1, 1926:10, 1932:11, 1934:15, 1987:17, 2006:8, 2021:22, 2023:20, 2023:22, 2039:10, 2040:13, 2040:20, 2154:15
**Stuyvesant** [9] - 1922:3, 1923:20, 1925:5, 1951:21, 1964:25, 1988:18, 2045:17, 2054:7, 2077:24
**subcontractor** [1] - 1961:13
**subject** [8] - 1925:15, 1929:5, 1961:22, 1971:20, 2024:20, 2050:18, 2068:19, 2123:12
**subject's** [1] - 2112:23
**submit** [5] - 1956:3, 1972:5, 1991:14, 2135:4, 2153:14
**submitted** [2] - 1920:25, 1991:17
**subpoena** [1] - 1995:19
**subsequent** [1] - 1942:23
**subsequently** [1] - 2123:3
**substance** [1] - 1963:9
**substantial** [1] - 2131:3
**substantive** [3] - 1916:17, 2068:17, 2132:5
**subtract** [1] - 2142:19
**subverting** [1] - 1989:21
**successful** [2] - 1946:22, 2036:15
**sue** [2] - 2005:19, 2005:22
**sued** [1] - 1920:20
**sufficient** [1] - 1937:15
**suggest** [2] - 1951:20, 2148:14
**suggested** [1] - 1951:22
**suggestion** [1] - 1955:15
**suggests** [1] - 2148:15
**sum** [11] - 2027:21, 2028:15, 2028:20, 2029:7, 2029:21, 2032:2, 2032:24, 2033:7, 2033:11, 2033:12, 2033:16
**summation** [5] - 2135:15, 2136:15, 2145:17, 2150:2, 2152:7
**summations** [3] - 2135:12, 2155:18, 2155:19
**summer** [1] - 2035:23
**sums** [2] - 1942:5, 1998:18
**Suozzi** [3] - 2037:4, 2037:10, 2037:13
**support** [2] - 2053:9, 2138:4
**suppose** [1] - 2026:16
**supposed** [7] - 1929:3, 1954:1, 2001:18, 2013:20, 2015:20, 2058:25, 2095:12
**suppressed** [3] - 2115:15, 2116:4, 2116:20
**suppression** [1] - 2068:23
**surely** [1] - 2059:3
**surprise** [3] - 2048:25, 2049:3, 2049:12
**surprised** [1] - 2000:2
**surrounding** [1] - 1967:14

**Susannah** [2] - 1912:22, 1915:3
**suspiciously** [1] - 2113:4
**sustained** [12] - 1932:13, 1935:18, 1955:21, 1980:20, 1989:8, 1989:12, 2000:7, 2000:12, 2093:16, 2123:10, 2123:15, 2156:19
**Sustained** [3] - 1980:18, 2040:4, 2107:22
**sweating** [1] - 2105:8
**sweep** [1] - 2112:25
**sweet** [1] - 1913:24
**switched** [1] - 2035:25
**swore** [1] - 2112:10
**sworn** [5] - 1918:3, 1972:12, 2075:9, 2075:20, 2098:3
**sworn/affirmed** [1] - 2061:3
**Synod** [39] - 1926:19, 1926:23, 1927:2, 1927:5, 1927:9, 1927:24, 1945:15, 1945:22, 1946:14, 1946:20, 1947:4, 2005:9, 2005:22, 2029:13, 2029:22, 2030:1, 2030:9, 2030:10, 2031:23, 2032:22, 2033:13, 2035:23, 2047:4, 2047:8, 2047:11, 2048:1, 2048:3, 2051:24, 2052:8, 2052:15, 2052:16, 2053:6, 2058:23, 2059:2, 2059:5, 2059:23, 2060:4, 2146:18
**Synod's** [1] - 1927:15
**system** [1] - 2042:16

## T

**tab** [1] - 2043:23
**table** [6] - 2049:4, 2063:10, 2082:22, 2106:8, 2117:15, 2117:16
**talent** [1] - 2072:9
**talkative** [1] - 2100:10
**tape** [6] - 1988:25, 2110:8, 2140:6, 2142:15, 2146:22, 2147:7
**tape-recorded** [1] - 2110:8
**taped** [1] - 2122:13
**tapes** [3] - 1949:3, 2142:7
**Tax** [1] - 2037:14
**tax** [7] - 1981:4, 1998:20, 2038:4, 2038:24, 2045:23, 2081:6, 2082:17
**taxes** [10] - 1960:6, 1971:4, 2037:17, 2046:1, 2081:1, 2081:5, 2087:23, 2091:5, 2091:8, 2091:13
**teacher** [1] - 1940:7
**team** [3] - 2087:22, 2106:23, 2107:11
**technician** [1] - 2111:17
**telephone** [8] - 1919:20, 1932:3, 1935:6, 1938:3, 1949:3, 1950:3, 1950:11, 2081:24
**television** [1] - 2062:19
**template** [12] - 1939:4, 1941:15, 1941:16, 1942:18, 1943:5, 1943:10, 1943:11, 1944:6, 2008:12, 2010:11, 2012:14, 2014:5
**templates** [2] - 1939:6, 2010:19
**temporary** [1] - 2066:5
**tempting** [1] - 1970:6

**Ten** [1] - 2127:5
**ten** [11] - 1940:8, 1944:7, 1966:9, 2032:9, 2050:13, 2050:20, 2064:20, 2065:4, 2065:6, 2081:5, 2144:7
**tenant** [7] - 2077:10, 2091:4, 2091:6, 2093:7, 2093:23, 2094:22, 2094:24
**term** [8] - 1928:1, 1957:12, 2005:11, 2016:6, 2023:12, 2104:24, 2129:5, 2151:23
**terms** [9] - 1938:13, 1944:9, 1944:17, 1956:13, 1959:13, 1959:16, 1959:17, 1962:4, 1995:22
**test** [1] - 2092:3
**tested** [1] - 1970:21
**testified** [55] - 1918:3, 1918:16, 1936:4, 1936:9, 1945:14, 1955:14, 1960:21, 1973:10, 1976:2, 1977:3, 1977:14, 1977:20, 1982:3, 1982:12, 1983:2, 1983:14, 1985:12, 1985:19, 1986:6, 1986:25, 1987:16, 1990:4, 2002:7, 2005:11, 2006:7, 2007:6, 2015:1, 2027:18, 2028:9, 2028:14, 2032:13, 2036:12, 2036:17, 2036:23, 2075:21, 2098:3, 2098:12, 2102:12, 2108:10, 2109:3, 2112:4, 2112:5, 2112:7, 2114:11, 2115:17, 2115:19, 2116:14, 2117:5, 2119:10, 2123:16, 2133:24, 2138:19, 2146:19, 2147:18, 2148:22
**testifies** [2] - 1968:1, 1969:16
**testify** [29] - 1934:7, 1936:16, 1957:3, 1957:19, 1983:5, 1983:20, 1989:14, 2000:17, 2006:22, 2018:16, 2018:24, 2019:2, 2029:23, 2067:5, 2067:19, 2067:21, 2068:5, 2068:11, 2068:19, 2068:20, 2068:22, 2102:23, 2110:16, 2116:13, 2117:20, 2133:12, 2133:14, 2133:18, 2133:24
**testifying** [9] - 1934:12, 1952:7, 1970:3, 1970:20, 2008:11, 2069:2, 2102:15, 2104:21, 2133:9
**testimony** [80] - 1918:9, 1926:18, 1926:20, 1934:3, 1936:12, 1945:16, 1955:3, 1955:4, 1955:25, 1960:23, 1970:7, 1973:13, 1975:10, 1977:1, 1977:25, 1978:6, 1978:8, 1978:13, 1980:12, 1982:5, 1983:17, 1985:21, 1987:19, 1989:4, 1989:18, 1990:7, 1990:16, 2006:9, 2006:25, 2008:4, 2008:8, 2008:9, 2014:13, 2015:9, 2015:24, 2016:15, 2016:22, 2017:9, 2019:13, 2019:16, 2019:20, 2019:23, 2020:22, 2023:14, 2027:17, 2039:9, 2042:7, 2047:22, 2067:6, 2068:11, 2068:12, 2100:13, 2106:12, 2110:19, 2110:22, 2112:12, 2112:14, 2116:1, 2122:24, 2123:21, 2128:22, 2129:3, 2133:16, 2133:20, 2133:21, 2135:22, 2137:5, 2137:23, 2139:4, 2141:7, 2141:20, 2142:2, 2142:9, 2143:10, 2144:14, 2144:15, 2146:2, 2147:7, 2149:7, 2156:16
**text** [1] - 1995:13

**THE** [370] - 1912:10, 1913:5, 1913:9, 1913:16, 1913:17, 1913:18, 1913:20, 1913:21, 1913:23, 1913:24, 1913:25, 1914:2, 1914:4, 1914:5, 1914:6, 1914:7, 1914:9, 1914:10, 1914:13, 1914:14, 1914:18, 1914:22, 1915:4, 1915:8, 1915:11, 1915:15, 1915:16, 1915:18, 1915:19, 1916:10, 1916:19, 1916:22, 1917:2, 1917:3, 1918:4, 1918:6, 1918:8, 1932:13, 1932:15, 1933:8, 1933:14, 1934:2, 1935:18, 1935:23, 1936:18, 1936:22, 1937:10, 1937:15, 1937:18, 1948:25, 1949:7, 1949:10, 1949:14, 1955:21, 1956:21, 1957:6, 1957:11, 1957:16, 1957:23, 1958:17, 1964:11, 1964:13, 1966:4, 1966:9, 1967:3, 1967:4, 1967:6, 1968:19, 1969:5, 1969:8, 1969:20, 1970:14, 1970:18, 1971:22, 1972:14, 1972:22, 1973:3, 1973:5, 1973:7, 1974:24, 1975:1, 1975:3, 1975:7, 1975:9, 1977:22, 1979:13, 1979:18, 1979:19, 1980:18, 1980:19, 1980:20, 1983:23, 1989:8, 1989:10, 1989:12, 1993:23, 1996:4, 1996:6, 2000:7, 2000:12, 2000:19, 2000:22, 2008:6, 2008:18, 2009:6, 2009:12, 2009:19, 2009:25, 2011:7, 2011:21, 2012:7, 2018:23, 2019:17, 2024:7, 2024:10, 2024:14, 2024:18, 2024:24, 2025:7, 2025:10, 2025:15, 2026:6, 2026:8, 2026:14, 2027:1, 2027:4, 2027:5, 2027:6, 2027:8, 2027:10, 2027:13, 2027:24, 2028:1, 2028:2, 2028:3, 2028:4, 2030:16, 2030:20, 2034:2, 2035:6, 2038:7, 2038:10, 2039:23, 2040:4, 2040:8, 2043:19, 2043:25, 2044:2, 2055:22, 2056:2, 2056:4, 2056:7, 2058:16, 2058:18, 2060:20, 2060:22, 2061:1, 2061:4, 2061:6, 2061:9, 2064:14, 2064:17, 2064:19, 2064:20, 2065:2, 2065:3, 2065:5, 2065:6, 2065:9, 2065:13, 2065:15, 2065:18, 2066:16, 2066:24, 2067:2, 2067:8, 2067:15, 2067:24, 2068:2, 2068:18, 2068:22, 2069:4, 2069:9, 2069:13, 2070:2, 2070:4, 2070:6, 2070:9, 2074:6, 2074:8, 2074:19, 2074:20, 2074:23, 2074:24, 2075:6, 2075:8, 2075:10, 2075:12, 2075:13, 2075:15, 2075:16, 2075:18, 2084:10, 2084:11, 2084:22, 2085:4, 2085:7, 2085:19, 2087:7, 2090:9, 2090:11, 2090:13, 2091:16, 2092:5, 2092:10, 2092:18, 2092:21, 2093:16, 2095:15, 2097:4, 2097:6, 2097:7, 2097:12, 2097:13, 2097:14, 2098:23, 2100:9, 2102:6, 2103:2, 2103:7, 2103:11, 2103:14, 2104:20, 2105:4, 2105:6, 2107:22, 2108:3, 2108:15, 2108:18, 2108:21, 2108:25, 2109:24, 2111:14, 2115:5, 2115:9, 2115:15, 2116:3,

2116:8, 2116:11, 2116:16, 2116:19, 2116:22, 2120:1, 2120:4, 2123:10, 2123:15, 2124:5, 2124:8, 2125:5, 2125:6, 2125:23, 2126:14, 2126:17, 2126:20, 2126:22, 2126:23, 2127:10, 2127:16, 2127:18, 2127:20, 2127:22, 2128:1, 2128:3, 2128:5, 2128:10, 2128:16, 2128:24, 2129:8, 2129:17, 2129:25, 2130:5, 2130:7, 2130:10, 2130:12, 2130:15, 2130:20, 2130:23, 2131:5, 2131:8, 2131:11, 2131:14, 2131:18, 2131:21, 2131:24, 2132:2, 2132:6, 2132:14, 2132:20, 2132:23, 2133:1, 2133:3, 2133:7, 2134:1, 2134:6, 2134:8, 2135:1, 2135:9, 2136:11, 2136:25, 2137:3, 2137:15, 2137:21, 2138:10, 2138:13, 2138:20, 2139:7, 2139:12, 2139:19, 2139:21, 2139:25, 2140:13, 2140:18, 2140:21, 2141:7, 2141:10, 2143:9, 2143:14, 2143:19, 2143:23, 2144:2, 2144:13, 2145:2, 2145:7, 2145:10, 2145:20, 2146:3, 2147:3, 2148:6, 2148:18, 2148:25, 2149:14, 2149:16, 2149:21, 2150:4, 2150:7, 2150:11, 2150:15, 2150:18, 2150:20, 2151:11, 2151:20, 2151:25, 2152:2, 2152:8, 2152:15, 2153:3, 2153:20, 2153:25, 2154:8, 2154:18, 2154:23, 2155:5, 2155:7, 2155:12, 2155:16, 2155:25, 2156:4, 2156:7, 2156:9, 2156:19

**theft** [1] - 2088:23

**theirs** [1] - 2079:23

**themselves** [2] - 2073:15, 2144:1

**theory** [1] - 2154:11

**thereafter** [1] - 1952:16

**therefore** [8] - 1923:8, 1968:12, 2084:2, 2099:14, 2146:9, 2147:1, 2153:14, 2154:12

**thereto** [1] - 1994:22

**they..** [1] - 1953:22

**thinking** [1] - 2056:19

**third** [3] - 2096:4

**thirteen** [1] - 1962:17

**thirty** [4] - 1927:16, 1976:3, 1978:12, 2076:25

**thirty-eight** [1] - 1976:3

**thirty-four** [1] - 1978:12

**thirty-three** [1] - 2076:25

**Thomas** [2] - 2114:17, 2114:18

**thoughts** [2] - 1916:11, 2138:24

**thousand** [11] - 1965:20, 1965:21, 2016:7, 2016:14, 2016:23, 2029:11, 2032:5, 2034:14, 2038:2, 2055:15, 2089:19

**threatened** [1] - 2154:7

**three** [20] - 1921:10, 1925:8, 1925:12, 1925:13, 1925:14, 1926:1, 1928:21, 1948:20, 1950:8, 1960:25, 1961:24, 1977:24, 2071:17, 2076:25, 2104:3, 2114:8, 2118:9, 2126:4, 2126:11,

2126:15

**three-family** [1] - 1928:21

**threshold** [1] - 1987:8

**threw** [1] - 2065:25

**Throughout** [1] - 2135:2

**throughout** [6] - 1919:17, 1920:18, 1920:21, 1925:1, 1927:25, 1973:21

**throw** [3] - 2003:7, 2140:7, 2142:8

**throwing** [3] - 2002:19, 2003:21, 2141:1

**throws** [1] - 2147:9

**ticket** [1] - 1978:23

**timeframe** [3] - 2054:6, 2064:11, 2119:9

**tired** [2] - 1926:5, 2138:25

**title** [19] - 1960:12, 1979:4, 1979:14, 1979:24, 2021:3, 2021:4, 2023:2, 2023:4, 2023:5, 2023:18, 2023:19, 2048:7, 2048:15, 2048:17, 2049:1, 2049:9, 2049:12, 2052:11, 2052:19

**titles** [1] - 2022:23

**today** [5] - 1960:10, 1983:14, 1983:17, 2002:12, 2143:10

**together** [8] - 1944:10, 1985:13, 2054:1, 2063:23, 2071:12, 2071:24, 2079:23, 2096:23

**Tom** [3] - 2037:4, 2037:10, 2037:13

**tomorrow** [11] - 2101:24, 2102:1, 2124:12, 2124:19, 2125:13, 2125:14, 2125:16, 2135:13, 2155:17, 2155:23, 2156:1

**ton** [1] - 2072:23

**tone** [1] - 1925:23

**tonight** [2] - 2130:8, 2130:11

**tons** [1] - 2071:8

**took** [13] - 1930:16, 1955:11, 2028:12, 2088:19, 2088:20, 2092:6, 2094:13, 2099:7, 2101:15, 2107:12, 2112:7, 2118:9, 2120:15

**top** [3] - 1940:25, 1984:23, 2133:12

**topic** [1] - 2004:8

**TORRES** [1] - 1912:23

**total** [2] - 1944:5, 2003:9

**totally** [3] - 1954:18, 2014:6, 2031:16

**touch** [1] - 2155:9

**tour** [1] - 2094:5

**towards** [1] - 1948:8

**track** [3] - 1998:13, 2000:4, 2000:9

**trades** [1] - 1920:5

**traditional** [1] - 1936:22

**traffic** [1] - 1978:23

**trained** [2] - 2111:17, 2111:19

**trait** [1] - 2072:19

**traits** [1] - 2072:14

**trans** [1] - 1940:13

**transaction** [2] - 2045:16, 2088:14

**transactional** [1] - 1939:9

**transactions** [7] - 1974:20, 1985:8, 2150:14, 2150:17, 2150:18, 2151:5, 2151:16

**TRANSCRIPT** [1] - 1912:10

**transcript** [10] - 1912:25, 1950:25, 1951:1, 1978:7, 1987:16, 2001:2,

2001:11, 2100:13, 2102:12, 2136:1

**Transcription** [1] - 1912:25

**transcripts** [4] - 1949:5, 1949:13, 1949:15, 1949:16

**transport** [3] - 2100:4, 2112:24, 2117:2

**transported** [3] - 2107:16, 2114:11, 2118:8

**travel** [1] - 1941:8

**traveling** [1] - 1965:11

**treating** [1] - 2065:22

**treatment** [2] - 2144:8

**tremendous** [2] - 1934:17, 1959:23

**trial** [7] - 1914:22, 2018:4, 2092:15, 2124:10, 2126:9, 2135:2, 2135:19

**TRIAL** [1] - 1912:10

**Trial** [1] - 1915:25

**tried** [3] - 2106:3, 2147:19, 2156:11

**trip** [1] - 2100:14

**trouble** [2] - 1948:16, 2058:8

**true** [28] - 1937:8, 1967:22, 1970:22, 1971:2, 1977:16, 1978:15, 1994:5, 1994:10, 2017:14, 2017:15, 2019:25, 2024:4, 2036:22, 2039:12, 2039:13, 2039:14, 2040:10, 2050:2, 2053:19, 2054:22, 2057:13, 2084:6, 2120:5, 2120:8, 2120:11, 2149:11

**truly** [1] - 1968:14

**truth** [10] - 1933:2, 1933:12, 1934:9, 1934:10, 1956:3, 1958:4, 1970:4, 2000:15, 2009:22, 2112:10

**truthful** [1] - 1969:7

**truthfulness** [4] - 1968:6, 1969:4, 1969:18, 2023:1

**try** [10] - 1962:12, 2012:16, 2015:13, 2053:4, 2058:25, 2080:20, 2082:4, 2106:7, 2136:20, 2148:1

**trying** [12] - 1956:9, 1962:15, 1989:24, 2015:16, 2023:21, 2031:14, 2053:1, 2059:18, 2060:4, 2106:6, 2130:1, 2155:16

**turn** [6] - 1922:11, 2087:21, 2099:11, 2104:3, 2107:19, 2120:24

**turned** [5] - 1950:23, 2095:9, 2101:19, 2121:1, 2136:16

**turns** [1] - 2088:11

**TV** [1] - 2062:22

**Twelve** [2] - 2127:17, 2127:18

**twelve** [1] - 1959:19

**twenty** [2] - 1920:18, 2057:19

**twenty-five** [1] - 1920:18

**twenty-six** [1] - 2057:19

**two** [44] - 1927:3, 1928:13, 1940:24, 1943:7, 1946:10, 1965:5, 1965:20, 1967:7, 1978:16, 1986:14, 1988:17, 1991:15, 2004:14, 2008:16, 2009:11, 2017:17, 2031:19, 2032:21, 2039:8, 2049:4, 2055:5, 2055:24, 2056:3, 2056:4, 2062:9, 2067:21, 2071:19, 2072:14, 2089:19, 2102:8, 2102:9, 2102:23, 2103:9, 2109:25, 2114:8, 2115:2, 2115:7, 2118:9, 2119:8,

2130:21, 2131:17, 2133:23

**two-level** [1] - 2131:17

**two-way** [2] - 2115:2, 2115:7

**type** [10] - 1941:21, 1997:14, 2010:24, 2011:13, 2018:1, 2028:16, 2031:10, 2032:22, 2032:23, 2051:2

**typed** [3] - 1998:1, 2121:19, 2121:20

**types** [7] - 1919:17, 1952:5, 1960:7, 1960:15, 1983:16, 2031:19, 2033:5

**typewriter** [1] - 2003:16

**typewritten** [4] - 1965:16, 2003:14, 2003:15, 2030:25

**typically** [3] - 1954:21, 1959:18, 1962:11

# U

**U.S** [2] - 2144:10, 2154:4

**ultimately** [1] - 2019:6

**unable** [1] - 1983:3

**unbelieving** [1] - 2110:21

**uncommon** [1] - 1998:11

**under** [24] - 1918:7, 1951:13, 1956:4, 1957:7, 1957:25, 1959:13, 1965:20, 1967:12, 1969:14, 1970:20, 2017:17, 2017:20, 2043:17, 2044:10, 2049:1, 2103:24, 2127:12, 2137:20, 2138:5, 2142:9, 2143:4, 2145:13, 2150:19, 2150:23

**underlying** [4] - 1967:24, 1968:9, 1968:17, 1969:11

**underperforming** [1] - 1928:1

**undersigned** [1] - 2022:22

**understandings** [1] - 2021:25

**understood** [1] - 2139:1

**undertake** [1] - 2068:8

**undertaken** [1] - 1941:4

**undertook** [1] - 1937:13

**unemployment** [2] - 2063:2, 2063:4

**unequivocally** [2] - 2039:9, 2058:9

**unfortunately** [1] - 2016:12

**unimproved** [1] - 2045:17

**unique** [1] - 1956:4

**UNITED** [3] - 1912:1, 1912:3, 1912:11

**United** [13] - 1912:5, 1912:13, 1912:16, 1913:6, 1914:23, 1919:18, 1920:19, 1920:21, 1981:15, 2048:22, 2049:1, 2049:2, 2062:14

**unlawful** [5] - 1974:20, 2150:13, 2150:16, 2151:5, 2151:16

**unless** [5] - 1915:19, 1915:22, 2074:20, 2103:4, 2131:14

**unquote** [1] - 1926:14

**unsigned** [1] - 2007:25

**untrue** [1] - 2146:17

**untrustworthy** [1] - 2083:17

**unusual** [6] - 1924:15, 1940:6, 2023:8, 2023:11, 2064:4, 2106:16

**up** [67] - 1914:1, 1924:25, 1925:16, 1929:5, 1930:15, 1936:20, 1946:2, 1946:16, 1947:11, 1948:6, 1953:2,

1953:11, 1959:23, 1960:7, 1964:7, 1972:2, 1972:10, 1981:25, 1982:4, 1982:6, 1982:12, 1998:1, 2002:23, 2002:24, 2002:25, 2016:20, 2021:3, 2021:4, 2023:4, 2023:6, 2032:20, 2034:21, 2043:21, 2043:22, 2044:5, 2051:16, 2053:8, 2059:21, 2063:19, 2065:25, 2066:2, 2066:12, 2071:11, 2072:12, 2081:9, 2084:10, 2085:4, 2096:5, 2096:8, 2097:12, 2102:2, 2106:3, 2106:6, 2106:7, 2109:20, 2109:22, 2118:6, 2121:6, 2135:19, 2135:22, 2138:2, 2140:13, 2140:14, 2146:25, 2147:19, 2151:21, 2152:23

**upfront** [1] - 1939:16

**upset** [1] - 2095:5

**upshot** [1] - 1921:18

**Urban** [1] - 2019:10

**urge** [1] - 2149:21

**urged** [1] - 2150:12

**urgency** [1] - 2013:9

**useful** [2] - 1990:2, 2136:5

**usual** [1] - 1934:17

**utmost** [1] - 2073:3

# V

**vacant** [3] - 2081:13, 2081:15, 2081:19

**vacation** [1] - 1940:12

**Valente** [3] - 1996:24, 2000:3, 2000:8

**value** [4] - 1968:11, 1968:15, 1970:4, 2045:8

**values** [1] - 1948:10

**variety** [2] - 1926:14, 2072:25

**various** [2] - 1918:21, 2078:17

**VButlerRPR@aol.com** [1] - 1912:24

**Vecchio** [7] - 1981:9, 1981:14, 2042:20, 2056:11, 2056:19, 2057:9, 2057:23

**Vecchio's** [1] - 2043:4

**vegetables** [1] - 1920:3

**vehicle** [23] - 2099:22, 2099:25, 2107:12, 2110:23, 2111:2, 2111:3, 2111:4, 2112:5, 2112:15, 2112:17, 2112:18, 2113:7, 2114:15, 2114:16, 2115:19, 2116:2, 2117:3, 2117:11, 2119:10, 2119:11, 2119:18, 2119:21, 2120:15

**venture** [1] - 1919:25

**Verizon** [1] - 1919:21

**version** [9] - 1936:11, 1944:10, 1955:24, 1956:1, 1956:15, 1957:8, 1958:1, 2030:25, 2134:7

**versus** [4] - 1914:23, 1979:5, 2040:6, 2043:9

**veteran** [2] - 2079:19, 2096:12

**viable** [1] - 2053:2

**vice** [20] - 1919:12, 1964:14, 1964:17, 1965:13, 2021:2, 2021:5, 2021:13, 2022:3, 2023:12, 2023:14, 2023:17, 2023:18, 2023:20, 2023:22, 2037:8, 2040:13, 2040:15, 2048:18, 2061:20, 2061:23

**vicinity** [2] - 1959:19, 2118:11

**victimize** [3] - 2019:3, 2019:20, 2019:23

**Victor** [5] - 1915:17, 1938:24, 2028:4, 2066:2, 2125:3

**VICTORIA** [1] - 1912:23

**Victoria** [1] - 2039:25

**videotape** [1] - 2122:9

**view** [3] - 2024:25, 2092:3, 2149:3

**vigorously** [1] - 2138:8

**vindicate** [1] - 2096:19

**violate** [1] - 2147:15

**violated** [5] - 2146:9, 2147:1, 2147:10, 2147:13, 2148:4

**violates** [1] - 2142:19

**violating** [2] - 2142:3, 2148:7

**violation** [2] - 2139:23, 2148:14

**virus** [1] - 2066:9

**vitriol** [1] - 2087:21

**volunteer** [2] - 2064:7, 2064:8

**volunteers** [1] - 2071:9

# W

**wage** [1] - 2154:16

**wait** [3] - 1914:19, 2120:1, 2156:8

**waiting** [1] - 2155:24

**waive** [1] - 2140:19

**waiver** [2] - 2073:8, 2115:25

**wake** [1] - 2140:13

**Wall** [2] - 2062:24, 2063:3

**Walter** [4] - 1956:23, 1957:1, 1957:3, 1958:22

**Walters** [27] - 1955:5, 1955:14, 1955:17, 1955:24, 1956:1, 1956:11, 1956:17, 1956:22, 1957:24, 1958:1, 1958:2, 1958:5, 1958:8, 1958:12, 1958:14, 1958:21, 1959:4, 1960:17, 1960:21, 1965:25, 1987:7, 1989:14, 2045:15, 2131:16, 2132:22, 2132:25, 2155:3

**Walters'** [1] - 1989:4

**wants** [8] - 1936:15, 1956:25, 1967:24, 1968:16, 1969:18, 2013:5, 2132:17, 2136:20

**War** [2] - 2079:19, 2096:12

**warnings** [2] - 2114:19, 2114:23

**waste** [1] - 1920:3

**watched** [3] - 2111:2, 2111:3, 2113:6

**water** [4] - 1920:3, 1930:5, 2105:18, 2113:20

**Wednesday** [1] - 1912:7

**week** [4] - 1914:3, 1914:4, 1960:13, 2109:25

**weekend** [1] - 2125:12

**weeks** [2] - 1946:10, 2020:16

**weird** [1] - 1970:5

**Weiss** [4] - 1918:19, 1918:20, 1918:23, 1918:25

**welcome** [1] - 2146:25

**Wendell** [5] - 1955:5, 1960:17, 1965:25, 1987:7, 2045:15

**whereas** [1] - 2028:15

All Word // USA v Stevenson Dunn, et al.

**white** [1] - 1988:17
**whole** [10] - 1921:16, 1930:23, 1944:7, 1972:4, 2001:20, 2018:8, 2088:20, 2108:15, 2116:11, 2151:13
**wife** [3] - 1940:7, 1984:8, 2086:17
**willing** [5] - 1933:4, 1959:14, 2034:14, 2066:17, 2089:2
**win** [2] - 2059:15, 2060:5
**wire** [3] - 1919:22, 2132:9
**wires** [1] - 1919:20
**wishes** [2] - 1971:7, 2066:11
**withdrawing** [1] - 2066:25
**withdrawn** [4] - 2047:5, 2047:6, 2120:11, 2121:8
**withdrew** [1] - 1976:11
**Witness** [4] - 1917:16, 2024:17, 2097:8, 2097:17
**WITNESS** [21] - 1964:13, 1979:19, 1980:19, 2028:1, 2028:3, 2060:22, 2061:6, 2064:19, 2065:2, 2065:5, 2074:19, 2074:24, 2075:8, 2075:12, 2075:15, 2084:11, 2090:13, 2095:15, 2097:7, 2105:6, 2157:3
**witness** [61] - 1918:2, 1956:11, 1956:15, 1967:11, 1967:13, 1967:16, 1968:1, 1968:20, 1969:11, 1970:21, 1972:5, 1972:21, 1973:3, 1979:12, 1992:3, 2000:14, 2000:16, 2000:17, 2000:19, 2000:20, 2009:22, 2010:22, 2025:1, 2025:3, 2025:4, 2027:11, 2034:1, 2060:23, 2061:3, 2065:3, 2066:14, 2066:21, 2070:2, 2074:25, 2075:9, 2075:20, 2084:9, 2089:9, 2092:13, 2097:10, 2098:2, 2103:13, 2109:11, 2111:12, 2124:3, 2124:7, 2128:8, 2128:14, 2128:19, 2128:20, 2128:21, 2129:2, 2129:11, 2133:16, 2144:18, 2144:20, 2145:20, 2146:9, 2149:4, 2152:25
**witness'** [3] - 2000:15, 2092:3, 2129:6
**witness's** [1] - 2111:12
**witnesses** [13] - 1967:8, 1967:20, 1968:10, 1970:11, 1971:15, 2128:7, 2128:11, 2129:1, 2129:3, 2129:6, 2129:18, 2129:19, 2133:21
**wives** [3] - 2080:3, 2080:9, 2084:15
**Wolitz** [1] - 2155:2
**woman** [2] - 1996:24, 2072:5
**wonderful** [1] - 2072:1
**word** [5] - 1951:19, 2003:14, 2015:24, 2083:4
**wording** [1] - 2001:23
**words** [5] - 1934:23, 1963:9, 1977:10, 2129:5, 2152:25
**wore** [1] - 1990:4
**workers'** [1] - 2154:16
**workout** [1] - 1962:13
**works** [2] - 2049:1, 2124:13
**World** [2] - 2079:19, 2096:12
**worldwide** [1] - 2073:1
**worst** [1] - 2050:20

**worth** [5] - 2029:10, 2029:11, 2032:5, 2099:18
**wrap** [1] - 2106:3
**wrapped** [1] - 1914:1
**write** [9] - 2011:24, 2021:14, 2085:12, 2120:17, 2120:23, 2121:9, 2122:1, 2149:22, 2149:23
**written** [6] - 1942:23, 2033:23, 2084:12, 2084:14, 2101:15, 2144:11
**wrongdoing** [1] - 1957:10
**wrote** [6] - 2036:4, 2038:11, 2038:12, 2087:18, 2109:12, 2121:17

## Y

**year** [18] - 1920:10, 1936:15, 1938:14, 1939:22, 1959:18, 1976:14, 1976:16, 2014:11, 2016:13, 2029:10, 2029:22, 2034:16, 2038:11, 2070:13, 2071:3, 2071:4, 2071:11, 2089:24
**Year's** [2] - 1940:9, 2013:6
**year's** [1] - 2032:3
**year-and-a-half** [2] - 1920:10, 1976:16
**years** [58] - 1925:13, 1925:21, 1925:24, 1927:16, 1950:8, 1950:22, 1951:11, 1953:22, 1968:5, 1968:22, 1976:3, 1977:24, 1978:11, 1978:12, 1982:8, 1982:10, 1983:13, 1991:15, 1991:17, 1995:24, 1996:15, 1996:19, 1997:2, 2000:2, 2000:9, 2002:2, 2016:18, 2017:17, 2050:15, 2050:16, 2053:10, 2056:24, 2057:15, 2057:17, 2057:19, 2057:20, 2058:7, 2058:10, 2063:24, 2063:25, 2070:24, 2076:6, 2076:13, 2077:6, 2077:9, 2078:14, 2079:16, 2079:18, 2081:5, 2088:17, 2088:22, 2095:10, 2140:25, 2144:7, 2145:9, 2146:20
**yesterday** [14] - 1918:16, 1920:23, 1976:2, 1977:3, 1977:14, 1977:20, 1982:3, 1982:12, 1986:25, 1987:16, 2018:16, 2023:9, 2036:12, 2058:8
**YORK** [1] - 1912:1
**York** [29] - 1912:5, 1912:14, 1912:15, 1913:7, 1948:4, 1948:14, 1976:5, 1976:8, 1976:25, 1979:1, 1979:5, 1980:24, 1991:11, 1991:14, 1993:12, 2019:6, 2019:20, 2037:13, 2043:9, 2048:23, 2061:21, 2063:3, 2074:13, 2074:15, 2076:2, 2076:5, 2093:11, 2127:12, 2144:6
**York's** [1] - 2144:8
**yourself** [7] - 1984:8, 1989:20, 1990:11, 1990:16, 2021:2, 2091:1, 2121:15
**yourselves** [1] - 1986:9